# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JARITA MESA LIVESTOCK GRAZING
ASSOCIATION, ALAMOSA LIVESTOCK
GRAZING ASSOCIATION, SEBEDEO
CHACON, THOMAS GRIEGO, DONALD
GRIEGO, MICHAEL PENA, JUAN GIRON,
JOE GURULE, FERNANDO GURULE,
DIEGO JARAMILLO, LORENZO JARAMILLO,
GABRIEL ALDAZ, ARTURO RODARTE,
EFFREY CHACON, GLORIA VALDEZ,
JERRY VASQUEZ, CARLOS ORTEGA,
LEON ORTEGA, HORACIO MARTINEZ,
RONALD MARTINEZ, STEVE CHAVEZ,
VANGIE CHAVEZ, ALFONSO CHACON,
DANIEL RAEL, JOHN VALDEZ
and
BOARD OF COUNTY COMMISSIONERS OF
THE COUNTY OF RIO ARRIBA,

          Plaintiffs,

vs.                                                                                   No. CIV 12-0069 JB/KBM

THE UNITED STATES FOREST SERVICE
and DIANA TRUJILLO,
In her official and individual capacities,

          Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Memorandum in Support of

Motion to Dismiss, filed May 23, 2012 (Doc. 17).  The Court held a hearing on November 9,

2012.  The primary issues are: (i) whether the Court should extend a cause of action under <u>Bivens</u>

<u>v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971)(hereinafter

"<u>Bivens</u>") to cover the claims of the Plaintiffs -- Sebedeo Chacon, Thomas Griego, Donald Griego,

Michael Pena, Juan Giron, Joe Gurule, Jr., Fernando Gurule, Diego Jaramillo, Lorenzo Jaramillo, Gabriel Aldaz, Arturo Rodarte, Jeffrey Chacon, Gloria Valdez, Jerry Vasquez, Carlos Ortega, Leon Ortega, Horacio Martinez, Ronald Martinez, Steve Chavez, Vangie Chavez, Alfonso Chacon, Daniel Rael, John Valdez, Jarita Mesa Livestock Grazing Association, Alamosa Livestock Grazing Association, and Board of County Commissions of the County of Rio Arriba, (collectively, "the Plaintiffs") -- against Defendant Diana Trujillo, District Ranger for the El Rito District in the Carson National Forest in New Mexico, in her personal capacity for damages; (ii) whether the Plaintiffs have stated a claim that the United States Forest Service ("USFS") and Trujillo (collectively, "the Defendants") violated the Plaintiffs' First Amendment rights to speech and petition the government for redress; and (iii) whether the Court should entertain the Plaintiffs' requests for equitable relief against the Defendants.   The Court concludes that it should not extend a cause of action to the Plaintiffs under Bivens for the alleged violation of their First Amendment rights, because Congress created an adequate, alternative remedy in the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), for the Plaintiffs to bring their claim that Trujillo's actions violated the Plaintiffs' constitutional rights.   The Court concludes that the Plaintiffs have sufficiently alleged that the Defendants plausibly violated the Plaintiffs' First Amendment rights. The Plaintiffs have alleged sufficient facts for the Court to plausibly conclude that Trujillo's decision in 2010 to reduce grazing permits by eighteen-percent was retaliation for the Plaintiffs' repeated public criticism of Trujillo's and the USFS' management of the Carson National Forest. The Plaintiffs seek both declaratory and injunctive relief from Trujillo's actions, requests which the Court may properly entertain, because the Plaintiffs seek to resolve an actual controversy regarding Trujillo's and the USFS' rights and obligations with respect to their future conduct towards the Plaintiffs, specifically, the enforcement of Trujillo's 2010 decision to reduce certain

Plaintiffs' grazing permits by eighteen-percent through the 2015 grazing season.

## FACTUAL BACKGROUND

The history of the Plaintiffs' case predates the parties before the Court.   The Plaintiffs set forth a backdrop of social, cultural, and economic factors, which are inextricably intertwined to the Plaintiffs' cattle grazing within the Carson National Forest.   The Plaintiffs also allege a history of tension between the USFS and the Plaintiffs' ancestors, tension which bears on the legality of the Defendants' actions managing national forestland in northern New Mexico over the last three years.[1]   The Court takes as true all non-conclusory factual statements in the Complaint for Declaratory and Injunctive Relief (First Amendment to the United States Constitution, National Environmental Policy Act; National Forest Management Act, Sustain Yield Forest Management Act; Administrative Procedure Act) filed Jan. 20, 2012 (Doc. 1)("Complaint").

### 1.    **The Parties.**

"The Plaintiffs and their ancestors are Hispanic stockmen whose families have been grazing livestock" in northern New Mexico for many generations.   Id. ¶ 3, at 2-3.   Most of the Individual Plaintiffs' families were grazing livestock in the area of the Vallecitos Federal Sustained Yield Unit ("the Unit") before the USFS existed.   Id. ¶ 3, at 3.   The Unit is an area of the Carson National Forest that Congress set aside to be managed for the economic benefit of the communities located in the Unit.   Congress specifically provided that these local communities should have access to the timber and other forest products within the Unit, as needed for the communities' economic stability.   See id. ¶ 39, at 14.   Grazing livestock is an "integral part of their existence and is a central part of life in the villages they reside in . . . all of Northern New

---

[1] The USFS originated in 1891 with the Forest Reserve Act, which empowered "the president to establish forest reserves from timber covered public domain land."   US Forest Service, *History*, US Forest Service, (Dec. 22, 2009), http://www.fs.fed.us/aboutus/history/.

Mexico."   Id. ¶ 3, at 3.

The Jarita Mesa Allotment and the Alamosa Allotment are areas within the Unit on which cattle grazing is allowed.   Complaint ¶ 2, at 2.   S. Chacon, Pena, Giron, Aldaz, Rodarte, T. Griego, D. Griego, J. Gurule, Jaramillo, J. Chacon, and G. Valdez (collectively, "the Jarita Mesa Permittees") have permits issued by the USFS which allow them to graze cattle on the Jarita Mesa Allotment.   Id. ¶ 3, at 2.   T. Griego, D. Griego, C. Ortega, L. Ortega, Rael, H. Martinez, R. Martinez, F. Gurule, J. Vasquez, J. Vasquez, Jr., and A. Chacon (collectively, "the Alamosa Permittees") have permits, issued by the USFS, which allow them to graze cattle on the Alamosa Allotment.   Id. ¶ 3, at 2.   S. Chavez is a former permittee on the Alamosa Allotment, and now lives within the Unit with his wife, V. Chavez.   See id. ¶ 3, at 2.   J. Valdez is a former permittee on the Jarita Mesa Allotment and now resides within the Unit.   See id. ¶ 3, at 2-3.   The Jarita Mesa Grazing Association and the Alamosa Grazing Association (collectively, "the Associations") are "local livestock associations made up exclusively of grazing permittees on the respective allotments."   Complaint ¶ 13, at 5.   The Associations were established to: (i) protect and promote the permittees' livestock grazing on the Allotments; (ii) manage and share the costs of handling livestock, range improvements, and other programs for the benefit of the Allotments and their resources; (iii) express the Associations' members' wishes; and (iv) meet with and work with the USFS to ensure proper management of livestock and range resources on the allotments.   See id. ¶ 13, at 6.   S. Chacon was president of the Jarita Mesa Grazing Association throughout the events set forth in the Complaint.   See id. ¶ 14, at 6.   T. Griego was president of the Alamosa Grazing Association throughout the events set forth in the Complaint.   See id. ¶ 15, at 7.

Board of County Commissioners of the County of Rio Arriba ("Rio Arriba County") is a political subdivision in northern New Mexico, in which a large portion of the Carson National

Forest, including the Allotments and the El Rito Ranger District, is located.   Id. ¶ 16, at 7.   The

Individual Plaintiffs are all residents of Rio Arriba County.   Rio Arriba County and local school

districts receive payment derived from the grazing fees, in lieu of taxes, from the USFS.   This

payment is derived, in part, from grazing fees.   Rio Arriba County is thus interested in ensuring

that the "grazing permits on land administered by the Forest Service within Rio Arriba County are

not unlawfully reduced."   Complaint ¶ 16, at 7.   Rio Arriba County is also interested in

protecting the social fabric, customs, traditions, and cultural integrity of the traditional

communities within the county.   Rio Arriba County is interested in the economic betterment of its

citizens.   Rio Arriba County is also interested in "making sure federal laws are followed and that

its citizens are not punished by federal officials for expressing their views on federal agency policy

to elected officials and others."   Id.¶ 16, at 7.

The USFS is an agency of the United States Department of Agriculture and is charged with

the "administration of lands within the United States that have been designated as National Forest

Lands."   Id. ¶ 17, at 8.   The USFS is charged with the management of the Unit.   Throughout the

events set forth in the Complaint, Trujillo was employed by the USFS as the El Rito District

Ranger.   Id. ¶ 19, at 8.   Both Allotments are located in the El Rito District of the Carson National

Forest.   See Complaint ¶ 1, at 2.   Trujillo is charged with "managing the natural resources in her

district, including the range resource."   Id. ¶ 19, at 8.

## 2.    The Events.

"[A]ll or a substantial part of the events or omissions giving rise to the [Plaintiffs'] claims

. . . occurred within this judicial district."   Id. ¶ 12, at 5.   The Hispanic people in northern New

Mexico have lived in the area for hundreds of years, long before the USFS was created.   See id. ¶

37, at 13.   They have a unique culture, shaped by and dependent on their relationship with the

land.  See id. ¶ 37, at 13.   The Hispanic people living in villages nearby the Carson National

Forests have historically relied on the resources of the national forests of northern New Mexico for

sustenance.  See Complaint ¶ 37, at 13.   These Hispanics rely upon the "fodder, including

grasses and other forage, like the marsh hay, mushrooms, nuts, and seeds" within the Unit for their

sustenance.  Id. ¶ 39, at 14.   Livestock grazing is central to their cultural, social, and economic

fabric, and has been since at least the 1690s.  See id. ¶ 40, at 14.   The Associations represent the

communities "that have historically relied on, and continue to rely on, grazing on these ancient

community . . . lands."  Id. ¶ 40, at 15.

Beginning in the 1920s, the USFS's management practices led to a reduction of the number

of Hispanic residents near the Carson National Forest who were allowed to graze in the forest

under permit.  See id. ¶ 43, at 16-17.   The USFS gradually eliminated milk cow and draft horse

permits.  See Complaint ¶ 43, at 17.   The reduction in these permits has destabilized the

Plaintiffs' cultural and social fabric.  See id. ¶ 43, at 17.   The Plaintiffs have "repeatedly voiced

opposition to and have been highly critical of various actions taken by the Defendants," especially

Trujillo's actions in recent years.  Id. ¶ 57, at 22-23.   The Plaintiffs have written letters, spoken at

public meetings, and contacted their congressional representatives about the Defendants' actions.

See id. ¶ 57, at 23.

Under the USFS' management, the population of wild horses and elk on the Unit has

grown to the point that the vegetative cover, upon which the Plaintiffs rely for grazing their cattle,

has degraded.  See id. ¶ 58, at 23.   In 2002, the USFS found that the wild horses on Jarita Mesa

were competing with the cattle for forage.  See Complaint ¶ 59, at 23.   In 2002, the USFS issued

a Decision Notice ("2002 Decision Notice") which authorized the number of wild horses to

increase from between twelve and fourteen, to between twenty and seventy.  Id. ¶ 60, at 24.   The

2002 Decision Notice provided certain measures to be taken in case that the wild horse herd size grew above seventy horses.   See id. ¶ 60, at 24.

On or about April 8, 2006, S. Chacon, as the President of the Jarita Mesa Grazing Association, sent a letter to New Mexico Governor Bill Richardson and to the New Mexico Congressional delegation, signed by over eighty residents of the Unit, in which S. Chacon complained about the USFS' management of the El Rito Ranger District.   The letter specifically complained about the USFS' failure to reduce the number of wild horse herds and to control the number of elk herds on the Unit.   See id. ¶ 62, at 25.   On May 24, 2006, the Plaintiffs[2] wrote to Trujillo's supervisor, Carson National Forest Supervisor Martin Chavez, and alleged that Trujillo was acting "in an abusive manner towards the Jarita Mesa permittees, was dealing with them in a less than honest manner, was arbitrarily and capriciously reducing the grazing time allowed under their permits, and was otherwise impairing their grazing rights" under the permits.   Id. ¶ 63, at 25. In June, 2006, an USFS employee admitted that the wild horse herd exceeded the number that the 2002 Decision Notice allowed and was numbering at least 150.   See Complaint ¶ 64, at 25.

On July 5, 2006, Trujillo ordered all cattle removed from the Jarita Mesa Allotment by July 31, 2006.   See id. ¶ 66, at 26.   Some of the Plaintiffs, including S. Chacon and Aldaz, appealed Trujillo's order.   See id. ¶ 66, at 27.   On July 25, 2006, Trujillo wrote to the Jarita Mesa Grazing Association and stated that the range conditions had not improved significantly, and thus she would not change her July 5, 2006 order to remove cattle by July 31, 2006.   See id. ¶ 68, at 27. On July 28, 2006, acting Carson Forest Supervisor Kendall Clark ruled that, because of recent rains and soil moisture levels, Trujillo's order would be delayed two weeks.   A report by the

_____

[2]   The Plaintiffs do not clarify if all Plaintiffs were signatories to the May 24, 2006 letter, or only the Individual Plaintiffs, or only the Jarita Mesa Permittees -- whose permits were allegedly affected by Trujillo's management of the Jarita Mesa Allotment.   See Complaint ¶ 3, at 25.

Range Improvement Task Force ("RITF"), associated with New Mexico State University ("NMSU"), subsequently found that the past grazing of the permittees' cattle had not damaged grazing resources, and that there was sufficient grass to complete the grazing season as the permits authorized.   The Jarita Mesa Permittees were eventually allowed to complete their grazing season as their permits specified.   See id. ¶ 69, at 28.

In 2006, David Correia, a scholar who had been researching the history of the Unit over several years, began assisting the Plaintiffs with their interactions with Trujillo.   Correia attended a meeting in the El Rito area regarding grazing issues, at which Trujillo made statements to the effect that residents of the Unit caused most or all of the problems facing the Unit.   See Complaint ¶ 72, at 28.   Correia responded publicly at the meeting that the USFS' mismanagement of the Unit over the years was the actual source of the Unit's problems.   Correia had been previously granted full access to the USFS' records at the El Rito District Office for his research on the Unit. Subsequent to the 2006 meeting, Trujillo refused to allow Correia access to any records at the El Rito District Office and informed him that this change of policy was because of his statements at the meeting.   See id. ¶ 72, at 29.

Trujillo then announced that she would end the 2006 grazing season in September, 2006 instead of on October 31, 2006 as set forth in the Plaintiffs' permits.   Trujillo stated that this change was because the Plaintiffs failed to meet certain conditions she had imposed which allowed the season to end on October 31, 2006.   S. Chacon, as President of the Jarita Mesa Grazing Association, proposed a compromise end date of October 15, 2006.   See id. ¶ 73, at 29.   Trujillo responded that she would view S. Chacon's request as that of his alone and that individual permittees would need to address their needs to her individually.   Trujillo stated that if the conditions she imposed were not met, she would suspend or cancel the permits, and charge fines

for any cattle not removed by October 2, 2006. See id. ¶ 74, at 30.

As of October 5, 2006, S. Chacon had seventeen cows unaccounted for in the Carson National Forest. Locating cattle at the end of a grazing season is often difficult for the permittees, given the size of the Allotments. On October 6, 2006, Trujillo reduced S. Chacon's grazing permit by twenty-percent over the next two years, because he had not retrieved all of his cattle by the deadline she imposed. This decision was upheld on appeal. See id. ¶ 75, at 30-31. A Riparian Specialist and Natural Resource Specialist from NMSU wrote to Trujillo regarding S. Chacon's permit reduction, and expressed that her standards were "unreasonable and unyielding," and that the USFS was aware that S. Chacon was not given enough time to recover his cattle. Complaint ¶ 77, at 31-32.

Moving ahead three years, the Plaintiffs complained to Trujillo and her staff in the spring of 2009 regarding the USFS' management of the Allotments. Trujillo responded with a certified letter in which she outlined the repercussions that the Plaintiffs would face if they did not comply with their grazing permits' terms. See id. ¶ 79, at 32. On June 1, 2009, S. Chacon and T. Griego sent Trujillo a letter, that twenty-six permittees signed, in which the Plaintiffs criticized Trujillo's management of the Allotments. The Plaintiffs also sent the letter to the New Mexico Congressional delegation, Governor Richardson, and Trujillo's immediate supervisor, Carson Forest Supervisor Clark. The Plaintiffs stated in the letter that Trujillo's certified letter insulted them, and the Plaintiffs accused Trujillo of attempting to intimidate them. The Plaintiffs also alleged the Trujillo had failed to "install needed cattle guards or to fix plugged ones," and that Trujillo would sanction the permittees when their cattle then drifted from one allotment to another. Id. ¶ 80, at 32-33. The Plaintiffs also complained in the letter that they believed Trujillo was attempting to end grazing on the Allotments. See id. ¶ 80, at 33.

In 2009 and 2010, the USFS began preparing an Environmental Assessment ("EA"),[3] that would determine the amount of grazing allowed on the Allotments for 2011 and subsequent years. See id. ¶ 78, at 32.   On August 20, 2009, the USFS made public three alternative courses of action for the El Rito District: (i) no grazing; (ii) grazing at the same level as the previous ten years, but with a minor reduction and improved management; and (iii) an eighteen-percent reduction in the number of permits with improved management.   The EA did not propose a reduction to the wild horse or elk population.   See Complaint ¶ 81, at 33.

The USFS requested comments from the RITF regarding the EA's proposals.   The RITF had been studying the socioeconomic and environmental effects and implications of USFS decisions regarding the Allotments for many years.   See id. ¶ 82, at 33.   The RITF sent a letter to

---

[3]   Under the National Environmental Policy Act of 1969, federal agencies are required to assess the environmental impacts of proposed actions that will significantly affect the quality of a human environment.   Agencies must prepare an environmental impact statement that sets forth proposed actions and their environmental impact.   See 42 U.S.C. § 4332(2)(C).   When the agency cannot determine whether a proposed action will have an environmental impact, the agency must prepare an EA.   See 40 C.F.R. § 1501.4(b).   An EA:

  (a) Means a concise public document for which a Federal agency is responsible that serves to:

      (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

      (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

      (3) Facilitate preparation of a statement when one is necessary.

  (b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

Trujillo expressing concern over the EA's scientific methodology, and the RITF noted that the permittees "feel discouraged and powerless vis-à-vis" the USFS, as evidenced by the strained relationship of the two over recent years.   Id. ¶ 82, at 34.   The RITF recommended that Trujillo adopt the second proposal in the EA, which would allow grazing to remain at the same level as the previous years.   See id. ¶ 84, at 34.   The RITF also recommended a longer grazing season.   See id. ¶ 84, at 34.

Rio Arriba County submitted a letter to the Defendants on September 17, 2009, in which it expressed concern of what it viewed as a "historical pattern of unjustified Forest Service action to reduce grazing opportunities for villagers that has chipped away and eroded the culture in the area and the way of life integral to that culture."   Complaint ¶ 85, at 35.   The Associations also submitted comments on September 17, 2009, in which they stated that the USFS should, as part of the upcoming EA, consider managing the wild horse and elk populations.   See id. ¶ 86, at 35.   On September 18, 2009, the New Mexico Department of Agriculture submitted comments in which it recommended that Trujillo adopt the EA's second proposal and stated its belief that proper management of the Carson National Forest would obviate the need to reduce the number of permits.   See id. ¶ 87, at 35.

On January 11, 2010, at a public meeting, Trujillo expressed her view that the current level of permits was an eighteen-percent temporary increase above the correct level, an increase which occurred in 1980 and had improperly not since been reduced to the correct level.   See id. ¶ 89, at 36.   Trujillo also stated that she had been working with outside groups regarding the possibility of purchasing the Plaintiffs' permits.   See id. ¶ 89, at 36.   Trujillo further stated that she would seek an eighteen-percent reduction in the number of permits, regardless of the EA's proposals.   See Complaint ¶ 89, at 37.   That month, Trujillo contacted outside groups later in January and

suggested that they purchase the Plaintiffs' permits.   See id. ¶ 90, at 37.

In March, 2010, the Plaintiffs submitted a petition to Carson National Forest Supervisor Clark, and Corbin Newman, the Regional Forester, signed by over 200 residents of the Unit, in which they requested that Trujillo be transferred from the El Rito District Ranger position. Trujillo was "extremely upset and angered by" the Plaintiffs' request.   Id. ¶ 92, at 38.

On September 30, 2010, the USFS issued its EA.   Id. ¶ 4, at 3.   The EA contains approximately one page describing the socioeconomic and cultural impact which the proposed actions may have.   See id. ¶ 93, at 38.   The EA did not contain any recommendations regarding reducing the wild horse and elk population on the Allotments.   See Complaint ¶ 94, at 39.   The EA noted that, if the second alternative was adopted, which would allow the permittees to remain at the same number but with better management, the overall environmental impact would be positive, and the economic impact on the permittees would be less harsh than if the third alternative, an eighteen-percent reduction in the number of permittees, was adopted.   See id. ¶ 97, at 40.   The EA thus designated the second alternative as the Proposed Action.   See id. ¶ 98, at 41.

The 2010 EA's Proposed Action would have allowed the Plaintiffs to "continue grazing on both allotments with approximately the same number of cows as Plaintiffs have grazed on those allotments since 1980."   Id.¶ 4, at 3; id. ¶ 98, at 41.   Normally, the District Range for the Carson and Santa Fe National Forests adopts the Proposed Action set forth in an EA.   See Complaint ¶ 4, at 3; id. ¶ 99, at 41.   Rather than adopting the 2010 EA's Proposed Action, Trujillo adopted the third alternative set forth in the 2010 EA, which imposed an eighteen-percent reduction in the Plaintiffs' grazing permits.   See id. ¶ 5, at 3.   Trujillo stated that she took this action because the current number of permitted livestock on the Unit was unsustainable.   See id. ¶ 5, at 3-4; id. ¶ 100, at 42.   The EA had not concluded that the current grazing numbers were unsustainable.   See

Complaint ¶ 100, at 42.

On November 29, 2010, the Associations and Rio Arriba County appealed Trujillo's 2010 Decision Notice.  See id. ¶ 105, at 44.   In 2011, Trujillo's' supervisors ruled on the appeal and announced that they are upholding her decision.  See id. ¶ 106, at 44.

The Plaintiffs assert that they "will be significantly injured as a result of the imposition of the 18% reduction in permitted cow/calf numbers."  Id. ¶ 17, at 8.  The Plaintiffs assert that the loss of grazing permits "causes not only severe economic harm to Plaintiffs but also grave damage to viability of the unique cultural and social fabric of their families and communities."  Id. ¶ 17, at 8.  The Plaintiffs assert that the importance of their social and cultural fabric "has been recognized by Defendant Forest Service as essential not just to the residents of northern New Mexico but to the entire nation."  Complaint ¶ 17, at 8.

## PROCEDURAL BACKGROUND

All of the Plaintiffs' alleged injuries are related to Trujillo's 2010 decision to reduce grazing on the Jarita Mesa and Alamosa Grazing Allotments, both of which lie within the El Rito Ranger District of the Carson National Forest.  The Plaintiffs allege that the eighteen-percent reduction in their permits violated the Plaintiffs' First Amendment right to free speech and to petition for redress of their grievances.  The Plaintiffs bring this action under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4331-4370 ("NEPA"), the National Forest Management Act of 1976, Pub. L. No. 94-588, 90 Stat. 2949 (codified in scattered section of 16 U.S.C.)("NFMA"), the Federal Sustained Yield Forest Management Act of 1944, 16 U.S.C. §§ 583, 583a-583i ("FSYMA"), and the APA.   Complaint ¶ 9, at 4-5.   The Plaintiffs assert that the Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1346, 2201, and 2202. See Complaint ¶ 10, at 5.

- 13 -

The Plaintiffs assert that, under NEPA, all federal agencies are required to prepare an environmental impact statement ("EIS") regarding proposed actions which will significantly affect the quality of a human environment.   Complaint ¶ 23, at 9 (citing 42 U.S.C. § 4332(2)(C)).   The Plaintiffs assert that agencies must prepare an EA when a proposed action's effect is uncertain. See Complaint ¶ 24, at 10 (citing 40 C.F.R. §§ 1501.4(b), 1508.9).   As part of the EIS and EAs prepared under NEPA, the Plaintiffs assert that an agency "must consider a reasonable range of alternatives and analyze both the direct and indirect impacts of all proposed major federal actions significantly affecting the human environment."   Complaint ¶ 26, at 10 (citing 40 C.F.R. § 1502.14).   The Plaintiffs assert that, when a range of proposed actions are available and an EA is prepared, the EA "is considered the functional equivalent of the preferred alternative" in an EIS. Complaint ¶ 26, at 10.   The Plaintiffs assert that an agency is required to "insure the professional integrity, including scientific integrity," of the environmental analyses underlying an EIS and EA. Complaint ¶ 28, at 10 (citing Natural Res. Def. Council v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972); 40 C.F.R. § 1502.24).   The Plaintiffs assert that the environmental review process which NEPA requires is subject to public comment, and agencies must respond to public comments with thorough modifications, or with a thorough explanation for why no modification is necessary. See Complaint ¶ 29, at 10-11 (citing 40 C.F.R. § 1503.4).

