## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JARITA MESA LIVESTOCK GRAZING
ASSOCIATION; ALAMOSA LIVESTOCK
GRAZING ASSOCIATION; SEBEDEO
CHACON; THOMAS GRIEGO; DONALD
GRIEGO; MICHAEL PENA; JUAN GIRON;
JOE GURULE, JR.; FERNANDO GURULE;
DIEGO JARAMILLO; LORENZO
JARAMILLO; GABRIEL ALDAZ; ARTURO
RODARTE; JEFFREY CHACON; GLORIA
VALDEZ; JERRY VASQUEZ; CARLOS
ORTEGA; LEON ORTEGA; HORACIO
MARTINEZ; RONALD MARTINEZ; STEVE
CHAVEZ; VANGIE CHAVEZ; ALFONSO
CHACON; DANIEL RAEL; JOHN VALDEZ
and BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF
RIO ARRIBA,

         Plaintiffs,

vs.                                        No. CIV 12-0069 JB/KBM

UNITED STATES FOREST SERVICE and
DIANA TRUJILLO, in her official and
individual capacities,

         Defendants.

## MEMORANDUM OPINION[1]

    **THIS MATTER** comes before the Court on the Federal Defendants' Motion for

Reconsideration, filed February 7, 2013 (Doc. 53)("Motion to Reconsider"). The Court held a

hearing on July 26, 2013. The primary issue is whether the Court should reconsider the portion

---

[1]On September 30, 2013, the Court entered an Order granting in part and denying in part the Federal Defendants' Motion for Reconsideration, filed February 7, 2013 (Doc. 53). See Order, filed September 30, 2013 (Doc. 101)("Order"). The Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

of its earlier Memorandum Opinion and Order, filed January 24, 2013 (Doc. 49)("MOO"), in which it concluded that the Plaintiffs have asserted two separate claims for violation of the First Amendment to the Constitution of the United States -- one under the Administrative Procedure Act of 1946, Pub. L. No. 79-404, 60 Stat. 237 ("APA"), and the other a "standalone" First Amendment claim outside of the APA -- and that the Plaintiffs are entitled to "robust discovery" on the standalone claim but are limited to the administrative record on the APA First Amendment claim.  MOO at 113.  The Court now concludes that only one First Amendment claim exists, that the APA governs that First Amendment claim, and that the Plaintiffs are thus limited to the APA's discovery provisions, which preclude discovery outside of the administrative record unless and until the plaintiff makes certain factual showings.

## FACTUAL BACKGROUND

The history of the Plaintiffs' case predates the parties before the Court.  The Plaintiffs set forth a backdrop of social, cultural, and economic factors, which they say are inextricably intertwined with the Plaintiffs' cattle grazing within the Carson National Forest.  The Plaintiffs also allege a history of tension between the United States Forest Service ("USFS") and the Plaintiffs' ancestors, which bears on the legality of the Defendants' actions managing national forestland in northern New Mexico over the last three years.[2]  The Court takes as true all non-conclusory factual statements in the Complaint for Declaratory and Injunctive Relief (First Amendment to the United States Constitution, National Environmental Policy Act; National Forest Management Act, Sustain Yield Forest Management Act; Administrative Procedure Act), filed January 20, 2012 (Doc. 1)("Complaint").

---

[2]The USFS originated in 1891 with the Forest Reserve Act, which empowered "the president to establish forest reserves from timber covered public domain land."  US Forest Service, History, U.S. Forest Service, (Dec. 22, 2009), http://www.fs.fed.us/aboutus/history.

1.      **The Parties to the Litigation.**

"The Plaintiffs and their ancestors are Hispanic stockmen whose families have been grazing livestock" in northern New Mexico for many generations.  Complaint ¶ 3, at 2-3.  Most of the natural-person Plaintiffs' families were grazing livestock in the area of the Vallecitos Federal Sustained Yield Unit ("the Unit") before the USFS existed.  See Complaint ¶ 3, at 3. The Unit is an area of the Carson National Forest that Congress set aside to be managed for the economic benefit of the communities located in the Unit.  Congress specifically provided that these local communities should have access to the timber and other forest products within the Unit, as needed for the communities' economic stability.  See Complaint ¶ 39, at 14.  Grazing livestock is an "integral part of their existence and is a central part of life in the villages they reside in . . . all of Northern New Mexico."  Complaint ¶ 3, at 3.

The Jarita Mesa Allotment and the Alamosa Allotment are areas within the Unit on which cattle grazing is allowed.  See Complaint ¶ 2, at 2.  Plaintiffs Sebedeo Chacon, Michael Pena, Juan Giron, Gabriel Aldaz, Arturo Rodarte, Thomas Griego, Donald Griego, Joe Gurule, Jr., Lorenzo Jaramillo, Jeffrey Chacon, and Gloria Valdez (collectively, "the Jarita Mesa Permittees") have permits, that the USFS issued, which allow them to graze cattle on the Jarita Mesa Allotment.  See Complaint ¶ 3, at 2.  Plaintiffs Thomas Griego, Donald Griego, Carlos Ortega, Leon Ortega, Daniel Rael, Horacio Martinez, Ronald Martinez, Fernando Gurule, Jerry Vasquez, and Alfonso Chacon (collectively, "the Alamosa Permittees") have permits, that the USFS issued, which allow them to graze cattle on the Alamosa Allotment.  See Complaint ¶ 3, at 2.  S. Chavez is a former permittee on the Alamosa Allotment and now lives within the Unit with his wife, V. Chavez.  See Complaint ¶ 3, at 2.  J. Valdez is a former permittee on the Jarita Mesa Allotment and now resides within the Unit.  See Complaint ¶ 3, at 2-3.  The Jarita Mesa Grazing

Association and the Alamosa Grazing Association (collectively, "the Associations") are "local livestock associations made up exclusively of grazing permittees on the respective allotments." Complaint ¶ 13, at 5.  The Associations were established to: (i) protect and promote the permittees' livestock grazing on the Allotments; (ii) manage and share the costs of handling livestock, range improvements, and other programs for the benefit of the Allotments and their resources; (iii) express the Associations' members' wishes; and (iv) meet with and work with the USFS to ensure proper management of livestock and range resources on the allotments.  See Complaint ¶ 13, at 6.  S. Chacon was president of the Jarita Mesa Grazing Association throughout the events set forth in the Complaint.  See Complaint ¶ 14, at 6.  T. Griego was president of the Alamosa Grazing Association throughout the events set forth in the Complaint. See Complaint ¶ 15, at 7.

The Hispanic people in northern New Mexico have lived in the area for hundreds of years, long before the USFS was created.  See Complaint ¶ 37, at 13.  They have a unique culture, shaped by and dependent on their relationship with the land.  See Complaint ¶ 37, at 13. The Hispanic people living in villages nearby the Carson National Forests have historically relied on the resources of the national forests of northern New Mexico for sustenance.  See Complaint ¶ 37, at 13.  These Hispanics rely upon the "fodder, including grasses and other forage, like the marsh hay, mushrooms, nuts, and seeds" within the Unit for their sustenance. Complaint ¶ 39, at 14.  Livestock grazing is central to their cultural, social, and economic fabric, and has been since at least the 1690s.  See Complaint ¶ 40, at 14.  The Associations represent the communities "that have historically relied on, and continue to rely on, grazing on these ancient community . . . lands."  Complaint ¶ 40, at 15.

The Board of County Commissioners of the County of Rio Arriba ("Rio Arriba County") is a political subdivision in northern New Mexico, in which a large portion of the Carson National Forest, including the Allotments and the El Rito Ranger District, is located. See Complaint ¶ 16, at 7. The Individual Plaintiffs are all residents of Rio Arriba County. Rio Arriba County and local school districts receive payment derived from the grazing fees, in lieu of taxes, from the USFS. This payment is derived, in part, from grazing fees. Rio Arriba County is thus interested in ensuring that the "grazing permits on land administered by the Forest Service within Rio Arriba County are not unlawfully reduced." Complaint ¶ 16, at 7. Rio Arriba County is also interested in protecting the social fabric, customs, traditions, and cultural integrity of the traditional communities within the county, and in the economic betterment of its citizens. Rio Arriba County is further interested in "making sure federal laws are followed and that its citizens are not punished by federal officials for expressing their views on federal agency policy to elected officials and others." Complaint ¶ 16, at 7.

The USFS is an agency of the United States Department of Agriculture and is charged with the "administration of lands within the United States that have been designated as National Forest Lands." Complaint ¶ 17, at 8. The USFS is charged with the management of the Unit. Throughout the events set forth in the Complaint, Trujillo was employed by the USFS as the El Rito District Ranger. Complaint ¶ 19, at 8. Both Allotments are located in the El Rito District of the Carson National Forest. See Complaint ¶ 1, at 2. Trujillo is charged with "managing the natural resources in her district, including the range resource." Complaint ¶ 19, at 8.

## 2. The Events Giving Rise to the Litigation.

"[A]ll or a substantial part of the events or omissions giving rise to the [Plaintiffs'] claims . . . occurred within this judicial district." Complaint ¶ 12, at 5. Beginning in the 1920s, the

USFS' management practices led to a reduction of the number of Hispanic residents near the Carson National Forest who were allowed to graze in the forest under permit.  See Complaint ¶ 43, at 16-17.   The USFS gradually eliminated milk cow and draft horse permits.   See Complaint ¶ 43, at 17.  The reduction in these permits has destabilized the Plaintiffs' cultural and social fabric.  See Complaint ¶ 43, at 17.  The Plaintiffs have "repeatedly voiced opposition to and have been highly critical of various actions taken by the Defendants," especially Trujillo's actions in recent years.  Complaint ¶ 57, at 22-23.  The Plaintiffs have written letters, spoken at public meetings, and contacted their congressional representatives about the Defendants' actions. See Complaint ¶ 57, at 23.

Under the USFS' management, the population of wild horses and elk on the Unit has grown to the point that the vegetative cover, upon which the Plaintiffs rely for grazing their cattle, has degraded.  See Complaint ¶ 58, at 23.  In 2002, the USFS concluded that the wild horses on Jarita Mesa were competing with the cattle for forage.  See Complaint ¶ 59, at 23.  In 2002, the USFS issued a Decision Notice ("2002 Decision Notice"), which authorizes the number of wild horses to increase from between twelve and fourteen, to between twenty and seventy.  Complaint ¶ 60, at 24.  The 2002 Decision Notice provides certain measures to be taken if the wild horse herd size grows above seventy horses.  See Complaint ¶ 60, at 24.

On or about April 8, 2006, S. Chacon, as the President of the Jarita Mesa Grazing Association, sent a letter to New Mexico's then-Governor Bill Richardson and to the New Mexico Congressional delegation, which over eighty residents of the Unit signed, and in which S. Chacon complained about the USFS' management of the El Rito Ranger District.  The letter specifically complained about the USFS' failure to reduce the number of wild horse herds and to control the number of elk herds on the Unit.  See Complaint ¶ 62, at 25.  On May 24, 2006, the

Plaintiffs[3] wrote to Trujillo's supervisor, Carson National Forest Supervisor Martin Chavez, and alleged that Trujillo was acting "in an abusive manner towards the Jarita Mesa permittees, was dealing with them in a less than honest manner, was arbitrarily and capriciously reducing the grazing time allowed under their permits, and was otherwise impairing their grazing rights" under the permits.  Complaint ¶ 63, at 25.  In June, 2006, an USFS employee admitted that the wild horse herd exceeded the number that the 2002 Decision Notice allowed and was numbering at least 150.  See Complaint ¶ 64, at 25.

On July 5, 2006, Trujillo ordered all cattle removed from the Jarita Mesa Allotment by July 31, 2006.  See Complaint ¶ 66, at 26.  Some of the Plaintiffs, including S. Chacon and Aldaz, appealed Trujillo's order.  See Complaint ¶ 66, at 27.  On July 25, 2006, Trujillo wrote to the Jarita Mesa Grazing Association and stated that the range conditions had not improved significantly, and, thus, she would not change her July 5, 2006, order to remove cattle by July 31, 2006.  See Complaint ¶ 68, at 27.  On July 28, 2006, acting Carson Forest Supervisor Kendall Clark decided to delay Trujillo's order for two weeks because of recent rains and soil moisture levels.  A report by the Range Improvement Task Force ("RITF"), associated with New Mexico State University ("NMSU"), subsequently found that the past grazing of the permittees' cattle had not damaged grazing resources, and that there was sufficient grass to complete the grazing season as the permits authorized.  The Jarita Mesa Permittees were eventually allowed to complete their grazing season as their permits specified.  See Complaint ¶ 69, at 28.

David Correia is a scholar who had been researching the Unit's history over several years.  Correia had been previously granted full access to the USFS' records at the El Rito

---

[3]The Plaintiffs do not clarify if all Plaintiffs were signatories to the May 24, 2006 letter, only the Individual Plaintiffs, or only the Jarita Mesa Permittees -- whose permits Trujillo's management of the Jarita Mesa Allotment affected.  See Complaint ¶ 3, at 25.

District Office for his research on the Unit.  In 2006, he began assisting the Plaintiffs with their interactions with Trujillo.  Correia attended a meeting in the El Rito area regarding grazing issues, at which Trujillo made statements to the effect that residents of the Unit caused most or all of the problems facing the Unit.  See Complaint ¶ 72, at 28.  Correia responded publicly at the meeting that the USFS' mismanagement of the Unit over the years was the actual source of the Unit's problems.  Subsequent to the 2006 meeting, Trujillo refused to allow Correia access to any records at the El Rito District Office and informed him that this change of policy was because of his statements at the meeting.  See Complaint ¶ 72, at 29.

Trujillo then announced that she would end the 2006 grazing season in September, 2006, instead of on October 31, 2006, as set forth in the Plaintiffs' permits.  Trujillo stated that this change was because the Plaintiffs failed to meet certain conditions that she had imposed -- conditions that, had they been met, would have allowed the season to end on October 31, 2006. S. Chacon, as President of the Jarita Mesa Grazing Association, proposed a compromise end date of October 15, 2006.  See Complaint ¶ 73, at 29.  Trujillo responded that she would view S. Chacon's request as that of his alone and that individual permittees would need to address their needs to her individually.  Trujillo stated that, if the conditions she imposed were not met, she would suspend or cancel the permits, and charge fines for any cattle not removed by October 2, 2006.  See Complaint ¶ 74, at 30.

