# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JARITA MESA LIVESTOCK GRAZING
ASSOCIATION; ALAMOSA LIVESTOCK
GRAZING ASSOCIATION; SEBEDEO
CHACON; THOMAS GRIEGO; DONALD
GRIEGO; MICHAEL PENA; JUAN GIRON;
JOE GURULE, JR.; FERNANDO GURULE;
DIEGO JARAMILLO; LORENZO
JARAMILLO; GABRIEL ALDAZ; ARTURO
RODARTE; JEFFREY CHACON; GLORIA
VALDEZ; JERRY VASQUEZ; CARLOS
ORTEGA; LEON ORTEGA; HORACIO
MARTINEZ; RONALD MARTINEZ; STEVE
CHAVEZ; VANGIE CHAVEZ; ALFONSO
CHACON; DANIEL RAEL; JOHN VALDEZ
and BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF
RIO ARRIBA,

   Plaintiffs,

vs.              No. CIV 12-0069 JB/KBM

UNITED STATES FOREST SERVICE and
DIANA TRUJILLO, in her official and
individual capacities,

   Defendants.

## AMENDED MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the Federal Defendants' Motion to Dismiss Count 1 for Failure to Exhaust Administrative Remedies, filed February 18, 2013 (Doc. 55)("MTD"). The Court held a hearing on July 26, 2013. The primary issue is whether the Court should dismiss the Plaintiffs' retaliation claim under the First Amendment to the Constitution of the United States for failure to exhaust administrative remedies. Because the Plaintiffs never argued their First Amendment retaliation claim before Defendant United States Forest Service in the administrative proceedings, because a claim is not exempt from the administrative-exhaustion requirement merely because it is constitutional in nature, and because the administrative-exhaustion requirement is mandatory and thus not subject to judicial waiver, the Court will dismiss without prejudice the First Amendment retaliation claim for failure to exhaust administrative remedies pursuant to 7 U.S.C. § 6912(e). The Court, thus, grants the MTD.

## FACTUAL BACKGROUND

The history of the Plaintiffs' case predates the parties before the Court. The Plaintiffs set forth a backdrop of social, cultural, and economic factors, which they say are inextricably intertwined with the Plaintiffs' cattle grazing within the Carson National Forest in northern New

---

[1]On September 30, 2013, the Court entered an Order granting the Federal Defendants' Motion to Dismiss Count 1 for Failure to Exhaust Administrative Remedies, filed February 18, 2013 (Doc. 55). See Order, filed September 30, 2013 (Doc. 102)("Order"). The Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." Order at 1 n.1. Yesterday, the Court issued the promised Memorandum Opinion, filed November 17, 2014 (Doc. 134), and it now amends that Memorandum Opinion to make two corrections. First, the Court modifies its ruling from a dismissal with prejudice to a dismissal without prejudice. See infra at 2, 48, 104-105. Second, the Court modifies two of its footnotes and one of its accompanying citations to change them from referencing the current set of Forest Service procedural regulations -- which do not apply to this case -- to referencing the older set of regulations. See note 15, infra, at 79, and accompanying text; note 16, infra, at 81.

Mexico.  The Plaintiffs also allege a history of tension between the Forest Service and the Plaintiffs' ancestors, which bears on the legality of the Defendants' actions managing national forestland in northern New Mexico over the last three years.[2]  The Court takes as true all non-conclusory factual statements in the Complaint for Declaratory and Injunctive Relief (First Amendment to the United States Constitution, National Environmental Policy Act; National Forest Management Act, Sustain Yield Forest Management Act; Administrative Procedure Act), filed January 20, 2012 (Doc. 1)("Complaint").

1. <u>**The Parties to the Litigation**</u>.

"The Plaintiffs and their ancestors are Hispanic stockmen whose families have been grazing livestock" in northern New Mexico for many generations.  Complaint ¶ 3, at 2-3.  Most of the natural-person Plaintiffs' families were grazing livestock in the area of the Vallecitos Federal Sustained Yield Unit ("the Unit") before the Forest Service existed.  <u>See</u> Complaint ¶ 3, at 3.  The Unit is an area of the Carson National Forest that Congress set aside to be managed for the economic benefit of the communities located in the Unit.  Congress specifically provided that these local communities should have access to the timber and other forest products within the Unit, as needed for the communities' economic stability.  <u>See</u> Complaint ¶ 39, at 14.  Grazing livestock is an "integral part of their existence and is a central part of life in the villages they reside in . . . all of Northern New Mexico."  Complaint ¶ 3, at 3.

The Jarita Mesa Allotment and the Alamosa Allotment are areas within the Unit on which cattle grazing is allowed.  <u>See</u> Complaint ¶ 2, at 2.  Plaintiffs Sebedeo Chacon, Michael Pena, Juan Giron, Gabriel Aldaz, Arturo Rodarte, Thomas Griego, Donald Griego, Joe Gurule, Jr.,

---

[2]The Forest Service originated in 1891 with the Forest Reserve Act, which empowered "the president to establish forest reserves from timber covered public domain land."  US Forest Service, History, <u>U.S. Forest Service</u>, (Dec. 22, 2009), http://www.fs.fed.us/aboutus/history.

Lorenzo Jaramillo, Jeffrey Chacon, and Gloria Valdez (collectively, "the Jarita Mesa Permittees") have permits that the Forest Service issued, which allow them to graze cattle on the Jarita Mesa Allotment.  Complaint ¶ 3, at 2.  T. Griego, D. Griego, Plaintiffs Carlos Ortega, Leon Ortega, Daniel Rael, Horacio Martinez, Ronald Martinez, Fernando Gurule, Jerry Vasquez, and Alfonso Chacon (collectively, "the Alamosa Permittees") have permits that the Forest Service issued, which allow them to graze cattle on the Alamosa Allotment.  Complaint ¶ 3, at 2.  Plaintiff Steve Chavez is a former permittee on the Alamosa Allotment and now lives within the Unit with his wife, Plaintiff Vangie Chavez.  See Complaint ¶ 3, at 2.  J. Valdez is a former permittee on the Jarita Mesa Allotment and now resides within the Unit.  See Complaint ¶ 3, at 2-3.  The Jarita Mesa Grazing Association and the Alamosa Grazing Association (collectively, "the Associations") are "local livestock associations made up exclusively of grazing permittees on the respective allotments."  Complaint ¶ 13, at 5.  The Associations were established to: (i) protect and promote the permittees' livestock grazing on the Allotments; (ii) manage and share the costs of handling livestock, range improvements, and other programs for the benefit of the Allotments and their resources; (iii) express the Associations' members' wishes; and (iv) meet with and work with the Forest Service to ensure proper management of livestock and range resources on the allotments.  See Complaint ¶ 13, at 6.  S. Chacon was president of the Jarita Mesa Grazing Association throughout the events set forth in the Complaint.  See Complaint ¶ 14, at 6.  T. Griego was president of the Alamosa Grazing Association throughout the events set forth in the Complaint.  See Complaint ¶ 15, at 7.

The Hispanic people in northern New Mexico have lived in the area for hundreds of years, long before Congress created the Forest Service.  See Complaint ¶ 37, at 13.  They have a unique culture, shaped by and dependent on their relationship with the land.  See Complaint ¶ 37,

at 13.  The Hispanic people living in villages near the Carson National Forests have historically relied on the resources of the national forests of northern New Mexico for sustenance.  See Complaint ¶ 37, at 13.  These Hispanics rely upon the "fodder, including grasses and other forage, like the marsh hay, mushrooms, nuts, and seeds" within the Unit for their sustenance.  Complaint ¶ 39, at 14.  Livestock grazing is central to their cultural, social, and economic fabric, and has been since at least the 1690s.  See Complaint ¶ 40, at 14.  The Associations represent the communities "that have historically relied on, and continue to rely on, grazing on these ancient community . . . lands."  Complaint ¶ 40, at 15.

Plaintiff Board of County Commissioners of the County of Rio Arriba ("Rio Arriba County") is a political subdivision in northern New Mexico, in which a large portion of the Carson National Forest, including the Allotments and the El Rito Ranger District, is located.  See Complaint ¶ 16, at 7.  The Individual Plaintiffs are all residents of Rio Arriba County.  Rio Arriba County and local school districts receive payment derived from the grazing fees, in lieu of taxes, from the Forest Service.  This payment is derived, in part, from grazing fees.  Rio Arriba County is thus interested in ensuring that the "grazing permits on land administered by the Forest Service within Rio Arriba County are not unlawfully reduced."  Complaint ¶ 16, at 7.  Rio Arriba County is also interested in protecting the social fabric, customs, traditions, and cultural integrity of the traditional communities within the county, and in the economic betterment of its citizens.  Rio Arriba County is further interested in "making sure federal laws are followed and that its citizens are not punished by federal officials for expressing their views on federal agency policy to elected officials and others."  Complaint ¶ 16, at 7.

The Forest Service is an agency of the United States Department of Agriculture and is charged with the "administration of lands within the United States that have been designated as

National Forest Lands." Complaint ¶ 17, at 8. The Forest Service is charged with the Unit's management. Throughout the events set forth in the Complaint, the Forest Service employed Trujillo as the El Rito District Ranger. Complaint ¶ 19, at 8. Both Allotments are located in the El Rito District of the Carson National Forest. See Complaint ¶ 1, at 2. Trujillo is charged with "managing the natural resources in her district, including the range resource." Complaint ¶ 19, at 8.

        **2.**      **The Events Giving Rise to the Litigation.**

"[A]ll or a substantial part of the events or omissions giving rise to the [Plaintiffs'] claims . . . occurred within this judicial district." Complaint ¶ 12, at 5. Beginning in the 1920s, the Forest Service's management practices led to a reduction of the number of Hispanic residents near the Carson National Forest who were allowed to graze in the forest under permit. See Complaint ¶ 43, at 16-17. The Forest Service gradually eliminated milk cow and draft horse permits. See Complaint ¶ 43, at 17. The reduction in these permits has destabilized the Plaintiffs' cultural and social fabric. See Complaint ¶ 43, at 17. The Plaintiffs have "repeatedly voiced opposition to and have been highly critical of various actions taken by the Defendants," especially Trujillo's actions in recent years. Complaint ¶ 57, at 22-23. The Plaintiffs have written letters, spoken at public meetings, and contacted their congressional representatives about the Defendants' actions. See Complaint ¶ 57, at 23.

Under the Forest Service's management, the population of wild horses and elk on the Unit has grown to the point that the vegetative cover, upon which the Plaintiffs rely for grazing their cattle, has degraded. See Complaint ¶ 58, at 23. In 2002, the Forest Service concluded that the wild horses on Jarita Mesa were competing with the cattle for forage. See Complaint ¶ 59, at 23. In 2002, the Forest Service issued a Decision Notice ("2002 Decision Notice"), which

authorizes the number of wild horses to increase from between twelve and fourteen, to between twenty and seventy.   Complaint ¶ 60, at 24.   The 2002 Decision Notice provides certain measures to be taken if the wild horse herd size grows above seventy horses.   See Complaint ¶ 60, at 24.

On or about April 8, 2006, S. Chacon, as the President of the Jarita Mesa Grazing Association, sent a letter to New Mexico's then-Governor Bill Richardson and to the New Mexico Congressional delegation, which over eighty residents of the Unit signed, and in which S. Chacon complained about the Forest Service's management of the El Rito Ranger District. The letter specifically complained about the Forest Service's failure to reduce the number of wild horse herds and to control the number of elk herds on the Unit.   See Complaint ¶ 62, at 25.   On May 24, 2006, the Plaintiffs[3] wrote to Trujillo's supervisor, Carson National Forest Supervisor Martin Chavez, and alleged that Trujillo was acting "in an abusive manner towards the Jarita Mesa permittees, was dealing with them in a less than honest manner, was arbitrarily and capriciously reducing the grazing time allowed under their permits, and was otherwise impairing their grazing rights" under the permits.   Complaint ¶ 63, at 25.   In June, 2006, a Forest Service employee admitted that the wild horse herd exceeded the number that the 2002 Decision Notice allowed and was numbering at least 150.   See Complaint ¶ 64, at 25.

On July 5, 2006, Trujillo ordered all cattle removed from the Jarita Mesa Allotment by July 31, 2006.   See Complaint ¶ 66, at 26.   Some of the Plaintiffs, including S. Chacon and Aldaz, appealed Trujillo's order.   See Complaint ¶ 66, at 27.   On July 25, 2006, Trujillo wrote to the Jarita Mesa Grazing Association and stated that the range conditions had not improved

---

[3]The Plaintiffs do not clarify if all Plaintiffs were signatories to the May 24, 2006 letter, only the Individual Plaintiffs, or only the Jarita Mesa Permittees -- whose permits Trujillo's management of the Jarita Mesa Allotment affected.   See Complaint ¶ 3, at 25.

significantly, and, thus, she would not change her July 5, 2006, order to remove cattle by July 31, 2006.  See Complaint ¶ 68, at 27.  On July 28, 2006, acting Carson Forest Supervisor Kendall Clark decided to delay Trujillo's order for two weeks because of recent rains and soil moisture levels.  A report by the Range Improvement Task Force ("RI Task Force"), associated with New Mexico State University ("NMSU"), subsequently found that the past grazing of the permittees' cattle had not damaged grazing resources, and that there was sufficient grass to complete the grazing season as the permits authorized.  The Jarita Mesa Permittees were eventually allowed to complete their grazing season as their permits specified.  See Complaint ¶ 69, at 28.

David Correia, a professor of American Studies at the University of New Mexico, is a scholar who had been researching the Unit's history over several years.  Correia had been previously granted full access to the Forest Service records at the El Rito District Office for his research on the Unit.  In 2006, he began assisting the Plaintiffs with their interactions with Trujillo.  Correia attended a meeting in the El Rito area regarding grazing issues, at which Trujillo made statements to the effect that Unit residents caused most or all of the problems facing the Unit.  See Complaint ¶ 72, at 28.  Correia responded publicly at the meeting that the Forest Service's mismanagement of the Unit over the years was the source of the Unit's problems.  Subsequent to the 2006 meeting, Trujillo refused to allow Correia access to any records at the El Rito District Office and informed him that this change of policy was because of his statements at the meeting.  See Complaint ¶ 72, at 29.

Trujillo then announced that she would end the 2006 grazing season in September, 2006, instead of on October 31, 2006, as set forth in the Plaintiffs' permits.  Trujillo stated that this change was because the Plaintiffs failed to meet certain conditions that she had imposed -- conditions that, had they been met, would have allowed the season to end on October 31, 2006.

S. Chacon, as President of the Jarita Mesa Grazing Association, proposed a compromise end date of October 15, 2006.  See Complaint ¶ 73, at 29.  Trujillo responded that she would view S. Chacon's request as that of his alone and that individual permittees would need to address their needs to her individually.  Trujillo stated that, if the conditions she imposed were not met, she would suspend or cancel the permits, and charge fines for any cattle not removed by October 2, 2006.  See Complaint ¶ 74, at 30.

As of October 5, 2006, S. Chacon had seventeen cows lost in the Carson National Forest. Give the size of the Allotments, locating cattle at the end of a grazing season is often difficult for the permittees.  On October 6, 2006, Trujillo reduced S. Chacon's grazing permit by twenty percent over the next two years, because he had not retrieved all of his cattle by the deadline she imposed.  This decision was upheld on appeal.  See Complaint ¶ 75, at 30-31.  A Riparian Specialist and Natural Resource Specialist from New Mexico State University wrote to Trujillo regarding S. Chacon's permit reduction, and expressed that her standards were "unreasonable and unyielding," and that the Forest Service was aware that S. Chacon was not given enough time to recover his cattle.  Complaint ¶ 77, at 31-32.

Moving ahead three years, the Plaintiffs complained to Trujillo and her staff in the spring of 2009 regarding the Forest Service's management of the Allotments.  Trujillo responded with a certified letter in which she outlined the repercussions that the Plaintiffs would face if they did not comply with their grazing permits' terms.  See Complaint ¶ 79, at 32.  On June 1, 2009, S. Chacon and T. Griego sent Trujillo a letter, that twenty-six permittees signed, in which the Plaintiffs criticized Trujillo's management of the Allotments.  The Plaintiffs also sent the letter to the New Mexico Congressional delegation, Governor Richardson, and Trujillo's immediate supervisor, Carson Forest Supervisor Clark.  The Plaintiffs stated in the letter that Trujillo's

certified letter insulted them, and the Plaintiffs accused Trujillo of attempting to intimidate them. The Plaintiffs alleged that Trujillo had failed to "install needed cattle guards or to fix plugged ones," and that Trujillo would sanction the permittees when their cattle then drifted from one allotment to another.   Complaint ¶ 80, at 32-33.   The Plaintiffs complained that they believed Trujillo was attempting to end grazing on the Allotments.   See Complaint ¶ 80, at 33.

In 2009 and 2010, the Forest Service began preparing an Environmental Assessment ("EA")[4] that would determine the amount of grazing allowed on the Allotments for 2011 and subsequent years.   See Complaint ¶ 78, at 32.   On August 20, 2009, the Forest Service made public three alternative courses of action for the El Rito District: (i) no grazing; (ii) grazing at the

---

[4]Under the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852, federal agencies are required to assess the environmental impacts of proposed actions that will significantly affect the quality of a human environment.   Agencies must prepare an environmental impact statement that sets forth proposed actions and their environmental impact. See 42 U.S.C. § 4332(2)(C).   When the agency cannot determine whether a proposed action will have an environmental impact, the agency must prepare an EA.   See 40 C.F.R. § 1501.4(b).   An EA:

   (a)   Means a concise public document for which a Federal agency is responsible that serves to:

      (1)   Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

      (2)   Aid an agency's compliance with the Act when no environmental impact statement is necessary.

      (3)   Facilitate preparation of a statement when one is necessary.

   (b)   Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

same level as the previous ten years, but with a minor reduction and improved management; and (iii) an eighteen-percent reduction in the number of permits with improved management.  The EA did not propose a reduction to the wild horse or elk population.  See Complaint ¶ 81, at 33.

The Forest Service requested comments from the RI Task Force regarding the EA's proposals.  The RI Task Force had been studying the socioeconomic and environmental effects and implications of Forest Service decisions regarding the Allotments for many years.  See Complaint ¶ 82, at 33.  The RI Task Force sent a letter to Trujillo expressing concern over the EA's scientific methodology, and the RI Task Force noted that the permittees "feel discouraged and powerless vis-à-vis" the Forest Service, as evidenced by the strained relationship of the two over recent years.  Complaint ¶ 82, at 34.  The RI Task Force recommended that Trujillo adopt the second proposal in the EA, which would allow grazing to remain at the same level as the previous years.  See Complaint ¶ 84, at 34.  The RI Task Force also recommended a longer grazing season.  See Complaint ¶ 84, at 34.

Rio Arriba County submitted a letter to the Defendants on September 17, 2009, in which it expressed concern about what it viewed as a "historical pattern of unjustified Forest Service action to reduce grazing opportunities for villagers that has chipped away and eroded the culture in the area and the way of life integral to that culture."  Complaint ¶ 85, at 35.  The Associations also submitted comments on September 17, 2009, in which they stated that the Forest Service should, as part of the upcoming EA, consider managing the wild horse and elk populations.  See Complaint ¶ 86, at 35.  On September 18, 2009, the New Mexico Department of Agriculture submitted comments in which it recommended that Trujillo adopt the EA's second proposal and stated its belief that proper management of the Carson National Forest would obviate the need to reduce the number of permits.  See Complaint ¶ 87, at 35.

- 11 -

On January 11, 2010, at a public meeting, Trujillo expressed her view that the current level of permits was an eighteen-percent temporary increase above the correct level -- an increase which occurred in 1980, and had, improperly, never been reduced to the correct level. <u>See</u> Complaint ¶ 89, at 36.  Trujillo also stated that she had been working with outside groups regarding the possibility of purchasing the Plaintiffs' permits.  <u>See</u> Complaint ¶ 89, at 36. Trujillo further stated that she would seek an eighteen-percent reduction in the number of permits, regardless of the EA's proposals.  <u>See</u> Complaint ¶ 89, at 37.  That month, Trujillo contacted outside groups later in January and suggested that they purchase the Plaintiffs' permits. <u>See</u> Complaint ¶ 90, at 37.

In March, 2010, the Plaintiffs submitted a petition to Carson National Forest Supervisor Clark, and Corbin Newman, the Regional Forester, which over 200 Unit residents signed, in which they requested that Trujillo be transferred from the El Rito District Ranger position. Trujillo was "extremely upset and angered by" the Plaintiffs' request.  Complaint ¶ 92, at 38.

On September 30, 2010, the Forest Service issued its EA.  <u>See</u> Complaint ¶ 4, at 3.  The EA contains approximately one page describing the socioeconomic and cultural impact that the proposed actions may have.  <u>See</u> Complaint ¶ 93, at 38.  The EA did not contain any recommendations regarding reducing the wild horse and elk population on the Allotments.  <u>See</u> Complaint ¶ 94, at 39.  The EA noted that, if the second alternative was adopted, which would allow the permittees to remain at the same number but with better management, the overall environmental impact would be positive, and the economic impact on the permittees would be less harsh than if the third alternative, an eighteen-percent reduction in the number of permittees, was adopted.  <u>See</u> Complaint ¶ 97, at 40.  The EA thus designated the second alternative as the Proposed Action.  <u>See</u> Complaint ¶ 98, at 41.

The 2010 EA's Proposed Action would have allowed the Plaintiffs to "continue grazing on both allotments with approximately the same number of cows as Plaintiffs have grazed on those allotments since 1980." Complaint ¶ 4, at 3; id. ¶ 98, at 41. Normally, the District Ranger for the Carson and Santa Fe National Forests in New Mexico adopts the Proposed Action set forth in an EA. See Complaint ¶ 4, at 3; id. ¶ 99, at 41. Rather than adopting the 2010 EA's Proposed Action, Trujillo adopted the third alternative set forth in the 2010 EA, which imposed an eighteen-percent reduction in the Plaintiffs' grazing permits. See Complaint ¶ 5, at 3. Trujillo stated that she took this action because the current number of permitted livestock on the Unit was unsustainable. See Complaint ¶ 5, at 3-4; id. ¶ 100, at 42. The EA did not conclude that the current grazing numbers were unsustainable. See Complaint ¶ 100, at 42.

