IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JARITA MESA LIVESTOCK GRAZING
ASSOCIATION; ALAMOSA LIVESTOCK
GRAZING ASSOCIATION; SEBEDEO
CHACON; THOMAS GRIEGO; DONALD
GRIEGO; MICHAEL PENA; JUAN GIRON;
JOE GURULE, JR.; FERNANDO GURULE;
DIEGO JARAMILLO; LORENZO
JARAMILLO; GABRIEL ALDAZ; ARTURO
RODARTE; JEFFREY CHACON; GLORIA
VALDEZ; JERRY VASQUEZ; CARLOS
ORTEGA; LEON ORTEGA; HORACIO
MARTINEZ; RONALD MARTINEZ; STEVE
CHAVEZ; VANGIE CHAVEZ; ALFONSO
CHACON; DANIEL RAEL; JOHN VALDEZ
and BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF
RIO ARRIBA,

        Plaintiffs,

vs.                                   No. CIV 12-0069 JB/KBM

UNITED STATES FOREST SERVICE and
DIANA TRUJILLO, in her official and
individual capacities,

        Defendants.

MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Supplement and/or Complete

the Administrative Record, and for Limited Discovery, filed November 25, 2013 (Doc. 106)

("Motion").  The Court held a hearing on November 7, 2014.  The primary issues are: (i) whether

the Plaintiffs have shown that Defendant United States Forest Service acted in bad faith, such

that they can add to the administrative record -- and possibly even take discovery; (ii) whether

the Forest Service has compiled an incomplete administrative record for the Court, which would

require the Forest Service to add the omitted materials even absent a showing of bad faith; and (iii) whether and in what circumstances the Court can look to materials outside of the administrative record, even when the record is complete and the Plaintiffs have made no showing of agency bad faith.  The Court answers these questions no, yes, and yes, respectively.  On the first issue, the Court concludes that the Plaintiffs have failed to make the necessary showing of bad faith and will thus deny their request to supplement the administrative record with new materials.  On the second issue, the Court concludes that a proper and complete administrative record includes all materials that the Forest Service considered at any time and not merely the materials it considered upon administrative appeal.  The Court will allow the Plaintiffs -- or the Defendants, for that matter -- to complete the administrative record using any material that Forest Service considered in forming or reconsidering its 2010 Decision Notice.  On the third issue, the Court concludes that it may consider materials outside the administrative record to the extent that they go towards establishing legislative, rather than adjudicative, facts.  The Court will consider some of the materials that the Plaintiffs seek to introduce -- all of which are already in existence -- but will not allow the Plaintiffs any additional discovery.  The Court, thus, grants the Motion in part and denies it in part.

## FACTUAL BACKGROUND

The history of the Plaintiffs' case predates the parties before the Court.  The Plaintiffs set forth a backdrop of social, cultural, and economic factors that they say are inextricably intertwined with the Plaintiffs' cattle grazing within the Carson National Forest in northern New Mexico.  The Plaintiffs also allege a history of tension between the Forest Service and the Plaintiffs' ancestors, which bears on the legality of the Defendants' actions managing national

forestland in northern New Mexico over the last three years.[1]   The Court takes as true all non-conclusory factual statements in the Complaint for Declaratory and Injunctive Relief (First Amendment to the United States Constitution, National Environmental Policy Act; National Forest Management Act, Sustain Yield Forest Management Act; Administrative Procedure Act), filed January 20, 2012 (Doc. 1)("Complaint").

1.      **The Parties to the Litigation.**

"The Plaintiffs and their ancestors are Hispanic stockmen whose families have been grazing livestock" in northern New Mexico for many generations.  Complaint ¶ 3, at 2-3.  Most of the natural-person Plaintiffs' families were grazing livestock in the area that is now the Vallecitos Federal Sustained Yield Unit ("the Unit") before the Forest Service existed.  See Complaint ¶ 3, at 3.  The Unit is an area of the Carson National Forest that Congress set aside to be managed for the economic benefit of the communities located in the Unit.  Congress specifically provided that these local communities should have access to the timber and other forest products within the Unit, as needed for the communities' economic stability.  See Complaint ¶ 39, at 14.  Grazing livestock is an "integral part of their existence and is a central part of life in the villages they reside in . . . all of Northern New Mexico."  Complaint ¶ 3, at 3.

The Jarita Mesa Allotment and the Alamosa Allotment are areas within the Unit on which cattle grazing is allowed.  See Complaint ¶ 2, at 2.  Plaintiffs Sebedeo Chacon, Michael Pena, Juan Giron, Gabriel Aldaz, Arturo Rodarte, Thomas Griego, Donald Griego, Joe Gurule, Jr., Lorenzo Jaramillo, Jeffrey Chacon, and Gloria Valdez (collectively, "the Jarita Mesa Permittees") have permits that the Forest Service issued, which allow them to graze cattle on the

---

[1]The Forest Service originated in 1891 with the Forest Reserve Act, which empowered "the president to establish forest reserves from timber covered public domain land."  US Forest Service, History, U.S. Forest Service, (Dec. 22, 2009), http://www.fs.fed.us/aboutus/history.

Jarita Mesa Allotment.  Complaint ¶ 3, at 2.  T. Griego, D. Griego, Plaintiffs Carlos Ortega, Leon

Ortega, Daniel Rael, Horacio Martinez, Ronald Martinez, Fernando Gurule, Jerry Vasquez, and

Alfonso Chacon (collectively, "the Alamosa Permittees") have permits that the Forest Service

issued, which allow them to graze cattle on the Alamosa Allotment.   Complaint ¶ 3, at 2.

Plaintiff Steve Chavez is a former permittee on the Alamosa Allotment and now lives within the

Unit with his wife, Plaintiff Vangie Chavez.  See Complaint ¶ 3, at 2.  J. Valdez is a former

permittee on the Jarita Mesa Allotment and now resides within the Unit.  See Complaint ¶ 3, at

2-3.  The Jarita Mesa Grazing Association and the Alamosa Grazing Association (collectively,

"the Associations") are "local livestock associations made up exclusively of grazing permittees

on the respective allotments."   Complaint ¶ 13, at 5.   The Associations were established to:

(i) protect and promote the permittees' livestock grazing on the Allotments; (ii) manage and

share the costs of handling livestock, range improvements, and other programs for the benefit of

the Allotments and their resources; (iii) express the Associations' members' wishes; and

(iv) meet with and work with the Forest Service to ensure proper management of livestock and

range resources on the allotments.  See Complaint ¶ 13, at 6.  S. Chacon was president of the

Jarita Mesa Grazing Association throughout the events set forth in the Complaint.  See

Complaint ¶ 14, at 6.  T. Griego was president of the Alamosa Grazing Association throughout

the events set forth in the Complaint.  See Complaint ¶ 15, at 7.

The Hispanic people in northern New Mexico have lived in the area for hundreds of

years, long before Congress created the Forest Service.  See Complaint ¶ 37, at 13.  They have a

unique culture, shaped by and dependent on their relationship with the land.  See Complaint ¶ 37,

at 13.  The Hispanic people living in villages near the Carson National Forests have historically

relied on the resources of the national forests of northern New Mexico for sustenance.  See

- 4 -

Complaint ¶ 37, at 13.   These Hispanics rely upon the "fodder, including grasses and other forage, like the marsh hay, mushrooms, nuts, and seeds" within the Unit for their sustenance. Complaint ¶ 39, at 14.  Livestock grazing is central to their cultural, social, and economic fabric, and has been since at least the 1690s.  See Complaint ¶ 40, at 14.  The Associations represent the communities "that have historically relied on, and continue to rely on, grazing on these ancient community . . . lands."  Complaint ¶ 40, at 15.

Plaintiff Board of County Commissioners of the County of Rio Arriba ("Rio Arriba County") is a political subdivision in northern New Mexico, in which a large portion of the Carson National Forest, including the Allotments and the El Rito Ranger District, is located.  See Complaint ¶ 16, at 7.  The Individual Plaintiffs are all residents of Rio Arriba County.  Rio Arriba County and local school districts receive payments derived from the grazing fees, in lieu of taxes, from the Forest Service.  This payment is derived, in part, from grazing fees.  Rio Arriba County is thus interested in ensuring that the "grazing permits on land administered by the Forest Service within Rio Arriba County are not unlawfully reduced."  Complaint ¶ 16, at 7. Rio Arriba County is also interested in protecting the social fabric, customs, traditions, and cultural integrity of the traditional communities within the county, and in the economic betterment of its citizens.  Rio Arriba County is further interested in "making sure federal laws are followed and that its citizens are not punished by federal officials for expressing their views on federal agency policy to elected officials and others."  Complaint ¶ 16, at 7.

The Forest Service is an agency of the United States Department of Agriculture and is charged with the "administration of lands within the United States that have been designated as National Forest Lands."  Complaint ¶ 17, at 8.  The Forest Service is charged with the Unit's management.  Throughout the events set forth in the Complaint, the Forest Service employed

Defendant Diana Trujillo as the El Rito District Ranger.  Complaint ¶ 19, at 8.  Both Allotments are located in the El Rito District of the Carson National Forest.  See Complaint ¶ 1, at 2. Trujillo is charged with "managing the natural resources in her district, including the range resource."  Complaint ¶ 19, at 8.

   **2.**  **The Events Giving Rise to the Litigation.**

  "[A]ll or a substantial part of the events or omissions giving rise to the [Plaintiffs'] claims . . . occurred within this judicial district."  Complaint ¶ 12, at 5.  Beginning in the 1920s, the Forest Service's management practices led to a reduction of the number of Hispanic residents near the Carson National Forest who were allowed to graze in the forest under permit.  See Complaint ¶ 43, at 16-17.  The Forest Service gradually eliminated milk cow and draft horse permits.  See Complaint ¶ 43, at 17.  The reduction in these permits has destabilized the Plaintiffs' cultural and social fabric.  See Complaint ¶ 43, at 17.  The Plaintiffs have "repeatedly voiced opposition to and have been highly critical of various actions taken by the Defendants," especially Trujillo's actions in recent years.  Complaint ¶ 57, at 22-23.  The Plaintiffs have written letters, spoken at public meetings, and contacted their congressional representatives about the Defendants' actions.  See Complaint ¶ 57, at 23.

  Under the Forest Service's management, the population of wild horses and elk on the Unit has grown to the point that the vegetative cover, upon which the Plaintiffs rely for grazing their cattle, has degraded.  See Complaint ¶ 58, at 23.  In 2002, the Forest Service concluded that the wild horses on Jarita Mesa were competing with the cattle for forage.  See Complaint ¶ 59, at 23.  In 2002, the Forest Service issued a Decision Notice ("2002 Decision Notice"), which authorizes the number of wild horses to increase from between twelve and fourteen, to between twenty and seventy.  Complaint ¶ 60, at 24.  The 2002 Decision Notice provides certain

measures to be taken if the wild horse herd size grows above seventy horses.  See Complaint
¶ 60, at 24.

On or about April 8, 2006, S. Chacon, as the President of the Jarita Mesa Grazing
Association, sent a letter to New Mexico's then-Governor Bill Richardson and to the New
Mexico Congressional delegation, which over eighty residents of the Unit signed, and in which
S. Chacon complained about the Forest Service's management of the El Rito Ranger District.
The letter specifically complained about the Forest Service's failure to reduce the number of wild
horse herds and to control the number of elk herds on the Unit.  See Complaint ¶ 62, at 25.  On
May 24, 2006, the Plaintiffs[2] wrote to Trujillo's supervisor, Carson National Forest Supervisor
Martin Chavez, and alleged that Trujillo was acting "in an abusive manner towards the Jarita
Mesa permittees, was dealing with them in a less than honest manner, was arbitrarily and
capriciously reducing the grazing time allowed under their permits, and was otherwise impairing
their grazing rights" under the permits.  Complaint ¶ 63, at 25.  In June, 2006, a Forest Service
employee admitted that the wild horse herd exceeded the number that the 2002 Decision Notice
allowed and was numbering at least 150.  See Complaint ¶ 64, at 25.

On July 5, 2006, Trujillo ordered all cattle removed from the Jarita Mesa Allotment by
July 31, 2006.  See Complaint ¶ 66, at 26.  Some of the Plaintiffs, including S. Chacon and
Aldaz, appealed Trujillo's order.  See Complaint ¶ 66, at 27.  On July 25, 2006, Trujillo wrote to
the Jarita Mesa Grazing Association and stated that the range conditions had not improved
significantly, and, thus, she would not change her July 5, 2006, order to remove cattle by July 31,
2006.  See Complaint ¶ 68, at 27.  On July 28, 2006, acting Carson Forest Supervisor Kendall

---

[2]The Plaintiffs do not clarify if all Plaintiffs were signatories to the May 24, 2006 letter,
only the Individual Plaintiffs, or only the Jarita Mesa Permittees -- whose permits Trujillo's
management of the Jarita Mesa Allotment affected.  See Complaint ¶ 3, at 25.

Clark decided to delay Trujillo's order for two weeks, because of recent rains and soil moisture levels. A report by the Range Improvement Task Force ("RI Task Force"), associated with New Mexico State University ("NMSU"), subsequently found that the past grazing of the permittees' cattle had not damaged grazing resources and that there was sufficient grass to complete the grazing season as the permits authorized. The Jarita Mesa Permittees were eventually allowed to complete their grazing season as their permits specified. See Complaint ¶ 69, at 28.

Dr. David Correia, a professor of American Studies at the University of New Mexico, is a scholar who had been researching the Unit's history over several years. Dr. Correia had been previously granted full access to the Forest Service records at the El Rito District Office for his research on the Unit. In 2006, he began assisting the Plaintiffs with their interactions with Trujillo. Dr. Correia attended a meeting in the El Rito area regarding grazing issues, at which Trujillo made statements to the effect that Unit residents caused most or all of the problems facing the Unit. See Complaint ¶ 72, at 28. Dr. Correia responded publicly at the meeting that the Forest Service's mismanagement of the Unit over the years was the source of the Unit's problems. Subsequent to the 2006 meeting, Trujillo refused to allow Dr. Correia access to any records at the El Rito District Office and informed him that this change of policy was because of his statements at the meeting. See Complaint ¶ 72, at 29.

Trujillo then announced that she would end the 2006 grazing season in September, 2006, instead of on October 31, 2006, as set forth in the Plaintiffs' permits. Trujillo stated that this change was because the Plaintiffs failed to meet certain conditions that she had imposed -- conditions that, had they been met, would have allowed the season to end on October 31, 2006. S. Chacon, as President of the Jarita Mesa Grazing Association, proposed a compromise end date of October 15, 2006. See Complaint ¶ 73, at 29. Trujillo responded that

she would view S. Chacon's request as that of his alone and that individual permittees would need to address their needs to her individually. Trujillo stated that, if the conditions she imposed were not met, she would suspend or cancel the permits, and charge fines for any cattle not removed by October 2, 2006. See Complaint ¶ 74, at 30.

As of October 5, 2006, S. Chacon had seventeen cows lost in the Carson National Forest. Give the size of the Allotments, locating cattle at the end of a grazing season is often difficult for the permittees. On October 6, 2006, Trujillo reduced S. Chacon's grazing permit by twenty percent over the next two years, because he had not retrieved all of his cattle by the deadline she imposed. This decision was upheld on appeal. See Complaint ¶ 75, at 30-31. A Riparian Specialist and Natural Resource Specialist from New Mexico State University wrote to Trujillo regarding S. Chacon's permit reduction, and expressed that her standards were "unreasonable and unyielding," and that the Forest Service was aware that S. Chacon was not given enough time to recover his cattle. Complaint ¶ 77, at 31-32.

Moving ahead three years, the Plaintiffs complained to Trujillo and her staff in the spring of 2009 regarding the Forest Service's management of the Allotments. Trujillo responded with a certified letter in which she outlined the repercussions that the Plaintiffs would face if they did not comply with their grazing permits' terms. See Complaint ¶ 79, at 32. On June 1, 2009, S. Chacon and T. Griego sent Trujillo a letter, that twenty-six permittees signed, in which the Plaintiffs criticized Trujillo's management of the Allotments. The Plaintiffs also sent the letter to the New Mexico Congressional delegation, Governor Richardson, and Trujillo's immediate supervisor, Carson Forest Supervisor Clark. The Plaintiffs stated in the letter that Trujillo's certified letter insulted them, and the Plaintiffs accused Trujillo of attempting to intimidate them. The Plaintiffs alleged that Trujillo had failed to "install needed cattle guards or to fix plugged

ones," and that Trujillo would sanction the permittees when their cattle then drifted from one allotment to another.  Complaint ¶ 80, at 32-33.  The Plaintiffs complained that they believed Trujillo was attempting to end grazing on the Allotments.  See Complaint ¶ 80, at 33.

In 2009 and 2010, the Forest Service began preparing an Environmental Assessment ("EA")[3] that would determine the amount of grazing allowed on the Allotments for 2011 and subsequent years.  See Complaint ¶ 78, at 32.  On August 20, 2009, the Forest Service made public three alternative courses of action for the El Rito District: (i) no grazing; (ii) grazing at the same level as the previous ten years, but with a minor reduction and improved management; and

---

[3]Under the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852, federal agencies are required to assess the environmental impacts of proposed actions that will significantly affect the quality of a human environment.  Agencies must prepare an environmental impact statement that sets forth proposed actions and their environmental impact.  See 42 U.S.C. § 4332(2)(C).  When the agency cannot determine whether a proposed action will have an environmental impact, the agency must prepare an EA.  See 40 C.F.R. § 1501.4(b).  An EA:

(a)     Means a concise public document for which a Federal agency is responsible that serves to:

(1)     Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2)     Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3)     Facilitate preparation of a statement when one is necessary.