The Plaintiffs assert that, under the NFMA, the USFS is required to develop land resource management plans ("Forest Plans") for each national forest, and must implement the plan on a site-specific level.   Complaint ¶¶ 30-32, at 11 (citing Pub. L. No. 94-588; 16 U.S.C. § 1604(a); 36 C.F.R. § 219.10).   The Plaintiffs assert that the implementation of a Forest Plan must be consistent with the Forest Plan.   See Complaint ¶ 32, at 11 (citing 16 U.S.C. § 1604(i)).   The Plaintiffs assert that, under the SYFMA, the USFS must use timber and non-timber forest products

within a sustained unit for the "benefit of and to stabilize the communities within each sustained yield unit." Complaint ¶ 33, at 12 (citing 16 U.S.C. §§ 583(b), 583(a)).

The Plaintiffs assert that the USFS 1972 Region 3 Policy ("the Policy") recognizes that northern New Mexico communities are dependent upon forest resources, declares the Spanish-American/Hispanic culture of the area to be a "resource," and that the USFS' "objectives and policies must be altered to the extent possible to recognize and be responsive to the culture and peoples." Complaint ¶ 34, at 12 (citing the Policy at 3). The Plaintiffs assert that the Policy "'explicitly recognized the intimate relationship that the Native American and Hispanic residents of Northern New Mexico had with the land' . . . and that 'their economic well-being is often tied closely to the resources of the National Forests and the manner in which they are utilized." Complaint ¶ 49, at 19-20 (quoting from the Policy at 2). The Plaintiffs assert that the Policy requires the USFS to take actions for the preservation of Spanish-American/Hispanic culture in the region, including authorizing livestock permits. See Complaint ¶¶ 35-36, at 12-13.

The Plaintiffs assert that the USFS reduced their grazing permits out of racial animus. See Complaint ¶¶ 43-44, at 17. The Plaintiffs assert that the Unit was created in 1948 "to address some of the economic and social afflictions" harming the Plaintiffs' communities, and resulting from the reduction in their grazing permits over the years. Complaint ¶¶ 45-46, at 18. The Plaintiffs assert that, contrary to the Policy, the USFS "has, for the most part, dealt with the Hispanic communities within the Unit . . . , by continuing to pursue . . . a reduction in grazing permits, that have worked to further destabilize and impair the cultural, social, and economic fabric" of the Plaintiffs' communities. Complaint ¶ 54, at 22. The Plaintiffs assert that, instead of "managing the [U]nit to provide stability to the communities within the Unit as required by law," the USFS' conduct has "resulted in an increase in economic and cultural instability for the

communities in the Unit."   Complaint ¶ 56, at 22.

The Plaintiffs assert that Trujillo has responded to their public criticism "by engaging in a continuing and ongoing campaign of retaliation, misusing her position to harass and punish Plaintiffs for their constitutionally protected conduct."   Complaint ¶ 57, at 23.   The Plaintiffs assert that swelling of the wild horse and elk on the Unit has contributed to the destabilization of the Plaintiffs' grazing tradition and culture.   See Complaint ¶ 58, at 23.   The Plaintiffs assert that, rather than reducing the number of wild horses on the Unit, as outlined in the 2002 Decision Notice, the Defendants have used the damaged forage as an "excuse to harass" the Plaintiffs about foraging conditions and to restrict their grazing rights.   Complaint ¶ 61, at 25.

The Plaintiffs assert that Trujillo's July 5, 2006 order that the Plaintiffs remove their cattle from Jarita Mesa by July 31, 2006, and her refusal to lift that order, were "motivated, in whole or in part, by a desire to retaliate against Plaintiffs for the exercise of their First Amendment rights to free speech and to petition for redress of grievances."   Complaint ¶ 70, at 28.   The Plaintiffs assert that Trujillo's actions were part of an "ongoing pattern and practice of retaliatory conduct." Complaint ¶ 71, at 28.   The Plaintiffs assert that Trujillo's decision in 2006 to reduce S. Chacon's grazing permit by twenty-percent had a profound economic impact on him, "costing him tens of thousands of dollars," and also damaged the social and cultural fabric of his community and extended family.   Complaint ¶ 75, at 31.   The Plaintiffs assert that S. Chacon was "singled out for disparately harsh punishment by Defendant Trujillo because she perceived him as a leader of the Jarita Mesa Grazing Association," and because the Jarita Mesa Permittees had criticized her to the government.   Complaint ¶ 76, at 31.   The Plaintiffs assert that Trujillo acted as she did so as to chill the Plaintiffs' speech.   See Complaint ¶ 76, at 31.

The Plaintiffs also assert that what Trujillo stated was an eighteen-percent increase in

- 16 -

permits was the result of an agreement in which the Plaintiffs agreed to a shorter grazing permit, but an eighteen-percent increase in the number of permits.  See Complaint ¶ 89, at 36.  The Plaintiffs assert that Trujillo's attempts to orchestrate the purchase of their permits was "completely outrageous" and beyond the scope of her duties, in addition to being in violation of the "letter and spirit" of the Policy.  Complaint ¶ 91, at 37.  The Plaintiffs assert that this "shocking" conduct demonstrates her "deep animosity towards the needs and aspirations of the permittees."  Complaint ¶ 91, at 37.

The Plaintiffs also assert that Trujillo's 2010 Decision Notice, in which she chose to reduce the available permits by eighteen-percent, was done out of her anger towards the Plaintiffs, and because she had "determined to retaliate against the Plaintiffs for having the temerity to point out her errors and criticize her mismanagement of the two allotments and the entire Sustained Yield Unit."  Complaint ¶ 99, at 42.  The Plaintiffs assert that Trujillo decided to reduce their permits by eighteen-percent "long before the Final EA was issued."  Complaint ¶ 103, at 43.  The Plaintiffs assert that Trujillo's statements regarding the current level of permittees being unsustainable "was a pretext to conceal her retaliatory motive . . . to punish Plaintiffs and the other permittees for having complaint to other government officials about Defendant Trujillo's conduct."  Complaint ¶ 104, at 44.

The Plaintiffs assert that the economic loss they have suffered and will continue to suffer because of the 2010 Decision Notice is far greater than the $32,000.00 which the USFS estimates will be their economic loss.   The Plaintiffs assert that their economic injuries are "compounded by permanent, irreparable damage to the social and cultural fabric" of their communities.   Complaint ¶ 107, at 45.  The Plaintiffs point out that their "large extended families" share the beef they acquire from cattle raising, providing "the larger population of local residents with healthy and

inexpensive meat on which they depend for a vital part of their diet," and the Plaintiffs will now have twenty-percent less beef available for their needs.   Complaint ¶ 109, at 46.

The Plaintiffs' first count in the Complaint is alleged against Trujillo.   The Plaintiffs assert that the Trujillo violated their right to free speech, "the related right to petition for redress of grievances," and their right to freedom of association, as the First Amendment guarantees. Complaint ¶ 112, at 47.   The Plaintiffs assert that they did not have an opportunity during the EA process, and during their appeal of Trujillo's July 5, 2006, "to discover and present evidence of disparate treatment, violation of normal procedure or practice, or other evidence from which retaliatory animus may be inferred," including the evidence that district rangers normally adhere to the proposed actions in EAs.   Complaint ¶ 12, at 47.   The Plaintiffs assert that they have "no remedy other than an action under the First Amendment" to remedy this asserted constitutional violation, "which resulted in a reduction in their permits for the 2011 grazing season," a reduction which continues through the 2015 grazing season, "and to compensate them for the losses already accrued as a result of Defendant Trujillo's retaliatory conduct."   Complaint ¶ 112, at 47-48.   The Plaintiffs assert that Trujillo acted in an "arbitrary and capricious manner," and "intentionally and/or with deliberate indifference to the First Amendment rights of Plaintiffs."   Complaint ¶ 113, at 48.   The Plaintiffs also assert that Trujillo's actions violated the APA.   See Complaint ¶ 114, at 48 (citing 5 U.S.C. §§ 702, 706(2)(b)).   The Plaintiffs assert that they "will suffer irreparable harm if these reductions are allowed to proceed," and they assert that they "have no adequate remedy at law to stop them."   Complaint ¶ 115, at 48.

As their second cause of action, the Plaintiffs allege that the Defendants failed to properly analyze environmental impact in the 2010 EA, and by failing to take a "hard look" at the social, economic, and environmental justice impact each alternative would have, in violation of the APA.

Complaint ¶¶ 116-119, at 48-49 (citing <u>Natural Resources Def. Council v. Morton</u>, 458 F.2d at 8385; 5 U.S.C. §§ 702, 706(2)).   The Plaintiffs allege as their third cause of action that the Defendants failed to properly analyze environmental impact in the 2010 EA by failing to develop a proper baseline with the best available science for their study, in violation of the APA.   <u>See</u> Complaint ¶¶ 120-123, at 49 (citing 40 C.F.R. § 1502.24; 5 U.S.C. §§ 702, 706(2)).   The Plaintiffs allege as their fourth cause of action that the Defendants failed to properly consider and respond to comments, and failed to consider a reasonable range of alternatives in the 2010 EA, in violation of NEPA and the APA.   <u>See</u> Complaint ¶¶ 124-127, at 49-50 (citing 40 C.F.R. 1503.4; 36 C.F.R. § 220.4(c); 5 U.S.C. §§ 702, 706(b)).   As their fifth cause of action the Plaintiffs allege that Trujillo failed to consider the findings in the 2010 EA when she made her 2010 Decision Notice, in violation of NEPA and the APA.   <u>See</u> Complaint ¶¶ 128-131 (citing 36 C.F.R. § 220.4(c)(4); 5 U.S.C. §§ 702, 706(2)).   As their sixth cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan range standards and guidelines related to grazing numbers, in violation of the NFMA and the APA.   <u>See</u> Complaint ¶¶ 132-136, at 50-51 (citing 16 U.S.C. § 1604(i); 5 U.S.C. §§ 702, 706(b)).   As their seventh cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan's range standards and guidelines related to the management of wild horses on the Jarita Mesa Allotment, in violation of the NFMA and the APA.   <u>See</u> Complaint ¶¶ 137-140, at 51-52 (citing 5 U.S.C. §§ 702, 706(2)). As their eighth cause of action, the Plaintiffs allege that the Defendants violated the SYFMA and the APA, by failing to use the Carson National Forest for the benefit of the communities within the Unit.   <u>See</u> Complaint ¶¶ 141-143, at 52 (citing 5 U.S.C. §§ 702, 706(2)).   As their ninth cause of action, the Plaintiffs allege that the Defendants violated the Policy and the APA, by failing to manage the Allotments in a manner that is responsive to and compatible with the well-being of the

local resource-dependent communities, and did so without a reasonable explanation.  See Complaint ¶¶ 144-146, at 52-53 (citing 5 U.S.C. §§ 702, 706(2)).

The Plaintiffs request various forms of relief.  The Plaintiffs request that the Court: (i) declare that the "acts complained of herein violated the First Amendment rights" of the Plaintiffs, Complaint ¶ 1, at 53; (ii) declare that any future reductions to the number of cattle permitted on the Allotments for the 2012-2015 grazing seasons, based on Trujillo's 2010 Decision Notice, would be contrary to the Constitution, see Complaint ¶ 2, at 53; (iii) declare that the Defendants violated NEPA by failing to analyze adequately, or to "take a hard look" at the social, economic, and environmental impacts which would result from the 2010 EA and 2010 Decision Notice for the Allotments, Complaint ¶ 3, at 53; (iv) declare that the Defendants violated NEPA by "failing to properly analyze impacts insofar as they failed to develop or use a proper baseline based on the best available science," Complaint ¶ 4, at 53; (v) declare that the Defendants violated NEPA by failing to properly consider and respond to comments and by failing to consider a reasonable range of alternatives, see Complaint ¶ 5, at 54; (vi) declare that Trujillo violated NEPA by failing to consider the alternatives the EA analyzed before issuing the 2010 Decision Notice, see Complaint ¶ 6, at 54; (vii) declare that the Defendants violated NFMA by failing to act in accordance with the Carson National Forest Plan's range standards and guidelines regarding grazing numbers, see Complaint ¶ 7, at 54; (viii) declare that the Defendants violated NFMA by failing to act consistently with the Carson National Forest Plan's range standards and guidelines regarding wild horse management, see Complaint ¶ 8, at 54; (ix) declare that the Defendants violated the Plaintiffs' rights under the SYFMA, by failing to manage the forest for the benefit of the communities within the Unit, see Complaint ¶ 9, at 54; (x) declare that the Defendants violated the Policy by failing to be responsive to the needs of the local, resource-dependent communities and

failing to act in a way that supports their future well-being, see Complaint ¶ 10, at 54; (xi) declare that the Defendants' actions violated the APA by not observing the procedures required by law, and were arbitrary and capricious "and/or unconstitutional," Complaint ¶ 11, at 55; (xii) issue a judgment and injunction which voids the 2010 Decision Notice and orders the Defendants to adhere to the second alternative the 2010 EA which would allow the Plaintiffs to keep their permits at approximately the same levels as before the 2010 EA was issued, see Complaint ¶ 12, at 55; (xiii) issue an injunction that compels the USFS to comply with NEPA, NFMA, SYFMA, and the APA, so as to prevent irreparable harm and satisfy the public interest, see Complaint ¶ 13, at 55; (xiv) issue an injunction which requires the Defendants to adhere to the second alternative in the 2010 EA, see Complaint ¶ 14, at 55; (xv) award compensatory damages, against Trujillo, to the Plaintiffs who had their permits reduced in the 2011 grazing season and any subsequent grazing season, see Complaint ¶ 15, at 55; (xvi) award punitive damages against Trujillo, see Complaint ¶ 16, at 56; (xvii) award the Plaintiffs their "costs, expenses, expert witness fees, and reasonable attorney fees under applicable law," Complaint ¶ 17, at 56; and (xviii) grant the Plaintiffs "such other and further relief as the Court deems proper," Complaint ¶ 18, at 56.

Trujillo and USFS move to dismiss Count I and the corresponding relief requested in paragraphs 1, 2, 15, and 16 of the Complaint, at 53-56.  See MTD at 1.  The Defendants argue that the Court should dismiss Count I, because: (i) Bivens does not provide a remedy for purported violations of the Plaintiffs' First Amended rights; (ii) the Plaintiffs have failed to plead sufficient facts to support a retaliatory motive; and (iii) Trujillo is entitled to qualified immunity.   See MTD at 1.  The Defendants also argue that the Court should dismiss the Plaintiff's request for declaratory relief against Trujillo because it is not appropriate to declare that a plaintiff's constitutional rights were violated.   See MTD at 1-2.

The Defendants first allege that the Plaintiff's alleged violation of their First Amendment rights is not a cause of action available against federal officials under Bivens.  The Defendants assert that a Bivens suit is not available for all constitutional torts that federal officials may commit.  See MTD at 5 (citing Corr. Servs. Corp v. Malesko, 534 U.S. 61, 76 (2001)).  The Defendants assert that the Supreme Court has "cautioned that a damages remedy should not be inferred from the Constitution where 'special factors counsel hesitation in the absence of affirmative action by Congress.'"  MTD at 5 (quoting Bivens, 403 U.S. at 396-97).  The Defendants assert that "the Supreme Court has repeatedly recognized that the availability of other remedies created by Congress as part of a comprehensive remedial scheme may constitute a 'special factor' counseling against a Bivens remedy even where those remedies provide less than complete relief to an injured plaintiff."  MTD at 5 (quoting Bush v. Lucas, 462 U.S. 367, 390 (1983)).

The Defendants assert that, in Wilkie v. Robbins, 551 U.S. 537, 550 (2007), the Supreme Court of the United States held that a Bivens remedy should only be inferred if: (i) no alternative process for protecting a constitutional interest exists; and (ii) there are no special factors counseling hesitation against a judicially created remedy.  See MTD at 5.  The Defendants assert that the Supreme Court has only twice implied a damages remedy under Bivens, and has, since its decision in Carlson v. Green, 446 U.S. 14 (1980), "refused to extend Bivens liability to any new context or new category of defendants."  MTD at 5-6 (quoting Wilkie v. Robbins, 551 U.S. at 549-550).  The Defendants assert that, in Wilkie v. Robbins, the Supreme Court declined to recognize a Bivens remedy for claims of First Amendment violations by federal officials or employees.  See MTD at 6.

The Defendants further argue that, under the United States Court of Appeals for the Tenth

Circuit's precedent, courts should defer to a congressional remedy scheme where one exists, even if incomplete, if "indications exist that Congress' inaction in creating a damages remedy for constitutional violations was not inadvertent."   MTD at 6 (citing Robbins v. Wilkie, 300 F.3d 1208, 1212 (10th Cir. 2002)).   The Defendants assert that the APA is a "comprehensive statutory scheme for review of improper agency action, including unconstitutional agency action, such as Plaintiffs allege here."   MTD at 7 (citing 5 U.S.C. § 706).   The Defendants assert that, under La Compania Ocho v. U.S. Forest Serv., 874 F. Supp. 1242, 1246-47 (D.N.M. 1994), the remedies provided under the APA preclude the availability of a Bivens remedy, where the alleged violation is an agency action that the APA covered.   See MTD at 7.   The Defendants assert that La Compania Ocho v. U.S. Forest Serv. raised issues factually and legally similar to the Plaintiff's claim in Count I, and that the court found that the APA precluded a Bivens action against Forest Service officials and employees' whose actions were covered by the APA.   See MTD at 8-9.

The Defendants assert that, because the Plaintiffs do not dispute that the 2010 Decision Notice is an "agency action" subject to judicial review under the APA, and because the Plaintiffs seek review of the 2010 Decision Notice in their Complaint, the Court should dismiss their Bivens action.   See MTD at 10.

Regarding the Defendant's argument that the Plaintiffs have failed to state sufficient facts to show that Trujillo plausibly acted with a retaliatory motive, the Defendants assert that the Plaintiffs must establish that: (i) the Plaintiffs were engaged in a constitutionally protected activity; (ii) Trujillo's actions caused the Plaintiffs to suffer an injury that would "chill a person of ordinary firmness from continuing to engage in the activity;" and (iii) Trujillo's action was "'substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'"   MTD at 10 (quoting Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)).   The

Defendants contend that the Plaintiffs' Complaint contains only "labels and conclusions" in support of their allegation that Trujillo acted with a retaliatory motive.   MTD at 10.   The Defendants assert that the only motive which the Plaintiffs have alleged is that Trujillo was "motivated by the desire to end grazing on the allotments," and that her actions "'reflect the Forest Service's long-standing failure to properly manage and balance' the numbers of elk, wild horses and livestock."   MTD at 11 (quoting Complaint ¶ 67, at 27).   The Defendants contend that these facts do not support a retaliatory motive and, on that basis, the Court should dismiss Count I for failure to state a claim.   See MTD at 11.

The Defendants also argue that the Plaintiffs are not entitled to declaratory relief that their constitutional rights were violated.   The Defendants assert that, if a federal court were to grant a declaratory judgment that Trujillo violated their First Amendment Rights in the past it would be an improper declaratory judgment, in that the judgment would not resolve a dispute, and would "not help to redress the harm Plaintiffs claim to have suffered."   MTD at 11-12 (citing Wilton v. Seven Falls, Co., 515 U.S. 277, 286 (1995); Exxon Shipping Co. v. Airport Depot Diner, Inc., 120 F. 3d. 166, 168 (9th Cir. 1997); Gerlich v. United States Dep't of Justice, 659 F. Supp. 2d 1, 19 (D.D.C. 2009)).

Lastly, the Defendants assert that Trujillo is entitled to qualified immunity, because the Plaintiffs have failed to set forth a plausible claim for relief in Count I.   The Defendants assert that "the sufficiency of [the Plaintiff's] pleadings is both 'inextricably intertwined with' . . . and 'directly implicated by' . . . the qualified immunity defense."   MTD at 12 (quoting Ashcraft v. Iqbal, 556 U.S. 662, 672 (2009)(internal quotations omitted)).   The Defendants assert that the Plaintiffs do not have a Bivens action against Trujillo, have not alleged sufficient facts to state a plausible claim for First Amendment retaliation, and are not entitled to declaratory judgment

against Trujillo, and thus the Defendants assert that Trujillo is entitled to qualified immunity from the Plaintiffs' claims in Count I.   See MTD at 12.

The Plaintiffs respond that, to establish a violation of the First Amendment right to free speech for retaliatory conduct, they need demonstrate only: (i) that the Plaintiffs engaged in constitutionally protected activity; (ii) "that Defendants' actions caused Plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;" and (iii) that the Defendants' "adverse action was substantially motived as a response to Plaintiffs' exercise of constitutionally protected conduct."   Plaintiffs' Memorandum in Response to Defendants' Motion to Dismiss Count I, filed June 21, 2012 (Doc. 22)("Response").   The Plaintiffs assert that they "need only present sufficient facts from which the jury may infer that their protected conduct was a motivating, not the sole or even the primary, reason for the challenged action."   Response at 15 (citing Vill. of Arlington Hts. v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977)).   The Plaintiffs assert that retaliatory or discriminatory intent or animus, sufficient to demonstrate causation and defeat a motion to dismiss, "may be established through evidence of disparate treatment and through evidence that a defendant's proffered explanation is a pretext."   Response at 15 (citing Randle v. City of Aurora, 69 F. 3d 441 (10th Cir. 1995)).   The Plaintiffs assert that the factfinder may infer an improper motive from "evidence of pretext."   Response at 15 (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993)). The Plaintiffs thus assert that they need only allege sufficient circumstantial evidence of pretext to survive a motion to dismiss.   See Response at 16 (citing Randle v. City of Aurora, 69 F. 3d at 451).

The Plaintiffs also assert that retaliatory intent is rarely supported by direct evidence, and thus, where circumstantial evidence is used to show improper intent, the factfinder "may view

each piece of evidence in combination with one another . . . and dismissal of a claim is improper where the jury could find the proffered explanation was a pretext from the totality of the evidence." Response at 16 (citing Bisbee v. Bey, 39 F.3d 1096, 1101 (10th Cir. 1994)).   The Plaintiffs assert that the Tenth Circuit has "emphasized that: 'Judgments about intent are best left for trial and are within the provision of the jury.'"   Response at 16 (quoting Randle v. City of Aurora, 69 F.3d at 453).   The Plaintiffs also assert that pretext may be established through "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendant's proffered explanation" which are of a sufficient gravity that a factfinder could reasonably find that the defendant's explanation is unworthy of credence.   Response at 16 (citing EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1198 (10th Cir. 2000)).   The Plaintiffs assert that the Complaint "includes sufficient allegations of specific facts which under the established methods of alleging and proving unconstitutional motive or intent constitute sufficient allegations of improper motive."   Response at 17.

The Plaintiffs assert that the Complaint "is replete with allegations of specific facts that constitute indirect, circumstantial evidence of pretext sufficient to allow a reasonable trier of fact to find retaliatory animas [sic]."   Response at 17.   The Plaintiffs specifically assert that the following facts demonstrate Trujillo's retaliatory motive towards the Plaintiffs:

1.  Defendant Trujillo's decision to disregard the Proposed Action recommended in the EA was a departure from and violated established practice and policy by the District Rangers within the various ranger districts in the Carson and Santa Fe National Forests to adopt the proposed actions recommended in an EA. [(citing Complaint ¶¶ 97-99, at 40-42)].

2.  Defendant Trujillo's decision to implement that 18% reduction rather than adopt the EA Proposed Action was a departure from and violated the mandatory procedures required by Defendant Forest Service's 2002 Decision Notice to be implemented before reducing grazing permits when the size of the wild horse herd exceeded 20-70 horses. [(citing Complaint ¶¶ 59-60, at 23-24; id. ¶¶ 100-101, at 42-43)].

3. The proffered explanations put forward by Defendant Trujillo to justify her decision to disregard the Proposed Action recommended by the Interdisciplinary Team in the EA were implausible because they were false, and a reasonable trier of fact could rationally find her explanations unworthy of credence.   [(citing Complaint ¶¶ 100-102, at 42-43)].

4. Defendant Trujillo's decision to disregard the Proposed Action in the EA and to implement an 18% reduction in grazing permits was a departure from and violated numerous provisions of the Forest Service's 1972 Region 3 Policy. [(citing Complaint ¶¶ 49-53, at 19-21; id. ¶¶ 107-109, at 45-46)].

5. Defendant Trujillo's concerted efforts to obtain buy-outs of the grazing permits of permittees on the Jarita Mesa and Alamosa Allotments who had not asked her to do so exceeded the scope of her duties as District Ranger as to give rise to an inference of retaliatory animus.   [(citing Complaint ¶¶ 89-91, at 36-37)].