As of October 5, 2006, S. Chacon had seventeen cows lost in the Carson National Forest. Give the size of the Allotments, locating cattle at the end of a grazing season is often difficult for the permittees.  On October 6, 2006, Trujillo reduced S. Chacon's grazing permit by twenty percent over the next two years, because he had not retrieved all of his cattle by the deadline she imposed.  This decision was upheld on appeal.  See Complaint ¶ 75, at 30-31.  A Riparian

Specialist and Natural Resource Specialist from NMSU wrote to Trujillo regarding S. Chacon's permit reduction, and expressed that her standards were "unreasonable and unyielding," and that the USFS was aware that S. Chacon was not given enough time to recover his cattle. Complaint ¶ 77, at 31-32.

Moving ahead three years, the Plaintiffs complained to Trujillo and her staff in the spring of 2009 regarding the USFS' management of the Allotments. Trujillo responded with a certified letter in which she outlined the repercussions that the Plaintiffs would face if they did not comply with their grazing permits' terms. See Complaint ¶ 79, at 32. On June 1, 2009, S. Chacon and T. Griego sent Trujillo a letter, that twenty-six permittees signed, in which the Plaintiffs criticized Trujillo's management of the Allotments. The Plaintiffs also sent the letter to the New Mexico Congressional delegation, Governor Richardson, and Trujillo's immediate supervisor, Carson Forest Supervisor Clark. The Plaintiffs stated in the letter that Trujillo's certified letter insulted them, and the Plaintiffs accused Trujillo of attempting to intimidate them. The Plaintiffs alleged that Trujillo had failed to "install needed cattle guards or to fix plugged ones," and that Trujillo would sanction the permittees when their cattle then drifted from one allotment to another. Complaint ¶ 80, at 32-33. The Plaintiffs complained that they believed Trujillo was attempting to end grazing on the Allotments. See Complaint ¶ 80, at 33.

In 2009 and 2010, the USFS began preparing an Environmental Assessment ("EA")[4] that would determine the amount of grazing allowed on the Allotments for 2011 and subsequent

---

[4]Under the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852, federal agencies are required to assess the environmental impacts of proposed actions that will significantly affect the quality of a human environment. Agencies must prepare an environmental impact statement that sets forth proposed actions and their environmental impact. See 42 U.S.C. § 4332(2)(C). When the agency cannot determine whether a proposed action will have an environmental impact, the agency must prepare an EA. See 40 C.F.R. § 1501.4(b). An EA:

years.  See Complaint ¶ 78, at 32.  On August 20, 2009, the USFS made public three alternative courses of action for the El Rito District: (i) no grazing; (ii) grazing at the same level as the previous ten years, but with a minor reduction and improved management; and (iii) an eighteen-percent reduction in the number of permits with improved management.  The EA did not propose a reduction to the wild horse or elk population.  See Complaint ¶ 81, at 33.

The USFS requested comments from the RITF regarding the EA's proposals.  The RITF had been studying the socioeconomic and environmental effects and implications of USFS decisions regarding the Allotments for many years.  See Complaint ¶ 82, at 33.  The RITF sent a letter to Trujillo expressing concern over the EA's scientific methodology, and the RITF noted that the permittees "feel discouraged and powerless vis-à-vis" the USFS, as evidenced by the strained relationship of the two over recent years.  Complaint ¶ 82, at 34.  The RITF recommended that Trujillo adopt the second proposal in the EA, which would allow grazing to

---

(a)      Means a concise public document for which a Federal agency is responsible that serves to:

         (1)      Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

         (2)      Aid an agency's compliance with the Act when no environmental impact statement is necessary.

         (3)      Facilitate preparation of a statement when one is necessary.

(b)      Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

remain at the same level as the previous years.  See Complaint ¶ 84, at 34.  The RITF also recommended a longer grazing season.  See Complaint ¶ 84, at 34.

Rio Arriba County submitted a letter to the Defendants on September 17, 2009, in which it expressed concern about what it viewed as a "historical pattern of unjustified Forest Service action to reduce grazing opportunities for villagers that has chipped away and eroded the culture in the area and the way of life integral to that culture."  Complaint ¶ 85, at 35.  The Associations also submitted comments on September 17, 2009, in which they stated that the USFS should, as part of the upcoming EA, consider managing the wild horse and elk populations.  See Complaint ¶ 86, at 35.  On September 18, 2009, the New Mexico Department of Agriculture submitted comments in which it recommended that Trujillo adopt the EA's second proposal and stated its belief that proper management of the Carson National Forest would obviate the need to reduce the number of permits.  See Complaint ¶ 87, at 35.

On January 11, 2010, at a public meeting, Trujillo expressed her view that the current level of permits was an eighteen-percent temporary increase above the correct level -- an increase which occurred in 1980, and had, improperly, never been reduced to the correct level. See Complaint ¶ 89, at 36.  Trujillo also stated that she had been working with outside groups regarding the possibility of purchasing the Plaintiffs' permits.  See Complaint ¶ 89, at 36. Trujillo further stated that she would seek an eighteen-percent reduction in the number of permits, regardless of the EA's proposals.  See Complaint ¶ 89, at 37.  That month, Trujillo contacted outside groups later in January and suggested that they purchase the Plaintiffs' permits. See Complaint ¶ 90, at 37.

In March, 2010, the Plaintiffs submitted a petition to Carson National Forest Supervisor Clark, and Corbin Newman, the Regional Forester, which over 200 Unit residents signed, in

which they requested that Trujillo be transferred from the El Rito District Ranger position. Trujillo was "extremely upset and angered by" the Plaintiffs' request.  Complaint ¶ 92, at 38.

On September 30, 2010, the USFS issued its EA.  See Complaint ¶ 4, at 3.  The EA contains approximately one page describing the socioeconomic and cultural impact that the proposed actions may have.  See Complaint ¶ 93, at 38.  The EA did not contain any recommendations regarding reducing the wild horse and elk population on the Allotments.  See Complaint ¶ 94, at 39.  The EA noted that, if the second alternative was adopted, which would allow the permittees to remain at the same number but with better management, the overall environmental impact would be positive, and the economic impact on the permittees would be less harsh than if the third alternative, an eighteen-percent reduction in the number of permittees, was adopted.  See Complaint ¶ 97, at 40.  The EA thus designated the second alternative as the Proposed Action.  See Complaint ¶ 98, at 41.

The 2010 EA's Proposed Action would have allowed the Plaintiffs to "continue grazing on both allotments with approximately the same number of cows as Plaintiffs have grazed on those allotments since 1980."  Complaint ¶ 4, at 3; id. ¶ 98, at 41.  Normally, the District Range for the Carson and Santa Fe National Forests adopts the Proposed Action set forth in an EA.  See Complaint ¶ 4, at 3; id. ¶ 99, at 41.  Rather than adopting the 2010 EA's Proposed Action, Trujillo adopted the third alternative set forth in the 2010 EA, which imposed an eighteen-percent reduction in the Plaintiffs' grazing permits.  See Complaint ¶ 5, at 3.  Trujillo stated that she took this action because the current number of permitted livestock on the Unit was unsustainable.  See Complaint ¶ 5, at 3-4; id. ¶ 100, at 42.  The EA did not conclude that the current grazing numbers were unsustainable.  See Complaint ¶ 100, at 42.

On November 29, 2010, the Associations and Rio Arriba County appealed Trujillo's 2010 Decision Notice.  See Complaint ¶ 105, at 44.  In 2011, Trujillo's' supervisors ruled on the appeal and announced that they are upholding her decision.  See Complaint ¶ 106, at 44.  The Plaintiffs assert that they "will be significantly injured as a result of the imposition of the 18% reduction in permitted cow/calf numbers."  Complaint ¶ 17, at 8.  The Plaintiffs assert that the loss of grazing permits "causes not only severe economic harm to Plaintiffs but also grave damage to viability of the unique cultural and social fabric of their families and communities."  Complaint ¶ 17, at 8.  The Plaintiffs assert that the importance of their social and cultural fabric "has been recognized by Defendant Forest Service as essential not just to the residents of northern New Mexico but to the entire nation."  Complaint ¶ 17, at 8.

## PROCEDURAL BACKGROUND

The Court will summarize -- as needed to dispose of the Motion to Reconsider -- the Complaint, the Court's MOO, and the USFS' Motion to Reconsider a portion of that MOO.

### 1.    The Claims in the Complaint.

All of the Plaintiffs' alleged injuries are related to Trujillo's 2010 decision to reduce grazing on the Jarita Mesa and Alamosa Grazing Allotments, both of which lie within the El Rito Ranger District of the Carson National Forest.  The Plaintiffs allege that the eighteen-percent reduction in their permits violated the Plaintiffs' First Amendment right to free speech and to petition for redress of their grievances.  The Plaintiffs bring this action under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4331-4370 ("NEPA"), the National Forest Management Act of 1976, Pub. L. No. 94-588, 90 Stat. 2949 (codified in scattered section of 16 U.S.C.)("NFMA"), the Federal Sustained Yield Forest Management Act of 1944, 16 U.S.C. §§ 583, 583a-583i ("FSYMA"), and the APA.  See Complaint ¶ 9, at 4-5.  The Plaintiffs assert

that the Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1346, 2201, and 2202.  See Complaint ¶ 10, at 5.

The Plaintiffs assert that, under NEPA, all federal agencies are required to prepare an environmental impact statement ("EIS") regarding proposed actions that will significantly affect the quality of a human environment.  See Complaint ¶ 23, at 9 (citing 42 U.S.C. § 4332(2)(C)).  The Plaintiffs assert that agencies must prepare an EA when a proposed action's effect is uncertain.  See Complaint ¶ 24, at 10 (citing 40 C.F.R. §§ 1501.4(b), 1508.9).  The Plaintiffs assert that, as part of the EIS and EAs prepared under NEPA, an agency "must consider a reasonable range of alternatives and analyze both the direct and indirect impacts of all proposed major federal actions significantly affecting the human environment."  Complaint ¶ 26, at 10 (citing 40 C.F.R. § 1502.14).  The Plaintiffs assert that, when a range of proposed actions are available and an EA is prepared, the EA "is considered the functional equivalent of the preferred alternative" in an EIS.  Complaint ¶ 26, at 10.  The Plaintiffs assert that an agency is required to "insure the professional integrity, including scientific integrity," of the environmental analyses underlying an EIS and EA.  Complaint ¶ 28, at 10 (citing Natural Res. Def. Council v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972); 40 C.F.R. § 1502.24).  The Plaintiffs assert that the environmental review process that NEPA requires is subject to public comment, and agencies must respond to public comments with thorough modifications, or with a thorough explanation for why no modification is necessary.  See Complaint ¶ 29, at 10-11 (citing 40 C.F.R. § 1503.4).

The Plaintiffs assert that, under the NFMA, the USFS is required to develop land resource management plans ("Forest Plans") for each national forest, and must implement the plan on a site-specific level.  See Complaint ¶¶ 30-32, at 11 (citing Pub. L. No. 94-588; 16 U.S.C. § 1604(a); 36 C.F.R. § 219.10).  The Plaintiffs assert that the implementation of a

Forest Plan must be consistent with the Forest Plan.  See Complaint ¶ 32, at 11 (citing 16 U.S.C. § 1604(i)).  The Plaintiffs assert that, under the SYFMA, the USFS must use timber and non-timber forest products within a sustained unit for the "benefit of and to stabilize the communities within each sustained yield unit."  Complaint ¶ 33, at 12 (citing 16 U.S.C. §§ 583(b), 583(a)).

The Plaintiffs assert that the USFS 1972 Region 3 Policy ("the Policy") recognizes that northern New Mexico communities are dependent upon forest resources, declares the Spanish-American/Hispanic culture of the area to be a "resource," and acknowledge that the USFS' "objectives and policies must be altered to the extent possible to recognize and be responsive to the culture and peoples."  Complaint ¶ 34, at 12 (citing the Policy at 3).  The Plaintiffs assert that the Policy "'explicitly recognized the intimate relationship that the Native American and Hispanic residents of Northern New Mexico had with the land' . . . and that 'their economic well-being is often tied closely to the resources of the National Forests and the manner in which they are utilized."  Complaint ¶ 49, at 19-20 (quoting from the Policy at 2).  The Plaintiffs assert that the Policy requires the USFS to take actions for the preservation of Spanish-American/Hispanic culture in the region, including authorizing livestock permits.  See Complaint ¶¶ 35-36, at 12-13.

The Plaintiffs assert that the USFS reduced their grazing permits out of racial animus.  See Complaint ¶¶ 43-44, at 17.  The Plaintiffs assert that the Unit was created in 1948 "to address some of the economic and social afflictions" harming the Plaintiffs' communities, and resulting from the reduction in their grazing permits over the years.  Complaint ¶¶ 45-46, at 18.  The Plaintiffs assert that, contrary to the Policy, the USFS "has, for the most part, dealt with the Hispanic communities within the Unit . . . , by continuing to pursue . . . a reduction in grazing permits, that have worked to further destabilize and impair the cultural, social, and economic

fabric" of the Plaintiffs' communities.  Complaint ¶ 54, at 22.  The Plaintiffs assert that, instead of "managing the [U]nit to provide stability to the communities within the Unit as required by law," the USFS' conduct has "resulted in an increase in economic and cultural instability for the communities in the Unit."  Complaint ¶ 56, at 22.

The Plaintiffs assert that Trujillo has responded to their public criticism "by engaging in a continuing and ongoing campaign of retaliation, misusing her position to harass and punish Plaintiffs for their constitutionally protected conduct."  Complaint ¶ 57, at 23.  The Plaintiffs assert that swelling of the wild horse and elk populations on the Unit has contributed to the destabilization of the Plaintiffs' grazing tradition and culture.  See Complaint ¶ 58, at 23.  The Plaintiffs assert that, rather than reducing the number of wild horses on the Unit, as outlined in the 2002 Decision Notice, the Defendants have used the damaged forage as an "excuse to harass" the Plaintiffs about foraging conditions and to restrict their grazing rights.  Complaint ¶ 61, at 25.

The Plaintiffs assert that Trujillo's July 5, 2006, order that the Plaintiffs remove their cattle from Jarita Mesa by July 31, 2006, and her refusal to lift that order, were "motivated, in whole or in part, by a desire to retaliate against Plaintiffs for the exercise of their First Amendment rights to free speech and to petition for redress of grievances."  Complaint ¶ 70, at 28.  The Plaintiffs assert that Trujillo's actions were part of an "ongoing pattern and practice of retaliatory conduct."  Complaint ¶ 71, at 28.  The Plaintiffs assert that Trujillo's decision in 2006 to reduce S. Chacon's grazing permit by twenty percent had a profound economic impact on him, "costing him tens of thousands of dollars," and also damaged the social and cultural fabric of his community and extended family.  Complaint ¶ 75, at 31.  The Plaintiffs assert that S. Chacon was "singled out for disparately harsh punishment by Defendant Trujillo because she perceived him as a leader of the Jarita Mesa Grazing Association," and because the Jarita Mesa

Permittees had criticized her to the government.  Complaint ¶ 76, at 31.  The Plaintiffs assert that Trujillo acted as she did to chill the Plaintiffs' speech.  See Complaint ¶ 76, at 31.