On November 29, 2010, the Associations and Rio Arriba County appealed Trujillo's 2010 Decision Notice. See Complaint ¶ 105, at 44. In 2011, Trujillo's' supervisors ruled on the appeal and announced that they are upholding her decision. See Complaint ¶ 106, at 44. The Plaintiffs assert that they "will be significantly injured as a result of the imposition of the 18% reduction in permitted cow/calf numbers." Complaint ¶ 17, at 8. The Plaintiffs assert that the loss of grazing permits "causes not only severe economic harm to Plaintiffs but also grave damage to viability of the unique cultural and social fabric of their families and communities." Complaint ¶ 17, at 8. The Plaintiffs assert that the importance of their social and cultural fabric "has been recognized by Defendant Forest Service as essential not just to the residents of northern New Mexico but to the entire nation." Complaint ¶ 17, at 8.

## PROCEDURAL BACKGROUND

The events in this case -- and those relating to the First Amendment retaliation claim, specifically -- have come in an unusual sequence. The Court denied an earlier motion to dismiss

the claim on the merits.  Only after receiving that ruling has the Forest Service moved to dismiss it on exhaustion grounds.  The Court will summarize this sequence of events in the order in which they occurred.

> 1.       **The Claims in the Complaint.**

All of the Plaintiffs' alleged injuries are related to Trujillo's 2010 decision to reduce grazing on the Jarita Mesa and Alamosa Grazing Allotments, both of which lie within the El Rito Ranger District of the Carson National Forest.  The Plaintiffs allege that the eighteen-percent reduction in their permits violated their First Amendment right to free speech and to petition for redress of their grievances.  The Plaintiffs bring this action under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4331-4370 ("NEPA"), the National Forest Management Act of 1976, Pub. L. No. 94-588, 90 Stat. 2949 (codified in scattered section of 16 U.S.C.)("NFMA"), the Federal Sustained Yield Forest Management Act of 1944, 16 U.S.C. §§ 583, 583a-583i ("FSYMA"), and the Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 ("APA"). See Complaint ¶ 9, at 4-5.  The Plaintiffs assert that the Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1346, 2201, and 2202.  See Complaint ¶ 10, at 5.

The Plaintiffs assert that, under NEPA, all federal agencies are required to prepare an environmental impact statement regarding proposed actions that will significantly affect the quality of a human environment.  See Complaint ¶ 23, at 9 (citing 42 U.S.C. § 4332(2)(C)).  The Plaintiffs assert that agencies must prepare an EA when a proposed action's effect is uncertain.  See Complaint ¶ 24, at 10 (citing 40 C.F.R. §§ 1501.4(b), 1508.9).  The Plaintiffs assert that, as part of the impact statement and EAs prepared under NEPA, an agency "must consider a reasonable range of alternatives and analyze both the direct and indirect impacts of all proposed major federal actions significantly affecting the human environment."  Complaint ¶ 26, at 10

- 14 -

(citing 40 C.F.R. § 1502.14). The Plaintiffs assert that, when a range of proposed actions are available and an EA is prepared, the EA "is considered the functional equivalent of the preferred alternative" in an impact statement. Complaint ¶ 26, at 10. The Plaintiffs assert that an agency is required to "insure the professional integrity, including scientific integrity," of the environmental analyses underlying an impact statement and EA. Complaint ¶ 28, at 10 (citing Natural Res. Def. Council v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972); 40 C.F.R. § 1502.24). The Plaintiffs assert that the environmental review process that NEPA requires is subject to public comment, and agencies must respond to public comments with thorough modifications or with a thorough explanation for why no modification is necessary. See Complaint ¶ 29, at 10-11 (citing 40 C.F.R. § 1503.4).

The Plaintiffs assert that the NFMA requires the Forest Service to develop land resource management plans ("Forest Plans") for each national forest and must implement the plan on a site-specific level. Complaint ¶¶ 30-32, at 11 (citing Pub. L. No. 94-588; 16 U.S.C. § 1604(a); 36 C.F.R. § 219.10). The Plaintiffs assert that the implementation of a Forest Plan must be consistent with the Forest Plan. See Complaint ¶ 32, at 11 (citing 16 U.S.C. § 1604(i)). The Plaintiffs assert that, under the SYFMA, the Forest Service must use timber and non-timber forest products within a sustained unit for the "benefit of and to stabilize the communities within each sustained yield unit." Complaint ¶ 33, at 12 (citing 16 U.S.C. §§ 583(b), 583(a)).

The Plaintiffs assert that the Forest Service's 1972 Region 3 Policy ("the Policy") recognizes that northern New Mexico communities are dependent upon forest resources, declares the Spanish-American/Hispanic culture of the area to be a "resource," and acknowledges that the Forest Service's "objectives and policies must be altered to the extent possible to recognize and be responsive to the culture and peoples." Complaint ¶ 34, at 12 (citing the Policy at 3). The

Plaintiffs assert that the Policy "'explicitly recognized the intimate relationship that the Native American and Hispanic residents of Northern New Mexico had with the land' . . . and that 'their economic well-being is often tied closely to the resources of the National Forests and the manner in which they are utilized." Complaint ¶ 49, at 19-20 (quoting the Policy at 2). The Plaintiffs assert that the Policy requires the Forest Service to take actions for the preservation of Spanish-American/Hispanic culture in the region, including authorizing livestock permits. See Complaint ¶¶ 35-36, at 12-13.

The Plaintiffs assert that the Forest Service reduced their grazing permits out of racial animus. See Complaint ¶¶ 43-44, at 17. The Plaintiffs assert that the Unit was created in 1948 "to address some of the economic and social afflictions" harming the Plaintiffs' communities, and resulting from the reduction in their grazing permits over the years. Complaint ¶¶ 45-46, at 18. The Plaintiffs assert that, contrary to the Policy, the Forest Service "has, for the most part, dealt with the Hispanic communities within the Unit . . . , by continuing to pursue . . . a reduction in grazing permits, that have worked to further destabilize and impair the cultural, social, and economic fabric" of the Plaintiffs' communities. Complaint ¶ 54, at 22. The Plaintiffs assert that, instead of "managing the [U]nit to provide stability to the communities within the Unit as required by law," the Forest Service's conduct has "resulted in an increase in economic and cultural instability for the communities in the Unit." Complaint ¶ 56, at 22.

The Plaintiffs assert that Trujillo has responded to their public criticism "by engaging in a continuing and ongoing campaign of retaliation, misusing her position to harass and punish Plaintiffs for their constitutionally protected conduct." Complaint ¶ 57, at 23. The Plaintiffs assert that swelling of the wild horse and elk populations on the Unit has contributed to the destabilization of the Plaintiffs' grazing tradition and culture. See Complaint ¶ 58, at 23. The

Plaintiffs assert that, rather than reducing the number of wild horses on the Unit, as the 2002 Decision Notice outlines, the Defendants have used the damaged forage as an "excuse to harass" the Plaintiffs about foraging conditions and to restrict their grazing rights.  Complaint ¶ 61, at 25.

The Plaintiffs assert that Trujillo's July 5, 2006, order that the Plaintiffs remove their cattle from Jarita Mesa by July 31, 2006, and her refusal to lift that order, were "motivated, in whole or in part, by a desire to retaliate against Plaintiffs for the exercise of their First Amendment rights to free speech and to petition for redress of grievances."  Complaint ¶ 70, at 28.  The Plaintiffs assert that Trujillo's actions were part of an "ongoing pattern and practice of retaliatory conduct."  Complaint ¶ 71, at 28.  The Plaintiffs assert that Trujillo's decision in 2006 to reduce S. Chacon's grazing permit by twenty percent had a profound economic impact on him, "costing him tens of thousands of dollars," and also damaged the social and cultural fabric of his community and extended family.  Complaint ¶ 75, at 31.  The Plaintiffs assert that S. Chacon was "singled out for disparately harsh punishment by Defendant Trujillo because she perceived him as a leader of the Jarita Mesa Grazing Association" and because the Jarita Mesa Permittees had criticized her to the state government.  Complaint ¶ 76, at 31.  The Plaintiffs assert that Trujillo acted as she did to chill the Plaintiffs' speech.  See Complaint ¶ 76, at 31.

The Plaintiffs also assert that what Trujillo stated was an eighteen-percent increase in permits was the result of an agreement in which the Plaintiffs agreed to a shorter grazing permit, but an eighteen-percent increase in the number of permits.  See Complaint ¶ 89, at 36.  The Plaintiffs assert that Trujillo's attempts to orchestrate the purchase of their permits was "completely outrageous" and beyond the scope of her duties, in addition to being in violation of the Policy's "letter and spirit."  Complaint ¶ 91, at 37.  The Plaintiffs assert that this "shocking"

conduct demonstrates her "deep animosity towards the needs and aspirations of the permittees." Complaint ¶ 91, at 37.

The Plaintiffs also assert that Trujillo's 2010 Decision Notice, in which she chose to reduce the available permits by eighteen percent, was done out of her anger towards the Plaintiffs, and because she had "determined to retaliate against the Plaintiffs for having the temerity to point out her errors and criticize her mismanagement of the two allotments and the entire Sustained Yield Unit." Complaint ¶ 99, at 42. The Plaintiffs assert that Trujillo decided to reduce their permits by eighteen percent "long before the Final EA was issued." Complaint ¶ 103, at 43. The Plaintiffs assert that Trujillo's statements regarding the current level of permittees being unsustainable "was a pretext to conceal her retaliatory motive . . . to punish Plaintiffs and the other permittees for having complain[ed] to other government officials about Defendant Trujillo's conduct." Complaint ¶ 104, at 44.

The Plaintiffs assert that the economic loss they have suffered and will continue to suffer because of the 2010 Decision Notice is far greater than the $32,000.00 which the Forest Service estimates will be their economic loss. The Plaintiffs assert that their economic injuries are "compounded by permanent, irreparable damage to the social and cultural fabric" of their communities. Complaint ¶ 107, at 45. The Plaintiffs point out that their "large extended families" share the beef they acquire from cattle raising, providing "the larger population of local residents with healthy and inexpensive meat on which they depend for a vital part of their diet," and the Plaintiffs will now have twenty percent less beef available for their needs. Complaint ¶ 109, at 46.

The Plaintiffs' first count in the Complaint is alleged against Trujillo. The Plaintiffs assert that Trujillo violated their right to free speech, "the related right to petition for redress of

grievances," and their right to freedom of association, as the First Amendment guarantees. Complaint ¶ 112, at 47. The Plaintiffs assert that they did not have an opportunity during the EA process, or during their appeal of Trujillo's July 5, 2006, order, "to discover and present evidence of disparate treatment, violation of normal procedure or practice, or other evidence from which retaliatory animus may be inferred," including the evidence that district rangers normally adhere to the proposed actions in EAs. Complaint ¶ 12, at 47. The Plaintiffs assert that they have "no remedy other than an action under the First Amendment" to remedy this asserted constitutional violation, "which resulted in a reduction in their permits for the 2011 grazing season," a reduction which continues through the 2015 grazing season, "and to compensate them for the losses already accrued as a result of Defendant Trujillo's retaliatory conduct." Complaint ¶ 112, at 47-48. The Plaintiffs assert that Trujillo acted in an "arbitrary and capricious manner," and "intentionally and/or with deliberate indifference to the First Amendment rights of Plaintiffs." Complaint ¶ 113, at 48. The Plaintiffs also assert that Trujillo's actions violated the APA. See Complaint ¶ 114, at 48 (citing 5 U.S.C. §§ 702, 706(2)(b)). The Plaintiffs assert that they "will suffer irreparable harm if these reductions are allowed to proceed" and that they "have no adequate remedy at law to stop them." Complaint ¶ 115, at 48.

As their second cause of action, the Plaintiffs allege that the Defendants failed to properly analyze environmental impact in the 2010 EA, and, by failing to take a "hard look" at the social, economic, and environmental justice impact each alternative would have, violated the APA. Complaint ¶¶ 116-119, at 48-49 (citing Natural Res. Def. Council v. Morton, 458 F.2d at 838; 5 U.S.C. §§ 702, 706(2)). The Plaintiffs allege as their third cause of action that the Defendants failed to properly analyze the environmental impact in the 2010 EA by failing to develop a proper baseline with the best available science for their study, in violation of the APA. See

Complaint ¶¶ 120-123, at 49 (citing 40 C.F.R. § 1502.24; 5 U.S.C. §§ 702, 706(2)).    The Plaintiffs allege, as their fourth cause of action, that the Defendants failed to properly consider and respond to comments, and failed to consider a reasonable range of alternatives in the 2010 EA, in violation of NEPA and of the APA.    See Complaint ¶¶ 124-127, at 49-50 (citing 40 C.F.R. § 1503.4; 36 C.F.R. § 220.4(c); 5 U.S.C. §§ 702, 706(b)).    As their fifth cause of action, the Plaintiffs allege that Trujillo failed to consider the findings in the 2010 EA when she made her 2010 Decision Notice, in violation of NEPA and of the APA.    See Complaint ¶¶ 128-131 (citing 36 C.F.R. § 220.4(c)(4); 5 U.S.C. §§ 702, 706(2)).    As their sixth cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan range standards and guidelines related to grazing numbers, in violation of the NFMA and of the APA. See Complaint ¶¶ 132-136, at 50-51 (citing 16 U.S.C. § 1604(i); 5 U.S.C. §§ 702, 706(b)).    As their seventh cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan's range standards and guidelines related to the management of wild horses on the Jarita Mesa Allotment, in violation of the NFMA and of the APA.  See Complaint ¶¶ 137-140, at 51-52 (citing 5 U.S.C. §§ 702, 706(2)).    As their eighth cause of action, the Plaintiffs allege that the Defendants violated the SYFMA and the APA, by failing to use the Carson National Forest for the benefit of the communities within the Unit.  See Complaint ¶¶ 141-143, at 52 (citing 5 U.S.C. §§ 702, 706(2)).    As their ninth cause of action, the Plaintiffs allege that the Defendants violated the Policy and the APA by failing to manage the Allotments in a manner that is responsive to and compatible with the well-being of the local resource-dependent communities, and that they did so without a reasonable explanation.  See Complaint ¶¶ 144-146, at 52-53 (citing 5 U.S.C. §§ 702, 706(2)).

The Plaintiffs request various forms of relief.  The Plaintiffs request that the Court: (i) declare that the "acts complained of herein violated the First Amendment rights" of the Plaintiffs, Complaint ¶ 1, at 53; (ii) declare that any future reductions to the number of cattle permitted on the Allotments for the 2012-2015 grazing seasons, based on Trujillo's 2010 Decision Notice, would be contrary to the Constitution, see Complaint ¶ 2, at 53; (iii) declare that the Defendants violated NEPA by failing to analyze adequately, or to "take a hard look" at, the social, economic, and environmental impacts that would result from the 2010 EA and the 2010 Decision Notice for the Allotments, Complaint ¶ 3, at 53; (iv) declare that the Defendants violated NEPA by "failing to properly analyze impacts insofar as they failed to develop or use a proper baseline based on the best available science," Complaint ¶ 4, at 53; (v) declare that the Defendants violated NEPA by failing to properly consider and respond to comments, and by failing to consider a reasonable range of alternatives, see Complaint ¶ 5, at 54; (vi) declare that Trujillo violated NEPA by failing to consider the alternatives that the EA analyzed before issuing the 2010 Decision Notice, see Complaint ¶ 6, at 54; (vii) declare that the Defendants violated the NFMA by failing to act in accordance with the Carson National Forest Plan's range standards and guidelines regarding grazing numbers, see Complaint ¶ 7, at 54; (viii) declare that the Defendants violated the NFMA by failing to act consistently with the Carson National Forest Plan's range standards and guidelines regarding wild horse management, see Complaint ¶ 8, at 54; (ix) declare that the Defendants violated the Plaintiffs' rights under the SYFMA by failing to manage the forest for the benefit of the communities within the Unit, see Complaint ¶ 9, at 54; (x) declare that the Defendants violated the Policy by failing to be responsive to the needs of the local, resource-dependent communities and failing to act in a way that supports their future well-being, see Complaint ¶ 10, at 54; (xi) declare that the Defendants' actions violated the APA by

not observing the procedures required by law, and were arbitrary and capricious "and/or unconstitutional," Complaint ¶ 11, at 55; (xii) issue a judgment and injunction that voids the 2010 Decision Notice, and orders the Defendants to adhere to the second alternative the 2010 EA, which would allow the Plaintiffs to keep their permits at approximately the same levels as before the 2010 EA was issued, see Complaint ¶ 12, at 55; (xiii) issue an injunction that compels the Forest Service to comply with NEPA, the NFMA, the SYFMA, and the APA, so as to prevent irreparable harm and satisfy the public interest, see Complaint ¶ 13, at 55; (xiv) issue an injunction which requires the Defendants to adhere to the second alternative in the 2010 EA, see Complaint ¶ 14, at 55; (xv) award compensatory damages, against Trujillo, to the Plaintiffs who had their permits reduced in the 2011 grazing season and any subsequent grazing season, see Complaint ¶ 15, at 55; (xvi) award punitive damages against Trujillo, see Complaint ¶ 16, at 56; (xvii) award the Plaintiffs their "costs, expenses, expert witness fees, and reasonable attorney fees under applicable law," Complaint ¶ 17, at 56; and (xviii) grant the Plaintiffs "such other and further relief as the Court deems proper," Complaint ¶ 18, at 56.

### 2. The Court's Pre-MTD Treatment of the First Amendment Retaliation Claim.

The MTD now before the Court is not the Forest Service's first attempt to have the Court dismiss the Plaintiffs' First Amendment retaliation claim.  The Forest Service first moved to dismiss the First Amendment retaliation claim on May 23, 2012 -- not on exhaustion grounds, but for failure to state a plausible claim.  See Defendants' Memorandum in Support of Motion to Dismiss, filed May 23, 2012 (Doc. 17)("Earlier MTD").  The Plaintiffs moved the Court to dismiss: (i) the claim under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"); (ii) the First Amendment retaliation claim; and (iii) the claims for declaratory relief.  See Earlier MTD at 1.  The Court granted the Earlier MTD

as to (i) and (iii), and denied it as to (ii).  See Memorandum Opinion and Order at 1-3, 114, filed

January 24, 2013, 921 F. Supp. 1137 (Doc. 49)("MOO").

The Court ruled that the Plaintiffs stated a proper and plausible First Amendment

retaliation claim.  See MOO at 93-114.  It also ruled, at that time, that the Complaint contained,

not one, but two First Amendment retaliation claims: one under the APA and the other a

"standalone" claim.  MOO at 111-13.  The Court wrote:

> 2.  The Plaintiffs May Seek Equitable Relief for the Violation of Their Constitutional Rights Outside of the APA.
>
> The Plaintiffs seek equitable relief from Trujillo in her official capacity. "An action against federal employees in their official capacities is in effect a suit against the United States for which a waiver of sovereign immunity must exist." Cortez v. EEOC, 585 F. Supp. 2d 1273, 1287 (D.N.M. 2007). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." FDIC v. Meyer, 510 U.S. at 475. "[A]n official capacity suit is only another way of pleading an action against an entity of which an officer is an agent." Johnson v. Bd. of Cnty. Comm'rs for Cnty. of Fremont, 85 F.3d 489, 493 (1996)(internal quotation marks omitted).
>
> Through 5 [U.S.C.] § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief." United States v. Murdock Mach. and Eng'g Co. of Utah, 81 F.3d at 930 n.8. "This waiver is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1233.
>
>> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis. Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." As we held in Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005), § 702's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act." Id. at 1233; see also Hanson v. Wyatt, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008)(Gorsuch, J., concurring)("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver." (citation omitted)).

Gilmore v. Weatherford, 694 F.3d at 1166 n.1.  The Plaintiffs may therefore bring their claims under the First Amendment, and not under the APA, against the Defendants without implicating sovereign immunity, because of the United States' general waiver, in 5 U.S.C. § 702, of sovereign immunity in suits seeking equitable relief.  Additionally, the Court has jurisdiction under 28 U.S.C. § 1331 of this claim.  See Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1232, 1236 (finding that a federal court has jurisdiction under 28 U.S.C. § 1331 for claims "seeking vindication of their constitutional rights . . . and may obtain relief in the nature of either injunction or mandamus").   The United States' waiver of sovereign immunity in the APA extends to claims for "nonmonetary relief against federal officials and agencies," over which the Court has jurisdiction, such as those for equitable relief brought under 28 U.S.C. § 1331.  Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1232, 1236.  Indeed, in the Plaintiffs' Second Notice of Additional Authority in Response to Defendants' Motion to Dismiss Count I, the Plaintiffs cite to persuasive authority from the United States Court of Appeals for the District of Columbia Circuit, which comes to the same conclusion as the Court has here.  See Trudeau v. Federal Trade Comm'n, 456 F.3d at 187 ("In sum, we hold that APA § 702's waiver of sovereign immunity permits not only Trudeau's APA cause of action, but his nonstatutory and First Amendment actions as well.").

The Court is fully aware of the tension that exists between allowing a standalone First Amendment claim for declaratory relief and the APA claims. Although the stand alone First Amendment claim allows the Plaintiffs robust discovery, while the similar claim under the APA and Olenhouse v. Commodity and Credit Corp., enjoys no or very little discovery.  The end result of both claims are likely to be similar if the Plaintiffs prevail: an injunction under the stand alone claim and invariably under the APA claim.  The Defendants appear to ask the Court to fashion some doctrine -- like in the Bivens area -- that precludes the declaratory judgment action if there is another remedy.  There is, however, no such doctrine, and the Court is reluctant to create one here.  While the stand alone First Amendment claim undercuts Olenhouse v. Commodity and Credit Corp. in this case, this situation is unusual and relatively rare.  The Plaintiffs could have brought only a First Amendment claim in a separate case and enjoyed robust discovery; there is no sound reason to prevent them from joining it with an APA claim, which largely raises statutory issues.  While the Plaintiffs could not get much, if any, discovery on their APA First Amendment claim, there is no sound reason to preclude them from getting discovery on their standalone claim simply because they also have an APA First Amendment claim.

MOO at 111-113 (boldface omitted in opening heading to avoid confusion).[5]

---

[5]The Court cited no authority for its conclusions in the final quoted paragraph, but it did append the following footnote at the end of the final sentence: "The Defendants appear to be prepared for this fact, as Department of Justice Attorney Andrew A. Smith appears to be

The Forest Service asked the Court to reconsider the above-quoted portion of the MOO -- specifically the final two sentences.  See Federal Defendants' Motion for Reconsideration, filed February 7, 2013 (Doc. 53)("Motion to Reconsider").  The Forest Service disagreed with the Court's refusal to dismiss the First Amendment retaliation claim, but it did not challenge that ruling in the Motion to Reconsider.  Rather, the Motion to Reconsider asked the Court to clarify that only one First Amendment retaliation claim exists -- not two -- and that the claim is subject to the APA's procedural provisions.  See Motion to Reconsider at 7-8 & n.1.  The Forest Service's stated goal in filing the Motion to Reconsider was to limit the Court's fact-finding to the administrative record and bar the Plaintiffs from obtaining discovery on their claims.  See Motion to Reconsider at 7-8 & n.1.  The Forest Service cited numerous cases in which courts, including the United States Court of Appeals for the Tenth Circuit, have adjudicated constitutional claims within the APA's procedural framework.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d at 1085 ("We review Robbins' due process claim against the [agency] under the framework set forth in the APA."); Olenhouse v. Commodity Credit Corp., 42 F.3d at 1573.