(b)     Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

(iii) an eighteen-percent reduction in the number of permits with improved management.  The EA did not propose a reduction to the wild horse or elk population.  See Complaint ¶ 81, at 33.

The Forest Service requested comments from the RI Task Force regarding the EA's proposals.  The RI Task Force had been studying the socioeconomic and environmental effects and implications of Forest Service decisions regarding the Allotments for many years.  See Complaint ¶ 82, at 33.  The RI Task Force sent a letter to Trujillo expressing concern over the EA's scientific methodology, and the RI Task Force noted that the permittees "feel discouraged and powerless vis-à-vis" the Forest Service, as evidenced by the strained relationship of the two over recent years.  Complaint ¶ 82, at 34.  The RI Task Force recommended that Trujillo adopt the second proposal in the EA, which would allow grazing to remain at the same level as the previous years.  See Complaint ¶ 84, at 34.  The RI Task Force also recommended a longer grazing season.  See Complaint ¶ 84, at 34.

Rio Arriba County submitted a letter to the Defendants on September 17, 2009, in which it expressed concern about what it viewed as a "historical pattern of unjustified Forest Service action to reduce grazing opportunities for villagers that has chipped away and eroded the culture in the area and the way of life integral to that culture."  Complaint ¶ 85, at 35.  The Associations also submitted comments on September 17, 2009, in which they stated that the Forest Service should, as part of the upcoming EA, consider managing the wild horse and elk populations.  See Complaint ¶ 86, at 35.  On September 18, 2009, the New Mexico Department of Agriculture submitted comments in which it recommended that Trujillo adopt the EA's second proposal and stated its belief that proper management of the Carson National Forest would obviate the need to reduce the number of permits.  See Complaint ¶ 87, at 35.

On January 11, 2010, at a public meeting, Trujillo expressed her view that the current level of permits was an eighteen-percent temporary increase above the correct level -- an increase which occurred in 1980, and had, improperly, never been reduced to the correct level. <u>See</u> Complaint ¶ 89, at 36.  Trujillo also stated that she had been working with outside groups regarding the possibility of purchasing the Plaintiffs' permits.  <u>See</u> Complaint ¶ 89, at 36. Trujillo further stated that she would seek an eighteen-percent reduction in the number of permits, regardless of the EA's proposals.  <u>See</u> Complaint ¶ 89, at 37.  Trujillo contacted outside groups later in January and suggested that they purchase the Plaintiffs' permits.  <u>See</u> Complaint ¶ 90, at 37.

In March, 2010, the Plaintiffs submitted a petition to Carson National Forest Supervisor Clark, and Corbin Newman, the Regional Forester, which over 200 Unit residents signed, in which they requested that Trujillo be transferred from the El Rito District Ranger position. Trujillo was "extremely upset and angered by" the Plaintiffs' request.  Complaint ¶ 92, at 38.

On September 30, 2010, the Forest Service issued its EA.  <u>See</u> Complaint ¶ 4, at 3.  The EA contains approximately one page describing the socioeconomic and cultural impact that the proposed actions may have.  <u>See</u> Complaint ¶ 93, at 38.  The EA did not contain any recommendations regarding reducing the wild horse and elk population on the Allotments.  <u>See</u> Complaint ¶ 94, at 39.  The EA noted that, if the second alternative was adopted, which would allow the permittees to remain at the same number but with better management, the overall environmental impact would be positive, and the economic impact on the permittees would be less harsh than if the third alternative, an eighteen-percent reduction in the number of permittees, was adopted.  <u>See</u> Complaint ¶ 97, at 40.  The EA thus designated the second alternative as the Proposed Action.  <u>See</u> Complaint ¶ 98, at 41.

The 2010 EA's Proposed Action would have allowed the Plaintiffs to "continue grazing on both allotments with approximately the same number of cows as Plaintiffs have grazed on those allotments since 1980." Complaint ¶ 4, at 3; id. ¶ 98, at 41. Normally, the District Ranger for the Carson and Santa Fe National Forests in New Mexico adopts the Proposed Action set forth in an EA. See Complaint ¶ 4, at 3; id. ¶ 99, at 41. Rather than adopting the 2010 EA's Proposed Action, Trujillo adopted the third alternative set forth in the 2010 EA, which imposed an eighteen-percent reduction in the Plaintiffs' grazing permits. See Complaint ¶ 5, at 3. Trujillo stated that she took this action because the current number of permitted livestock on the Unit was unsustainable. See Complaint ¶ 5, at 3-4; id. ¶ 100, at 42. The EA did not conclude that the current grazing numbers were unsustainable. See Complaint ¶ 100, at 42.

On November 29, 2010, the Associations and Rio Arriba County appealed Trujillo's 2010 Decision Notice. See Complaint ¶ 105, at 44. In 2011, Trujillo's' supervisors ruled on the appeal and announced that they are upholding her decision. See Complaint ¶ 106, at 44. The Plaintiffs assert that they "will be significantly injured as a result of the imposition of the 18% reduction in permitted cow/calf numbers." Complaint ¶ 17, at 8. The Plaintiffs assert that the loss of grazing permits "causes not only severe economic harm to Plaintiffs but also grave damage to viability of the unique cultural and social fabric of their families and communities." Complaint ¶ 17, at 8. The Plaintiffs assert that the importance of their social and cultural fabric "has been recognized by Defendant Forest Service as essential not just to the residents of northern New Mexico but to the entire nation." Complaint ¶ 17, at 8.

## PROCEDURAL BACKGROUND

The events in this case have come in an unusual sequence. The Court partially granted an earlier motion to dismiss in this case, and, in doing so, characterized the Plaintiffs' then-exiting

First Amendment retaliation claim in such a way as to suggest that the Plaintiffs were entitled to discovery outside of the APA's procedural framework, which allows no discovery at the judicial-review stage. The Court later reconsidered its prior opinion, and, even later, dismissed the First Amendment claim in its entirety for failure to exhaust administrative remedies. The Court will summarize this sequence of events in the order in which they occurred.

### 1.     The Claims in the Complaint.

All of the Plaintiffs' alleged injuries are related to Trujillo's 2010 decision to reduce grazing on the Jarita Mesa and Alamosa Grazing Allotments, both of which lie within the El Rito Ranger District of the Carson National Forest. The Plaintiffs alleged that the eighteen-percent reduction in their permits violated their First Amendments right to free speech and to petition for redress of their grievances. The Plaintiffs bring this action under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4331-4370 ("NEPA"), the National Forest Management Act of 1976, Pub. L. No. 94-588, 90 Stat. 2949 (codified in scattered section of 16 U.S.C.)("NFMA"), the Federal Sustained Yield Forest Management Act of 1944, 16 U.S.C. §§ 583, 583a-583i ("FSYMA"), and the Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 ("APA"). See Complaint ¶ 9, at 4-5. The Plaintiffs assert that the Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1346, 2201, and 2202. See Complaint ¶ 10, at 5.

The Plaintiffs assert that, under NEPA, all federal agencies are required to prepare an environmental impact statement regarding proposed actions that will significantly affect the quality of a human environment. See Complaint ¶ 23, at 9 (citing 42 U.S.C. § 4332(2)(C)). The Plaintiffs assert that agencies must prepare an EA when a proposed action's effect is uncertain. See Complaint ¶ 24, at 10 (citing 40 C.F.R. §§ 1501.4(b), 1508.9). The Plaintiffs assert that, as part of the impact statement and EAs prepared under NEPA, an agency "must consider a

reasonable range of alternatives and analyze both the direct and indirect impacts of all proposed major federal actions significantly affecting the human environment."   Complaint ¶ 26, at 10 (citing 40 C.F.R. § 1502.14).   The Plaintiffs assert that, when a range of proposed actions are available and an EA is prepared, the EA "is considered the functional equivalent of the preferred alternative" in an impact statement.   Complaint ¶ 26, at 10.   The Plaintiffs assert that an agency is required to "insure the professional integrity, including scientific integrity," of the environmental analyses underlying an impact statement and EA.   Complaint ¶ 28, at 10 (citing Natural Res. Def. Council v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972); 40 C.F.R. § 1502.24). The Plaintiffs assert that the environmental review process that NEPA requires is subject to public comment, and that agencies must respond to public comments with thorough modifications or with a thorough explanation for why no modification is necessary.   See Complaint ¶ 29, at 10-11 (citing 40 C.F.R. § 1503.4).

The Plaintiffs assert that the NFMA requires the Forest Service to develop land resource management plans ("Forest Plans") for each national forest and must implement the plan on a site-specific level.   Complaint ¶¶ 30-32, at 11 (citing Pub. L. No. 94-588; 16 U.S.C. § 1604(a); 36 C.F.R. § 219.10).   The Plaintiffs assert that the implementation of a Forest Plan must be consistent with the Forest Plan.   See Complaint ¶ 32, at 11 (citing 16 U.S.C. § 1604(i)).   The Plaintiffs assert that, under the SYFMA, the Forest Service must use timber and non-timber forest products within a sustained unit for the "benefit of and to stabilize the communities within each sustained yield unit."   Complaint ¶ 33, at 12 (citing 16 U.S.C. §§ 583(b), 583(a)).

The Plaintiffs assert that the Forest Service's 1972 Region 3 Policy ("the Policy") recognizes that northern New Mexico communities are dependent upon forest resources, declares the Spanish-American/Hispanic culture of the area to be a "resource," and acknowledges that the

Forest Service's "objectives and policies must be altered to the extent possible to recognize and be responsive to the culture and peoples." Complaint ¶ 34, at 12 (citing the Policy at 3). The Plaintiffs assert that the Policy "'explicitly recognized the intimate relationship that the Native American and Hispanic residents of Northern New Mexico had with the land' . . . and that 'their economic well-being is often tied closely to the resources of the National Forests and the manner in which they are utilized." Complaint ¶ 49, at 19-20 (quoting the Policy at 2). The Plaintiffs assert that the Policy requires the Forest Service to take actions for the preservation of Spanish-American/Hispanic culture in the region, including authorizing livestock permits. See Complaint ¶¶ 35-36, at 12-13.

The Plaintiffs assert that the Forest Service reduced their grazing permits out of racial animus. See Complaint ¶¶ 43-44, at 17. The Plaintiffs assert that the Unit was created in 1948 "to address some of the economic and social afflictions" harming the Plaintiffs' communities, and resulting from the reduction in their grazing permits over the years. Complaint ¶¶ 45-46, at 18. The Plaintiffs assert that, contrary to the Policy, the Forest Service "has, for the most part, dealt with the Hispanic communities within the Unit . . . , by continuing to pursue . . . a reduction in grazing permits, that have worked to further destabilize and impair the cultural, social, and economic fabric" of the Plaintiffs' communities. Complaint ¶ 54, at 22. The Plaintiffs assert that, instead of "managing the [U]nit to provide stability to the communities within the Unit as required by law," the Forest Service's conduct has "resulted in an increase in economic and cultural instability for the communities in the Unit." Complaint ¶ 56, at 22.

The Plaintiffs assert that Trujillo has responded to their public criticism "by engaging in a continuing and ongoing campaign of retaliation, misusing her position to harass and punish Plaintiffs for their constitutionally protected conduct." Complaint ¶ 57, at 23. The Plaintiffs

assert that the swelling of the wild horse and elk populations on the Unit has contributed to the destabilization of the Plaintiffs' grazing tradition and culture.  See Complaint ¶ 58, at 23.  The Plaintiffs assert that, rather than reducing the number of wild horses on the Unit, as the 2002 Decision Notice outlines, the Defendants have used the damaged forage as an "excuse to harass" the Plaintiffs about foraging conditions and to restrict their grazing rights.  Complaint ¶ 61, at 25.

The Plaintiffs assert that Trujillo's July 5, 2006, order that the Plaintiffs remove their cattle from Jarita Mesa by July 31, 2006, and her refusal to lift that order, were "motivated, in whole or in part, by a desire to retaliate against Plaintiffs for the exercise of their First Amendment rights to free speech and to petition for redress of grievances."  Complaint ¶ 70, at 28.  The Plaintiffs assert that Trujillo's actions were part of an "ongoing pattern and practice of retaliatory conduct."  Complaint ¶ 71, at 28.  The Plaintiffs assert that Trujillo's decision in 2006 to reduce S. Chacon's grazing permit by twenty percent had a profound economic impact on him, "costing him tens of thousands of dollars," and also damaged the social and cultural fabric of his community and extended family.  Complaint ¶ 75, at 31.  The Plaintiffs assert that S. Chacon was "singled out for disparately harsh punishment by Defendant Trujillo because she perceived him as a leader of the Jarita Mesa Grazing Association," and because the Jarita Mesa Permittees had criticized her to the state government.  Complaint ¶ 76, at 31.  The Plaintiffs assert that Trujillo acted as she did to chill the Plaintiffs' speech.  See Complaint ¶ 76, at 31.

The Plaintiffs also assert that what Trujillo stated was an eighteen-percent increase in permits was the result of an agreement in which the Plaintiffs agreed to a shorter grazing permit term, but an eighteen-percent increase in the number of permits.  See Complaint ¶ 89, at 36.  The Plaintiffs assert that Trujillo's attempts to orchestrate the purchase of their permits was "completely outrageous" and beyond the scope of her duties, in addition to being in violation of

the Policy's "letter and spirit."  Complaint ¶ 91, at 37.  The Plaintiffs assert that this "shocking" conduct demonstrates her "deep animosity towards the needs and aspirations of the permittees." Complaint ¶ 91, at 37.

The Plaintiffs also assert that Trujillo's 2010 Decision Notice, in which she chose to reduce the available permits by eighteen percent, was done out of her anger towards the Plaintiffs, and because she had "determined to retaliate against the Plaintiffs for having the temerity to point out her errors and criticize her mismanagement of the two allotments and the entire Sustained Yield Unit."  Complaint ¶ 99, at 42.  The Plaintiffs assert that Trujillo decided to reduce their permits by eighteen percent "long before the Final EA was issued."  Complaint ¶ 103, at 43.  The Plaintiffs assert that Trujillo's statements regarding the current level of permittees being unsustainable "was a pretext to conceal her retaliatory motive . . . to punish Plaintiffs and the other permittees for having complain[ed] to other government officials about Defendant Trujillo's conduct."  Complaint ¶ 104, at 44.

The Plaintiffs assert that the economic loss they have suffered and will continue to suffer because of the 2010 Decision Notice is far greater than the $32,000.00 which the Forest Service estimates will be their economic loss.  The Plaintiffs assert that their economic injuries are "compounded by permanent, irreparable damage to the social and cultural fabric" of their communities.  Complaint ¶ 107, at 45.  The Plaintiffs point out that their "large extended families" share the beef they acquire from cattle raising, providing "the larger population of local residents with healthy and inexpensive meat on which they depend for a vital part of their diet," and the Plaintiffs will now have twenty percent less beef available for their needs.  Complaint ¶ 109, at 46.

The Plaintiffs' first count in the Complaint is alleged against Trujillo.  The Plaintiffs assert that Trujillo violated their right to free speech, "the related right to petition for redress of grievances," and their right to freedom of association, as the First Amendment guarantees. Complaint ¶ 112, at 47.  The Plaintiffs assert that they did not have an opportunity during the EA process, or during their appeal of Trujillo's July 5, 2006, order, "to discover and present evidence of disparate treatment, violation of normal procedure or practice, or other evidence from which retaliatory animus may be inferred," including the evidence that district rangers normally adhere to the proposed actions in EAs.  Complaint ¶ 12, at 47.  The Plaintiffs assert that they have "no remedy other than an action under the First Amendment" to remedy this asserted constitutional violation, "which resulted in a reduction in their permits for the 2011 grazing season," a reduction which continues through the 2015 grazing season, "and to compensate them for the losses already accrued as a result of Defendant Trujillo's retaliatory conduct."  Complaint ¶ 112, at 47-48.  The Plaintiffs assert that Trujillo acted in an "arbitrary and capricious manner," and "intentionally and/or with deliberate indifference to the First Amendment rights of Plaintiffs."  Complaint ¶ 113, at 48.  The Plaintiffs also assert that Trujillo's actions violated the APA.  See Complaint ¶ 114, at 48 (citing 5 U.S.C. §§ 702, 706(2)(b)).  The Plaintiffs assert that they "will suffer irreparable harm if these reductions are allowed to proceed" and that they "have no adequate remedy at law to stop them."  Complaint ¶ 115, at 48.