6. Defendant Trujillo engaged in numerous acts of retaliation against Plaintiffs from 2006 through 2009 and 2010 sufficient to constitute an unwritten custom and practice of retaliation.   [(citing Complaint ¶ 61, at 24-25; id. ¶ 66, at 26-27; id. ¶ 68, at 27-28; id. ¶¶ 72-75, at 28-30; id. ¶ 79, at 32; Complaint ¶¶ 89-91, at 36-37; id. ¶¶ 97-104, at 40-44).]

Response at 17-18.   The Plaintiffs assert that the Defendants have ignored the "numerous factual allegations in the Complaint set forth above which contain specific facts that constitute circumstantial evidence of pretext sufficient to allow the trier of fact to infer retaliatory animus." Response at 18.   The Plaintiffs also assert that "under well established case law Plaintiffs have alleged a plethora of circumstantial evidence of the type that courts have repeatedly held to be sufficient basis from which a reasonable trier of fact may infer that the conduct complained of was 'substantially motivated' by retaliatory animus."   Response at 18.

The Plaintiffs assert that they need not allege that their protected conduct was a substantial motivating factor in the Trujillo's decisions, nor do they need to establish that their conduct was the sole or primary reason for Trujillo's violations.   See Response at 19 (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. at 265).   The Plaintiffs further assert that Trujillo's May, 21, 2009, letter was clearly set forth in the Complaint as containing retaliatory threats to the

Plaintiffs' protected speech in the form of complaint letter to Trujillo's supervisor, Governor Richardson, and the New Mexico Congressional delegation.   See Response at 19 (citing Complaint ¶¶ 79-80, at 32-33).   The Plaintiffs further assert that the Complaint alleges that Trujillo attempted to buy out their permits to the Unit "to rid the Carson National Forest of Plaintiffs and their Cattle."   Response at 20 (citing Complaint ¶ 90, at 37).   The Plaintiffs contend that these allegations are consistent with the Plaintiffs' theory that Trujillo "was trying to retaliate against them."   Response at 20.

The Plaintiffs also assert that they are entitled to proceed against Trujillo in her individual capacity under Bivens.   The Plaintiffs assert that the Defendants "misapprehend the nature of Plaintiff's claim for damages" and the adequacy of the APA to address those claims.   Response at 20-21.   The Plaintiffs assert that, although the Supreme Court held in Bush v. Lucas, 462 U.S. 367 (1983), that a federal employee could not bring a Bivens claim for a violation of his First Amendment rights, that decision was limited to the Supreme Court's finding that the "[c]ongressionally created federal civil service procedures . . . provided meaningful redress for civil service employees" through "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations."   Response at 22.   The Plaintiffs assert that a Bivens suit is available to redress a First Amendment violation where Congress has not created such an "'elaborate remedies system.'"   Response at 22 (quoting Nat'l Commodity and Barter Ass'n v. Archer, 31 F.3d 1521, 1527 (10th Cir. 1994)).   The Plaintiffs assert that, when "a plaintiff . . . has set forth a clear . . . claim alleging retaliation for the exercise of a clearly protected First Amendment conduct, a Bivens action will not be barred unless there is an alternative remedy available to the plaintiff that contains a sufficient deterrent effect for potential defendants."   Response at 24-25 (citing Minneci v. Pollard, 132 S. Ct. 617 (2012); Carlson v.

Green, 446 U.S. at 21).

The Plaintiffs assert that they may bring their claims in Count I under Bivens against Trujillo, because the First Amendment violation they allege is a well-recognized constitutional action, because the APA does not provide an adequate remedy for persons who criticize federal officials and suffer retaliation from the officials in response, and because the APA does not provide an incentive to deter future unconstitutional conduct.   See Response at 25.   The Plaintiffs assert that Trujillo retaliated against them for the Plaintiffs' criticism of her by sending the May, 2009, threatening letter, attempting to buyout their permits with outside groups, and adopting a plan to reduce the Plaintiffs' permits by eighteen-percent in response to the 2010 Environmental Assessment.   See Response at 25-26.   The Plaintiffs contend that the APA's remedies are "not an even remotely adequate or comparable alternative to the compensatory and punitive monetary damages that would be available [against] Defendant Trujillo[ for her] unconstitutional retaliation under Plaintiffs' Bivens claim."   Response at 26.   The Plaintiffs contend that the APA is an inadequate remedy, because it does not provide for full compensatory and punitive damages.   The Plaintiffs contend in the Complaint that the equitable relief available under the APA will not redress the monetary harms they allege they have suffered.   See Response at 26 (citing Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 262 (1999); Bowen v. Massachusetts, 487 U.S. 879, 895 (1988)).   The Plaintiffs also assert that the APA will not serve a deterrent effect, because punitive damages are not available under the APA.   See Response at 26.   The Plaintiffs thus assert that their available relief under the APA is a stark contrast to the situations of other plaintiffs for whom the Supreme Court has denied a Bivens suit, because an alternative remedy "provided 'roughly similar incentives for potential defendants to comply'" with the plaintiffs' constitutional rights.   Response at 26-27 (quoting Minneci v. Pollard, 132 S. Ct. at 625).

The Plaintiffs assert that "[a]lthough at this stage of the proceedings it is unclear what specific monetary relief may be available under the APA for past economic loss" caused by the Defendants' allegedly unlawful conduct, they nonetheless contend that the relief available to them under the APA "will not be designed or able to fully compensate Plaintiffs' for all the harms they claim to have suffered as a result of Defendant Trujillo's alleged constitutional violation." Response at 27.   The Plaintiffs assert that, because the USFS, and not Trujillo, would pay any monetary relief awarded to the Plaintiffs under the APA, "Trujillo would face no consequences whatsoever for her unconstitutional conduct."   Response at 72.   The Plaintiffs assert that the Supreme Court has found "precisely this lack of consequences to the offending individual employee" to be a proper basis for allowing a <u>Bivens</u> suit.   Response at 27 (citing <u>Carlson v. Green</u>, 446 U.S. at 21-22).   The Plaintiffs assert that the defendants have not explained how, in light of the need to deter similar conduct by other federal officials, the APA is "an alternative remedy sufficient to bar a <u>Bivens</u> action."   Response at 28 (citing <u>Minneci v. Pollard</u>, 132 S. Ct. at 625).   The Plaintiffs assert that district courts in other districts have similarly found that the APA is not a "congressional comprehensive system," such that it is sufficient to preclude a <u>Bivens</u> action for an alleged First Amendment violation.   Response at 28 (citing <u>Navab-Safavi v. Broad. Bd. of Governors</u>, 650 F. Supp. 2d 40 (D.D.C. 2009)).

The Plaintiffs also assert that Trujillo's allegedly retaliatory actions of sending a threatening letter and attempting to orchestrate a buyout of their permits are not actions reviewable under the APA.   <u>See</u> Response at 28.   The Plaintiffs thus assert that a <u>Bivens</u> action is the only method available for them to redress these retaliatory actions.   <u>See</u> Response at 29.   The Plaintiffs also assert that the violations of their First Amendment rights are "separate from, although related to, the legality of Defendant Trujillo's conduct under the APA."   Response at 29.

The Plaintiffs assert that, unlike in Bush v. Lucas, the Defendants have not shown that Congress intends the APA to be the sole remedy against federal employees for allegedly First Amendment violations.   See Response at 29.

The Plaintiffs also allege that there are no factors counseling hesitation such that warrant denying them a Bivens action.   The Plaintiffs distinguish Wilkie v. Robbins, in that the Plaintiffs' alleged First Amendment claim is a "core . . . claim long recognized by the courts" and not a "creative new property rights-based Bivens action."   Response at 29-30.   The Plaintiffs assert that "the law is settled that as a general matter the First Amendment prohibits government official, including federal official, from subjecting an individual to retaliatory actions for speaking out." Response at 30 (citing Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)).   The Plaintiffs assert that, in Wilkie v. Robbins, the Supreme Court "refused to allow a Bivens action . . . [because] there was no defined violation, such as . . . a traditional First Amendment claim alleging retaliation for the exercise of free speech," and the "'elements of [the plaintiff's] claim are so unclear that no one can tell in advance what claim might qualify or what might not.'"   Response at 30 (quoting Wilkie v. Robbins, 551 U.S. at 561).   The Plaintiffs also contend that, in La Compania Ocho, Inc., v. United States Forest Serv., the Honorable Juan Guerrero Burciaga, Senior United States District Judge for the District of New Mexico, found that the APA did not provide a remedy for the USFS' allegedly retaliatory acts, specifically, "sending a letter threatening [the plaintiffs] with punishment for allegedly improper conduct in an effort to intimidate them and by initiating a meritless criminal investigation."   Response at 31 (citing La Compania Ocho, Inc., v. United States Forest Serv., 874 F. Supp. at 1249).   The Plaintiffs contend that they have alleged that Trujillo committed a similar retaliatory act, and as such, the APA provides the Plaintiffs with no remedy for her "willful violation of their constitutionally protected First Amendment rights."

Response at 31.

Regarding the Defendants' assertion that Trujillo is entitled to qualified immunity, the Plaintiffs contend that qualified immunity is "not available to government officials who violate clearly established law," and that "the law was clearly established in 2009 and 2010 that she could not take any actions against Plaintiffs for the purpose of retaliating against them for engaging in speech protected by the First Amendment."  Response at 32.  The Plaintiffs further contend that they have pled all of the facts necessary to state a First Amendment claim and, on that basis, Trujillo is not entitled to qualified immunity at this stage of the proceedings.  See Response at 32. The Plaintiffs also assert that whether a remedy is available under the APA is not a fact relevant to whether Trujillo is entitled to qualified immunity; and the Plaintiffs argue that they have demonstrated that the APA does not provide them an adequate remedy.  See Response at 32-33.

In the Defendant's Reply in Support of Motion to Dismiss, filed July 20, 2012 (Doc. 26)("Reply in Support"), the Defendants assert that the "Plaintiffs do not dispute declaratory judgment against Defendant Trujillo in her individual capacity is inappropriate," and, accordingly, the Court should dismiss the Plaintiffs' requests for declaratory relief against Trujillo in her individual capacity.  Reply in Support at 2.  The Defendants also assert that Trujillo is entitled to qualified immunity on two grounds: (i) the Complaint fails to "state a claim for a First Amendment violation because Bivens does not provide a remedy;" and (ii) the Plaintiffs "failed to adequately plead retaliatory motive."  Reply in Support at 3.

The Defendants assert that the Supreme Court has found that a motion to dismiss for failure to state a claim functions as a defense to qualified immunity.  See Reply in Support at 4 (citing Ashcroft v. Iqbal, 556 U.S. at 672).  The Defendants assert that "'the sufficiency of the pleadings is both inextricably intertwined with, and directly implicated by the qualified immunity defense.'"

Reply in Support at 4 (quoting Ashcroft v. Iqbal, 556 U.S. at 673)(internal alterations omitted). The Defendants further assert that a Bivens action is "the exception rather than the rule" and that a plaintiff is not automatically entitled to receive damages for violation of the plaintiff's rights. Reply in Support at 5 (citing Wilkie v. Robbins, 551 U.S. at 550, La Compania Ocho, Inc. v. United States Forest Serv., 874 F. Supp. at 1245-46).

The Defendants further assert that "many controlling cases . . . establish that, while the APA may not provide a damages remedy for purported constitutional violations[,] it provides an adequate remedy, making a Bivens action unavailable."   Reply in Support at 5 (citing McConaha v. Fed. Aviation Admin., 54 F. App'x 914, 916 (10th Cir. 2003); La Compania Ocho, Inc., v. United States Forest Serv., 874 F. Supp. at 1246-47).   The Defendants also assert that multiple courts in other circuits have found that the APA precludes a Bivens suit for an alleged First Amendment violation.   See Reply in Support at 6 (citing W. Radio Servs. Co. v. U.S. Forest Serv., 578 F.3d 1116, 1122-25 (9th Cir. 2009); Winnemen Wintu Tribe v. U.S. Dep't of Interior, 725 F. Supp. 2d 1119 (E.D. Cal. 2010); W. Radio Servs. v U.S. Forest Serv., No. CV 04-1346-AA, 2008 WL 427787 (D. Or. Feb. 12, 2008)).   The Defendants further assert that the Supreme Court recognized in Wilkie v. Robbins that the APA provided a remedy for "conventional" agency action.   Reply in Support at 6.   The Defendants contend that the Plaintiffs have alleged that a single "conventional" agency action violated their First Amendment rights -- the 2010 Decision Notice -- and that Congress specifically designed the APA to redress such grievances, and, thus, the APA precludes the Plaintiffs' Bivens suit.   See Reply in Support at 6-7 (citing Gleason v. Malcom, 718 F.2d 1044, 1048 (11th Cir. 1983); Custodio v. United States, 866 F. Supp. 479, 482 (D. Co. 1994)).   The Defendants also assert that the Tenth Circuit views Bush v. Lucas and Schweiker v. Chilicky as "cutting back significantly on the availability of Bivens actions."   Reply

in Support at 7 (citing La Compania Ocho, Inc. v. United States Forest Serv., 874 F. Supp. at 1247

(quoting Brothers v. Custis, 886 F. 2d 1282, 1283 (10th Cir. 1989); Lombardi v. Small Bus.

Admin., 889 F.2d 959, 961-61 (10th Cir. 1989))).

        The Defendants also assert that the APA provides sufficient deterrence.   The Defendants

assert that federal officials are deterred by the possibility of their decision being set aside.   The

Defendants moreover assert that the Supreme Court has recognized the deterrent effect served by

the injunctive relief available under the APA.   See Reply in Support at 7-8 (citing Fed. Aviation

Admin. v. Cooper, 132 S. Ct. 1441, 1445 n.12 (2012)).   The Defendants assert that Congress

specifically designed the APA to remedy constitutional violations.   See Reply in Support at 8

(citing 5 U.S.C. § 706).   The Plaintiffs contend that, because the APA waived sovereign immunity

only in actions where the plaintiffs seek declaratory or injunctive relief, but not money damages,

Congress specifically intended to foreclose Bivens suits where the APA provides for a remedy.

See Reply in Support at 8 (citing 5 U.S.C. § 702; La Compania Ocho, Inc., v. United States Forest

Serv., 874 F. Supp. at 1248).   The Defendants contend that the unavailability of money damages

under the APA "'does not mandate the creation of a Bivens remedy when other meaningful

safeguards or remedies for the rights of persons'" asserting constitutional violations are available.

Reply in Support at 8-9 (quoting Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v.

Gibbs, 886 F. 2d 1240, 1247 (10th Cir. 1989)(internal quotation omitted)).   The Defendants

further contend that the authority upon which the Plaintiffs rely to assert that the APA is not an

adequate alternative remedy -- Navab-Safavi v. Broad. Bd. of Governors -- is not on point.   The

Defendants argue that the plaintiffs in that case did not allege a "conventional agency decision" --

rather, the plaintiffs contended that the United States had terminated a services contract because

the plaintiffs spoke out against the war in Iraq -- such as could be remedied under the APA,

whereas the Plaintiffs have alleged that a "conventional final agency action" -- the 2010 Decision Notice -- violated their First Amendment rights.   Reply in Support at 9.   The Defendants further contend that the Tenth Circuit "has noted and reaffirmed there is no <u>Bivens</u> action for 'constitutional violations . . . committed in the process of reaching a final agency decision.'" Reply in Support at 9 (quoting <u>McConaha v. Fed. Aviation Admin.</u>, 54 F. App'x at 914).

Regarding the Plaintiffs' contention that Trujillo's May, 2009, "threatening letter" and attempt to orchestrate a buyout of the Plaintiffs' permits are not agency actions that the APA may remedy, the Defendants assert that the Plaintiffs do not "explain how such actions caused Plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the activity."   Reply in Support at 9-10.   The Defendants also point out that these two actions by Trujillo were not included in the Complaint as a basis for the Plaintiffs' First Amendment claim, and that, "[a]ccording to the Complaint, neither of these actions did in fact have a chilling effect on Plaintiffs' speech."   Reply in Support at 10 n.3.   The Defendants point out that, after these actions by Trujillo, the Plaintiffs submitted a petition requesting that Trujillo be transferred from the El Rito Range District, and the Plaintiffs continued to criticize Trujillo publicly.   <u>See</u> Reply in Support at 10.

The Defendants assert that there are two special factors counseling hesitation in allowing a <u>Bivens</u> remedy for the Plaintiffs: (i) Congress created an adequate alternative remedy (citing <u>Minneci v. Pollard</u>); and (ii) creation of a <u>Bivens</u> remedy for the Plaintiffs would have a grave impact on agency action, because "the threat of a lawsuit would provide incentive to reach a decision that presents the least risk to the employee, rather than a decision that is most consistent with the mission of the agency."   Reply in Support at 10-11.   The Defendants assert that APA provides a "meaningful check on the legality of agency action without adding motivations that

may interfere with the agency mission."   Reply in Support at 11.

The Defendants assert that the Plaintiffs' alleged First Amendment violations are "conclusory" and fail to provide factual support for "Plaintiffs' claim the decision to reduce grazing permits was motivated by retaliation."   Reply in Support at 11.   Regarding the Plaintiffs' assertion that Trujillo's July 5, 2006, decision to shorten the grazing season was a retaliation against the Plaintiffs for letters they wrote in the previous April and May, 2006, the Defendants point out that the Plaintiffs "concede the Allotment was deteriorating and something needed to be done," and that "drought conditions were adversely affecting the Allotment," and thus the Defendants assert that Trujillo acted merely to remedy the Allotment's deterioration.   Reply in Support at 11.   The Defendants assert that, although the Plaintiffs may have disagreed on the chosen method to address the Allotment's deterioration, such a disagreement is not evidence of retaliation.   See Reply in Support at 12 (citing Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994)).   The Defendants also point out that, although the Plaintiffs allegedly disagreed with Trujillo's 2006 decision, they did not appeal her decision.   See Reply in Support at 12.

The Defendants contend that the only allegation of retaliation "that comes close to being supported" with facts is Trujillo's 2006 alleged retaliation against Correia, who is not a party to this action.   Reply in Support at 12.   The Defendants nonetheless contend that "this one allegation of retaliation against a person who is not a party to this action and is not a permittee is insufficient to support Plaintiffs' conclusion that Defendant Trujillo had an unwritten custom or practice of retaliatory conduct."   Reply in Support at 12 (internal quotations omitted).

The Defendants assert that Trujillo's decision to reduce Chacon's grazing permit, because he failed to "abide by terms of the grazing permit," is not evidence of retaliation.   Reply in Support at 12.   The Defendants assert that Trujillo's decision to reduce Chacon's permit was

upheld on appeal.   See Reply in Support at 12.   The Defendants also assert that the Complaint does not support the Plaintiffs' allegation that Chacon was singled out by Trujillo, because the Plaintiffs do not allege that "other permittees allowed their cattle to remain on the National Forest after the end of the grazing season and were not sanctioned or allege any other factual basis upon which the Court could conclude that Plaintiff Chacon was singled out."   Reply in Support at 13 (internal quotations omitted).   The Defendants assert that no facts support these allegations and thus do not sufficiently plead a retaliatory motive.   See Reply in Support at 13 (citing Parker v. Standifird, No. CV 11-6312, 2012 WL 925718, at *1 (10th Cir. Mar. 20, 2012)).

Regarding the allegedly "threatening letter" which Trujillo sent to the Plaintiffs in May, 2009, the Defendants contend that the Complaint "does not describe the purported threats and does not offer an actual basis upon which one could conclude the letter was sent in retaliation."   Reply in Support at 13.   The Defendants also assert that the Plaintiffs have not alleged that they suffered any injury as a result of the threatening letter, because the Plaintiffs continued to publicly criticize Trujillo's management of the Allotments after receiving the letter.   See Reply in Support at 13.

The Defendants also assert that the Plaintiffs have not shown how Trujillo's attempts to orchestrate buyouts of the Plaintiffs' permits were retaliatory acts.   The Defendants contend that Trujillo was given the responsibility of managing the Allotment, which was in decay, and thus Trujillo's "exploration of different solutions is not surprising."   Reply in Support at 14.   The Defendants point out that the Plaintiffs have not alleged that Trujillo attempted to coerce the Plaintiffs into selling their permits, and that the Plaintiffs do not put forward evidence that Trujillo's contact with outside groups was retaliatory or harmed the Plaintiffs.   See Reply in Support at 14.

The Defendants also assert that the Plaintiffs have failed to plead facts to show that

retaliation motivated the 2010 Decision Notice.   The Defendants assert that the Plaintiffs have not shown how the 2010 Decision Notice was a departure from established procedures, because the Plaintiffs have not submitted any evidence of a policy which requires rangers to follow certain procedures.   See Reply in Support at 14-15.   The Defendants assert that "the policy requirement . . . is for Defendant Trujillo to consider all alternatives."   Reply in Support at 15 (citing 40 C.F.R. §§ 1505.1(e), 1500.2)(internal alteration omitted).   The Defendants assert that the Plaintiffs provide no facts to support their contention that Trujillo decided to reduce the Plaintiffs' grazing permits by eighteen-percent before the 2010 EA was published.   The Defendants assert that Trujillo considered alternative remedies and chose a course of action after the 2010 EA was published, "in compliance with the requirements of NEPA."   Reply in Support at 15.

The Court held a hearing on November 9, 2012.   See Transcript of Hearing, taken November 9, 2012 ("Tr.").[4]   The Defendants began by asserting that the Plaintiffs have failed to state a claim for which relief can be granted, because Bivens does not provide for the remedy which the Plaintiffs seek, and because the Plaintiffs have failed to allege facts which support the reasonable or plausible conclusion that Trujillo's actions were retaliatory to Plaintiffs' free speech. See Tr. at 3:7-13 (Keegan).   The Court noted that the Plaintiff's claims under the APA do not provide for damages as a remedy, and the Defendants agreed.   See Tr. at 3:20-24 (Court, Keegan). The Court then inquired if the Defendants have case law to support the APA being a comprehensive remedial scheme, even though damages are not available under the APA, but are available in a Bivens suit.   See Tr. at 3:25-4:3 (Court).   The Defendants assert that, under Wilkie v. Robbins, the Supreme Court "indicated that the APA was sufficient even if it didn't provide

---

[4] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

damages for those injuries which the APA addresses."   Tr. at 4:4-8 (Keegan).

The Defendants asserted that there have been at least a dozen cases in which the Supreme Court has declined to recognize a <u>Bivens</u> action since the Court last recognized a <u>Bivens</u> action in the 1970s.   <u>See</u> Tr. at 4:19-24 (Keegan, Court).   The Defendants asserted that the only case in which the Supreme Court addressed the APA's adequacy as an alternative remedial scheme was <u>Wilkie v. Robbins,</u> in which the Supreme Court found the APA to be an adequate remedy.   <u>See</u> Tr. at 4:24-5:5 (Court, Keegan).   The Defendants also asserted that the Tenth Circuit, in <u>McConaha v. Fed. Aviation Admin.,</u> has found the APA to be an adequate alternative remedial scheme to a <u>Bivens</u> suit.   <u>See</u> Tr. at 5:6-10 (Court, Keegan).   The Defendants thus asserted that the Tenth Circuit has ruled that "a <u>Bivens</u> action is not available for actions attempting to hold individual defendants liable for alleged constitutional violations they may have committed in the process of reaching a final agency decision."   Tr. at 5:23-6:4 (Keegan)(quoting <u>McConaha v. Fed. Aviation Admin.,</u> 514 F. App'x at 916).   The Defendants asserted that the Tenth Circuit has also shown a "reluctance to extend the <u>Bivens</u> remedy" in cases which predate <u>Wilkie v. Robbins,</u> and that the Tenth Circuit has not addressed extending the <u>Bivens</u> remedy since <u>Wilkie v. Robbins.</u>   Tr. at 6:15-19 (Keegan).   The Defendants also asserted that qualified immunity operates the same under <u>Bivens</u> as it does under 42 U.S.C. § 1983.   <u>See</u> Tr. at 7:17-22 (Court, Keegan).   The Court inquired of the Defendants in which case the Supreme Court addressed qualified immunity under <u>Bivens,</u> and the Defendants answered that in <u>Ashcroft v. Iqbal</u> the Supreme Court discussed qualified immunity under Bivens, on a motion to dismiss for failure to state a claim.   Tr. at 7:23-8:8 (Court, Keegan).

The Court asked the Defendants whether they had raised any issue regarding the "clearly established prong of qualified immunity," and the Defendants said that they had not, and that they

had only challenged whether the Plaintiffs suffered a constitutional violation.   Tr. at 8:12-21 (Court, Keegan).   The Court inquired whether it needed to reach the issue of a constitutional violation if it determined that there was no <u>Bivens</u> action, and the Defendants asserted that the Court is correct in that it need not determine whether a constitutional violation occurred if the Court finds that a <u>Bivens</u> action is not available for the Plaintiffs.   <u>See</u> Tr. at 8:19-9:2 (Court, Keegan).