The Plaintiffs also assert that what Trujillo stated was an eighteen-percent increase in permits was the result of an agreement in which the Plaintiffs agreed to a shorter grazing permit, but an eighteen-percent increase in the number of permits.  See Complaint ¶ 89, at 36.  The Plaintiffs assert that Trujillo's attempts to orchestrate the purchase of their permits was "completely outrageous" and beyond the scope of her duties, in addition to being in violation of the "letter and spirit" of the Policy.  Complaint ¶ 91, at 37.  The Plaintiffs assert that this "shocking" conduct demonstrates her "deep animosity towards the needs and aspirations of the permittees."  Complaint ¶ 91, at 37.

The Plaintiffs also assert that Trujillo's 2010 Decision Notice, in which she chose to reduce the available permits by eighteen percent, was done out of her anger towards the Plaintiffs, and because she had "determined to retaliate against the Plaintiffs for having the temerity to point out her errors and criticize her mismanagement of the two allotments and the entire Sustained Yield Unit."  Complaint ¶ 99, at 42.  The Plaintiffs assert that Trujillo decided to reduce their permits by eighteen percent "long before the Final EA was issued."  Complaint ¶ 103, at 43.  The Plaintiffs assert that Trujillo's statements regarding the current level of permittees being unsustainable "was a pretext to conceal her retaliatory motive . . . to punish Plaintiffs and the other permittees for having complain[ed] to other government officials about Defendant Trujillo's conduct."  Complaint ¶ 104, at 44.

The Plaintiffs assert that the economic loss they have suffered and will continue to suffer because of the 2010 Decision Notice is far greater than the $32,000.00 which the USFS estimates will be their economic loss.  The Plaintiffs assert that their economic injuries are "compounded

by permanent, irreparable damage to the social and cultural fabric" of their communities. Complaint ¶ 107, at 45.  The Plaintiffs point out that their "large extended families" share the beef they acquire from cattle raising, providing "the larger population of local residents with healthy and inexpensive meat on which they depend for a vital part of their diet," and the Plaintiffs will now have twenty percent less beef available for their needs.  Complaint ¶ 109, at 46.

The Plaintiffs' first count in the Complaint is alleged against Trujillo.  The Plaintiffs assert that the Trujillo violated their right to free speech, "the related right to petition for redress of grievances," and their right to freedom of association, as the First Amendment guarantees. Complaint ¶ 112, at 47.  The Plaintiffs assert that they did not have an opportunity during the EA process, or during their appeal of Trujillo's July 5, 2006 order, "to discover and present evidence of disparate treatment, violation of normal procedure or practice, or other evidence from which retaliatory animus may be inferred," including the evidence that district rangers normally adhere to the proposed actions in EAs.  Complaint ¶ 12, at 47.  The Plaintiffs assert that they have "no remedy other than an action under the First Amendment" to remedy this asserted constitutional violation, "which resulted in a reduction in their permits for the 2011 grazing season," a reduction which continues through the 2015 grazing season, "and to compensate them for the losses already accrued as a result of Defendant Trujillo's retaliatory conduct."  Complaint ¶ 112, at 47-48.  The Plaintiffs assert that Trujillo acted in an "arbitrary and capricious manner," and "intentionally and/or with deliberate indifference to the First Amendment rights of Plaintiffs." Complaint ¶ 113, at 48.  The Plaintiffs also assert that Trujillo's actions violated the APA.  See Complaint ¶ 114, at 48 (citing 5 U.S.C. §§ 702, 706(2)(b)).  The Plaintiffs assert that they "will

suffer irreparable harm if these reductions are allowed to proceed," and they assert that they "have no adequate remedy at law to stop them."  Complaint ¶ 115, at 48.

As their second cause of action, the Plaintiffs allege that the Defendants failed to properly analyze environmental impact in the 2010 EA, and, by failing to take a "hard look" at the social, economic, and environmental justice impact each alternative would have, violated the APA. Complaint ¶¶ 116-119, at 48-49 (citing Natural Res. Def. Council v. Morton, 458 F.2d at 838; 5 U.S.C. §§ 702, 706(2)).  The Plaintiffs allege as their third cause of action that the Defendants failed to properly analyze the environmental impact in the 2010 EA by failing to develop a proper baseline with the best available science for their study, in violation of the APA.  See Complaint ¶¶ 120-123, at 49 (citing 40 C.F.R. § 1502.24; 5 U.S.C. §§ 702, 706(2)).   The Plaintiffs allege, as their fourth cause of action, that the Defendants failed to properly consider and respond to comments, and failed to consider a reasonable range of alternatives in the 2010 EA, in violation of NEPA and of the APA.  See Complaint ¶¶ 124-127, at 49-50 (citing 40 C.F.R. 1503.4; 36 C.F.R. § 220.4(c); 5 U.S.C. §§ 702, 706(b)).  As their fifth cause of action, the Plaintiffs allege that Trujillo failed to consider the findings in the 2010 EA when she made her 2010 Decision Notice, in violation of NEPA and of the APA.  See Complaint ¶¶ 128-131 (citing 36 C.F.R. § 220.4(c)(4); 5 U.S.C. §§ 702, 706(2)).  As their sixth cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan range standards and guidelines related to grazing numbers, in violation of the NFMA and of the APA.  See Complaint ¶¶ 132-136, at 50-51 (citing 16 U.S.C. § 1604(i); 5 U.S.C. §§ 702, 706(b)).  As their seventh cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan's range standards and guidelines related to the management of wild horses on the Jarita Mesa Allotment, in violation of the NFMA and of the APA.  See Complaint ¶¶ 137-140, at

51-52 (citing 5 U.S.C. §§ 702, 706(2)).  As their eighth cause of action, the Plaintiffs allege that the Defendants violated the SYFMA and the APA, by failing to use the Carson National Forest for the benefit of the communities within the Unit.  See Complaint ¶¶ 141-143, at 52 (citing 5 U.S.C. §§ 702, 706(2)).  As their ninth cause of action, the Plaintiffs allege that the Defendants violated the Policy and the APA by failing to manage the Allotments in a manner that is responsive to and compatible with the well-being of the local resource-dependent communities, and that they did so without a reasonable explanation.  See Complaint ¶¶ 144-146, at 52-53 (citing 5 U.S.C. §§ 702, 706(2)).

The Plaintiffs request various forms of relief.  The Plaintiffs request that the Court: (i) declare that the "acts complained of herein violated the First Amendment rights" of the Plaintiffs, Complaint ¶ 1, at 53; (ii) declare that any future reductions to the number of cattle permitted on the Allotments for the 2012-2015 grazing seasons, based on Trujillo's 2010 Decision Notice, would be contrary to the Constitution, see Complaint ¶ 2, at 53; (iii) declare that the Defendants violated NEPA by failing to analyze adequately, or to "take a hard look" at the social, economic, and environmental impacts that would result from the 2010 EA and 2010 Decision Notice for the Allotments, Complaint ¶ 3, at 53; (iv) declare that the Defendants violated NEPA by "failing to properly analyze impacts insofar as they failed to develop or use a proper baseline based on the best available science," Complaint ¶ 4, at 53; (v) declare that the Defendants violated NEPA by failing to properly consider and respond to comments, and by failing to consider a reasonable range of alternatives, see Complaint ¶ 5, at 54; (vi) declare that Trujillo violated NEPA by failing to consider the alternatives that the EA analyzed before issuing the 2010 Decision Notice, see Complaint ¶ 6, at 54; (vii) declare that the Defendants violated the NFMA by failing to act in accordance with the Carson National Forest Plan's range standards

- 20 -

and guidelines regarding grazing numbers, see Complaint ¶ 7, at 54; (viii) declare that the Defendants violated the NFMA by failing to act consistently with the Carson National Forest Plan's range standards and guidelines regarding wild horse management, see Complaint ¶ 8, at 54; (ix) declare that the Defendants violated the Plaintiffs' rights under the SYFMA by failing to manage the forest for the benefit of the communities within the Unit, see Complaint ¶ 9, at 54; (x) declare that the Defendants violated the Policy by failing to be responsive to the needs of the local, resource-dependent communities and failing to act in a way that supports their future well-being, see Complaint ¶ 10, at 54; (xi) declare that the Defendants' actions violated the APA by not observing the procedures required by law, and were arbitrary and capricious "and/or unconstitutional," Complaint ¶ 11, at 55; (xii) issue a judgment and injunction that voids the 2010 Decision Notice, and orders the Defendants to adhere to the second alternative the 2010 EA, which would allow the Plaintiffs to keep their permits at approximately the same levels as before the 2010 EA was issued, see Complaint ¶ 12, at 55; (xiii) issue an injunction that compels the USFS to comply with NEPA, the NFMA, the SYFMA, and the APA, so as to prevent irreparable harm and satisfy the public interest, see Complaint ¶ 13, at 55; (xiv) issue an injunction which requires the Defendants to adhere to the second alternative in the 2010 EA, see Complaint ¶ 14, at 55; (xv) award compensatory damages, against Trujillo, to the Plaintiffs who had their permits reduced in the 2011 grazing season and any subsequent grazing season, see Complaint ¶ 15, at 55; (xvi) award punitive damages against Trujillo, see Complaint ¶ 16, at 56; (xvii) award the Plaintiffs their "costs, expenses, expert witness fees, and reasonable attorney fees under applicable law," Complaint ¶ 17, at 56; and (xviii) grant the Plaintiffs "such other and further relief as the Court deems proper," Complaint ¶ 18, at 56.

2.     **The USFS' Motion to Dismiss and the Court's MOO Ruling on the Motion.**

The USFS filed a motion to dismiss May 23, 2012.  <u>See</u> Defendants' Memorandum in

Support of Motion to Dismiss, filed May 23, 2012 (Doc. 17)("MTD").  The MTD moved the

Court to dismiss (i) the claim under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of

Narcotics</u>, 403 U.S. 388 (1971)("<u>Bivens</u>"); (ii) the First Amendment retaliation claim; and

(iii) the claims for declaratory relief.  <u>See</u> MTD at 1.  The Court granted the MTD as to (i) and

(iii), and denied it as to (ii).  <u>See</u> MOO at 1-2.

The Court ruled that the Plaintiffs stated a proper and plausible First Amendment

retaliation claim.  <u>See</u> MOO at 93-114.  The USFS disagrees with the Court's ruling on this

claim, but does not challenge it here.  The Motion to Reconsider, instead, focuses entirely on the

following portion of the MOO, in which the Court has bolded the particularly relevant sentences:

> 2.     <u>The Plaintiffs May Seek Equitable Relief for the Violation
> of Their Constitutional Rights Outside of the APA</u>.

>       The Plaintiffs seek equitable relief from Trujillo in her official capacity.
> "An action against federal employees in their official capacities is in effect a suit
> against the United States for which a waiver of sovereign immunity must exist."
> <u>Cortez v. EEOC</u>, 585 F. Supp. 2d 1273, 1287 (D.N.M. 2007).  "Absent a waiver,
> sovereign immunity shields the Federal Government and its agencies from suit."
> <u>FDIC v. Meyer</u>, 510 U.S. at 475.  "[A]n official capacity suit is only another way
> of pleading an action against an entity of which an officer is an agent."  <u>Johnson
> v. Bd. of Cnty. Comm'rs for Cnty. of Fremont</u>, 85 F.3d 489, 493 (1996)(internal
> quotation marks omitted).

>       Through 5 [U.S.C.] § 702, Congress provided "a general waiver of the
> government's sovereign immunity from injunctive relief."  <u>United States v.
> Murdock Mach. and Eng'g Co. of Utah</u>, 81 F.3d at 930 n.8.  "This waiver is not
> limited to suits under the Administrative Procedure Act."  <u>Simmat v. U.S. Bureau
> of Prisons</u>, 413 F.3d at 1233.

>       Whether plaintiffs' claims arise under the APA or common law is
> also immaterial with respect to the sovereign immunity analysis.
> Under 5 U.S.C. § 702, the United States waives sovereign
> immunity as to actions "in a court of the United States seeking
> relief other than money damages and stating a claim that an agency

- 22 -

> or an officer or employee thereof acted or failed to act in an
> official capacity or under color of legal authority."  As we held in
> Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005),
> § 702's waiver of sovereign immunity "is not limited to suits under
> the Administrative Procedure Act."  Id. at 1233; see also Hanson v.
> Wyatt, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008)(Gorsuch, J.,
> concurring)("Section 702 is a waiver of sovereign immunity, but
> we have not treated Section 704 as a limit on that waiver."
> (citation omitted)).

Gilmore v. Weatherford, 694 F.3d at 1166 n.1.  The Plaintiffs may therefore bring
their claims under the First Amendment, and not under the APA, against the
Defendants without implicating sovereign immunity, because of the United
States' general waiver, in 5 U.S.C. § 702, of sovereign immunity in suits seeking
equitable relief.  Additionally, the Court has jurisdiction under 28 U.S.C. § 1331
of this claim.  See Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1232, 1236
(finding that a federal court has jurisdiction under 28 U.S.C. § 1331 for claims
"seeking vindication of their constitutional rights . . . and may obtain relief in the
nature of either injunction or mandamus").  The United States' waiver of
sovereign immunity in the APA extends to claims for "nonmonetary relief against
federal officials and agencies," over which the Court has jurisdiction, such as
those for equitable relief brought under 28 U.S.C. § 1331.  Simmat v. U.S. Bureau
of Prisons, 413 F.3d at 1232, 1236.  Indeed, in the Plaintiffs' Second Notice of
Additional Authority in Response to Defendants' Motion to Dismiss Count I, the
Plaintiffs cite to persuasive authority from the United States Court of Appeals for
the District of Columbia Circuit, which comes to the same conclusion as the Court
has here.  See Trudeau v. Federal Trade Comm'n, 456 F.3d at 187 ("In sum, we
hold that APA § 702's waiver of sovereign immunity permits not only Trudeau's
APA cause of action, but his nonstatutory and First Amendment actions as
well.").