The Court granted the Motion to Reconsider and nullified the above-quoted portion of its earlier MOO, concluding: "[T]here is only one First Amendment retaliation claim; it arises under the Constitution, but it is subject to the APA's procedural provisions, which generally limit the judicial review to the administrative record."  Memorandum Opinion at 64, filed October 22, 2014 (Doc. 131)("MO").  The Court wrote that,

---

representing the United States on the APA issues, and Assistant United States Attorney Ruth F. Keegan appears to be doing the heavy lifting regarding the First Amendment claims against Trujillo."  MOO at 113 n.8.

> with respect to all entities that come within the Chapter's definition of "agency," <u>see</u> 5 U.S.C. § 701(b), if review is not available under the APA it is not available at all.  Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing judicial review of all federal agency action.  <u>While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA</u> unless *specifically* excluded, <u>see</u> 5 U.S.C. § 559.

486 U.S. at 607 n.* (underlining added)(italics in original).  The Tenth Circuit has held that the USFS is an "agency" under § 701.  <u>E.g.</u>, <u>Utah Envtl. Congress v. Bosworth</u>, 372 F.3d 1219, 1223 n.3 (10th Cir. 2004)("We review the Forest Service's approval of the Monroe Project as final agency action under the APA, 5 U.S.C. §§ 701-706.").  The issuance, revocation, or modification of a license is an agency action.  <u>See</u> 5 U.S.C. § 551(13) (providing that "'agency action' includes the whole or a part of an agency rule, order, <u>license</u>, sanction, relief, or the equivalent or denial thereof, or failure to act" (emphasis added)); <u>McKeen v. U.S. Forest Serv.</u>, 615 F.3d at 1246, 1257-58 (holding that a USFS "livestock grazing permit" decision "constitutes a 'final agency action' that is subject to judicial review under the APA").  The USFS' eighteen-percent reduction of the Plaintiffs' livestock permitting is central to the Plaintiffs' claims, including the First Amendment retaliation claim.  <u>See</u> Complaint ¶ 112, at 47 ("[The] decision to reduce the individual Plaintiff permittees' livestock permits by 18% was an adverse action calculated to retaliate against and punish them for the exercise of rights protected by the First Amendment and to chill their future exercise of such rights . . . .").  This case, thus, is subject to the APA's provisions.

The case before the Court is an appeal of an agency action in every respect: that the appeal alleges constitutional violations as well as statutory ones does not take it outside of the APA, <u>see</u> 5 U.S.C. § 706(2)(B) ("The reviewing court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to <u>constitutional</u> right, power, privilege, or immunity . . . ."  (emphasis added)); and that the appellants allege, as part of their argument on appeal, that the lower forum was motivated by an illicit animus does not relieve the Plaintiffs of the substantial burdens the law would impose on them but for the allegations.  Given the difficulty of surmounting a successful administrative appeal in the face of arbitrary-or-capricious factual review and <u>Chevron [U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984)("<u>Chevron</u>")]]/<u>Auer [v. Robbins</u>, 519 U.S. 452 (1997)] legal deference, for the Court to hold otherwise -- and allow fresh discovery, submission of new evidence and legal arguments, or de novo review -- would be to incentivize every unsuccessful party to agency action to allege bad faith, retaliatory animus, and constitutional violations to trade in the APA's restrictive procedures for the more even-handed ones of the Federal Rules of Civil Procedure.

The relationship between the USFS and the Plaintiffs is fundamentally that of tribunal and litigant, and not that of adversarial parties to a lawsuit.  See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 652 (2002)(describing "the regulatory commission" as "a nominal defendant when a party appeals in the federal system," and noting that many substantively similar state-court administrative schemes caption cases judicially reviewing agency decisions as appeals, and not as adversarial proceedings between the appellant and the agency).  The Plaintiffs cannot avoid the hardships of the Court's deference to the agency by making allegations of agency malevolence.  These "hardships" from the Plaintiffs' perspective are, from the perspective of the judiciary, Congress, and the public, consciously designed efficiencies.  For better or for worse, in the modern administrative state, agencies are a part of the adjudicatory apparatus -- not merely a party to it.

. . . .

The burden will be properly placed on the Plaintiffs for much of what they do in this case.  Devices such as rule 56 summary judgment are incompatible with this scheme, and the Court thus cannot use them.  As a group, the devices normally used by appellate courts are generally more consistent with the APA's judicial review scheme than the devices that trial courts normally use, which presume nothing about the merits of the case and divide burdens of proof and production almost equally between the plaintiff and defendant.  The Court can see no reason, however, why the Plaintiffs cannot use the familiar procedural devices of the Federal Rules of Civil Procedure if they wish, at least to the extent that they comport with or can be modified to comport with the APA.

. . . .

There are other motions already pending in this case -- the MTD for Failure to Exhaust and the Motion for Discovery -- that present the question more squarely, and in which the Court can more appropriately flesh out the parameters of the administrative record rule and its exceptions.  For now, the Court will only clarify that: (i) the Plaintiffs have alleged one First Amendment retaliation claim, which arises under the Constitution; and (ii) that claim, because it arises from a final agency action, is subject to the APA's procedural provisions, which include a general rule that the reviewing court must limit its review to the administrative record.  It is not without meaning that the Plaintiffs' claim is constitutional in nature: if the claim were statutory, even the USFS' legal interpretations, in addition to its factual findings, would be entitled considerable deference; as it stands, the Court will undertake a de novo review of the constitutional legal issues in the case.  Although the substantive nature of the claim does change the substantive standard of review -- e.g., arbitrary-and-capricious review, Chevron deference, de novo review, etc. -- it does not change the procedural framework under which the case must progress: the APA.  The Court will grant the Motion to

- 27 -

Reconsider and will not permit discovery except upon motion and proper evidentiary showing by the Plaintiffs.

MO at 64-71 (footnote omitted).

### 3. The Briefing and Hearing on the MTD.

The Forest Service filed the MTD on February 18, 2013 -- after the Court issued its MOO sustaining the First Amendment retaliation claim on the merits and before the Court issued its MO ruling on the Motion to Reconsider. The MO has rendered much of the parties' briefing on the MTD irrelevant; namely, both parties make references to how the Court should differentiate between the "APA" and "standalone" First Amendment retaliation claims -- a duality the Court has since disavowed in the MO. In the same way that the Forest Service's Motion to Reconsider essentially asked the Court to impose the APA's zero-discovery regime on both the APA and standalone First Amendment claims, the MTD asks the Court to subject both claims to the administrative-exhaustion requirement and dismiss them accordingly. As the Court has rejected this distinction and now recognizes only one First Amendment claim, which the APA procedurally governs, much of the briefing and argument on the MTD is dedicated to an issue the Court has now decided. The Court will summarize the parties' arguments insofar as they remain relevant to the Court's analysis.

### a. The Forest Service Files the MTD.

The Forest Service mounts its MTD under rule 12(b)(1) of the Federal Rules of Civil Procedure. See MTD at 4. It argues that the "Plaintiffs' failure to exhaust their administrative remedies is a jurisdictional defect," and that, "[w]hen reviewing a factual attack on subject-matter jurisdiction under Rule 12(b)(1), a district court may not presume the truthfulness of the complaint's factual allegations and may consider affidavits and other materials from outside the complaint . . . [without] convert[ing] the motion to a Rule 56 motion for summary judgment."

- 28 -

MTD at 4 (citing <u>Pringle v. United States</u>, 208 F.3d 1220, 1222 (10th Cir. 2000)).  It also asserts that the MTD's procedural posture is not entirely clear, because there is a split among courts whether exhaustion is a jurisdictional prerequisite -- and thus appropriately attacked under rule 12(b)(1) -- or an affirmative defense -- and thus properly challenged under rule 12(b)(6).  <u>See</u> MTD at 4 n.2.  Substantively, the Forest Service argues: (i) that plaintiffs are, as a general matter, obligated to exhaust all available remedies before pursuing a claim judicially, <u>see</u> MTD at 5-8; (ii) that "constitutional claims are not exempt from" this obligation, MTD at 8; <u>see</u> MTD at 8-11; (iii) that the Plaintiffs failed to exhaust their administrative remedies with regard to their First Amendment retaliation claim, <u>see</u> MTD at 11-16; (iv) that the Plaintiffs' failure to exhaust is not subject to judicial waiver, <u>see</u> MTD at 16-18; and (v) that, even if judicial waiver were a potentially applicable doctrine, the Plaintiffs have not established any of the grounds for judicial waiver to apply in this case, <u>see</u> MTD at 18-22.

On the first point, the Forest Service contends that 7 U.S.C. § 6912(e) specifically requires administrative exhaustion "[w]ith respect to decisions of the Department of Agriculture" "and admits of no exception."  MTD at 6.  It asserts that, "[w]here a statute explicitly requires exhaustion as a prerequisite to judicial review, it should be strictly enforced."  MTD at 6 (citing <u>Darby v. Cisneros</u>, 509 U.S. 137, 153-54 (1993)).  It asserts that the Tenth Circuit has "very recently" called § 6912(e)'s exhaustion requirement "'mandatory.'"  MTD at 6-7 (quoting <u>Forest Guardians v. U.S. Forest Serv.</u>, 641 F.3d 423, 432 (10th Cir. 2011)).

On the second point -- that constitutional claims are not exempt from the exhaustion requirement -- the Forest Service cites numerous cases that require exhaustion of administrative claims.  <u>See</u> MTD at 8-11.  Most directly on point is a case from the United States Court of

Appeals for the District of Columbia Circuit, <u>Munsell v. U.S. Department of Agriculture</u>, 509

F.3d 572 (D.C. Cir. 2007).  The Forest Service describes the case as follows:

> [T]he plaintiff, a meat processor, alleged that the Department of Agriculture
> engaged in a series of enforcement actions against him in retaliation for his
> exercise of constitutionally protected speech.  The D.C. Circuit found that
> "§ 6912(e)'s express language makes it clear that judicial review [of Munsell's
> constitutional claim] is only available . . . after all administrative remedies have
> been exhausted."

MTD at 9 (alteration and omission in MTD but not source case)(quoting <u>Munsell v. U.S. Dep't</u>

<u>of Agriculture</u>, 509 F.3d at 591).  The Forest Service also discusses <u>Simmat v. U.S. Bureau of</u>

<u>Prisons</u>, 413 F.3d 1225 (10th Cir. 2005), which it says found that the exhaustion requirement

applies even to standalone constitutional claims brought under the Prison Litigation Reform Act,

42 U.S.C. § 1997e ("PLRA").  MTD at 10 (citing 413 F.3d at 1236-38).  The Forest Service also

cites two other cases, <u>Gilmore v. Weatherford</u>, 694 F.3d 1160 (10th Cir. 2012), and <u>St. Regis</u>

<u>Paper Co. v. Marshall</u>, 591 F.2d 612 (10th Cir. 1979), without explication.  <u>See</u> MTD at 8-9.

On the third point -- that the Plaintiffs did not exhaust their remedies before filing suit in

this case -- the Forest Service states that the "Complaint does not assert that Plaintiffs exhausted

their administrative remedies with regard to their First Amendment claim, and appears to

concede that they did not."  MTD at 10 n.3 (citing Complaint ¶ 105, at 44; <u>id.</u> ¶ 112, at 47).  The

Forest Service asserts that, although it "provides a comprehensive and straightforward process

for administratively appealing agency decisions, the majority of the Plaintiffs entirely failed to

administratively appeal the 2010 Decision Notice."  MTD at 11.  It argues that the only Plaintiffs

who have standing to bring a First Amendment retaliation claim are those Plaintiffs whose

permits Trujillo actually reduced and asserts that "[n]one of th[ose] Plaintiffs . . . lodged an

administrative appeal challenging the 2010 Decision Notice."  MTD at 12.  It further argues that

even the Plaintiffs who appealed did not raise a First Amendment retaliation challenge.  <u>See</u>

MTD at 12.   The Forest Service attaches a preliminary letter from S. Chavez to Trujillo indicating his desire to appeal, see Letter from Steve Chavez to Diana Trujillo, filed February 18, 2013 (Doc. 55-1), as well as the actual notice of appeal that the Grazing Associations' lawyer filed, see Notice of Appeal for Jarita Mesa Livestock Grazing Association, Alamosa Livestock Grazing Association and Board of County Commissioners of the County of Rio Arriba of the El Rito District EA and FONSI, filed February 18, 2013 (Doc. 55-2)("Notice of Appeal").   The Forest Service states that the attached documents prove its assertions.

On the fourth point -- that the exhaustion requirement is not subject to judicial waiver under any circumstances -- the Forest Service acknowledges that some Courts of Appeals have found that § 6912(e)'s exhaustion requirement is subject to judicial waiver, but that the Tenth Circuit "has explicitly declined to determine whether such equitable waiver doctrines are applicable."   MTD at 16 (referring to Forest Guardians v. U.S. Forest Service).   The Forest Service argues that, where an exhaustion requirement is judicially created, it is subject to waiver, but where it is statutory, it is "not subject to waiver for any reason."   MTD at 17.

On the fifth point -- that, even if judicial waiver could excuse failure to exhaust, no ground for judicial waiver applies -- the Forest Service lays out what it says are the five grounds for excusing failure to exhaust:

> (1) the unexhausted remedy would plainly be inadequate; (2) the plaintiff makes a constitutional claim that is collateral to its merits claim and that would remain standing after exhaustion of the administrated remedy; (3) the plaintiff seeks relief that the administrative agency cannot grant (such as a facial challenge to agency regulations); (4) exhaustion of administrative remedies would be futile; and (5) the plaintiff may suffer irreparable harm if unable to secure immediate judicial review.

MTD at 18-19 (citing Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d 592, 606 (5th Cir. 2007); Ace Prop. & Cas. Insu. Corp. v. Fed. Crop Ins. Corp., 440 F.3d 992, 999-1000 (8th Cir.

2006); McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 980 (9th Cir. 2002)).  The Forest Service asserts that neither the first nor third ground applies, as the Forest Service can provide the remedy that the Plaintiffs seek: reinstatement of their full, pre-reduction permits.  See MTD at 19.  It contends that the second ground does not apply, because the First Amendment retaliation claim "is 'not "bound up with the merits so closely that [the court's] decision would constitute 'interference with agency process.'"'"  MTD at 19-20 (alteration in MTD but not source case)(quoting McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d at 980).  The Forest Service asserts that the fourth ground does not apply, because, "[t]o demonstrate futility, Plaintiffs 'must show that it is *certain* that their claim will be denied on appeal, not merely that they doubt an appeal will result in a different decision.'"  MTD at 21 (emphasis in MTD but not source case)(quoting Shawnee Trail Conservancy v. U.S. Dep't of Agriculture, 222 F.3d 383, 389 (7th Cir. 2000)).  The Forest Service asserts that the fifth ground does not apply, because two facts ensure that the Plaintiffs will not suffer irreparable harm from the lack of judicial review: (i) the Plaintiffs waited a year from the end of the administrative process to initiate this suit; and (ii) implementation of the 2010 Decision Notice was automatically stayed pending all administrative appeals.  See MTD at 21-22.

> **b.        The Plaintiffs Respond to the MTD.**

The Plaintiffs responded to the MTD.  See Plaintiffs' Memorandum in Response to Defendants' Motion to Dismiss Count I for Failure to Exhaust Administrative Remedies, filed March 13, 2013 (Doc. 67)("Response").  They first argue that the MTD should be analyzed under rule 12(b)(6), and not under rule 12(b)(1).  See Response at 3.  They note that the Supreme Court, in Jones v. Bock, 549 U.S. 199 (2007), overturned Simmat v. U.S. Bureau of Prisons, in which the Tenth Circuit held that the PLRA's exhaustion requirement was procedural rather than

jurisdictional.  See Response at 3.  They assert that in the Tenth Circuit's subsequent decision in

Forest Guardians v. U.S. Forest Service, the Tenth Circuit "noted that 'Administrative

exhaustion is often an affirmative defense, rather than a jurisdictional prerequisite.'"  Response

at 4 (quoting Forest Guardians v. U.S. Forest Serv., 641 F.3d at 431).

Substantively, the Plaintiffs argue that they have exhausted their administrative remedies,

because the two Grazing Associations administratively appealed Trujillo's decision and were not

required to specifically raise their First Amendment claim.[6]  See Response at 5-30.  The

Plaintiffs base this contention in large part on what they contend is the distinction between

administrative exhaustion of remedies and issue exhaustion.  See Response at 10-24.  They assert

that the "Supreme Court clarified in 2000, *issue exhaustion* is a separate requirement and is not

necessarily a corollary to *exhaustion of administrative remedies*."  Response at 10 (emphasis in

original)(citing Sims v. Apfel, 530 U.S. 103, 107 (2000)).  The Plaintiffs argue that, although

§ 6912(e) requires exhaustion of administrative remedies, it does not require issue exhaustion.

See Response at 10-12.  They further contend:

> Even if the Court imposes an issue exhaustion requirement in this case, the
> requirement is to be interpreted broadly and "plaintiffs have exhausted their
> administrative appeals if the appeal, taken as a whole, provided sufficient notice
> to the Forest Service to afford it an opportunity to rectify the violations that the
> plaintiffs alleged."

Response at 11-12 (quoting Native Ecosystems Council v. Dombeck, 304 F.3d 886, 899 (9th Cir.

2002)).

---

[6]This argument appears to apply only to the two Grazing Associations, i.e., the Plaintiffs
appear to concede that the other Plaintiffs failed to exhaust their administrative remedies.  The
Plaintiffs launch an alternative argument -- that judicial waiver excuses the exhaustion
requirement -- which would permit all Plaintiffs to sustain their First Amendment retaliation
claims, but if the Court were to reject that argument, then it must dismiss the Individual
Plaintiffs.  See Response at 30-32.

The Plaintiffs' argument necessarily requires that the Grazing Associations have standing to pursue the First Amendment retaliation claim, even though the Grazing Associations did not themselves suffer a permit reduction.  See Response at 5-8.  They state that the Grazing Associations were permittees: "The Jarita Mesa Grazing Association has 16 permits for bulls and the Alamosa Grazing Association has permits for 20 bulls that are subject to the reduction and had long been a permit holder on the Allotment."  Response at 6.  They also contend that the more flexible standing requirements attendant to First Amendment claims allow an institution to pursue a claim on its members' behalf.  See Response at 8 (citing NAACP v. Button, 371 U.S. 415, 428 (1963)).

Last, the Plaintiffs contend that their First Amendment retaliation claim is a collateral constitutional issue and thus triggers judicial waiver of the exhaustion requirement.  See Response at 30-32.  They state that a claim is collateral when it is "'(1) collateral to a substantive claim of entitlement, (2) colorable, and (3) "one whose resolution would not serve the purposes of exhaustion."'"  Response at 30 (quoting McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d at 980).  The Court believes this argument, if accepted, would apply to all Plaintiffs, and not just the two Grazing Associations that appealed the Forest Service's ruling.

<b>c.      The Forest Service Replies to the Response.</b>

The Forest Service Replied to the Response.  See Federal Defendants' Reply in Support of Their February 18, 2013 "Motion to Dismiss Count 1 for Failure to Exhaust Administrative Remedies," Doc. 55, filed April 16, 2013 (Doc. 76)("Reply").  It first argues that, regardless whether the Court analyzes the MTD under rule 12(b)(1) or rule 12(b)(6), the same deference regime applies: the Court must accept as true the material factual allegations in the Complaint as they relate to the sufficiency of the claims, but it may not presume the truth of the Complaint's

factual allegations as they bear on the Court's subject-matter jurisdiction.  See Reply at 1-2.  The Forest Service states that, "[e]ven if 7 U.S.C. § 6912(e) is not jurisdictional, the Court must nonetheless resolve factual disputes and Plaintiffs are not entitled to any presumptions in their favor."  Reply at 2 (footnote omitted).  The Forest Service also alleges that the Plaintiffs mischaracterize Forest Guardians v. U.S. Forest Service; the Forest Service says that the case opted not to resolve the issue whether the administrative-exhaustion requirement is jurisdictional or procedural, and upheld the Court's ruling that it is jurisdictional.  See Reply at 2 n.1.

The Forest Service argues that the two Grazing Associations' administrative appeal does not satisfy the exhaustion requirement on behalf of the Individual Plaintiffs, asserting that, "[u]nder Section 6912(e), each person (or entity) must exhaust administrative appeal remedies before *that person* may bring that challenge in federal court."  Reply at 3 (emphasis in original). The Forest Service asserts that the appeal that the Grazing Associations filed does not list any of the Individual Plaintiffs' names, mailing addresses, or daytime telephone numbers -- all of which, the Forest Service says, is a requirement for appeals under 36 C.F.R. § 215.14(b)(1) and (b)(2).  See Reply at 3-4.  Additionally, although the Forest Service acknowledges that the Grazing Associations, themselves, possess grazing permits, it asserts that the 2010 Decision Notice does not reduce their grazing permits, and thus they still lack standing.  See Reply at 5.

The Forest Service next addresses the Plaintiffs' attempt to delineate between administrative exhaustion and issue exhaustion, asserting that § 6912(e) and the Forest Service's regulations both require issue exhaustion.  See Reply at 5-6.  It asserts that § 6912(e) "requires a person to 'exhaust *all* administrative appeal procedures established by the [Forest Service].'" Reply at 5 (emphasis in Reply but not source statute)(alteration in Reply but not source statute)(quoting 7 U.S.C. § 6912(e)).  It asserts that the Forest Service's regulations, "in turn,

provide that '[i]t is the appellant's responsibility to provide sufficient project- or activity-specific *evidence and rationale*, focusing on the decision, to show why the Responsible Official's decision should be reversed,' including '[h]ow the appellant believes the decision *specifically* violates law, regulation, or policy.'"   Reply at 5 (emphases in Reply but not source regulation)(alterations in Reply but not source regulation)(quoting 36 C.F.R. § 215.14(a), (b)(9)). The Forest Service argues that the Plaintiffs' contention that all they must do to satisfy the exhaustion requirement is participate in the administrative appeal process and receive a final decision is contrary to the Tenth Circuit's holding in <u>Forest Guardians v. U.S. Forest Service</u>. <u>See</u> Reply at 5-6.  In that case, the Forest Service asserts, the Tenth Circuit dismissed a plaintiff's claim, because it was not "'presented in "sufficient detail [in the administrative appeal] to allow the agency to rectify the alleged violation."'"   Reply at 5-6 (alteration in Reply but not in source case)(quoting <u>Forest Guardians v. U.S. Forest Serv.</u>, 495 F.3d at 1170).   The Forest Service concluded:

> The rule in Forest Service cases under Section 6912(e), then, is that "claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." <u>Forest Guardians</u>, 641 F.3d at 430 (quoting <u>Kleissler v. U.S. Forest Serv.</u>, 183 F.3d 196, 202 (3rd Cir. 1999)). <u>See id.</u> at 431 ("'Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised . . . .'")(quoting <u>Idaho Sporting Cong., Inc. v. Rittenhouse</u>, 305 F.3d 957, 965 (9th Cir. 2002)).  Since the Associations' administrative appeal failed to put the Forest Service on notice of their First Amendment claim, the First Amendment claim must be dismissed.