As their second cause of action, the Plaintiffs allege that the Defendants failed to properly analyze the environmental impact in the 2010 EA, and, by failing to take a "hard look" at the social, economic, and environmental justice impact each alternative would have, violated the APA.  Complaint ¶¶ 116-119, at 48-49 (citing Natural Res. Def. Council v. Morton, 458 F.2d at 838; 5 U.S.C. §§ 702, 706(2)).  The Plaintiffs allege, as their third cause of action, that the

Defendants failed to properly analyze the environmental impact in the 2010 EA by failing to develop a proper baseline with the best available science for their study, in violation of the APA. See Complaint ¶¶ 120-123, at 49 (citing 40 C.F.R. § 1502.24; 5 U.S.C. §§ 702, 706(2)).   The Plaintiffs allege, as their fourth cause of action, that the Defendants failed to properly consider and respond to comments, and failed to consider a reasonable range of alternatives in the 2010 EA, in violation of NEPA and of the APA.   See Complaint ¶¶ 124-127, at 49-50 (citing 40 C.F.R. § 1503.4; 36 C.F.R. § 220.4(c); 5 U.S.C. §§ 702, 706(b)).   As their fifth cause of action, the Plaintiffs allege that Trujillo failed to consider the findings in the 2010 EA when she made her 2010 Decision Notice, in violation of NEPA and of the APA.   See Complaint ¶¶ 128-131 (citing 36 C.F.R. § 220.4(c)(4); 5 U.S.C. §§ 702, 706(2)).   As their sixth cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan range standards and guidelines related to grazing numbers, in violation of the NFMA and of the APA. See Complaint ¶¶ 132-136, at 50-51 (citing 16 U.S.C. § 1604(i); 5 U.S.C. §§ 702, 706(b)).   As their seventh cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan's range standards and guidelines related to the management of wild horses on the Jarita Mesa Allotment, in violation of the NFMA and of the APA.   See Complaint ¶¶ 137-140, at 51-52 (citing 5 U.S.C. §§ 702, 706(2)).   As their eighth cause of action, the Plaintiffs allege that the Defendants violated the SYFMA and the APA by failing to use the Carson National Forest for the benefit of the communities within the Unit.   See Complaint ¶¶ 141-143, at 52 (citing 5 U.S.C. §§ 702, 706(2)).   As their ninth cause of action, the Plaintiffs allege that the Defendants violated the Policy and the APA by failing to manage the Allotments in a manner that is responsive to and compatible with the well-being of the local resource-dependent

communities, and that they did so without a reasonable explanation.  See Complaint ¶¶ 144-146, at 52-53 (citing 5 U.S.C. §§ 702, 706(2)).

The Plaintiffs request various forms of relief.  The Plaintiffs request that the Court: (i) declare that the "acts complained of herein violated the First Amendment rights" of the Plaintiffs, Complaint ¶ 1, at 53; (ii) declare that any future reductions to the number of cattle permitted on the Allotments for the 2012-2015 grazing seasons, based on Trujillo's 2010 Decision Notice, would be contrary to the Constitution, see Complaint ¶ 2, at 53; (iii) declare that the Defendants violated NEPA by failing to adequately analyze, or to "take a hard look" at, the social, economic, and environmental impacts that would result from the 2010 EA and the 2010 Decision Notice for the Allotments, Complaint ¶ 3, at 53; (iv) declare that the Defendants violated NEPA by "failing to properly analyze impacts insofar as they failed to develop or use a proper baseline based on the best available science," Complaint ¶ 4, at 53; (v) declare that the Defendants violated NEPA by failing to properly consider and respond to comments, and by failing to consider a reasonable range of alternatives, see Complaint ¶ 5, at 54; (vi) declare that Trujillo violated NEPA by failing to consider the alternatives that the EA analyzed before issuing the 2010 Decision Notice, see Complaint ¶ 6, at 54; (vii) declare that the Defendants violated the NFMA by failing to act in accordance with the Carson National Forest Plan's range standards and guidelines regarding grazing numbers, see Complaint ¶ 7, at 54; (viii) declare that the Defendants violated the NFMA by failing to act consistently with the Carson National Forest Plan's range standards and guidelines regarding wild horse management, see Complaint ¶ 8, at 54; (ix) declare that the Defendants violated the Plaintiffs' rights under the SYFMA by failing to manage the forest for the benefit of the communities within the Unit, see Complaint ¶ 9, at 54; (x) declare that the Defendants violated the Policy by failing to be responsive to the needs of the

local, resource-dependent communities and failing to act in a way that supports their future well-being, see Complaint ¶ 10, at 54; (xi) declare that the Defendants' actions violated the APA by not observing the procedures required by law, and were arbitrary and capricious "and/or unconstitutional," Complaint ¶ 11, at 55; (xii) issue a judgment and injunction that voids the 2010 Decision Notice, and orders the Defendants to adhere to the second alternative the 2010 EA, which would allow the Plaintiffs to keep their permits at approximately the same levels as before the 2010 EA was issued, see Complaint ¶ 12, at 55; (xiii) issue an injunction that compels the Forest Service to comply with NEPA, the NFMA, the SYFMA, and the APA, so as to prevent irreparable harm and satisfy the public interest, see Complaint ¶ 13, at 55; (xiv) issue an injunction which requires the Defendants to adhere to the second alternative in the 2010 EA, see Complaint ¶ 14, at 55; (xv) award compensatory damages, against Trujillo, to the Plaintiffs who had their permits reduced in the 2011 grazing season and any subsequent grazing season, see Complaint ¶ 15, at 55; (xvi) award punitive damages against Trujillo, see Complaint ¶ 16, at 56; (xvii) award the Plaintiffs their "costs, expenses, expert witness fees, and reasonable attorney fees under applicable law," Complaint ¶ 17, at 56; and (xviii) grant the Plaintiffs "such other and further relief as the Court deems proper," Complaint ¶ 18, at 56.

### 2.      The Court's Prior Opinions in This Case.

The Defendants first moved to dismiss the First Amendment retaliation claim on May 23, 2012 -- not on exhaustion grounds, but for failure to state a plausible claim.  See Defendants' Memorandum in Support of Motion to Dismiss, filed May 23, 2012 (Doc. 17)("Earlier MTD"). They moved the Court to dismiss: (i) the claim under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"); (ii) the First Amendment retaliation claim; and (iii) the claims for declaratory relief.  See Earlier MTD at 1.  The Court

granted the Earlier MTD as to (i) and (iii), and denied it as to (ii).  See Memorandum Opinion

and Order at 1-3, 114, filed January 24, 2013, 921 F. Supp. 2d 1137, 1141, 1205 (Doc. 49)

("MOO").

The Court ruled that the Plaintiffs stated a proper and plausible First Amendment

retaliation claim.  See MOO at 93-114, 921 F. Supp. 2d at 1193-1205.  It also ruled, at that time,

that the Complaint contained not one, but two First Amendment retaliation claims: one under the

APA and the other a "standalone" claim.  MOO at 111-13, 921 F. Supp. 2d at 1203-04.  The

Court wrote:

> 2.   The Plaintiffs May Seek Equitable Relief for the Violation
>      of Their Constitutional Rights Outside of the APA.
>
> The Plaintiffs seek equitable relief from Trujillo in her official capacity.
> "An action against federal employees in their official capacities is in effect a suit
> against the United States for which a waiver of sovereign immunity must exist."
> Cortez v. EEOC, 585 F. Supp. 2d 1273, 1287 (D.N.M. 2007).  "Absent a waiver,
> sovereign immunity shields the Federal Government and its agencies from suit."
> FDIC v. Meyer, 510 U.S. at 475.  "[A]n official capacity suit is only another way
> of pleading an action against an entity of which an officer is an agent."  Johnson
> v. Bd. of Cnty. Comm'rs for Cnty. of Fremont, 85 F.3d 489, 493 (1996)(internal
> quotation marks omitted).
>
> Through 5 [U.S.C.] § 702, Congress provided "a general waiver of the
> government's sovereign immunity from injunctive relief."  United States v.
> Murdock Mach. and Eng'g Co. of Utah, 81 F.3d at 930 n.8.  "This waiver is not
> limited to suits under the Administrative Procedure Act."  Simmat v. U.S. Bureau
> of Prisons, 413 F.3d at 1233.
>
>> Whether plaintiffs' claims arise under the APA or common law is
>> also immaterial with respect to the sovereign immunity analysis.
>> Under 5 U.S.C. § 702, the United States waives sovereign
>> immunity as to actions "in a court of the United States seeking
>> relief other than money damages and stating a claim that an agency
>> or an officer or employee thereof acted or failed to act in an
>> official capacity or under color of legal authority."  As we held in
>> Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005),
>> § 702's waiver of sovereign immunity "is not limited to suits under
>> the Administrative Procedure Act."  Id. at 1233; see also Hanson v.
>> Wyatt, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008)(Gorsuch, J.,

concurring)("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver." (citation omitted)).

Gilmore v. Weatherford, 694 F.3d at 1166 n.1.  The Plaintiffs may therefore bring their claims under the First Amendment, and not under the APA, against the Defendants without implicating sovereign immunity, because of the United States' general waiver, in 5 U.S.C. § 702, of sovereign immunity in suits seeking equitable relief.  Additionally, the Court has jurisdiction under 28 U.S.C. § 1331 of this claim.  See Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1232, 1236 (finding that a federal court has jurisdiction under 28 U.S.C. § 1331 for claims "seeking vindication of their constitutional rights . . . and may obtain relief in the nature of either injunction or mandamus").  The United States' waiver of sovereign immunity in the APA extends to claims for "nonmonetary relief against federal officials and agencies," over which the Court has jurisdiction, such as those for equitable relief brought under 28 U.S.C. § 1331.  Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1232, 1236.  Indeed, in the Plaintiffs' Second Notice of Additional Authority in Response to Defendants' Motion to Dismiss Count I, the Plaintiffs cite to persuasive authority from the United States Court of Appeals for the District of Columbia Circuit, which comes to the same conclusion as the Court has here.  See Trudeau v. Federal Trade Comm'n, 456 F.3d at 187 ("In sum, we hold that APA § 702's waiver of sovereign immunity permits not only Trudeau's APA cause of action, but his nonstatutory and First Amendment actions as well.").

The Court is fully aware of the tension that exists between allowing a standalone First Amendment claim for declaratory relief and the APA claims.  Although the stand alone First Amendment claim allows the Plaintiffs robust discovery, while the similar claim under the APA and Olenhouse v. Commodity and Credit Corp., enjoys no or very little discovery.  The end result of both claims are likely to be similar if the Plaintiffs prevail: an injunction under the stand alone claim and invariably under the APA claim.  The Defendants appear to ask the Court to fashion some doctrine -- like in the Bivens area -- that precludes the declaratory judgment action if there is another remedy.  There is, however, no such doctrine, and the Court is reluctant to create one here.  While the stand alone First Amendment claim undercuts Olenhouse v. Commodity and Credit Corp. in this case, this situation is unusual and relatively rare.  The Plaintiffs could have brought only a First Amendment claim in a separate case and enjoyed robust discovery; there is no sound reason to prevent them from joining it with an APA claim, which largely raises statutory issues.  While the Plaintiffs could not get much, if any, discovery on their APA First Amendment claim, there is no sound reason to preclude them from getting discovery on their standalone claim simply because they also have an APA First Amendment claim.

MOO at 111-113, 921 F. Supp. 2d at 1203-05 (boldface omitted in opening heading to avoid confusion).[4]

The Forest Service asked the Court to reconsider the above-quoted portion of the MOO -- specifically the final two sentences.   See Federal Defendants' Motion for Reconsideration, filed February 7, 2013 (Doc. 53)("Motion to Reconsider").  The Forest Service disagreed with the Court's refusal to dismiss the First Amendment retaliation claim, but it did not challenge that ruling in the Motion to Reconsider.  Rather, the Motion to Reconsider asked the Court to clarify that only one First Amendment retaliation claim exists -- not two -- and that the claim is subject to the APA's procedural provisions.  See Motion to Reconsider at 7-8 & n.1. The Forest Service's stated goal in filing the Motion to Reconsider was to limit the Court's fact-finding to the administrative record and bar the Plaintiffs from obtaining discovery on their claims.  See Motion to Reconsider at 7-8 & n.1.  The Forest Service cited numerous cases in which courts, including the United States Court of Appeals for the Tenth Circuit, have adjudicated constitutional claims within the APA's procedural framework.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d at 1085 ("We review Robbins' due process claim against the [agency] under the framework set forth in the APA."); Olenhouse v. Commodity Credit Corp., 42 F.3d at 1573.

The Court granted the Motion to Reconsider and nullified the above-quoted portion of its earlier MOO, concluding: "[T]here is only one First Amendment retaliation claim; it arises under the Constitution, but it is subject to the APA's procedural provisions, which generally limit the

---

[4]The Court appended the following footnote at the end of the final sentence: "The Defendants appear to be prepared for this fact, as Department of Justice Attorney Andrew A. Smith appears to be representing the United States on the APA issues, and Assistant United States Attorney Ruth F. Keegan appears to be doing the heavy lifting regarding the First Amendment claims against Trujillo."  MOO at 113 n.8, 921 F. Supp. 2d at 1205 n.8.

judicial review to the administrative record."  Memorandum Opinion at 64, filed October 22, 2014, 2014 WL 5859067, at *35 (Doc. 131)("MO").  The Court wrote that

> with respect to all entities that come within the Chapter's definition of "agency," <u>see</u> 5 U.S.C. § 701(b), if review is not available under the APA it is not available at all.  Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing judicial review of all federal agency action.  <u>While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA</u> unless *specifically* excluded, <u>see</u> 5 U.S.C. § 559.

<u>Webster</u> v. <u>Doe</u>, 486 U.S. 592, 607 n.* (1988)(Scalia, J.)(underlining added) (italics in original).  The Tenth Circuit has held that the USFS is an "agency" under § 701.  <u>E.g.</u>, <u>Utah Envtl. Congress v. Bosworth</u>, 372 F.3d 1219, 1223 n.3 (10th Cir. 2004)("We review the Forest Service's approval of the Monroe Project as final agency action under the APA, 5 U.S.C. §§ 701-706.").  The issuance, revocation, or modification of a license is an agency action.  <u>See</u> 5 U.S.C. § 551(13) (providing that "'agency action' includes the whole or a part of an agency rule, order, <u>license</u>, sanction, relief, or the equivalent or denial thereof, or failure to act" (emphasis added)); <u>McKeen v. U.S. Forest Serv.</u>, 615 F.3d at 1246, 1257-58 (holding that a USFS "livestock grazing permit" decision "constitutes a 'final agency action' that is subject to judicial review under the APA").  The USFS' eighteen-percent reduction of the Plaintiffs' livestock permitting is central to the Plaintiffs' claims, including the First Amendment retaliation claim.  <u>See</u> Complaint ¶ 112, at 47 ("[The] decision to reduce the individual Plaintiff permittees' livestock permits by 18% was an adverse action calculated to retaliate against and punish them for the exercise of rights protected by the First Amendment and to chill their future exercise of such rights . . . .").  This case, thus, is subject to the APA's provisions.

The case before the Court is an appeal of an agency action in every respect: that the appeal alleges constitutional violations as well as statutory ones does not take it outside of the APA, <u>see</u> 5 U.S.C. § 706(2)(B) ("The reviewing court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to <u>constitutional</u> right, power, privilege, or immunity . . . ." (emphasis added)); and that the appellants allege, as part of their argument on appeal, that the lower forum was motivated by an illicit animus does not relieve the Plaintiffs of the substantial burdens the law would impose on them but for the allegations.  Given the difficulty of surmounting a successful administrative appeal in the face of arbitrary-or-capricious factual review and <u>Chevron</u> [<u>U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984)("<u>Chevron</u>")]]/<u>Auer</u> [v. <u>Robbins</u>, 519 U.S. 452 (1997)] legal deference, for the Court to hold otherwise -- and allow fresh discovery, submission of new

evidence and legal arguments, or de novo review -- would be to incentivize every unsuccessful party to agency action to allege bad faith, retaliatory animus, and constitutional violations to trade in the APA's restrictive procedures for the more even-handed ones of the Federal Rules of Civil Procedure.

The relationship between the USFS and the Plaintiffs is fundamentally that of tribunal and litigant, and not that of adversarial parties to a lawsuit.  See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 652 (2002) (describing "the regulatory commission" as "a nominal defendant when a party appeals in the federal system," and noting that many substantively similar state-court administrative schemes caption cases judicially reviewing agency decisions as appeals, and not as adversarial proceedings between the appellant and the agency).  The Plaintiffs cannot avoid the hardships of the Court's deference to the agency by making allegations of agency malevolence.  These "hardships" from the Plaintiffs' perspective are, from the perspective of the judiciary, Congress, and the public, consciously designed efficiencies.  For better or for worse, in the modern administrative state, agencies are a part of the adjudicatory apparatus -- not merely a party to it.