The Defendants then asserted that a special factor counseling hesitation in this case is the Supreme Court's "hesitation" to recognize any new <u>Bivens</u> action, but the Court questioned whether that is a special factor.   Tr. at 9:7-15 (Keegan, Court).   The Court asked the Defendants to articulate how the Supreme Court's hesitation to recognize a new <u>Bivens</u> action is a special factor counseling hesitation, and the Defendants asserted that the special factor is that extending a new <u>Bivens</u> action is "rare if ever essential[.]"   Tr. at 9:23-10:5 (Court, Keegan).

The Defendants also asserted that another "very important" factor is that the practicality of recognizing the Plaintiffs' <u>Bivens</u> account would make it "very difficult" for any district ranger to "get any work done," if rangers had to be "concerned about a personal lawsuit against them for every decision they had to make on the national forest or elsewhere."   Tr. at 10:6-12 (Keegan). The Defendants asserted that, were the Court to recognize the Plaintiffs' <u>Bivens</u> action, it would be very easy for a plaintiff to "fabricate a <u>Bivens</u> claim, particularly under circumstances such as we have here."   Tr. at 10:12-14 (Keegan).   The Defendants asserted that any ranger's public decision adverse to a portion of the public could be construed as a retaliatory action if a <u>Bivens</u> action is available for plaintiffs who comment publicly against a ranger's forthcoming decision, before a ranger decides on a course of action, when a proposed plan is released to the public.   <u>See</u> Tr. at 10:12-11:1 (Keegan).

The Court inquired whether fear of a federal suit is a genuine deterrent to a federal employee's work, because "if they get sued there's probably no personal liability."   Tr. at 11:2-8 (Court).   Counsel for the Defendants, Ruth Keegan, responded that she had "yet to meet an individual that got sued that did not take it extremely personally, first of all; and second of all they are personally sued" under Bivens.   Tr. at 11:11-14 (Keegan).   The Court responded that United States Attorney General Eric Holder is "sued quite a bit in my Court and I don't think he gets personally worked up about that."   Tr. at 11:15-17 (Court).   The Defendants responded that an average federal employee "works very hard to do the best they can to do their job," and that the "threat of litigation hanging over [an average federal employee's] head if they reach a decision that is unpopular" does not serve the mission of a federal agency or of the government.   Tr. at 11:18-23 (Keegan).   The Defendants asserted that an average federal employee may have to pay for their own defense, and has no security when sued in his or her individual capacity.   See Tr. at 12:1-6 (Keegan).   The Defendants did not have any other special factors counseling hesitation of which to make the Court aware at the hearing.   See Tr. at 12:23-13:1 (Court, Keegan).

The Plaintiffs asserted that, in "every possible civil rights claim against every possible defendant," the defendant asserts that the fear of lawsuits "deter[s] them and whatnot."   Tr. at 13:5-12 (Rosenstock).   The Plaintiffs admitted that they were not sure whether their APA claims could grant them the prospective relief which they seek for their First Amendment violations, a relief available under the Declaratory Judgment Act which would stop the proposed reduction in their grazing permits.   See Tr. at 13:13-24 (Rosenstock, Court).   The Plaintiffs contended that, under the Declaratory Judgment Act, they would be able to pursue discovery "necessary to demonstrate intent or motive," which goes beyond the record review that the APA allows.   Tr. at 14:1-6 (Rosenstock).   The Plaintiffs contended that demonstrating that Trujillo violated an

"unwritten practice and policy" within the Santa Fe and Carson National Forests by not adopting the 2010 EA's recommendation, and by choosing to reduce the Plaintiffs' permits by eighteen-percent, would require discovery beyond that which a record review uncovers, and would require the discovery available under the Declaratory Judgment Act.   Tr. at 14:8-25 (Rosenstock).

The Court questioned whether the Plaintiffs have brought a First Amendment claim under the Declaratory Judgment Act only to be able to discover additional evidence.   See Tr. at 15:1-6 (Court, Rosenstock).   The Plaintiffs asserted that they believe that Trujillo's decision to reduce their permits by eighteen-percent was "motivated almost entirely, if not entirely, by the fact that since 2006 [the Plaintiffs] had begun criticizing [D]efendant Trujillo to the [C]ongressional delegation" and her supervisors.   Tr. at 15:7-14 (Rosenstock).   The Plaintiffs asserted that there "was a reason why the normal procedure of adopting the findings of the EA were [sic] disregarded in this case."   Tr. at 15:16-18 (Rosenstock).   The Plaintiffs contended that the centerpiece of their Complaint is the First Amendment claim, which "can be addressed to some extent in the APA," but that they also have a claim under the First Amendment for declaratory injunctive relief.   Tr. at 15:19-25 (Rosenstock).

The Court inquired what the Plaintiffs are seeking through the Declaratory Judgment Act, and the Plaintiffs asserted that they are seeking declaratory injunctive relief.   See Tr. at 16:6-10 (Court, Rosenstock).   The Court stated that it does not see how the Declaratory Judgment Act offers a different remedy that the APA, in that both would provide for equitable relief.   See Tr. at 16:11-15 (Court).   The Plaintiffs asserted that the Declaratory Judgment Act could provide for injunctive relief in addition to equitable relief.   See Tr. at 16:16-22 (Court, Rosenstock).   The Court inquired what injunctive relief the Plaintiffs could have if the Court, under the APA, determined that the Defendants had reduced the Plaintiffs grazing too much.   See Tr. at 17:1-6

(Court).   The Plaintiffs asserted that they would be entitled to having the decision to reduce the permits set aside, as well as to recover monetary damages for the harms that the permittees suffered.   See Tr. at 17:12-18 (Rosenstock).   The Plaintiffs asserted that, under the APA, they would receive a guarantee that the Defendants would follow the NEPA process, but nothing more. See Tr. at 17:18-22 (Rosenstock).   The Plaintiffs contended that, if the Court finds their First Amendment rights were violated, they would receive a very different remedy than if the Court finds only that the Defendants violated NEPA.   See Tr. at 17:23-18:1 (Rosenstock).

The Court inquired whether the Plaintiffs could raise their First Amendment claim in the context of an APA action, and the Plaintiffs stated they could.   See Tr. at 18:2-8 (Court, Rosenstock).   The Plaintiffs nonetheless contended that they would not be entitled to the same compensatory damages under the APA as they are under the Declaratory Judgment Act.   See Tr. at 18:9-20 (Court, Rosenstock).

Regarding the availability of a Bivens action for the Plaintiffs, the Plaintiffs contended that they are not alleging that the Unit's decay is Trujillo's fault.   See Tr. at 18:24-19:1 (Rosenstock). The Plaintiffs asserted that they are alleging that Trujillo violated the Jarita Mesa Permittees' and Alamosa Permittees' constitutional rights, through punishing those Plaintiffs for the exercise of the First Amendment rights by deciding to reduce the number of available permits by eighteen-percent.   See Tr. at 19:1-12 (Rosenstock).   The Plaintiffs contended that Trujillo had decided to reduce their permits "nine or ten months before the [E]nvironmental [A]ssessement" was issued, and pointed out that she informed the Plaintiffs of her intention to reduce their permits. Tr. at 19:12-18 (Rosenstock).   The Plaintiffs contended that, in Wilkie v. Robbins, the Supreme Court did not reach the issue of whether the APA was an adequate remedy.   See Tr. at 19:19-21 (Rosenstock).   The Plaintiffs contended that the Supreme Court has assumed "that a Bivens claim

would exist" for alleged Equal Protection violations, as well as First Amendment violations.   Tr. at 20:12-21:1 (Rosenstock)(citing Ashcroft v. Iqbal; Hartman v. Moore, 547 U.S. 250, 256 (2006)); Tr. at 21:3-6 (Court, Rosenstock).   The Court inquired of the Plaintiffs what their assessment is of the Supreme Court's desire to recognize Bivens actions since the 1970s, and the Plaintiffs asserted that the Supreme Court has recognized Bivens actions, citing Carlson v. Green and Davis v. Passman.   See Tr. at 21:14-23 (Court, Rosenstock).   The Plaintiffs further asserted that, for an alternative remedy to be adequate, the Supreme Court has recognized an alternative remedy only where a plaintiff could be made whole "at least in the economic sense," and where the judicial branch had a "convincing reason" to refrain from allowing a Bivens suit for damages.   Tr. at 22:8-25 (Rosenstock)(citing Schweiker v. Chilicky, Wilkie v. Robbins).   The Plaintiffs also contended that, in Wilkie v. Robbins, the Supreme Court based its decision to not recognize a Bivens action on the cases' "highly unusual" set of facts.   Tr. at 23:3-7 (Rosenstock).   The Plaintiffs contended that Wilkie v. Robbins presented a factual circumstance "that strayed far from your traditional First Amendment[-]type retaliation claim," a claim which the Plaintiffs assert the Supreme Court has recognized.   Tr. at 24:2-9 (Rosenstock).   The Plaintiffs contended that the claims they bring are different from those in Wilkie v. Robbins in that, in Wilkie v. Robbins, the Supreme Court was confronted with "a legitimate process in which each side has a legitimate purpose in taking action contrary to [each] other's interest," which the Plaintiffs assert is not the factual situation of their claims in Count I.   Tr. at 24:10-16 (Rosenstock)(citing Wilkie v. Robbins).

The Plaintiffs discussed Minneci v. Pollard, in which the Supreme Court found that an adequate alternative to a Bivens action was present in the California tort law remedies.   See Tr. at 24:20-25:13 (Rosenstock).   The Plaintiffs asserted that the Supreme Court found the tort law

remedies to be adequate, because the alternative remedies present provided roughly similar incentives for potential defendants to comply with the constitutional interest at issue and also provided a roughly similar compensation to the victim of the purported violations.  See Tr. at 25:14-19 (Rosenstock).   The Plaintiffs contended that deterrence was specifically served by the California tort law remedies, because tort law allowed for punitive, as well as compensatory, damages.  See Tr. at 25:20-24 (Rosenstock).

The Plaintiffs contended that the APA is not a remedial scheme like California tort law, which could preclude their Bivens action.  See Tr. at 25:25-26:4 (Rosenstock).  The Plaintiffs contended that the APA does not provide a sufficient deterrent effect for future constitutional violations that Trujillo committed or other similarly placed officials may commit, even if the Court sets aside Trujillo's decision to reduce the Plaintiffs' permits by eighteen-percent.  See Tr. at 26:5-12 (Rosenstock).  The Plaintiffs asserted that setting aside a decision does not have the deterrent effect seen in Minneci v. Pollard, which provided "full economic compensation."   Tr. at 26:13-22 (Rosenstock).  The Plaintiffs further contended that, even if they are able to obtain compensatory benefits under the APA, that remedy would still be incomplete if they cannot get emotional distress damages or punitive damages.  See Tr. at 26:23-27:5 (Rosenstock).  The Plaintiffs asserted that, unless the Defendants will agree that the Plaintiffs can be made "whole at least in a pecuniary sense," then their remedy under the APA is incomplete.  Tr. at 27:13-17 (Rosenstock)(citing Bush v. Lucas and Schweiker v. Chilicky).  The Plaintiffs asserted that the Tenth Circuit has found that the APA is an adequate remedy where plaintiffs are able to receive "reinstatement and back pay" for a wrongful termination.  Tr. at 27:18-25 (Rosenstock)(citing Bush v. Lucas).

The Plaintiffs asserted that the Defendants have not addressed the adequacy of the APA's

deterrent effect at all, a required inquiry under Minneci v. Pollard.   See Tr. at 28:2-6 (Rosenstock).   The Plaintiffs further contended that they have "alleged some actions that we claim were retaliatory . . . that would not be considered final agency actions" subject to the APA's remedial scheme.   Tr. at 30:19-25 (Rosenstock).   The Plaintiffs asserted that Trujillo's "threatening letters and statements" to the Plaintiffs, and Trujillo's attempt to buyout the Plaintiffs' permits, are retaliatory actions that are not final agency decisions.   Tr. at 31:1-9 (Rosenstock).   The Plaintiffs contended that Minneci v. Pollard is the Supreme Court's "latest word" on Bivens actions, that the Supreme Court placed an "emphasis on the plaintiff being able to obtain roughly similar relief," and that the Plaintiffs are not able to receive full relief under the APA.   Tr. at 31:10-17 (Rosenstock).

The Court noted that, since the 1980s, there "seems to be a hostility from the Supreme Court toward any sort of implied cause of action or Bivens action."   Tr. at 32:2-6 (Court).   The Court noted that, although some of the cases from the Supreme Court may be distinguishable from the facts of the Plaintiffs' case, the Supreme Court nonetheless does not seem inclined to find an implied cause of action, as the Supreme Court appears to be "restricting the ability to sue the Federal Government for damages."   Tr. at 32:6-12 (Court).   The Plaintiffs admitted that "[i]t's hard to disagree" with the Court's summation of the Supreme Court's tendency to deny Bivens actions, but nonetheless asserted that their case present "classically core" First Amendment violations which are viable Bivens actions.   Tr. at 32:16-33:1 (Rosenstock).   The Court asked the Plaintiffs how they respond to the Defendants' contention that "it's so easy to fabricate one of these" claims, and the Plaintiffs responded that their case is not one which can be fabricated, as Trujillo's reaction to several years of the Plaintiffs' criticism was to "deviate[] from Forest Service practice and custom and totally disregard[] what the [E]nvironmental [A]ssessment had

recommended be done," contrary to the Plaintiffs' well-being.   Tr. at 33:7-17 (Rosenstock).   The Plaintiffs contended that these facts put their case "far outside the type of hypothetical that [the Defendants were] suggesting."   Tr. at 33:25-34:2 (Rosenstock).

The Court then asked the Defendants to respond to the Plaintiffs' contention that, where the courts have not recognized a <u>Bivens</u>, the courts have not denied the <u>Bivens</u> action because the APA was an adequate substitute or comprehensive scheme, but rather denied the <u>Bivens</u> action because other factors counseled against recognizing the cause of action.   <u>See</u> Tr. at 34:11-18 (Court).   The Defendants asserted that <u>Wilkie v. Robbins</u> stands for the "broad proposition" that a court should not recognize a <u>Bivens</u> action should where: (i) there is "already a statutory scheme that provides compensation;" and (ii) Congress has already developed a system to handle a plaintiffs' alleged constitutional violations.   Tr. at 34:19-35:5 (Keegan).   The Court inquired how a constitutional claim would work if alleged under the APA, and the Defendants' counsel stated that she had "not handled many APA cases," but pointed out that the APA specifically provides for an agency decision to be overturned if it violates the Constitution, even if the decision was correct.   Tr. at 35:6-18 (Court, Keegan).   The Court inquired whether the Plaintiffs would be able to raise the "identical arguments against Ms. Trujillo in" an APA case as they are now, and the Defendants responded that the Plaintiffs could raise the identical arguments.   Tr. at 35:20-36:3 (Court, Keegan).   The Defendants contended that Congress established through the APA procedures for handling constitutional violations.   <u>See</u> Tr. at 36:6-15 (Keegan).

The Court inquired whether the Plaintiffs would be able to argue their First Amendment claim in the context of the APA, and the Defendants asserted that the claim "can be litigated in the context of the APA . . . as limited by the APA."   Tr. at 37:3-11 (Court, Keegan).   The Defendants asserted that the APA's limitations on remedies, procedures, and scope of review are the methods

that Congress has chosen for reviewing alleged constitutional violations.   See Tr. at 37:8-11 (Keegan).   The Court inquired whether the APA provides a damages remedy, and the Defendants stated that it does not.   See Tr. at 37:12-19 (Court, Keegan).   The Defendants stated that the APA provides "[v]ery, very limited" monetary relief, which would not be available for the Plaintiffs' claims.   Tr. at 37:20-23 (Court, Keegan).   The Defendants stated that an APA remedy may allow a plaintiff to be reimbursed for fines associated with a wrongful penalty, but that there are not damages available under the APA.   See Tr. at 37:25-38:2 (Keegan).   The Defendants affirmed that the issue is whether, through the APA, the Plaintiffs would be able to receive individual damages or whether the Court should set aside Trujillo's 2010 Decision through the APA.   Tr. at 38:3-7 (Court, Keegan).   The Defendants asserted that, in Nat'l Commodity & Barter Assoc. v. Archer, the Tenth Circuit found that the "unavailability of complete relief does not mandate a creation of a Bivens action."   Tr. at 38:7-39:12 (Keegan).   The Defendants asserted that the Supreme Court indicated, in Schweiker v. Chilicky, that the completeness of the relief available under an alternative remedial scheme is "not a factor when you're looking at what Congress has done, and when Congress has indicated, [by passing] a statute, that it has determined the relief and the scope of that relief" to be the bounds of relief for an alleged constitutional violation.   The Defendants further asserted that the Supreme Court intends for lower courts to defer to Congress's decision regarding the scope of available relief.   Tr. at 39:13-19 (Keegan).

Regarding the Plaintiffs' contention that the APA does not deter further First Amendment violations, the Defendants asserted that the Plaintiffs are making a "huge assumption[] that a lawsuit based on Ms. Trujillo's conduct does not have any sort of . . . affect on her."   Tr. at 39:20-40:4 (Court, Keegan).   The Defendants also asserted that the Court could issue an injunction against Trujillo under the APA, which would deter her from violating the Plaintiffs'

rights in the future.   See Tr. at 40:5-13 (Keegan).   The Defendants asserted that, "if Congress has spoken, it doesn't matter, essentially," if Congress "decided what is appropriate relief under the [APA], . . . that is what this Court must defer to."   Tr. at 40:14-18 (Keegan).

Regarding the Plaintiffs' request for declaratory relief under the Declaratory Judgment Act, the Defendants contended that declaratory relief is inappropriate here, because there would be no future benefit to the Plaintiffs through declaring that Trujillo violated the Plaintiffs' rights in the past.   See Tr. at 40:19-41:11 (Court, Keegan).   The Court inquired whether the Plaintiffs need to assert a claim under the Declaratory Judgment Act to receive equitable relief, or if the APA provides the same equitable relief, and the Defendants asserted that, in their reading of the Complaint, the Plaintiffs are only seeking a declaration that Trujillo violated their rights in the past.   See Tr. at 41:12-24 (Court, Keegan); id. at 42:2-22 (Keegan, Court).

Last, the Defendants asserted that, under Wilkie v. Robbins, "if there is any factor indicating hesitation," the Court should not recognize a Bivens action.   Tr. at 42:24-43:4 (Keegan).   The Defendants asserted that recognizing a Bivens action here would "have a very stifling effect on the Government and how the Government is going to operate," which warrants hesitation.   Tr. at 43:7-10 (Keegan).   The Defendants contended that the Plaintiffs' allegation that Trujillo's May, 2009 letter was retaliatory is problematic, because rangers send out "thousands" of similar letters each month.   Tr. at 43:11-16 (Keegan).   The Defendants thus argued that "if a district ranger has to think twice about sending such a letter because they might be [accused] of [retaliation] nothing[ is] going to happen."   Tr. at 43:17-29 (Keegan).   The Defendants asserted that allowing a suit against Trujillo in her individual capacity would bring the Forest Service "to a stop" and would inhibit the USFS from pursuing its mission.   Tr. at 43:24-43:6 (Keegan).

The Court pointed out that the people are not dissuaded from joining the police force, nor do police not do their job, because of the existence of numerous excessive force cases, and thus the Court expressed that it is not persuaded that the threat of a lawsuit would chill a ranger from doing his or her job.   See Tr. at 44:7-10 (Court); id. at 44:12-15 (Court).   The Defendants asserted that Plaintiffs' alleged cause of action is one for which the facts are "easy to generate."   Tr. at 44:21-22 (Keegan).   The Defendants contended that the public could create a cause of action by speaking out against a federal official in anticipation of that federal official's upcoming decision. See Tr. at 45:1-5 (Keegan).   The Court pointed out that the way to deal with such cases under § 1983 is not by ruling that there is no cause of action, but rather by ruling that there is no proof of a violation.   See Tr. at 45:10-14 (Court).   The Defendants contended that the Plaintiffs' cause of action is different, in that the public is aware that a ranger will be making a decision in the future, the possible decisions are available for the public to review before the decision is made, and thus, a person could decide to speak out publicly against the ranger before the decision is made to dissuade the ranger from making a decision contrary to the person's interest, so that the ranger cannot be sued for retaliation under Bivens.   See Tr. at 45:20-46:5 (Keegan).   The Defendants asserted that the situation is thus different from that where a plaintiff fabricates a § 1983 case after the fact, because a plaintiff could create the case before the ranger acts so as to keep the ranger from making a decision contrary to the plaintiff's interests.   See Tr. at 45:15-19; id. at 46:6-11 (Keegan).   The Defendants asserted that the difference is "between literally being able to generate the facts to make a lawsuit that are truthful facts that make a lawsuit go forward versus making up facts about what happened in the past."   Tr. at 46:15-18 (Keegan).

Regarding the Defendants' contention that the Plaintiffs are not seeking prospective relief, the Plaintiffs pointed out that paragraphs twelve and fourteen of the Complaint ask for injunctive

relief voiding the 2010 Decision, and granting prospective relief regarding future decision-making. See Tr. at 47:2-7 (Rosenstock). The Plaintiffs asserted that they could amend the Complaint to make their request more clear if needed. See Tr. at 47:9-11 (Rosenstock). The Plaintiffs also asserted that the Defendants have mischaracterized the Tenth Circuit's holding in Nat'l Commodity & Barter Assoc. v. Archer; the Plaintiffs asserted that the Tenth Circuit recognized a First Amendment claim against the Internal Revenue Service, a defendant in that case, but denied the Bivens action for the plaintiffs' request to recover wrongful penalty assessments, because other statutes allowed the plaintiffs to recover for penalties wrongfully imposed. See Tr. at 47:12-25 (Rosenstock). The Plaintiffs asserted that, in contrast, they are not able to recovery any damages under the APA, let alone for economic loss. See Tr. at 48:1-5 (Rosenstock).

Regarding the Defendants' contention that the relief available need not be complete for an alternative remedial scheme to preclude a Bivens action, the Plaintiffs contended that there is not precedent to support precluding a Bivens action where the alternative remedial scheme provides only for a decision to be set aside. See Tr. at 48:6-12 (Court, Rosenstock). The Plaintiffs contended that they have suffered a "significant loss economically," in addition to pain and suffering related to that economic loss. Tr. at 48:15-18 (Rosenstock). The Plaintiffs asserted that some of them have had to sell cattle, because, after Trujillo made the forest unavailable, they could not afford to keep their cattle in another location. See Tr. at 48:19-22 (Rosenstock). The Plaintiffs asserted that they should be allowed to proceed under the Declaratory Judgment Act to recover prospective and equitable relief from Trujillo's actions, and the Plaintiffs asserted that the availability of similar relief under the APA is "unclear." Tr. at 48:22-49:4 (Rosenstock). The Plaintiffs asserted that the APA "was not designed by Congress to address constitutional injury,"

and that, although the APA allows a court to set aside a decision if a constitutional deprivation caused the decision, Congress designed the APA to "prevent governmental agencies from engaging in arbitrary and capricious decisions."   Tr. at 49:4-9 (Rosenstock).

The Plaintiffs contended that a First Amendment or race discrimination claim cannot be proven under the APA's procedure of reviewing governmental records, because it would "take a pretty stupid [g]overnment official to put in the record" evidence of discrimination or retaliation. Tr. at 49:10-16 (Rosenstock).   The Plaintiffs asserted that a First Amendment or race discrimination claim can only be proved by "developing circumstantial evidence" from which the factfinder can "infer discriminatory intent."   Tr. at 49:17-20 (Rosenstock).   The Plaintiffs contended that they have set forth "a host of specific facts that are the type that the courts have recognized for years as the type of facts that show pretext from which the trier of fact can infer discriminatory intent."   Tr. at 49:20-23 (Rosenstock).   The Plaintiffs asserted that the records reviewed in an APA action will not reveal that the goal of the 2010 EA was to protect cattle grazers, which the 2010 Decision Notice ignored.   See Tr. at 50:11-15 (Rosenstock).   The Plaintiffs asserted that the Complaint sets forth various USFS policies that demonstrate a goal of conforming to the needs of particular communities for historical and cultural reasons, but that those policies would not be included in a review of the record.   See Tr. at 50:16-23 (Rosenstock).

The Plaintiffs further asserted that Congress has not specifically stated that the APA is designed to address the claims which the Plaintiffs are bringing and that the APA is not an adequate remedy, because the APA does not allow the Plaintiffs to recover for their economic losses.   See Tr. at 51:2-13 (Rosenstock).   The Plaintiffs contended that the APA is thus unlike the alternative remedies available in Bush v. Lucas and in Schweiker v. Chilicky, because those remedial scheme allowed the plaintiffs to recover compensatory damages, which the APA does

not allow.  See Tr. at 51;14-20 (Rosenstock).  The Plaintiffs contended that the Defendants'
theories would make any ranger who acts in retaliation to the public's complaints immune from
damages, because the ranger would not "be crazy enough to say" that he or she took a course of
action in retaliation to or out of discrimination towards a group of people.  Tr. at 51:21-52:4
(Rosenstock).