    The Court is fully aware of the tension that exists between allowing a
standalone First Amendment claim for declaratory relief and the APA claims.
Although the stand alone First Amendment claim allows the Plaintiffs robust
discovery, while the similar claim under the APA and Olenhouse v. Commodity
and Credit Corp., enjoys no or very little discovery.  The end result of both claims
are likely to be similar if the Plaintiffs prevail: an injunction under the stand alone
claim and invariably under the APA claim.  The Defendants appear to ask the
Court to fashion some doctrine -- like in the Bivens area -- that precludes the
declaratory judgment action if there is another remedy.  There is, however, no
such doctrine, and the Court is reluctant to create one here.  While the stand alone
First Amendment claim undercuts Olenhouse v. Commodity and Credit Corp. in
this case, this situation is unusual and relatively rare.  **The Plaintiffs could have
brought only a First Amendment claim in a separate case and enjoyed robust
discovery; there is no sound reason to prevent them from joining it with an
APA claim, which largely raises statutory issues.  While the Plaintiffs could**

- 23 -

> **not get much, if any, discovery on their APA First Amendment claim, there is
> no sound reason to preclude them from getting discovery on their standalone
> claim simply because they also have an APA First Amendment claim.**

MOO at 111-113 (boldface omitted in opening heading to avoid confusion)(boldface in last two

sentences added).  The Court cited no authority for its conclusions in the final quoted paragraph,

but it did append the following footnote at the end of the final sentence: "The Defendants appear

to be prepared for this fact, as Department of Justice Attorney Andrew A. Smith appears to be

representing the United States on the APA issues, and Assistant United States Attorney Ruth F.

Keegan appears to be doing the heavy lifting regarding the First Amendment claims against

Trujillo."  MOO at 113 n.8.

### 3.    The Motion to Reconsider.

The USFS filed its Motion to Reconsider on February 7, 2013.  See Motion to Reconsider

at 1.  The USFS' opening paragraph in its argument section sums up its request:

> The APA and Supreme Court common law predating the APA require that
> federal agency action be reviewed pursuant to the procedures set forth in the
> APA.  The presence of Plaintiffs' constitutional claim does not alter this rule. The
> Tenth Circuit's opinion in Simmat v. United States Bureau of Prisons, 413 F.3d
> 1225 (10th Cir. 2005), on which this Court relied to recognize a "stand alone"
> First Amendment claim, is consistent with this rule.  Moreover, as Plaintiffs
> appear to acknowledge in their Complaint, the fact that Plaintiffs seek review of a
> final agency action makes Administrative Record review particularly appropriate.
> Finally, the policy reasons underlying Administrative Record review of agency
> decisions apply to constitutional claims as well as all other APA claims.
> However, should this Court decide to follow those few cases that have allowed
> discovery on constitutional claims, like those courts, this Court should prohibit
> discovery until it has had an opportunity to review the Administrative Record and
> Plaintiffs show cause for allowing discovery.

Motion to Reconsider at 7-8 & n.1.  The USFS notes that,

> [u]nder the APA, the presumption is that discovery is not allowed and
> review is limited to the Administrative Record.  Sims v. Nat'l Transp. Safety
> Board, 662 F.2d 668, 671 (10th Cir. 1981)("[T]he APA does not provide for
> discovery, and the Federal Rules of Civil Procedure do not apply to an agency.").
> While the APA has limited exceptions to the rule, it is Plaintiffs' burden to show

- 24 -

that the exceptions apply.  Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993)("[T]he designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity.")(citing Wilson v. Hodel, 758 F.2d 1369, 1374 (10th Cir. 1985)).  Whether exceptions apply here is not the subject of this Motion; nor does this Motion address the standard of review.  Rather, the sole issue presented here is whether the scope of this Court's review of Plaintiffs' First Amendment claim is governed by the procedures set forth in the APA and Olenhouse in the first instance, rather than the Federal Rules of Civil Procedure.

Motion to Reconsider at 7 n.1.

The USFS argues that the APA's provision that the reviewing "court *shall* review the whole record or those parts of it cited by a party," requires district courts to limit their review of agency actions to the administrative record.   Motion to Reconsider at 8 (emphasis in original)(quoting 5 U.S.C. § 706).  It contends that "[t]he APA does not make an exception for constitutional claims but expressly states that constitutional claims are also reviewed pursuant to APA procedures," and asserts that "Olenhouse, itself[,] included a constitutional due process claim[] that the United States Court of Appeals for the Tenth Circuit reviewed 'consistent with the judicial review provisions of the APA.'"  Motion to Reconsider at 8.

The USFS also contends that the APA largely codifies the common law of agency review that existed before its enactment, and that this common law indicates that district courts should limit their review of agency decisions to the administrative record.  See Motion to Reconsider at 9-10 (citing Tagg Bros. & Moorhead v. United States, 280 U.S. 420 (1930)).  It argues that this limitation applies even if the Plaintiffs have a claim directly under the First Amendment.  See Motion to Reconsider at 10-11 (citing Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991); Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)).  In particular, it quotes the dissent of the Honorable Antonin G. Scalia, Associate Justice of the Supreme Court of the United States, for the proposition that, "[w]hile a

right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *specifically* excluded."  Motion to Reconsider at 12 (emphasis in original)(quoting <u>Webster v. Doe</u>, 486 U.S. 592, 607 n.* (1988)(Scalia, J., dissenting)).

The USFS further argues that <u>Simmat v. U.S. Bureau of Prisons</u>, 413 F.3d 1225 (10th Cir. 2005) -- the case upon which it says the Court relied to fashion or recognize a standalone First Amendment claim -- is consistent with the requirement of limiting judicial review to the administrative record.  <u>See</u> Motion to Reconsider at 13-14.  The USFS asserts that the plaintiffs in that case sought discovery, but that the Tenth Circuit nonetheless based its review on the administrative record alone and dismissed their case for failure to exhaust administrative remedies.  <u>See</u> Motion to Reconsider at 14 n.3 (citing <u>Simmat v. U.S. Bureau of Prisons</u>, 413 F.3d at 1231 n.9).  The USFS also block quotes a portion of <u>Simmat v. U.S. Bureau of Prisons</u>, drawing particular attention to the final sentence of the block quote: "If Mr. Simmat had pursued his administrative remedies, he would have received either relief or an explanation, *and the courts would have something to review*."  Motion to Reconsider at 14 (emphasis in Motion to Reconsider but not source)(quoting 413 F.3d at 1238).  The USFS last asserts that limiting judicial review to the administrative record is particularly appropriate in this case, because the Court is reviewing a final agency decision and because policies of fairness, orderly procedure, and competence support a limited review.  <u>See</u> Motion to Reconsider at 17-22.

In the alternative to a complete bar on evidence outside the administrative record, the USFS asks the Court to defer discovery until it has reviewed the administrative record to precisely tailor discovery to the issues presented.  <u>See</u> Motion to Reconsider at 22-23.  It asserts that even the courts that have allowed discovery outside of the administrative record have strictly

conditioned the discovery.  See Motion to Reconsider at 22-23 (citing Puerto Rico Pub. Housing

Admin. v. U.S. Dep't of Housing, 59 F. Supp. 2d 310, 327-28 (D.P.R. 1999)).   The USFS

preemptively rebuts the Plaintiffs' expected contention that the administrative record is

insufficient to evaluate whether the actions of the USFS were retaliatory, stating that, "[i]f that is

the case, it is because Plaintiffs failed to exhaust their administrative remedies."   Motion to

Reconsider at 23.   The USFS notes that, in fact, a motion to dismiss for failure to exhaust

administrative remedies is forthcoming, see Motion to Reconsider at 14 n.2, and it has since filed

this motion, see Federal Defendants' Motion to Dismiss Count 1 for Failure to Exhaust

Administrative Remedies, filed February 18, 2013 (Doc. 55)("MTD for Failure to Exhaust").

        The Plaintiffs responded to the Motion to Reconsider within a month.   See Plaintiffs'

Memorandum in Response to Defendants' Motion for Reconsideration, filed March 4, 2013

(Doc. 59)("Response").   They argue that the Court must undertake a de novo review of the

USFS' actions, at least with regard to the standalone First Amendment claim.  See Response at 7.

They address Webster v. Doe, asserting that the Supreme Court

>            held that the limitations of the APA did not preclude an independent review of the
>            plaintiff's constitutional claims which would include discovery in the district
>            court, noting that "[t]he District Court has the latitude to control any discovery
>            process which may be instituted so as to balance respondent's need for access to
>            proof which would support a colorable constitutional claim against the
>            extraordinary needs of the CIA for confidentiality . . . ."

Response at 9 (quoting 486 U.S. at 604).

        The Plaintiffs quote extensively from Porter v. Califano, 592 F.2d 770 (5th Cir. 1979), a

case in which, according to the Plaintiffs, the United States Court of Appeals for the Fifth Circuit

allowed a plaintiff discovery on judicial review of an administrative dismissal of her First

Amendment retaliatory termination claim.  See Response at 9-10.   The Plaintiffs also cite

Pickering v. Board of Education, 391 U.S. 653 (1968), a case in which the Supreme Court stated

Case 1:12-cv-00069-JB-KBM   Document 131   Filed 10/22/14   Page 28 of 72


that courts should conduct "an independent examination of the record," Response at 10 (quoting 391 U.S. at 579 n.2), rather than deferring to the agency's expertise, as, "in general, courts, not agencies, are expert on the First Amendment," Response at 11 (quoting Porter v. Califano, 592 F.2d at 780 n.15).

The Plaintiffs assert that district courts should conduct de novo review of constitutional claims.  See Response at 12 (citing McNary v. Haitian Refugee Ctr., 498 U.S. 479, 497 (1991)). The Plaintiffs cite a number of cases in which they assert district courts permitted supplementary discovery on top of an administrative record: Miccosukee Tribe of Indians of Florida v. United States, 2010 WL 337653 (S.D. Fla. 2010); Grill v. Quinn, 2012 WL 174873 (E.D. Cal. 2012); and Puerto Rico Public Housing Administration v. U.S. Department of Housing & Urban Development, 59 F. Supp. 2d 310 (D.P.R. 1999).  See Response at 13-15.  The Plaintiffs also attempt to distinguish the cases that the USFS cites, arguing: that Olenhouse v. Commodity Credit Corp. "did not involve an independent constitutional claim and did not involve a discussion of what type of discovery is permissible on an independent First Amendment retaliation claim or on any independent constitutional claim," Response at 16; that Franklin Savings Association v. Director, Office of Thrift Supervision did not involve an allegation of an unconstitutional motive on the part of the agency, see Response at 16; that Robbins v. U.S. Bureau of Land Management "did not involve any issues about the scope of discovery on an independent constitutional claim," Response at 16; that, in National Broadcasting Co. v. United States, the Supreme Court "did not consider or discuss the scope of discovery that would be appropriate in a case alleging unconstitutional motive or intent by a federal official," Response at 17; and that, in Munsell v. U.S. Department of Agriculture, "[t]he court did not even reach the

issue of whether the plaintiff had a constitutional claim because it found he had failed to exhaust administrative actions," Response at 18.

As a backstop to their primary argument that the Court should permit full discovery of all issues by virtue of the standalone claim being outside the APA, the Plaintiffs argue that their allegations of bad faith entitle them to discovery even under the APA.  See Response at 20-24. They argue that, "[a]lthough generally the scope of judicial review of agency action under the [APA] is limited to review of the administrative record . . . , there are several well recognized exceptions to this rule."  Response at 21.  They note that, "[i]n particular, extra-record discovery is appropriate where the plaintiff makes 'a strong showing of bad faith or improper behavior' by agency decision-makers."  Response at 21 (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420 (1971)).  They quote a case out of the United States District Court for the Western District of Wisconsin for the proposition that, "[i]f there are adequate grounds to suspect that an agency decision was tainted by improper political pressure, courts have a responsibility to bring out the truth of the matter."   Response at 22 (alteration in Response)(quoting Sokaogon Chippewa Cmty. v. Babbitt, 961 F. Supp. 1276 (W.D. Wis. 1996)).

The USFS replied, largely reiterating the arguments from their Motion to Reconsider. See Federal Defendants' Reply in Support of Their February 7, 2013 "Motion for Reconsideration," Doc. 53, filed April 3, 2013 (Doc. 74)("Reply").  It first reiterates its argument that an implied cause of action under the First Amendment is still subject to the APA's procedural requirements, regardless whether it is standalone.  See Reply at 2-7.  It next argues that the comprehensive remedial scheme that Congress provides in the APA "leaves neither need nor room for an implied direct constitutional action for equitable relief."  Reply at 7 (emphasis omitted)(capitalization altered for readability).  It first asserts that the Plaintiffs' suit is, in

actuality, an appeal from a final agency action.  See Reply at 7 (citing 5 U.S.C. § 551(13)).  It asserts that the APA is the "comprehensive remedial scheme" applicable to final agency actions, Reply at 10, and, thus, "'[t]he APA is the proper avenue for reviewing an agency's action or decision,' including for alleged constitutional violations," Reply at 8 (alteration in original)(internal quotation marks omitted)(citing Robbins v. Wilkie, 300 F.3d at 1212).  It contends that the Declaratory Judgment Act, 28 U.S.C. § 2201, likewise, does not circumvent the APA's procedural framework.  See Reply at 11-14.

The USFS next argues that § 706(2)(F) of the APA, which provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court," is inapplicable.  Reply at 17-20.  It first asserts that the Court has already held that the Plaintiffs discovery on the APA claims will be severely curtailed.  See Reply at 17 ("Plaintiffs could not get much, if any, discovery on their APA First Amendment claim." (quoting MOO at 113)).  It contends that § 706(2)(F) is applicable in two circumstances: (i) "when the action is adjudicatory in nature and the agency's fact-finding procedures [were] inadequate"; and (ii) "when issues not previously before the agency are raised in a proceeding to enforce a nonadjudicatory action."  Reply at 18 (emphasis in Reply but not source)(quoting Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1142 n.7 (10th Cir. 1991)).

The USFS spends the rest of its Reply arguing that the Plaintiffs have not triggered the bad-faith exception to the rule that judicial review is limited to the administrative record.  See Reply at 20-36.  It contends that the bad-faith exception arises from the Supreme Court's statement in Citizens to Preserve Overton Park, Inc. v. Volpe that a federal court "'may [but is

not required to] require the administrative officials who participated in the decision to give testimony explaining their action' when there is 'a strong showing of bad faith or improper behavior.'"  Reply at 21 (alteration in Reply but not source)(quoting 401 U.S. at 420).  The USFS asserts that the Tenth Circuit limits this exception to "extremely limited circumstances," Reply at 21 (quoting Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1096 (10th Cir. 2007))(internal quotation marks omitted), and that the Plaintiffs must submit evidence, not merely allegations, establishing the bad faith, see Reply at 22.  The USFS concludes its brief by rebutting a number of the Complaint's factual allegations, although it makes clear that it does not believe it is obligated to do so, because the Plaintiffs have submitted no evidence supporting their allegations.