Reply at 6.  It elaborates:

> The Supreme Court's decision in <u>Sims v. Apfel</u>, 530 U.S. 103 (2000), does not change this rule.  The administrative appeal regulations at issue in <u>Sims</u> did not require issue exhaustion, <u>id.</u> at 108, provided for a form appeal containing "only three lines for the request for review," <u>id.</u> at 112, and resulted in the agency, "not the [appellant], ha[ving] primary responsibility for identifying and developing the issues."  <u>Id.</u> at 112.  The Forest Service regulations, in contrast,

provide that it is the "appellant's responsibility" to produce "specific evidence and rationale" as to why the challenged decision "specifically violates law." 36 C.F.R. § 215.14(a), (b)(9).

Reply at 6 n.2.

Next, the Forest Service argues that the Grazing Associations' administrative appeal did not raise a First Amendment claim.  See Reply at 6-15.  It applies the standard it says comes from Forest Guardians v. U.S. Forest Service and concludes that the Grazing Associations' administrative appeal bears no resemblance to the First Amendment claim alleged in the Complaint.  See Reply at 6-7.  It argues that the "appeal did not, even remotely, put the Forest Service on notice of a First Amendment claim."  Reply at 7.  It asserts that the "appeal does not mention the First Amendment, and does not contain or reference any argument, evidence, or even statement that Plaintiffs had engaged in constitutionally-protected free speech, let alone that the 2010 Decisioni Notice was intended to 'retaliate' or 'punish' the Plaintiffs" for said speech. Reply at 7.  It asserts that the appeal contains no reference to Trujillo's anger, nor any allegation that her anger motivated her to issue the 2010 Decision Notice.  See Reply at 7.  The Forest Service also argues that § 6912(e)'s exhaustion requirement is mandatory and may not be waived, largely repeating its arguments in the MTD.  See Reply at 15-24.

### d.    The Court Holds a Hearing on the MTD.

The Court heard the Motion to Reconsider, the MTD, and two other housekeeping motions in the same hearing.  See Transcript of Hearing (taken July 26, 2013)("Tr.").[7]  See also Clerk's Minutes at 1, filed July 26, 2013 (Doc. 100).  The Court asked the Plaintiffs why Simmat v. U.S. Bureau of Prisons -- in which the Tenth Circuit ultimately dismissed a prisoner's claim

---

[7]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

for denial of medical treatment under the Eight Amendment to the Constitution of the United States because the prisoner had not exhausted his administrative remedies under the PLRA -- would not control.  See Tr. at 68:23-69:3 (Court).  The Plaintiffs responded by noting that Simmat v. U.S. Bureau of Prisons had not discussed any of the exceptions to the exhaustion requirement and that, in this case, judicial waiver should apply to the requirement.  See Tr. at 69:4-12 (Rosenstock).  The Plaintiffs asserted that judicial waiver is available, because § 6912(e)'s exhaustion requirement is not jurisdictional, but rather an affirmative defense.  See Tr. at 69:4-12 (Rosenstock).  The Court asked why that matters, given the case law characterizing the requirement as "mandatory," and the Plaintiffs replied that the requirement's nature -- as a jurisdictional requirement or an affirmative defense -- affects the availability of judicial waiver.  Tr. at 69:14-70:21 (Court, Rosenstock).

The Plaintiffs concede that the administrative appeal did not mention the First Amendment, see Tr. at 72:8-9 (Rosenstock), but said that the gist of a First Amendment retaliation claim was there, see Tr. 72:9-14 (Rosenstock)("I realize that it wasn't put together and I didn't say 'First Amendment,' but [if] somebody comes into my office and explains those facts to me, I'm thinking First Amendment retaliation.").  The Court stated it did not believe that the words contained in the administrative appeal, "highly controversial," were sufficient to put the Forest Service on notice of a First Amendment claim.  Tr. at 72:15-22 (Court).  The Plaintiffs admitted that, by themselves, those words would not, but, because "it was . . . attached to a discussion about the prior history between the Forest Service and the appellants in that case," the Forest Service should have realized that the Plaintiffs were asserting a First Amendment retaliation claim.  Tr. at 72:23-73:2 (Rosenstock).

The Plaintiffs argued that courts, including the Tenth Circuit in <u>Simmat v. U.S. Bureau of Prisons</u>, justified the exhaustion requirement on the ground that the agency possessed special expertise to resolve the claim and that, in this case, the Forest Service possesses no such expertise with regard to the First Amendment. <u>See</u> Tr. at 76:19-77:4 (Rosenstock).  The Court inquired how much expertise one needed to know that the government cannot retaliate against citizens for exercising their First Amendment rights, and the Plaintiffs replied that, although not much expertise was needed, they stand behind their assertion insofar as the agency lacks superior expertise to the courts.  <u>See</u> Tr. at 77:24-78:13 (Court, Rosenstock).

The Plaintiffs argued that any attempt to raise the claim at the administrative level would have been futile, because the administrative process grants no discovery that would be probative of Trujillo's motives, and, thus, Trujillo could simply state that she acted as she did for the reasons she stated in the Decision Order and on the record.  <u>See</u> Tr. at 83:2-84:1 (Rosenstock). The Court agreed that the process is "not very good," but asked whether "it is so imperfect that we should say ['just skip it, just come straight to federal court[']?"  Tr. at 84:2-6 (Court).  The Plaintiffs responded that it was not that the administrative process is inherently flawed, but that the process was not followed in this case.  <u>See</u> Tr. at 85:14-86:1 (Rosenstock).  They assert that "[i]t was a stacked deck, and the[ Plaintiffs] couldn't win."  Tr. at 85:25-86:1 (Rosenstock).

## <u>LAW REGARDING RULE 12(b)(1)</u>

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  <u>Henry v. Office of Thrift Supervision</u>, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83,

104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."). Rule 12(b)(1) allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion. Fed. R. Civ. P. 12(b)(1). The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." Ruiz v. McDonnell, 299 F .3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981). But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Hill v. Vanderbilt Capital Advisors, LLC, No. CIV 10-0133 JB/KBM, 2011 WL 6013025, at *8 (D.N.M. Sept. 30, 2011)(Browning, J.)(quoting Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9 (D.N.M. Mar. 11, 2009)(Browning, J.)). The United States Court of Appeals for the Fifth Circuit has stated,

> the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.  See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's

favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC

v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible."  The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Oklahoma, 519 F.3d at 1247 (citations omitted)(quoting Bell Atl. Corp. v. Twombly,

550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not

argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the

defendant asserts an immunity defense -- the courts handle these cases differently than other

motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M.

2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519

F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are

apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir.

1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss

for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself,

the motion may be disposed of under this rule.").  The defense of limitations is the affirmative

defense that is most likely to be established by the uncontroverted facts in the complaint.  See 5

Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N.

Steinman, Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004).  If the complaint

sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period,

then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R.

Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir.

1945);  Andrew v. Schlumberger Tech. Co., 808  F. Supp. 2d  1288, 1292  (D.N.M. 2011)(Browning, J.).  The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV 08-0140 W, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this practice, see Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, at *17, *37-39 (D.N.M. May 16, 2014)(Browning, J.).

## LAW REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

"The doctrine of exhaustion of administrative remedies is one among related doctrines -- including abstention, finality, and ripeness -- that govern the timing of federal-court decisionmaking."  McCarthy v. Madigan, 503 U.S. 140, 144 (1992), abrogated by statute as recognized in Garrett v. Hawk, 127 F.3d 1263, 1265 (10th Cir. 1997).  A court conducting an exhaustion inquiry must give "paramount importance" to congressional intent.  McCarthy v.

Madigan, 503 U.S. at 144 (quoting Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 501 (1982)).

Where Congress provides that certain administrative remedies are exclusive, exhaustion is

required.  See Patsy v. Bd. of Regents of Fla., 457 U.S. at 502 n.4 (citing Myers v. Bethlehem

Shipbuilding Corp., 303 U.S. 41 (1938)).  Moreover, even where there is no explicit statutory

exhaustion requirement, courts must draw guidance from congressional intent "in determining

whether application of the doctrine would be consistent with the statutory scheme."  Patsy v. Bd.

of Regents of Fla., 457 U.S. at 502 n.4.  Thus, in deciding whether exhaustion of federal

remedies is required, "courts generally focus on the role Congress has assigned to the relevant

federal agency, and tailor the exhaustion rule to fit the particular administrative scheme created

by Congress."  Patsy v. Bd. of Regents of Fla., 457 U.S. at 502 n.4 (citing McKart v. United

States, 395 U.S. 185, 193-95 (1969)).  Not only does a party's failure to exhaust mandatory

administrative remedies bar the court from hearing that party's claim, but it also prevents the

court from treating that party as a class member in a class action claim.  See Arctic Slope Native

Ass'n v. Sebelius, 583 F.3d 785, 796 (Fed. Cir. 2009).

"The Administrative Procedure Act requires that plaintiffs exhaust available

administrative remedies before bringing their grievances to federal court."  Idaho Sporting Cong.

v. Rittenhouse, 305 F.3d at 965 (citing 5 U.S.C. § 704).

> [T]he exhaustion doctrine continues to apply as a matter of judicial discretion in
> cases not governed by the APA.  But where the APA applies, an appeal to
> 'superior agency authority' is a prerequisite to judicial review only when
> expressly required by statute or when an agency rule requires appeal before
> review and the administrative action is made inoperative pending that review.

Darby v. Cisneros, 509 U.S. 137, 153-54 (1993).  Further, "[s]tatutes and regulations governing

actions of the Forest Service reiterate the administrative exhaustion requirement."  Darby v.

Cisneros, 509 U.S. at 153-54 (citing 7 U.S.C. § 6912(e), and 36 C.F.R. § 215.20).

Section 6912 of Title 7 of the United States Code provides:

(e)     Exhaustion of administrative appeals.

Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against --

(1)     the Secretary;

(2)     the Department; or

(3)     an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e).  Federal courts have strictly applied the statutory exhaustion requirement when asked to review Department of Agriculture administrative proceedings.  "[T]he statutory provision mandating exhaustion contained in 7 U.S.C. § 6912(e) is explicit . . . .  There can be little doubt that Congress's intent, in enacting this statute, was to require plaintiffs to exhaust all administrative remedies before bringing suit in federal court."  Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94-95 (2d Cir. 1998).[8]  The United States Court of Appeals for the Second Circuit, in Bastek v. Federal Crop Insurance Corp., held that "7 U.S.C. § 1912(e) unambiguously required plaintiffs to exhaust their administrative remedies before bringing suit, and their failure to do so deprived them of the opportunity to obtain relief in the district court."  145 F.3d at 95.

---

[8]The United States Court of Appeals for the Second Circuit extended this conclusion, i.e., that § 6912(e)'s exhaustion requirement is mandatory, to further conclude that § 6912(e)'s requirement is a jurisdictional requirement, rather than an affirmative defense.  Ensuing case law has called this second conclusion into question, see, e.g., Jones v. Bock, 549 U.S. 199 (2007); Munsell v. Dep't of Agriculture, 509 F.3d at 578-81; Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d 592, 603-04 (5th Cir. 2007), but its conclusion that the exhaustion requirement is mandatory remains intact, see Forest Guardians v. U.S. Forest Serv., 641 F.3d at 431-32.

In Kleissler v. U.S. Forest Service, 183 F.3d 196 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit described the exhaustion process in claims brought against the USFS:

> It is abundantly clear by the plain language of the applicable statutes and regulations that the Forest Service must be given written notice of an objector's challenges.   Therefore, we will consider only those allegations and comments contained in written documentation and correspondence to the Forest Service. Moreover, we hold that the claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court.   We are admonished that:
>
>> administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated.
>
> Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553-54 (1978).

Kleissler v. U.S. Forest Serv., 183 F.3d at 202 (footnote omitted).  See Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 965 ("Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and we must consider exhaustion arguments on a case-by-case basis.").  "The rationale underlying the exhaustion requirement is to avoid premature claims and to ensure that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties."  Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 965 (citing Saulsbury Orchards & Almond Processing, Inc. v. Yeutter, 917 F.2d 1190, 1195 (9th Cir. 1990)).

The Supreme Court at one time recognized at least three broad exceptions to the exhaustion requirement: (i) "[f]irst, requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action," McCarthy v. Madigan, 503 U.S. at

146-47; (ii) "[s]econd, an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief,'" McCarthy v. Madigan, 503 U.S. at 147 (quoting Gibson v. Berryhill, 411 U.S. 564, 575 n.14 (1973)); and (iii) "[t]hird, an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it," McCarthy v. Madigan, 503 U.S. at 147. The PLRA's passage abrogated the case that outlined these three exceptions, McCarthy v. Madigan, which concluded that federal prisoners need not exhaust their administrative remedies before filing Bivens[9] actions. See Garrett v. Hawk, 127 F.3d at 1265. Furthermore, the exhaustion requirement into which the Supreme Court carved exceptions in McCarthy v. Madigan was itself a judicial -- not statutory -- creation. See McCarthy v. Madigan, 503 U.S. at 143 ("[B]ecause Bivens actions are a creation of the judiciary, the courts may impose reasonable conditions upon their filing[, such as t]he exhaustion rule . . . ."). Some courts have suggested that exceptions to an exhaustion requirement can be made for judicially created exhaustion requirements, but not for statutory ones:

> Two kinds of exhaustion doctrine are currently applied by the courts, and the distinction between them is pivotal. Statutory exhaustion requirements are mandatory, and courts are not free to dispense with them. Common law (or "judicial") exhaustion doctrine, in contrast, recognizes judicial discretion to employ a broad array of exceptions that allow a plaintiff to bring his case in district court despite his abandonment of the administrative review process.

Bastek v. Fed. Crop Ins. Corp., 145 F.3d at 94. "[A] dismissal based on lack of exhaustion should ordinarily be without prejudice . . . ." Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1139 (10th Cir. 2005)(emphasis omitted). "[A] district court may, notwithstanding failure to exhaust, proceed to the merits of the claim and dismiss with prejudice if it concludes a party

---

[9]A Bivens action is the federal analogue to 42 U.S.C. § 1983 claim; it is a private right of action for damages arising directly under the Constitution. See MOO at 64-75.

would be unsuccessful even absent the exhaustion issue." Fitzgerald v. Corr. Corp. of Am., 403

F.3d at 1139.  See Friedlander v. Davis & Pierce, No. CIV 07-1016 JB/RHS, 2009 WL 1330059,

at *7 (D.N.M. May 1, 2009)(Browning, J.).

## LAW REGARDING THE APA'S JUDICIAL REVIEW PROVISIONS

The APA describes the exclusive mechanism -- unless another mechanism is specifically

provided by statute -- by which the federal district courts may review the actions of federal

administrative agencies.

> [W]ith respect to all entities that come within the Chapter's definition of
> "agency," if review is not available under the APA it is not available at all.
> Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing
> judicial review of all federal agency action.  While a right to judicial review of
> agency action may be created by a separate statutory or constitutional provision,
> once created it becomes subject to the judicial review provisions of the APA
> unless *specifically* excluded.

Webster v. Doe, 486 U.S. at 607 n.* (Scalia, J., dissenting)(emphasis in original)(citations

omitted).  Specifically, the APA provides that

> [a] person suffering legal wrong because of agency action, or adversely
> affected or aggrieved by agency action within the meaning of a relevant statute, is
> entitled to judicial review thereof.  An action in a court of the United States
> seeking relief other than money damages and stating a claim that an agency or an
> officer or employee thereof acted or failed to act in an official capacity or under
> color of legal authority shall not be dismissed nor relief therein be denied on the
> ground that it is against the United States or that the United States is an
> indispensable party.  The United States may be named as a defendant in any such
> action, and a judgment or decree may be entered against the United States:
> Provided, that any mandatory or injunctive decree shall specify the Federal officer
> or officers (by name or by title), and their successors in office, personally
> responsible for compliance.  Nothing herein (1) affects other limitations on
> judicial review or the power or duty of the court to dismiss any action or deny
> relief on any other appropriate legal or equitable ground; or (2) confers authority
> to grant relief if any other statute that grants consent to suit expressly or impliedly
> forbids the relief which is sought.

5 U.S.C. § 702.  The APA applies to both formal and informal agency proceedings -- "formality" being determined by the agency's compliance with the provision of 5 U.S.C. §§ 556 and 557 -- and empowers the federal district courts to:

> **(1)** compel agency action unlawfully withheld or unreasonably delayed; and
>
> **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be --
>
>> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> **(B)** contrary to constitutional right, power, privilege, or immunity;
>>
>> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>
>> **(D)** without observance of procedure required by law;
>>
>> **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>>
>> **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

### 1.    The APA Does Not Impart Subject-Matter Jurisdiction, but It Waives Sovereign Immunity.

The APA does not, through § 702, create an independent basis of subject-matter jurisdiction, see Eagle-Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. 1990); it allows for judicial review of final agency action only if there is also an independent basis for

subject-matter jurisdiction, see Colo. Dep't of Soc. Servs. v. Dep't of Health & Human Servs., 558 F. Supp. 337, 339 (D. Colo. 1983). Notably, before review of the grievance may occur, the party must demonstrate that statutes do not preclude judicial review and that the law does not commit the action to agency discretion. See Heckler v. Chaney, 470 U.S. 821, 828 (1985). Section 702 waives sovereign immunity, and makes clear that suits under the APA are for equitable relief only and not for damages. See 5 U.S.C. § 702.

Through 5 U.S.C. § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief." United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996). "This waiver is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).

> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis. Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." As we held in Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005), § 702's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1233. See also Hanson v. Wyatt, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008)(Gorsuch, J., concurring)("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver." (citation omitted)).

Gilmore v. Weatherford, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012). See Trudeau v. Fed. Trade Comm'n, 456 F.3d at 186 (holding that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not"); Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)(holding the same).

2.      **District Courts Must Treat Cases Arising From Agency Actions as Appeals.**

Pursuant to Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  42 F.3d at 1580.  See Wyoming v. U.S. Dep't of Interior, 587 F.3d 1245, 1251 n.2 (10th Cir. 2009)(quoting Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580).  District courts may not entertain motions for summary judgment or any other procedural devices that shift the appellant's substantial burden -- arbitrary-or-capricious review for questions of fact and Chevron deference for questions of statutory interpretation -- onto the agency.  See Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579-80.  See generally infra at 59-62 (describing Chevron deference).  The Tenth Circuit has admonished district courts not to treat suits arising out of agency actions as "separate and independent actions," stating:

> The use of motions for summary judgment or so-called motions to affirm permits the issues on appeal to be defined by the appellee and invites (even requires) the reviewing court to rely on evidence outside the administrative record.  Each of these impermissible devices works to the disadvantage of the appellant.  We have expressly disapproved of the use of this procedure in administrative appeals in the past, and explicitly prohibit it now.
>
> A district court is not exclusively a trial court.  In addition to its nisi prius functions, it must sometimes act as an appellate court.  Reviews of agency action in the district courts must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure.  Motions to affirm and motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal.

Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579-80 (footnotes omitted).

3.      **The Standard of Review for Factual Issues Is Arbitrary-or-Capricious Review -- Also Known as "Substantial Evidence" Review.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary[ or] capricious," and, in appeals from formal

proceedings, unless they are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). Although these standards appear different, the modern view is that they are the same, and that a decision is arbitrary and capricious if substantial evidence does not support it. See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984).   In reviewing a decision under the arbitrary-or-capricious standard, the court reviews the entire administrative record -- or at least those portions of the record that the parties provided -- but it may not consider materials outside of the administrative record.[10]   See 5 U.S.C. § 706.

---

[10]Section 706(2)(F) provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."   The Tenth Circuit has limited this provision's application as follows:

> 5 U.S.C. § 706(2)(F) of the APA has been interpreted as authorizing de novo review in two instances: (1) when the action is adjudicatory in nature and the agency's fact-finding procedures inadequate; and (2) when issues not previously before the agency are raised in a proceeding to *enforce* a nonadjudicatory action.   However, neither situation exists in the case before us.

Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.3d at 1141 n.7 (emphasis in original)(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 415).   Although the Tenth Circuit's statement could be construed as implying that these two situations are the only circumstances that trigger § 706(2)(F), it does not explicitly say as much, nor does it state that the district court lacked authority to employ § 702(2)(F) because the situation fell outside of the two established § 706(2)(F)-triggering circumstances.

Moreover, § 706(2)(F) provides for a "trial de novo," but the district court may wish to supplement the administrative record with new evidence without necessarily conducting a trial de novo.   A leading treatise describes the ill-defined -- and, in the Tenth Circuit, largely undefined -- exceptions to the rule that district courts may not venture outside of the administrative record:

> It is black letter law that, except in the rare case, review in federal court must be based on the agency's record.   Generally, a court may not reach a decision without the administrative record.   A court may delve outside the administrative record under a strong showing of bad faith or improper behavior. See Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1096 (10th Cir. 2007).   Courts will generally confine themselves

to the administrative record[,] which includes all the materials compiled by the agency before it made a decision.  See Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997); Sierra Club v. Slater, 120 F.3d 623, 637-638 (6th Cir. 1997); Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir. 1998).  The Ninth Circuit observed: "A reviewing court must review the administrative record before the agency at the time the agency made its decision."  Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir. 2004); Partridge v. Reich, 141 F.3d 920, 926 n.4 (9th Cir. 1998).  Even review by a trial level court is generally confined to the administrative record.  See Smith v. Office of Civilian Health & Med. Program of Uniformed Servs., 66 F.3d 905, 912 (7th Cir. 1995); First Nat. Bank & Trust, Wibaux, Mont. v. Dep't of Treasury, Comptroller of Currency, 63 F.3d 894, 897-898 (9th Cir. 1995).