The Court must carefully manage the procedural posture of this case and the motions in it.  Review of agency actions generally comes to the Court in the form of an appeal, and not a "separate and independent action, initiated by a complaint and subjected to discovery and a 'pretrial' motions practice." Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579 (explaining that "[t]his process, at its core, is inconsistent with the standards for judicial review of agency action under the APA").  The Court does not, however, read the APA or Olenhouse v. Commodity Credit Corp. as requiring any one particular form of action.  Section 703 provides that "[t]he form of proceeding for judicial review is . . . any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." Olenhouse v. Commodity Credit Corp. says that a "district court should govern itself by referring to the Federal Rules of Appellate Procedure," a requirement that the Tenth Circuit has confirmed as recently as 2009.  42 F.3d at 1580.  See Wyoming v. U.S. Dep't of Interior, 587 F.3d at 1251 n.2.  See also Hamilton v. Sec'y of Health & Human Servs. of U.S., 961 F.2d 1495, 1504 (10th Cir. 1992) ("[D]istrict courts should process these cases as appeals, eliminate aberrant motion practices, and follow the Federal Rules of Appellate Procedure.").  The Federal Rules of Civil Procedure for the United States District Courts, which govern district courts in the first instance as a matter of Supreme Court and congressional mandate, see Fed. R. Civ. P. 1,12 provide that "[t]here is one form of action -- the civil action," Fed. R. Civ. P. 2.   Looking past the mixed signals sent by the legal authorities and instead to the purposes underlying Olenhouse v. Commodity Credit Corp., the Court concludes that there is no harm in taking the case in the form that the parties -- namely the Plaintiffs -- have presented it, so long as the procedural devices the Court uses respect the congressionally determined scheme of judicial review.

The burden will be properly placed on the Plaintiffs for much of what they do in this case.  Devices such as rule 56 summary judgment are incompatible with this scheme, and the Court thus cannot use them.  As a group, the devices normally used by appellate courts are generally more consistent with the APA's judicial review scheme than the devices that trial courts normally use, which presume nothing about the merits of the case and divide burdens of proof and production almost equally between the plaintiff and defendant.  The Court can see no reason, however, why the Plaintiffs cannot use the familiar procedural devices of the Federal Rules of Civil Procedure if they wish, at least to the extent that they comport with or can be modified to comport with the APA.

The APA generally limits the Court's review to the administrative record; the Federal Rules of Appellate Procedure reiterate the statute's limitation.  See Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency.").  This limitation does not, however, leave the Plaintiffs entirely without recourse to supplement that record.  The Tenth Circuit explicitly allows for supplementation of the administrative record if the Plaintiffs can demonstrate that "the agency's fact-finding procedures[were] inadequate."  Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.3d at 1141 n.7.   The Court will additionally borrow the Ninth Circuit's exceptions and allow supplementation of the record: (i) as necessary to determine "whether the agency has considered all relevant factors and has explained its decision," an exception the Court concludes is functionally identical to the Tenth Circuit's exception; (ii) if the Plaintiffs can show that "the agency has relied on documents not in the record"; (iii) if "supplementing the record is necessary to explain technical terms or complex subject matter"; and (iv) if the Plaintiffs can present evidence "mak[ing] a showing of agency bad faith."  Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).  Although the Tenth Circuit has not yet recognized these additional bases for supplementing the record, it has also not disclaimed them.

There are three ways to supplement the administrative record, listed here in descending order of favorability: (i) remanding the case to the USFS for additional findings or conclusions, which the Court may specifically request or order; (ii) allowing the Plaintiffs to submit supplementary evidence -- which they have obtained on their own -- to the Court; and (iii) granting the Plaintiffs limited rights to impose Court-mandated discovery on the USFS and others.  The Court will allow the Plaintiffs to present evidence freely for the sole purpose of triggering one of the above four exceptions.  The Court will place the burden on the Plaintiffs, not only to present evidence establishing the factual predicate for one of the exceptions to the administrative-record rule, but also to argue why they need the specific remedial measure -- (i), (ii), or (iii) in this paragraph -- they seek.  If the Plaintiffs show only that the USFS inadequately considered the

determination below or failed to consider all relevant factors, the Court will be inclined to remand the case back to the USFS for further deliberation.  If the Plaintiffs show only that the USFS relied on a limited number of documents outside of the record, the Court will likely supplement the record only with the documents in question.  If supplementation is needed to explain technical terms or complex subject matter -- and the Court can likely make this determination for itself, without the Plaintiffs' help -- the Court can likely conduct its own judicial noticing, or allow the parties to submit limited learned treatise or similar material to explain the technical matter.  The last exception -- which is also the one the Plaintiffs allege in this case -- bad faith, is the only one in which the Court can reasonably foresee permitting discovery.  The Court will demand a compelling factual showing to trigger this exception in the first instance, and it will additionally tailor any remedial supplementation narrowly to the Plaintiffs' needs.

There are other motions already pending in this case -- the MTD for Failure to Exhaust and the Motion for Discovery -- that present the question more squarely, and in which the Court can more appropriately flesh out the parameters of the administrative record rule and its exceptions.  For now, the Court will only clarify that: (i) the Plaintiffs have alleged one First Amendment retaliation claim, which arises under the Constitution; and (ii) that claim, because it arises from a final agency action, is subject to the APA's procedural provisions, which include a general rule that the reviewing court must limit its review to the administrative record.  It is not without meaning that the Plaintiffs' claim is constitutional in nature: if the claim were statutory, even the USFS' legal interpretations, in addition to its factual findings, would be entitled considerable deference; as it stands, the Court will undertake a de novo review of the constitutional legal issues in the case.  Although the substantive nature of the claim does change the substantive standard of review -- e.g., arbitrary-and-capricious review, Chevron deference, de novo review, etc. -- it does not change the procedural framework under which the case must progress: the APA.  The Court will grant the Motion to Reconsider and will not permit discovery except upon motion and proper evidentiary showing by the Plaintiffs.

MO at 64-71 (footnotes omitted)(internal cross-reference citation omitted).

After all of the above transpired, the Forest Service moved for, and the Court granted,

dismissal of the First Amendment claim.  See Amended Memorandum Opinion, filed November

18, 2014, 2014 WL 6612108 (Doc. 135)("AMO").[5]   The Court dismissed the claim without

---

[5]The AMO dismissed the First Amendment claim without prejudice.  The Court had entered a Memorandum Opinion, filed November 17, 2014 (Doc. 134), a day earlier in which it dismissed the claim with prejudice, but that decision was incorrect, and the Court noticed and corrected it sua sponte.  See AMO at 2 n.1, 2014 WL 6612108, at *1 n.1.

prejudice as a result of the Plaintiffs' failure to exhaust their administrative remedies with the Forest Service.  See AMO at 2, 105, 2014 WL 6612108, at *1, *59.

### 3.   The Briefing and Hearing on the Motion.

As the Plaintiffs filed the Motion now before the Court after the MOO -- which the Court filed on January 24, 2013, and which stated that the Plaintiffs were entitled to discovery on their standalone First Amendment retaliation claim -- but before the MO and the AMO -- which clarified that no standalone First Amendment claim exists outside of the APA and dismissed the First Amendment claim altogether, respectively -- the Motion makes arguments that no longer apply in light of the aforementioned rulings.  The Court will summarize the briefing insofar as the parties arguments remain relevant.

### a.   The Plaintiffs' Motion.

The Plaintiffs couch their Motion, not as one to supplement the complete and proper administrative record, but as one to fill out an incomplete administrative record.  See Motion at 1-7.  They contend that the administrative record must contain all items in the agency's possession at the time the agency was considering the decision, which is not limited to that evidence that "'literally passed before the eyes of the final agency decisionmakers.'"  Motion at 4 (quoting Ctr. for Native Ecosys. v. Salazar, 711 F. Supp. 2d 1267, 1275 (D. Colo. 2010)).  The Plaintiffs note that, while an agency's designation of what materials constitute the administrative record "is generally afforded a presumption of regularity," Motion at 4, here, "it seems clear that the Administrative Record filed by Defendants is incomplete," Motion at 6.  Most notably, the Plaintiffs cite case law for the proposition that all documents that the agency itself authored must be made a part of the administrative record.  See Motion at 4, 6.

The Plaintiffs also repeat their bad-faith allegations and ask the Court to open the proceedings to discovery, asserting that "the government may not hide behind the administrative record in the face of rationally articulated charges of bad faith or improper conduct."  Motion at 10.  The Plaintiffs state that they have met their burden of showing bad faith and are entitled to supplement the record with new discovery:

> Not only have Plaintiffs alleged conduct that constitutes bad faith, i.e., retaliatory conduct, the Court already has found numerous allegations in Plaintiffs' Complaint, if proven, would constitute bad faith retaliatory action. January 24, 2013, Memorandum Opinion and Order, Doc. 49, at 2, 103, 105.  The Plaintiffs have offered particularized credible allegations that Defendant Trujillo's actions consistently, over time, were adverse to those who spoke out against her and the USFS.  They also have sufficiently alleged that the 2010 Decision Notice was contrary to the weight of evidence before Defendant Trujillo, and was made after the Plaintiffs deeply angered Defendant Trujillo by requesting her removal. Doc. 49 at 106.  Thus, Plaintiffs have made a strong, sufficient, showing of bad faith sufficient to justify discovery and supplementation of the record.

> Moreover, although the record filed by Defendants already contains some evidence of retaliatory conduct, it appears to improperly exclude various materials that would confirm such improper motive.  Accordingly, discovery and supplementation of the record are necessary to further support allegations of Defendants' bad faith actions and develop counts 2 through 9 of Plaintiffs' Complaint.  Accordingly, extra record discovery and supplementation of the record is warranted pursuant to the bad faith exception to the record review rule articulated in Citizens to Preserve Overton Park v. Volpe.

Motion at 11-12 (footnote omitted).

The Plaintiffs specifically ask for documents concerning the number of wild horses on the Jarita Mesa and Alamosa Grazing Allotment from 2005 to present.  See Motion at 12.  They request what they call "targeted discovery" of the Defendants' bad faith and retaliatory motive. Motion at 16.  They attach to their Motion several documents they want the Court to consider, including three Forest Service reports, see Nontimber Forest Products in the United States: Montreal Process Indicators as Measures of Current Conditions and Sustainability, filed November 25, 2013 (Doc. 106-2)("Nontimber Forest Report"), and affidavits from two

- 31 -

permittees, <u>see</u> Affidavit of Felipe Martinez, filed April 22, 2013 (Doc. 78-2); Affidavit of David

Correa, filed April 22, 2013 (Doc. 78-1).  The Plaintiffs also attach an exhibit outlining the

outside-the-record documents, currently in the Plaintiffs' possession, that it would like the Court

to consider.  <u>See</u> Motion to Supplement and/or Complete the Administrative Record, and for

Limited Discovery, filed November 25, 2013 (Doc. 106-1)("Requested Document List").  As for

the Plaintiffs' discovery requests, the Court will reproduce the final few paragraphs of the

Motion in their entirety:

> In order to ensure that all records and information concerning these
> relevant factors are properly before the Court to enable it to conduct a well-
> grounded, informed review of Defendants challenged actions, Plaintiffs
> respectfully request that the Court enter an order permitting Plaintiffs to engage in
> the following targeted and limited discovery.  Plaintiffs propose that not more
> than 35 requests for production of documents, including the numbered items in
> the list attached hereto as Exhibit 1, relating to the topics described above would
> suffice to achieve Plaintiffs' legitimate discovery needs in connection with these
> aspects of their APA claims.
>
> Plaintiffs further propose that not more than 10 interrogatories relating to
> these topics would suffice to achieve their legitimate discovery needs in
> connection with these aspects of their APA claims.
>
> Finally, Plaintiffs propose that they be permitted to conduct no more than
> three depositions: one of Defendant Trujillo; one of her former supervisor, former
> Carson National Forest Supervisor, Kendall Clark; and one of their supervisor,
> Region 3 Director, Corbin Newman.  These are the three individuals with the
> greatest knowledge of the history of conflict between Defendant Trujillo and the
> Jarita Mesa and Alamosa Grazing Allotment permittees.

Motion at 21-22.  The Plaintiffs followed their Motion up with a Supplement to Motion to

Supplement and/or Complete the Administrative Record, and for Limited Discovery, filed

February 27, 2014 (Doc. 112), describing and attaching three additional documents they would

like the Court to consider: (i) the Forest Service Compliance Review Report, Civil Rights

Program Review, filed February 27, 2014 (Doc. 112-1)("Civil Rights Report"); (ii) the Affidavit

of Fernando Gurule, filed February 27, 2014 (Doc. 112-2); and (iii) the Affidavit of Ronald Martinez, filed February 27, 2014 (Doc. 112-3).

b.      **The Defendants' Response.**

The Defendants responded to the Motion almost eight months after the Plaintiffs filed the Motion.  See Federal Defendants' Response in Opposition to Plaintiffs' February 27, 2014 Supplemented Motion to Supplement or Complete the Administrative Record [ECF Nos. 106 and 112], filed July 16, 2014 (Doc. 118)("Response").   The Defendants first argue that the Motion is the Plaintiffs' attempt to circumvent the AMO.  See Response at 2.  Second, they argue that the Forest Service's presumption of regularity in compiling the administrative record can only be overcome by a showing of clear evidence of incompleteness and that the Plaintiffs have not made such a showing.  See Response at 3 (citing Bar MK Ranches v. Yeutter, 994 F.2d 735, 740 (10th Cir. 1993)).   The Defendants contend that the Plaintiffs' proposed standard, which the Defendants characterize as being "that any document that may be in the Forest Service's files anywhere in the country are properly part of the Administrative Record," is incorrect.  Response at 3.   The Defendants state that "[t]he complete administrative record consists of all documents and materials directly or indirectly considered by the agency," and that "[t]he task of the reviewing court is to apply the appropriate APA standard or review to the agency decision *based on the record the agency presents to the reviewing court*."  Response at 5 (emphasis in Response but not source case)(quoting Bar MK Ranches v. Yeutter, 994 F.2d at 739; Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985)).

The Defendants argue that, under administrative-exhaustion rules, the Plaintiffs are not permitted to raise any new arguments nor introduce any new material that they did not put before the administrative appeal board.  See Response at 6-8.  The Defendants cite to ample case law

- 33 -

supporting their proposition that the Plaintiffs forfeit any claims or legal theories not raised at the administrative-appeal level, but not necessarily to support their argument that the only evidence that can be used at the judicial-review stage -- i.e., all evidence that is properly included in the administrative record -- is evidence that was introduced before the agency appeals board.  See Response at 6-12.  The Defendants' argument on this front is based on a Forest Service regulation that requires an appellant to "produce 'specific evidence and rationale' to show how the appealed decision 'specifically violates law.'"  Response at 10 (quoting 36 C.F.R. § 215.14(a), (b)(8)).

The Defendants quote a case that they say outlines the relevant standard for completing an incomplete administrative record when an agency has allegedly omitted documents from it:

> To overcome the presumption of regularity and meet the burden of proving that the record designated by the agency is incomplete, Petitioners must clearly set forth in their motion: (1) when the documents were presented to the agency; (2) to whom; (3) and under what context.  This showing is not, however, sufficient grounds for admitting the proffered documents into the Administrative Record.  Petitioners must also establish that these documents were directly or indirectly considered by the relevant agency decision makers.

Response at 13 (quoting Ctr. for Native Ecosys. v. Salazar, 711 F. Supp. 2d 1267, 1275 (D. Colo. 2010)).  The Defendants also argue that, even if the Court were to find that the administrative record that they proffered was deficient, the proper remedy would be to remand the case to the Forest Service, rather than allowing the Plaintiffs to supplement the record.  See Response at 16 (citing Fla. Power Power & Light Co. v. Lorion, 470 U.S. at 744).

The Defendants argue that the Supreme Court allows supplementation of the administrative record only in "rare circumstances," and that the Plaintiffs have failed to present a strong evidentiary showing of Trujillo's bad faith -- the "rare circumstance[]" most relevant to this case.  Response at 16.  They assert that "[a]llegations in a Complaint are just

- 34 -

that -- allegations -- and cannot constitute the 'strong showing' required by the Tenth Circuit and Supreme Court." Response at 17-18. Last, the Defendants present substantive arguments justifying Trujillo's actions -- including that the Forest Supervisor, and not Trujillo, as a District Ranger, makes all decisions related to wild-horse eradication -- in an attempt to show that she made her decisions for reasons other than retaliatory animus. See Response at 19-27.

> c.   **The Plaintiffs' Reply**.

The Plaintiffs replied within three months, largely reiterating the arguments in their Motion. See Reply in Support of Supplemented Motion to Supplement and/or Complete the Administrative Record, and for Limited Discovery [ECF Nos. 106 and 112], filed October 10, 2014 (Doc. 128)("Reply"). The Plaintiffs first argue that, even though the Court dismissed their First Amendment retaliation claim, they can still request that the Court allow supplementation of the record, for the purpose of adjudicating the other claims, on the ground that the Defendants acted in bad faith. See Reply at 5-10. The Plaintiffs contend that this bad faith manifested itself as retaliatory animus -- i.e., it greatly resembles the underlying substance of the now-dismissed First Amendment claim -- but that their inability to pursue a substantive claim does not foreclose their inability to remedy what they view as a procedural/evidentiary defect in the record. See Reply at 5-10. They argue that

> the detailed facts laid out in the Complaint, the deficiencies in the record that Plaintiffs have pointed out, and the supplementary materials proffered by Plaintiffs in support of this Motion, together, constitute a substantial showing that the Defendants used a pretextual justification in bad faith to implement a predetermined decision to impose the 18% grazing reduction.

Reply at 17. Last, the Plaintiffs argue that two internal Forest Service reports written in 1935 and 1947, as well as a 2013 civil rights report relating to the Forest Service, should be admitted into the record as evidence of the Forest Service's historical animus towards traditional, land-

based Hispanic communities, see Reply at 19-22, and the affidavits are necessary to show "that the Defendants failed to genuinely consider a relevant factor in their decision," Reply at 22.