The Defendants responded that "at least four other Court of Appeals have found that the
APA is an adequate remedy and that Congress intended it to be the remedy" for administrative
decisions.  Tr. at 53:20-25 (Keegan, Court).  The Defendants asserted that the plaintiffs in Wilkie
v. Robbins alleged very similar violations to those that the Plaintiffs allege in this case, and that, in
Wilkie v. Robbins, the Supreme Court "specifically [] pointed out that there are remedies . . . that
would have been adequate if all [the] individual claim[s] were violations of the APA."  Tr. at
54:2-13 (Keegan).

The Defendants then argued that, in response to the Plaintiffs' claim for declaratory
judgment, that the requests for declaratory judgment that the Defendants violated the Plaintiffs'
rights in the past, not other portions of the Complaint that ask for prospective relief, are the claims
which the Defendants are moving to dismiss.  See Tr. at 54:21-55:7 (Keegan).  The Defendants
stated that they are moving to dismiss the paragraphs which request declaratory relief for past
violations of the Plaintiffs' rights.  See Tr. at 55:8-20 (Keegan)(referring to Complaint ¶¶ 1-2, at
53).

The Defendants then argued in support of their motion that the Plaintiffs had failed to state
a claim for a violation of their First Amendment rights.  See Tr. at 55:21-22 (Keegan, Court).
The Defendants asserted that the Plaintiffs have failed to allege facts sufficient for the Court to
conclude that Trujillo's 2010 Decision Notice was connected to any of the Plaintiffs' speech.  See

Tr. at 56:5-11 (Keegan).   Regarding the Plaintiffs' argument that a federal official will not create

a record evidencing retaliation, the Defendants asserted that such evidence would support a claim

against Trujillo in her official capacity, and not her in her individual capacity, and the Defendants

stated that they were moving to dismiss the claims against Trujillo in her individual capacity,

which the Defendants understood were the only claims against her in the Complaint.   See Tr. at

56:19-57:9 (Court, Keegan).

The Court inquired what evidence would be sufficient to show that a desire to chill the

Plaintiffs' speech substantially motivated Trujillo's actions, and the Defendants asserted that

evidence that Trujillo reduced grazing as soon as the Plaintiffs spoke out, or that the Plaintiffs

overheard Trujillo stating that she intended to retaliate would be sufficient.   See Tr. at 57:10-22

(Keegan, Court).   The Court stated that scienter may be alleged generally, and that proof of a

substantial motive to retaliate could be extremely difficult.   See Tr. at 57:23-25(Court); id. at

58:2-4 (Court).     The Defendants nonetheless contended that evidence showing that Trujillo

treated the Plaintiffs differently, or that she retaliated sooner than several months after the

purported speech, would be better evidence of a retaliatory motive.   See Tr. at 58:10-17 (Court,

Keegan).   The Defendants contended that the Complaint sets forth that Trujillo was always

planning to reduce the grazing permits and that there is no evidence in the Complaint that the

Plaintiffs were treated differently than anybody else.   See Tr. at 59:20-25 (Keegan).   The

Defendants asserted that Trujillo did not sign the allegedly threatening May, 21, 2009, letter, and

the letter is similar to that is sent out to thousands of permittees regarding the permittees'

compliance with the conditions of their permit.   See Tr. at 60:1-7 (Keegan).   The Defendants

thus asserted that the letter alone does not provide any evidence which "could lead a reasonable

person to conclude it is in retaliation."   Tr. at 60:7-9 (Keegan).   The Defendants also asserted that

the letter is not sufficient to chill ordinary people from speech, because, as the Plaintiffs alleged in their Complaint, the Plaintiffs spoke out against Trujillo multiple times after receiving the letter. See Tr. at 60:10-15 (Keegan).

Regarding Trujillo's alleged attempts to buyout the Plaintiffs' permits, the Defendants asserted that the Plaintiffs did not put forward any facts to show that Trujillo's actions were singling the Plaintiffs out or treating them differently than any other people with whom Trujillo interacts in the course of her work.   See Tr. at 60:16-22 (Keegan).   The Defendants asserted that Trujillo's desire to reduce grazing on the Allotments is not evidence of a retaliatory motive.   See Tr. at 61:3-8 (Keegan).   The Defendants asserted that managing the forest is part of Trujillo's job. See Tr. at 61:8-10 (Keegan).   The Defendants also contended that the Plaintiffs did not allege that either the threatening letter or Trujillo's attempts to orchestrate a buyout caused the Plaintiffs any harm, aside from offending the Plaintiffs, which the Defendants asserted is not sufficient to support a claim for retaliation.   See Tr. at 61:11-15 (Keegan).

The Plaintiffs asserted that the Complaint "read as a whole" demonstrates that they are seeking prospective relief as well as a declaration of past unlawful conduct.  Tr. at 62:7-14 (Rosenstock).   Regarding the sufficiency of their facts in the Complaint, the Plaintiffs asserted that the facts in the Complaint are detailed, and lay out the "kind of specific circumstantial evidence that the Tenth Circuit and every other court has recognized as being sufficient to demonstrate pretext and get past summary judgment," and the Court should allow the claim for a First Amendment violation to proceed on the merits.  Tr. at 62:23-63:4 (Rosenstock).   The Plaintiffs asserted one of the "well-established methods of pleading and proving retaliatory intent" is demonstrating a "violation of policies and procedures and normal practices," such as Trujillo's decision to reduce the Plaintiffs' permits by eighteen percent rather than adopt the

recommendation in the 2010 EA.   Tr. at 63:5-22 (Rosenstock).   The Plaintiffs asserted that the USFS' stated policy is to "tailor its decision to benefit the needs of the communities that lie within" the Carson Forest and Santa Fe National Forest.   Tr. at 64:1-7 (Rosenstock).   The Plaintiffs asserted that the Complaint sets forth that Trujillo decided to reduce the Plaintiffs' permits before the 2010 EA was published and that Trujillo did not care what the scientific evidence was in regards to her decision.   See Tr. at 65:5-11 (Rosenstock).   The Plaintiffs contended that Trujillo's disregard for the findings from the 2010 EA, and that she admitted to be indifferent to its findings is "evidence from which the Court as a trier [of] fact can infer retaliatory intent."   Tr. at 65:14-19 (Rosenstock).

The Court inquired whether the Plaintiffs have more circumstantial evidence of retaliatory intent than what is in the Complaint, and the Plaintiffs asserted that they do not.   See Tr. at 66:6-13 (Court, Rosenstock).   The Plaintiffs asserted that they have evidence which supports their allegation in the Complaint that normally district rangers adopt the findings of an environmental assessment.   See Tr. at 66:16-25 (Rosenstock).   The Plaintiffs asserted that this evidence demonstrates that Trujillo deviated from normal procedure and practice, which under Vill. of Arlington Heights v. Metro. Hous. Corp., is a method of proving pretext.   See Tr. at 67: 3-6 (Rosenstock).   The Plaintiffs asserted that Trujillo's 2010 Decision Notice violated several other policies, as set forth in the Complaint, including the 2002 EA's requirement that wild horses be kept within certain limits on Jarita Mesa before cattle grazing is reduced.   See Tr. at 67:13-20 (Rosenstock).

The Plaintiffs also asserted that the Court may infer retaliatory intent where a "proffered explanation for [a] decision at issue is unworthy of credence."   Tr. at 67:21-25 (Rosenstock). The Plaintiffs contended that Trujillo's explanation for the 2010 Decision was not believable.

<u>See</u> Tr. at 68:1-3 (Rosenstock).   The Plaintiffs asserted that Trujillo's statement that "grazing at the current levels is not feasible" was untrue, because the 2010 EA "had specifically concluded that they should be allowed to continue at approximately the same level, with a very minor reduction."   Tr. at 68:3-8 (Rosenstock).   The Plaintiffs also asserted that Trujillo's statement that there were only sixty-seven wild horses on the Jarita Mesa Allotment was untrue, because the sixty-seven "horse figure was taken from the study done in January of 2008," and was thus more than two-and-one-half years out of date; the Plaintiffs asserted that they have alleged, and can prove, that the number of horses on the Allotment was over one-hundred and probably closer to one-hundred-fifty at the time of Trujillo's decision.   Tr. at 68:9-24 (Rosenstock).   The Plaintiffs also asserted that Trujillo's statement that the eighteen percent "reduction would have no effect on the goals and objectives" of the Unit was untrue, as the Plaintiffs allege in the Complaint that 2010 Decision Notice violated the Unit's.   Tr. at 72:1-7 (Rosenstock).

Regarding the Defendants' assertion that the Complaint fails to allege disparate treatment, the Plaintiffs asserted that that is "just one method of proving retaliatory intent or race discrimination," and not the only method.   Tr. at 71:14-19 (Rosenstock).   The Plaintiffs asserted that they had "set forth evidence of a pattern of retaliatory conduct by [D]efendant Trujillo [beginning[ back in . . . 2006."   Tr. at 72:13-19 (Rosenstock).   The Plaintiffs pointed out that they have alleged that: (i) Trujillo's 2006 refusal to allow the Plaintiffs to graze after her supervisor determined that weather conditions allowed the grazing season to last as allowed under their permits was retaliatory; (ii) Trujillo's refusal to allow Correia to examine documents in her office was retaliation for Correia's support of the Plaintiffs; and (iii) Trujillo's attempts to buyout the Plaintiffs' permits was beyond the scope of her position and retaliatory.   <u>See</u> Tr. at 72:13-73:22 (Rosenstock).

The Defendants asserted that the Plaintiffs "misunderstand[] what [] has to [be] alleged in order to prove a claim for retaliation."   Tr. at 74:23-25 (Keegan).   The Defendants asserted that, in a Title VII employment discrimination case, the Court would use a burden-shifting analysis after a plaintiff alleged pretext, but the Defendants contended that pretext is insufficient to show retaliation outside of the employment discrimination context.   See Tr. at 75:1-8 (Keegan).   The Defendants asserted that the Tenth Circuit requires the Plaintiffs to show that Trujillo's actions "would not have happened but for a retaliatory motive."   Tr. at 75:9-12 (Keegan).   The Defendants contended that the Plaintiffs had put forward no facts in the Complaint which show that Trujillo's decision to reduce cattle was done in retaliation for the Plaintiffs' speech.   See Tr. at 75:12-18 (Keegan).

The Defendants asserted that the letters which the Complaint references are the "kind of letter[s] that go[] out all over the place all the time."   Tr. at 75:19-76:5 (Keegan).   The Court noted that it is not aware that these letters are sent out "all the time."   Tr. at 76:13-14 (Court). The Defendants asserted that the references to letters would have been more informative to the Court had the Plaintiffs alleged that they had "never received a letter like this until we complained to" Trujillo.   Tr. at 76:18-21 (Keegan).   The Defendants asserted that the Plaintiffs' allegations regarding Trujillo's failure to "correctly apply the law," or to "reach the correct result," or to "follow NEPA" are not evidence that Trujillo's actions were retaliatory.   Tr. at 77:1-10 (Keegan). The Defendants asserted that Trujillo is not bound to "pick the option that was suggested in the NEPA analysis" and that Trujillo's position requires her to "keep an open mind, to consider all of the factors in reaching her conclusion."   Tr. at 77:11-23 (Keegan).   The Defendants contended pretext is a method of proving retaliation in an employment discrimination case, but not in a First Amendment retaliation case.   See Tr. at 78:5-11 (Court, Keegan).   The Defendants asserted that

the facts in the Complaint fail to show a "reasonable inference, beyond pure speculation" that retaliation motivated Trujillo's 2010 Decision Notice.   Tr. at 79:6-14 (Keegan).

The Plaintiffs responded that they do not believe the Defendants can prove that district rangers do not follow the recommendations in EAs as often as they adopt the recommendations. See Tr. at 80:2-14 (Rosenstock).   The Plaintiffs also asserted that the Defendants are wrong to argue that the pretext analysis applies only in a Title VII or employment discrimination context. See Tr. at 80:15-18 (Rosenstock).   The Plaintiffs contended that, under Perez v. Ellington, 421 F.3d 1128, 1132 (10th Cir. 2005) and Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. at 265, the Tenth Circuit and the Supreme Court have found that a court may infer pretext where an official fails to follow regular procedures.   See Tr. at 80:18-81:2 (Rosenstock).   The Plaintiffs also asserted that, under St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2749 (1993), Randle v. City of Aurora, 69 F.3d at 441, Laidley v. McClain, 914 F.2d 1386, 1393-94 (10th Cir. 1990), and Smith v. Maschner, 899 F.2d 940, 949 (10th Cir. 1990), circumstantial evidence which demonstrates pretext allow a factfinder to infer unconstitutional intent in the context of a First Amendment claim.   See Tr. at 81:3-14 (Rosenstock).

The Defendants contended that the term "pretext" is not used in any of the cases to which the Plaintiffs cite.   Tr. at 81:22-82:2 (Keegan).

The Court stated that it is "inclined to agree with the [P]laintiff that there's probably enough here to go forward on the Complaint" under Bell Atl. Corp. v. Twombly and Ashcroft v. Iqbal, but that the Bivens argument troubles the Court.   Tr. at 82:11-17 (Court).   The Court stated that it is likely to join with other circuits in finding that the APA provides a sufficient remedy here, and thus the Court is not inclined to allow the First Amendment claim in Count I to go forward. See Tr. at 82:17-25 (Court).

The Court inquired how the parties would structure the case if Count I is dismissed, and the Defendants responded that, if Count I is dismissed, the Defendants would produce an administrative record.   See Tr. at 83:3-14 (Court); id. at 83:19-20 (Smith).   The Court inquired how the parties would structure the case if Count I remains, and the Defendants affirmed that they would need a traditional initial scheduling order and scheduling conference.   See Tr. at 84:25-85:3 (Court, Smith).

The Plaintiffs asserted that, in Count I, they are also seeking equitable relief against Trujillo in her official capacity, and not under Bivens.   See Tr. at 86:3-8 (Rosenstock).   The Plaintiffs asserted that, under the Declaratory Judgment Act, they are seeking injunctive, declaratory and prospective relief against Trujillo for the violation of their First Amendment rights.   See Tr. at 86:16-87:1 (Rosenstock).   The Plaintiffs contended that the scope of discovery available under the APA will not provide the evidence they need to "prove a constitutional claim under any statute," as the record would not contain evidence of patterns and practices in other instances, nor would the record evidence disparate treatment as compared with people who are not permitted to graze on the Allotment in particular.   See Tr. at 87:1-10 (Rosenstock).

The Court noted that the parties may need to litigate the scope of discovery available under the APA.   See Tr. at 87:11-15 (Court).   The Defendants asserted that, in their reading of Count I, the claim was stated against Trujillo in her individual capacity, and not in her official capacity. See Tr. at 89:2-5 (Keegan).   The Defendants stated that they did not interpret Count I as a claim against the USFS and thus may file a motion to dismiss that aspect of Count I "to the extent the [C]ourt feels like it [] hasn't already been addressed."   Tr. at 89:5-8 (Keegan).   The Court stated that the Declaratory Judgment Act claim was new to the Court, and thus the Court may not rule on that aspect of Count I.   See Tr. at 89:10-12 (Court).

After the hearing, the Plaintiffs submitted an additional authority regarding the availability of a <u>Bivens</u> action for them: <u>United States v. Smith</u>, 562 F.3d 1090, 1102 (10th Cir. 2009).   <u>See</u> Plaintiffs' Notice of Additional Authority in Response to Defendants' Motion to Dismiss Count I, filed Nov. 10, 2012 (Doc. 34).   The Plaintiffs also submitted <u>Trudeau v. Fed. Trade Comm'n</u>, 456 F.3d 178, 187, 190 n.22 (D.C. Cir. 2006), as an additional authority in support of "the availability of an action for injunctive relief directly under the First Amendment."   Plaintiffs' Second Notice of Additional Authority in Response to Defendant's Motion to Dismiss Count I, filed Jan. 16, 2013 (Doc. 47).   Regarding the "availability of an action for injunctive relief directly under the First Amendment," the Plaintiffs submitted the additional authority of <u>Gilmore v. Weatherford</u>, 694 F.3d 1160, 1161 n.1 (10th Cir. 2012); <u>Sattar v. Holder</u>, No. 07-cv-02698-WDM-KLM, 2011 WL 2415738, at *2 (D. Colo. June 16, 2011); and <u>Saunders v. Wilner</u>, No. 09-cv-00114-REB-KMT, 2010 WL 582373, at *7 (D. Colo. Feb. 18, 2010).   <u>See</u> Plaintiffs' Third Notice of Additional Authority in Response to Defendants' Motion to Dismiss Count I, filed Jan. 18, 2013 (Doc. 48).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."   <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994).   The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff=s favor.   <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the

defendant prevail on a motion to dismiss."); <u>Smith v. United States</u>, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

## RELEVANT LAW ON <u>BIVENS</u>

In <u>Bivens</u>, the Supreme Court recognized that citizens may obtain money damages for injuries suffered as a result of federal agents' violation of the Fourth Amendment.   <u>See</u> 403 U.S. at 395-397.   "In <u>Bivens</u> -- proceeding on the theory that a right suggests a remedy -- this Court 'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'"   <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675 (quoting <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 66 (2001)).   <u>Copar Pumice Co., Inc. v. Morris</u>, No. CIV 07-0079 JB/ACT, 2009 WL 5201799, 13 (D.N.M.,2009)(Browning, J.), <u>aff'd</u> 639 F.3d 1025 (10th Cir. 2011)(noting that, in <u>Bivens</u>, the Supreme Court held that, "'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' 403 U.S. at 396–397.").

<u>Bivens</u> suits are the "federal analog" to suits brought against state officials under 42 U.S.C.§ 1983.   <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675-76.   Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.   Unlike suits under § 1983, <u>Bivens</u> does not allow a plaintiff to seek equitable relief -- he or she may only seek damages for alleged constitutional violations, and must look to other areas of the law to receive equitable relief for his or her injuries.   <u>See Bivens</u>, 403 U.S. at 410 (Harlan, J., concurring)("For people in Bivens' shoes, it is damages or nothing.").

[T]he decision whether to recognize a <u>Bivens</u> remedy may require two steps. In the first place, there is the question whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages . . . .   But even in the absence of an alternative, a <u>Bivens</u> remedy is a subject of judgment: 'the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.'

<u>Wilkie v. Robbins</u>, 551 U.S. at 550 (quoting <u>Bush v. Lucas</u>, 462 U.S. at 378).   "In sum, the concept of 'special factors counselling hesitation in the absence of affirmative action by Congress' has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent."   <u>Schweiker v. Chilicky</u>, 487 U.S. at 423.

The Supreme Court has not allowed a <u>Bivens</u> action since <u>Carlson v. Green</u> in 1980.

In 30 years of <u>Bivens</u> jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against <u>individual officers</u> alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked <u>any alternative remedy</u> for harms caused by an individual officer's unconstitutional conduct.

<u>Corr. Svs. Corp. v. Malesko</u>, 534 U.S. 61, 70 (2001)(emphasis in original).   "In most instances we have found a <u>Bivens</u> remedy unjustified."   <u>Wilkie v. Robbins</u>, 551 U.S. at 550.   "[A]ny freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest . . . ."   <u>Wilkie v. Robbins</u>, 551 U.S. at 550.

1. **Bivens <u>Suits are Unavailable When Congress has Provided an Adequate, Alternative Remedy</u>.**

A <u>Bivens</u> suit is not available for every alleged constitutional violation that a federal actor

commits.   "When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional <u>Bivens</u> remedies."   <u>Schweiker v. Chilicky</u>, 487 U.S. at 423.   The Supreme Court explains that, where Congress "provides an alternative remedy," which Congress intends "by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself" to preclude a remedy in federal court, a federal court should decline to allow a cause of action under <u>Bivens</u>.   <u>Bush v. Lucas</u>, 462 U.S. at 378. State law remedies may provide an adequate alternative as well.   <u>See</u> <u>Minneci v. Pollard</u>, 132 S.Ct. at 621-25 (explaining that, "in principle, the question is whether, in general, state tort law remedies provide roughly similar incentives for potential defendants to comply with the Eighth Amendment while also providing roughly similar compensation to victims of violations.").

        For example, in recognizing a <u>Bivens</u> action for a plaintiff seeing to recover against her former congressional employer for the employer's unconstitutional discrimination based upon gender, the Supreme Court found that a damages action was implicit in the Fifth Amendment's Due Process Clause, but emphasized that no "other alternative forms of judicial relief" were available to the plaintiff, and there was "no evidence" that Congress or the Constitution intended to foreclose such a remedy.   <u>Davis v. Passman</u>, 442 U.S. at 245, 248-49.   In <u>Carlson v. Green</u>, the Supreme Court allowed a <u>Bivens</u> action under the Eighth Amendment against individual officers whose deliberate indifference caused the death of a federal prisoner.   <u>See</u> 446 U.S. at 14-16.   The Supreme Court allowed the <u>Bivens</u> action, even though the prisoner's estate could have brought a claim under the Federal Tort Claims Act for damages against the United States, as the officer's employer, because the Court found that <u>Bivens</u> was a more effective deterrent for the officer's

conduct.   The Supreme Court also noted that Bivens was preferable, because a Bivens action would not leave the compensation to the "vagaries" of state tort law, but rather provide a "uniform rules" for the plaintiff's case.   446 U.S. at 21-23.   But see Minneci v. Pollard, 132 S.Ct. at 623 (declining to extend a Bivens action to a plaintiff against the employees of a privately-owned federal prison, in light of the plaintiff being able to bring his claims against the employees under state tort law); Corr. Servs. Corp. v. Malesko, 534 U.S. at 72 (declining to extend a Bivens action to a plaintiff who brought a suit against a private corporation that managed a federal prison, in part because the plaintiff had a "effective remedies" in state tort law for the corporation's alleged negligence).

   a.   **Bush v. Lucas.**

   On the other hand, in Bush v. Lucas, the Supreme Court found that federal civil service procedures provided meaningful redress for a federal employee alleging that he was dismissed for exercising his rights under the First Amendment, and the Court thus did not allow the employee to bring his claims under Bivens.   See 462 U.S. at 386-88.   Looking to legislative history, the Supreme Court noted that Congress had passed various legislation which resulted in a scheme for a federal civil servant who is discharged or demoted in retaliation for the exercise of his or her rights under the First Amendment: The Civil Service Commission.   The Supreme Court explained:

> Federal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures -- administrative and judicial -- by which improper action may be redressed. They apply to a multitude of personnel decisions that are made daily by federal agencies.   Constitutional challenges to agency action, such as the First Amendment claims raised by petitioner, are fully cognizable within this system. As the record in this case demonstrates, the Government's comprehensive scheme is costly to administer, but it provides meaningful remedies for employees who may have been unfairly disciplined for making critical comments about their

- 67 -

agencies.

462 U.S. at 386.   The employee had in fact received "retroactive reinstatement and $30,000.00 in backpay" through the Civil Service Commissions' administrative review.   462 U.S. at 386 n.29. The Supreme Court did not allow the employee to bring his claims in federal court, seeking damages for the violation of his First Amendment rights, even though the Supreme Court noted that the "civil service remedies were not as effective as an individual damages remedy and did not fully compensate him for the harm he suffered."   462 U.S. at 372.   Thus, the Supreme Court denied the employee a Bivens action even though "Congress has provided a less than complete remedy for the wrong."   462 U.S. at 373.

   **b.** **Schweiker v. Chilicky.**

   In Schweiker v. Chilicky, the Supreme Court disallowed a Bivens action for the plaintiffs, recipients of social security disability benefits, whose benefits were wrongfully terminated and had to wait months before their benefits were reinstated.   See 487 U.S. at 415.   The Supreme Court determined that Congress had provided an adequate alternative remedy through the administrative procedures of the Social Security Act, 42 U.S.C. §§ 423(a), (d).   The Supreme Court noted that Congress had outlined detailed steps for redressing an appeal for the denial of one's benefits under the Social Security System.   "At each point, Congress chose specific forms and levels of protection for the rights of persons affected by incorrect eligibility determinations under" the Social Security Act.   487 U.S. at 427.   The Supreme Court held that the Social Security Act was an adequate alternative remedy, even though Congress, as in Bush v. Lucas, failed to provide "complete relief," because the plaintiffs could only receive retroactive benefits, and not damages for emotional distress or for other "hardships suffered because of delays in their

receipt of Social Security benefits."  487 U.S. at 423.  The Supreme Court nonetheless stated that, "Congress . . . has not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were."  487 U.S. at 423.  The Supreme Court viewed the absence of such remedies within the Social Security Act as evidence that Congress was unwilling "to provide consequential damages for unconstitutional deprivations of a statutory right" and thus as justification for denying a <u>Bivens</u> action to the plaintiffs.  487 U.S. at 427.