> Because Plaintiffs have plainly failed to meet their burden of making a strong showing of bad faith necessary to invoke the extremely limited exception to the Administrative Record rule, there is nothing for Federal Defendants to rebut. Nonetheless, to the extent the Court considers Plaintiffs' allegations, Federal Defendants provide only the following examples demonstrating the false thread of allegations running through Plaintiffs' Complaint.

Reply at 23.

The Court granted the Plaintiffs leave to file a surreply.  See Surreply in Opposition to Defendants' Motion for Reconsideration, filed April 26, 2013 (Doc. 82-1)("Surreply"); Order, filed March 31, 2014 (Doc. 116)(granting the alternative relief -- submission of a surreply -- requested in the Motion to Strike Portions of Defendants' Reply, or in the Alternative, for Leave to File Surreply in Opposition to Defendants' Motion for Reconsideration, filed April 26, 2013 (Doc. 82)).  They argue that the Court was correct to recognize a standalone First Amendment claim, because 5 U.S.C. § 702 provides a general waiver of sovereign immunity that is not limited to suits under the APA.  See Surreply at 5 (citing, e.g., Trudeau v. FTC, 456 F.3d 178, 187 (D.C. Cir. 2006)).  They attack the USFS' contention that the APA is a comprehensive

remedial scheme, arguing that Schweiker v. Chillicky, 487 U.S. 412 (1988) -- a case the Plaintiffs say "held that a Bivens claim for money damages for an alleged due process violation were not appropriate because of the other remedies available" -- is inapposite.  Surreply at 7.  They argue, primarily, that Bivens' alternative remedy framework is inapplicable, because Bivens suits involve money damages, and not equitable relief, and, additionally, because there is no basis in the case law to suggest that it should be applied to the APA.  See Surreply at 7-8.  The Plaintiffs devote the remainder of their Surreply individually responding to the USFS' rebuttals of the Complaint's allegations.  See Surreply at 9-24.  As the Plaintiffs have since filed a motion specifically seeking discovery, and the Court considers that motion to be the more appropriate place to consider whether the Plaintiffs have met any required factual burden to receive discovery, the Court will not consider either the USFS' rebuttals in the Reply or the Plaintiffs' responses in the Surreply.   See Motion to Supplement and/or Complete the Administrative Record, and for Limited Discovery, filed November 25, 2013 (Doc. 106)("Motion for Discovery").  In short, the Court will use this Memorandum Opinion to describe the conditions under which the Plaintiffs are entitled to discovery, and reserve the question whether those conditions are satisfied for the Motion for Discovery.

The Court held a hearing on the Motion to Reconsider -- as well as the MTD for Failure to Exhaust, which took up the vast majority of the hearing -- on July 26, 2013.  See Transcript of Hearing (taken July 26, 2013)("Tr.").[5]   At the hearing, the Court focused the debate on the relevant two sentences on page 113 of the MOO.  See Tr. at 7:20-8:7 (Court).  The Court stated that it was inclined to grant the Motion to Reconsider and noted that it was especially influenced

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

by Justice Scalia's dissent in <u>Webster v. Doe</u>.  <u>See</u> Tr. at 8:23-9:16 (Court).  <u>See also</u> Tr. at 17:8-12 (Court).  The USFS clarified its position and reiterated its arguments from the briefing that: (i) there is no standalone First Amendment claim, but, rather, only one under the APA; and (ii) regardless of the Court's decision on issue (i), the Plaintiffs should be limited to the APA's procedural and discovery machinations, which restrict the Court largely to a review of the administrative record.  <u>See</u> Tr. at 12:11-24:9 (Court, Smith).

The Plaintiffs elaborated on their attempt to distinguish <u>Webster v. Doe</u>, arguing that the majority opinion holds that "the limitations of the APA do[] not preclude . . . review of the plaintiffs' constitution[al retaliation] claims."  Tr. at 26:3-5 (Rosenstock).  They assert that the majority opinion contains the following quote: "[T]he district court has the latitude to . . . control any discovery process which may be instituted so as to balance respondent[']s need for access to prove which would support a colorable constitutional claim . . . ."  Tr. at 26:5-8 (Rosenstock).  The Court asked the Plaintiffs whether they could point to "a ton of cases that say you have a stand-alone claim under the First Amendment that's outside the APA box."  Tr. at 33:12-14 (Court).  The Plaintiffs pointed to case cited in their Surreply, <u>Wolf v. Barnhart</u>, and an unspecified case from the United States District Court for the District of Minnesota.  <u>See</u> Tr. at 34:4-22 (Rosenstock).  The remainder of the hearing focused principally on the issue of administrative exhaustion.

## LAW REGARDING MOTIONS TO RECONSIDER

Rule 59(e) provides: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  Rule 60 provides in relevant part:

> (b)  **Grounds for Relief from a Final Judgment, Order, or Proceeding.**  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1)     mistake, inadvertence, surprise, or excusable neglect;

(2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)     the judgment is void;

(5)     the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

(c)     **Timing and Effect of the Motion.**

(1)     **Timing.**  A motion under Rule 60(b) must be made within a reasonable time -- and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

(2)     **Effect on Finality.**   The motion does not affect the judgment's finality or suspend its operation.

Fed. R. Civ. P. 60(b)-(c).  The Tenth Circuit has recognized:

Generally, a "motion for reconsideration, not recognized by the Federal Rules of Civil Procedure, Clough v. Rush, 959 F.2d 182, 186 n.4 (10th Cir. 1992), may be construed in one of two ways: if filed within 10 days of the district court's entry of judgment, it is treated as a motion to alter or amend the judgment under Rule 59(e); if filed more than 10 days after entry of judgment, it is treated as a motion for relief from judgment under Rule 60(b)."  Computerized Thermal Imaging, Inc. v. Bloomberg, LP, 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).

Price v. Philpot, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005).  The time limit in rule 59(e) is now twenty-eight days rather than ten days.  See Fed. R. Civ. P. 59(e).  A motion for reconsideration under rule 59(e) is an "inappropriate vehicle[] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were

available at the time of the original motion." Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d at 1012. "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." Servants of Paraclete v. Does, 204 F.3d at 1012. A district court has considerable discretion in ruling on a motion to reconsider under rule 59(e). See Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief." Fed. R. Civ. P. 60(b). A court cannot enlarge the time for filing a rule 59(e) motion. See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . ."). "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment." 12 James Wm. Moore et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted). Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)." Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, a party can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . .").  Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or comply with deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993)("This leaves, of course, the Rule's requirement that the party's neglect be 'excusable.'"); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962))(internal quotation marks omitted).  The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct"

and has noted that those "who act through agents are customarily bound," even though, when "an

attorney is poorly prepared to cross-examine an expert witness, the client suffers the

consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002). The Court

has previously stated:

> There is a tension between how the law treats attorney actions that are without
> authority, thus permitting relief under rule 60(b), and how the law treats those
> attorney actions which are inexcusable litigations decisions, thus failing to qualify
> for relief; although the distinction between those actions may not always be
> logical, it is well established.

Wilson v. Jara, No. 10-0797, 2012 WL 1684595, at *7 (D.N.M. May 10, 2012)(Browning, J.).[6]

---

[6]The Supreme Court of the United States has recognized that individuals must be "held
accountable for the acts and omissions of their chosen counsel," and that the "proper focus is
upon whether the neglect of respondents *and their counsel* was excusable." Pioneer Inv. Servs.
Co. v. Brunswick Assoc. LP, 507 U.S. 380, 397 (1993)(emphasis in original). At the same time,
the Tenth Circuit has held that, when counsel acts without authority, rule 60(b)(1) provides relief
from judgment. See Cashner v. Freedom Stores, Inc., 98 F.3d at 576 ("[A]s a general
proposition, the 'mistake' provision in Rule 60(b)(1) provides for the reconsideration of
judgment only where . . . an attorney in the litigation has acted without authority from a party
. . . ."). "There is a tension between these decisions, because, ordinarily, a client will not
authorize his or her attorney to act in a negligent manner or to make a mistake." Wilson v. Jara,
2012 WL 1684595, at *7 n.7.

The Court is inclined to conclude that, when the client acknowledges that he or she has
hired the attorney, there is a difference between decisions which terminate the litigation, such as
settlement or a stipulation of dismissal, and other litigation decisions, because decisions to
terminate the litigation are ordinarily left to the client. See Chavez v. Primus Auto. Fin. Servs.,
125 F.3d 861, 1997 WL 634090, at *4-5 (10th Cir. 1997)(unpublished)(citing Navajo Tribe of
Indians v. Hanosh Chevrolet-Buick, Inc., 749 P.2d 90, 92 (1988); Bolles v. Smith, 591 P.2d 278,
280 (1979)). "Otherwise the Court has difficulty explaining attorney decisions which are made
without authority and attorney decisions for which it is acceptable that the client suffer the
consequences." Wilson v. Jara, 2012 WL 1684595, at *7 n.7. In Chavez v. Primus Auto. Fin.
Servs., the Tenth Circuit recognized that "the mere employment of an attorney does not give him
the actual, implied or apparent authority to compromise his client's case." 1997 WL 634090, at
*4. Few Tenth Circuit cases analyze whether an attorney has acted without authority. The cases
in which the Tenth Circuit has found a lack of authority appear to fall into two categories:
(i) cases in which the attorney entered an appearance without the client's knowledge, see, e.g.,
FDIC v. Oaklawn Apts., 959 F.2d at 175-76 (finding that there were factual issues which the
district court needed to resolve where "[t]here is nothing in the record indicating when
Appellants became aware of the lawsuit and of Newcombe's purported representation"); and
(ii) cases in which the attorney's actions terminate the litigation, see, e.g., Thomas v. Colo. Trust

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case."

Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks

omitted).  "If the reasons offered for relief from judgment could be considered under one of the

more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule

---

Deed Funds, Inc., 366 F.2d 136, 139-40 (10th Cir. 1966)(finding that, as to one of the plaintiffs, "the record shows that he did not participate in the transactions and negotiations with the S.E.C. and did not consent to the execution of the stipulation of the judgment"); Cashner v. Freedom Stores, Inc., 98 F.3d at 577 (citing with approval Surety Ins. Co. of Cal. v. Williams, 729 F.2d 581, 582-83 (8th Cir. 1984), which held that a "judgment entered upon an agreement by the attorney may be set aside on affirmative proof that the attorney had no right to consent to its entry").  Because decisions that terminate the litigation are ordinarily the client's prerogative, those decisions fit more squarely within rule 60(b)(1)'s "lack of consent" prong.  Decisions where the purported client is unaware of the litigation, or of the attorney's attempt to act on his or her behalf, would also fit within rule 60(b)(1)'s "lack of consent" prong, because an individual has the right to choose his or her own attorney, or whether he or she wishes to have any attorney. Other litigation decisions are made jointly or are within the attorney's control, see Model Code of Prof'l Conduct R. 1.2 cmt. 1 (2011)("With respect to the means by which the client's objectives are to be pursued, the lawyer shall consult with the client . . . and may take such action as is impliedly authorized to carry out the representation."); Pittman ex rel. Sykes v. Franklin, 282 F. App'x 418, 427 n.6 (6th Cir. 2008)(unpublished)("[T]he decision to allege comparative fault as an affirmative defense falls within a narrow band of circumstance in which an attorney may act without consulting his or her client."), and, thus, to give final judgments meaning and allow cases to terminate, it is logical that those decisions must fall within the "excusable litigation mistake" prong, or be based on a substantive mistake of law or fact.

Although the Tenth Circuit does not appear to have expressed its views on where the line is drawn between attorneys acting without consent and litigation mistakes, or acknowledged the tension between these two categories, the Court concludes that the appropriate division is, when the client is aware that the attorney is acting on his or her behalf, between decisions which dispose of the case and ordinarily require client consent, and other routine attorney decisions which take place over the course of the case.  The Court also notes that rules of professional conduct require, "[i]n a criminal case," for a lawyer to "abide by the client's decision, after consultation with the lawyer, as to the plea to be entered, whether to waive a jury trial and whether the client will testify."  Model Rules of Prof'l Conduct R. 1.2(a).  While a decision on the plea to be entered in a criminal case is comparable to whether to settle a civil case, the Court has not located any decisions permitting rule 60(b) relief when a civil attorney waives his or her client's right to a jury trial.  One unpublished decision from the United States Court of Appeals for the Fourth Circuit discussed briefly a scenario where, without resolving the merits of the issue, a criminal defendant raised through a rule 60(b) motion in a habeas preceding that "his trial counsel had prevented him from testifying in his defense."  United States v. McMahan, 8 F. App'x 272, 274 (4th Cir. 2001)(unpublished).

60(b)(6)."  Moore, supra § 60.48[2], at 60-182.  Accord Liljeberg v. Health Servs. Acquisition

Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and

suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does

not particularize the factors that justify relief, but we have previously noted that it provides

courts with authority 'adequate to enable them to vacate judgments whenever such action is

appropriate to accomplish justice,' while also cautioning that it should only be applied in

'extraordinary circumstances.'"  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863.

Generally, the situation must be one beyond the control of the party requesting relief under rule

60(b)(6) to warrant relief.  See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The

comparison [of prior precedent] strikingly points up the difference between no choice and

choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no

chance for negligence and inexcusable negligence.  Subsection 6 of Rule 60(b) has no

application to the situation of petitioner.").  Legal error that provides a basis for relief under rule

60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying
> relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720,
> 722 (10th Cir. 1975)(en banc)].  In that case, this court granted relief under
> 60(b)(6) when there had been a post-judgment change in the law "arising out of
> the same accident as that in which the plaintiffs . . . were injured."  Pierce v. Cook
> & Co., 518 F.2d at 723.  However, when the post-judgment change in the law did
> not arise in a related case, we have held that "[a] change in the law or in the
> judicial view of an established rule of law" does not justify relief under Rule
> 60(b)(6).  Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

952 F.2d at 1244-45.

## LAW REGARDING THE APA'S JUDICIAL REVIEW PROVISIONS

The APA describes the exclusive mechanism -- unless another mechanism is specifically provided by statute -- by which the federal district courts may review the actions of federal administrative agencies.