. . . .

The record for review includes testimony and documentary evidence admitted at the hearing.  It also includes the decision of any lower level decisionmakers.

. . .  The boundaries of a record in an informal agency action are sometimes vague but it is not necessary that the reviewing court be presented with a record like that produced in a formal evidentiary hearing.  The Supreme Court recognized that the APA contemplates review of informal records.  See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).  An informal record includes any information the administrative decisionmaker actually considered.  See Kent Cnty., Del. Levy Court v. U.S. EPA, 963 F.2d 391 (D.C. Cir. 1992); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys., 745 F.2d 677, 684 (D.C. Cir. 1984)(holding that the administrative record "might well include crucial material that was neither shown to nor known by the private parties").

The Supreme Court has also recognized that the agency may need to develop a "record" for judicial consideration that reflects the basis for a decision but had not been compiled in a discrete form until the litigation.  While the agency may create such a record for the litigation, the information and justification must be that actually relied on by the agency.  Where additional explanation or clarification is required, the litigation motivated material must reflect the agency's findings and justification at the time the decision was made.

. . . .

[U]nder some circumstances, the court is allowed to go outside the record and the parties are allowed to add to the record.

      (a)    *Methods for adding to the record.*  Most often information may be added to the record, if at all, by a petition to the court.  [In the D.C. Circuit, a] party may not supplement

the record by means of an affidavit.  The D.C. Circuit has ruled that materials that could have been submitted to the agency may be added to the record only by joint stipulation.

(b)     *Additions by the agency.*  An agency may submit extra-record evidence to explain its decision under very limited circumstances.  The limitation in short is that the agency cannot offer information that it did not consider at the time the decision was made.

(c)     *Review of judicial discretion.*   The decision to allow additional evidence is left to the discretion of the district court and that decision will be reviewed only for abuse.  The court must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo.

(d)     *Justification for adding to the record.*   Some federal statutes expressly permit the administrative record to be supplemented on judicial review.   However statutory authority to take new evidence does not transform the review proceeding into a trial de novo.

The evidence must be sufficiently relevant and probative so that there is a reasonable probability that it will change the administrative decision.  The party will not be permitted to supplement the record unless it demonstrates good cause for not presenting the evidence in the proceeding below.  A party will not be permitted to expand the record if the administrative record is adequate.  The Eleventh Circuit summarized: "[A court] may deny a motion to correct the record where, among other reasons, the proffered item does not fall within the definition of the record, the proffered item is immaterial or incomplete, or the agency did not have the opportunity to consider the evidence."  Nat'l Ass'n of State Util. Consumer Advocates v. FCC, 457 F.3d 1238, 1248 (11th Cir. 2006).  The Ninth Circuit said: "Courts may review such extra-record materials only when: (1) it is necessary to determine whether the agency has considered all relevant factors and explained its decision, (2) the agency has relied on documents not in the record, (3) supplementing the record is necessary to explain technical terms or complex subject matter, or (4) plaintiffs make a showing of bad faith."  City

of Las Vegas, Nev. v. FAA, 570 F.3d 1109, 1116 (9th Cir. 2009).  Accord Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010).

The court may supplement the record to obtain background information necessary to make an informed decision.  The record may be supplemented for the purpose of explaining the existing record and judging the adequacy of the procedures and facts considered.  The Second Circuit found that additional evidence may be appropriate: "where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice."   Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997).  Perhaps the administrative record may be supplemented because of evidence considered by the agency was excluded by clerical mistake or other oversights.

The D.C. Circuit would allow additions to the administrative record upon a "strong showing of bad faith or improper behavior" or that the record is so bare that review is impossible.   "When as here there is a contemporaneous administrative record and no need for additional explanation of the agency decision, 'there must be a strong showing of bad faith or improper behavior' before the reviewing court may permit discovery and evidentiary supplementation of the administrative record."

The Ninth Circuit allows additional evidence in four circumstances:

(1)     if necessary to determine "whether the agency has considered all relevant factors and has explained its decision;"

(2)     "when the agency has relied on documents not in the record;"

(3)     "when supplementing the record is necessary to explain technical terms or complex subject matter;" and

(4)     "when the plaintiffs make a showing of agency bad faith."

- 56 -

Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996). Accord Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir. 1998).

    (e)    *Remand to add information to the administrative record.* If additional information is necessary, a court should generally remand to the agency so that it, not the court, initially considers the additional evidence. Denial of a motion for a remand to add to the record will be reviewed for abuse of discretion.

    (f)    *Overton hearing: Expansion of the agency's justification.* The Supreme Court in Citizens to Preserve Overton Park v. Volpe, and Camp v. Pitts, 411 U.S. 138 (1973), created some lasting law supporting judicial authority to supplement the informal record through an "Overton hearing." As reiterated in Camp v. Pitts, these "Overton" hearings give the reviewing court limited authority to "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."

    Generally, if a reviewing court finds the record produced by an informal adjudication to be inadequate for review, it may conduct an "Overton hearing," but the Supreme Court has expressed a preference for remand.

    In Sierra Club v. United States Army Corps of Engineers, 772 F.2d 1043 (2d Cir. 1985), the Second Circuit contrasted this proceeding from a de novo hearing. (By its terms, the difference between "plenary" review and trial de novo.) The case involved the Corps' grant of a dredging permit. The appellate court criticized the district court for undertaking a full de novo hearing, including calling its own expert witnesses to substitute their judgment for that of the agency. It found that ordinarily such de novo review would be reversible error and that such review would not be proper every time an agency record is incomplete.

Charles H. Koch, Jr. & Richard Murphy, Administrative Law & Practice § 8:27 (3d ed.)(emphases in original)(footnotes omitted or converted to inline citations).

    [R]eview may not probe the minds of an official: "It was not the function of the court to probe the mental processes of the [administrative decisionmaker]."

> In cases where Congress has provided for judicial review without setting forth the standards to be used or procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had . . . .

Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d at 1137.  See Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."  (emphasis added)).  The court should not pass judgment on the wisdom or merits of the agency's decision.  See Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172 (stating that NEPA prohibits uninformed actions, but not unwise actions).  To fulfill its function under the arbitrary-or-capricious standard of review, however, a reviewing court should engage in a "thorough, probing, in-depth review" of the administrative record. Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation omitted).  The Tenth Circuit explained the relevant standard of review as follows:

----

United States v. Morgan, 313 U.S. 409, 422 (1941)("Morgan IV").  In Morgan IV the Court disapproved of the conduct of the trial court in having the Secretary of Agriculture appear in person at trial and questioned "regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates."  Ever since this decision, any judicial action which interjects itself in this way into the decisionmaking process has been considered improper.

However the Supreme Court has required what has become known as an "Overton hearing" where the reasons in informal action are inadequate for judicial review.  In Overton Park, the Court found that a lower court could require the agency decisionmaker to provide sufficient justification either through testimony or affidavit.  Both the Supreme Court and lower courts, however, have remained true to Morgan IV in refusing to permit these Overton Park hearings to delve into the mental processes of the agency head.  Courts have usually refused to put the official on the stand and have relied instead on affidavit or remand.

Koch & Murphy, supra § 8:28.

- 58 -

In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if

the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1167 (omission in original)(citations omitted)(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))(internal quotation marks omitted).  The standard of review requires the district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions."  Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580.  While the court may not think up a reasoned basis for the agency's action that the agency did not give, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(citations omitted).  The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings.  See SEC v. Chenery Corp., 318 U.S. 80 (1943).

### 4. **The Standard of Review for Legal Issues Varies Depending Upon the Source of Law That the Agency Is Interpreting.**

In promulgating and enforcing regulations, agencies must interpret the content of the Constitution, statutes, and their own previously enacted regulations.   The federal judiciary accords considerable deference to agencies' interpretations of their own organic statutes -- the statutes Congress has tasked an agency with enforcing, from which it derives its authority to act. See United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22

F.3d 235, 238 (10th Cir. 1994).  This deference has come to be known as <u>Chevron</u> deference, named after the first case supposedly adopting[11] the approach, <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).  <u>Chevron</u> deference involves a two-step process,[12] first asking whether the statutory provision in question is clear and then, if it is not, asking whether the agency's interpretation of the unclear statute is a reasonable one.  As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative agency interpretations of their organic statutes laid down by the Supreme Court in <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).  Those directives require that we first determine whether Congress has directly spoken to the precise question at issue.  If the congressional intent is clear, we must give effect to that intent.  If the statute is silent or ambiguous on that specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

---

[11]The case itself is unremarkable and uninstructive, does not explicitly outline the now-familiar two-step process of applying <u>Chevron</u> deference, and does not appear to have been intended to become a "big name" case at all.  Its author, the Honorable John Paul Stevens, Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of <u>Chevron</u> deference's greatest detractors in subsequent years.  <u>See generally</u> Charles Evans Hughes, <u>Justice Stevens and the Chevron Puzzle</u>, 106 Nw. U. L. Rev. 551 (2012).

[12]There is, additionally, a threshold step -- the so-called step zero -- which asks whether <u>Chevron</u> deference applies to the agency decision at all.  <u>See</u> Cass R. Sunstein, Chrevron <u>Step Zero</u>, 92 Va. L. Rev. 187 (2006).  Step zero asks: (i) whether the agency is <u>Chevron</u>-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded <u>Chevron</u> deference, <u>see, e.g.</u>, <u>U.S. West, Inc. v. FCC</u>, 182 F.3d 1224 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to <u>Chevron</u> deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, <u>United States v. Mead Corp.</u>, 533 U.S. 218, 229 (2001) -- opinion letters by agency's, for example, do not speak with the force of law and are thus not entitled to <u>Chevron</u> deference, <u>see</u> <u>Christensen v. Harris Cnty.</u>, 529 U.S. 576 (2000).  An affirmative answer to all three inquiries results in the agency's decision passing step zero.

United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22 F.3d at 238 (citation omitted).

Chevron's second step is the easier one describe, because it is all but toothless: if the agency's decision makes it to step two, it is upheld almost without exception.  See Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L. Rev. 1253, 1261 (1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second Chevron step."   (footnote omitted)); Jason J. Czarnezki, An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice.").  Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

There is substantial disagreement, however, even at the Supreme Court-level, about what Chevron's first step means.  Sometimes clarity is assessed in terms of obviousness -- meaning that, if a statute requires in-depth interpretation, it cannot be clear.  Other times clarity is assessed in terms of the court's confidence that its interpretation is correct -- meaning that in-depth interpretation may result in a court concluding that the statute is clear.  An appellate court's conclusion that a statute is clear has binding stare decicis effect, see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967 (2005), but its conclusion that a statute is unclear does not, see United States v. Home Concrete & Supply, LLC, 132 S. Ct. 1836 (2012).  In an earlier case, the Court noted the varying approaches taken by different Justices in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine.  Those Justices, such as Justice Scalia, who

are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step.  These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine.  Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for <u>Chevron</u> doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

<u>Griffin v. Bryant</u>, No. CIV 13-0799 JB/GBW, 2014 WL 3377705, at *42 n.23 (D.N.M. June 18, 2014)(Browning, J.).  A number of policy considerations animate <u>Chevron</u> deference, among them: (i) statutory interpretation, <u>i.e.</u>, that Congress, by passing extremely open-ended and vague organic statutes, is granting discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, <u>i.e.</u>, that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, <u>i.e.</u>, that agencies, as executive bodies ultimately headed by the President of the United States, can be held politically accountable for their interpretations; and (iv) efficiency, <u>i.e.</u>, that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but Circuit-fragmented federal judiciary can.

When agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as <u>Auer</u> or <u>Seminole Rock</u> deference.  <u>See Auer v. Robbins</u>, 519 U.S. 452 (1997); <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410 (1945).  This deference is applied in the same manner as <u>Chevron</u> deference and is substantively identical.  There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, more uncertain.  Justice Scalia, after years of applying the doctrine followed by

years of gradually beginning to question its soundness, finally denounced Auer deference just

last year in his dissent in Decker v. Northwest Environmental Defense Center, 133 S. Ct. 1326

(2013). The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine

better than the Justice did:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations." Talk America, Inc. v. Michigan Bell Telephone Co., 131 S. Ct. 2254, 2265 (2011)(Scalia, J., concurring). This is generally called Seminole Rock or Auer deference.
>
> . . . .
>
> The canonical formulation of Auer deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation." But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation. Obviously, that is not enough, or there would be nothing for Auer to do. In practice, Auer deference is Chevron deference applied to regulations rather than statutes. The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.
>
> Our cases have not put forward a persuasive justification for Auer deference. The first case to apply it, Seminole Rock, offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Our later cases provide two principal explanations, neither of which has much to be said for it. First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it. The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false. There is true of regulations what is true of statutes. As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.
>
> The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the

agency deems effective.  Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its "special expertise" to formulate the best rule.  But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is."  Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience.  Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation will be given effect if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors.  If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for <u>Auer</u> deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that Congress enacted, as we do per <u>Chevron</u>, it is a fortiori reasonable to defer to them regarding the meaning of regulations that they themselves crafted.  To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all.  The theory of <u>Chevron</u> (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute.  While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations.  For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands.  "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."  Montesquieu, <u>Spirit of the Laws</u> bk. XI, at 151-152 (O. Piest ed., T. Nugent transl. 1949).  Congress cannot enlarge its own power through <u>Chevron</u> -- whatever it leaves vague in the statute will be worked out by someone else.  <u>Chevron</u> represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)  So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else.  Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will

enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it." 1 Wm. Blackstone, Commentaries on the Laws of England 58 (1765). And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation. The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke ed. 1961). Auer deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures." Auer is not a logical corollary to Chevron but a dangerous permission slip for the arrogation of power.

It is true enough that Auer deference has the same beneficial pragmatic effect as Chevron deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court. The agency's view can be relied upon, unless it is, so to speak, beyond the pale. But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute. For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear. The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing. It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here. And there is another respect in which a lack of Chevron-type deference has less severe pragmatic consequences for rules than for statutes. In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute. That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. at 1339-42 (Scalia, J., dissenting)(alterations in original). Justice Scalia's attack on Auer was in a dissent, but two other Justices, the Honorable

John G. Roberts and Samuel A. Alito, joined in a concurring opinion stating that "[i]t may be appropriate to reconsider [Auer deference] in an appropriate case. But this is not that case." 133 S. Ct. at 1338 (Roberts, C.J., concurring). Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution. See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))). Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content. The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation. See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d at 1085 ("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

## LAW REGARDING FEDERAL SOVEREIGN IMMUNITY

"The United States cannot be sued without its consent." Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.). "Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F. Supp. 2d at 1137-38. As with any jurisdictional issue, the party

bringing suit against the United States bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  Accordingly, the "plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims."  Garcia v. United States, 709 F. Supp. 2d at 1138.  Accord Bork v. Carroll, 449 F. App'x 719, 721 (10th Cir. 2011)(unpublished)[13]("So it is that a plaintiff seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished)(holding that, in a case brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983))).

---

[13]Bork v. Carroll is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Bork v. Carroll, Summa v. United States, 936 F.2d 584, 1991 WL 114638 (10th Cir. 1991)(unpublished), Liverman v. Committee on the Judiciary, 51 F. App'x 825 (10th Cir. 2002)(unpublished), How v. City of Baxter Springs, 217 F. App'x 787 (10th Cir. 2007)(unpublished), Mitchell v. City of Wichita, Kan., 140 F. App'x 767 (10th Cir. 2005)(unpublished), Miskovsky v. Jones, 437 F. App'x 707 (10th Cir. 2011)(unpublished), Evans v. Fogarty, 241 F. App'x 542 (10th Cir. 2007)(unpublished), and Cummings v. Equitable Life & Casualty Insurance Co., 177 F. App'x 794 (10th Cir. 2006)(unpublished), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted). Accord FDIC v. Meyer, 510 U.S. 471, 475 (1994); United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). A waiver of sovereign immunity cannot be implied and must be unequivocally expressed. See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996); Wells Fargo Bank, Nat. Ass'n v. Se. N.M. Affordable Hous. Corp., 877 F. Supp. 2d 1115, 1139-40 (D.N.M. 2012)(Browning, J.)(finding that, by the statute's express terms, the United States waived its sovereign immunity under 28 U.S.C. § 1346(a)(2) for actions seeking damages, but not when a plaintiff seeks equitable or injunctive relief). The United States' agencies also have sovereign immunity, absent a waiver. See FDIC v. Meyer, 510 U.S. at 475 ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.").

Immunity serves to limit "the general costs of subjecting officials to the risks of trial -- distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." Harlow v. Fitzgerald, 457 U.S. 800, 816 (1982). "Harlow emphasizes that even such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)(quoting Harlow v. Fitzgerald, 457 U.S. at 817). In Liverman v. Committee on the Judiciary, 51 F. App'x 825 (10th Cir. 2002)(unpublished), the Tenth Circuit rejected the argument that the "district court erred in staying discovery pending resolution of the Committee's motion to dismiss," because, in part, "the Committee raised sovereign immunity

and other immunity-based defenses in its motion to dismiss." 51 F. App'x at 827. Based on the Supreme Court's statement that, "[u]ntil [the] threshold immunity question is resolved, discovery should not be allowed," Siegert v. Gilley, 500 U.S. 226, 231 (1991), the Tenth Circuit found "no logical reason why this rule should not apply where the defendant raises the defense of sovereign immunity and the defense is primarily one of law," Liverman v. Comm. on the Judiciary, 51 F. App'x at 827-28. Accordingly, the Court has previously allowed government entities extensions of time so that they need not respond to pleadings until the Court determines whether their sovereign immunity protects them from a suit. See Hill v. Vanderbilt Capital Advisors, LLC, 2010 WL 5151251, at *5.

## LAW REGARDING FIRST AMENDMENT RETALIATION CLAIMS

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" Hartman v. Moore, 547 U.S. at 256 (quoting Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)). It is therefore "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. at 256 (citation omitted). In addition to prohibitive laws, the Constitution also proscribes "[g]overnment retaliation . . . in as much as retaliatory actions tend to chill individuals' exercise of constitutional rights." How v. City of Baxter Springs, 217 F. App'x 787, 797 (10th Cir. 2007)(unpublished). See Perez v. Ellington, 421 F.3d at 1131 ("The First Amendment bars retaliation for exercising the right of association."). The Tenth Circuit has explained that "any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." How v. City of Baxter Springs, 217 F. App'x at 797 (quoting Worrell v.

Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)).   To establish a claim of retaliation, outside the

employment context, for exercising the right to associate guaranteed under the First Amendment,

a plaintiff must establish three elements: (i) the plaintiff was engaged in constitutionally

protected activity; (ii) the defendant's actions caused the plaintiff to suffer an injury that would

chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the

plaintiff's exercise of the constitutionally protected activity substantially motivated the

defendant's adverse action.   See Perez v. Ellington, 421 F.3d at 1131-32 (quoting Worrell v.

Henry, 219 F.3d at 1212).   In line with Hartman v. Moore, the Tenth Circuit has held that a

plaintiff must establish the following elements to allege a cause of action under the First

Amendment against a defendant who is not his employer:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the
> defendant's actions caused the plaintiff to suffer an injury that would chill a
> person of ordinary firmness from continuing to engage in that activity; and
> (3) that the defendant's adverse action was substantially motivated as a response
> to the plaintiff's exercise of constitutionally protected conduct.  Worrell v. Henry,
> 219 F.3d 1197, 1212 (10th Cir. 2000).

Klen v. City of Loveland, Colo., 661 F.3d 498, 508 (10th Cir. 2011).  In Harapat v. Vigil, 676

F. Supp. 2d 1250 (D.N.M. 2009)(Browning, J.), the Court found that a reasonable jury could

conclude a sheriff's arrest of protesters, who would not move their protest from the front of a

district attorney's office to the other side when the sheriff directed, was a retaliatory action

substantially motivated by the sheriff's desire to chill the protesters from the exercise of their

First Amendment rights.  See 676 F. Supp. 2d at 1254, 1207-71.  Additionally, in Edwards-Flynn

v. Yara, No. CIV 08-0186 JB/ACT, 2009 WL 1563375 (D.N.M. May 18, 2009)(Browning, J.),

the Court ruled that a political candidate had stated a First Amendment retaliation claim when

she alleged that a city official intentionally certified the candidate to run for city councilor in the

wrong ward because the official did not agree with the candidate's political views, and thereby

the official defeated the candidate's ability to fairly run for public office in the correct ward.  See 2009 WL 1563375, at *8-9.

When analyzing whether a defendant's actions would have a chilling effect, a court is to "focus, of course, . . . upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled," thus conducting an objective and not subjective inquiry.  Smith v. Plati, 258 F.3d 1167, 1177 (10th Cir. 2001).  If a plaintiff is seeking to prove the causal connection between the retaliatory animus of a third party, and the action of another, the Tenth Circuit requires that "the plaintiff . . . show a causal connection between the third-party's animus and the action."  Leverington v. City of Colo. Springs, 643 F.3d 719, 731 n.10 (10th Cir. 2011).

When direct evidence of retaliatory animus is not present, a plaintiff may establish a prima facie case of retaliation with indirect evidence.  The Supreme Court has "established methods for identifying the presence of an illicit reason (in competition with others), not only in retaliation cases but on claims of discrimination based on race or other characteristics."  Wilkie v. Robbins, 551 U.S. at 556 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  See Waters v. Churchill, 511 U.S. 661, 691 (1994)(Scalia, J., concurring)(noting that the Supreme Court "considers 'pretext' analysis sufficient in other First Amendment contexts."); Renton v. Playtime Theatres, Inc., 475 U.S. 41, 54 (1986)(holding that a city's zoning restriction on adult theatres does not violate the First Amendment unless the zoning is a "pretext for suppressing expression" (internal quotation marks omitted)).  First of all, "[c]laims of age, race, national origin, gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green."  Gamez v. Country Cottage Care and Rehab., 377 F. Supp. 2d 1103, 1119 (D.N.M.

2005)(Browning, J.).  Under the <u>McDonnell Douglas Corp. v. Green</u> framework, a plaintiff must set forth a prima-facie case of retaliation.  <u>See</u> <u>Kelley v. City of Albuquerque</u>, 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004)(Browning, J.), <u>aff'd</u>, 542 F.3d 802 (10th Cir. 2008).  If the plaintiff establishes a prima-facie case for any of his or her retaliation or discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision."  <u>Mitchell v. City of Wichita, Kan.</u>, 140 F. App'x 767, 777 (10th Cir. 2005)(unpublished).  "Upon the employer's articulation of a legitimate, nondiscriminatory reason . . . the presumption of discrimination established by the prima-facie case simply drops out of the picture."  <u>Kelley v. City of Albuquerque</u>, 375 F. Supp. 2d at 1210 (internal quotation marks omitted).  The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual.  <u>See</u> <u>Kelley v. City of Albuquerque</u>, 375 F. Supp. 2d at 1210 (citing <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000)).  When the burden shifts back to the plaintiff, the plaintiff may establish pretext through "'evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in a defendant's 'proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer' that the defendant 'did not act for the asserted non-discriminatory reasons.'"  <u>Fye v. Okla. Corp. Comm'n</u>, 516 F.3d 1217, 1228 (10th Cir. 2008)(quoting <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1203 (10th Cir. 2006)).