### d.    The Hearing on the Motion.

The Court held a hearing less than a month after the Plaintiffs filed their Reply.  See Transcript of Hearing (taken November 7, 2014)("Tr.").[6]  The Court asked the Plaintiffs how they would prioritize their requests -- i.e., if they could only get in a few documents or categories, what would they be -- to which the Plaintiffs responded:

> The specific documents, including the affidavits that we attached to our motion, those are crucial in our view.  And the reports particularly the one on nontimber forest products and --
>
> THE COURT:  That's the one out of the northwest?
>
> MR. HERSKOVITZ:  Yes, that addresses the meaning of this terminology that it doesn't have an obvious natural meaning, although anybody could impose an interpretation on it, or a crux on it.  But we think that that's very instructive in terms of what is meant by or covered by the duties imposed on the Forest Service by the sand hill management.  And the affidavits, of course, in our view are critical direct evidence of the alleged bad faith behavior of the defendants or basis for their action.  And that goes for the two affidavits of Ronald Martinez and I'm forgetting his name at the moment, but let me just look it up, and then tell you who it is.  It's [Fernando] Gurulé.  Those go both to bad faith and in our view are essential for the court to have an understanding of sort of blatant implausible or wildly unreasonable way in which the defendants simply masked or didn't acknowledge the obvious times of economic and socioeconomic harm that would result from imposing a roughly one fifth reduction on the grazing permits of these rural folk.  And in our view, the outrageousness of that and pointing that another to the court is important in terms of seeing what we think is one of a number of pieces or acts that check tiff I will really demonstrate a pattern of bad faith sort of punitive or retaliatory conduct towards the plaintiffs.  So those affidavits are in our view crucial in those reports that we've identified.

---

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain different page and/or line numbers.  The Court additionally notes that the transcript appears to capture the entire hearing -- it begins with the attorneys entering their appearances and exchanging pleasantries -- but nonetheless starts on page 45.  Thus, the difference in pagination between the Court's draft version and any final version may be greater than usual.

> And that also includes the civil rights report, is what we have called it. It's what in our view it's essentially a statement against interest by the Forest Service where in a survey, an analysis done shortly after this case was filed, surveying these areas and these types of constituencies, rural, northern New Mexico, Hispanic, and Indian ranchers who were having chronic problems, it reflects exactly the same sorts of things and patterns of disregard and arbitrary and at times hostile and punitive action that we've alleged in this case. So those documents I think are in our view[] top priority.

Tr. at 57:13-60:3 (Court, Herskovitz). "Of perhaps lesser importance," the Plaintiffs identified the 1935 and 1947 reports. Tr. at 60:4 (Herskovitz).

In terms of discovery, the Plaintiffs emphasized the importance, in their eyes, of deposing Trujillo and her supervisors. See Tr. at 61:23-62:24 (Herskovitz). The Plaintiffs argued that they could not even establish the bounds of the administrative record -- i.e., "what [Trujillo] did and didn't take into account" -- without such depositions. Tr. at 65:13-14 (Herskovitz). The Plaintiffs noted, however, that, since the Court dismissed the First Amendment claim, the Plaintiffs had "dropped the[ir] interrogatories and reduced the number of documents . . . being requested." Tr. at 66:20-22 (Herskovitz).

The Plaintiffs referenced a case, which the Honorable Barbara B. Crab, United States District Judge for the Western District of Wisconsin, wrote, applying the bad-faith exception to the administrative-record rule. See Tr. at 51:15-53:2 (Herskovitz, Court)(referring to Sokaogon Chippewa Comm. (Mole Lake Band of Lake Sup. Chippewa) v. Babbitt, 961 F. Supp. 1276 (1997)(Crabb, J.)). The Plaintiffs characterized that case as setting the bar for supplementing the record as whether "the evidence was at least sufficient to support a reasonable inference or a possible inference that would be reasonable that there could have been some form of bad faith, some form of improper influence or . . . improper consideration on the part of the agency decision makers." Tr. at 52:21-53:2 (Herskovitz). The Plaintiffs also argued that their proposed

supplementation was justifiable on grounds other than bad faith -- namely, the ground that extra-record evidence may be introduced to show "whether the agency has considered all relevant factors and has explained its decision."   Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).  See Tr. at 67:17-70:11 (Herskovitz).

The Defendants acknowledged that both the Supreme Court and the Tenth Circuit had recognized circumstances in which plaintiff-appellants at the judicial review stage in APA cases are allowed to supplement the record.   See Tr. at 71:12-71:23 (Smith).   They contended, however, that the Tenth Circuit "has never found an application [of the] bad faith exception." Tr. at 71:24-25 (Smith).  The Defendants told the Court that, "with all respect to [J]udge [C]rab, her standard is way off base, and I think you articulated the standard actually for bad faith very well in your [MO, on] page 70."  Tr. at 74:12-15 (Smith).  The Defendants argued that the Court should narrowly tailor any supplementation that it decides to allow -- just as the Court said it was inclined to do in its MO.  See Tr. at 74:19-75:11 (Smith).  The Defendants said that, in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971), the case that invented the bad-faith exception to the administrative-record rule, the Supreme Court characterized the administrative record "as a naked nonexistent record."  Tr. at 75:12 (Smith).  The Defendants contrasted that statement with the reality of this case, in which the administrative record that the Forest Service submitted is "12,000 pages long," is "massive and . . . huge," and contains "all kinds of underlying scientific reports [on] all the various issues."  Tr. at 75:14-22 (Smith).

The Defendants also argued that same administrative-exhaustion doctrine that the Court employed to dismiss the Plaintiffs' First Amendment retaliation claim should bar the Plaintiffs from attempting to supplement the administrative record via the bad-faith exception:

THE COURT:  . . . .  Why can those not be -- which I think are in the record -- and were complained about below, why can those not be used for bad faith here?

MR. SMITH:  Because the administrative exhaustion rule is that a court cannot overturn a decision based on an issue or a claim that was not raised in the administrative appeal.  So there was no claim in the administrative appeal that as Your Honor found again when we were arguing about exhaustion of administrative rem[edies] for the First Amendment claim, we never argued they had so say First Amendment or that they had to lay out the mea[t] of a First Amendment claim.  All we said is that if they're basing a First Amendment claim on the argument that district ranger Trujillo acted i[n] bad faith, retaliatory animus, that that has to be in their administrative appeal.  It wasn't because it was a First Amendment claim.  It was the issue that was the basis for that claim.  Now they're just moving that same issue over to I guess their NEPA claim, it's not entirely clear to me, but over to their NEPA claim as the same basis.  It's essentially their First Amendment claim, they're now saying, oh, well, we don't need the First Amendment anyway.  We can just say it's a NEPA claim.  So it's not the label of the claim that counts.  It's whether they raised the underlying issue in the administrative appeal and Your Honor has already said they didn't.  Your Honor didn't say, oh, they didn't say First Amendment in their administrative appeal.  What Your Honor said is they didn't raise anything about retaliation, that this decision was the product of retaliation in their administrative appeal.  That's the basis for their bad faith claim, whether it's a NEPA claim or a First Amendment claim, it's not properly before the court.  There's no distinction there.  If you want to raise a bad faith claim against a decision of the Forest Service because of the statute requiring exhaustion of administrative remedies, you have to raise that issue in your administrative appeal.

Tr. at 80:24-82:14 (Court, Smith).

The Court then asked the Defendants the flip-side question of the one it asked the Plaintiffs about prioritizing their requests: "[P]ut[ting] aside the discovery . . . [and] focus[ing] on the[] six documents that they're wanting to get in[, are] there any of those that you care strongly about?"  Tr. at 82:25-83:3 (Court).  The Defendants responded that they "want to see the administrative record rule applied properly, and [they] don't think any of those fit under any of the exceptions to the administrative record rule, [but a]s a matter of, oh, is this going to ruin our case, no.  None of those . . . show anything."  Tr. at 83:5-10 (Smith).

- 39 -

The Plaintiffs then defended their bad-faith argument, first agreeing with the Defendants that they had no qualms with the Court's articulation of the bad-faith standard in its MOO.

> THE COURT:  I asked Mr. Smith a broad question, when you got that opinion, was there anything in there, I know that you disagreed with the bottom line, but was there anything this there about the discussion that might impact on what we're doing today that you disagreed with?
>
> MR. HERSKOVITZ:  Well, no, Your Honor, not at all.  Whatsoever.  But I do want to check with my co-counsel and make sure, since we actually haven't conferred on that.
>
> No, Your Honor.  We thought it was a correct and of course acceptable interpretation of the law.

Tr. at 90:15-91:2 (Court, Herskovitz).  The Plaintiffs discussed the basis of their bad-faith contention, which revolves around a number of complaints that permittees wrote to Trujillo's higher-ups -- both her actual superiors, and individuals such as the Governor of New Mexico and United States Congressmen -- in response to what they viewed as an out-of-control wild horse population.  See Tr. at 97:3-109:1 (Herskovitz, Court).  The Plaintiffs also reiterated their concern that the present-day Forest Service-permittee relationship evolved from one in which the Forest Service held openly antagonistic and racist views towards the permittees -- although the Plaintiffs were careful to clarify that they did not believe the facts of the present case could be ascribed to direct racism.  See Tr. at 125:7-22 (Court, Herskovitz).  The Defendants, on the other hand, maintained that: (i) the wild-horse problems, while acknowledged, were intractable because of the expensive nature of remediation; (ii) Trujillo lacked direct authority over many of the decisions that the Plaintiffs argue she made out of retaliatory animus; and (iii) the permittees' violations of Forest Service policy and their permits -- i.e., failing to fix fences -- is what ultimately led to the reduction.  See Tr. at 210:3-212:11 (Smith).

- 40 -

## LAW REGARDING THE APA'S JUDICIAL REVIEW PROVISIONS

The APA describes the exclusive mechanism -- unless another statute provides an alternative or supplemental mechanism -- by which the federal district courts may review the actions of federal administrative agencies.

> [W]ith respect to all entities that come within the Chapter's definition of "agency," if review is not available under the APA it is not available at all. Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing judicial review of all federal agency action. While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *specifically* excluded.

Webster v. Doe, 486 U.S. at 607 n.* (Scalia, J., dissenting)(emphasis in original)(citations omitted). Specifically, the APA provides that

> [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702. The APA applies to both formal and informal agency proceedings -- "formality" being determined by the agency's compliance with the provision of 5 U.S.C. §§ 556 and 557 -- and empowers the federal district courts to:

> **(1)**    compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be --

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

### 1.    The APA Does Not Impart Subject-Matter Jurisdiction, but It Waives Sovereign Immunity.

The APA does not, through § 702, create an independent basis of subject-matter jurisdiction, see Eagle-Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. 1990); it allows for judicial review of final agency action only if there is also an independent basis for subject-matter jurisdiction, see Colo. Dep't of Soc. Servs. v. Dep't of Health & Human Servs., 558 F. Supp. 337, 339 (D. Colo. 1983). Notably, before review of the grievance may occur, the party must demonstrate that statutes do not preclude judicial review and that the law does not commit the action to agency discretion. See Heckler v. Chaney, 470 U.S. 821, 828 (1985).

Section 702 waives sovereign immunity, and makes clear that suits under the APA are for equitable relief only and not for damages.  See 5 U.S.C. § 702.

Through 5 U.S.C. § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief."  United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996).  "This waiver is not limited to suits under the Administrative Procedure Act."  Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).

> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis.  Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  As we held in Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005), § 702's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1233.  See also Hanson v. Wyatt, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008)(Gorsuch, J., concurring)("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver."  (citation omitted)).

Gilmore v. Weatherford, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012).  See Trudeau v. Fed. Trade Comm'n, 456 F.3d at 186 (holding that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not"); Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)(holding the same).

## 2.    District Courts Must Treat Cases Arising From Agency Actions as Appeals.

Pursuant to Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  42 F.3d at 1580.  See Wyoming v. U.S. Dep't of Interior, 587 F.3d 1245, 1251 n.2 (10th Cir. 2009)(quoting Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580).  District courts may not entertain

motions for summary judgment or any other procedural devices that shift the appellant's

substantial burden -- arbitrary-or-capricious review for questions of fact and Chevron deference

for questions of statutory interpretation -- onto the agency.  See Olenhouse v. Commodity Credit

Corp., 42 F.3d at 1579-80.  See generally infra at 51-54 (describing Chevron deference).  The

Tenth Circuit has admonished district courts not to treat suits arising out of agency actions as

"separate and independent actions," stating:

> The use of motions for summary judgment or so-called motions to affirm permits
> the issues on appeal to be defined by the appellee and invites (even requires) the
> reviewing court to rely on evidence outside the administrative record.  Each of
> these impermissible devices works to the disadvantage of the appellant.  We have
> expressly disapproved of the use of this procedure in administrative appeals in the
> past, and explicitly prohibit it now.

> A district court is not exclusively a trial court.  In addition to its nisi prius
> functions, it must sometimes act as an appellate court.  Reviews of agency action
> in the district courts must be processed as appeals.  In such circumstances the
> district court should govern itself by referring to the Federal Rules of Appellate
> Procedure.   Motions to affirm and motions for summary judgment are
> conceptually incompatible with the very nature and purpose of an appeal.

Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579-80 (footnotes omitted).

### 3.     The Standard of Review for Factual Issues Is Arbitrary-or-Capricious Review -- Also Known as "Substantial Evidence" Review.

Under the APA, a reviewing court must accept an agency's factual determinations in

informal proceedings unless they are "arbitrary[ or] capricious," and, in appeals from formal

proceedings, unless they are "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (E).

Although these standards appear different, the modern view is that they are the same, and that a

decision is arbitrary and capricious if substantial evidence does not support it.  See Ass'n of Data

Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d 677, 683-84

(D.C. Cir. 1984).  In reviewing a decision under the arbitrary-or-capricious standard, the court

reviews the entire administrative record -- or at least those portions of the record that the parties

provided -- but it may not consider materials outside of the administrative record.[7]  See 5 U.S.C.

§ 706.

_____

[7]Section 706(2)(F) of the APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."  The Tenth Circuit has limited this provision's application as follows:

> 5 U.S.C. § 706(2)(F) of the APA has been interpreted as authorizing de novo review in two instances: (1) when the action is adjudicatory in nature and the agency's fact-finding procedures inadequate; and (2) when issues not previously before the agency are raised in a proceeding to *enforce* a nonadjudicatory action.  However, neither situation exists in the case before us.

Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.3d at 1141 n.7 (emphasis in original)(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 415).  Although the Tenth Circuit's statement could be construed as implying that these two situations are the only circumstances that trigger § 706(2)(F), it does not explicitly say as much, nor does it state that the district court lacked authority to employ § 702(2)(F) because the situation fell outside of the two established § 706(2)(F)-triggering circumstances.

Moreover, § 706(2)(F) provides for a "trial de novo," but the district court may wish to supplement the administrative record with new evidence without necessarily conducting a trial de novo.  A leading treatise describes the ill-defined -- and, in the Tenth Circuit, largely undefined -- exceptions to the rule that district courts may not venture outside of the administrative record:

> It is black letter law that, except in the rare case, review in federal court must be based on the agency's record.  Generally, a court may not reach a decision without the administrative record.  A court may delve outside the administrative record under a strong showing of bad faith or improper behavior.  See Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1096 (10th Cir. 2007).  Courts will generally confine themselves to the administrative record[,] which includes all the materials compiled by the agency before it made a decision.  See Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997); Sierra Club v. Slater, 120 F.3d 623, 637-638 (6th Cir. 1997); Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir. 1998).  The Ninth Circuit observed: "A reviewing court must review the administrative record before the agency at the time the agency made its decision."  Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir. 2004); Partridge v. Reich, 141 F.3d 920, 926 n.4 (9th Cir. 1998).  Even review by a trial level court is generally confined to the administrative record.  See Smith v. Office of Civilian Health & Med. Program of Uniformed Servs., 66 F.3d 905, 912 (7th Cir. 1995); First Nat. Bank & Trust, Wibaux, Mont. v. Dep't of Treasury, Comptroller of Currency, 63 F.3d 894, 897-898 (9th Cir. 1995).

_____

. . . .

The record for review includes testimony and documentary evidence admitted at the hearing. It also includes the decision of any lower level decisionmakers.

. . . The boundaries of a record in an informal agency action are sometimes vague but it is not necessary that the reviewing court be presented with a record like that produced in a formal evidentiary hearing. The Supreme Court recognized that the APA contemplates review of informal records. See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). An informal record includes any information the administrative decisionmaker actually considered. See Kent Cnty., Del. Levy Court v. U.S. EPA, 963 F.2d 391 (D.C. Cir. 1992); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys., 745 F.2d 677, 684 (D.C. Cir. 1984)(holding that the administrative record "might well include crucial material that was neither shown to nor known by the private parties").

The Supreme Court has also recognized that the agency may need to develop a "record" for judicial consideration that reflects the basis for a decision but had not been compiled in a discrete form until the litigation. While the agency may create such a record for the litigation, the information and justification must be that actually relied on by the agency. Where additional explanation or clarification is required, the litigation motivated material must reflect the agency's findings and justification at the time the decision was made.

. . . .

[U]nder some circumstances, the court is allowed to go outside the record and the parties are allowed to add to the record.