   2.   **A Federal Court Should Decline to not Allow a Bivens Action When "Special Factors Counseling Hesitation" are Present.**

In <u>Bivens</u>, the Supreme Court indicated that suits for damages against individual federal officers would be unavailable when "special factors counseling hesitation" are present.  403 U.S. at 396.  In <u>Davis v. Passman</u>, the Supreme Court admitted that "a suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation," but noted that the Speech and Debate Clause of the Constitution, Art. I, § 6, cl. 1, shielded most Congressional actions, and thus, if not shielded by the Speech and Debate Clause, "legislator ought . . . generally to be bound by the law as are ordinary persons." 442 U.S. at 246 (internal alterations and quotations omitted).  Further, in <u>Carlson v. Green</u>, the Supreme Court indicated that calling a federal official into court to defend themselves from respondent's suit did not raise a special factor counseling hesitation, even if the federal official's ability to perform his or her duties were inhibited by the suit, because federal officials' qualified immunity "provides adequate protection."  446 U.S. at 19.  On the other hand, in <u>Schweiker v. Chilicky</u>, the Supreme Court noted that the "prospect of personal liability for official acts . . . would undoubtedly lead to new difficulties and expense in recruiting administrators for the programs Congress has established."  487 U.S. at 425.  The Supreme Court expressed that

Congress, not the judiciary, is competent at "balancing governmental efficiency and the rights of individuals." 487 U.S. at 425 (citing Bush v. Lucas, 462 U.S. at 389). Although not defined explicitly as such, the Supreme Court's concern that creating personal liability for official acts could make the recruitment process more difficult and expensive for administrative agencies caused the Supreme Court to hesitate and not allow a Bivens remedy for the plaintiffs.

      a.      **Federal Fiscal or Personnel Policy.**

The Supreme Court noted in Bivens, that a special factor could be present when a suit raises issues of "federal fiscal policy," such as were present in United States v. Standard Oil Co., 332 U.S. 301 (1947). Bivens, 403 U.S. at 396. In United States v. Standard Oil Co., federal fiscal policy was implicated, because the United States sought indemnity from an entity whose negligence caused a soldier's injury for which the United States paid. See 332 U.S. at 311, 316. "The decision regarding indemnity involved questions of employee discipline and morale, fiscal policy, and the efficiency of the federal service," which the Supreme Court believed Congress better handled than the judiciary. Bush v. Lucas, 462 U.S. at 380 (citing United States v. Standard Oil, 332 U.S. at 318; United States v. Gilman, 347 U.S. 507, (1954)).

In Bush v. Lucas, the Supreme Court found that the plaintiffs' claim of retaliatory demotion involved "federal personnel policy," similar to the "federal fiscal policy present in United States v. Standard Oil and United States v. Gilman," in that the suit would address the remedies available to the plaintiff arising from injuries in the course of the United States' relationship with its employees. 462 U.S. at 380-81. The Supreme Court indicated that this "federal personnel policy" is a special factor counseling hesitation, even though the plaintiff raised more than just monetary claims but also alleged constitutional violations, which the Supreme

Court did not address in either <u>United States v. Standard Oil</u> or in <u>United States v. Gilman</u>.   <u>See</u> 462 U.S. at 378-81.

        **b.**     **<u>Matters Incident to Military Service</u>.**

"[N]o <u>Bivens</u> remedy is available for injuries that 'arise out of or are in the course of activity incident to service.'"   <u>United States v. Stanley</u>, 483 U.S. 669, 683 (1987)(quoting <u>Feres v. United States</u>, 340 U.S. 137, 146 (1950)).   "[T]he unique disciplinary structure of the military establishment and Congress activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a <u>Bivens</u>-type remedy against their superior officers."   <u>Chappell v. Wallace</u>, 462 U.S. 296, 304 (1983).   In <u>Chappell v. Wallace</u>, the Supreme Court noted that, while in the civilian life of a democracy, the majority rules the few, in the military, the paradigm is reversed.   462 U.S. at 300.   "Military necessity makes demands on its personnel 'without counterpart in civilian life.'"   465 U.S. at 300 (quoting <u>Schlesinger v. Councilman</u>, 420 U.S. 738, 757 (1975)).   Allowing a <u>Bivens</u> suit for matters incident to military service could conflict with the "inescapable demands of military discipline and obedience to orders" that cannot be taught on battlefields, and with the "habit of immediate compliance with military procedures and orders" which must be a virtual "reflex with no time for debate or reflection."   <u>Chappell v. Wallace</u>, 462 U.S. at 300.   The "'rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty.'"   <u>Chappell v. Wallace</u>, 462 U.S. at 300 (quoting <u>Burns v. Wilson</u>, 346 U.S. 137, 140 (1953)(plurality opinion)).

        Centuries of experience has developed a hierarchical structure of discipline and obedience to command, unique in its application to the military establishment and wholly different from civilian patterns.   Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the

> military establishment.  It is clear that the Constitution contemplated that the
> Legislative Branch has plenary control over rights, duties, and responsibilities in
> the framework of the military establishment, including regulations, procedures and
> remedies related to military discipline; and Congress and the courts have acted in
> conformity with that view.

Chappell v. Wallace, 462 U.S. at 300-01.  When a matter "arises in the context of Congress'

authority over national defense and military affairs," the Supreme Court has stated that "perhaps in

no other area has the Court accorded Congress greater deference."  462 U.S. at 301 (citing

Rostker v. Goldberg, 453 U.S. 57, 64-65 (1981).

> The special status of the military has required, the Constitution contemplated,
> Congress has created and this Court has long recognized two systems of justice, to
> some extent parallel: one for civilians and one for military personnel.  Burns v.
> Wilson, supra, 346 U.S., at 140 . . . .  The special nature of military life, the need
> for unhesitating and decisive action by military officers and equally disciplined
> responses by enlisted personnel, would be undermined by a judicially created
> remedy exposing officers to personal liability at the hands of those they are charged
> to command. Here, as in Feres, we must be "concern[ed] with the disruption of
> '[t]he peculiar and special relationship of the soldier to his superiors' that might
> result if the soldier were allowed to hale his superiors into court," Stencel Aero
> Engineering Corp. v. United States, supra, 431 U.S., at 676, . . . (Marshall, J.,
> dissenting), quoting United States v. Brown, supra, 348 U.S., at 112, . . . .

Chappell v. Wallace, 462 U.S. at 303-04.

In light of the "special statute of the military," the Supreme Court held, in Chappell v.

Wallace, that "enlisted military personnel may not maintain a suit to recover damages from a

superior officer" for racial discrimination consisting of being assigned undesirable duties, threats,

low performance evaluations, and the imposition of unusually severe penalties.  462 U.S. at 297,

303, 305.  In United States v. Stanley, the Supreme Court held that a former serviceman could not

bring a suit under Bivens against his superior officers for damages arising from the administration,

unknown to him, of lysergic acid diethylamide ("LSD"), which caused him to suffer from severe

personality changes, impaired his military service, and ultimately led to the dissolution of his

marriage.   483 U.S. at 672, 683-84.

       **c.**       **Wilkie v. Robbins.**

       In <u>Wilkie v. Robbins</u>, the Supreme Court declined to extend a <u>Bivens</u> remedy to Frank Robbins, who alleged that Bureau of Land Management ("BLM") employees "carried on a campaign of harassment and intimidation aimed at forcing him to regrant" an easement which the BLM lost because of its own inadvertence.   551 U.S. at 543.   Robbins alleged that the defendants' campaign consisted of: (i) tort-like conduct, including trespass and malicious prosecution; (ii) unfavorable agency actions, including issuing baseless citations and cancelling his right-of-way on BLM land; (iii) persuading the local sheriff not to prosecute Robbins' neighbor for having hit him with her truck while on the neighbor's land; (iv) videotaping guests at Robbins' ranch relieve themselves while driving cattle with Robbins, ostensibly in an attempt to catch Robbins trespassing on BLM land; and (v) attempts by the defendant-employees to pressure other BLM employees into impounding Robbins' cattle.   <u>See</u> 551 U.S. at 551-553.   The Supreme Court noted that it was unclear about the significance of the defendants' having persuaded the sheriff not to prosecute Robbins' neighbor and attempts to persuade another employee to impound Robbins' cattle.   The Supreme Court also noted that the videotaping may not have been unlawful, and Robbins' guests, not Robbins, would likely be the proper plaintiffs to bring any charge therefor.   Regarding the availability of alternative remedies for Robbins' remaining allegations, the Supreme Court found that he had an "administrative, and ultimately a judicial, process for vindicating virtually all of his complaints," as he could have appealed the agency decisions to the Interior Board of Land Appeals and ultimately sought judicial review under the APA.   551 U.S. at 553-54.

Robbins' alleged injuries could be redressed in a "patchwork . . . assemblage of state and federal, administrative and judicial" forums.   551 U.S. at 554.   Robbins was not seeking, however, individual remedies for each allegedly unlawful action, but rather was alleging that the defendants' "course of dealing as a whole" was a violation of his First Amendment rights.   551 U.S. at 555.   The Supreme Court found that Robbins' case presented multiple factors which weighed against recognizing a cause of actions for damages for him.   The Supreme Court explained that "trying to induce someone to grant an easement for public use is a perfectly legitimate purpose," and thus Robbins' allegations that the defendants' actions were in retaliation against him for his exercise of his First Amendment right to "keep the Government out," was not a First Amendment retaliation claim.   551 U.S. at 555-56.   The Supreme Court also noted that "Robbins' challenge . . . that the defendants simply demanded too much and went too far" created an unworkable standard for determining a defendant's liability, especially because, in Robbins' case, the defendants' tactics -- strictly enforcing rules against trespass or conditions on grazing permits -- were legitimate.   551 U.S. at 556-57.   The Supreme Court explained that, if it recognized a <u>Bivens</u> action for Robbins, "[e]xercising any governmental authority affecting the value or enjoyment of property interests would fall within the <u>Bivens</u> regime, and across this enormous swath of potential litigation would hover the difficulty of devising a 'too much' standard that could guide an employee's conduct and a judicial factfinder's conclusion."   551 U.S. at 537. The Supreme Court, thus, declined to authorize a <u>Bivens</u> action for Robbins, in part because other judicial and administrative remedies were available to him, but also because a "judicial standard to identify illegitimate pressure going beyond legitimately hard bargaining would be endlessly knotty to work out, and a general provision for tort like liability when Government employees are unduly

zealous in pressing a governmental interest affecting property would invite an onslaught of <u>Bivens</u> actions." 551 U.S. at 562.

## <u>RELEVANT LAW REGARDING THE ADMINISTRATIVE PROCEDURE ACT</u>

The APA confers jurisdiction on federal district courts with respect to non-monetary claims. <u>See</u> <u>Castella v. Army & Air Force Exch. Serv.</u>, 657 F. Supp. 25, 27 (N.D. Tex. 1986). Specifically, 5 U.S.C. § 702 provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

Under the APA, a district court has the power to:

> **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

> **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

>> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>> **(B)** contrary to constitutional right, power, privilege, or immunity;

>> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>> **(D)** without observance of procedure required by law;

- 75 -

> **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.   A district court is limited in its review, however, to the "whole record or those parts of it cited by a party."   5 U.S.C. § 706.

Through 5 U.S.C. § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief."   United States v. Murdock Mach. and Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996).   "This waiver is not limited to suits under the Administrative Procedure Act."   Simmat v. United States Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).

> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis.   Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."   As we held in Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir.2005), § 702's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act."   Id. at 1233; see also Hanson v. Wyatt, 552 F.3d 1148, 1173 n.11 (10th Cir.2008)(Gorsuch, J., concurring) ("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver." (citation omitted)).

Gilmore v. Weatherford, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012).   See also Trudeau v. Fed. Trade Comm'n, 456 F.3d at 186 (holding that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)(same).

The APA does not, through § 702, create an independent basis of jurisdiction, see Eagle–Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. 1990); it allows for judicial review of final agency action only if there is also an independent basis for subject-matter jurisdiction, see Colo. Dep't of Soc. Servs. v. Dep't of Health & Human Servs., 558 F. Supp. 337, 339 (D. Colo. 1983).   Notably, before review of the grievance may occur, the party must demonstrate that statutes do not preclude judicial review and that the law does not commit the action to agency discretion.   See Heckler v. Chaney, 470 U.S. 821, 828 (1985).

## A DISTRICT COURT'S STANDARD OF REVIEW UNDER THE APA

Pursuant to Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."   42 F.3d at 1580.

Under the APA, a reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   In reviewing a decision under the arbitrary-and-capricious standard, the Court reviews the entire administrative record or so much of that record as has been provided by the parties.   See 5 U.S.C. § 706(2).   See also Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999).   The court does not pass judgment on the wisdom or merits of the agency's decision.   See Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172 (stating that NEPA prohibits uninformed actions, but not unwise actions).   To fulfill its function under the arbitrary-and-capricious standard of review, however, a reviewing court should engage in a "thorough, probing, in-depth review."   Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir.

- 77 -

2002)(citation omitted).   The Tenth Circuit explains the relevant standard of review:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1167 (citations and internal quotations omitted).   The

standard of review requires the district court "to engage in a substantive review of the record to

determine if the agency considered relevant factors and articulated a reasoned basis for its

conclusions."   Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580.   While the court may not

supply a reasoned basis for the agency's action not given by the agency itself, the court should

"uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(internal

citations omitted).

## LAW REGARDING SOVEREIGN IMMUNITY

"The United States cannot be sued without its consent."   Garcia v. United States, 709 F.

Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.).   "Congressional consent -- a waiver of the

traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction."

Garcia v. United States, 709 F. Supp. 2d at 1137-38.   As with any jurisdictional issue, the party

bringing suit against the United States bears the burden of proving that sovereign immunity has

been waived.   See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).   Accordingly, the

"plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his

claims."   Garcia v. United States, 709 F. Supp. 2d at 1138.   Accord Bork v. Carroll, 449 F. App'x

719, 721 (10th Cir. 2011)(unpublished)("So it is that a plaintiff seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in an FTCA case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983)).[5]

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."   United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted).   Accord FDIC v. Meyer, 510 U.S. 471, 475 (1994): United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).   A waiver of sovereign immunity cannot be implied and must be unequivocally expressed.   See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996); Wells Fargo Bank, Nat. Ass'n v. Se. New Mexico Affordable Hous. Corp., 877 F. Supp. 2d 1115, 1139-40 (D.N.M. 2012)(Browning, J.)(finding that, by the express terms of the statute, the United States waived its sovereign immunity under 28 U.S.C. § 1346(a)(2) for actions

---

[5] Garcia v. United States and Summa v. United States are unpublished opinions, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .   However, if an unpublished opinion . . .  has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."   United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court finds that Garcia v. United States and Summa v. United States have persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

seeking damages, but not when a plaintiff seeks equitable or injunctive relief).   The United States'

agencies also have sovereign immunity, absent a waiver.   See FDIC v. Meyer, 510 U.S. 471, 475

(1994)("Absent a waiver, sovereign immunity shields the Federal Government and its agencies

from suit.").

Immunity serves to limit "the general costs of subjecting officials to the risks of

trial-distraction of officials from their governmental duties, inhibition of discretionary action, and

deterrence of able people from public service."   Harlow v. Fitzgerald, 457 U.S. 800, 816 (1982).

"Harlow emphasizes that even such pretrial matters as discovery are to be avoided if possible, as

'[i]nquiries of this kind can be peculiarly disruptive of effective government.'"   Mitchell v.

Forsyth, 472 U.S. at 526 (quoting Harlow v. Fitzgerald, 457 U.S. at 817). In Liverman v. Comm.

On The Judiciary, 51 F. App'x 825 (10th Cir. 2002), the Tenth Circuit rejected the argument that

the "district court erred in staying discovery pending resolution of the Committee's motion to

dismiss," because, in part, "the Committee raised sovereign immunity and other immunity-based

defenses in its motion to dismiss."   51 F. App'x at 827.   Based on the Supreme Court's statement

that, "[u]ntil [the] threshold immunity question is resolved, discovery should not be allowed,"

Siegert v. Gilley, 500 U.S. 226, 231 (1991), the Tenth Circuit found "no logical reason why this

rule should not apply where the defendant raises the defense of sovereign immunity and the

defense is primarily one of law."   51 F. App'x at 827-28.   Accordingly, the Court has previously

allowed federal entities extensions of time so that they need not respond to pleadings until the

Court determines whether their sovereign immunity protects them from a suit.   See Hill v.

Vanderbilt Capital Advisors, LLC, No. CIV 10-0133 JB/KBM, 2010 WL 5151251, at *5 (D.N.M.

Oct. 31, 2010)(Browning, J.).

## LAW REGARDING THE DECLARATORY JUDGMENT ACT

Section 2201 of Title 28 of the United States Code provides that:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.   Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).   The Supreme Court, in <u>Maryland Cas. Co. v. Pac. Coal & Oil Co.</u>, 312 U.S. 270 (1941), announced the test for determining whether, as contemplated by the Declaratory Judgment Act, an actual controversy exists: "Basically, the question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."   312 U.S. at 273. <u>Accord</u> <u>United States v. Fisher-Otis, Inc.</u>, 496 F.2d 1146, 1151 (10th Cir. 1974).   "'A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply proclaim liability from a past act.'"   <u>Copar Pumice Co., Inc. v. Morris</u>, No. CIV 07-0079 JB/ACT, 2009 WL 5201799, at *17 (D.N.M. Oct. 23, 2009)(Browning, J.)(quoting <u>Lawrence v. Kuenhold</u>, 271 F. App'x. 763, 766 (10th Cir. 2008), <u>aff'd</u>, 639 F.3d 1025 (10th Cir. 2011)).   <u>See</u> <u>Utah Animal Rights Coal. v. Salt Lake City Corp.</u>, 371 F.3d 1248, 1266 (10th Cir.2004)(McConnell, J., concurring)("[A] declaratory judgment action involving past conduct that will not recur is not justiciable.").

The Tenth Circuit has stated that a district court should consider the following factors when deciding whether to entertain a request for declaratory relief:

- 81 -

[1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994).

Additionally, "the existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. Thus, "declaratory relief is alternative or cumulative and not exclusive or extraordinary." Fed. R. Civ. P. 57 advisory committee's note (1937 adoption).

## LAW REGARDING FIRST AMENDMENT RETALIATION CLAIMS

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" Hartman v. Moore, 547 U.S. at 256 (quoting Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1988)). It is therefore "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. at 256 (citation omitted). In addition to prohibitive laws, the Constitution also proscribes "[g]overnment retaliation . . . in as much as retaliatory actions tend to chill individuals' exercise of constitutional rights." How v. City of Baxter Springs, 217 F. App'x 787, 797 (10th Cir. Feb. 22, 2007). See Perez v. Ellington, 421 F.3d at 1131 ("The First Amendment bars retaliation for exercising the right of association."). The Tenth Circuit has explained that "any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." How

- 82 -

v. City of Baxter Springs, 217 F. App'x at 797 (quoting Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)).   To establish a claim of retaliation, outside the employment context, for exercising the right to associate guaranteed under the First Amendment, a plaintiff must establish three elements: (i) the plaintiff was engaged in constitutionally protected activity; (ii) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the plaintiff's exercise of the constitutionally protected activity substantially motivated the defendant's adverse action.   See Perez v. Ellington, 421 F.3d at 1131-32 (quoting Worrell v. Henry, 219 F.3d at 1212).   In line with Hartman v. Moore, the Tenth Circuit has held that a plaintiff must establish the following elements to allege a cause of action under the First Amendment against a defendant who is not his employer:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.   Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000).

Klen v. City of Loveland, Colo., 661 F.3d 498, 508 (10th Cir. 2011).   In Harapat v. Vigil, 676 F. Supp. 2d 1250 (D.N.M. 2009)(Browning, J.), the Court found that a reasonable jury could conclude a sheriff's arrest of protesters, who would not move their protest from the front of a district attorney's office to the other side when the sheriff directed, was a retaliatory substantially motivated by the sheriff's desire to chill the protesters from the exercise of their First Amendment rights.   See 676 F. Supp. 2d at 1254, 1207-71.   Additionally, in Edward-Flynn v. Yara, No. CIV 08-0186 JB/ACT, 2009 WL 1563375 (D.N.M. May 18, 2009)(Browning, J.), the Court ruled that a political candidate had stated a claim of First Amendment retaliation, when she alleged that a city

- 83 -

official intentionally certified the candidate to run for city councilor in the wrong ward because the official did not agree with the candidate's political views, and thereby the official defeated the candidate's ability to fairly run for public office in the correct ward.   See 2009 WL 1563375, at **8-9.

When analyzing whether a defendant's actions would have a chilling effect, a court is to "focus, of course, . . . upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled," thus conducting an objective, and not subjective inquiry.   Smith v. Plati, 258 F. 3d 1167, 1177 (10th Cir. 2001).   If a plaintiff is seeking to prove the causal connection between the retaliatory animus of a third party, and the action of another, the Tenth Circuit requires that "the plaintiff . . . show a causal connection between the third-party's animus and the action."   Leverington v. City of Colorado Springs, 643 F.3d 719, 731 n.10 (10th Cir. 2011).

When direct evidence of retaliatory animus is not present, a plaintiff may establish a prima facie case of retaliation with indirect evidence.   The Supreme Court has "established methods for identifying the presence of an illicit reason (in competition with others), not only in retaliation cases but on claims of discrimination based on race or other characteristics.   See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)."   Wilkie v. Robbins, 551 U.S. at 556.   See also Waters v. Churchill, 511 U.S. 661, 691 (1994)(Scalia, J., concurring)(noting that the Supreme Court "considers 'pretext' analysis sufficient in other First Amendment contexts."); Renton v. Playtime Theatres, Inc., 475 U.S. 41, 54 (1986)(holding that a city's zoning restriction on adult theatres does not violate the First Amendment unless the zoning is a "pretext for suppressing expression" (internal quotation omitted)).   First of all, "[c]laims of age, race, national origin,

gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green."   Gamez v. Country Cottage Care and Rehab., 377 F. Supp. 2d 1103, 1119 (D.N.M. 2005)(Browning, J.). Under the McDonnell Douglas Corp. v. Green framework, a plaintiff must set forth a prima-facie case of retaliation.   See Kelly v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004)(Browning, J.).   If the plaintiff establishes a prima-facie case for any of his or her retaliation or discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision."   Mitchell v. City of Wichita, Kan., 140 F. App'x 767, 777 (10th Cir. 2005)(unpublished).   "Upon the employer's articulation of a legitimate, nondiscriminatory reason . . . the presumption of discrimination established by the prima-facie case simply drops out of the picture."   Kelly v. City of Albuquerque, 375 F. Supp. 2d at 1210 (internal quotation marks omitted).   The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual.   See Kelly v. City of Albuquerque, 375 F.Supp.2d at 1210 (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)).   When the burden shifts back to the plaintiff, the plaintiff establish pretext through "'evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in a defendant's 'proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer' that the defendant 'did not act for the asserted non-discriminatory reasons.'"   Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1228 (10th Cir. 2008)(quoting Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1203 (10th Cir. 2006)).

In determining whether an action was substantially motivated by retaliatory animus, one element which courts have considered is the temporal proximity between a plaintiff's speech and a defendant's allegedly retaliatory action.   For example, in Miskovsky v. Jones, 437 F. App'x 707, (10th Cir. 2011)(unpublished), the Tenth Circuit determined that a prisoner stated a claim for retaliation under the First Amendment, when the prisoner alleged that his transfer to a more dangerous prison was retaliation for his lawsuit against a judge and prison official alleging harassment, filed in "close temporal proximity - 15 days" before the transfer.   See 437 F. App'x at 713 (internal quotations omitted).   The Tenth Circuit has also expressed that a six-month period between protected activity and alleged retaliation, without more evidence, is insufficient to establish that a defendant's alleged retaliation was a response to a plaintiff's constitutionally protected conduct.   See 437 F. App'x at 712-13 ("A six-month gap between the protected activity . . . and the alleged retaliation cannot, without more, establish causation.").   Accord Anderson v. Coors Brewing, Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(noting that, in an employment discrimination cases alleging retaliation for protected activity, "we have held that a three-month period, standing alone, is insufficient to establish causation.").   On the other hand, the Tenth Circuit has found that a reasonable jury could find a pattern of retaliation over a period of twenty-five months, when plaintiffs' allege that they received disparate reimbursement and experienced increased administrative burdens from their health care administrator over the nearly two-years in which the plaintiffs lobbied for legislation adverse to their administrator's interests. See Evans v. Fogarty, 241 F. App'x 542, 544-45, 551-55 (10th Cir. 2007)(unpublished).   The Tenth Circuit noted that evidence of disparate reimbursements and increased administrative burdens was circumstantial, but explained that, "'in a § 1983 proceeding circumstantial evidence

generally plays a major role.'"   241 F. App'x at 555 n.14 (quoting <u>Butcher v. City of McAlester</u>, 956 F.2d 973, 978 (10th Cir. 1992)).   The Tenth Circuit also noted that the administrator's retaliatory motivation as more likely when viewed against the backdrop of "'intense emotional conflict'" seen through the parties' "poisonous, long-running political battle."   <u>Evans v. Fogarty</u>, 241 F. App'x at 555 n.14 (quoting <u>Butcher v. City of McAlester</u>, 956 F.2d at 978)).