> [W]ith respect to all entities that come within the Chapter's definition of "agency," if review is not available under the APA it is not available at all. Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing judicial review of all federal agency action. While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *specifically* excluded.

Webster v. Doe, 486 U.S. at 607 n.* (Scalia, J., dissenting)(emphasis in original)(citations omitted). Specifically, the APA provides that

> [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702. The APA applies to both formal and informal agency proceedings -- "formality" being determined by the agency's compliance with the provision of 5 U.S.C. §§ 556 and 557 -- and empowers the federal district courts to:

> **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)**   hold unlawful and set aside agency action, findings, and
conclusions found to be --

   **(A)**   arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law;

   **(B)**   contrary to constitutional right, power, privilege, or
immunity;

   **(C)**   in excess of statutory jurisdiction, authority, or
limitations, or short of statutory right;

   **(D)**   without observance of procedure required by law;

   **(E)**   unsupported by substantial evidence in a case
subject to sections 556 and 557 of this title or
otherwise reviewed on the record of an agency
hearing provided by statute; or

   **(F)**   unwarranted by the facts to the extent that the facts
are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record
or those parts of it cited by a party, and due account shall be taken of the rule of
prejudicial error.

5 U.S.C. § 706.

### 1.   The APA Does Not Impart Subject-Matter Jurisdiction, but It Waives Sovereign Immunity.

The APA does not, through § 702, create an independent basis of subject-matter

jurisdiction, see Eagle-Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. 1990);

it allows for judicial review of final agency action only if there is also an independent basis for

subject-matter jurisdiction, see Colo. Dep't of Soc. Servs. v. Dep't of Health & Human Servs.,

558 F. Supp. 337, 339 (D. Colo. 1983).  Notably, before review of the grievance may occur, the

party must demonstrate that statutes do not preclude judicial review and that the law does not

commit the action to agency discretion.  See Heckler v. Chaney, 470 U.S. 821, 828 (1985).

Section 702 waives sovereign immunity and makes clear that suits under the APA are for equitable relief only, and not for damages.  See 5 U.S.C. § 702.

Through 5 U.S.C. § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief."  United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996).  "This waiver is not limited to suits under the Administrative Procedure Act."  Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).

> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis.  Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  As we held in Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005), § 702's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1233.  See also Hanson v. Wyatt, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008)(Gorsuch, J., concurring)("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver."  (citation omitted)).

Gilmore v. Weatherford, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012).  See Trudeau v. Fed. Trade Comm'n, 456 F.3d at 186 (holding that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)(holding the same).

### 2.       District Courts Must Treat Cases Arising From Agency Actions as Appeals.

Pursuant to Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  42 F.3d at 1580.  See Wyoming v. U.S. Dep't of Interior, 587 F.3d 1245, 1251 n.2 (10th Cir. 2009)(quoting Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580).  District courts may not entertain

motions for summary judgment or any other procedural devices that shift the appellant's substantial burden -- arbitrary-or-capricious review for questions of fact and Chevron deference for questions of statutory interpretation -- onto the agency.  See Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579-80.  See generally infra at 50-53 (describing Chevron deference).  The Tenth Circuit has admonished district courts, not to treat suits arising out of agency actions as "separate and independent actions," stating:

> The use of motions for summary judgment or so-called motions to affirm permits the issues on appeal to be defined by the appellee and invites (even requires) the reviewing court to rely on evidence outside the administrative record.  Each of these impermissible devices works to the disadvantage of the appellant.  We have expressly disapproved of the use of this procedure in administrative appeals in the past, and explicitly prohibit it now.
>
> A district court is not exclusively a trial court.  In addition to its nisi prius functions, it must sometimes act as an appellate court.  Reviews of agency action in the district courts must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure.  Motions to affirm and motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal.

Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579-80 (footnotes omitted).

### 3.     The Standard of Review for Factual Issues Is Arbitrary-or-Capricious Review -- Also Known as "Substantial Evidence" Review.

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary[ or] capricious," and, in appeals from formal proceedings, unless they are "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (E).  Although these standards appear different, the modern view is that they are the same, and that a decision is arbitrary and capricious if substantial evidence does not support it.  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984).  In reviewing a decision under the arbitrary-or-capricious standard, the court reviews the entire administrative record -- or at least those portions of the record that the parties

provided -- but it may not consider materials outside of the administrative record.[7]  See 5 U.S.C.

§ 706; Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d at 1137 ("In cases

---

[7]Section 706(2)(F) provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."  The Tenth Circuit has limited this provision's application as follows:

> 5 U.S.C. § 706(2)(F) of the APA has been interpreted as authorizing de novo review in two instances: (1) when the action is adjudicatory in nature and the agency's fact-finding procedures inadequate; and (2) when issues not previously before the agency are raised in a proceeding to *enforce* a nonadjudicatory action.  However, neither situation exists in the case before us.

Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.3d at 1141 n.7 (emphasis in original)(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 415).  Although the Tenth Circuit's statement could be construed as implying that these two situations are the only circumstances that trigger § 706(2)(F), it does not explicitly say as much, nor does it state that the district court lacked authority to employ § 702(2)(F) because the situation fell outside of the two established § 706(2)(F)-triggering circumstances.

Moreover, § 706(2)(F) provides for a "trial de novo," but the district court may wish to supplement the administrative record with new evidence without necessarily conducting a trial de novo.  A leading treatise describes the ill-defined -- and, in the Tenth Circuit, largely undefined -- exceptions to the rule that district courts may not venture outside of the administrative record:

> It is black letter law that, except in the rare case, review in federal court must be based on the agency's record.  Generally, a court may not reach a decision without the administrative record.  A court may delve outside the administrative record under a strong showing of bad faith or improper behavior.  See Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1096 (10th Cir. 2007).  Courts will generally confine themselves to the administrative record[,] which includes all the materials compiled by the agency before it made a decision.  See Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997); Sierra Club v. Slater, 120 F.3d 623, 637-638 (6th Cir. 1997); Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir. 1998).  The Ninth Circuit observed: "A reviewing court must review the administrative record before the agency at the time the agency made its decision."  Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir. 2004); Partridge v. Reich, 141 F.3d 920, 926 n.4 (9th Cir. 1998).  Even review by a trial level court is generally confined to the administrative record.  See Smith v. Office of Civilian Health & Med. Program of Uniformed Servs., 66 F.3d 905, 912 (7th Cir. 1995); First Nat. Bank & Trust, Wibaux, Mont. v. Dep't of Treasury, Comptroller of Currency, 63 F.3d 894, 897-898 (9th Cir. 1995).

- 44 -

———————————————

. . . .

The record for review includes testimony and documentary evidence admitted at the hearing.  It also includes the decision of any lower level decisionmakers.

. . . The boundaries of a record in an informal agency action are sometimes vague but it is not necessary that the reviewing court be presented with a record like that produced in a formal evidentiary hearing.  The Supreme Court recognized that the APA contemplates review of informal records.  See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).  An informal record includes any information the administrative decisionmaker actually considered.  See Kent Cnty., Del. Levy Court v. U.S. EPA, 963 F.2d 391 (D.C. Cir. 1992); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys., 745 F.2d 677, 684 (D.C. Cir. 1984)(holding that the administrative record "might well include crucial material that was neither shown to nor known by the private parties").

        The Supreme Court has also recognized that the agency may need to develop a "record" for judicial consideration that reflects the basis for a decision but had not been compiled in a discrete form until the litigation.  While the agency may create such a record for the litigation, the information and justification must be that actually relied on by the agency.  Where additional explanation or clarification is required, the litigation motivated material must reflect the agency's findings and justification at the time the decision was made.

. . . .

[U]nder some circumstances, the court is allowed to go outside the record and the parties are allowed to add to the record.

        (a)     *Methods for adding to the record.*  Most often information may be added to the record, if at all, by a petition to the court.  [In the D.C. Circuit, a] party may not supplement the record by means of an affidavit.  The D.C. Circuit has ruled that materials that could have been submitted to the agency may be added to the record only by joint stipulation.

        (b)     *Additions by the agency.*  An agency may submit extra-record evidence to explain its decision under very limited circumstances.  The limitation in short is that the agency cannot offer information that it did not consider at the time the decision was made.

(c)    *Review of judicial discretion.*  The decision to allow additional evidence is left to the discretion of the district court and that decision will be reviewed only for abuse. The court must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo.

(d)    *Justification for adding to the record.*  Some federal statutes expressly permit the administrative record to be supplemented on judicial review.  However statutory authority to take new evidence does not transform the review proceeding into a trial de novo.

The evidence must be sufficiently relevant and probative so that there is a reasonable probability that it will change the administrative decision. The party will not be permitted to supplement the record unless it demonstrates good cause for not presenting the evidence in the proceeding below.  A party will not be permitted to expand the record if the administrative record is adequate. The Eleventh Circuit summarized: "[A court] may deny a motion to correct the record where, among other reasons, the proffered item does not fall within the definition of the record, the proffered item is immaterial or incomplete, or the agency did not have the opportunity to consider the evidence." Nat'l Ass'n of State Util. Consumer Advocates v. FCC, 457 F.3d 1238, 1248 (11th Cir. 2006).  The Ninth Circuit said: "Courts may review such extra-record materials only when: (1) it is necessary to determine whether the agency has considered all relevant factors and explained its decision, (2) the agency has relied on documents not in the record, (3) supplementing the record is necessary to explain technical terms or complex subject matter, or (4) plaintiffs make a showing of bad faith." City of Las Vegas, Nev. v. FAA, 570 F.3d 1109, 1116 (9th Cir. 2009). Accord Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010).

The court may supplement the record to obtain background information necessary to make an informed decision. The record may be supplemented for the purpose of explaining the existing record and judging the adequacy of the procedures and facts considered. The Second Circuit found that additional evidence may be appropriate: "where the absence of formal administrative findings makes such

investigation necessary in order to determine the reasons for the agency's choice." Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997). Perhaps the administrative record may be supplemented because of evidence considered by the agency was excluded by clerical mistake or other oversights.

The D.C. Circuit would allow additions to the administrative record upon a "strong showing of bad faith or improper behavior" or that the record is so bare that review is impossible. "When as here there is a contemporaneous administrative record and no need for additional explanation of the agency decision, 'there must be a strong showing of bad faith or improper behavior' before the reviewing court may permit discovery and evidentiary supplementation of the administrative record."

The Ninth Circuit allows additional evidence in four circumstances:

(1)     if necessary to determine "whether the agency has considered all relevant factors and has explained its decision;"

(2)     "when the agency has relied on documents not in the record;"

(3)     "when supplementing the record is necessary to explain technical terms or complex subject matter;" and

(4)     "when the plaintiffs make a showing of agency bad faith."

Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996). Accord Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir. 1998).

(e)     *Remand to add information to the administrative record.* If additional information is necessary, a court should generally remand to the agency so that it, not the court, initially considers the additional evidence. Denial of a motion for a remand to add to the record will be reviewed for abuse of discretion.

- 47 -

(f)    *Overton hearing: Expansion of the agency's justification.* The Supreme Court in <u>Citizens to Preserve Overton Park v. Volpe</u>, and <u>Camp v. Pitts</u>, 411 U.S. 138 (1973), created some lasting law supporting judicial authority to supplement the informal record through an "<u>Overton</u> hearing." As reiterated in <u>Camp v. Pitts</u>, these "<u>Overton</u>" hearings give the reviewing court limited authority to "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."

Generally, if a reviewing court finds the record produced by an informal adjudication to be inadequate for review, it may conduct an "<u>Overton</u> hearing," but the Supreme Court has expressed a preference for remand.

In <u>Sierra Club v. United States Army Corps of Engineers</u>, 772 F.2d 1043 (2d Cir. 1985), the Second Circuit contrasted this proceeding from a de novo hearing. (By its terms, the difference between "plenary" review and trial de novo.) The case involved the Corps' grant of a dredging permit. The appellate court criticized the district court for undertaking a full de novo hearing, including calling its own expert witnesses to substitute their judgment for that of the agency. It found that ordinarily such de novo review would be reversible error and that such review would not be proper every time an agency record is incomplete.

Charles H. Koch, Jr. & Richard Murphy, <u>Administrative Law & Practice</u> § 8:27 (3d ed.)(emphases in original)(footnotes omitted or converted to inline citations).

[R]eview may not probe the minds of an official: "It was not the function of the court to probe the mental processes of the [administrative decisionmaker]." <u>United States v. Morgan</u>, 313 U.S. 409, 422 (1941)("<u>Morgan IV</u>"). In <u>Morgan IV</u> the Court disapproved of the conduct of the trial court in having the Secretary of Agriculture appear in person at trial and questioned "regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates." Ever since this decision, any judicial action which interjects itself in this way into the decisionmaking process has been considered improper.

However the Supreme Court has required what has become known as an "<u>Overton</u> hearing" where the reasons in informal action are inadequate for judicial review. In <u>Overton Park</u>, the Court found that a lower court could require the

where Congress has provided for judicial review without setting forth the standards to be used or procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had . . . .").  See also Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."  (emphasis added)).  The court should not pass judgment on the wisdom or merits of the agency's decision. See Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172 (stating that NEPA prohibits uninformed actions, but not unwise actions).  To fulfill its function under the arbitrary-or-capricious standard of review, however, a reviewing court should engage in a "thorough, probing, in-depth review" of the administrative record.   Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation omitted).  The Tenth Circuit explained the relevant standard of review as follows:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if
>
>> the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

agency decisionmaker to provide sufficient justification either through testimony or affidavit.  Both the Supreme Court and lower courts, however, have remained true to Morgan IV in refusing to permit these Overton Park hearings to delve into the mental processes of the agency head.  Courts have usually refused to put the official on the stand and have relied instead on affidavit or remand.

Koch & Murphy, supra § 8:28.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1167 (omission in original)(citations omitted)(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))(internal quotation marks omitted).  The standard of review requires the district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions."  Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580.  While the court may not think up a reasoned basis for the agency's action that the agency did not give, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(citations omitted).  The agency must articulate the same rationale for its findings and conclusions on appeal that it relied upon in its internal proceedings.  See SEC v. Chenery Corp., 318 U.S. 80 (1943).