In determining whether retaliatory animus substantially motived an action, one element that courts have considered is the temporal proximity between a plaintiff's speech and a defendant's allegedly retaliatory action.  For example, in <u>Miskovsky v. Jones</u>, 437 F. App'x 707 (10th Cir. 2011)(unpublished), the Tenth Circuit determined that a prisoner stated a claim for

retaliation under the First Amendment when the prisoner alleged that his transfer to a more dangerous prison was retaliation for his lawsuit against a judge and prison official alleging harassment, filed in "close temporal proximity -- 15 days" before the transfer.  437 F. App'x at 713 (internal quotation marks omitted).  The Tenth Circuit also expressed that a six-month period between protected activity and alleged retaliation, without more evidence, is insufficient to establish that a defendant's alleged retaliation was a response to a plaintiff's constitutionally protected conduct.  See 437 F. App'x at 712-13 ("A six-month gap between the protected activity . . . and the alleged retaliation cannot, without more, establish causation.").  Accord Anderson v. Coors Brewing, Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(noting that, in employment discrimination cases alleging retaliation for protected activity, "we have held that a three-month period, standing alone, is insufficient to establish causation").  On the other hand, the Tenth Circuit has found that a reasonable jury could find a pattern of retaliation over a period of twenty-five months, when the plaintiffs alleged that they received disparate reimbursement and experienced increased administrative burdens from their health care administrator over the nearly two-years in which the plaintiffs lobbied for legislation adverse to their administrator's interests.   See Evans v. Fogarty, 241 F. App'x 542, 544-45, 551-55 (10th Cir. 2007)(unpublished).  The Tenth Circuit noted that evidence of disparate reimbursements and increased administrative burdens was circumstantial, but explained that "'in a § 1983 proceeding circumstantial evidence generally plays a major role.'"  241 F. App'x at 555 n.14 (quoting Butcher v. City of McAlester, 956 F.2d 973, 978 (10th Cir. 1992)).  The Tenth Circuit also noted that the administrator's retaliatory motivation as more likely when viewed against the backdrop of "'intense emotional conflict'" seen through the parties' "poisonous, long-running political

battle."  Evans v. Fogarty, 241 F. App'x at 555 n.14 (quoting Butcher v. City of McAlester, 956 F.2d at 978).

**ANALYSIS**

The Court grants the MTD and dismisses the Plaintiffs' First Amendment retaliation claim.  First, judicial review of Forest Service proceedings require issue exhaustion, not merely remedy exhaustion, and constitutional claims -- even First Amendment retaliation claims -- are not exempt from this requirement.  Second, although failure to exhaust constitutes an affirmative defense, not a jurisdictional bar, the exhaustion requirement -- because it is statutory, and the statute is clear -- is still mandatory and thus admits of no exceptions.  Third, the Court finds that the Plaintiffs did not satisfy the issue-exhaustion requirement in the proceedings before the Forest Service, because they did not specifically raise their First Amendment retaliation issue in a way that the Forest Service could be expected to understand and respond to it.  Last, the Court concludes that, even if the exhaustion requirement were subject to judicial waiver, the facts here would not merit the application of a waiver.

I. **SECTION 6912(e) REQUIRES ISSUE EXHAUSTION -- NOT MERELY REMEDY EXHAUSTION -- AND CONSTITUTIONAL CLAIMS, INCLUDING FIRST AMENDMENT RETALIATION CLAIMS, ARE NOT EXEMPT FROM THIS REQUIREMENT.**

The Forest Service is an agency within the Department of Agriculture, see, e.g. Utah Envtl. Congress v. Bosworth, 372 F.3d 1219, 1223 n.3 (10th Cir. 2004)("We review the Forest Service's approval of the Monroe Project as final agency action under the APA, 5 U.S.C. §§ 701-706."), and Congress restricts judicial review of Department of Agriculture actions under the following provision:

(e)    Exhaustion of administrative appeals

- 74 -

Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against --

(1) the Secretary;

(2) the Department; or

(3) an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e). The Code of Federal Regulations, in turn, contains the "administrative appeal procedures established by the Secretary or required by law" to which the statute refers:

(a) It is the appellant's responsibility to provide sufficient project- or activity-specific evidence and rationale, focusing on the decision, to show why the Responsible Official's decision should be reversed (paragraph (b)(6-9)).

(b) The appeal must be filed with the Appeal Deciding Officer § 215.8 in writing. At a minimum, an appeal must include the following:

(1) Appellant's name and address (§ 215.2), with a telephone number, if available;

(2) Signature or other verification of authorship upon request (a scanned signature for electronic mail may be filed with the appeal);

(3) When multiple names are listed on an appeal, identification of the lead appellant (§ 215.2) and verification of the identity of the lead appellant upon request;

(4) The name of the project or activity for which the decision was made, the name and title of the Responsible Official, and the date of the decision;

(5) Any specific change(s) in the decision that the appellant seeks and rationale for those changes;

(6) Any portion(s) of the decision with which the appellant disagrees, and explanation for the disagreement;

(7) Why the appellant believes the Responsible Official's decision failed to consider the substantive comments; and

(8)     How the appellant believes the decision specifically violates law, regulation, or policy.

(c)     The Appeal Deciding Officer shall not process an appeal when one or more of the following applies:

(1)     An appellant's identity is not provided or cannot be determined from the signature (written or electronically scanned) and a reasonable means of contact is not provided.

(2)     The appellant has not provided a reasonable means of contact.

(3)     The decision cannot be identified.

(4)     The appeal is illegible for any reason, including those submitted electronically in a format different from that specified in the legal notice.

36 C.F.R. § 215.14.[14]

The Plaintiffs argue that these provisions require mere remedy exhaustion and not the more-stringent requirement of issue exhaustion.  See Response at 10-13.  They cite Sims v. Apfel, a case in which the Supreme Court held that a Social Security claimant need not exhaust all issues at the administrative stage, provided that he or she obtains a final decision from the Commissioner of Social Security.  See 530 U.S. at 106-10.  The Supreme Court wrote:

The Social Security Act provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . may obtain a review of such decision by a civil action" in federal district court.  42 U.S.C. § 405(g).  But the Act does not define "final decision," instead leaving it to the SSA to give meaning to that term through regulations. SSA regulations provide that, if the Appeals Council grants review of a claim,

---

[14]Since the MTD's filing, the Forest Service has "update[d], rename[d], and relocate[d] the administrative appeal regulations" that 36 C.F.R. § 215.14 formerly provided.  78 F.R. 33705-01 (June 5, 2013); 79 F.R. 44291-01 (July 31, 2014).  Part 214 of Title 36 of the Code of Federal Regulations now sets forth the appeal procedures.  The old, above-quoted provision, however, governs the proceedings that took place in this case.  The Court has surveyed the new provisions, and it does not appear that this case would come out any differently if the new provisions were in effect when this case was in its administrative stages.

- 76 -

then the decision that the Council issues is the Commissioner's final decision. But if, as here, the Council denies the request for review, the ALJ's opinion becomes the final decision.  If a claimant fails to request review from the Council, there is no final decision and, as a result, no judicial review in most cases.  In administrative-law parlance, such a claimant may not obtain judicial review because he has failed to exhaust administrative remedies.

The Commissioner rightly concedes that petitioner exhausted administrative remedies by requesting review by the Council.  Petitioner thus obtained a final decision, and nothing in § 405(g) or the regulations implementing it bars judicial review of her claims.

Nevertheless, the Commissioner contends that we should require issue exhaustion in addition to exhaustion of remedies.  That is, he contends that a Social Security claimant, to obtain judicial review of an issue, not only must obtain a final decision on his claim for benefits, but also must specify that issue in his request for review by the Council.  (Whether a claimant must exhaust issues before the ALJ is not before us.)  The Commissioner argues, in particular, that an issue-exhaustion requirement is "an important corollary" of any requirement of exhaustion of remedies.  We think that this is not necessarily so and that the corollary is particularly unwarranted in this case.

Initially, we note that requirements of administrative issue exhaustion are largely creatures of statute.  Our cases addressing issue exhaustion reflect this fact. . . .  Here, the Commissioner does not contend that any statute requires issue exhaustion in the request for review.

Similarly, it is common for an agency's regulations to require issue exhaustion in administrative appeals.  See, e.g., 20 CFR § 802.211(a) (1999)(petition for review to Benefits Review Board must "lis[t] the specific issues to be considered on appeal").  And when regulations do so, courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues.  See, e.g., South Carolina v. U.S. Dep't of Labor, 795 F.2d 375, 378 (4th Cir. 1986); Sears, Roebuck and Co. v. FTC, 676 F.2d 385, 398, n.26 (9th Cir. 1982).  Yet, SSA regulations do not require issue exhaustion.  (Although the question is not before us, we think it likely that the Commissioner could adopt a regulation that did require issue exhaustion.)

It is true that we have imposed an issue-exhaustion requirement even in the absence of a statute or regulation.  But the reason we have done so does not apply here.  The basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts.  As the Court explained in Hormel v. Helvering, 312 U.S. 552 (1941) [("Hormel")]:

> Ordinarily an appellate court does not give consideration to issues not raised below.  For our procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact.  This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.  And the basic reasons which support this general principle applicable to trial courts make it equally desirable that parties should have an opportunity to offer evidence on the general issues involved in the less formal proceedings before administrative agencies entrusted with the responsibility of fact finding.

Hormel, 312 U.S. at 556.

As we further explained in L.A. Tucker Truck Lines, courts require administrative issue exhaustion "as a general rule" because it is usually "appropriate under [an agency's] practice" for "contestants in an adversary proceeding" before it to develop fully all issues there.  344 U.S., at 36-37.

But, as Hormel and L.A. Tucker Truck Lines suggest, the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding.  Where the parties are expected to develop the issues in an adversarial administrative proceeding, it seems to us that the rationale for requiring issue exhaustion is at its greatest.  Hormel[ and] L.A. Tucker Truck Lines . . . involved an adversarial proceeding.  Where, by contrast, an administrative proceeding is not adversarial, we think the reasons for a court to require issue exhaustion are much weaker.  More generally, we have observed that "it is well settled that there are wide differences between administrative agencies and courts," Shepard v. NLRB, 459 U.S. 344, 351 (1983), and we have thus warned against reflexively "assimilat[ing] the relation of . . . administrative bodies and the courts to the relationship between lower and upper courts," FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 144 (1940).

Sims v. Apfel, 530 U.S. at 106-10 (citations omitted)(footnote omitted).

Looking only at the sixth through ninth paragraphs above, one might be tempted to conclude that the Court should not extend an issue-exhaustion requirement to claims like this one.  The Plaintiffs' arguments about futility could be retrofitted to make for a compelling argument that the Hormel rationale is not satisfied here.  Had the Plaintiffs raised their First

Amendment retaliation claim at the administrative stage, it would likely not have resembled an impartial, adversarial judicial proceeding.  The claim's factual basis materialized only after the primary adjudication's issuance -- the 2010 Decision Notice -- and the adversary is not some outsider to the adjudicatory apparatus, but Trujillo, the adjudicator herself.  It is true that other individuals within the Forest Service, rather than Trujillo personally, handle the administrative appeal, but the Plaintiffs' cynicism about the Forests Service's impartiality and its willingness to find itself guilty of bad-faith constitutional violations is not unreasonable.  See 36 C.F.R. § 215.8(a) (effective until June 30, 2014); 36 C.F.R. § 214.7 (describing the levels of review in the Forest Service).[15]  Also, the administrative appeals process does not afford the Plaintiffs the tool they need to develop a First Amendment retaliation claim: discovery regarding Trujillo's subjective motives.  See 36 C.F.R. § 214.  If it were up to the Court's discretion -- as, in other contexts, it sometimes is -- the Court might decline to require issue exhaustion on First Amendment retaliation claims.

It is, however, not up to the Court.  The fifth paragraph of the Sims v. Apfel's above-quoted text describes the first -- and, in this case, conclusive -- step in determining whether to require issue exhaustion:

> [I]t is common for an agency's regulations to require issue exhaustion in administrative appeals.  See, e.g., 20 CFR § 802.211(a) (1999)(petition for review

---

[15]Section 214.7 is one of the new provisions that does not govern this case.  See note 14, supra, at 76.  It accurately describes, however, the levels of appellate review within the Forest Service as they existed when this case was under review: as a District Ranger, Trujillo's decisions are appealable to a Forest Supervisor.  See 36 C.F.R. § 215.8(a) (effective until June 30, 2014)(providing that decisions made by a District Ranger are appealable to a Forest Supervisor).  The Notice of Appeal's face makes clear that the appeal was not directed to Trujillo personally, but rather to Forest Supervisor Kendall Clark.  See Notice of Appeal at 1.  Clark apparently assigned a subordinate, John Pierson, to investigate the appeal and produce a recommended disposition, but Clark personally signed off on the appeal's disposition.  See Administrative Appellate Disposition at 2, 7, filed February 18, 2013 (Doc. 55-3).

> to Benefits Review Board must "lis[t] the specific issues to be considered on appeal"). And when regulations do so, courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues. See, e.g., South Carolina v. U.S. Dep't of Labor, 795 F.2d 375, 378 (4th Cir. 1986); Sears, Roebuck and Co. v. FTC, 676 F.2d 385, 398, n.26 (9th Cir. 1982). Yet, SSA regulations do not require issue exhaustion. (Although the question is not before us, we think it likely that the Commissioner could adopt a regulation that did require issue exhaustion.)

Sims v. Apfel, 530 U.S. at 108. The remaining text, describing the Hormel rationale, is relevant only in situations where the statutory text and agency regulations are both silent whether issue exhaustion is required. The line immediately following this paragraph, opening the Supreme Court's discussion of Hormel and when to discretionarily impose an issue-exhaustion requirement, is: "It is true that we have imposed an issue-exhaustion requirement even in the absence of a statute or regulation." Sims v. Apfel, 530 U.S. at 108. This paragraph, and the subsequent sentence, clarify that judicial discretion in this arena is a one-way street: (i) courts may impose an issue-exhaustion requirement where none exists in the statute or regulation, but (ii) they may not remove or disregard a statute or regulation that requires issue exhaustion. This self-evident proposition gets lost in Sims v. Apfel's depths, because the case's primary point is to cut down on the imposition of non-statutory, non-regulatory issue-exhaustion requirements -- or at least give courts some guidance for imposing them, including that they are not to be imposed automatically when a statute requires remedy exhaustion -- but this holding in no way permits courts to ignore statute- or regulation-mandated issue-exhaustion requirements.

The example that the Supreme Court used to illustrate "an agency[] regulation[] t[hat] require[s] issue exhaustion in administrative appeals" is 20 C.F.R. § 802.11, which regulates judicial review of Benefits Review Board decisions. Sims v. Apfel, 530 U.S. at 108. The language in that regulation, which the Supreme Court considers sufficient to impart an issue-exhaustion requirement, provides that, "[w]ithin 30 days after the receipt of an acknowledgement

of a notice of appeal issued pursuant to § 802.210, the petitioner shall submit a petition for review to the Board which petition <u>lists the specific issues to be considered on appeal</u>." 20 C.F.R. § 802.211(a) (emphasis added).  The quoted sentence constitutes the regulation's entire subsection, and there is nothing else in the section that comes close to describing an issue-exhaustion requirement.  The Supreme Court quoted the underscored portion -- despite that it involves an agency and review process unrelated to the case before it -- as a model example of a regulation that requires issue exhaustion.  <u>See</u> 530 U.S. at 108.

The regulation at issue here, 36 C.F.R. § 215.14, requires issue exhaustion more clearly than the Supreme Court's model example.  Section 215.14(b) requires that, "[a]t a minimum, an appeal must include the following":

>   (5)   Any specific change(s) in the decision that the appellant seeks and rationale for those changes;
>
>   (6)   Any portion(s) of the decision with which the appellant disagrees, and explanation for the disagreement;
>
>   (7)   Why the appellant believes the Responsible Official's decision failed to consider the substantive comments; and
>
>   (8)   <u>How the appellant believes the decision specifically violates law, regulation, or policy</u>.

36 C.F.R. § 215.14(b)(5)-(8) (emphasis added).[16]  This language goes beyond the language in the Supreme Court's model, which contained only a passing reference to "specific issues."[17]  <u>Sims v.</u>

---

[16]Another section of the then-effective regulatory scheme is titled "judicial proceedings." 36 C.F.R. § 215.21 (capitalization altered).  It provides, rather spartanly, that "[i]t is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to appeal is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the appeal procedures in this part (7 U.S.C. [§] 6912(e))."  36 C.F.R. § 215.21.  The Plaintiffs could make a colorable argument that, regardless what § 215.14(b) says, § 215.21 requires only remedy exhaustion, and not issue exhaustion, and that, because § 215.21 is devoted specifically to judicial review, it should trump § 215.14(b).

Apfel, 530 U.S. at 108.  The Court thus concludes that judicial review of the Forest Service's

actions requires issue exhaustion and not merely remedy-exhaustion.

---

The question, then, is whether: (i) section 215.21 incorporates § 215.14(b)'s issue-exhaustion requirement; (ii) section 215.14(b) sets forth an issue-exhaustion requirement entirely independent of § 215.21's remedy-exhaustion requirement; or (iii) section 215.21's remedy-exhaustion requirement is the sole restriction on judicial review.  Interpretations (i) and (ii) result in the issue-exhaustion requirement being retained, while interpretation (iii) results in only a remedy-exhaustion requirement remaining, unless the Court judicially grafts an issue-exhaustion requirement under the Hormel rationale, which it has already indicated it would be disinclined to do.  Interpretation (iii) undermines the Forest Service's ability to enforce its internal procedural rules, rendering them largely toothless, because, under interpretation (iii), an appellant could ignore § 215.14(b)'s specificity requirement and still seek judicial review of claims that he or she failed to assert in the administrative appeal.  Interpretation (ii) renders § 215.21 mere surplusage, because § 215.14(b) does all of the same work of § 215.21, and more, thus leaving nothing for § 215.21 to do.  The Court thus concludes that interpretation (i) is the best interpretation: § 215.14(b) sets forth an internal Forest Service procedural rule, and § 215.21 makes it a precondition of judicial review.

As the Court noted earlier, both § 215.14(b) and § 215.21 have since been replaced by a new Part -- containing twenty-two sections -- governing the Forest Service's "postdecisional administrative review process."  36 C.F.R. 214 (capitalization altered for readability).  See note 14, supra, at 76.  One of these new sections, 36 C.F.R. § 214.20, is titled "exhaustion of administrative remedies."  It is analogous to the old § 215.21 and provides that, "[p]er 7 U.S.C. 6912(e), judicial review of a decision that is appealable under this part is premature unless the plaintiff has exhausted the administrative remedies under this part."  36 C.F.R. § 214.20.  The old § 215.14(b), however, has been replaced by a new section which sets forth an issue-exhaustion requirement in even clearer terms: "All appeals must include . . . discussion of issues raised by the decision being appealed, including identification of any laws, regulations, or policies that were allegedly violated in reaching the decision being appealed."  36 C.F.R. § 214.8(a)(6).

[17]It is true that 36 C.F.R. § 215.14(b) does not use the word "issues," as the Supreme Court's example does.  The Court nonetheless concludes that § 215.14 requires issue exhaustion.  First, there is no case law to suggest that a statute or regulation must use certain "magic words" to put into place an issue-exhaustion requirement.  Section 215.14(b)'s requirement that the administrative appellant specify "[h]ow the appellant believes the decision specifically violates law, regulation, or policy," captures the substance of issue exhaustion.  36 C.F.R. § 215.14(b)(8) (emphasis added).  Second, the Court notes that the Forest Service promulgated § 215.14 before the Supreme Court issued Sims v. Apfel, and thus, quite possibly, did not know to use the term "issues" or "issue exhaustion" to be on the safe side.  The Forest Service has since rectified that shortcoming.  The new Forest Service regulations provide: "All appeals must include . . . [a] discussion of issues raised by the decision being appealed, including identification of any laws, regulations, or policies that were allegedly violated in reaching the decision being appealed."  36 C.F.R. § 214.8(a)(6) (emphasis added).  See note 16, supra, at 81.

The Plaintiffs put forth another argument -- grounded mostly in policy and pragmatism, not statutory or regulatory text or case law -- for why the Court should excuse their First Amendment claim from the issue-exhaustion requirement.  They contend that constitutional claims should be categorically excused from the issue-exhaustion requirement, because courts, not agencies, possess superior expertise in interpreting the Constitution.  See Tr. at 76:1-77:11 (Rosenstock, Court); Response at 25-30.  It is true, of course, that modern administrative law, including the formidable substantive deference regimes of Chevron, Auer, and arbitrary-and-capricious review, is built on the assumption that agencies possess expertise in their subject matter that is superior to that which generalist courts possess.  See, e.g., Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. at 1340; Porter v. Califano, 592 F.2d 770, 780 n.15 (5th Cir. 1979)("Judicial deference to agency fact-finding and decision-making is generally premised on the existence of agency expertise in a particular specialized or technical area.").  It is also true that "courts, not agencies, are expert on the First Amendment," Porter v. Califano, 592 F.2d at 780 n.15, and, accordingly, courts afford agencies no deference on matters of constitutional interpretation, see U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . .  [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions."  (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  That the Court will ultimately accord the Forest Service no legal deference on constitutional issues, however, does not compel the conclusion that the normal procedural provisions should not apply. The Court has already found just the opposite with regard to the APA, ruling that, just because an "appeal alleges constitutional violations as well as statutory ones does not take it outside of the APA."  MO at 65 (citing 5 U.S.C. § 706(2)(B)).  See Robbins v. U.S. Bureau of Land Mgmt.,

438 F.3d at 1085 ("We review Robbins' due process claim against the [agency] under the framework set forth in the APA."); <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d at 1573.  The Court must still defer to agency factfinding even when the facts have constitutional significance, and it must still respect the administrative-record rule, a logical consequence of which is that the plaintiff must exhaust his remedies with the agency for the Court to "have something to review." <u>Simmat v. U.S. Bureau of Prisons</u>, 413 F.3d at 1238; MO at 64-71 (explaining that the administrative-record rule applies to constitutional claims).  For the Court to conclude otherwise and excuse failure to exhaust First Amendment retaliation claims would open the floodgates to unsuccessful administrative litigants everywhere to allege -- not merely that the agency erred, but that it did so in retaliation for protected speech.[18]  These litigants would not only avoid the steep uphill battle that <u>Chevron</u>, <u>Auer</u>, and arbitrary-and-capricious review create; they would avoid having to raise their claims before the agency at all.  What Congress intended to be an efficient, minimalist judicial review scheme would turn into a full-fledged second bite at the apple for plaintiffs.