     (a)    *Methods for adding to the record.* Most often information may be added to the record, if at all, by a petition to the court. [In the D.C. Circuit, a] party may not supplement the record by means of an affidavit. The D.C. Circuit has ruled that materials that could have been submitted to the agency may be added to the record only by joint stipulation.

     (b)    *Additions by the agency.* An agency may submit extra-record evidence to explain its decision under very limited circumstances. The limitation in short is that the agency cannot offer information that it did not consider at the time the decision was made.

- 46 -

(c)     *Review of judicial discretion.*   The decision to allow
         additional evidence is left to the discretion of the district
         court and that decision will be reviewed only for abuse.
         The court must be careful not to allow such evidence to
         change the character of the hearing from one of review to a
         trial de novo.

(d)     *Justification for adding to the record.*   Some federal
         statutes expressly permit the administrative record to be
         supplemented on judicial review.   However statutory
         authority to take new evidence does not transform the
         review proceeding into a trial de novo.

         The evidence must be sufficiently relevant and
         probative so that there is a reasonable probability that it
         will change the administrative decision.   The party will not
         be permitted to supplement the record unless it
         demonstrates good cause for not presenting the evidence in
         the proceeding below.   A party will not be permitted to
         expand the record if the administrative record is adequate.
         The Eleventh Circuit summarized: "[A court] may deny a
         motion to correct the record where, among other reasons,
         the proffered item does not fall within the definition of the
         record, the proffered item is immaterial or incomplete, or
         the agency did not have the opportunity to consider the
         evidence." Nat'l Ass'n of State Util. Consumer Advocates
         v. FCC, 457 F.3d 1238, 1248 (11th Cir. 2006).   The Ninth
         Circuit said: "Courts may review such extra-record
         materials only when: (1) it is necessary to determine
         whether the agency has considered all relevant factors and
         explained its decision, (2) the agency has relied on
         documents not in the record, (3) supplementing the record
         is necessary to explain technical terms or complex subject
         matter, or (4) plaintiffs make a showing of bad faith." City
         of Las Vegas, Nev. v. FAA, 570 F.3d 1109, 1116 (9th Cir.
         2009).   Accord Fence Creek Cattle Co. v. U.S. Forest Serv.,
         602 F.3d 1125, 1131 (9th Cir. 2010).

         The court may supplement the record to obtain
         background information necessary to make an informed
         decision.   The record may be supplemented for the purpose
         of explaining the existing record and judging the adequacy
         of the procedures and facts considered.   The Second Circuit
         found that additional evidence may be appropriate: "where
         the absence of formal administrative findings makes such

- 47 -

investigation necessary in order to determine the reasons for the agency's choice." <u>Nat'l Audubon Soc'y v. Hoffman</u>, 132 F.3d 7, 14 (2d Cir. 1997). Perhaps the administrative record may be supplemented because of evidence considered by the agency was excluded by clerical mistake or other oversights.

The D.C. Circuit would allow additions to the administrative record upon a "strong showing of bad faith or improper behavior" or that the record is so bare that review is impossible. "When as here there is a contemporaneous administrative record and no need for additional explanation of the agency decision, 'there must be a strong showing of bad faith or improper behavior' before the reviewing court may permit discovery and evidentiary supplementation of the administrative record."

The Ninth Circuit allows additional evidence in four circumstances:

(1)     if necessary to determine "whether the agency has considered all relevant factors and has explained its decision;"

(2)     "when the agency has relied on documents not in the record;"

(3)     "when supplementing the record is necessary to explain technical terms or complex subject matter;" and

(4)     "when the plaintiffs make a showing of agency bad faith."

<u>Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.</u>, 100 F.3d 1443, 1450 (9th Cir. 1996). <u>Accord</u> <u>Northcoast Envtl. Ctr. v. Glickman</u>, 136 F.3d 660, 665 (9th Cir. 1998).

(e)     *Remand to add information to the administrative record.* If additional information is necessary, a court should generally remand to the agency so that it, not the court, initially considers the additional evidence. Denial of a motion for a remand to add to the record will be reviewed for abuse of discretion.

- 48 -

(f)    *Overton hearing: Expansion of the agency's justification.*
The Supreme Court in <u>Citizens to Preserve Overton Park v.
Volpe</u>, and <u>Camp v. Pitts</u>, 411 U.S. 138 (1973), created
some lasting law supporting judicial authority to
supplement the informal record through an "<u>Overton</u>
hearing."   As reiterated in <u>Camp v. Pitts</u>, these "<u>Overton</u>"
hearings give the reviewing court limited authority to
"obtain from the agency, either through affidavits or
testimony, such additional explanation of the reasons for
the agency decision as may prove necessary."

Generally, if a reviewing court finds the record
produced by an informal adjudication to be inadequate for
review, it may conduct an "<u>Overton</u> hearing," but the
Supreme Court has expressed a preference for remand.

In <u>Sierra Club v. United States Army Corps of
Engineers</u>, 772 F.2d 1043 (2d Cir. 1985), the Second
Circuit contrasted this proceeding from a de novo hearing.
(By its terms, the difference between "plenary" review and
trial de novo.)   The case involved the Corps' grant of a
dredging permit.   The appellate court criticized the district
court for undertaking a full de novo hearing, including
calling its own expert witnesses to substitute their judgment
for that of the agency.   It found that ordinarily such de novo
review would be reversible error and that such review
would not be proper every time an agency record is
incomplete.

Charles H. Koch, Jr. & Richard Murphy, <u>Administrative Law & Practice</u> § 8:27 (3d ed.)
(emphases in original)(footnotes omitted or converted to inline citations).

[R]eview may not probe the minds of an official: "It was not the function of the
court to probe the mental processes of the [administrative decisionmaker]."
<u>United States v. Morgan</u>, 313 U.S. 409, 422 (1941)("<u>Morgan IV</u>").   In <u>Morgan IV</u>
the Court disapproved of the conduct of the trial court in having the Secretary of
Agriculture appear in person at trial and questioned "regarding the process by
which he reached the conclusions of his order, including the manner and extent of
his study of the record and his consultation with subordinates."   Ever since this
decision, any judicial action which interjects itself in this way into the
decisionmaking process has been considered improper.

However the Supreme Court has required what has become known as an
"<u>Overton</u> hearing" where the reasons in informal action are inadequate for judicial
review.   In <u>Overton Park</u>, the Court found that a lower court could require the

In cases where Congress has provided for judicial review without setting forth the standards to be used or procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had . . . .

Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d at 1137.  See Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency." (emphasis added)).  The court should not pass judgment on the wisdom or merits of the agency's decision.  See Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172 (stating that NEPA prohibits uninformed actions, but not unwise actions).  To fulfill its function under the arbitrary-or-capricious standard of review, however, a reviewing court should engage in a "thorough, probing, in-depth review" of the administrative record. Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation omitted).  The Tenth Circuit explained the relevant standard of review as follows:

In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if

the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

_____

agency decisionmaker to provide sufficient justification either through testimony or affidavit.  Both the Supreme Court and lower courts, however, have remained true to Morgan IV in refusing to permit these Overton Park hearings to delve into the mental processes of the agency head.  Courts have usually refused to put the official on the stand and have relied instead on affidavit or remand.

Koch & Murphy, supra § 8:28.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1167 (omission in original)(citations omitted)

(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))

(internal quotation marks omitted).  The standard of review requires the district court "to engage

in a substantive review of the record to determine if the agency considered relevant factors and

articulated a reasoned basis for its conclusions."  Olenhouse v. Commodity Credit Corp., 42 F.3d

at 1580.  While the court may not think up a reasoned basis for the agency's action that the

agency did not give, the court should "uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,

419 U.S. 281, 286 (1974)(citations omitted).  The agency must articulate the same rationale for

its findings and conclusions on appeal upon which it relied in its internal proceedings.  See SEC

v. Chenery Corp., 318 U.S. 80 (1943).

> **4.    The Standard of Review for Legal Issues Varies Depending Upon the Source of Law That the Agency Is Interpreting.**

In promulgating and enforcing regulations, agencies must interpret the content of the

Constitution, statutes, and their own previously enacted regulations.   The federal judiciary

accords considerable deference to agencies' interpretations of their own organic statutes -- the

statutes Congress has tasked an agency with enforcing, from which it derives its authority to act.

See United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22

F.3d 235, 238 (10th Cir. 1994).  This deference has come to be known as Chevron deference,

named after the first case supposedly adopting[8] the approach, Chevron U.S.A., Inc. v. Natural

---

[8]The case itself is unremarkable and uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all.  Its author, the Honorable John Paul Stevens, Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest

Resources Defense Council, Inc., 467 U.S. 837 (1984).  Chevron deference involves a two-step

process,[9] first asking whether the statutory provision in question is clear and then, if it is not,

asking whether the agency's interpretation of the unclear statute is a reasonable one.  As the

Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative
> agency interpretations of their organic statutes laid down by the Supreme Court in
> Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837
> (1984).  Those directives require that we first determine whether Congress has
> directly spoken to the precise question at issue.  If the congressional intent is
> clear, we must give effect to that intent.  If the statute is silent or ambiguous on
> that specific issue, we must determine whether the agency's answer is based on a
> permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22 F.3d

at 238 (citation omitted).

Chevron's second step is the easier one to describe, because it is all but toothless: if the

agency's decision makes it to step two, it is upheld almost without exception.  See Ronald M.

Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L. Rev. 1253, 1261

(1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely

---

detractors in subsequent years.  See generally Charles Evans Hughes, Justice Stevens and the
Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

[9]There is, additionally, a threshold step -- the so-called step zero -- which asks whether
Chevron deference applies to the agency decision at all.  See Cass R. Sunstein, Chrevron Step
Zero, 92 Va. L. Rev. 187 (2006).  Step zero asks: (i) whether the agency is Chevron-qualified,
meaning whether the agency involved is the agency charged with administering the statute -- for
example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No.
88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded
the deference -- interpretation of contracts, the Constitution, and the agency's own regulations
are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir.
1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference."); and
(iii) whether Congress intended the agency to "speak with the force of law" in making the
decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by
agency's, for example, do not speak with the force of law and are thus not entitled to Chevron
deference, see Christensen v. Harris Cnty., 529 U.S. 576 (2000).  An affirmative answer to all
three inquiries results in the agency's decision passing step zero.

on the second Chevron step."   (footnote omitted)); Jason J. Czarnezki, An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice.").  Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

There is substantial disagreement, however, even at the Supreme Court-level, about what Chevron's first step means.  Sometimes clarity is assessed in terms of obviousness -- meaning that, if a statute requires in-depth interpretation, it cannot be clear.  Other times clarity is assessed in terms of the court's confidence that its interpretation is correct -- meaning that in-depth interpretation may result in a court concluding that the statute is clear.  An appellate court's conclusion that a statute is clear has binding stare decicis effect, see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967 (2005), but its conclusion that a statute is unclear does not, see United States v. Home Concrete & Supply, LLC, 132 S. Ct. 1836 (2012).  In an earlier case, the Court noted the varying approaches taken by different Justices in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine.  Those Justices, such as Justice Scalia, who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step.  These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine.  Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for Chevron doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

<u>Griffin v. Bryant</u>, No. CIV 13-0799 JB/GBW, 2014 WL 3377705, at *42 n.23 (D.N.M. June 18, 2014)(Browning, J.).   A number of policy considerations animate <u>Chevron</u> deference, among them: (i) statutory interpretation, <u>i.e.</u>, that Congress, by passing extremely open-ended and vague organic statutes, is granting discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, <u>i.e.</u>, that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, <u>i.e.</u>, that agencies, as executive bodies ultimately headed by the President of the United States, can be held politically accountable for their interpretations; and (iv) efficiency, <u>i.e.</u>, that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but Circuit-fragmented federal judiciary can.

When agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as <u>Auer</u> or <u>Seminole Rock</u> deference.  <u>See</u> <u>Auer v. Robbins</u>, 519 U.S. 452 (1997); <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410 (1945).  This deference is applied in the same manner as <u>Chevron</u> deference and is substantively identical.  There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, more uncertain.  Justice Scalia, after years of applying the doctrine followed by years of gradually beginning to question its soundness, finally denounced <u>Auer</u> deference just last year in his dissent in <u>Decker v. Northwest Environmental Defense Center</u>, 133 S. Ct. 1326 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice did:

> For decades, and for no good reason, we have been giving agencies the
> authority to say what their rules mean, under the harmless-sounding banner of

"defer[ring] to an agency's interpretation of its own regulations."  Talk America, Inc. v. Michigan Bell Telephone Co., 131 S. Ct. 2254, 2265 (2011)(Scalia, J., concurring).  This is generally called Seminole Rock or Auer deference.

. . . .

The canonical formulation of Auer deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for Auer to do.  In practice, Auer deference is Chevron deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for Auer deference.  The first case to apply it, Seminole Rock, offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means."  Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'"  That is true enough, and it leads to the conclusion that agencies and not courts should make regulations.  But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective.  Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its "special expertise" to formulate the best rule.  But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is."  Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience.  Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation will be given effect if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of

his successors.  If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for <u>Auer</u> deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that Congress enacted, as we do per <u>Chevron</u>, it is a fortiori reasonable to defer to them regarding the meaning of regulations that they themselves crafted.  To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all.  The theory of <u>Chevron</u> (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute.  While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations.  For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands.  "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."  Montesquieu, <u>Spirit of the Laws</u> bk. XI, at 151-152 (O. Piest ed., T. Nugent transl. 1949).  Congress cannot enlarge its own power through <u>Chevron</u> -- whatever it leaves vague in the statute will be worked out by someone else.  <u>Chevron</u> represents a presumption about who, as between the Executive and the Judiciary, that someone else will be.  (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)  So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else.  Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect.  "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power."  Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it."  1 Wm. Blackstone, <u>Commentaries on the Laws of England</u> 58 (1765).  And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation.  The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke

ed. 1961).   <u>Auer</u> deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  <u>Auer</u> is not a logical corollary to <u>Chevron</u> but a dangerous permission slip for the arrogation of power.

It is true enough that <u>Auer</u> deference has the same beneficial pragmatic effect as <u>Chevron</u> deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court.  The agency's view can be relied upon, unless it is, so to speak, beyond the pale.  But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute.  For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear.  The circumstances of this case demonstrate the point.   While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing.  It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here.  And there is another respect in which a lack of <u>Chevron</u>-type deference has less severe pragmatic consequences for rules than for statutes.   In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from <u>Auer</u> deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

<u>Decker v. Nw. Envtl. Def. Ctr.</u>, 133 S. Ct. at 1339-42 (Scalia, J., dissenting)(alterations in

original).  Justice Scalia's attack on <u>Auer</u> was in a dissent, but two other Justices, the Honorable

John G. Roberts and Samuel A. Alito, Joined in a concurring opinion stating that "[i]t may be

appropriate to reconsider [<u>Auer</u> deference] in an appropriate case.  But this is not that case."  133

S. Ct. at 1338 (Roberts, C.J., concurring).  Although the Court shares Justice Scalia's concerns

about <u>Auer</u> deference, it is, for the time being, the law of the land, and, as a federal district court,

the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution.  See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . .  [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions."  (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d at 1085 ("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

## ANALYSIS

The Court will grant the Motion in part and deny it in part.  The Motion raises three questions: (i) whether the Plaintiffs have shown that the Forest Service acted in bad faith, such that they can add to the administrative record and possibly take discovery; (ii) whether the Forest Service has compiled an incomplete administrative record for the Court, which would require the Forest Service to add the omitted materials even absent a showing of bad faith; and (iii) whether and in what circumstances the Court can look to materials outside of the administrative record, even when the record is complete and the agency has not been shown to have acted in bad faith.  On the first question, the Court concludes that the Plaintiffs have failed to make the necessary showing of bad faith and will thus deny their request to supplement the administrative record

with new materials.  On the second question, the Court concludes that a proper and complete administrative record includes all materials that the Forest Service considered at any time and not merely the materials it considered upon administrative appeal.  The Court will allow the parties to complete the administrative record using any material that Forest Service considered in forming or reconsidering its 2010 Decision Notice.  On the third question, the Court concludes that it may consider materials outside the administrative record to the extent that they go towards establishing legislative, rather than adjudicative, facts.

The Court cannot discern -- at least not in every instance -- the identity of the documents it is allowing into the record by making these decisions.  Most of the ambiguity arises from the second issue, the completeness of the administrative record that the Forest Service compiled. The Forest Service appears to represent that it has excluded from the administrative record some materials that it used to formulate the 2010 Decision Notice, but it is not clear what documents those are.  If the Forest Service or its employees considered a document in formulating the 2010 Decision Notice, then the Plaintiffs are entitled to use that evidence at the judicial-review stage. The Court will not, however, remand the case, or require the Forest Service to re-compile a new administrative record.  Rather, the Court will permit the Plaintiffs to designate documents that they believe in good faith that Trujillo or her supervisors considered in making the decisions now being appealed before the Court.  If the Defendants then represent to the Court that they did not consider a given piece of designated evidence in formulating the 2010 Decision Notice, then the Court will exclude the evidence from the record.  Otherwise, the Court will require the Defendants to add the designated material to the administrative record.  Separate from this issue, some additional ambiguity arises regarding what facts are adjudicative and what facts are legislative; the Court will address this issue later in this Memorandum Opinion and Order.