## ANALYSIS

The Plaintiffs assert that, without a suit for damages under <u>Bivens</u>, they will not receive complete relief for the injuries they have suffered.   Specifically, the Plaintiffs argue that the APA is not an adequate, alternative remedy, because it does not provide the Plaintiffs with the full scope of damages that they seek and therefore does not adequately deter future unconstitutional conduct by the Defendants.   The Court does not agree.   An adequate, alternative remedy need not provide the Plaintiffs with complete relief, or be as effective a deterrent as a <u>Bivens</u> action to preclude a <u>Bivens</u> action.   The Tenth Circuit has held that the APA is the correct forum for redressing constitutional violations arising from final agency actions, as the Plaintiffs here allege.   Further, the possibility of personal liability for federal officials in Trujillo's shoes may make recruiting forest rangers unnecessarily difficult and expensive, a balancing factor which the Court concludes Congress weighed in establishing the APA.   The Court will, therefore, not extend jurisdiction under <u>Bivens</u> to the Plaintiffs' claims for personal damages from Trujillo.

In the Complaint, the Plaintiffs set forth facts which make a conclusion that Trujillo's retaliatory animus motivated the 2010 Decision Notice more than possible, but plausible.   The Court notes that bringing forward direct evidence of retaliatory intent is difficult at this stage, as a defendant's actions are frequently subject to multiple interpretations without the benefit of

discovery to provide support for a plaintiff's claims.   The Plaintiffs seek equitable relief for the alleged violation of their First Amendment rights, and the Court concludes that it may entertain the Plaintiffs' requests for declaratory and injunctive relief that would enjoin the enforcement of the 2010 Decision Notice.   The Plaintiffs may bring these claims directly under the Constitution, as the claims are within the Court's equity jurisdiction and fall under 28 U.S.C. § 1331.

## I.   THE COURT WILL NOT EXTEND A BIVENS ACTION TO THE PLAINTIFFS.

Trujillo moves the Court to dismiss the claims against her in Count I, because Bivens does not provide a remedy for the purported violation of the Plaintiffs' rights therein.   See MTD at 1. The Defendants assert that the APA is a "comprehensive statutory scheme for review of improper agency action, including unconstitutional agency action, such as Plaintiffs allege here."   MTD at 7.   The Plaintiffs assert that the Defendants "misapprehend" the APA's adequacy because the APA does not allow the Plaintiffs to recover damages for Trujillo's allegedly unconstitutional conduct.   Response at 21.

"When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional Bivens remedies."   Schweiker v. Chilicky, 487 U.S. at 423.   The Plaintiffs allege that Trujillo's 2010 Decision Notice "was an adverse action calculated to retaliate against and punish them for the exercise of rights protected by the First Amendment and to chill their future exercise of such rights."   Complaint ¶ 112, at 47. Under the APA, a federal district court is empowered to review final agency decisions which allegedly violate plaintiffs' rights.   See 5 U.S.C. §§ 702, 703.   The district court may either compel agency action which was unlawfully withheld or unreasonably delayed, or set aside

unlawful agency action, findings, and conclusion.   See 5 U.S.C. § 706(a)(1)-(2).   Unlawful agency actions include actions that are: (i) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" (ii) "contrary to constitutional right, power, privilege, or immunity;" (iii) in excess of the agency's statutory authority; (iv) made without observance of procedure required by law; (v) unsupported by substantial evidence; and (vi) unwarranted by the facts presented to the district court.   5 U.S.C. § 706(2)(a)-(e).   By the APA's statutory language, therefore, Congress intended for its provisions to govern federal courts' review of final agency determinations, and Congress empowered federal courts to set aside actions which violate constitutional rights.   The "statutory language" of the APA evidences a congressional intent for claims such as the Plaintiffs bring in Count I -- that Trujillo's 2010 Decision Notice violated their rights under the First Amendment -- to be brought under the APA, and not in a suit under Bivens. See Bush v. Lucas, 462 U.S. at 378.

The Plaintiffs contend that the APA is not an adequate, alternative remedy, because it does not provide for damages and thereby does not deter future unconstitutional conduct.   See Response at 26; Tr. at 14:1-6 (Rosenstock).   The absence of a damages remedy in the APA does not indicate that Congress intended for plaintiffs to be able to obtain damages under Bivens. Although in Carlson v. Green the Supreme Court indicated that a Bivens suit was preferable to an action under the FTCA, because Bivens allowed for damages and thereby provided a deterrent effect unavailable under the FTCA, see Carlson v. Green, 445 U.S. at 21-23, the Supreme Court has since indicated that the congressional unwillingness "to provide consequential damages for unconstitutional deprivations of a statutory right," is evidence that Congress intends for damages to be unavailable for plaintiffs whose claims fall within the purview of a federal remedial scheme,

see Schweiker v. Chilicky, 487 U.S. at 427.  Further, even if the APA does not provide the

Plaintiffs with full compensatory damages, punitive damages, or damages for emotional distress,

which they seek here, the Supreme Court rejected the argument that the absence of adequate

compensation is grounds for extending a Bivens suit in Schweiker v. Chilicky.   See 487 U.S. at

428-29 (explaining that "respondent's various arguments are rooted in their insistent and vigorous

contention that they simply have not been adequately recompensed for their injuries," but deciding

that "Congress . . . has addressed the problems created by state agencies' wrongful termination of

disability benefits," and regardless whether Congress' response "was the best response, Congress

is the body charged with making the inevitable compromises required in the design of a massive

and complex welfare benefits program").   Further, even if the Plaintiffs are correct that the APA

does not serve the deterrent effect that a Bivens action would, in Bush v. Lucas, the Supreme Court

found that the Civil Service Commission provided an adequate, alternative remedy even though it

did not fully compensate the employee and was "not as effective as an individual damages

remedy."   462 U.S. at 372.   Although the record review available under the APA does not allow

the scope of discovery which the Plaintiffs would like, because the Supreme Court does not require

that an alternative remedy be "as effective" as a Bivens suit, the limited discovery is not evidence

that the Plaintiffs are without an adequate remedy under the APA.   Bush v. Lucas, 462 U.S. at

372.   The absence of a complete remedy for the Plaintiffs under the APA does not, therefore,

indicate that the Court should allow the Plaintiffs to bring a claim for damages under Bivens when

Congress has created a remedial scheme for reviewing the constitutionality of agency decisions

under the APA.   Furthermore, in Schweiker v. Chilicky the Supreme Court recognized that the

"prospect of personal liability for official acts . . . would undoubtedly lead to new difficulties and

expense in recruiting administrators for the programs Congress has established," a special factor which similarly warrants the Court's hesitation in extending a suit for damages against Trujillo. 487 U.S. at 425.   "[B]alancing governmental efficiency and the rights of individuals," is a duty for which Congress is competent, and, as the Supreme Court has noted, not a role which the judiciary should undertake.   487 U.S. at 425[6] (citing Bush v. Lucas, 462 U.S. at 389).

Moreover, the Tenth Circuit has held that the APA is an adequate, alternative remedy for plaintiffs seeking to redress the constitutional harms committed in the course of an agency decision.   See Robbins v. Wilkie, 300 F.3d at 1212 ("The APA is the proper avenue for reviewing an agency's action or decision.   If Appellant attempted to hold Defendants liable for alleged constitutional violations committed while reaching a final agency decision, a Bivens action would not be available.").   See also McConaha v. Fed. Aviation Admin., 54 F. App'x at 916 ("A Bivens action is not available for actions attempting to hold individual defendants liable for alleged constitutional violations they may have committed in the process of reaching a final agency decision." (emphasis in original)(citing Robbins v. Wilkie, 300 F.3d at1212; Nat'l Commodity & Barter Ass'n v. Archer, 31 F.3d at 1532; Zephyr Aviation, L.L.C. v. Dailey, 247 F.3d 565, 572 (5th Cir. 2001); Green v. Brantley, 981 F.2d 514, 521 (11th Cir. 1993)).   In light of the existence of a congressionally created remedy for addressing constitutional violations committed through agency actions, and the Tenth Circuit's holding that the APA is an adequate alternative remedy for claims such as the Plaintiffs bring, the Court cannot soundly find that it should allow the Plaintiffs

---

[6] While the Court is not as convinced as is apparently the Supreme Court that people will decline federal employment because of suits for damages, for which the United States would likely pay any judgment, the Supreme Court has identified this factor as a relative consideration, and while the Court does not think this factor is particularly weighty, the factor probably is applicable here as in every case.

a cause of action for damages under Bivens.

The Plaintiffs submitted Smith v. United States as supplemental authority in support of their assertion that the Court should a cause of action under Bivens for their damages claims.   See Plaintiffs' Notice of Additional Authority in Response to Defendants' Motion to Dismiss Count I at 1.   In Smith v. United States, the Tenth Circuit held that the Inmate Accident Compensation Act ("IACA"), 18 U.S.C. § 4126, did not preclude a Bivens action by a prisoner who alleged that prison officials violated his rights under the Eighth Amendment by exposing him to asbestos while working at a federal prisoner.   In so holding, the Tenth Circuit explained that the IACA did not explicitly foreclose a Bivens remedy, there was little deterrent effect within the IACA because it did not provide for punitive damages or a jury trial, and the IACA did not provide a forum for the prisoner to address his alleged constitutional violation.   See 562 F.3d at 1102-03.   The APA, on the other hand, explicitly provides a forum for redressing constitutional violations, and is thus distinguishable from the remedial scheme available under the IACA.   See 5 U.S.C. § 706(2)(B). Indeed, in Smith v. United States, the Tenth Circuit noted that both Bush v. Lucas and Schweiker v. Chilicky were distinguishable from the IACA, because, "although the plaintiffs were denied a constitutional remedy, the statutory alternative provided a forum where the allegedly unconstitutional conduct would come to light."   562 F.3d at 1103.   Moreover, even if the deterrent effect which the APA serves is less than that which the Plaintiffs may achieve under Bivens, unlike the IACA, the Tenth Circuit has held that the APA, not Bivens, is the appropriate avenue for a plaintiff to bring allegations that an agency action is unconstitutional.   See Robbins v. Wilkie, 300 F.3d at 1212.   The Court cannot, thus, soundly conclude that the Plaintiffs should be allowed to seek damages for Trujillo's alleged unconstitutional conduct, when Congress has

provided a remedial scheme in the APA which the Tenth Circuit recognizes as the adequate forum for the Plaintiffs to raise their constitutional claims arising from the 2010 Decision Notice.

"In sum, the concept of 'special factors counselling hesitation in the absence of affirmative action by Congress' has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent." Schweiker v. Chilicky, 487 U.S. at 423. The Plaintiffs allege that the 2010 Decision Notice, a final agency action subject to judicial review, was unconstitutional. The Court cannot soundly conclude that the unavailability of full discovery, punitive damages, and damages for emotional distress under the APA is a result of inadvertent congressional inaction, in light of the Tenth Circuit's direction that similarly situated plaintiffs should redress under the APA their constitutional claims arising from agency actions. Further, imposing personal liability against Trujillo could lead to new difficulties and expenses in recruiting forest rangers for the USFS, and balancing individual rights against governmental efficiencies is a task for Congress and not the Courts. In most cases since the creation of the action, the Supreme Court has found a "Bivens remedy unjustified." Wilkie v. Robbins, 551 U.S. at 550. The Court sees no sound reason to extend a Bivens remedy where the Tenth Circuit believes it is unwarranted and will not do so.

## II.   THE PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A FIRST AMENDMENT VIOLATION FOR WHICH THEY MAY RECEIVE PROSPECTIVE EQUITABLE RELIEF.

The Plaintiffs request two forms of declaratory relief. They first request that the Court declare that the "acts complained of herein violated the Jarita Mesa Permittees' and Alamosa Permittees' First Amendment rights to freedom of speech and the right to petition for redress of grievances." Complaint ¶ 1, at 53. The Plaintiffs also request that the Court declare that any

future reductions in the number of cattle permitted to graze in the Allotments for the 2012-2015 grazing seasons based upon the 2010 Decision Notice "would be contrary to the Constitution." Complaint ¶ 2, at 53.   The Defendants assert that the Plaintiffs are "not entitled to declaratory relief that their constitutional rights have been violated" and, on that basis, move the Court to dismiss the Plaintiffs' first request for declaratory relief.   MTD at 11.   The Defendants also assert that the Plaintiffs have failed to allege facts which would support a conclusion that Trujillo engaged in a pattern of retaliation and that retaliation motivated the 2010 Decision Notice.   See MTD at 11-16.   At the hearing, the Defendants stated that they have moved to dismiss the Plaintiffs' requests for declaratory relief to the extent that the Plaintiffs request the Court to declare Trujillo's past actions violated the Constitution.   See Tr. 54:21-55:20 (Keegan).   The Defendants also stated that they have not moved to dismiss a request for relief against Trujillo in her official capacity, because, as the Defendants read the Complaint, the Plaintiffs did not request declaratory relief against Trujillo in her official capacity.   See Tr. at 57:3-7 (Keegan).   The Plaintiffs asserted at the hearing that they are seeking declaratory relief against Trujillo in her official capacity.   See Tr. at 13:13-21 (Rosenstock).

Construing all reasonable inferences in the Plaintiffs' favor, as the Court is bound to do on a motion to dismiss, the Court believes that the Plaintiffs' allegations nudge the Complaint across the line from the possible to the plausible that Trujillo's desire to retaliate against the Plaintiffs for having spoken against her substantially motivated the 2010 Decision Notice.   Declaratory relief is not appropriate to declare that past acts violated the Constitution, and therefore, the Court must dismiss the Plaintiffs' request that the Court declare Trujillo's previous actions were in violation of the Constitution.   On the other hand, as the Plaintiffs assert, they seek declaratory relief against

Trujillo in her official capacity that the future reduction of their permits would be unconstitutional, and the Court may grant this form of declaratory relief which requests the definition of the Plaintiffs' rights in anticipation of the Defendants' future enforcement of the 2010 Decision Notice.

A.   **THE PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT TRUJILLO'S RETALIATORY ANIMUS AGAINST THE PLAINTIFFS FOR HAVING PUBLICLY CRITICIZED HER MOTIVATED THE 2010 DECISION NOTICE.**

The Plaintiffs allege that "Defendant Trujillo, acting to retaliate against and punish Plaintiffs for engaging in conduct protected by the First Amendment, issued a Decision Notice that departed from the EA's Proposed Action and . . . imposed an 18% reduction in permitted grazing levels by the Plaintiffs."   Complaint ¶ 5, at 3.   The Defendants contend that the Plaintiffs have used "labels and conclusions to support their claim that . . . Trujillo's action was substantially motivated by retaliation," MTD at 10 (internal quotations omitted), and that the Plaintiffs have alleged only that they disagreed with Trujillo's chosen course of action for the Unit, and thus the Plaintiffs' facts do not sufficiently support concluding that Trujillo acted out of retaliatory animus, see Reply in Support at 11-17.

For a plaintiff to survive a motion to dismiss on the theory that a government official's actions violated the plaintiff's First Amendment rights, the plaintiff must plead facts sufficient to allow a plausible conclusion

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

Worrell v. Henry, 219 F.3d at 1212.

The First Amendment to the United States Constitution states: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."   U.S. Const., amend. I. The Plaintiffs have alleged that, through multiple avenues, they petitioned Trujillo, her supervisors, the then-current New Mexico governor, and the New Mexico Congressional delegation for redress of their grievances arising from Trujillo's actions and the USFS' management of the Unit.   The First Amendment guarantees this right, and thus the Plaintiffs' Complaint sufficiently alleges the first element of a claim for the violation of their constitutional rights.

The Plaintiffs have also sufficiently alleged that an eighteen-percent reduction in their permits would chill a person of ordinary firmness from continuing to complain about the USFS and Trujillo's management of the Unit.   Taking the facts set forth in the Complaint as true, the USFS' estimate that the Plaintiffs will collectively lose "over $32,000.000 in economic loss" as a result of the 2010 Decision Notice is an underestimate of the financial harm the Plaintiffs and their communities will suffer.   Complaint ¶ 107, at 45.   The Plaintiffs set forth throughout the Complaint that they are dependent upon the Unit's natural resources, including cattle grazing, see Complaint ¶ 40, at 15, and the reduction will damage the "social and cultural fabric" and the future of the Plaintiffs' "land-based communities," id. ¶ 107, at 45 for which the Plaintiffs' cattle grazing is "integral," id. ¶ 52, at 21.   Additionally, the Plaintiffs allege that "a loss of over $32,000.00 to communities suffering under the economic conditions that prevail within these communities is quite significant and likely to significantly erode the communities' continued viability." Complaint ¶ 107, at 45.   The Plaintiffs also allege that Trujillo's 2006 decision to reduce S.

Chacon's grazing permit by twenty-percent would result in a loss of "tens of thousands of dollars," and had a "very damaging effect on the social and cultural fabric of the small poor rural Hispanic community and extended family of which Plaintiff Chacon is a vital leader."  Complaint ¶ 75, at 31.  The standard for determining whether government action would have a chilling effect is an objective one, not subjective, and thus the Defendants' assertion that the Plaintiffs -- several of whom are leaders in their communities and have been charged by their peers to raise issues implicating the Allotments' futures -- continued criticism defeats their claim under the First Amendment for retaliation.  See Smith v. Plati, 258 F.3d at 1177 (explaining that, for First Amendment retaliation claims, the "focus, of course, . . . [is] upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled").  The Court can logically conclude that the entire community would suffer similar effects from an eighteen-percent reduction in all permits, and such wide-reaching social, cultural, and economic effects would likely persuade individuals to not speak out against the USFS' or Trujillo's management of the Unit.

The primary issue of contention between the parties is whether the Plaintiffs have sufficiently alleged that retaliatory animus substantially motivated Trujillo's 2010 Decision Notice.  The Plaintiffs allege only that the 2010 Decision Notice was done in retaliation for the Plaintiffs have exercised their First Amendment rights of speech and to petition for redress, although the Plaintiffs assert that Trujillo's retaliatory animus is displayed over the course of her interactions with the Plaintiffs from 2006 to 2009.  The Complaint does set forth other possible motivations for Trujillo's 2010 Decision Notice.  The Plaintiffs assert that the Unit was deteriorating, in part because of drought and the overgrown wild horse population, and the

Plaintiffs also assert that Trujillo decided in 2006 to end the grazing season early in part so that grazing conditions could be allowed time to improve.   See Complaint ¶¶ 60, 64, 66, at 24, 26-25. In this regard, the Defendants are correct that other factors could have motivated Trujillo when she decided to reduce grazing permits by eighteen-percent in 2010.   On the other hand, nearly every official federal action is likely to have a legitimate, non-discriminatory explanation, and therefore, the mere possibility of legitimate motive does not preclude a claim for retaliation when the facts make a retaliatory motive more plausible.   The Plaintiffs have alleged that the 2010 Decision Notice was a break from USFS previous policy and procedures, which leads to a possible inference that Trujillo was not acting with a legitimate motive.   Cf. Bell Atl. Corp. v. Twombly, 550 U.S. at 554 (finding that pleading only facts which are consistent with defendants' liability, without more, is insufficient to state a claim when defendants' conduct is in line with the majority of other actors).   At this stage, taking the Plaintiffs' facts as true, the entirety of the Complaint forecloses the possibility that Trujillo did not issue the 2010 Decision Notice in retaliation for the Plaintiffs' public criticisms of the Defendants.   Cf. Ashcroft v. Iqbal, 556 U.S. at 681-82 (noting that pleading facts consistent with a cause of action alone is insufficient to make a claim of discriminatory animus plausible).   "Precisely because the ultimate fact of retaliation turns on defendants' state of mind, it is particularly difficult to establish by direct evidence."   Smith v. Maschner, 899 F.2d at 949.

Taking the Plaintiffs' allegations one at time, they have sufficiently alleged that Trujillo's July 5, 2006, decision to remove all cattle from the Jarita Mesa Allotment by July 31, 2006, was retaliation against the Jarita Mesa Permittees for having expressed their dissatisfaction with Trujillo to Governor Richardson, to the New Mexico Congressional delegation, and Trujillo's

supervisor.   Trujillo ordered that the cattle be removed two months after the letters were sent.

See Complaint ¶¶ 62, 63, at 25; id. ¶¶ 66, 68, at 26-27.   Although the Plaintiffs do not contest that

Trujillo had the legal authority to determine the end of the 2006 grazing season, the temporal

proximity to the letters of complaint and the decision to end the grazing season could be evidence

that Trujillo retaliated against the Plaintiffs for having voiced their concerns.   The Jarita Mesa

Permittees complained in April, 2006, and May, 2006, and no more than two months later Trujillo

decided to shorten the 2006 grazing season.   Cf. Anderson v. Coors Brewing, Co., 181 F.3d at

1179 (holding that a three-month period between constitutionally protected activity and alleged

retaliation is insufficient, without other evidence, to establish that an adverse action substantially

motivated by retaliation).   Notably, Trujillo shortened the grazing season on the Jarita Mesa

Allotment, not the Alamosa Allotment, in July, 2006, which further supports the Plaintiffs' theory

that Trujillo retaliated against the permittees who spoke out against her conduct.   Furthermore,

Trujillo's decision to end the 2006 grazing season in September, 2006, rather than in October,

2006, is evidence of a retaliatory animus, as Trujillo acted contrary to the RITF's

recommendations and against her supervisor's ruling that the grazing season could continue as set

forth in the permits.   See Complaint ¶ 69, at 28; id. ¶ 73, at 29.   Trujillo's actions in October,

2006, against S. Chacon further suggest a pattern of retaliation.   Although it is unclear from the

Complaint whether Trujillo decided to end the 2006 grazing season early on both the Jarita Mesa

and Alamosa Allotments, the Plaintiffs set forth that only S. Chacon, who previously publicly

criticized Trujillo, was penalized for not complying with the October 2, 2006 deadline.   See

Complaint ¶¶ 73-74, at 29-30.   Indeed, the Plaintiffs set forth that Trujillo's actions against S.

Chacon were viewed as "unreasonable and unyielding" by Natural Resource Specialists and

Riparian Specialists at NMSU, which supports a conclusion that Trujillo acted with greater severity than was necessary to address any concerns regarding range conditions at the time. Complaint ¶ 77, at 31.

These actions support a conclusion that Trujillo took a retaliatory stance towards those who publicly criticized her and the USFS.   In Evans v. Fogarty, the Tenth Circuit found that there were sufficient facts to support finding that health care administrators' termination of a provider's contract was retaliation for the provider's political lobbying that blocked legislation the administrators wanted enacted.   See 241 F. App'x at 544-45, 558.   The Tenth Circuit noted that there was ample evidence that the provider had irritated the administrators through his lobbying efforts and disclosure requests, even though billing issues and other personnel problems could have motivated the termination.   See 241 F. App'x at 558.   The Court can logically conclude that multiple letters which publicly criticized Trujillo and the USFS in 2006 would be an irritant to them, and that, especially in light of the Plaintiffs' other allegations in the Complaint, Trujillo's adverse actions towards the Plaintiffs were retaliation for the Plaintiffs' public criticism.

Trujillo's animus towards those who publicly criticize the USFS is also seen in her refusal to allow Correia access to her records after Correia expressed that the USFS, not the residents. caused the Unit's deterioration.   Indeed, taking the Plaintiffs facts as true, Trujillo told Correia that he would not have access to her records because he spoke publicly against the USFS.   In other cases, the courts have found that expressing similar retaliatory animus is evidence that the plaintiffs' constitutionally protected conduct substantially motivated a defendants' actions.   See Miskovsky v. Jones, 437 F. App'x at 713 (finding that when a prisoner was transferred to a dangerous prison two weeks after filing a complaint in which the prisoner alleged that a judge

conspired with prison guards to harass the prisoner, and a prison guard informed the prisoner that he was transferred because he "really pissed off a Judge," was sufficient evidence of retaliatory animus); DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990)(finding that a police detective's statements that a suspect was "not being very cooperative" when informed that the suspect had hired counsel, and subsequently, when the suspect was arrested, "that's what she got for hiring a smart-ass lawyer," were evidence that the detective caused the suspect's arrest and prosecution at least partly in retaliation for the suspect's exercise of her First Amendment right to free association and speech which included hiring an attorney); Stone v. Juarez, No. Civ. 05-508 JB/RLP, 2008 WL 1305039, at *14 (D.N.M. Apr. 23, 2006)(Browning, J.)(finding that a police officer's admittance that he arrested a plaintiff when the plaintiff said "fuck you," constitutionally protected speech, was sufficient to show that the plaintiff's engaging in constitutionally protected conduct substantially motivated the arrest).   Correia may not be a party to this case, but Trujillo's actions towards him support, at least as evidence, a theory that Trujillo consistently took adverse actions against those who publicly criticized her and the USFS.

Trujillo's actions in 2009 and 2010 similarly display a plausible pattern of retaliatory action.   The Plaintiffs' May 21, 2010, letter complaining to Trujillo was met with a letter containing "threats" of punishment for not complying with the terms of the Plaintiffs' permits. Complaint ¶ 79, at 32.   The Defendants make a number of criticisms regarding this letter.   For example, the Defendants assert that the Plaintiffs should have alleged that they had never received a letter like this until they complained to Trujillo.   The Defendants also assert that the Plaintiffs have not shown that Trujillo singled them out or treated them differently than any other permittees. See Tr. at 60:16-22 (Keegan).   The Plaintiffs point out that disparate treatment is "just one method

of proving retaliatory intent," not the only method.   Tr. at 71:14-19 (Rosenstock).   This additional evidence would be helpful to the Plaintiffs, but this allegation is not essential.   First, the evidence may not be available, and even if the Plaintiffs had received such a letter before this one, there is other evidence that raises a plausible inference that Trujillo's letter was sent in retaliation. A plaintiff has to make his or her case with the evidence he or she has, and not with evidence not available; there is not essential evidence.   Just because a person has been arrested before does not mean the last arrest was not in unlawful retaliation.