**4.      The Standard of Review for Legal Issues Varies Depending Upon the Source of Law That the Agency Is Interpreting.**

In promulgating and enforcing regulations, agencies must interpret the content of the Constitution, statutes, and their own previously enacted regulations.   The federal judiciary accords considerable deference to agency interpretations of their own organic statutes -- the statutes Congress has tasked an agency with enforcing, from which it derives its authority to act.  See United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994).  This deference has come to be known as Chevron deference, named after the first case supposedly adopting[8] the approach, Chevron U.S.A., Inc. v. Natural

_____

[8]The case itself is unremarkable and uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all.  Its author, the Honorable John Paul Stevens, Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years.

- 50 -

Resources Defense Council, Inc., 467 U.S. 837 (1984).  Chevron deference involves a two-step

process,[9] first asking whether the statutory provision in question is clear and then, if it is not,

asking whether the agency's interpretation of the unclear statute is a reasonable one.  As the

Tenth Circuit explained,

> we must be guided by the directives regarding judicial review of administrative
> agency interpretations of their organic statutes laid down by the Supreme Court in
> Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837
> (1984).  Those directives require that we first determine whether Congress has
> directly spoken to the precise question at issue.  If the congressional intent is
> clear, we must give effect to that intent.  If the statute is silent or ambiguous on
> that specific issue, we must determine whether the agency's answer is based on a
> permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22 F.3d

at 238 (citation omitted).

Chevron's second step is the easier one describe, because it is all but toothless: if the

agency's decision makes it to step two, it is upheld almost without exception.  See Ronald M.

Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L. Rev. 1253, 1261

(1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely

on the second Chevron step."   (footnote omitted)); Jason J. Czarnezki, An Empirical

---

[9]There is, additionally, a threshold step -- the so-called step zero -- which asks whether
Chevron deference applies to the agency decision at all.  See Cass R. Sunstein, Chrevron Step
Zero, 92 Va. L. Rev. 187 (2006).  Step zero asks: (i) whether the agency is Chevron-qualified,
meaning whether the agency involved is the agency charged with administering the statute -- for
example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No.
88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded
the deference -- interpretation of contracts, the Constitution, and the agency's own regulations
are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir.
1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference."); and
(iii) whether Congress intended the agency to "speak with the force of law" in making the
decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by
agency's, for example, do not speak with the force of law and are thus not entitled to Chevron
deference, see Christensen v. Harris Cnty., 529 U.S. 576 (2000).  An affirmative answer to all
three inquiries results in the agency's decision passing step zero.

Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice.").  Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

There is substantial disagreement, however, even at the Supreme Court-level, about what Chevron's first step means.  Sometimes clarity is assessed in terms of obviousness -- meaning that, if a statute requires in-depth interpretation, it cannot be clear.  Other times clarity is assessed in terms of the court's confidence that its interpretation is correct -- meaning that in-depth interpretation may result in a court concluding that the statute is clear.  An appellate court's conclusion that a statute is clear has binding stare decicis effect, see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967 (2005), but its conclusion that a statute is unclear does not, see United States v. Home Concrete & Supply, LLC, 132 S. Ct. 1836 (2012).  In an earlier case, the Court noted the varying approaches taken by different Justices in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine.  Those Justices, such as Justice Scalia, who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step.  These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine.  Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for Chevron doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

Griffin v. Bryant, No. CIV 13-0799 JB/GBW, 2014 WL 3377705, at *42 n.23 (D.N.M. June 18, 2014)(Browning, J.).  A number of policy considerations animate Chevron deference, among

them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, is granting discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the President of the United States, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than unified but Circuit-fragmented federal judiciary can.

When agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452 (1997); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).  This deference is applied in the same manner as Chevron deference and is substantively identical.  There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, far more uncertain.  Justice Scalia, after years of applying the doctrine followed by years of gradually beginning to question its soundness, finally denounced Auer deference just last year in his dissent in Decker v. Northwest Environmental Defense Center, 133 S. Ct. 1326 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice did:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations."  Talk America, Inc. v. Michigan Bell Telephone Co., 131 S. Ct. 2254, 2265 (2011)(Scalia, J., concurring).  This is generally called Seminole Rock or Auer deference.

The canonical formulation of Auer deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for Auer to do.  In practice, Auer deference is Chevron deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for Auer deference.  The first case to apply it, Seminole Rock, offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means."  Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'"  That is true enough, and it leads to the conclusion that agencies and not courts should make regulations.  But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective.  Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its "special expertise" to formulate the best rule.  But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is."  Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience.  Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation will be given effect if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors.  If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

- 54 -

Another conceivable justification for <u>Auer</u> deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that Congress enacted, as we do per <u>Chevron</u>, it is a fortiori reasonable to defer to them regarding the meaning of regulations that they themselves crafted.  To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all.  The theory of <u>Chevron</u> (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute.  While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations.  For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands.  "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."  Montesquieu, <u>Spirit of the Laws</u> bk. XI, at 151-152 (O. Piest ed., T. Nugent transl. 1949).  Congress cannot enlarge its own power through <u>Chevron</u> -- whatever it leaves vague in the statute will be worked out by someone else.  <u>Chevron</u> represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)   So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect.  "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power."  Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it."  1 Wm. Blackstone, <u>Commentaries on the Laws of England</u> 58 (1765).  And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation.  The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke ed. 1961).  <u>Auer</u> deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  <u>Auer</u> is not a logical corollary to <u>Chevron</u> but a dangerous permission slip for the arrogation of power.

- 55 -

It is true enough that Auer deference has the same beneficial pragmatic effect as Chevron deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court. The agency's view can be relied upon, unless it is, so to speak, beyond the pale. But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute. For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear. The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing. It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here. And there is another respect in which a lack of Chevron-type deference has less severe pragmatic consequences for rules than for statutes. In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute. That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. at (Scalia, J., dissenting). Justice Scalia's attack on Auer was in a dissent, but another two Justices, the Honorable John G. Roberts and Samuel A. Alito, joined in a concurring opinion stating that "[i]t may be appropriate to reconsider [Auer deference] in an appropriate case. But this is not that case." 133 S. Ct. at 1338 (Roberts, C.J., concurring). Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution. See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . . [D]eference to an agency interpretation is inappropriate not

only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))). Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the content of the Constitution. The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation. See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d at 1085 ("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

## LAW REGARDING FEDERAL SOVEREIGN IMMUNITY

"The United States cannot be sued without its consent." Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.). "Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F. Supp. 2d at 1137-38. As with any jurisdictional issue, the party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived. See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992). Accordingly, the "plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims." Garcia v. United States, 709 F. Supp. 2d at 1138. Accord Bork v. Carroll, 449 F. App'x 719, 721 (10th Cir. 2011)(unpublished)[10]("So it is that a plaintiff seeking to invoke the

---

[10]Bork v. Carroll is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished)(holding that, in a case brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983))).

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted). Accord FDIC v. Meyer, 510 U.S. 471, 475 (1994); United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). A waiver of sovereign immunity cannot be implied and must be unequivocally expressed. See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996); Wells Fargo Bank, Nat. Ass'n v. Se. N.M. Affordable Hous. Corp., 877

---

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that Bork v. Carroll, 449 F. App'x 719 (10th Cir. 2011)(unpublished), Summa v. United States, 936 F.2d 584, 1991 WL 114638 (10th Cir. 1991)(unpublished), Liverman v. Comm. on the Judiciary, 51 F. App'x 825 (10th Cir. 2002)(unpublished), How v. City of Baxter Springs, 217 F. App'x 787 (10th Cir. 2007)(unpublished), Mitchell v. City of Wichita, Kan., 140 F. App'x 767 (10th Cir. 2005)(unpublished), Miskovsky v. Jones, 437 F. App'x 707 (10th Cir. 2011)(unpublished), Evans v. Fogarty, 241 F. App'x 542 (10th Cir. 2007)(unpublished), and Chavez v. Primus Auto. Fin. Servs., 125 F.3d 861, 1997 WL 634090 (10th Cir. 1997)(unpublished), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

F. Supp. 2d 1115, 1139-40 (D.N.M. 2012)(Browning, J.)(finding that, by the express terms of the statute, the United States waived its sovereign immunity under 28 U.S.C. § 1346(a)(2) for actions seeking damages, but not when a plaintiff seeks equitable or injunctive relief). The United States' agencies also have sovereign immunity, absent a waiver. See FDIC v. Meyer, 510 U.S. 471, 475 (1994)("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.").

Immunity serves to limit "the general costs of subjecting officials to the risks of trial -- distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." Harlow v. Fitzgerald, 457 U.S. 800, 816 (1982). "Harlow emphasizes that even such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)(quoting Harlow v. Fitzgerald, 457 U.S. at 817). In Liverman v. Comm. on the Judiciary, 51 F. App'x 825 (10th Cir. 2002)(unpublished), the Tenth Circuit rejected the argument that the "district court erred in staying discovery pending resolution of the Committee's motion to dismiss," because, in part, "the Committee raised sovereign immunity and other immunity-based defenses in its motion to dismiss." 51 F. App'x at 827. Based on the Supreme Court's statement that, "[u]ntil [the] threshold immunity question is resolved, discovery should not be allowed," Siegert v. Gilley, 500 U.S. 226, 231 (1991), the Tenth Circuit found "no logical reason why this rule should not apply where the defendant raises the defense of sovereign immunity and the defense is primarily one of law." 51 F. App'x at 827-28. Accordingly, the Court has previously allowed federal entities extensions of time so that they need not respond to pleadings until the Court determines whether their sovereign immunity protects them from a suit.

See Hill v. Vanderbilt Capital Advisors, LLC, No. CIV 10-0133 JB/KBM, 2010 WL 5151251, at

*5 (D.N.M. Oct. 31, 2010)(Browning, J.).

## LAW REGARDING FIRST AMENDMENT RETALIATION CLAIMS

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to

inhibit exercise of the protected right.'"  Hartman v. Moore, 547 U.S. at 256 (quoting Crawford-

El v. Britton, 523 U.S. 574, 588 n.10 (1998)).  It is therefore "settled that as a general matter, the

First Amendment prohibits government officials from subjecting an individual to retaliatory

actions, including criminal prosecutions, for speaking out."  Hartman v. Moore, 547 U.S. at 256

(citation omitted).    In addition to prohibitive laws, the Constitution also proscribes

"[g]overnment retaliation . . . in as much as retaliatory actions tend to chill individuals' exercise

of constitutional rights."  How v. City of Baxter Springs, 217 F. App'x 787, 797 (10th Cir.

2007)(unpublished).  See Perez v. Ellington, 421 F.3d at 1131 ("The First Amendment bars

retaliation for exercising the right of association.").  The Tenth Circuit has explained that "any

form of official retaliation for exercising one's freedom of speech, including prosecution,

threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement

of that freedom."  How v. City of Baxter Springs, 217 F. App'x at 797 (quoting Worrell v.

Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)).  To establish a claim of retaliation, outside the

employment context, for exercising the right to associate guaranteed under the First Amendment,

a plaintiff must establish three elements: (i) the plaintiff was engaged in constitutionally

protected activity; (ii) the defendant's actions caused the plaintiff to suffer an injury that would

chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the

plaintiff's exercise of the constitutionally protected activity substantially motivated the

defendant's adverse action.  See Perez v. Ellington, 421 F.3d at 1131-32 (quoting Worrell v.

Henry, 219 F.3d at 1212).   In line with Hartman v. Moore, the Tenth Circuit has held that a plaintiff must establish the following elements to allege a cause of action under the First Amendment against a defendant who is not his employer:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.   Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000).

Klen v. City of Loveland, Colo., 661 F.3d 498, 508 (10th Cir. 2011).   In Harapat v. Vigil, 676 F. Supp. 2d 1250 (D.N.M. 2009)(Browning, J.), the Court found that a reasonable jury could conclude a sheriff's arrest of protesters, who would not move their protest from the front of a district attorney's office to the other side when the sheriff directed, was a retaliatory action substantially motivated by the sheriff's desire to chill the protesters from the exercise of their First Amendment rights.   See 676 F. Supp. 2d at 1254, 1207-71.   Additionally, in Edwards-Flynn v. Yara, No. CIV 08-0186 JB/ACT, 2009 WL 1563375 (D.N.M. May 18, 2009)(Browning, J.), the Court ruled that a political candidate had stated a First Amendment retaliation claim when she alleged that a city official intentionally certified the candidate to run for city councilor in the wrong ward because the official did not agree with the candidate's political views, and thereby the official defeated the candidate's ability to fairly run for public office in the correct ward.   See 2009 WL 1563375, at *8-9.

When analyzing whether a defendant's actions would have a chilling effect, a court is to "focus, of course, . . . upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled," thus conducting an objective and not subjective inquiry.   Smith v. Plati, 258 F.3d 1167, 1177 (10th Cir. 2001).   If a plaintiff is seeking to prove the causal connection between the retaliatory animus of a third party, and the action of another,

the Tenth Circuit requires that "the plaintiff . . . show a causal connection between the third-

party's animus and the action."  Leverington v. City of Colo. Springs, 643 F.3d 719, 731 n.10

(10th Cir. 2011).

When direct evidence of retaliatory animus is not present, a plaintiff may establish a

prima facie case of retaliation with indirect evidence.  The Supreme Court has "established

methods for identifying the presence of an illicit reason (in competition with others), not only in

retaliation cases but on claims of discrimination based on race or other characteristics."  Wilkie

v. Robbins, 551 U.S. at 556(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

See also Waters v. Churchill, 511 U.S. 661, 691 (1994)(Scalia, J., concurring)(noting that the

Supreme Court "considers 'pretext' analysis sufficient in other First Amendment contexts.");

Renton v. Playtime Theatres, Inc., 475 U.S. 41, 54 (1986)(holding that a city's zoning restriction

on adult theatres does not violate the First Amendment unless the zoning is a "pretext for

suppressing expression" (internal quotation marks omitted)).  First of all, "[c]laims of age, race,

national origin, gender discrimination, and retaliation are all subject to the burden shifting

framework that the Supreme Court of the United States established in McDonnell Douglas Corp.

v. Green."  Gamez v. Country Cottage Care and Rehab., 377 F. Supp. 2d 1103, 1119 (D.N.M.