Unfortunately for the Plaintiffs, the D.C. Circuit addressed this issue in <u>Munsell v. U.S. Department of Agriculture</u> and held that First Amendment retaliation claims against an agency are subject to the exhaustion requirement.[19]  The Honorable Harry T. Edwards, Senior United

---

[18]All plaintiffs would have to do for this strategy to work would be to salt the administrative record with references to the plaintiffs engaging protected First Amendment speech criticizing the agency, and they would be able to insulate themselves against an adverse decision on the merits with a viable First Amendment retaliation claim at the judicial-review stage.

[19]The D.C. Circuit did not specify whether it was requiring issue exhaustion or merely remedy exhaustion, an omission onto which the Plaintiffs latch.  <u>See</u> Response at 21-22 ("The Munsell decision was not based on Munsell's failure to label the acts complained of as a First Amendment violation but his failure to have complained about those acts to the Department of Agriculture at all.").  The Court concludes that this omission, while not ideal, does not affect the

States Circuit Judge, authored the opinion, which the Honorable Merrick B. Garland, Chief

United States Circuit Judge, and the Honorable Douglas H. Ginsburg, United States Circuit

Judge, joined.  See 509 F.3d at 574.  Judge Edwards wrote:

> There is a strong rationale for requiring constitutional claims against
> USDA to be raised first in the administrative process, as mandated by § 6912(e).
> In Bivens actions, plaintiffs typically claim that government officials have
> exceeded the scope of their authority and, in doing so, violated rights protected by
> the Constitution.  Bringing such claims to the agency in the first instance allows
> the agency to clarify its position about the conduct of the accused official.  In
> these fact intensive cases, an administrative process will also create a record on
> which a Bivens claim can be evaluated.  Bringing the complaint directly to the
> agency also may allow the agency to remedy the alleged offending conduct and,
> at the least, avoid continuing constitutional harm.

Munsell v. Dep't of Agriculture, 509 F.3d at 591.  Given the D.C. Circuit's national quasi-

primacy in administrative law[20] and the Tenth Circuit's silence on the issue, the Court is

_____

bottom line of the case's meaning.  The D.C. Circuit squarely held that, when a plaintiff
experiences First Amendment retaliation at an agency's hands during an administrative process,
the plaintiff must bring its claim to the agency's attention or, elsewise, face dismissal of the
claim at the judicial-review stage.

[20]Although it is not the Court's parent Court of Appeals, the D.C. Circuit carries clout in
the field of administrative law that goes well beyond that which a non-parent Circuit usually
wields.  The D.C. Circuit is not a formally subject-matter specialized Court of Appeals -- in the
way that the Court of Appeals for the Federal Circuit is on patent matters -- but, as a practical
matter, it is close: because most agencies are based in the District of Columbia, agency appeals
nationwide can almost always be brought before the D.C. Circuit; additionally, the United States
Code designates the D.C. Circuit as the exclusive venue for challenging many important agency
actions.  See Gary Lawson, Federal Administrative Law 245 (4th ed. 2007).
    The D.C. Circuit's influence in administrative law is head and shoulders above that of the
other Courts of Appeals, probably combined, and it does more to shape administrative law
nationally than the Supreme Court.  "From the perspective of administrative law, the D.C.
Circuit has for decades been by far the most important court in the country -- much more
important than the Supreme Court."  Lawson, supra, at 245 (emphasis in original).  See Antonin
G. Scalia, Vermont Yankee: The APA, the D.C. Circuit, and the Supreme Court, 1978 Sup. Ct.
Rev. 345, 371 ("As a practical matter, the D.C. Circuit is something of a resident manager [in
administrative law], and the Supreme Court an absentee landlord.").
    Judge Ginsburg described the D.C. Circuit's dominance in the administrative-law arena
in empirical terms:

Focusing upon petitions for review of a decision made by an administrative agency, as opposed to an appeal from a judgment of the district court, the peak [in number of filings] was again in 1988, when 960 such cases were filed. That number, too, fell steadily to an eventual low of 277 in 2009, and then rebounded to 372 in 2010. Therefore, the share of our docket devoted to review of administrative agency decisions has shrunk from fifty-two percent at its high point in 1987 to a low of twenty-seven percent in 2009 and thirty-two percent last year.

The peculiarity is that significant administrative cases nationwide have fallen to such an extent since 1986 that the percentage heard in the D.C. Circuit is now actually greater than ever. In order to make a meaningful comparison between the D.C. Circuit and the other federal courts of appeals, I exclude as not significant cases coming from the Board of Immigration Appeals and the Social Security Administration; those cases, which make up a large portion of the administrative docket in other circuits but are no part of the D.C. Circuit's caseload, are considerably less complex than most administrative cases of the types commonly filed in the D.C. Circuit.

Nationwide, in 1988 there were 2,899 cases arising from decisions of administrative agencies (other than the aforementioned two) filed in the courts of appeals. As in the D.C. Circuit, the number then declined, reaching a low of 1,052 in 2009 and 1,062 in 2010. This decline was much sharper than the decline in D.C., with the result that petitions for review of administrative decisions filed in the D.C. Circuit have increased from twenty-eight percent of the national total in 1986 to a high of thirty-eight percent in 2007 and thirty-six percent in 2010. Although the percentage has bounced around somewhat, there is a clear upward trend, as the chart below shows. In consequence, the D.C. Circuit has become a relatively specialized court in the area of administrative law.

Perhaps an explanation for our increasing "market share" lies in the rate at which the D.C. Circuit has reversed the decisions of administrative agencies and hence attracted challenges to agency decisions. Since the Supreme Court in Chevron v. NRDC called for greater judicial deference to an agency's interpretation of the statutes it administers, the D.C. Circuit has remained more likely than the other circuits to reverse an agency decision. Before Chevron, we reversed in a lower percentage of agency cases than did the other circuits. The trend since Chevron has been for an ever-increasing reversal rate in the D.C. Circuit even as the national reversal rate has declined. To wit, the reversal rate in D.C. from 1980 through 1985 was 14.22% but has been 22.93% in the years since; the national reversal rate from 1980 through 1985 was 19.22%, but has been only slightly above 15% since then. A party filing a petition for review of an agency decision usually may choose between the D.C. Circuit and at least one other circuit; other things being equal, it is likely to choose the forum it believes offers a greater probability of reversing the agency.

disinclined to come to a contrary conclusion.  Moreover, the Court finds the D.C. Circuit's reasoning persuasive, largely mirroring its own thoughts on the matter.  The Court thus concludes that the Plaintiffs' First Amendment retaliation claim is subject to a requirement of issue exhaustion.

## II.   SECTION 6912(e)'S EXHAUSTION REQUIREMENT IS NOT JURISDICTIONAL -- RATHER, IT GIVES RISE TO AN AFFIRMATIVE DEFENSE OF FAILURE TO EXHAUST -- BUT IT IS MANDATORY.

The Court concludes that § 6912(e)'s exhaustion requirement sets forth an affirmative defense and not a jurisdictional predicate, but that this distinction has a minimal effect on how the Court analyzes exhaustion.  The only practical impact this classification has to the Court is that the agency must assert failure to exhaust; the Court will not take it up sua sponte, as it is obligated to do with jurisdictional requirements.  The agency may also waive exhaustion by failing to raise it as an affirmative defense.

### A.   SECTION 6912(e)'S EXHAUSTION REQUIREMENT SETS FORTH AN AFFIRMATIVE DEFENSE AND NOT A JURISDICTIONAL PREDICATE.

Even though § 6912(e)'s status as an affirmative defense, vice a jurisdictional predicate, has minimal impact on the Court's analysis, this conclusion is in apparent tension with one of the Court's prior cases, Forest Guardians v. U.S. Forest Service, No. CIV 05-0372 JB/DJS, 2006 WL 4109661 (D.N.M. Aug. 22, 2006)(Browning, J.), so the Court will elaborate on why the provision is an affirmative defense.  The Court notes, at the outset, that much confusion stems

---

Hon. Douglas H. Ginsburg, Remarks upon Receiving the Lifetime Service Award of the Georgetown Federalist Society Chapter, 10 Geo. L.J. & Pub. Pol'y 1, 2-4 (2012)(footnotes omitted).  The D.C. Circuit's influence in administrative law could be analogized to the Delaware Court of Chancery's influence in corporate-governance law.  While the Court must of course follow Tenth Circuit precedent when it conflicts with D.C. Circuit case law, in the absence of Tenth Circuit precedent on point, the Court is inclined to give serious weight to D.C. Circuit precedent.

from the higher courts' interchanging of the jurisdictional-versus-procedural question with the mandatory-versus-subject-to-exception question.  The Court ultimately concludes that § 6912(e) is not jurisdictional, but it is mandatory.

Much of the leading case law construing exhaustion requirements is in the PLRA arena. In Simmat v. U.S. Bureau of Prisons, the Tenth Circuit held that the PLRA's administrative-exhaustion requirement was not "subject only to the common law doctrine of exhaustion, a matter of judicial discretion."  413 F.3d at 1237 (citing United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 550 (10th Cir. 2001)).  The Plaintiffs in this case characterize the Tenth Circuit's holding in that case as being "that exhaustion was jurisdictional."  Response at 3. It is clear, however, that the Tenth Circuit did not conclude that exhaustion was a jurisdictional bar, but "a pleading requirement rather than an affirmative defense."  Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1238 (citing Steele v. Fed. Bureau of Prisons, 355 F.3d 1204, 1210 (10th Cir. 2003)).

Regardless whether Simmat v. U.S. Bureau of Prisons held that the PLRA's exhaustion requirement was a jurisdictional predicate or a prima facie element, the Supreme Court overruled it in Jones v. Bock, 549 U.S. 199 (2007).  That case held that the PLRA's exhaustion requirement is an affirmative defense; it spent most its time, however, describing why it is not a jurisdictional predicate:

> There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.  What is less clear is whether it falls to the prisoner to plead and demonstrate exhaustion in the complaint, or to the defendant to raise lack of exhaustion as an affirmative defense.  The minority rule, adopted by the Sixth Circuit, places the burden of pleading exhaustion in a case covered by the PLRA on the prisoner; most courts view failure to exhaust as an affirmative defense.

> We think petitioners, and the majority of courts to consider the question, have the better of the argument.  Federal Rule of Civil Procedure 8(a) requires

simply a "short and plain statement of the claim" in a complaint, while Rule 8(c) identifies a nonexhaustive list of affirmative defenses that must be pleaded in response.[21]   The PLRA itself is not a source of a prisoner's claim; claims covered by the PLRA are typically brought under 42 U.S.C. § 1983, which does not require exhaustion at all.   Petitioners assert that courts typically regard exhaustion as an affirmative defense in other contexts, and respondents do not seriously dispute the general proposition.   We have referred to exhaustion in these terms, see, e.g., Wright v. Universal Maritime Serv. Corp., 525 U.S. 70, 75 (1998)(referring to "failure to exhaust" as an "affirmative defens[e]"), including in the similar statutory scheme governing habeas corpus, Day v. McDonough, 547 U.S. 198, 208 (2006)(referring to exhaustion as a "defense").   The PLRA dealt extensively with the subject of exhaustion, see 42 U.S.C. §§ 1997e(a), (c)(2), but is silent on the issue whether exhaustion must be pleaded by the plaintiff or is an affirmative defense.   This is strong evidence that the usual practice should be followed, and the usual practice under the Federal Rules is to regard exhaustion as an affirmative defense.

In a series of recent cases, we have explained that courts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns.   Thus, in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993), we unanimously reversed the Court of Appeals for imposing a heightened pleading standard in § 1983 suits against municipalities.   We explained that "[p]erhaps if [the] Rules . . . were rewritten today, claims against municipalities under § 1983 might be subjected to the added specificity requirement . . . .   But that is a result which must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."

. . . .

We think that the PLRA's screening requirement does not -- explicitly or implicitly -- justify deviating from the usual procedural practice beyond the departures specified by the PLRA itself.   Before the PLRA, the in forma pauperis

---

[21]In non-APA cases, such as Jones v. Bock, many affirmative defenses are waived if they are not raised in the answer.   See Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . . (emphasis added)).   Such a waiver does not apply here, because this case is subject to the APA's procedural provisions.   In Jones v. Bock, on the other hand, the suit was brought under 42 U.S.C. § 1983, and subject to the PLRA's administrative-exhaustion requirement; that suit was, thus, not subject to the APA's procedural provisions.   In the Tenth Circuit, cases brought under the APA are processed as appeals even at the district-court level and are governed by the Federal Rules of Appellate Procedure -- not the Federal Rules of Civil Procedure.   See Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580.   Therefore, in a case brought under the APA, an agency does not waive its exhaustion defense merely by failing to raise it in the answer.

provision of § 1915, applicable to most prisoner litigation, permitted sua sponte dismissal only if an action was frivolous or malicious.  In the PLRA, Congress added failure to state a claim and seeking monetary relief from a defendant immune from such relief as grounds for sua sponte dismissal of in forma pauperis cases, and provided for judicial screening and sua sponte dismissal of prisoner suits on the same four grounds.  Although exhaustion was a "centerpiece" of the PLRA, failure to exhaust was notably not added in terms to this enumeration.  There is thus no reason to suppose that the normal pleading rules have to be altered to facilitate judicial screening of complaints specifically for failure to exhaust.

Some courts have found that exhaustion is subsumed under the PLRA's enumerated ground authorizing early dismissal for "fail[ure] to state a claim upon which relief may be granted."  The point is a bit of a red herring.  A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief.  If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; that does not make the statute of limitations any less an affirmative defense.  Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract.  Determining that Congress meant to include failure to exhaust under the rubric of "failure to state a claim" in the screening provisions of the PLRA would thus not support treating exhaustion as a pleading requirement rather than an affirmative defense.

The argument that screening would be more effective if exhaustion had to be shown in the complaint proves too much; the same could be said with respect to any affirmative defense.  The rejoinder that the PLRA focused on exhaustion rather than other defenses simply highlights the failure of Congress to include exhaustion in terms among the enumerated grounds justifying dismissal upon early screening.  As noted, that is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim.  It is to say that there is no basis for concluding that Congress implicitly meant to transform exhaustion from an affirmative defense to a pleading requirement by the curiously indirect route of specifying that courts should screen PLRA complaints and dismiss those that fail to state a claim.

Respondents point to 42 U.S.C. § 1997e(g) as confirming that the usual pleading rules should not apply to PLRA suits, but we think that provision supports petitioners.  It specifies that defendants can waive their right to reply to a prisoner complaint without the usual consequence of being deemed to have admitted the allegations in the complaint.  This shows that when Congress meant to depart from the usual procedural requirements, it did so expressly.

We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.  We understand the reasons behind the decisions of some lower courts to impose a pleading requirement on plaintiffs in this context, but that effort cannot fairly be viewed as an interpretation of the PLRA.  "Whatever temptations the statesmanship of policy-making might wisely suggest," the judge's job is to construe the statute -- not to make it better.  The judge "must not read in by way of creation," but instead abide by the "duty of restraint, th[e] humility of function as merely the translator of another's command."  Given that the PLRA does not itself require plaintiffs to plead exhaustion, such a result "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."

Jones v. Bock, 549 U.S. at 211-17 (citations omitted).

This development in PLRA exhaustion jurisprudence had a sharp effect on courts' construction of § 6912(e)'s exhaustion requirement.  Before Jones v. Bock, the Second Circuit ruled that § 6912(e)'s exhaustion requirement was jurisdictional.  See Bastek v. Fed. Crop Ins. Corp., 145 F.3d at 94-95.  No Court of Appeals joined the Second Circuit in its conclusion, and two Courts of appeals, the United States Courts of Appeals for the Eighth and Ninth Circuits, split from the Second Circuit, holding that § 6912(e) was not jurisdictional.  See Ace Prop. & Cas. Ins. Co. v. Fed. Crop. Ins. Corp., 440 F.3d 992, 999 (8th Cir. 2006); McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 980 (9th Cir. 2002).  This trend accelerated after Jones v. Bock, with both the Fifth Circuit and the D.C. Circuit holding, within a year of Jones v. Bock's issuance, that § 6912(e) was not jurisdictional.  See Munsell v. Dep't of Agriculture, 509 F.3d 580-81; Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d at 603-06.  Both cases relied heavily on Jones v. Bock and criticized Bastek v. Federal Crop Insurance Corp. as being outdated.  Importantly, of the seven cases discussed in this section -- Simmat v. U.S. Bureau of Prisons, Jones v. Bock, Bastek v. Federal Crop Insurance Corp., Ace Property & Casualty Insurance Co., McBride Cotton & Cattle Corp. v. Veneman, Dawson Farms, LLC v. Farm Serv. Agency, or Munsell v. Department of Agriculture -- only one explicitly countenanced excusal or

judicial waiver of the exhaustion requirement,[22] see McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d at 982, and several explicitly describing the requirement as "mandatory" or not subject to exception, e.g., Jones v. Bock, 549 U.S. at 211; Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1238; Bastek v. Fed. Crop Ins. Corp., 145 F.3d at 94-95.

The Court discussed the issue in 2006, a year before Jones v. Bock. See Forest Guardians v. U.S. Forest Serv., 2006 WL 4109661, at *1. The Court declined to decide whether § 6912(e) was jurisdictional or procedural, but ruled that it was mandatory and not subject to exception. See 2006 WL 4109661, at *20 ("The Court also notes that exhaustion here is mandatory."). The Court dismissed the plaintiffs' claims for failure to exhaust administrative remedies. See 2006 WL 4109661, at *29-30. The Tenth Circuit affirmed the dismissals, but mischaracterized the Court's opinion as deciding that § 6912(e) was jurisdictional. See Forest Guardians v. U.S. Forest Serv., 641 F.3d at 431. The Tenth Circuit, writing several years after the issuance of Jones v. Bock, wrote:

> The district court concluded that § 6912(e)'s exhaustion requirement is jurisdictional.[[23]] Administrative exhaustion is often an affirmative defense, rather than a jurisdictional prerequisite. See Jones v. Bock, 549 U.S. 199, 212 (2007)("[T]he usual practice under the Federal Rules is to regard exhaustion as an affirmative defense."). Judicially created exhaustion doctrines, in particular, are prudential in nature. But a statutory exhaustion requirement may be jurisdictional if it provides "more than simply a codification of the judicially developed doctrine of exhaustion." Weinberger v. Salfi, 422 U.S. 749, 765-66 (1975). We must evaluate each statute separately, showing "regard for the particular administrative scheme at issue." Weinberger v. Salfi, 422 U.S. at 765-66. Among other criteria,

---

[22]The Forest Service candidly concedes that three cases -- Dawson Farms, LLC v. Farm Serv. Agency, Ace Property & Casualty Insurance Co., and McBride Cotton & Cattle Corp. v. Veneman -- conclude that § 6912(e)'s exhaustion requirement is subject to exception. See MTD at 17 n.7. The Court disagrees: only the United States Court of Appeals for the Ninth Circuit's case, McBride Cotton & Cattle Corp. v. Veneman, holds that the plaintiff met the requirements to be excused from his failure to exhaust administrative remedies; the other two cases only mention the possibility in dicta.

[23]The Tenth Circuit did not cite to the Court's opinion for this proposition.

- 92 -

we look for "sweeping and direct statutory language that goes beyond a requirement that only exhausted actions be brought."

The courts of appeals are split as to whether 7 U.S.C. § 6912(e) is jurisdictional. Regardless of whether it is jurisdictional, the explicit exhaustion requirement in § 6912(e) is, nonetheless, mandatory.

Forest Guardians v. U.S. Forest Serv., 641 F.3d at 431-32. Given that the Tenth Circuit determined that § 6912(e) is mandatory but not necessarily jurisdictional -- a conclusion that mirrors the Court's -- the Court suspects that the Tenth Circuit characterized the Court's opinion the way it did because of the way the parties briefed the case on appeal.

Regardless, the Court finds persuasive the logic of the growing consensus of the Courts of Appeals that § 6912(e) is not jurisdictional, but rather is an affirmative defense. This conclusion is consistent with the Court's prior treatment of the issue in Forest Guardians v. U.S. Forest Service.

**B.    ALTHOUGH § 6912(e) IS NOT JURISDICTIONAL, IT IS MANDATORY, AND THE COURT CAN FIND THE FACTS NECESSARY TO RESOLVE IT AT THE MOTION-TO-DISMISS STAGE.**

The question now is not whether § 6912(e) is a jurisdictional predicate or an affirmative defense, but, rather, whether it is mandatory or subject to exception. The cases cited in the preceding subpart, see Analysis Part II.A, supra, at 87-93, elucidate the latter issue as well as the former issue. The Tenth Circuit's opinion in Forest Guardians v. U.S. Forest Service is on point: "Regardless of whether it is jurisdictional, the explicit exhaustion requirement in § 6912(e) is, nonetheless, mandatory." 641 F.3d at 432. That the Fifth, Eighth, and Ninth Circuits disagree, and would appear to allow exceptions to § 6912(e), does not convince the Court that the Tenth Circuit would follow their lead. Those Courts of Appeals to conclude that statutory exhaustion requirements are nonetheless subject to exception do so on the basis that the exhaustion statute is not statutory in origin, but merely "the [statutory] preservation of a jurisprudential doctrine."

Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d at 603.  The Fifth Circuit described the test

as follows:

> [T]he threshold issue presented on appeal is whether 7 U.S.C. § 6912(e) is a jurisdictional or jurisprudential requirement for the exhaustion of administrative remedies.  If § 6912(e) is a jurisdictional requirement, it deprives federal courts of jurisdiction to consider excusing a failure to exhaust administrative remedies.  If the provision codifies a jurisprudential requirement, however, it merely continues the self-imposed doctrine of judicial restraint, leaving the federal courts with jurisdiction to consider excusing a failure to exhaust administrative remedies.

Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d at 602.  The Ninth Circuit offers a similar

description:

> The Supreme Court has indicated that a statute requiring plaintiffs to exhaust administrative remedies before coming into federal court may be either jurisdictional in nature or non jurisdictional, depending on the intent of Congress as evinced by the language used.  Under a jurisdictional statute, exhaustion of administrative remedies cannot be excused or waived and the failure by a party to exhaust is a jurisdictional bar.  In contrast, a non jurisdictional statute codifies the common law exhaustion principle under which exhaustion of administrative remedies is favored, but may be excused by a limited number of exceptions to the general rule.

Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp., 440 F.3d at 996.  The Ninth Circuit describes

the test as follows:

> A statute that requires exhaustion of administrative remedies may limit the district court's subject matter jurisdiction if the exhaustion statute is "more than a codified requirement of administrative exhaustion" and contains "sweeping and direct" language that goes beyond a requirement that only exhausted claims be brought.  However, failure to exhaust does not deprive a federal court of jurisdiction when the exhaustion statute is merely a codification of the exhaustion requirement.

McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d at 978.  Courts that espouse the "if a

statutory exhaustion requirement codifies the common law, it is not really a statutory

requirement and can be judicially waived" approach invariably rely on an old Supreme Court

case, Weinberger v. Salfi, 422 U.S. 749 (1975), which does not definitively endorse the

- 94 -

proposition.  The Supreme Court never adopts the test itself, and the closest it comes to doing so

-- on the page that the Ninth Circuit quotes from in the above excerpt -- is when it describes the

test that the district court applied, ultimately disagreeing with the district court's outcome, but

not necessarily its application of the test:

> The third sentence of 42 U.S.C. s 405(h) provides in part:

> No action against the United States, the Secretary, or any officer or employee thereof shall be brought under (s 1331 et seq.) of Title 28 to recover on any caim [sic] arising under (Title II of the Social Security Act).

> On its face, this provision bars district court federal-question jurisdiction over suits, such as this one, which seek to recover Social Security benefits.  Yet it was s 1331 jurisdiction which appellees successfully invoked in the District Court.  That court considered this provision, but concluded that it was inapplicable because it amounted to no more than a codification of the doctrine of exhaustion of administrative remedies.  The District Court's readig [sic] of s 405(h) was, we think, entirely too narrow.

> That the third sentence of s 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that no action shall be brought under s 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted.  Moreover, if the third sentence is construed to be nothing more than a requirement of administrative exhaustion, it would be superfluous.  This is because the first two sentences of s 405(h), which appear in the margin, assure that administrative exhaustion will be required.  Specifically, they prevent review of decisions of the Secretary save as provided in the Act, which provision is made in s 405(g).  The latter section prescribes typical requirements for review of matters before an administrative agency, including administrative exhaustion.  Thus the District Court's treatment of the third sentence of s 405(h) not only ignored that sentence's plain language, but also relegated it to a function which is already performed by other statutory provisions.

Weinberger v. Salfi, 422 U.S. at 756-57 (emphasis added)(footnotes omitted).  It is not clear how

this test operates, i.e., for what should courts look to determine whether a statutory exhaustion

requirement merely codifies the common law.  Certainly common-law exhaustion requirements

at least informed all statutory exhaustion requirements.  The above-cited cases from the Fifth,

Eighth, and Ninth Circuits do not fully apply the test -- that is, they do not attempt to uncover the

common-law exhaustion requirements that existed before the statutory requirement's enactment, nor do they look to the statutory exhaustion requirement's legislative history -- but, rather, they mostly use the test's existence to justify why they are creating judicial exceptions to a statutory requirement that admits none.  These courts also appear to fully equate "not jurisdictional" with "subject to exception," which the Supreme Court made explicitly clear in Jones v. Bock was not the case:

> There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court. . . . Th[ere] is strong evidence that the usual practice should be followed, and the usual practice under the Federal Rules is to regard exhaustion as an affirmative defense [and thus not jurisdictional].

Jones v. Bock, 549 U.S. at 199-200 (emphasis added).

Tenth Circuit case law, on the other hand, is intensely focused on the statutory text.[24]  In Simmat v. U.S. Bureau of Prisons, the Tenth Circuit refused to consider exceptions to the

---

[24]This focus on statutory text is in line with the Supreme Court's directives in Jones v. Bock:

> In a series of recent cases, we have explained that courts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns. . . .
>
> . . . .
>
> We understand the reasons behind the decisions of some lower courts to impose a pleading requirement on plaintiffs in this context, but that effort cannot fairly be viewed as an interpretation of the PLRA.  "Whatever temptations the statesmanship of policy-making might wisely suggest," the judge's job is to construe the statute-not to make it better.  The judge "must not read in by way of creation," but instead abide by the "duty of restraint, th[e] humility of function as merely the translator of another's command."  See United States v. Goldenberg, 168 U.S. 95, 103 (1897)("No mere omission . . . which it may seem wise to have specifically provided for, justif[ies] any judicial addition to the language of the statute").  Given that the PLRA does not itself require plaintiffs to plead exhaustion, such a result "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."

PLRA's exhaustion requirement, because such exceptions "appl[y] only to cases where there is

no other statutory exhaustion requirement.  Prison conditions litigation is not one of these."  413

F.3d at 1237.  In Garret v. Hawk, 127 F.3d 1263 (10th Cir. 1997), the Honorable David M. Ebel,

United States Circuit Judge, wrote:

> Because Congress has clearly required exhaustion through its amendments to 42 U.S.C. § 1997e, we need not address the individual and institutional interests that should be considered when Congress has not spoken.  See Patsy v. Bd. of Regents of State of Fla., 457 U.S. at 518 (White, J., concurring in part)("[E]xhaustion is 'a rule of judicial administration,' and *unless Congress directs otherwise*, rightfully subject to crafting by judges")(quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50 (1938)).

127 F.3d at 1265-66 (emphasis in Garret v. Hawk but not Patsy v. Board of Regents of State of

Florida).  Last, and most important, when the Tenth Circuit elected not to decide the issue

whether § 6912(e) is subject to exception in Forest Guardians v. U.S. Forest Service, it used

skeptical language in describing the possibility of judicial waiver:

> The courts of appeals are split as to whether 7 U.S.C. § 6912(e) is jurisdictional.  See Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d 592, 603-06 (5th Cir. 2007)(discussing the views of the various circuits).  We need not resolve this issue.  Regardless of whether it is jurisdictional, the explicit exhaustion requirement in § 6912(e) is, nonetheless, mandatory.  McCarthy v. Madigan, 503 U.S. at 144 ("Where Congress specifically mandates, exhaustion is required.").  Forest Guardians concedes that it did not exhaust its BAS argument during the administrative process.  It suggests that we should excuse the exhaustion requirement, but its arguments are unavailing.
>
> Section 6912(e) does not contain any explicit exceptions to the exhaustion requirement.  However, judicially created exhaustion doctrines are "subject to numerous exceptions," and several circuits have extended these exceptions to § 6912(e).  We have never decided which, if any, of these exceptions are applicable, nor need we do so now.  Even assuming that we could bypass § 6912(e)'s express direction, no exception is warranted on the facts of this case.

---

549 U.S. at 212, 216-17 (citations omitted).

Forest Guardians v. U.S. Forest Serv., 641 F.3d at 432-33 (emphasis added)(citations omitted)(footnote omitted).

Much of the confusion about the applicability of judicial waiver to exhaustion requirements stems from uncertainty regarding what "mandatory" means.  The Court concludes that mandatory has its plain meaning, which permits of no exceptions.  See Black's Law Dictionary 1047 (9th ed. 2009)(defining "mandatory" as "[o]f, relating to, or constituting a command; required; peremptory" (emphasis added)); id. at 1251 (defining "peremptory" as "[f]inal; absolute; conclusive; incontrovertible" or "[n]ot requiring any shown cause").  The Court acknowledges, however, that a permissible second reading exists, in which discretionary common-law exhaustion requirements, which the Court may choose not to apply, are contrasted with mandatory statutory exhaustion requirements, which, despite being "mandatory," are subject to the traditional exceptions.  Under this second reading, the Court is not sure what limits would exist on common-law exhaustion requirements, if, apparently, courts' discretion whether to apply them extend beyond the traditional requirements "in the interests of justice."  E.g., McCarthy v. Madigan, 503 U.S. at 150.  The Court, thus, interprets "mandatory" to mean what it actually means, and concludes that § 6912(e) is not subject to exception, so long as the agency asserts exhaustion as an affirmative defense.

Last, that § 6912(e) is not jurisdictional has a minimal impact on the MTD's procedural posture.  Generally, the Court's latitude to pierce the pleadings and factfind at the motion-to-dismiss stage is much greater regarding jurisdictional issues -- analyzed under rule 12(b)(1) -- than elements of the substantive claims -- analyzed under rule 12(b)(6).  Affirmative defenses, in particular, are difficult to establish at the motion-to-dismiss stage.  See Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, at *17, *36-42

(D.N.M. May 16, 2014)(Browning, J.)(describing the high bar defendants face in moving to dismiss on statute-of-limitations grounds, especially when the statute of limitations includes the discovery rule). This case, however, is not the ordinary lawsuit, in which the parties come before the Court on totally equal footing. This case is an appeal, and the APA's procedural provisions govern it. The Court wrote in its MO:

> The case before the Court is an appeal of an agency action in every respect: that the appeal alleges constitutional violations as well as statutory ones does not take it outside of the APA, see 5 U.S.C. § 706(2)(B) ("The reviewing court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to <u>constitutional</u> right, power, privilege, or immunity . . . ." (emphasis added)); and that the appellants allege, as part of their argument on appeal, that the lower forum was motivated by an illicit animus does not relieve the Plaintiffs of the substantial burdens the law would impose on them but for the allegations. Given the difficulty of surmounting a successful administrative appeal in the face of arbitrary-or-capricious factual review and <u>Chevron</u>/<u>Auer</u> legal deference, for the Court to hold otherwise -- and allow fresh discovery, submission of new evidence and legal arguments, or de novo review -- would be to incentivize every unsuccessful party to agency action to allege bad faith, retaliatory animus, and constitutional violations to trade in the APA's restrictive procedures for the more even-handed ones of the Federal Rules of Civil Procedure.
>
> The relationship between the USFS and the Plaintiffs is fundamentally that of tribunal and litigant, and not that of adversarial parties to a lawsuit. <u>See</u> <u>Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.</u>, 535 U.S. 635, 652 (2002)(describing "the regulatory commission" as "a nominal defendant when a party appeals in the federal system," and noting that many substantively similar state-court administrative schemes caption cases judicially reviewing agency decisions as appeals, and not as adversarial proceedings between the appellant and the agency). The Plaintiffs cannot avoid the hardships of the Court's deference to the agency by making allegations of agency malevolence. These "hardships" from the Plaintiffs' perspective are, from the perspective of the judiciary, Congress, and the public, consciously designed efficiencies. For better or for worse, in the modern administrative state, agencies are a part of the adjudicatory apparatus -- not merely a party to it.
>
> The Court must carefully manage the procedural posture of this case and the motions in it. Review of agency actions generally comes to the Court in the form of an appeal, and not a "separate and independent action, initiated by a complaint and subjected to discovery and a 'pretrial' motions practice." <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d at 1579 (explaining that "[t]his

process, at its core, is inconsistent with the standards for judicial review of agency action under the APA").   The Court does not, however, read the APA or Olenhouse v. Commodity Credit Corp. as requiring any one particular form of action.  Section 703 provides that "[t]he form of proceeding for judicial review is . . . any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." Olenhouse v. Commodity Credit Corp. says that a "district court should govern itself by referring to the Federal Rules of Appellate Procedure," a requirement that the Tenth Circuit has confirmed as recently as 2009.  42 F.3d at 1580.  See Wyoming v. U.S. Dep't of Interior, 587 F.3d at 1251 n.2.  See also Hamilton v. Sec'y of Health & Human Servs. of U.S., 961 F.2d 1495, 1504 (10th Cir. 1992)("[D]istrict courts should process these cases as appeals, eliminate aberrant motion practices, and follow the Federal Rules of Appellate Procedure.").  The Federal Rules of Civil Procedure for the United States District Courts, which govern district courts in the first instance as a matter of Supreme Court and congressional mandate, see Fed. R. Civ. P. 1, provide that "[t]here is one form of action -- the civil action," Fed. R. Civ. P. 2.  Looking past the mixed signals sent by the legal authorities and instead to the purposes underlying Olenhouse v. Commodity Credit Corp., the Court concludes that there is no harm in taking the case in the form that the parties -- namely the Plaintiffs -- have presented it, so long as the procedural devices the Court uses respect the congressionally determined scheme of judicial review.

The burden will be properly placed on the Plaintiffs for much of what they do in this case.  Devices such as rule 56 summary judgment are incompatible with this scheme, and the Court thus cannot use them.  As a group, the devices normally used by appellate courts are generally more consistent with the APA's judicial review scheme than the devices that trial courts normally use, which presume nothing about the merits of the case and divide burdens of proof and production almost equally between the plaintiff and defendant.  The Court can see no reason, however, why the Plaintiffs cannot use the familiar procedural devices of the Federal Rules of Civil Procedure if they wish, at least to the extent that they comport with or can be modified to comport with the APA.

MO at 65-68 (footnotes omitted).

The Court puts these principles into play here.   The Court can use the entire administrative record, or any portions of it that the parties present to the Court, in determining whether the failure-to-exhaust affirmative defense is established.  To do otherwise -- to cabin itself to the usual rules for looking outside the pleadings on a rule 12(b)(6) motion -- would be to let the Federal Rules of Civil Procedure's procedural forms trump the APA's.  The Court will

consider all available evidence, subject to the administrative-record rule and the potential exceptions the Court described in its MO, in ruling on the MTD.

## III.   THE COURT WILL DISMISS THE PLAINTIFFS' FIRST AMENDMENT RETALIATION CLAIMS FOR FAILURE TO EXHAUST.

The Plaintiffs failed to satisfy § 6912(e)'s exhaustion requirement with regard to their First Amendment retaliation claim, and the Court will, accordingly, dismiss it.  The Court will first dispense with the low-hanging fruit that is the Individual Plaintiffs.  They failed to file any administrative appeals whatsoever and thus would be subject to dismissal even if the only requirement were remedy exhaustion.

The Grazing Associations filed administrative appeals,[25] but they failed to exhaust the First Amendment retaliation issue.  The Forest Service properly characterizes the substantive standard attendant to issue exhaustion, see MTD at 14, and, although the Plaintiffs argue that they should not be subject to issue exhaustion, they do not dispute that the Forest Service's characterization of issue exhaustion is more-or-less correct.   The Tenth Circuit describes § 6912(e)'s issue-exhaustion requirement using the following two formulations: (i) "the claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court"; and (ii) "[c]laims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met . . . ."  Forest Guardians v.

---

[25]Rio Arriba County is also a named appellant in the Notice of Appeal, but its standing is less clear, as the Court does not know if it possessed any grazing permits that the 2010 Decision Order reduced -- and the parties have not briefed the issue.  The Court will nevertheless assume Rio Arriba County has standing to pursue a First Amendment claim -- although it will refer only to the Grazing Associations -- and dismiss the claim, along with the other Plaintiffs' First Amendment claims, for failure to exhaust.

U.S. Forest Serv., 641 F.3d at 430-31 (quoting Kleissler v. U.S. Forest Serv., 183 F.3d at 202;

Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002)).  Alternatively,

one could go to the source, 36 C.F.R. § 215.14, which provides:

> (a) It is the appellant's responsibility to provide sufficient project- or activity-specific evidence and rationale, focusing on the decision, to show why the Responsible Official's decision should be reversed (paragraph (b)(6-9)).
>
> (b) The appeal must be filed with the Appeal Deciding Officer § 215.8 in writing.  At a minimum, an appeal must include the following:
>
> . . . .
>
> > (5) Any specific change(s) in the decision that the appellant seeks and rationale for those changes;
> >
> > (6) Any portion(s) of the decision with which the appellant disagrees, and explanation for the disagreement;
> >
> > (7) Why the appellant believes the Responsible Official's decision failed to consider the substantive comments; and
> >
> > (8) How the appellant believes the decision specifically violates law, regulation, or policy.

36 C.F.R. § 215.14(a)-(b) (emphases added).

Given the lack of a bright-line test for when an administrative appeal satisfies the issue-exhaustion requirement, one can theorize numerous hypotheticals in which the Court would have to make tough decisions whether a claim was put forth with sufficient clarity and specificity, balancing the finality and efficiency interests of the agency against the fairness interests of the plaintiff.  The Court does not, however, have such a difficult call here.  The Notice of Appeal falls short of any of these standards.  It does not contain, anywhere within its fifteen pages, any reference to "retaliation," the "First Amendment," "speech," the "Constitution" or anything "constitutional," "animus," or anything "protected."  The Forest Service, thus, was not put "on notice of" a "specific[] violat[ion]" of the First Amendment "with sufficient clarity to allow the

decision maker to understand and rule on the issue raised" by the Notice of Appeal.  Forest Guardians v. U.S. Forest Serv., 641 F.3d at 430-31; 36 C.F.R. § 215.14(b)(8).  Additionally, the Notice of Appeal contains no reference to "criticism" or any close variant, "letter" or "letters," the "governor," or "anger" or "angry."  The body of the Notice of Appeals' sole reference to Trujillo by name, comes, in passing, at the bottom of page 12.[26]  Not only did the Plaintiffs not specify the legal nature of their claim in the Notice of Appeal, they failed to tell the basic factual story.  The Plaintiffs, thus, failed to satisfy § 6912(e)'s issue-exhaustion requirement, and the Court will dismiss the First Amendment retaliation claim accordingly.

Last, the Court concludes that, even if § 6912(e) were subject to judicial waiver, no such waiver would apply here.  The Tenth Circuit, in Forest Guardians v. U.S. Forest Service, declined to decide whether § 6912(e) was subject to exception, but ultimately concluded that, even if it were, no exception applied.  See 641 F.3d at 433.  The Court will do likewise.  In drawing its conclusion, the Tenth Circuit wrote:

> "[I]f there is significant doubt whether the facts fall into an exception [to the exhaustion doctrine], courts should require exhaustion."  We have never decided which, if any, of these exceptions are applicable, nor need we do so now.  Even assuming that we could bypass § 6912(e)'s express direction, no exception is warranted on the facts of this case.
>
> Forest Guardians argues that it would have been futile to present its BAS challenge to the agency because the USFS has already adopted the position in federal court that it considered and applied the BAS standard of the 2000 regulations to the project approval.  But despite the USFS's perceived stance on that issue, exhaustion of the BAS argument would not have been "futile" in the sense that courts have applied this exhaustion exception.  Specifically, there is no argument that: the USFS lacked the authority or the ability to resolve the challenge to the project approval, see McBride Cotton & Cattle Corp., 290 F.3d at 982; Ace Prop. & Cas. Ins. Co., 440 F.3d at 1000-01; this is purely a question of statutory interpretation, see Frontier Airlines, Inc. v. Civ. Aeronautics Bd., 621

---

[26]The lawyer who filed the Notice of Appeal is, coincidentally, also named Trujillo -- Ted Trujillo.  See Notice of Appeal at 1.

F.2d 369, 371 (10th Cir. 1980); or the court would not benefit from allowing the USFS to develop a full administrative record on the issue for our review, see Ace Prop. & Cas. Ins. Co., 440 F.3d at 1000-02.  Thus, assuming, arguendo, we could excuse § 6912(e)'s exhaustion requirement, Forest Guardians has not proffered reasons that demonstrate that an exception is warranted.

Forest Guardians v. U.S. Forest Serv., 641 F.3d at 432-33.  The Plaintiffs are in the same boat as those in Forest Guardians v. U.S. Forest Service: none of the recognized, well-beaten exceptions apply.  Although not a § 6912(e) case, the Plaintiffs are perhaps even more similar to those in Simmat v. U.S. Bureau of Prisons:

At oral argument, Mr. Simmat's appointed counsel suggested, by way of explanation for his failure to exhaust, that Mr. Simmat "felt stuck."  The question, however, is not whether he felt stuck, but whether he was stuck.  We do not mean to criticize counsel, whose explanation for Mr. Simmat's delinquency is entirely plausible, and who was unquestionably stuck with the record below.  We mean only to stress that the BOP provided a mechanism for administrative review, and the PLRA obligated Mr. Simmat to use it before coming to federal court.

413 F.3d at 1237.  The Plaintiffs' argument conflates "futility" with a deep suspicion in the arbiter and the process, and a brooding hopelessness that, if they submit their First Amendment claims for administrative review, the Forest Service will reject them.  Those concerns are perhaps not unfounded,[27] but they are not cause to circumvent the congressionally designed administrative scheme.  The Court will, thus, dismiss the First Amendment retaliation claim as to all Plaintiffs.

The Court's dismissals are without prejudice.  "[A] dismissal based on lack of exhaustion should ordinarily be **without** prejudice."  Fitzgerald v. Corr. Corp. of Am., 403 F.3d at 1139 (emphasis in original).  See Cummings v. Equitable Life & Cas. Ins. Co., 177 F. App'x 794, 796

_____

[27]It is worth noting, again, that Trujillo had no part in adjudicating the administrative appeal of her own decisions and would have had no part in adjudicating a First Amendment retaliation claim lodged against her.  See note 15, supra, at 79.  A Forest Supervisor -- such as Clark, who adjudicated the Plaintiffs' administrative appeal -- handles all appeals from Trujillo's decisions.  See 36 C.F.R. § 214.7(a).

(10th Cir. 2006)(unpublished)(holding that a dismissal for failure to exhaust administrative remedies under the Utah Administrative Procedures Act should be without prejudice).   The Tenth Circuit carved out an exception to this general rule, which is that the district court may proceed past the exhaustion issue and dismiss the claim, with prejudice, on the merits, but the Court does not do so here.   The Court has previously denied a Forest Service motion to dismiss the First Amendment claim on the merits, see MOO at 1-3, 114, and the motion now before the Court, the MTD, does not address the substantive sufficiency of the claim.   The general rule therefore applies, and the Court will dismiss the First Amendment claim without prejudice.

   **IT IS ORDERED** that the Federal Defendants' Motion to Dismiss Count 1 for Failure to Exhaust Administrative Remedies, filed February 18, 2013 (Doc. 55), is granted.   The First Amendment retaliation claim is dismissed without prejudice as to all Plaintiffs.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Simeon Herskovits
Iris A. Thornton
Advocates for Community and Environment
El Prado, New Mexico

--and--

Richard Rosenstock
Santa Fe, New Mexico

   *Attorneys for the Plaintiffs*

Damon P. Martinez
   United States Attorney
Ruth F. Keegan
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Andrew A. Smith
Environment & Natural Resources Division
United States Department of Justice
Albuquerque, New Mexico

     *Attorneys for the Defendants*