The Court will, however, give definitive rulings on the evidence that the Plaintiffs consider to be the most important.  See Tr. at 57:10-60:12 (Court, Herskovitz).  First, the Court will exclude the four affidavits from F. Martinez, Dr. Correia, Gurule, and R. Martinez.  These affidavits set forth adjudicative facts, and they were created after the lawsuit was filed and thus the Forest Service could not possibly have considered them.  Second, the parties may reference and rely upon the Nontimber Forest Report in their appellate briefs.  The report contains legislative facts that do not touch specifically upon this case's facts.  Moreover, the Court can use it "to explain technical terms or complex subject matter."  Sw. Ctr. for Bio. Diversity v. U.S. Forest Serv., 100 F.3d at 1450.  As the Forest Service authored the report, the Defendants cannot very well attack its credibility or competence, or argue unfair surprise from its introduction.  The Forest Service may argue that information contained in the report is inapposite for various reasons or that the Plaintiffs are misusing the report, but the Defendants can make these arguments in their response brief without the need for the report's exclusion.

Third, the Court will exclude the Civil Rights Report.  Like all the evidence that the Plaintiffs submitted, the Court has read the report and considered it for the purposes of making its bad-faith determination -- the purpose for which it is most relevant.  Having used the report for this purpose, the Plaintiffs have, for the most part, gotten what they wanted with regard to the report's introduction into evidence, as it is, obviously, minimally relevant to the NEPA, NFMA, and FSYMA claims.  The Forest Service did not consider the Civil Rights Report in formulating the 2010 Decision Notice or in adjudicating its appeal, and, as the report is a direct study of Forest Service civil-rights compliance and community and racial relations in New Mexico -- i.e., it is not a nationwide study or a study of other geographic regions -- the facts therein are adjudicative in nature.  The administrative-record rule, thus, bars the Civil Rights Report's

admission.   Fourth, the Court will bar the Plaintiffs from admitting the 1935 and 1947 Forest Service reports.   The reports concern New Mexico specifically and are thus in the same analytical boat as the Civil Rights report -- adjudicative factual material that the Court could consider for the purposes of determining bad faith,[10] but, because the Forest Service did not use the reports in formulating or adjudicating the appeal of the policy being appealed here, the Court cannot properly consider in adjudicating the merits of this appeal under the administrative-record rule.   Last, the Court will deny all of the Plaintiffs' requests for discovery.   The bad-faith showing was the Plaintiffs only possible opportunity to earn discovery, and they failed to make the needed showing.   Even if they had, however, the Court would be more inclined to remand this case to the Forest Service than it would to, for instance, grant the Plaintiffs' request to depose Trujillo.

---

[10]The Court has not considered the 1935 and 1947 reports in determining bad faith or for any other reason, because the Court does not have a copy of these reports.  All the Court knows about these reports is what the Plaintiffs told the Court about them in their Requested Document List, where they are the twenty-eight and thirtieth items listed:

> 28.   *The 1935 Defendant Forest Service report by Roger Morris, a Forest Service grazing assistant, entitled "A Dependency Study of Northern New Mexico."*

> . . . .

> 30.   *The 1947 Forest Service report wherein Defendant Forest Service claimed that the rangelands in the El Rito Ranger District were overgrazed and reports, letters, memoranda, or data related to any ecological study conducted of the local rangelands prior to Defendant's "determination" that they were overgrazed.*

Requested Document List at 3 (emphases in original).

I.     **THE PLAINTIFFS HAVE FAILED TO MAKE THE STRONG EVIDENTIARY SHOWING OF BAD FAITH REQUIRED TO SUPPLEMENT THE ADMINISTRATIVE RECORD.**

The Court has carefully read the Complaint, the briefing on the Motion, the Civil Rights Report, the affidavits from F. Martinez, Dr. Correia, Gurule, and R. Martinez, and the representations of counsel at the hearing, and finds that the Plaintiffs have fallen short of the strong evidentiary showing required to trigger the bad-faith exception to the administrative-record rule. The standard for what constitutes a "strong showing" of bad faith is undefined -- the Court had to borrow from Ninth Circuit case law to find any exceptions to the administrative-record rule at all.[11]   Citizens to Preserve Overton Park v. Volpe, 401 U.S. at 420.  See MO at 68-69 & n.13, 2014 WL 5859067, at *37-38 & n.13.  Perhaps the best and simplest way to flesh out the standard is that it should be analogous to the standard by which an appellate court judges the alleged bad faith of a trial court, but, unfortunately, this standard is, itself, largely undefined.[12]

---

[11]The Tenth Circuit has explicitly endorsed the bad-faith exception to the administrative-record rule; it appears that the Tenth Circuit's case law on delving outside the administrative record is fully consistent with -- albeit less developed than -- the Ninth Circuit's.  See Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1096 (10th Cir. 2007)("We may also delve outside the administrative record when there is a 'strong showing of bad faith or improper behavior.'"  (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 420)).

[12]The Court is not referring to the standard that appellate courts use to determine whether another judge should replace the current trial judge.  This standard is low -- requiring only that the judge's impartiality "might reasonably be questioned" -- and Trujillo would likely fail it. 28 U.S.C. § 455(a).  See Ligon v. City of New York, 736 F.3d 118 (2d Cir. 2013)(per curiam) (removing the Honorable Shira A. Scheindlin from the New York City "stop-and-frisk" cases, which she had previously consolidated in her courtroom, because of Judge Scheindlin's suggestion to a lawyer to mark stop-and-frisk cases as related and her participation in a New Yorker article devoted to the cases)("[R]eassignment is simply a mechanism that allows the courts to ensure that cases are decided by judges without even an *appearance* of partiality." (emphasis in original)).  The Court is, instead, analogizing to the showing that appellate courts would demand before they decided that the trial judge's impartiality was so comprised as to warrant vacating or reopening the proceedings below.  Judge Scheindlin's removal, for instance, still left all of her prior rulings intact.  See 736 F.3d at 129.

Still, the Court thinks this analogy is worthwhile; the Court must afford the agency the same basic assumptions of good faith, honesty, administrative regularity, and subject-matter competence that the Court expects from the Court of Appeals.[13]

The Court concludes that the strong-showing standard has three dimensions. First, evidence, and not merely counsel's argument, must support the showing. Second, the standard does not necessarily correspond to any particular standard of proof, e.g., preponderance, clear and convincing, or beyond a reasonable doubt. Rather, the Court concludes that it makes more sense to vary the standard of proof demanded -- i.e., the likelihood that bad faith exists -- inversely with the severity of the bad faith alleged -- i.e., the impact that the bad faith

---

[13]Administrative law builds deference into virtually every facet of judicial review. Agencies receive the same deference from the district courts that the district courts receive from the Courts of Appeals -- and then some. For example, Judicial preservation and waiver rules are analogous to the issue-exhaustion requirement; Fed. R. App. P. 10's restriction of appellate review to the district court record is analogous to the administrative-record rule; clearly erroneous factual review for the courts is analogous to arbitrary-and-erroneous factual review for agencies; and there is no judicial analogue to Chevron deference. Cf. Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991)("[A] court of appeals should review de novo a district court's determination of state law.")(eliminating the only analogue to Chevron deference that district courts enjoyed from the Courts of Appeals); Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.)(describing the development of Erie doctrine in the Tenth Circuit).

The Court has no problem with judicial deference to administrative rulings, in general; as the Court wrote earlier, deference to agencies reflects good statutory interpretation, promotes efficiency, and centralizes decisionmaking in bodies with subject-matter expertise. The Court is not sure, however, that cases like this one are well-suited for such vastly deferential judicial review. When a telecommunications company puts on evidence and testimony before a panel of technically savvy, quasi-judicial experts working for the Federal Communications Commission in Washington, D.C. -- proceedings that often resemble a judicial trial -- the justifications for deference are strong. Trujillo's decisionmaking, however, does not take this form. The Court does not intend that statement to be an indictment of Trujillo's ability, expertise, or impartiality, but only to point out that Trujillo resembles an executive government official -- like a police chief, a mayor, or a prison administrator, all of whom are routinely sued and afforded no judicial deference by virtue of their positions -- more than she resembles a quasi-judicial tribunal. The same is true of the administrative appeal: a single Forest Supervisor, Clark, handled it. See 36 C.F.R. § 215.8(a) (effective before June 30, 2014); AMO at 79 n.15, 2014 WL 6612108, *44 n.15.

would likely have on the agency's decisionmaking process if it existed.  This approach is analogous to demanding a lower burden of proof in a murder case than in a shoplifting case, and is not usually advised, but the Court concludes that the third dimension justifies it in this context. The third dimension relates to the relief the Court will grant if bad faith is found.  The Court concludes that any supplementation of the record or discovery should be narrowly tailored to: (i) determine the truth of the bad-faith allegations; (ii) flesh out the extent of the bad faith; (iii) ascertain the impact of the bad faith on the completeness of the administrative record; and (iv) rectify the impact of the bad faith on the administrative record.[14]  See MO at 69-70, 2014 WL 5859067, at *38.  For example, if a single, not-very-credible affiant alleged that Trujillo went on an epithet-laced racist tirade about how she was making the permit cuts for the purpose of eradicating Hispanics from northern New Mexico -- a very serious but low-probability allegation -- the Court might allow extremely limited discovery on the sole topic of whether such an encounter actually occurred.

Here, the Plaintiffs have failed to make the requisite strong showing.  Although several pieces of evidence concern the Court, none of them are the smoking gun for which the Court is looking.  First, Trujillo's decision to ignore the EA's recommendation -- which was that grazing be only slightly curtailed -- in favor of a more drastic eighteen-percent reduction is admittedly suspect.  This issue goes to the heart of this case's merits, however, and the Court will not consider merits evidence in making a bad-faith determination.  When an appellant appeals an agency's decision and argues that the normal appellate procedure should not be followed because

---

[14]It is important to bear in mind that the only impact of the bad faith with which the Court is concerned, at this stage, is its impact on the administrative record, i.e., whether the agency's bad faith caused them to omit from the record material that should be in the record.  Any substantive impact of the bad faith -- i.e., whether a good-faith decision on the merits would have come out in the appellant's favor -- can be rectified at the merits stage of the proceedings.

the agency acted in bad faith, the appellant should not be able to use the patent wrongness of the agency's substantive decision as proof of the agency's bad faith.  This approach would short-circuit the appellate process, effectively allowing the appellant to argue the merits of the appeal outside of the normal procedural rules.  Here, for example, the Court has considered all the evidence that the Plaintiffs have proffered -- regardless whether it is in the administrative record -- to determine whether the Forest Service made its decision in bad faith.  If the Court were to conclude, using this evidence, that the 2010 Decision Notice were so unjustified as to constitute evidence of bad faith, then the Court would, effectively, be granting the Plaintiffs an unlimited-record merits appeal merely because they alleged bad faith.  The Court concludes that this result would undermine the appellate posture and procedural deference regimes that administrative law creates.  Moreover, if the agency's substantive decision is so wrong as to constitute evidence of bad faith, then the appellant will likely prevail on the merits -- where such arguments should be made and heard, and where the administrative-record rule applies.

Second, the Court also gives minimal weight to the fact that several permittees and other opponents of Trujillo wrote letters complaining about her to government higher-ups.  Absent proof that Trujillo was actually angry, held a grudge, or felt animus towards the Plaintiffs, that the Plaintiffs gave her reason to feel this way means nothing.  If the Court gave administrative appellants credit, in the bad-faith calculus, for their own anger-inspiring words and actions, it would incentivize this behavior in all agency adjudications.  "All plaintiffs would have to do . . . would be to salt the administrative record with references to the plaintiffs engaging [in] protected First Amendment speech criticizing the agency, and they would be able to insulate themselves against an adverse decision" by alleging bad faith at the judicial-review stage.  AMO at 84 n.18, 2014 WL 6612108, at *46 n.18.  The Plaintiffs have adduced no direct evidence that

Trujillo was angry about anything.  See Tr. at 83:24-84:3 (Smith)("[T]here's no evidence that

she was angered by anything.").  Also, the Court agrees with the Defendants that "this kind of

activity of permittees, especially in northern New Mexico[ --] complaining and sending out

petitions and letters to Congress people -- that's common. . . .  That's just something that the

Forest Service is used to.  It doesn't anger them.  It's part of the job."  Tr. at 84:3-15 (Smith).

While this logic would not suffice if the burden of proof rested with the Defendants to show

good faith, the burden rests with the Plaintiffs to show bad faith.

Third, although the Court was initially concerned over the allegations that Trujillo barred

Dr. Correia from accessing Forest Service records in retaliation for his criticism of the Unit

management,[15] closer scrutiny of the Affidavit of Dr. Correia, filed April 26, 2013 (Doc. 82-2),

the Declaration of Jack D. Carpenter, filed July 16, 2014 (Doc. 118-6), and the news articles

mentioning Dr. Correia, see Protestors Shut Down Council Meeting, Albuquerque J., available at

http://www.abqjournal.com/394858/news/abq-news/protesters-interrupt-council-meeting.html,

filed July 16, 2014 (Doc. 118-3); 13 Arrested in City Hall Sit-In, Albuquerque J., available at

http://www.abqjournal.com/409733/news/apd-protesters-hold-mayors-office-sit-in.html,     filed

July 16, 2014 (Doc. 118-4)("Correia[] was charged with a felony for allegedly pushing a member

of the mayor's security detail."); Judge Bans UNM Professor from City Hall, Albuquerque J.,

available at http://www.abqjournal.com/410824/abqnewsseeker/judge-bans-unm-professor-from-

city-hall.html, filed July 16, 2014 (Doc. 118-5), allays the Court's concerns.  Trujillo gave

---

[15]Before being appointed to the bench, the Court was active in promoting the enactment
and enforcement of open-government and "sunshine" laws.  The Court believes that there are
very few things that government should keep secret from the people and that transparency deters
corruption more than judicial sanctions can -- although both are, of course, required.  Cf. United
States v. Courtney, No. CR 11-2860 JB, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)
(Browning, J.)(demonstrating that an increase in the likelihood of detection deters bad behavior
more than an equivalent increase in severity of punishment).

Dr. Correia free reign to use Forest Service records when she was under the impression that he was conducting impartial -- by which the Court means neutral as to the conflict between Trujillo and the permittees -- research.  See Affidavit of Dr. Correia ¶ 4, at 2 ("Trujillo had given me carte blanche to access the archives in the El Rito District Ranger office.  This included access to boxes and boxes of unorganized photos that I scanned.  Ms. Trujillo allowed me to walk into the office and access the files.").  When Dr. Correia appeared at a public meeting between Trujillo and the permittees, and "said the Forest Service's own records showed it was Forest Service mismanagement that was the major cause of the Unit's difficulties," Trujillo was "upset," told Dr. Correia that "it was inappropriate for [him] to have taken sides," and took away Dr. Correia's free access to the files, asking instead that he file FOIA requests.  Affidavit of Dr. Correia ¶¶ 6-8, at 2-3.  His FOIA requests went unanswered, because Dr. Correia failed to respond to inquiries that the official in charge of answering FOIA requests -- which was not Trujillo -- sent him to verify his eligibility for an "'educational or noncommercial scientific institution requester'" fee waiver.  Declaration of Jack D. Carpenter ¶¶ 14-20, at 3-4 (representing that, to be eligible for this fee waiver, a "requestor '[m]ust show that the request is . . . for furtherance of scholarly or scientific research[; r]equesters seeking records in furtherance of their own educational purposes, for example, completion of degree requirements or research for a class project, do not meet this standard" (alteration in original)).

Trujillo did not violate Dr. Correia's rights by making him file FOIA requests to get government information -- like anyone else would have to do.  Nor did the move necessarily constitute retaliation -- even of the legal variety.  In all likelihood, the only reason Trujillo ever gave Dr. Correia free reign of her office is that she was under the impression that he was conducting research that had no possibility of adversely impacting her or making her life more

difficult.  When it became clear that Dr. Correia was, in some respects, an anti-Forest Service advocate, Trujillo had little incentive to go out of her way to help Dr. Correia conveniently gather the very information with which he sought to criticize her.  It also undoubtedly became somewhat awkward to have him hanging around the office.

Some professors cautiously guard their impartiality and credibility -- much like judges do -- to better insulate their conclusions from charges of bias.  Others advocate vigorously for political causes that touch upon their areas of specialization, with the idea being that their subject-matter expertise and professional gravitas should be used to benefit society though activism, and not stowed away and displayed as idle personal prestige and unspent credibility. Both approaches are perfectly acceptable and add value to society, and they are not necessarily mutually exclusive.  Trujillo may very well have thought that Dr. Correia was taking the former approach with regard to his study of the Unit; it is apparent to the Court, after reading about Dr. Correia's exploits on this and other issues, that Dr. Correia tends to take the latter tack.  It would be very odd indeed for Trujillo -- or anyone, for that matter -- to allow someone whom she considered to be a vocal antagonist to mill about her office, talking to her co-workers and collecting information to use in his next attack on her.  Trujillo's disinvitation of Dr. Correia is not evidence of a bad faith or retaliatory animus towards the Plaintiffs; it is a natural human reaction to harsh criticism -- and a proactive measure to prevent more of it -- and likely represents nothing more than the spoiling of their relationship.