The Defendants also assert that thousands of similar letters are sent every year, and thus, such a letter could not possibly have been threatening.   See Tr. at 43:11-16 (Keegan).   The Court must, however, take Plaintiffs' non-conclusory allegations as true, and therefore cannot consider whether sending such a letter is a matter of course because the Plaintiffs do not allege that they normally received similar letters from Trujillo.   Moreover, there is nothing in the Complaint that says that thousands of such letters are sent out every year, and, if the Court were to rely on such a statement and not allow the First Amendment claim to go forward at this stage, it would not only be considering material statements in the Complaint, it would be considering counsels' statements rather than evidence only in the Complaint.   The bare statement of counsel would not even be competent evidence at summary judgment, much less on a motion to dismiss.   The Plaintiffs assert that, after their continued criticism throughout 2009, which included sending a letter with complaints to Trujillo, Governor Richardson, the New Mexico Congressional delegation, and to Trujillo's immediate supervisor, Trujillo informed the Plaintiffs in January, 2010, that she was attempting to orchestrate a buyout of their permits.   See Complaint ¶ 80, at 32-33; id. at ¶ 89, at 37.   Although the buyouts do not appear to have taken place, and Trujillo may have been acting

within her authority in managing the Unit when she attempted to orchestrate them, given the Unit's

history and the importance of cattle grazing to the Plaintiffs and their communities, Trujillo could

have planned her statements regarding the buyout to convey a message to the Plaintiffs that their

livelihood would be in danger if they did not cease complaining.   In other words, she may have

been attempting to eliminate entirely the Plaintiffs and their complaints.   Similarly, although the

Plaintiffs do not contest that the District Ranger is empowered to regulate permittees and permit

compliance, a letter which expresses that permits may be reduced, when sent in response to a letter

of complaint, could have been a cloaked threat to the Plaintiffs.   "[T]hreats of official sanctions

aimed at discouraging protected activity can form the basis of a constitutional violation."   Evans

v. Fogarty, 241 F. App'x at 559 (citing Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963)).

Trujillo's conduct before the 2010 Decision Notice support a plausible conclusion that she

took adverse action towards the Plaintiffs in response to their complaints regarding Trujillo and the

USFS.   The factual allegations leading up to the 2010 Decision Notice plausibly lay out that

Trujillo decided to reduce the Plaintiffs' permits by eighteen-percent out of a retaliatory animus.

First of all, the Plaintiffs allege that Trujillo decided to reduce their permits before the 2010 EA

was released, which supports a conclusion that her decision was based upon something other than

the 2010 EA's factual findings.   See Complaint ¶ 89, at 37.   Additionally, the Plaintiffs allege

that Trujillo's proffered justification for the 2010 Decision Notice -- that current grazing levels

were unsustainable -- "was a pretext to conceal her retaliatory motive . . . to punish Plaintiffs and

the other permittees for having complaint to other government officials about Defendant Trujillo's

conduct."   Complaint ¶ 104, at 44.   The Plaintiffs have alleged that the 2010 EA recommended

that Plaintiffs be allowed to continue grazing at the same levels as previous years, Complaint ¶ 84,

at 34-35, the RITF recommended that grazing be allowed "to continue on the two allotments at approximately its current level," id. ¶ 87, at 35-36, and the New Mexico Department of Agriculture commented that "proper management of the rangeland would obviate any need to reduce the number of permits," id. ¶ 98, at 41.   The Plaintiffs have thus alleged evidence which makes Trujillo's contention that continued grazing at the same level was unsustainable implausible, as the USFS' own findings in the 2010 EA recommended that Plaintiffs be continued to graze at the same levels, and the Plaintiffs have alleged that Trujillo's proffered justification is inconsistent with the RITF's and New Mexico Department of Agriculture's assessment of the Allotments.   See Fye v. Okla. Corp. Comm'n, 516 F.3d at 1228 (explaining that a plaintiff may establish pretext through "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in a defendant's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons"); Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d at 1203 (same).

As evidence that retaliatory animus substantially motivated the 2010 Decision Notice, the Plaintiffs allege that Trujillo was "extremely upset and angered" when the Plaintiffs submitted a petition for her removal in February or March of 2010.   Complaint ¶ 92, at 37-38.   Although Trujillo did not issue the 2010 Decision Notice until some six months after the Plaintiffs petitioned for her removal, she also issued the 2010 Decision Notice on the first possible day to do so -- the same day the 2010 EA was issued.   See Complaint ¶ 105, at 44.   In Perez v. Ellington, 421 F.3d at 1132, the Tenth Circuit found that defendants' "quick issuance of jeopardy tax assessments," and "failure to follow the normal procedures for issuing jeopardy tax assessments," could lead a

- 104 -

reasonable factfinder to determine that the defendants acted with retaliatory animus towards plaintiffs in an attempt to discourage the plaintiffs from associating with non-tribal members. 421 F.3d at 1132.   Similarly, Trujillo acted immediately in making good on her statement that she would reduce the Plaintiffs' permits.   Further, the Plaintiffs allege that Trujillo did not follow "practice and policy of the District Rangers . . . within the Carson and Santa Fe National Forests . . . to adopt the Proposed Action set forth in an EA."   Complaint ¶ 99, at 41.   Trujillo also disregarded the evidence and comments that the RITF, Rio Arriba County, and the New Mexico Department of Agriculture submitting when she adopted the third alternative, instead of allowing the Plaintiffs to keep their grazing permits at approximately the same levels as previous years. See Complaint ¶¶ 82-84, at 33-35; id. ¶¶ 85, 87 at 35.   The Plaintiffs have, thus, alleged that Trujillo's decision to reduce the Plaintiffs' permits was contrary to the weight of evidence before her, and thereby, a retaliatory animus towards the Plaintiff's complaints regarding her and the USFS' management of the Unit plausibly motivated her 2010 Decision Notice.

Taking all of the Plaintiffs' facts as true and construing all reasonable inferences in their favor, the Plaintiffs have plausibly alleged that the 2010 Decision Notice was made in retaliation for the Plaintiffs' exercise of their First Amendment right to petition the government for redress. "[P]lausibility" in this context must refer to the scope of the allegations in a complaint," and the Plaintiffs' allegations are not "so general that they encompass a wide swath" of mostly innocent conduct, but rather Trujillo's pattern of adverse action towards those who criticize her and the USFS nudges the Plaintiffs' claims of retaliation into the realm of plausibility, supporting the Court's conclusion that the Plaintiffs have plausibly, and not just speculatively, stated a claim for relief.   Robbins v. Oklahoma, 519 F.3d at 1247.   Plaintiffs have alleged a plausible pattern of

their First Amendment right to petition being met with adverse action by the Defendants over a course of three years.   Set against a plausibly emotionally-charged background -- Trujillo was intensely angered when the Plaintiffs requested her removal, the Plaintiffs feared for the future of their social and cultural bonds when their permits were reduced -- makes the Plaintiffs' allegations of retaliatory animus all the more likely.   See Evans v. Fogarty, 241 F. App'x at 555 n.14 (finding that retaliatory motivation is "more likely when viewed against the backdrop of intense emotional conflict seen through the parties' poisonous, long-running political battle")(internal quotations omitted).   Discovery may be deadly for the Plaintiffs, either because more evidence will reveal that a desire to preserve the Unit's natural resources substantially motivated Trujillo, or that the temporal proximity was too attenuated for the Plaintiffs' conduct to be the cause of the 2010 Decision Notice.   At this point, however, the Plaintiffs have plausibly alleged that a retaliatory animus substantially motivated the 2010 Decision Notice.   The Plaintiffs have shown that Trujillo's actions consistently, over time, were adverse to those who spoke out against her and the USFS.   They have also sufficiently alleged that the 2010 Decision Notice was contrary to the weight of evidence before Trujillo, and was made after the Plaintiffs deeply angered Trujillo by requesting her removal.   Given the difficulty with alleging direct evidence of retaliatory animus in a Complaint, the Court cannot soundly conclude that the Plaintiffs have failed to state a claim. The Court accordingly finds that the Plaintiffs have sufficiently alleged that Trujillo's retaliatory animus toward the Plaintiffs' for their continued complaints about her and the USFS' management of the Unit substantially motivated the 2010 Decision Notice.

The Court is keenly aware that its conclusion may make it relatively easy for a plaintiff to bring a First Amendment claim against a government official and shares the concern that the

United States expressed about such a development.   The Court is equally cognizant that there may be more benign reasons for Trujillo's actions than the Plaintiffs' address.   On the other hand, government retaliation against those who criticize the powerful is a real problem that cannot be ignored and set aside.   The Plaintiffs' claim of retaliation need only be plausible and possible, and not the actual, or, in the First Amendment context, the sole motivation.   To not allow this claim to go forward would make it very difficult for any First Amendment retaliation claim to go forward, because of the difficulty of proving intent and motivation at the pleading stage.   Also, the Court is not as concerned about the floodgates of similar litigation, because the Court has not seen -- in ten years on the bench -- a First Amendment claim and an APA appeal litigation before this one; the APA claims, especially in environmental cases, usually present issue more clearly stated.   Thus, the rarity of this scenario also counsels litigating the First Amendment claim of retaliation now filed.

> **B.    THE COURT WILL DISMISS THE PLAINTIFF'S REQUEST FOR DECLARATORY RELIEF THAT TRUJILLO'S PAST CONDUCT VIOLATED THE CONSTITUTION, BECAUSE DECLARATORY RELIEF IS INAPPROPRIATE TO REDRESS PAST ACTIONS.**

The Defendants assert that the Court should dismiss the Plaintiffs' request for declaratory relief, because the Plaintiffs' request "will not serve a legitimate purpose, in that it does not help to redress the harm Plaintiffs claim to have suffered."   MTD at 11.   The Court has previously held that a "'declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply proclaim liability from a past act.'"   Copar Pumice Co., Inc. v. Morris, 2009 WL 5201799, at *17 (quoting Lawrence v. Kuenhold, 271 F. App'x. at 766).   The Plaintiffs' first request for relief asks the Court for nothing more than to declare the Defendants' previous actions "violated the First Amendment rights of freedom of

speech and the right to petition for redress of grievances" of the Jarita Mesa Permittees and Alamosa Permittees.   Complaint ¶ 2, at 53.   The Defendants are correct that the declaratory relief requested here would be inappropriate, because the only form of relief which the Court could grant is to proclaim liability from the past, as, in this paragraph, the Plaintiffs do not request any adjudication in anticipation of a future controversy.   See Lawrence v. Keunhold, 271 F. App'x at 766 (finding that a plaintiffs' request for a declaratory judgment that a judge's judgment was void seeks "a declaration of past liability, not future rights," and there, a "declaratory judgment would serve no purpose here").   The Court, accordingly, will dismiss this request for relief because declaratory judgment is inappropriate to proclaim liability for Trujillo's past acts.

### C.   THE COURT WILL NOT DISMISS THE PLAINTIFFS' SECOND REQUEST FOR DECLARATORY RELIEF.

The Plaintiffs also request the Court to declare that "any future reductions in the number of cattle permitted to graze" in the Allotments "for the 2012, 2013, 2014, and 2015 grazing seasons based on Defendant Trujillo's September 2010 Decision Notice would be contrary to the Constitution."   Complaint ¶ 2, at 53.   The Defendants make a similar contention regarding this request for relief as they do for the Plaintiffs' first, that declaratory relief is inappropriate because, they assert, the Plaintiffs are requesting the Court to declare the Trujillo's past conduct was unconstitutional.   See MTD at 11.[7]   At the hearing, the Plaintiffs explained that they are bringing

---

[7] The Defendants move to dismiss Count I, and the relief requested in paragraphs 1, 12, 15, and 16 of the Complaint.   See MTD at 1.   In their Response, the Plaintiffs state that their claims

> for declaratory and injunctive relief against Defendant Trujillo in her official capacity . . . are not at issue in the instant motion [to dismiss] which is directed at the claims brought against Defendant Trujillo in her individual capacity except to the extent that Defendants allege that Plaintiffs have failed to properly plead a First Amendment claim.

this claim for declaratory relief against Trujillo in her official capacity, and that they are seeking

declaratory, as well as injunctive relief.   See Tr. at 13:13-21, 86:16-87:1 (Rosenstock).

---

Response at 3 n.1.  At the hearing, the Plaintiffs stated that, in Count I and paragraph 2 at 53, they are seeking declaratory and injunctive relief from Trujillo in her official capacity, as they are asking that the Court enjoin the enforcement of the 2010 Decision Notice.   See Tr. at 13:13-21; id. at 86:3-8 (Rosenstock).  The Defendants informed the Court, at the hearing, that they had not read the Complaint to allege a claim against Trujillo in her official capacity.   See Tr. at 57:1-9 (Keegan).  The Defendants did not mention the Plaintiffs' first footnote in the Response.  The Defendants stated, at the hearing, that they would file a motion to dismiss the Plaintiffs' claims against Trujillo "to the extent the [C]ourt feels like it hasn't already been addressed."   Tr. at 89:2-9 (Keegan).

The Court does not believe that it must adopt the Defendants' reading of the Complaint. The Defendants move to dismiss Count I, in which the Plaintiffs allege that "Defendants will continue to reduce Plaintiffs' grazing permits throughout the 2012-2015 grazing season," Complaint ¶ 112, at 47, and the Plaintiffs allege that they "will suffer irreparable harm if these reductions are allowed to proceed," Complaint ¶ 115, at 48.   The Defendants also move to dismiss the Plaintiffs' request that "any future reductions in the number of cattle permitted to graze" on the Allotments for the 2012-2015 "grazing seasons based on Defendant Trujillo's September 2010 Decision Notice would be contrary to the Constitution."   Complaint ¶ 2, at 53.  This request does not state that it is brought against Trujillo in her individual capacity, and the Court concludes that the Plaintiffs are requesting an injunction against the entity which would be enforcing the 2010 Decision Notice -- either the El Rito District Ranger, or the USFS.

Notably, the Plaintiffs name as "Defendants" "the United States Forest Service, and Diana Trujillo, in her official and individual capacities."   Complaint at 1.  The Plaintiffs' use of the word "Defendants" in Count I and paragraph 2 at 53 should therefore have put the Defendants on notice that these claims are not alleged only against Trujillo in her individual capacity.   See Complaint ¶¶ 112-114, at 47-48; id. ¶ 2, at 53.  Trujillo had the opportunity to respond to the claims against her in her official capacity.  In both the MTD and Reply in Support, the Defendants assert that the Plaintiffs fail to allege a plausible violation of their First Amendment rights.   See MTD at 10-11; Reply in Support at 11-14.   The Defendants failure to see that Count I and the relief requested in paragraph 2 at 53 of the Complaint were alleged against the USFS and Trujillo in her official capacity cannot preclude the Court from ruling on the MTD -- which seeks to dismiss these claims.   Moreover, the Court is granting the majority of the MTD: (i) the Court is dismissing the Plaintiffs' claims seeking damages from Trujillo in her individual capacity; and (ii) the Court is dismissing the Plaintiffs' request for a declaration that Trujillo's past actions violated the constitution.

The Defendants move the Court to dismiss Count I and the corresponding relief requested in paragraph 2 at 53 of the Complaint.   The Court will not abstain from ruling on the Defendant's MTD merely because the Defendants did not see the full spectrum of the Plaintiffs' claims alleged therein.   If the Defendants believe that the Court has come to the wrong conclusion, the Defendants may assert their position through a motion to reconsider.

1.      **Declaratory Relief Would be an Appropriate Remedy for This Controversy Between the Parties.**

An actual controversy exists between the parties regarding the 2010 Decision Notice.   The Plaintiffs allege that Trujillo's retaliatory animus substantially motivated the 2010 Decision Notice, and the 2010 Decision Notice is thus unconstitutional, and that the continued enforcement of the 2010 Decision Notice would therefore be unconstitutional.   While the Defendants assert that the Plaintiffs' request for declaratory relief would only define liability for Trujillo's previous conduct, the wording of the Plaintiffs' second request for declaratory relief indicates that the Plaintiffs are seeking an injunction against the future enforcement of the 2010 Decision Notice. See Complaint ¶ 2, at 53 ("Declare that any future reductions . . . based on Defendant Trujillo's 2010 Decision Notice would be contrary to the Constitution.").   This continuing impact of the 2010 Decision Notice creates a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment," because the 2010 Decision Notice will continue to be enforced to the Plaintiffs' detriment absent the Court's adjudication.   Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. at 273. Additionally, the Plaintiffs are asking the Court to define the Defendants' legal obligations in anticipation of some future conduct, and not to simply proclaim liability from a past act, as the Plaintiffs are seeking to stop the enforcement of the 2010 Decision Notice.   See Copar Pumice Co., Inc. v. Morris, 2009 WL 5201799, at *17.   A declaratory judgment would settle the controversy between the Plaintiffs, and the USFS and Trujillo in her official capacity, and serve a useful purpose in clarifying their legal relations, and, additionally, any remedy the Plaintiffs have under the APA would not be "better or more effective," because the Plaintiffs do not have the benefit of discovery beyond the administrative record with the APA.   State Farm Fire & Cas. Co.

v. Mhoon, 31 F.3d at 983 (explaining that a district court should consider: (i) "whether a declaratory action would settle" a controversy; (ii) whether a declaratory judgment "would serve a useful purpose in clarifying the legal relations at issue;" and (iii) "whether there is an alternative remedy which is better or more effective," before entertaining a request for declaratory relief). Moreover, even if the APA provides a separate remedy for the Plaintiffs' alleged constitutional violations, "the existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."   Fed. R. Civ. P. 57.   The Court may properly grant the Plaintiffs' request for declaratory relief in paragraph the Complaint ¶ 2, at 53.

### 2.   The Plaintiffs May Seek Equitable Relief for the Violation of Their Constitutional Rights Outside of the APA.

The Plaintiffs seek equitable relief from Trujillo in her official capacity.   "An action against federal employees in their official capacities is in effect a suit against the United States for which a waiver of sovereign immunity must exist."   Cortez v. E.E.O.C., 585 F. Supp. 2d at 1287. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." F.D.I.C. v. Meyer,   510 U.S. at 475.   "[A]n official capacity suit is only another way of pleading an action against an entity of which an officer is an agent." Johnson v. Bd. of Cnty Comm'rs for Cnty. of Fremont, 85 F.3d at 493 (internal quotation omitted).

Through 5 § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief."   United States v. Murdock Mach. and Eng'g Co. of Utah, 81 F.3d at 930 n.8.   "This waiver is not limited to suits under the Administrative Procedure Act." Simmat v. United States Bureau of Prisons, 413 F.3d at 1233.

> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis.   Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States

seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."   As we held in <u>Simmat v. U.S. Bureau of Prisons</u>, 413 F.3d 1225 (10th Cir.2005), § 702's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act."  <u>Id.</u> at 1233; <u>see also</u> <u>Hanson v. Wyatt</u>, 552 F.3d 1148, 1173 n.11 (10th Cir.2008)(Gorsuch, J., concurring) ("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver." (citation omitted)).

<u>Gilmore v. Weatherford</u>, 694 F.3d at 1166 n.1.   The Plaintiffs may therefore bring their claims under the First Amendment, and not under the APA, against the Defendants without implicating sovereign immunity, because of the United States' general waiver, in 5 U.S.C. § 702, of sovereign immunity in suits seeking equitable relief.   Additionally, the Court has jurisdiction under 28 U.S.C. § 1331 of this claim.   See <u>Simmat v. United States Bureau of Prisons</u>, 413 F.3d at 1232, 1236 (finding that a federal court has jurisdiction under 28 U.S.C. § 1331 for claims "seeking vindication of their constitutional rights . . . and may obtain relief in the nature of either injunction or mandamus").   The United States' waiver of sovereign immunity in the APA extends to claims for "nonmonetary relief against federal officials and agencies," over which the Court has jurisdiction, such as those for equitable relief brought under 28 U.S.C. § 1331.   <u>Simmat v. United States Bureau of Prisons</u>, 413 F.3d at 1232, 1236.   Indeed, in the Plaintiffs' Second Notice of Additional Authority in Response to Defendants' Motion to Dismiss Count I, the Plaintiffs cite to persuasive authority from the United States Court of Appeals for the District of Columbia Circuit, which comes to the same conclusion as the Court has here.   See <u>Trudeau v. Federal Trade Comm'n</u>,  456 F.3d at 187 ("In sum, we hold that APA § 702's waiver of sovereign immunity permits not only Trudeau's APA cause of action, but his nonstatutory and First Amendment actions as well.").

The Court is fully aware of the tension that exists between allowing a standalone First Amendment claim for declaratory relief and the APA claims.  Although the stand alone First Amendment claim allows the Plaintiffs robust discovery, while the similar claim under the APA and Olenhouse v. Commodity and Credit Corp., enjoys no or very little discovery.   The end result of both claims are likely to be similar if the Plaintiffs prevail: an injunction under the stand alone claim and invariably under the APA claim.   The Defendants appear to ask the Court to fashion some doctrine -- like in the Bivens area - that precludes the declaratory judgment action if there is another remedy.   There is, however, no such doctrine, and the Court is reluctant to create one here.  While the stand alone First Amendment claim undercuts Olenhouse v. Commodity and Credit Corp. in this case, this situation is unusual and relatively rare.   The Plaintiffs could have brought only a First Amendment claim in a separate case and enjoyed robust discovery; there is no sound reason to prevent them from joining it with an APA claim, which largely raises statutory issues.   While the Plaintiffs could not get much, if any, discovery on their APA First Amendment claim, there is no sound reason to preclude them from getting discovery on their standalone claim simply because they also have an APA First Amendment claim.[8]

The Court will therefore grant in part and deny in part the MTD.   The Court finds that it should not allow a Bivens action for the Plaintiffs claims seeking damages from Trujillo in her personal capacity, because Congress has created an adequate, alternative remedy in the APA for redressing constitutional violations arising from agency actions.   The Court therefore dismisses the Plaintiffs' requests for damages from Trujillo in her personal capacity.   On the other hand,

---

[8]  The Defendants appear to be prepared for this fact, as Department of Justice Attorney Andrew A. Smith appears to be representing the United States on the APA issues, and Assistant United States Attorney Ruth F. Keegan appears to be doing the heavy lifting regarding the First Amendment claims against Trujillo.

while a declaratory judgment may be cumulative, the Court should not deny the Plaintiffs' request only because an alternative remedy is available to the Plaintiffs in the APA.   The APA is neither better nor more effective than a declaratory judgment for the Plaintiffs.   The Plaintiffs' facts have nudged a conclusion from possible to plausible that the 2010 Decision Notice was made in retaliation for the Plaintiffs' exercise of their First Amendment right to petition the government for redress.   The Court may entertain Plaintiffs' second request for declaratory and injunctive relief, which requests the Court to declare the enforcement of the 2010 Decision Notice unconstitutional, because such a judgment would resolve an actual controversy between the parties.   The Plaintiffs may bring this claim under the Court's federal question jurisdiction, separately from the APA, as this claim for equitable relief arises under the Constitution, and the United States has waived its sovereign immunity from such suits.   The Court will dismiss the Plaintiffs' first request for declaratory relief, because it requests nothing more than a declaration that Trujillo's past acts violated the Constitution, and thus is inappropriate for declaratory relief.

**IT IS ORDERED** that the Defendants' Memorandum in Support of Motion to Dismiss, filed May 23, 2012 (Doc. 17) is granted in part and denied in part.   The Court will dismiss the Plaintiffs' request for damages from Defendant Diana Trujillo in her individual capacity in Count I, and paragraphs 15 and 16 on pages 55-56 of the Complaint for Declaratory and Injunctive Relief (First Amendment to the United States Constitution, National Environmental Policy Act; National Forest Management Act, Sustained Yield Forest Management Act; Administrative Procedure Act, filed Jan 20, 2012 (Doc. 1).   The Court will also dismiss the Plaintiffs' request for declaratory relief in paragraph 1, on page 53 of the Complaint.   The Court will not dismiss the Plaintiffs' requests for equitable relief in Count I, or in paragraph 2, on page 53 of the Complaint.

- 114 -

UNITED STATES DISTRICT JUDGE

Counsel:

Simeon Herskovits
Iris A. Thornton
Advocates for Community and Environment
El Prado, New Mexico

--and--

Richard Rosenstock
Santa Fe, New Mexico

    *Attorneys for the Plaintiffs*

Andrew A. Smith
United States Department of Justice
Environment & Natural Resources Division
United States Attorney's Office
Albuquerque, New Mexico

--and--

Kenneth J. Gonzales
   United States Attorney
Ruth Fuess Keegan
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Defendants*