2005)(Browning, J.).  Under the McDonnell Douglas Corp. v. Green framework, a plaintiff must

set forth a prima-facie case of retaliation.  See Kelley v. City of Albuquerque, 375 F. Supp. 2d

1183, 1210 (D.N.M. 2004)(Browning, J.), aff'd, 542 F.3d 802 (10th Cir. 2008).  If the plaintiff

establishes a prima-facie case for any of his or her retaliation or discrimination claims, "the

burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its

employment related decision."  Mitchell v. City of Wichita, Kan., 140 F. App'x 767, 777 (10th

Cir. 2005)(unpublished).  "Upon the employer's articulation of a legitimate, nondiscriminatory

reason . . . the presumption of discrimination established by the prima-facie case simply drops out of the picture." Kelley v. City of Albuquerque, 375 F. Supp. 2d at 1210 (internal quotation marks omitted). The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual. See Kelley v. City of Albuquerque, 375 F. Supp. 2d at 1210 (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)). When the burden shifts back to the plaintiff, the plaintiff may establish pretext through "'evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in a defendant's 'proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer' that the defendant 'did not act for the asserted non-discriminatory reasons.'" Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1228 (10th Cir. 2008)(quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1203 (10th Cir. 2006)).

In determining whether an action was substantially motivated by retaliatory animus, one element which courts have considered is the temporal proximity between a plaintiff's speech and a defendant's allegedly retaliatory action. For example, in Miskovsky v. Jones, 437 F. App'x 707 (10th Cir. 2011)(unpublished), the Tenth Circuit determined that a prisoner stated a claim for retaliation under the First Amendment when the prisoner alleged that his transfer to a more dangerous prison was retaliation for his lawsuit against a judge and prison official alleging harassment, filed in "close temporal proximity -- 15 days" before the transfer. See 437 F. App'x at 713 (internal quotation marks omitted). The Tenth Circuit has also expressed that a six-month period between protected activity and alleged retaliation, without more evidence, is insufficient to establish that a defendant's alleged retaliation was a response to a plaintiff's constitutionally protected conduct. See 437 F. App'x at 712-13 ("A six-month gap between the protected

activity . . . and the alleged retaliation cannot, without more, establish causation."). Accord Anderson v. Coors Brewing, Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(noting that, in employment discrimination cases alleging retaliation for protected activity, "we have held that a three-month period, standing alone, is insufficient to establish causation"). On the other hand, the Tenth Circuit has found that a reasonable jury could find a pattern of retaliation over a period of twenty-five months, when the plaintiffs alleged that they received disparate reimbursement and experienced increased administrative burdens from their health care administrator over the nearly two-years in which the plaintiffs lobbied for legislation adverse to their administrator's interests. See Evans v. Fogarty, 241 F. App'x 542, 544-45, 551-55 (10th Cir. 2007)(unpublished). The Tenth Circuit noted that evidence of disparate reimbursements and increased administrative burdens was circumstantial, but explained that "'in a § 1983 proceeding circumstantial evidence generally plays a major role.'" 241 F. App'x at 555 n.14 (quoting Butcher v. City of McAlester, 956 F.2d 973, 978 (10th Cir. 1992)). The Tenth Circuit also noted that the administrator's retaliatory motivation as more likely when viewed against the backdrop of "'intense emotional conflict'" seen through the parties' "poisonous, long-running political battle." Evans v. Fogarty, 241 F. App'x at 555 n.14 (quoting Butcher v. City of McAlester, 956 F.2d at 978).

## ANALYSIS

The Court will grant the Motion to Reconsider: there is only one First Amendment retaliation claim; it arises under the Constitution, but it is subject to the APA's procedural provisions, which generally limit the judicial review to the administrative record. As Justice Scalia wrote in his Webster v. Doe dissent,

> with respect to all entities that come within the Chapter's definition of "agency," see 5 U.S.C. § 701(b), if review is not available under the APA it is not available

at all.  Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing judicial review of all federal agency action.  <u>While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA</u> unless *specifically* excluded, <u>see</u> 5 U.S.C. § 559.

486 U.S. at 607 n.* (underlining added)(italics in original).  The Tenth Circuit has held that the USFS is an "agency" under § 701.  <u>E.g.</u>, <u>Utah Envtl. Congress v. Bosworth</u>, 372 F.3d 1219, 1223 n.3 (10th Cir. 2004)("We review the Forest Service's approval of the Monroe Project as final agency action under the APA, 5 U.S.C. §§ 701-706.").  The issuance, revocation, or modification of a license is an agency action.  <u>See</u> 5 U.S.C. § 551(13) (providing that "'agency action' includes the whole or a part of an agency rule, order, <u>license</u>, sanction, relief, or the equivalent or denial thereof, or failure to act" (emphasis added)); <u>McKeen v. U.S. Forrest Serv.</u>, 615 F.3d at 1246, 1257-58 (holding that a USFS "livestock grazing permit" decision "constitutes a 'final agency action' that is subject to judicial review under the APA").  The USFS' eighteen-percent reduction of the Plaintiffs' livestock permitting is central to the Plaintiffs' claims, including the First Amendment retaliation claim.  <u>See</u> Complaint ¶ 112, at 47 ("[The] decision to reduce the individual Plaintiff permittees' livestock permits by 18% was an adverse action calculated to retaliate against and punish them for the exercise of rights protected by the First Amendment and to chill their future exercise of such rights . . . .").  This case, thus, is subject to the APA's provisions.

The case before the Court is an appeal of an agency action in every respect: that the appeal alleges constitutional violations as well as statutory ones does not take it outside of the APA, <u>see</u> 5 U.S.C. § 706(2)(B) ("The reviewing court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to <u>constitutional</u> right, power,

privilege, or immunity . . . ."  (emphasis added));[11] and that the appellants allege, as part of their argument on appeal, that the lower forum was motivated by an illicit animus does not relieve the Plaintiffs of the substantial burdens the law would impose on them but for the allegations.  Given the difficulty of surmounting a successful administrative appeal in the face of arbitrary-or-capricious factual review and Chevron/Auer legal deference, for the Court to hold otherwise -- and allow fresh discovery, submission of new evidence and legal arguments, or de novo review -- would be to incentivize every unsuccessful party to agency action to allege bad faith, retaliatory animus, and constitutional violations to trade in the APA's restrictive procedures for the more even-handed ones of the Federal Rules of Civil Procedure.

The relationship between the USFS and the Plaintiffs is fundamentally that of tribunal and litigant, and not that of adversarial parties to a lawsuit.  See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 652 (2002)(describing "the regulatory commission" as "a nominal defendant when a party appeals in the federal system," and noting that many substantively similar state-court administrative schemes caption cases judicially reviewing agency decisions as appeals, and not as adversarial proceedings between the appellant and the agency).  The Plaintiffs cannot avoid the hardships of the Court's deference to the agency by making allegations of agency malevolence.  These "hardships" from the Plaintiffs' perspective are, from the perspective of the judiciary, Congress, and the public, consciously designed efficiencies.  For better or for worse, in the modern administrative state, agencies are a part of the adjudicatory apparatus -- not merely a party to it.

---

[11]The USFS also cites numerous cases in its Motion to Reconsider and Reply in which courts, including the Tenth Circuit, have adjudicated constitutional claims within the APA's procedural framework.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d at 1085 ("We review Robbins' due process claim against the [agency] under the framework set forth in the APA."); Olenhouse v. Commodity Credit Corp., 42 F.3d at 1573.

The Court must carefully manage the procedural posture of this case and the motions in it. Review of agency actions generally comes to the Court in the form of an appeal, and not a "separate and independent action, initiated by a complaint and subjected to discovery and a 'pretrial' motions practice." Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579 (explaining that "[t]his process, at its core, is inconsistent with the standards for judicial review of agency action under the APA"). The Court does not, however, read the APA or Olenhouse v. Commodity Credit Corp. as requiring any one particular form of action. Section 703 provides that "[t]he form of proceeding for judicial review is . . . any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." Olenhouse v. Commodity Credit Corp. says that a "district court should govern itself by referring to the Federal Rules of Appellate Procedure," a requirement that the Tenth Circuit has confirmed as recently as 2009. 42 F.3d at 1580. See Wyoming v. U.S. Dep't of Interior, 587 F.3d at 1251 n.2. See also Hamilton v. Sec'y of Health & Human Servs. of U.S., 961 F.2d 1495, 1504 (10th Cir. 1992)("[D]istrict courts should process these cases as appeals, eliminate aberrant motion practices, and follow the Federal Rules of Appellate Procedure."). The Federal Rules of Civil Procedure for the United States District Courts, which govern district courts in the first instance as a matter of Supreme Court and congressional mandate, see Fed. R. Civ. P. 1,[12] provide that "[t]here is one form of action -- the civil action," Fed. R. Civ. P. 2.

---

[12]The rule provides: "These rules govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81. They should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. None of rule 81's exceptions apply to judicial review of agency actions. The closest is rule 81(a)(6)(A), which applies to actions brought under "7 U.S.C. §§ 292, 499g(c), for reviewing an order of the Secretary of Agriculture." Although the USFS is under the Department of Agriculture, examination of 7 U.S.C. §§ 292 and 499g(c) refer to specific actions not involving the USFS.

Looking past the mixed signals sent by the legal authorities and instead to the purposes underlying Olenhouse v. Commodity Credit Corp., the Court concludes that there is no harm in taking the case in the form that the parties -- namely the Plaintiffs -- have presented it, so long as the procedural devices the Court uses respect the congressionally determined scheme of judicial review.

The burden will be properly placed on the Plaintiffs for much of what they do in this case. Devices such as rule 56 summary judgment are incompatible with this scheme, and the Court thus cannot use them. As a group, the devices normally used by appellate courts are generally more consistent with the APA's judicial review scheme than the devices that trial courts normally use, which presume nothing about the merits of the case and divide burdens of proof and production almost equally between the plaintiff and defendant. The Court can see no reason, however, why the Plaintiffs cannot use the familiar procedural devices of the Federal Rules of Civil Procedure if they wish, at least to the extent that they comport with or can be modified to comport with the APA.

The APA generally limits the Court's review to the administrative record; the Federal Rules of Appellate Procedure reiterate the statute's limitation. See Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."). This limitation does not, however, leave the Plaintiffs entirely without recourse to supplement that record. See supra note 7, at 44 (describing the reasons for which a district court may go outside the administrative record and the manners in which it may supplement the record). The Tenth Circuit explicitly allows for supplementation of the administrative record if the Plaintiffs can demonstrate that "the agency's fact-finding procedures

[were] inadequate."[13]  Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.3d at 1141 n.7.   The Court will additionally borrow the Ninth Circuit's exceptions and allow supplementation of the record: (i) as necessary to determine "whether the agency has considered all relevant factors and has explained its decision," an exception the Court concludes is functionally identical to the Tenth Circuit's exception; (ii) if the Plaintiffs can show that "the agency has relied on documents not in the record"; (iii) if "supplementing the record is necessary to explain technical terms or complex subject matter"; and (iv) if the Plaintiffs can present evidence "mak[ing] a showing of agency bad faith."  Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).  Although the Tenth Circuit has not yet recognized these additional bases for supplementing the record, it has also not disclaimed them.

There are three ways to supplement the administrative record, listed here in descending order of favorability: (i) remanding the case to the USFS for additional findings or conclusions, which the Court may specifically request or order; (ii) allowing the Plaintiffs to submit supplementary evidence -- which they have obtained on their own -- to the Court; and (iii) granting the Plaintiffs limited rights to impose Court-mandated discovery on the USFS and others.  The Court will allow the Plaintiffs to present evidence freely for the sole purpose of

---

[13]This exception applies only if the agency "action is adjudicatory in nature."  Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.3d at 1141 n.7.  Licensure proceedings are adjudicatory -- not rulemaking -- proceedings.  See 2 Am. Jur. 2d Administrative Law § 244 (2014)("The debate over whether the grant or denial of a license application is an adjudicatory or legislative process now seems settled in favor of viewing those proceedings as adjudicatory in nature and thus subject to constitutional due process limitations."  (citing Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964)).

The Tenth Circuit has recognized another basis for going outside the administrative record, but it is factually inapposite to this case: "[Section] 706(2)(F) of the APA has been interpreted as authorizing de novo review . . . when issues not previously before the agency are raised in a proceeding to *enforce* a nonadjudicatory action."  Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.3d at 1141 n.7 (emphasis in original).

triggering one of the above four exceptions. The Court will place the burden on the Plaintiffs, not only to present evidence establishing the factual predicate for one of the exceptions to the administrative record rule, but also to argue why they need the specific remedial measure -- (i), (ii), or (iii) in this paragraph -- they seek. If the Plaintiffs show only that the USFS inadequately considered the determination below or failed to consider all relevant factors, the Court will be inclined to remand the case back to the USFS for further deliberation. If the Plaintiffs show only that the USFS relied on a limited number of documents outside of the record, the Court will likely supplement the record only with the documents in question. If supplementation is needed to explain technical terms or complex subject matter -- and the Court can likely make this determination for itself, without the Plaintiffs' help -- the Court can likely conduct its own judicial noticing, or allow the parties to submit limited learned treatise or similar material to explain the technical matter. The last exception -- which is also the one the Plaintiffs allege in this case -- bad faith, is the only one in which the Court can reasonably foresee permitting discovery. The Court will demand a compelling factual showing to trigger this exception in the first instance, and it will additionally tailor any remedial supplementation narrowly to the Plaintiffs' needs.

There are other motions already pending in this case -- the MTD for Failure to Exhaust and the Motion for Discovery -- that present the question more squarely, and in which the Court can more appropriately flesh out the parameters of the administrative record rule and its exceptions. For now, the Court will only clarify that: (i) the Plaintiffs have alleged one First Amendment retaliation claim, which arises under the Constitution; and (ii) that claim, because it arises from a final agency action, is subject to the APA's procedural provisions, which include a general rule that the reviewing court must limit its review to the administrative record. It is not

without meaning that the Plaintiffs' claim is constitutional in nature: if the claim were statutory, even the USFS' legal interpretations, in addition to its factual findings, would be entitled considerable deference; as it stands, the Court will undertake a de novo review of the constitutional legal issues in the case.  Although the substantive nature of the claim does change the substantive standard of review -- e.g., arbitrary-and-capricious review, Chevron deference, de novo review, etc. -- it does not change the procedural framework under which the case must progress: the APA.  The Court will grant the Motion to Reconsider and will not permit discovery except upon motion and proper evidentiary showing by the Plaintiffs.

**IT IS ORDERED** that the Federal Defendants' Motion for Reconsideration, filed February 7, 2013 (Doc. 53), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Simeon Herskovits
Iris A. Thornton
Advocates for Community and Environment
El Prado, New Mexico

--and--

Richard Rosenstock
Santa Fe, New Mexico

    *Attorneys for the Plaintiffs*

Damon P. Martinez
   United States Attorney
Ruth F. Keegan
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Andrew A. Smith
Environment & Natural Resources Division
United States Department of Justice
Albuquerque, New Mexico

   *Attorneys for the Defendants*