Fourth, F. Martinez' affidavit also provides very little evidence of bad faith.  F. Martinez is not himself a Plaintiff -- he is a county commissioner and a permittee on the Lobato Allotment -- and, although Trujillo imposed a twenty-percent punitive reduction on his permits, F. Martinez admits that he committed the infraction for which the fine was levied -- failure to

repair his fences.  See Affidavit of Felipe Martinez ¶ 1, at 1; id. ¶ 7-8, at 3 ("I do not dispute that there was some work needed on my fence.").  F. Martinez "believe[s] that [he] was singled out for [the reduction] because of . . . statements he made on behalf of the ranchers on the Jarita Mesa and Alamosa Allotment," but this is speculation.  Affidavit of Felipe Martinez ¶ 8, at 3-4.  He may be correct about Trujillo's motives, but he presents no direct evidence attesting to these motives.[16]   The other affidavits that the Court considered -- those of Gurule and R. Martinez -- relate evocative personal stories about how permit reductions will adversely affect the affiants' finances and way of life, and additionally suggest that the Forest Service may have glossed over or misconstrued the economic impact that the reductions would have, but do not allege any acts of retaliation, anger, or bad faith by Trujillo.

Fifth, and finally, the Court read the Civil Rights Report in detail, and it too fails to present compelling evidence of the Forest Service's bad faith -- let alone bad faith by Trujillo, specifically.  At best, it confirms what the Court already knows: relations are not hunky dory between the Forest Service and the Hispanic stockmen of northern New Mexico.  See Civil Rights Report at 26-27.[17]  Unless the Court missed it, the Civil Rights Report does not mention Trujillo by name or title, opine that anti-Hispanic or anti-rancher prejudice taints Forest Service decisionmaking, or suggest that regulations are selectively enforced.

---

[16]The Court is aware that such evidence is hard to develop, and it will not be available in many cases in which bad faith exists.  It could exist, however, and plaintiffs will come across it in some cases.  It would likely take either an improvidently considered public statement by Trujillo, or a whistleblower from within the Forest Service coming forward and testifying that Trujillo formulated the 2010 Decision Notice in bad faith.  Even absent such a showing, the Plaintiffs may still attack Trujillo's decionmaking, but must do so within the procedural confines of the APA, which includes the administrative-record rule.

[17]These two pages are entitled "Summary of My Notes on Teleconference with Northern New Mexico Stockman Association Members -- June 11, 2013" and do not appear to be a part of the published report.

The Court, therefore, concludes that the Plaintiffs have failed to make the required strong showing of bad faith, and the Court's review will, thus, be limited to the administrative record. The remaining questions are: (i) are there materials that should be already in the administrative record -- meaning that the Forest Service considered them -- but that the Forest Service declined to include; and (ii) what extra-record materials can the Court consider on the ground that they are not "evidence," but, rather, convey legislative facts.

## II.   THE ADMINISTRATIVE RECORD SHOULD INCLUDE ALL MATERIALS THAT THE FOREST SERVICE CONSIDERED IN FORMULATING THE 2010 DECISION NOTICE, AS WELL AS IN PROCESSING ITS APPEAL.

The Defendants appear to argue -- and appear to have acted on the presumption that their argument is correct -- that they may exclude from the administrative record any evidence that the Trujillo considered in her original decisionmaking, but that Clark and John Pierson did not consider in adjudicating the administrative appeal.   See Response at 6 ("Plaintiffs are barred from pursuing any claim based on . . . materials they failed to present in their administrative appeal."   (emphasis omitted)(capitalization altered for readability)); id. at 9-10 ("Plaintiffs' failure to present the evidence in their Administrative Appeal that they now seek to have the Court rely on thwarts all of these objectives."); id. at 10 ("The Forest Service's Administrative Appeal regulations expressly required Plaintiffs to produce such evidence with their Administrative Appeal."   (citing 36 C.F.R. § 215.14(a), (b)(8))); id. at 11 ("Plaintiffs' Administrative Appeal failed to raise claims, issues, arguments, and evidence on which Plaintiffs now seek to base their appeal before this Court."   (emphasis added)); id. at 24 ("[N]either of these affidavits is properly before the Court because the Plaintiffs failed to produce them with their Administrative Appeal."); id. at 32 ("Plaintiffs [are] barred from submitting these affidavits for the first time in Court instead of with Plaintiffs' Administrative Appeal . . . .").  If that is what

the Defendants are arguing, then they must acquiesce to any requests by the Plaintiffs to add materials to the administrative record, provided that Trujillo or another Forest Service official considered the materials in formulating the 2010 Decision Notice.

The Defendants' apparent argument is predicated on the Forest Service regulations that set forth the issue-exhaustion requirement: "[I]t is 'the appellant's responsibility' to produce 'specific evidence and rationale' to show how the appealed decision 'specifically violates law.'" Response at 10 (quoting 36 C.F.R. § 215.14(a), (b)(8)). This argument is unavailing. Issue exhaustion is separate from the administrative-record rule, and an obligation to raise all claims and legal theories with the lower tribunal to preserve them for the higher tribunal does not imply a requirement to resubmit the same evidence at each successive level. Claims and arguments can be abandoned at the administrative-appeal level; evidence cannot be. Such an approach would be analogous to the Supreme Court refusing to consider transcripts of witness testimony taken at the district court, because the witnesses were not called to re-testify at the Court of Appeals. If an agency wants to get the benefit of having judicial review limited to the administrative record, it is responsible for maintaining a record -- from the ground up -- in the first place. Cf. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 420 ("[H]ere there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves."); Nat'l Audubon Soc'y v. Hoffman, 132 F.3d at 14 (holding that the reviewing court may supplement the administrative record "where the absence of formal administrative findings makes such investigation necessary in order to determine reasons for the agency's choice"). The Tenth Circuit said so, in terms that could not be clearer:

> The complete administrative record consists of all documents and materials directly or indirectly considered by the agency.

The "whole record" in this case consists of all documents and materials considered by the Forest Supervisor (the Deciding Officer) in making his initial decision, as well as all documents and materials contained in the agency appeal record as developed throughout the agency review process by the Regional Forester and the Chief (the Reviewing Officers). Therefore, as long as Defendants submitted all documents and information considered and developed at all three stages of the Forest Service's decision and review process, nothing more and nothing less, the Administrative Record submitted to the district court was correct.

Bar MK Ranches v. Yuetter, 994 F.2d at 739. There is no way to misinterpret this dictate; the case is even Forest Service-specific, thus cutting off any possible argument that the Forest Service's agency-specific regulations permit a less-inclusive administrative record.

It is possible that the Court is misapprehending the Defendants' argument, and that what they are arguing is that issue-exhaustion -- which the Court has already ruled bars the Plaintiffs from proceeding on their substantive First Amendment retaliation claim -- precludes the Plaintiffs from raising bad faith for the purpose of going outside the administrative record. If that is what the Defendants are arguing, then Court breathes a sigh of relief, as it means that the Court will not have to spend additional time on this case adjudicating disputes about what materials Trujillo did or did not consider in promulgating the 2010 Decision Notice. The Court would still, however, reject this argument. Issue exhaustion prevents the Plaintiffs from pursuing a substantive claim, and seeking legal or equitable relief, for the Defendants' retaliatory animus, but it does not bar them from attempting to supplement the record on bad-faith grounds. None of the Ninth Circuit cases that discuss the bad-faith exception to the administrative-record rule mention a requirement to exhaust or preserve the bad-faith argument at the agency level, see City of Las Vegas, Nev. v. FAA, 570 F.3d 1109, 1116 (9th Cir. 2009); Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d at 1450; Animal Def. Council v. Hodel, 840 F.2d 1432, 1438 (9th Cir. 1988); Pub. Power Council v. Johnson, 674 F.2d 791, 795 (9th Cir. 1982), nor

does the Tenth Circuit, <u>see</u> <u>Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy</u>, 485 F.3d at 1096, or the Supreme Court, <u>see</u> <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. at 420.

Moreover, there is no reason for an exhaustion requirement to apply to a procedural record-supplementation rule.  First, if exhaustion applies to this exception, then one might also expect it to apply to the other exceptions, which are: (i) to determine "whether the agency has considered all relevant factors and has explained its decision"; (ii) if the Plaintiffs can show that "the agency has relied on documents not in the record"; and (iii) if "supplementing the record is necessary to explain technical terms or complex subject matter."   <u>Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.</u>, 100 F.3d at 1450.  Applying an exhaustion requirement to any of these other exceptions would be nonsensical.  Second, the relief that the appellant stands to gain from sandbagging the agency is much less significant -- supplementation of the record versus winning a substantive claim -- and can be tailored to fit the circumstances.  If the alleged bad faith might have been easily rectified or excised from the decisionmaking process if the agency had been properly warned -- <u>e.g.</u>, if a single, replaceable member of an administrative panel is the only individual alleged to hold an animus -- then the Court can remedy the bad-faith finding with remand, rather than supplementation or discovery.  On the other hand, rigidly applying an exhaustion requirement to bad-faith contentions causes the appellant to forfeit not only any claim arising from the bad faith itself -- <u>i.e.</u>, any First Amendment retaliation claim -- but also, potentially, on all claims, if the administrative record is deficient enough to make a difference in the outcome.  The Court sees no reason to enforce such a harsh procedural-default rule.

The Court will, last, address the Plaintiffs' argument that every record or report that the Forest Service has ever produced, anywhere, must be included in the administrative record.  The

- 73 -

Plaintiffs premier citation for this proposition is a case from the United States District Court for the District of Columbia, which states that "it is axiomatic that documents created by an agency itself or otherwise located in its files were before it." Cnty. of San Miguel v. Kempthorne, 587 F. Supp. 2d 64, 76 (D.D.C. 2008)(Walton, J.); Motion at 4.  In that case, however, the plaintiffs, acting outside the administrative and judicial systems, made a FOIA request for all "'public documents possessed by the [agency] that comprise the "administrative record" for the [decision being appealed],'" and, in response to that FOIA request, the agency delivered certain documents which it later omitted from the administrative record it compiled for the district court.  587 F. Supp. 2d at 74, 76-77.  The district court ruled "that the records an agency produces pursuant to a FOIA request 'represent[] all public documents that were considered in the decision-making process.'"  587 F. Supp. 2d at 76-77 (alteration in original).  This ruling is a far cry from the per se rule that the Plaintiffs request.  In fact, that case, like virtually every other, requires that the agency have "'directly or indirectly considered' [the material] in coming to its decision."  587 F. Supp. 2d at 77.  More importantly, the Tenth Circuit has made it clear that the administrative record contains only the evidence considered: (i) by the specific agency officials charged with making the decision being appealed; (ii) while they made, and in relation to their making, the decision being appealed.

>        The "whole record" in this case consists of all documents and materials considered by the Forest Supervisor (the Deciding Officer) in making his initial decision, as well as all documents and materials contained in the agency appeal record as developed throughout the agency review process by the Regional Forester and the Chief (the Reviewing Officers).

Bar MK Ranches v. Yuetter, 994 F.2d at 739 (emphases added).  This standard excludes reports written by random Forest Service officials in Alaska, Vermont, and Tennessee, who have likely never heard of El Rito or even the Carson National Forest.  The Plaintiffs' proposed rule would

be unworkable, even if the case law did not contradict it.  Neither courts nor parties want to work with an administrative record that is laden with every single document the agency has ever produced -- most of which can be found online -- which is presumably what the Plaintiffs' rule would require.  The Court will, therefore, allow the Plaintiffs to complete the administrative record with materials that Trujillo considered in formulating the 2010 Decision Notice, but it will not allow the Plaintiffs to introduce materials solely on the ground that the Forest Service authored them.

## III.  THE PLAINTIFFS ARE NOT PERMITTED TO SUPPLEMENT THE RECORD, BUT THEY MAY, HOWEVER, DRAW THE COURT'S ATTENTION TO LEGISLATIVE FACTS.

The Court will take this opportunity to remind the parties that they may refer to materials outside the record for the purpose of establishing legislative facts.  Given this case's posture as an appeal, the Court will not take judicial notice of adjudicative facts, except to the extent that the underlying factual developments arose after the last agency action.[18]  See Fed. R. App. P. 10 (limiting appellate review to the record); Fed. R. Evid. 201 advisory committee's notes to subdivision (f) ("In accord with the usual view, Judicial notice may be taken at any stage of the proceedings, whether in the trial court or on appeal."); Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 150 (3d Cir. 1973)(citing a "limited exception" from the "normal rule" that an appellate court "can consider the record only as it existed at the time the court below made the order dismissing the action").  The drafters of the Federal Rules of Evidence describe the difference between legislative and adjudicative facts:

---

[18]This requirement does not merely mean that the evidence must have been created after the last agency action.  It means that real-world facts, directly relevant to the disposition of the appeal, arose after the last temporal point at which the agency could consider them.  See Bryant v. Carleson, 444 F.2d 353 (9th Cir. 1971)(Rosenn, J.).

Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body. . . .

The usual method of establishing adjudicative facts is through the introduction of evidence, ordinarily consisting of the testimony of witnesses. If particular facts are outside the area of reasonable controversy, this process is dispensed with as unnecessary. A high degree of indisputability is the essential prerequisite.

. . . .

An illustration is Hawkins v. United States, 358 U.S. 74 (1958), in which the Court refused to discard the common law rule that one spouse could not testify against the other, saying, "Adverse testimony given in criminal proceedings would, we think, be likely to destroy almost any marriage." This conclusion has a large intermixture of fact, but the factual aspect is scarcely "indisputable." If the destructive effect of the giving of adverse testimony by a spouse is not indisputable, should the Court have refrained from considering it in the absence of supporting evidence?

. . . .

What, then, are "adjudicative" facts? Davis refers to them as those "which relate to the parties," or more fully:

When a court or an agency finds facts concerning the immediate parties -- who did what, where, when, how, and with what motive or intent -- the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts. . . .

Stated in other terms, the adjudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses.

Fed. R. Civ. P. 201 advisory committee's notes to subdivision (a) (citations omitted).

The Court thinks that the adjudicative-legislative distinction can just as easily be broken down into whether the fact goes to illuminating a question of fact or a question of law. On questions of fact, the Court acts as a factfinder and should hold itself to the same rules that it

holds juries: do not go to the scene of the crime, do not conduct independent research, and rely

on the evidence presented.  The Tenth Circuit directs juries that,

> during the course of the trial you will receive all the evidence you properly may
> consider to decide the case.  Because of this, you should not attempt to gather any
> information or do any research on your own.  Do not attempt to visit any places
> mentioned in the case, either actually or on the internet, and do not in any other
> way try to learn about the case outside the courtroom.

Preliminary Instructions Before Trial, Tenth Circuit Criminal Pattern Jury Instruction 1.01, at 5

(2011 ed.).  On questions of law, on the other hand, the federal courts' constitutional role is to

independently determine what the law is -- an outward-looking factual inquiry -- and not what it

should be -- an inward-looking normative inquiry.

   To the extent that materials go towards elucidating the standard by which the Court

should judge the facts of this case, rather than elucidating the facts themselves, the Court may

look to, and the parties may cite to, evidence outside the record.  The Nontimber Forest Report

strikes the Court as such a document.  The report does not mention New Mexico, the Carson

National Forest, or any of the players involved in this case, yet it may be useful in analyzing this

case's facts.  There is always some vagueness inherent in the adjudicative-legislative divide, but

it is nothing that appellate lawyers do not confront in virtually every case they brief.  The Court

will not allow the parties extra words, space, or filings to present materials that contain

legislative facts -- after all, such materials comprise, at base, legal argument -- but the parties

may cite to them[19] and talk about them to the extent that they believe it will persuade the Court.

---

[19]An interesting rule of thumb is that materials that are highly probative of legislative
facts tend to be much more apt to be publicly available -- and thus able to be cited using a
Uniform Resource Locator (URL) or a legal reporter citation, rather than having to be
reproduced in full for the Court -- than materials that are probative mostly of adjudicative facts.
This generality holds true, because legislative facts must be universally applicable -- not tethered
to the case at hand -- and they must be influential or authoritative enough to warrant interpreting
society's laws in light of them.  For example, the Supreme Court relied upon the American

**IT IS ORDERED** that the Motion to Supplement and/or Complete the Administrative Record, and for Limited Discovery, filed November 25, 2013 (Doc. 106), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Simeon Herskovits
Iris A. Thornton
Advocates for Community and Environment
El Prado, New Mexico

--and--

Richard Rosenstock
Santa Fe, New Mexico

     *Attorneys for the Plaintiffs*

Damon P. Martinez
  United States Attorney
Ruth F. Keegan
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

---

Medical Association's amicus curiae brief to find that laws requiring spousal consent for abortions are apt to increase domestic violence, but it would have been less likely to do so if, instead of using published, peer-reviewed studies, the Association had conducted a study for the purposes of the litigation only and declined to publish it outside of the brief.  See Planned Parenthood of Se. Penn. v. Casey, 505 U.S. 833, 888-91 (1992).  Materials that bear primarily on adjudicative facts, however, typically lack universal relevance and applicability, and are routinely prepared in the shadow of litigation.

Andrew A. Smith
Environment & Natural Resources Division
United States Department of Justice
Albuquerque, New Mexico

*Attorneys for the Defendants*