# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JARITA MESA LIVESTOCK GRAZING
ASSOCIATION, *et al.*,

        Plaintiffs,

   v.

UNITED STATES FOREST SERVICE,
*et al.*,

        Federal Defendants.

Civ. No. 1:12-cv-00069-JB-KBM

## FEDERAL DEFENDANTS' MOTION AND MEMORANDUM

## TO DISMISS PLAINTIFFS' REMAINING CLAIMS

## TABLE OF CONTENTS

**INTRODUCTION** ………………………………………………....………………………. 1

**STANDARD OF REVIEW** …………….……………………………………………..…… 5

**ARGUMENT** …………………………………………………………………………… 8

I.   **PLAINTIFFS WHO DO NOT HOLD LIVESTOCK GRAZING PERMITS
     ON THE ALAMOSA AND JARITA MESA ALLOTMENTS THAT
     WERE NOT SUBJECT TO THE 18-PERCENT REDUCTION LACK
     STANDING** ………………………………………………………….…….. 8

     A.   **Standards For Reviewing Standing** …………………………..…….… 8

     B.   **Plaintiffs Who Do Not Hold Permits Subject To The 18-Percent
          Reduction Cannot Establish A Redressable Injury-In-Fact Caused
          By The Forest Service's Decision** …………………………………...… 9

II.  **PLAINTIFFS HAVE FAILED TO EXHAUST ADMINISTRATIVE
     REMEDIES FOR THEIR REMAINING NEPA, NFMA, AND
     OTHER CLAIMS** …………………………..……………………………….............. 13

     A.   **Standards For Exhaustion Of Forest Service Administrative
          Remedies** …………….…………………………………..……………… 14

     B.   **Plaintiffs' Remaining Claims Must Be Dismissed Because They
          Depend On The Same "Bad Faith" Retaliatory Animus Issue That
          The Court Has Held Plaintiffs Failed To Exhaust** ……………….….…16

     C.   **Even If They Were Not Based On The Retaliatory Animus Issue,
          The Claims In Counts 1 Through 9 Were Not Presented In Plaintiffs'
          Administrative Appeal And Are Barred** ……………………………..… 20

          1.   **NFMA Claims, Counts 6 And 7** ………………..…………..…….… 21

          2.   **SYFMA And 1972 Region 3 Policy Claims, Counts 8 And 9** ………23

          3.   **NEPA Claims, Counts 2 Through 5** ………………..…….…… 24

III. **PLAINTIFFS' ALLEGED INJURIES DO NOT FALL WITHIN THE
     "ZONE OF INTERESTS" PROTECTED BY NEPA FOR PLAINTIFFS'
     NEPA CLAIMS TO BE COGNIZABLE UNDER THE APA** ………….............. 29

     A.   **Standards For APA's Zone-Of-Interests Test For
          NEPA Claims** ………………………………………..……………… 30

i

      **B.**     **Plaintiffs' Alleged Interests In Challenging The 18-Percent
Reduction In Permitted Livestock Numbers Do Not Fall Within
NEPA's Environmental Zone Of Interests** …………………..…………...… 32

**IV.**   **PLAINTIFFS' CLAIM THAT THE FOREST SERVICE HAS VIOLATED
NFMA AND THE FOREST PLAN BY ALLEGEDLY "FAIL[ING] TO
ANNUALLY REMOVE EXCESS WILD HORSE POPULATIONS" IS
NOT COGNIZABLE PURSUANT TO THE SUPREME COURT'S *SUWA*
DECISION** ……………………………………………………………............… 35

      **A.**     **The Forest Plan Provision For Wild Horse Management Is A
Statement Of Objectives Subject To Forest Service Funding
And Priorities** ………………..…………………………..……………………… 36

      **B.**     **The APA Cannot Be Used To Compel Agency Action Pursuant
To The Objectives Of A Federal Land Management Plan** ……………...… 38

**V.**    **PLAINTIFFS' SYFMA CLAIM FAILS BECAUSE SYFMA CONTAINS
"NO LAW TO APPLY" FOR THE COURT TO REVIEW THE FOREST
SERVICE'S DECISION PURSUANT TO THAT STATUTE** ……………............41

      **A.**     **SYFMA Governs Management Of Timber Resources, Not
Range Management** …………………………………..……………….……… 41

      **B.**     **SYFMA Explicitly Prescribes Agency Discretion, Precluding
Judicial Review** …………………..………………………………………..… 44

**VI.**   **PLAINTIFFS' CLAIM THAT THE FOREST SERVICE VIOLATED
THE 1972 REGION 3 POLICY FAILS BECAUSE SUCH INTERNAL
AGENCY POLICIES ARE NOT BINDING AND THEREFORE NOT
ENFORCEABLE IN COURT** ……………....................................................… 47

**CONCLUSION** ……..…………………………………….…………………………..… 51

Federal Defendants, by and through undersigned counsel of record, hereby move to dismiss the remaining claims in Plaintiffs' January 20, 2012 "Complaint for Declaratory and Injunctive Relief" ECF No. 1, as follows:

## INTRODUCTION

On September 30, 2010, the Forest Service issued a Decision Notice approving 10-year term livestock grazing permits for the Alamosa and Jarita Mesa Allotments designed to "ensure the ecological health of the analysis area, provide reliable and sustainable grazing opportunities, and comply with applicable laws, regulations, and policies." AR011493.[1]  The decision by the District Ranger, "which includes an 18% reduction in permitted livestock [from the previous term permits], to be phased in over a period of the next five years," AR011488,[2] was upheld on administrative appeal by the Forest Supervisor for the Carson National Forest, after extensive independent review and analysis of the project record by an "Appeal Reviewing Officer" from a different (Gila) National Forest.  AR011520-40 (Administrative Appeal Decisions).  The District Ranger's and Forest Supervisor's decisions were subsequently reviewed and supported by the Regional Forester, who noted that the "apparent lack of certain management practices on the part of the permit holders has contributed to over utilization of meadows and grassland drainage bottoms and generally degraded resource conditions within these key areas."  AR011546-47.

Plaintiffs' Complaint challenges the 18-percent reduction in permitted livestock numbers, alleging that the decision was not based on the two-year analysis of the livestock grazing regime

---

[1] Citations to materials from the Administrative Record lodged with Court on DVD on March 18, 2013 are to each document's unique Bates page number, in the form ARxxxxxx.  *See* ECF No. 68 (Notice of Lodging Administrative Record).

[2] As explained in the Decision Notice, the Forest Service's action "removes the 18% temporary increase in permitted animal unit months authorized in 1980," AR011489, because "[t]he effects of the 18% increase in permitted livestock have now been evaluated and determined to be unsustainable."  AR011492.

and environmental impacts, but that the District Ranger was "acting to retaliate against and punish Plaintiffs for engaging in conduct protected by the First Amendment."  Complaint, ECF No. 1 ¶ 5.  Plaintiffs allege that the 18-percent reduction in permitted livestock numbers "causes not only severe economic harm to Plaintiffs but also grave damage to viability of the unique cultural and social fabric of their families and communities."  *Id.* ¶ 17.  Plaintiffs make these allegations of retaliatory animus and grave harm, despite the fact that the District Ranger's decision was supported and upheld in the administrative review process by individuals with no plausible basis to retaliate against Plaintiffs -- including, as noted above, the Appeal Reviewing Officer from the Gila National Forest in southern New Mexico -- and despite the fact that the 18-percent reduction mirrored the number of livestock that had actually grazed on the Allotments in the preceding 10 years.  *See, e.g.*, AR011547 (Regional Forester explaining that "actual use records show that these allotments have been operating below their permitted numbers of livestock for the past 10 years," averaging "86 percent of the total permitted numbers" on the Jarita Mesa Allotment and "80 percent of permitted numbers" on the Alamosa Allotment, indicating that "annual use of the allotments has typically been significantly less than that authorized on term grazing permits").  In other words, Plaintiffs' allegations of retaliatory animus and grave harm do not survive an independent review of the evidence in the Administrative Record.[3]

---

[3] Although this Court initially found that, "[t]aking all of the Plaintiffs' facts as true and construing all reasonable inferences in their favor, the Plaintiffs have plausibly alleged that the 2010 Decision Notice was made in retaliation for the Plaintiffs' exercise of their First Amendment right to petition the government for redress," ECF No. 49 at 105, Federal Defendants have since demonstrated -- with concrete evidence -- that Plaintiffs' core allegations and accusations are untrue, inaccurate, and nonsensical, and hence do not support any claim of retaliatory animus.  *See, e.g.*, ECF Nos. 74 at 20-36 and 118 at 17-27.

Despite the exhaustive (but unsubstantiated) allegations of retaliatory animus in the Complaint, Plaintiffs failed to levy any such allegations in any administrative challenge to the 2010 Decision Notice.  As a result, this Court has fully dismissed Count 1 of Plaintiffs' Complaint, ECF No. 1 ¶¶ 111-15, holding *inter alia* that Plaintiffs had failed to pursue an administrative appeal raising any retaliation argument that would support a First Amendment claim.  ECF Nos. 102, 135.[4]  Following dismissal of their First Amendment claim for failure to exhaust administrative remedies, Plaintiffs pivoted, seeking the same discovery they had sought in support of their First Amendment claim for their remaining claims, asserting that they were based on the same allegations of "bad faith" retaliation, even though the Court has held that the administrative appeal that some Plaintiffs filed was devoid of such allegations.  *See* ECF No. 106 (Plaintiffs' pending motion for discovery).  Because the Court dismissed Plaintiffs' First Amendment claim for Plaintiffs' failure to allege retaliation in any administrative appeal, it necessarily follows that the Court must dismiss Plaintiffs' remaining claims to the extent that they rely on those same unexhausted allegations.  *See* ECF No. 118 at 6-12.

In addition to failing to preserve any claims based on "bad faith" retaliatory animus, Plaintiffs failed to raise most of their remaining claims -- even if not based on "bad faith" -- in any administrative appeal.  For instance, while Plaintiffs' Complaint raises claims alleging violations of the National Forest Management Act ("NFMA"), the Sustained Yield Forest Management Act ("SYFMA"), and a "U.S. Forest Service 1972 Region 3 Policy," ECF No. 1 ¶¶ 132-46 (Counts 6 through 9), Plaintiffs' Administrative Appeal does not so much as mention SYFMA or the 1972 Region 3 Policy, and its single reference to NFMA is with regard to

---

[4] Before dismissing the First Amendment claim in its entirety, the Court had previously dismissed portions of Plaintiffs' First Amendment claim to the extent that claim sought damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and a declaratory judgment to redress past actions.  *See* ECF No. 49.

coordinating with State and local governments, which has nothing to do with the NFMA claims raised in the Complaint. Even with respect to Plaintiffs' National Environmental Policy Act ("NEPA") claims, ECF No. 1 ¶¶ 116-31 (Counts 2 through 5), there is a lack of congruence between the allegations in the Complaint and the arguments raised in Plaintiffs' Administrative Appeal.[5] Thus, as with Plaintiffs' First Amendment claim, Plaintiffs' NEPA, NFMA, and other claims are barred for failure to exhaust administrative remedies.

Plaintiffs' remaining claims fail on their face for other reasons as well, because they do not present claims subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. All of Plaintiffs' NEPA claims are subject to dismissal because Plaintiffs do not allege that the 18-percent reduction in permitted livestock numbers causes environmental impacts that injure Plaintiffs' interests. Instead, Plaintiffs only allege economic, social, and cultural injuries flowing from the 18-percent reduction. Such alleged injuries do not fall within the "zone of interests" protected by NEPA for Plaintiffs' NEPA claims to be subject to judicial review under the APA. In turn, Plaintiffs' NFMA "wild horse" claim, faulting the Forest Service for allegedly failing to meet the wild horse population objectives in the Forest Plan for the Carson National Forest, does not present a cognizable claim under the APA because such planning goals and objectives are not judicially enforceable, as the Supreme Court held in *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55 (2004). Plaintiffs' SYFMA claim fails because SYFMA -- even if it could be read to apply to livestock grazing management

---

[5] Plaintiffs have signaled an intention to rely on the Administrative Appeal of Plaintiff Steve Chavez to defend the assertion of exhaustion as to their NFMA "wild horse" claim. *See* ECF Nos. 136 and 138. Mr. Chavez, however, does not hold any permit at issue in this litigation, and thus lacks standing in this lawsuit, as discussed below. Moreover, even if his Administrative Appeal could be considered in determining whether Plaintiffs exhausted administrative remedies, the assertions Mr. Chavez made concerning the wild horse population did not raise the NFMA "wild horse" claim that Plaintiffs now seek to litigate in this case.

-- contains "no law to apply" to gauge the Forest Service's compliance, as required under the APA.  *See Heckler v. Chaney*, 70 U.S. 821, 830 (1985).  Similarly, Plaintiffs' claim alleging that the Forest Service violated its 1972 Region 3 Policy does not present a cognizable cause of action under the APA because it is well settled that such internal agency policies are non-binding, and therefore not enforceable in Court.  *See Schweiker v. Hansen*, 450 U.S. 785, 789-90 (1981).

For these reasons, as addressed below, Plaintiffs' remaining NEPA, NFMA, and other claims are not properly before the Court.  Therefore, Federal Defendants respectfully request that the Court dismiss Plaintiffs' remaining claims and close this case.

## STANDARD OF REVIEW

Rule 12(b) of the Federal Rules of Civil Procedure allows courts to dismiss a complaint both for "lack of subject-matter jurisdiction," *see* Fed. R. Civ. P. 12(b)(1), and for "failure to state a claim upon which relief can be granted," *see* Fed. R. Civ. P. 12(b)(6).  Dismissal under Rule 12(b) is appropriate in cases, such as this, that seek judicial review of agency action or inaction pursuant to *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994), but that fail to state a claim within the Court's jurisdiction. [6]

Pursuant to Rule 12(b)(1), a complaint must be dismissed for lack of subject matter jurisdiction if the action:

> does not 'arise under' the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, S[ection] 2, [of the Constitution], or is not a 'case or controversy' within the meaning of that section; or the cause is not one described by any jurisdictional statute.

---

[6] *See Kane Cnty v. Salazar*, 562 F.3d 1077, 1086 (10th Cir. 2009) ("[N]othing in *Olenhouse* . . . precludes an APA-based complaint from being summarily dismissed pursuant to Federal Rule of Civil Procedure 12(b).").

*Baker v. Carr*, 369 U.S. 186, 198 (1962).  Because federal courts are courts of limited

jurisdiction, "the presumption is that they lack jurisdiction unless and until a plaintiff pleads

sufficient facts to establish it."  *Celli v. Shoell,* 40 F.3d 324, 327 (9th Cir. 1994) (citations

omitted).  "Mere conclusory allegations of jurisdiction are not enough; the party pleading

jurisdiction 'must allege in his pleading the facts essential to show jurisdiction.'"  *Id.* (quoting

*Penteco Corp. Ltd. P'ship-1985A v. Union Gas Sys., Inc.,* 929 F.2d 1519, 1521 (10th Cir. 1991)).

Motions to dismiss pursuant to Rule 12(b)(1) may take two forms.  In the first form, the

movant asserts that the allegations in the complaint on their face fail to establish the court's

subject matter jurisdiction.  "In reviewing a facial attack on the complaint, a district court must

accept the allegations in the complaint as true."  *Holt v. United States*, 46 F.3d 1000, 1002 (10th

Cir. 1995) (citation omitted).  In the second form, the movant may present evidence challenging

the factual allegations in the complaint "upon which subject matter jurisdiction depends."  *Id.* at

1003 (citation omitted).  "When reviewing a factual attack on subject matter jurisdiction, a

district court may not presume the truthfulness of the complaint's factual allegations . . . [but]

reference to evidence outside the pleading does not convert the motion to a Rule 56 motion."  *Id.*

(citations omitted).

Federal Rule of Civil Procedure 12(b)(6) allows parties to move to dismiss claims for

"failure to state a claim upon which relief can be granted."  This rule authorizes a court to

dismiss a claim on the basis of a dispositive issue of law.  *Neitzke v. Williams*, 490 U.S. 319, 326

(1989) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and *Conley v. Gibson*, 355

U.S. 41 (1957)).

> [I]f as a matter of law 'it is clear that no relief could be granted under any set of
> facts that could be proved consistent with the allegations,' a claim must be
> dismissed, without regard to whether it is based on an outlandish legal theory or
> on a close but ultimately unavailing one.

*Id.* (quoting *Hishon*, 467 U.S. at 73).  Thus, a claim should be dismissed under Rule 12(b)(6) when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley*, 355 U.S. at 45-46.  In considering a Rule 12(b)(6) motion, a court "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity" without converting the motion to a motion for summary judgment.  *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

The Tenth Circuit has summarized the standard of review for a motion to dismiss under Rule 12(b)(6) as follows:

> In conducting such review, we must accept all the well-pleaded facts of the complaint as true and must construe them in the light most favorable to the plaintiff.  Dismissal is appropriate only if the plaintiff can prove no set of facts in support of the claim entitling her to relief.  However, counsel may not overcome pleading deficiencies with arguments that extend beyond the allegations contained in the complaint.  The complaint itself must show [that the plaintiff] is "entitled to relief" under each claim raised. Fed. R. Civ. P. 8(a)(2).

*Bauchman for Bauchman v. West High School*, 132 F.3d 542, 550 (10th Cir. 1997) (internal citations omitted).  As this Court has already stated, however, in reviewing a Rule 12(b)(6) motion in an APA case, the Court may look to materials in the Administrative Record to determine the viability of Plaintiffs' claims.  *See, e.g.*, ECF No. 135 at 100 ("The Court can use the entire administrative record, or any portions of it that the parties present to the Court, in determining whether the failure-to-exhaust affirmative defense is established," because "[t]o do otherwise -- to cabin itself to the usual rules for looking outside the pleadings on a rule 12(b)(6)

motion -- would be to let the Federal Rules of Civil Procedure's procedural forms trump the APA's.").

As set forth below, whether viewed under Rule 12(b)(1) or 12(b)(6), Plaintiffs' remaining claims against Federal Defendants must be dismissed.

## ARGUMENT

### I.    PLAINTIFFS WHO DO NOT HOLD LIVESTOCK GRAZING PERMITS ON THE ALAMOSA AND JARITA MESA ALLOTMENTS THAT WERE NOT SUBJECT TO THE 18-PERCENT REDUCTION LACK STANDING

Some of the Plaintiffs in this case are permittees who held term livestock grazing permits on the Alamosa and Jarita Mesa Allotments at the time the Forest Service's 2010 Decision Notice was upheld following the resolution of the two Administrative Appeals and who were issued new permits subject to the 18-percent reduction in permitted livestock numbers. Other Plaintiffs, however, did not hold permits at the time of the Forest Service Decision, did not hold permits at the time this lawsuit was filed, or hold permits that were not subject to the 18-percent reduction. *See* Complaint, ECF No. 1 ¶¶ 13-16. These other Plaintiffs lack standing and must be dismissed from this lawsuit.

#### A.    Standards For Reviewing Standing

Federal courts are courts of "limited jurisdiction," and the presumption is that they lack jurisdiction unless the party asserting jurisdiction establishes it. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Whether a party has standing under Article III of the U.S. Constitution is a "threshold jurisdictional question" that a court must decide before it may consider the merits. *Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 102 (1998). A party's standing to sue "constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Id.* at 103-04.

In order to demonstrate standing under Article III, a party must establish, at an "irreducible constitutional minimum" three requirements:

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).  "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  *Id.* at 562 (citations omitted).

**B.     Plaintiffs Who Do Not Hold Permits Subject To The 18-Percent Reduction Cannot Establish A Redressable Injury-In-Fact Caused By The Forest Service's Decision**

Plaintiffs' Complaint concedes that a number of the named Plaintiffs did not hold permits at the time this lawsuit was filed.  *See* Complaint, ECF No. 1 ¶¶ 14-15 (identifying Plaintiffs John Valdez and Steve Chavez as "former permittees," and Plaintiff Vangie Chavez as "the wife of former permittee Steve Chavez").  The Complaint does not allege that Plaintiffs Jarita Mesa Grazing Association, Alamosa Grazing Association, or Rio Arriba County hold permits.  *See id.* ¶¶ 13, 16.[7]  Because these Plaintiffs were not (or are not) the object of the 18-percent reduction in permitted numbers, they cannot establish the elements of standing and should be dismissed.

---

[7] While Plaintiffs' Complaint fails to allege that the Associations hold permits, elsewhere Plaintiffs have asserted the Associations are "permittees" holding permits for bulls on the Allotments.  ECF No. 67 at 5-6.  These permits, however, were not subject to the 18 percent reduction in the 2010 Decision Notice.  *See* AR011488.  Therefore, the Associations cannot claim that they suffered an injury in fact as permittees.

As noted, "[t]o establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  Because they do not hold permits that were subject to the Forest Service's 2010 Decision Notice reducing permitted livestock numbers by 18 percent, the non-permittee Plaintiffs listed above will not suffer the economic harm that Plaintiffs allege will result from the permittee Plaintiffs being unable to graze the number of livestock they were allowed to graze prior to the reduction.  *See* Complaint, ECF No. 1 ¶ 107.

Plaintiffs assert that non-permittee Plaintiff Steve Chavez has standing because he was a permittee on the Alamosa Allotment during the NEPA process and at the time of his Administrative Appeal, and therefore his interest in using the National Forest System lands "has been directly impaired and, in practical terms, even eliminated by that [the Forest Service's Decision].  ECF No. 138 at 2.  Standing, however, is measured at the time that the Complaint was filed (and must continue to be met throughout the lawsuit).  *See, e.g.*, *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.").  As Plaintiffs' own allegations concede, at the time the Complaint was filed, Mr. Chavez no longer held a permit. Complaint, ECF No. 1 ¶ 15 (stating that "Plaintiff Steve Chavez is a former permittee").  The Complaint does not allege that Mr. Chavez waived his permit in response to the Forest Service's 2010 Decision Notice, nor does the Complaint seek to have his permit taken away from the current permittee and returned to him.[8]  Mr. Chavez does not have standing based on a permit

---

[8] Mr. Chavez waived his permit and sold his livestock to permittee Plaintiff Fernando Gurule on April 19, 2011.  AR004156.  Mr. Gurule now holds the permit that Mr. Chavez waived.  *See* AR004160 ("This permit supersedes permit no. 2174, issued on 03/14/2011, to CHAVEZ,

that he no longer holds.  *See McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1256 (10th Cir. 2010)

(holding that where a Forest Service livestock grazing permittee no longer held the permit under

which his livestock grazing numbers had been reduced, his challenge to the agency decision

resulting in that reduction was moot).[9]

Plaintiffs also argue that non-permittee Plaintiff Steve Chavez has standing because "the

grazing reduction has damaged the viability of the entire community, and all community

residents have been harmed by the Defendants' actions."  ECF No. 138 at 2 (citing Complaint,

ECF No. 1 ¶¶ 37, 53-56, 107-10).  Plaintiffs offer no legal support for the proposition that every

individual in Mr. Chavez's "community" has standing to challenge the Forest Service's 2010

Decision Notice on the theory that the alleged economic harm to the regulated individuals (the

permittees on the Allotments) will allegedly result in adverse impacts on the community.

Indeed, the case law is to the contrary.

The Supreme Court emphasized in *Defenders of Wildlife* that "[w]hen . . . a plaintiff's

asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*,

much more is needed" to meet the elements of Article III standing because "[i]n that

circumstance, causation and redressability ordinarily hinge on the response of the regulated . . .

third party to the government action or inaction -- and perhaps on the response of others as well."

504 U.S. at 562 (emphasis in original).  How the permittees respond to the permitted livestock

numbers reduction, whether they could have and would have grazed more livestock if permitted,

STEVE.").  Because Mr. Gurule received his permit *after* and *subject to* the Forest Service's
2010 Decision Notice, he also lacks standing in this matter.  *See* AR004168.

[9] For the same reasons as Mr. Chavez, non-permittee Plaintiff John Valdez lacks standing as a
"former permittee."  ECF No. 1 ¶ 14.  Non-permittee Plaintiff Vangie Chavez, "the wife of
former permittee Steve Chavez," Complaint, ECF No. 1 ¶ 15, is even further removed from
having a legally protected interest since nowhere does the Complaint allege that she ever held a
permit.

whether the climate would have accommodated more grazing, how the community is affected by the innumerable outside variables that play roles in shaping such communities, and, ultimately, whether a member of that community is actually harmed are just a few of the many unanswerable questions and factors that render Plaintiffs' allegations of harm to the community speculative and unredressable by a decision of this Court. This is particularly so given that the 18-percent reduction in *permitted* livestock closely approximates the average numbers of livestock actually grazed on the Allotment in the decade prior to the Forest Service's 2010 Decision Notice. *See* AR011547.

The speculative nature of such claims based on attenuated and unpredictable chains of causation is the very reason that the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 133 S. Ct. at 1147. In *Clapper*, the Supreme Court held that the respondents lacked standing to challenge a provision of the Foreign Intelligence Surveillance Act because the "chain of contingencies" leading from the provision to any harm to respondents was so attenuated that it could not satisfy the "certainly impending" requirement. *Id.* at 1148. As in *Clapper*, Plaintiffs' allegations of harm to individual non-permittee Plaintiffs, such as Mr. Chavez, through "social and cultural" harm to the community stemming from possible economic effects on the permittee Plaintiffs as a result of the 18-percent reduction are based on a lengthy chain of speculative and attenuated contingencies that cannot establish a "certainly impending" injury traceable to the Forest Service's 2010 Decision Notice. Indeed, the

Complaint does not even allege what the particularized and personal harm to Mr. Chavez or the other non-permittee Plaintiffs would be.[10]

Plaintiffs' Complaint does not and cannot allege sufficient facts to establish the non-permittee Plaintiffs' standing in this matter.  Therefore, those Plaintiffs should be dismissed from this litigation.

## II.   PLAINTIFFS HAVE FAILED TO EXHAUST ADMINISTRATIVE REMEDIES FOR THEIR REMAINING NEPA, NFMA, AND OTHER CLAIMS

This Court has already held that Plaintiffs' First Amendment claim is barred because Plaintiffs failed to raise any claim that the 2010 Decision Notice was the product of retaliatory animus.  ECF Nos. 102, 135.  In granting Federal Defendants' Motion to Dismiss, the Court found that only the Grazing Associations and Rio Arriba County filed an Administrative Appeal,[11] and that Administrative Appeal "failed to exhaust the First Amendment retaliation

---

[10] Plaintiffs' Complaint does not allege that the County holds any permits for the Allotments, and does not allege any specific harm to the County.  *See, e.g.*, Complaint, ECF No. 1 ¶ 16.  Instead, the Complaint alleges that the County receives "Payment in Lieu of Taxes from Defendant Forest Service which are derived in part from grazing fees," *id.*, but does not allege that these payments will be reduced as a result of the 2010 Decision Notice.  Beyond that, the Complaint alleges that the County has various interests in protecting its "residents" and "citizens" from the actions of the Forest Service.  *Id.*  It is well-settled, however, that States (and local governments) cannot sue the United States based on an alleged need to protect their citizens from the actions of the United States.  *See, e.g.*, *State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992) ("[T]he State does not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens.").  Nor does a State or local government have standing to pursue a "generalized grievance that the [government] is not acting in a way in which [the State] maintains is in accordance with federal laws."  *Id.* (internal quotation marks and citation omitted).

[11] As noted above, Plaintiffs have asked the Court to amend this finding to recognize that Plaintiff Steve Chavez also filed an Administrative Appeal that Plaintiffs assert raised their NFMA "wild horse" claim.  *See* ECF Nos. 136 and 138.  As discussed, Mr. Chavez is not a permittee and does not have standing, and thus his Appeal cannot form the basis for the remaining Plaintiffs' assertion that they exhausted administrative remedies.  Even if the Court considers his Appeal, Mr. Chavez did not raise the NFMA "wild horse" claim that Plaintiffs pursue in this case.

issue," because the Appeal "does not contain, anywhere within its fifteen pages, any reference to 'retaliation,' the 'First Amendment,' 'speech,' the 'Constitution' or anything 'constitutional,' 'animus,' or anything 'protected.'" ECF No. 135 at 101-02. Applying the Court's prior rulings and reasoning to Plaintiffs' remaining claims, it is evident that Plaintiffs have failed to exhaust administrative remedies for these claims and that they therefore must be dismissed.[12]

**A.     Standards For Exhaustion Of Forest Service Administrative Remedies**

"Where Congress specifically mandates, exhaustion [of administrative remedies] is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992). In the case of the Forest Service, an agency in the U.S. Department of Agriculture, Congress has specifically mandated exhaustion:

> **Exhaustion of Administrative Appeals.**  Notwithstanding any other provision of law, a person *shall* exhaust *all* administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against (1) the Secretary; (2) the Department; or (3) an agency, office or employee of the Department.

7 U.S.C. § 6912(e) (emphasis added). In accordance with this statute, the Forest Service has promulgated detailed regulations establishing the agency's administrative appeal procedures. For instance, the Forest Service regulations provide that "[i]t is the appellant's responsibility to provide sufficient project- or activity-specific *evidence and rationale*, focusing on the decision, to show why the Responsible Official's decision should be reversed," including "[h]ow the

---

[12] In its ruling on Federal Defendants' Motion to Dismiss the First Amendment retaliation claim, this Court correctly found that none of the permittee Plaintiffs had filed Administrative Appeals. ECF No. 135 at 101. Because non-permittee Plaintiffs lack standing, as discussed above, there remains no Administrative Appeal that can form the basis for exhaustion of Plaintiffs' claims and, on this basis also, Plaintiffs' case may be dismissed.

appellant believes the decision *specifically* violates law, regulation, or policy."  36 C.F.R. §
215.14(a), (b)(8) (2013) (emphases added).[13]

The exhaustion requirement established by Section 6912(e) is explicit and admits of no
exception:  a plaintiff *shall* exhaust *all* administrative remedies before bringing an action in
court.  As one court has observed, "[i]t is hard to imagine more direct and explicit language"
requiring exhaustion of administrative remedies than Section 6912(e).  *Bastek v. Fed. Crop Ins.
Corp.*, 145 F.3d 90, 94 (2d Cir. 1998) (quoting *Gleichman v. U.S. Dep't of Agric.*, 896 F. Supp.
42, 44 (D. Me. 1995)).  Where a statute explicitly requires exhaustion as a prerequisite to judicial
review, it should be strictly enforced.  *Darby v. Cisneros*, 509 U.S. 137, 153-54 (1993).
Accordingly, the Tenth Circuit has emphasized that the exhaustion requirement of Section
6912(e) is "mandatory."  *Forest Guardians v. United States Forest Serv.*, 641 F.3d 423, 432
(10th Cir. 2011).  In dismissing Plaintiffs' First Amendment claim, this Court followed the Tenth
Circuit's lead and found that while Section 6912(e) is not "jurisdictional," its statutorily-
mandated exhaustion requirement may not be waived or excused, and this Court also required
specific issue exhaustion in accordance with the Forest Service's regulations.  ECF No. 135 at
74-101.[14]

---

[13] As this Court noted, the Forest Service's administrative appeal regulations were amended in
2014.  ECF No. 135 at 76 n.14.  Federal Defendants' citations to 36 C.F.R. Part 215 are to the
regulations in effect at the time Plaintiffs were required to exhaust administrative remedies by
administratively appealing the 2010 Decision Notice, and are therefore the regulations that apply
to this Court's analysis of whether Plaintiffs properly raised the claims, issues, and arguments
they now seek to pursue in this litigation.

[14] Because Federal Defendants have already presented the United States' position on these
standards in briefing the Motion to Dismiss Plaintiffs' First Amendment claim, and the Court's
detailed examination and conclusions on these standards is largely in agreement with the United
States' position, Federal Defendants will not repeat those discussions here, but refer the Court
back to Federal Defendants' prior briefs, ECF Nos. 55 and 76, and the Court's decision, ECF No.
135.

B.     **Plaintiffs' Remaining Claims Must Be Dismissed Because They Depend On The Same "Bad Faith" Retaliatory Animus Issue That The Court Has Held Plaintiffs Failed To Exhaust**

In dismissing Plaintiffs' First Amendment claim, this Court found that Plaintiffs' Administrative Appeal does not contain "any reference to 'retaliation,' the 'First Amendment,' 'speech,' the 'Constitution' or anything 'constitutional,' 'animus,' or anything 'protected,'" ECF No. 135 at 102, and that the Appeal "contains no reference to 'criticism' or any close variant, 'letter' or 'letters,' the 'governor,' or 'anger' or 'angry,'" *id.* at 103.  Because Plaintiffs' Administrative Appeal failed to raise allegations that the District Ranger's decision was based on "bad faith" retaliatory animus, the Forest Service was not put on notice of this issue, and the Court did not have a "difficult call" in dismissing Plaintiffs' "First Amendment retaliation claim."  *Id.* at 102-03.

Following the Court's dismissal of their First Amendment retaliation claim, ECF No. 102, but before the Court issued its written Memorandum Opinion, ECF No. 135, Plaintiffs filed a "Motion to Supplement," ECF No. 106, seeking virtually the same discovery and supplementation of the Administrative Record in support of the remaining "statutory" claims that Plaintiffs had sought in support of their First Amendment retaliation claim.  *See* ECF No. 118 at 6-7 and ECF No. 118-1 (Exhibit A) (Federal Defendants' response to the Motion to Supplement demonstrating the near identity of Plaintiffs' discovery and supplementation requests).  Understandably, since it seeks the same supplementation and discovery, Plaintiffs' Motion to Supplement is based on the same retaliatory animus issue that formed the foundation for Plaintiffs' First Amendment retaliation claim.  *See, e.g.*, ECF No. 106 at 7 (section heading asserting that the Administrative Record "Should Be Supplemented . . . To Substantiate Plaintiffs' Detailed Plausible Allegations Of Bad Faith And Retaliatory Motive On Defendants'

16

Part"); *id.* at 16 (section heading asserting that "Plaintiffs Should Be Permitted To Conduct
Targeted Discovery In Order To . . . Substantiate Their Detailed Allegations Of Bad Faith and
Retaliatory Motive").

In the Motion to Supplement, Plaintiffs explicitly identify the "bad faith retaliatory
animus" issue that they assert forms the basis for their "statutory" claims (i.e., their remaining
NEPA, NFMA, and other claims) as the same "bad faith retaliatory animus" issue that formed
the basis for their now-dismissed First Amendment retaliation claims.  For instance, in the
Introduction, Plaintiffs argue they should be allowed discovery and supplementation of the
Administrative Record "in light of Plaintiffs' detailed plausible allegations of Defendants' bad
faith retaliatory motive for their challenged decision," ECF No. 106 at 2, which is a plain
reference to this Court's earlier finding that Plaintiffs' Complaint had "plausibly alleged that a
retaliatory animus substantially motivated the 2010 Decision Notice" in support of the First
Amendment retaliation claim.  ECF No. 49 at 106.  If there were any doubt that Plaintiffs are
asserting that the same "bad faith retaliatory animus" issue forms the basis for *all* of Plaintiffs'
claims in this case -- both "statutory" (NEPA, NFMA, and other) and "First Amendment" --
Plaintiffs state as much in the Motion:  "The Complaint contains extensive detailed factual
allegations that the Defendants in this case are alleged to have acted improperly and in bad faith
in a number of ways, which allegations form much of the predicate for all of the alleged
violations in the Complaint – statutory as well as Constitutional."  ECF No. 106 at 10.  Plaintiffs
further state:

> Bad faith and improper retaliatory motive are a major part of the basis for
> Plaintiffs' statutory claims.  In this case, where Plaintiffs have alleged improper
> and unlawful retaliatory action on the part of Defendants, where the record
> already includes evidence of such retaliatory action, and where Plaintiffs have
> plausibly alleged retaliatory animus as a substantial motivation for Defendant

> Trujillo's decision, supplementation of the record through discovery is warranted and should be permitted under the bad faith exception to the record review rule.
>
> Not only have Plaintiffs alleged conduct that constitutes bad faith, i.e., retaliatory conduct, *the Court already has found numerous allegations in Plaintiffs' Complaint, if proven, would constitute bad faith retaliatory action.* January 24, 2013, Memorandum Opinion and Order, Doc. 49, at 2, 103, 105. The Plaintiffs have offered particularized credible allegations that Defendant Trujillo's actions consistently, over time, were adverse to those who spoke out against her and the [Forest Service]. They also have sufficiently alleged that the 2010 Decision Notice was contrary to the weight of evidence before Defendant Trujillo, and *was made after the Plaintiffs deeply angered Defendant Trujillo by requesting her removal.* Doc. 49 at 106. Thus, Plaintiffs have made a strong, sufficient, showing of bad faith sufficient to justify discovery and supplementation of the record.

ECF No. 106 at 11-12 (emphasis added; citation and footnote omitted).

By expressly relying on this Court's Memorandum Opinion and Order finding that Plaintiffs had alleged a plausible First Amendment claim, ECF No. 49, Plaintiffs have established that their remaining "statutory" NEPA, NFMA, and other claims depend on precisely the same bad faith retaliatory animus issue that the Court has held was absent from Plaintiffs' Administrative Appeal.  *See* ECF No. 135 at 101-02.  Indeed, the above-quoted passage as well as other portions of Plaintiffs' Motion to Supplement[15] rely on the same references to terms that the Court found were not in the Administrative Appeal, such as "retaliation," "speech," "animus," "protected." "criticism" (or any close variant), and "anger" or "angry."  *See* ECF No. 135 at 102-03.

By Plaintiffs' own admissions, Plaintiffs' remaining "statutory" NEPA, NFMA, and other claims can only survive if the Court reviews the bad faith retaliatory animus issue. Plaintiffs assert that "although the record filed by Defendants already contains some evidence of retaliatory conduct, it appears to improperly exclude various materials *that would confirm* such

---

[15] *See also, e.g.*, ECF No. 106 at 16 ("Defendants' deceptive conduct strongly suggests bad faith, whether undertaken for the purpose of retaliating against Plaintiffs for their protected speech as Plaintiffs' [sic] claim or for some other improper purpose.").

improper motive" and thus "discovery and supplementation of the record *are necessary* to further support allegations of Defendants' bad faith actions and develop counts 2 through 9 of Plaintiffs' Complaint." ECF No. 106 at 12 (emphasis added). Plaintiffs also assert:

> As alleged in detail in the Complaint, . . . the retaliatory nature of the agency action challenged in this case *can only be adequately understood and evaluated* in the context of a record that fully reflects the Plaintiffs' repeated efforts to vindicate their protected interests through the Forest Service's own procedures and through external political avenues, as well as Defendants' repeated punitive actions against Plaintiffs for doing so . . . .

ECF No. 106 at 19 (emphasis added). According to Plaintiffs' own representation, then, the claims in Counts 2 through 9 are *only* viable if the Court evaluates evidence of "retaliatory conduct" and "punitive actions" in response to Plaintiffs' "efforts to vindicate their protected interests," based on materials already in the Administrative Record as well as materials that Plaintiffs hope to obtain in discovery to supplement the Administrative Record.

Plaintiffs' statements and admissions are fatal to its remaining "statutory" claims. This Court has already held that the exhaustion of administrative remedies provisions of Section 6912(e) and the Forest Service regulations require issue exhaustion and are mandatory. ECF No. 135 at 74-82, 93-101.[16] And, the Court has already held that Plaintiffs failed to exhaust the "bad faith retaliatory animus" issue in dismissing Plaintiffs' First Amendment retaliation claim. *Id.* at 102-03. Because exhaustion of Forest Service administrative appeals is mandatory and requires issue exhaustion, Plaintiffs can no more pursue their remaining "statutory" claims based on the "retaliatory animus" issue and allegations than they can pursue the First Amendment retaliation

---

[16] *See also, e.g.*, 36 C.F.R. § 215.14(a), (b)(8) (2013) (stating that it is "the appellant's responsibility" to produce "specific evidence and rationale" to show how the appealed decision "specifically violates law"); *Forest Guardians*, 641 F.3d at 434 (holding that, pursuant to 7 U.S.C. § 6912(e), "Forest Guardians failed to adequately present [its NFMA] argument in its administrative appeal and thus has forfeited it.").

claim based on precisely the same "retaliatory animus" issue and allegations that the Court found were not present in Plaintiffs' Administrative Appeal.

Pursuant to this Court's Memorandum Opinion and Order dismissing Plaintiffs' First Amendment retaliation claim for failure to raise the "retaliatory animus" issue in any Administrative Appeal, the Court should dismiss Plaintiffs' remaining "statutory" claims, Counts 1 through 9, on that same basis. At a minimum, Plaintiffs must be barred from further relying on the "retaliatory animus" issue and allegations in support of these claims. *See N.M. Envtl. Improvemnet Div. v. Thomas*, 789 F.2d 825, 836 (10th Cir. 1986) ("The court will not entertain arguments which should have properly been made before the agency in the first instance.").

### C.   Even If They Were Not Based On The Retaliatory Animus Issue, The Claims In Counts 1 Through 9 Were Not Presented In Plaintiffs' Administrative Appeal And Are Barred

To exhaust Forest Service administrative remedies under Section 6912(e), "claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Forest Guardians*, 641 F.3d at 430 (quoting *Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 202 (3d Cir. 1999)); *see also id.* at 431 ("'Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised . . . .'") (citation omitted). Here, Plaintiffs' Complaint represents a marked departure from Plaintiffs' Administrative Appeal, which raised claims under NEPA that differ from the NEPA claims in this case, and which did not raise any claims alleging violations of NFMA, SYFMA, or the 1972 Region 3 Policy. Therefore, even to the extent the new claims in the Complaint are cognizable in the absence of the retaliatory animus issue, those claims are barred for failure to exhaust administrative remedies.

20

### 1.    NFMA Claims, Counts 6 And 7

Plaintiffs' first NFMA Claim, Count 6, alleges that the Forest Service violated the "consistency" provision of NFMA, 16 U.S.C. § 1604(i), by failing to "complete production utilization studies to determine the need for improvement to or change in the current [range] management system" as allegedly required by "Standards and Guidelines in the Range Section of the Carson National Forest Plan," prior to "[a]ny adjustment of the permitted [livestock] numbers."  Complaint, ECF No. 1 ¶¶ 133-36.  Plaintiffs' Administrative Appeal contains no claim alleging such a violation of NFMA, nor does it contain any assertions that the Forest Service acted inconsistently with the Forest Plan, that the agency failed to complete "production utilization studies," or that it was even required to do so.  *See generally* AR011509-16 (Plaintiffs' Administrative Appeal claims).

Indeed, the only reference to NFMA in the Administrative Appeal is a brief reference to an entirely different provision, 16 U.S.C. § 1604(a), which the Appeal alleges "requires the Forest Service to coordinate with the land and resource management planning of State and local governments," as part of a claim in the Appeal that the Forest Service violated *NEPA* by inadequately coordinating with Rio Arriba County during the NEPA process.  AR011513-14.  In contrast, Plaintiffs' Complaint contains no claim that the Forest Service violated NEPA or NFMA by failing to adequately coordinate with the County.  *See generally* Complaint, ECF No. 1 ¶¶ 111-46.  To the extent that Plaintiffs' Administrative Appeal raised a NFMA claim alleging that the Forest Service failed to coordinate properly with the County, that claim is distinct from the NFMA claim presented in Count 6.  Therefore, Count 6 is barred for failure to exhaust administrative remedies.

Plaintiffs' second NFMA Claim, Count 7, alleges that the Forest Service violated NFMA by allegedly "fail[ing] to annually remove excess wild horse populations to levels outlined in Management Plans in violation [of] the Range Standards and Guidelines of the Carson National Forest Plan."  Complaint, ECF No. 1 ¶¶ 138-40.  Again, Plaintiffs' Administrative Appeal contains no mention of NFMA in any context other than coordinating with the County.  The only reference to "wild horses" in the Administrative Appeal is a factual statement that the environmental assessment ("EA") "reports that '132 wild horses have been captured and adopted since 2004 increasing forage for cattle,'" AR011507, which appears to undermine the claim in Plaintiffs' Complaint.

Plaintiffs have indicated that they believe that the Administrative Appeal of Plaintiff Steve Chavez raised Plaintiffs' NFMA "wild horse" claim.  *See* ECF Nos. 136 and 138.  As explained above, however, Mr. Chavez does not have standing in this case, and therefore his Appeal cannot form the basis for the other Plaintiffs' assertion that they exhausted administrative remedies.

Moreover, even if Mr. Chavez's Administrative Appeal were relevant to the exhaustion analysis, that Appeal did not raise the NFMA "wild horse" claim that Plaintiffs pursue in this case.  Mr. Chavez's Appeal does not mention NFMA or any requirement of the Forest Plan to annually remove "excess" wild horses.  Instead, Mr. Chavez only asserts his belief that the result of the wild horse survey conducted in 2008, as reported in the 2010 Decision Notice, was not accurate and that he "knows that in fact the number is much higher."  AR011503.  Mr. Chavez's bare assertion that the wild horse population was larger than the number reported in the Decision Notice does not allege that the Forest Service is violating NFMA or the Forest Plan by failing to

remove excess animals.[17]  Mr. Chavez's Administrative Appeal thus cannot be said to have raised the claim that Plaintiffs now pursue in their Complaint, alleging that the Forest Service has violated the Forest Plan and NFMA by failing to annually remove "excess" wild horses from the Jarita Mesa Wild Horse Territory.  Thus, Count 7 is also barred for failure to exhaust administrative remedies.

### 2.   SYFMA And 1972 Region 3 Policy Claims, Counts 8 And 9

Count 8 alleges that the Forest Service's decision to "impose an 18% reduction in the number of permits allowed Plaintiffs and the other permittees on the Vallecitos Sustained Yield Unit and thus reduce their access to forage, a non-timber forest product, constituted a violation of the Sustained Yield Forest Management Act [('SYFMA')]" because, according to Plaintiffs, SYFMA "mandates" that the agency must manage such forage "for the benefit of and to stabilize the communities within the Unit."  Complaint, ECF No. 1 ¶¶ 142-43.[18]  Plaintiffs' Administrative Appeal, however, does not mention SYFMA, let alone raise any claim that the Forest Service violated SYFMA.  *See generally* AR011505-19.  Nor does the Administrative Appeal even state that the Allotments are located in the Vallecitos Sustained Yield Unit -- there is no mention of the Unit or any substantive requirement that the Forest Service must manage "forage" or "non-timber forest products" in the Unit in any particular manner.  The only "requirements" that the Administrative Appeal addresses are the *procedural* requirements of

---

[17] Notably, Mr. Chavez was a permittee on the Alamosa Allotment, whereas the wild horse population is located only on the Jarita Mesa Allotment, and the Alamosa Allotment receives only "incidental" use by wild horses.  *See* AR011410-11.

[18] This allegation incorrectly alleges "an 18% reduction in the number of permits" when, in fact, there was no reduction in the number of permits.  Instead, the District Ranger's decision was "an 18% reduction *in permitted livestock.*"  AR011488 (emphasis added).  The number of permits authorized for the Alamosa and Jarita Mesa Allotments did not change in the Decision, only the number of livestock permitted in those permits, phased in over a five-year period.  *Id.*

NEPA and its implementing regulations.  Plaintiffs failed to exhaust administrative remedies for their new-found SYFMA claim.

Similarly, Plaintiffs' Administrative Appeal contains no mention of the 1972 Region 3 Policy that Plaintiffs now allege the Forest Service violated in Count 9 of the Complaint.  *See generally* AR011505-19.  Count 9 alleges that the 1972 Region 3 Policy "requires that all Forest Service programs and plans be compatible with the future well-being and continuance of local resource dependent communities and that Forest Service objectives and policies be altered to recognize and be responsive to the culture and peoples of those communities," and that the "inadequate analysis" in the EA and the 18-percent reduction in permitted livestock numbers violated this Policy.  Complaint, ECF No. 1 ¶¶ 145-46.  As with Plaintiffs' SYFMA claim, Plaintiffs' Administrative Appeal does not make any argument concerning the 1972 Region 3 Policy, nor does it make any claim that the Forest Service was *substantively* required to maintain the welfare of any particular community.  Because Plaintiffs' Region 3 Policy claim makes its first appearance in Plaintiffs' Complaint, and not in Plaintiffs' Administrative Appeal, Count 9 must be dismissed for failure to exhaust administrative remedies as required by Section 6912(e).

### 3.     NEPA Claims, Counts 2 Through 5

Unlike Plaintiffs' NFMA, SYFMA, and 1972 Region 3 Policy claims, Plaintiffs' Administrative Appeal actually raised NEPA claims.  *See* AR011509-16 (raising four NEPA claims under the heading "Basis for Reversal").  While superficially similar to a couple of the NEPA claims raised in Plaintiffs' Complaint, a comparison of the Administrative Appeal and Complaint reveals that the NEPA claims in the two documents are, in fact, distinct.

For instance, the third NEPA claim in Plaintiffs' Administrative Appeal alleges that the Forest Service violated NEPA by "fail[ing] to provide the County with it procedural rights,

assuring participation in its NEPA process." AR011513. As noted above, however, there are no claims in the Complaint -- NEPA or otherwise -- alleging that the Forest Service did not properly include the County in the NEPA process. This claim in the Administrative Appeal thus did not exhaust any claims raised in Plaintiffs' Complaint.

Similarly, the second and fourth NEPA claims in Plaintiffs' Administrative Appeal argue that the Forest Service failed to properly consider the "context" and "intensity" criteria of NEPA regulation 40 C.F.R. § 1508.27 for determining whether the environmental impacts of a proposed action are "significant" for NEPA purposes, thereby requiring preparation of a detailed environmental impact statement ("EIS"). *See* AR011512-13, AR011515-16. The second NEPA claim asserts that the District Ranger should have determined that the proposal to reduce permitted livestock numbers by 18 percent was both "highly controversial" (because the permittees opposed it) and "uncertain" (because the Decision Notice did not adequately discuss impacts on the permittees), thereby triggering these two (fourth and fifth) "intensity" factors under 40 C.F.R. § 1508.27 for requiring preparation of an EIS. AR011512-13. Likewise, the fourth NEPA claim in the Appeal asserts that "the Jarita Mesa and Alamosa stockmen could even be viewed as cultural resources" under the eighth "intensity" factor of 40 C.F.R. § 1508.27, and that because effects on the "stockmen's environment" was "significant" and "uncertain," the Forest Service was required to prepare an EIS. AR011515-16; *see also* AR011517 (alleging that, based on these arguments, the District Ranger "misinterprets and thus misapplies 40 [C.F.R.§ ] 1508.27" and thus "an EIS [should be] required by the Appeal Deciding Officer, if only on this misinterpretation of the law").

Unlike the second and fourth NEPA claims in Plaintiffs' Administrative Appeal, Plaintiffs' Complaint contains no reference to 40 C.F.R. § 1508.27, and raises no claim that three

of the "significance" factors required the Forest Service to prepare an EIS.  *See* Complaint, ECF No. 1 ¶¶ 116-31 (Plaintiffs' NEPA claims).  In fact, nowhere does the Complaint allege that the potential impacts of the Forest Service's decision are "controversial" or "uncertain" in the NEPA sense, and Plaintiffs do not request a declaration or preparation of an EIS in the Complaint's requests for relief.  *See id.* at 53-56.  The second and fourth NEPA claims in Plaintiffs' Administrative Appeal are not included among the NEPA claims in Plaintiffs' Complaint, and thus do not demonstrate that Plaintiffs exhausted administrative remedies.

The remaining NEPA claim in Plaintiffs' Administrative Appeal, the first claim, alleges that the "economics, social and environmental justice" section of the EA is "insufficient" to satisfy NEPA.  AR011509-12.  This claim is, at least on its face, similar to Count 2 of Plaintiffs' Complaint, which alleges that "[t]he Forest Service's discussion and analysis of social, economic, and environmental justice impacts in the [EA] is cursory at best and does not rise to the level of the hard look required under NEPA."  Complaint, ECF No. 1 ¶¶ 117-19.  As discussed above, however, Plaintiffs contend that all of their "statutory" claims are based on Plaintiffs' argument that the alleged legal deficiencies were the product of "retaliatory animus."  Thus, because Plaintiffs' Administrative Appeal does not assert that "retaliatory animus" resulted in the alleged inadequate discussion of "social, economic, and environmental justice impacts" in the EA, as Plaintiffs now contend, the Administrative Appeal did not put the Forest Service on notice of this claim.  Moreover, the claim in the Complaint also relies on the 1972 Region 3 Policy, *see id.* ¶ 118, which as discussed above is not raised in Plaintiffs' Administrative Appeal.  For these reasons, despite the superficial similarity in the claims, the Appeal did not adequately put the Forest Service on notice of the claim as now presented in Count 2 of the Complaint, and the claim should be dismissed.

The remaining NEPA claims raised in Plaintiffs' Complaint, Counts 3, 4, and 5, were not raised in Plaintiffs' Administrative Appeal.  Count 3 alleges that the Forest Service violated NEPA by allegedly failing "to use adequate range monitoring and data collection techniques as pointed out in RITF's [("Range Improvement Task Force's")] 2009 comments and thus the impacts analysis is based on an improper baseline arrived at using faulty methodology." Complaint, ECF No. 1 ¶¶ 121-23.  Plaintiffs' Administrative Appeal does not mention or fault the Forest Service's "range monitoring and data collection techniques,"  nor does it allege that the EA is "based on an improper baseline" or a "faulty methodology."  Indeed, the Appeal does not even include the phrases "range monitoring," "data collection techniques," "improper baseline," or "faulty methodology," not does it contain any language approximating these phrases as used in this context.  *See* AR011505-18.  Moreover, the only reference to RITF is in the "Statement of Facts" section, which simply states that the NEPA process involved only "minimal participation" from the County and other entities "such as [RITF]."  AR011508.  There is no assertion in the Appeal that the Forest Service did not consider or address RITF's comments in preparing the EA.  Therefore, Plaintiffs failed to exhaust administrative remedies for Count 3.

Count 4 alleges that the Forest Service failed to consider a "reasonable range of alternatives" in the NEPA analysis, and specifically an alternative that would reduce the wild horse and elk populations or an alternative for season-long livestock grazing.  Complaint, ECF No. 1 ¶¶ 125-27.  NEPA regulations "require[e] the EA to consider the 'environmental impacts of the proposed action and alternatives.'"  *Airport Neighbors Alliance v. United States*, 90 F.3d 426, 432 (10th Cir. 1996) (quoting 40 C.F.R. § 1508.9(b)). "An agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote,

speculative, or . . . impractical or ineffective." *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir. 1984).  Here, Plaintiffs' Administrative Appeal does not assert that the Forest Service should have considered any alternatives that were not considered in the EA, nor does the appeal fault the Forest Service for failing to consider a "reasonable range of alternatives."

Instead, the Appeal only addresses the sufficiency of the analysis of the impacts of the alternatives that were assessed in the EA.  AR011509-10; *see, e.g.*, AR011509 (alleging that "[t]he actual analysis of the impact of the three Alternatives (no grazing), (grazing) and (proposed action of 18% reduction) in the EA are simply stated in the form of conclusions without any factual analysis to support either discussion").  Plaintiffs' Administrative Appeal does not mention "season-long grazing" at all; mentions wild horses only in the factual background section, AR011507; and discusses elk in terms of the adequacy of impact analysis, not in terms of elk reduction being included as an alternative to be considered in the EA, AR011508, AR011513.  Because Plaintiffs' Administrative Appeal failed to argue that the Forest Service violated NEPA by failing to consider action alternatives for reducing wild horse or elk populations or for allowing season-long grazing, Count 4 must be dismissed.

Plaintiffs' final NEPA claim, Count 5, is that the District Ranger violated NEPA by allegedly failing to "consider the findings contained in the [EA] prior to making her decision to reduce grazing levels by 18%" because she "made the decision to implement Alternative 3 instead of the proposed action long before the Final EA was even issued."  Complaint, ECF No. 1 ¶¶ 129-31.  As set forth in the Complaint, the only alleged basis for the District Ranger to ignore the EA was that she had decided to select the 18-percent reduction in permitted livestock numbers alternative to "punish" Plaintiffs for speaking out against her.  *See, e.g.*, *id.* ¶ 5 (alleging that "Defendant Trujillo, *acting to retaliate against and punish Plaintiffs for engaging in conduct*

*protected by the First Amendment*, issued a Decision Notice that departed from the EA's Proposed Action and adopted Alternative 3, which imposed an 18% reduction in permitted grazing levels against Plaintiffs") (emphasis added).  Because Count 5 is based solely on the allegations of retaliatory animus that formed the basis for Plaintiffs' First Amendment claim that the Court found were not raised in Plaintiffs' Administrative Appeal, Count 5 must be dismissed as well.

In sum, Plaintiffs have taken the position before this Court that all of their remaining claims alleging violations of NEPA, NFMA, SYFMA, and the 1972 Region 3 Policy are based on the same "retaliatory animus" allegations that form the basis for Plaintiffs' First Amendment retaliation claim.  The Court dismissed Plaintiffs' First Amendment retaliation claim because Plaintiffs had failed to raise those allegations in any Administrative Appeal, and it therefore follows that Plaintiffs' remaining claims must be dismissed for this same reason.  Even beyond the "retaliatory animus" issue, Plaintiffs' Complaint raises claims that depart from the claims raised in Plaintiffs' Administrative Appeal.  While Plaintiffs may have switched counsel between the filing of their Administrative Appeal and the filing of their Complaint, such a change in representation does not allow Plaintiffs to change their claims.  The Court should dismiss Plaintiffs' remaining claims for failure to exhaust administrative remedies as mandated by Section 6912(e).

## III. PLAINTIFFS' ALLEGED INJURIES DO NOT FALL WITHIN THE "ZONE OF INTERESTS" PROTECTED BY NEPA FOR PLAINTIFFS' NEPA CLAIMS TO BE COGNIZABLE UNDER THE APA

In addition to being barred for Plaintiffs' failure to exhaust administrative remedies, Plaintiffs' NEPA claims are subject to dismissal because Plaintiffs' claims of injury in this case do not fall within the "zone of interests" that Congress sought to protect in enacting NEPA.

29

Plaintiffs' claims of injury from the 18-percent reduction in permitted livestock numbers are economic, social, and cultural, but not environmental.  *See, e.g.*, Complaint, ECF No. 1 ¶ 17.  To bring a cognizable claim under the APA, a plaintiff's interests must fall within the zone of interests protected by the statute the federal agency is alleged to have violated.  Because only injuries flowing from the environmental impacts of an agency's action satisfy the APA's zone-of-interests requirement for NEPA claims, Plaintiffs' NEPA claims must be dismissed.

### A.      Standards For APA's Zone-Of-Interests Test For NEPA Claims

"In addition to the immutable requirements of Article III," federal courts adhere to a set of prudential justiciability requirements or "judicially self-imposed limits on the exercise of federal jurisdiction." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  One such limit is that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Id.*  Although federal courts had previously followed the Supreme Court's lead in framing the zone-of-interests test as "prudential standing," the Supreme Court recently clarified that prudential standing is a misnomer, and the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l v. Static Control Components*, 134 S. Ct. 1377, 1387 (2014).  That change in label, however, has not changed the courts' analysis.  *See id.* at 1388, 1389 (stating that a statutory cause of action "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked," and that the zone-of-interest requirement "*always* applies and is never negated") (emphasis in original; citations omitted).

Because NEPA does not provide for a private right of action, Plaintiffs' NEPA claims are cognizable, if at all, only pursuant to the judicial review requirements of the APA.  *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1226 (10th Cir. 2011).  Pursuant to the APA, a plaintiff must establish that it is "adversely affected or aggrieved . . . within the meaning of a relevant statute" by some final agency action.  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (quoting 5 U.S.C. § 702).  Under this provision, "[t]he court may grant relief only when a petitioner shows its claims 'fall within the zone of interests protected by the statute forming the basis of [its] claims.'"  *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1058 n.25 (10th Cir. 2014) (quoting *Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998)).  "We therefore analyze whether a plaintiff satisfies the zone of interests test by 'discern[ing] the interests "arguably . . . to be protected" by the statutory provision at issue,' and then by 'inquir[ing] whether the plaintiff's interests affected by the agency action in question are among them.'"  *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1243 (10th Cir. 2008) (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998).  The "relevant statute" at issue for Plaintiffs' NEPA claims is, of course, NEPA.

While the zone-of-interests test is not intended to be "especially demanding," *Lexmark*, 134 S. Ct. at 1389 (citation omitted), federal courts have consistently applied the test in NEPA cases to require that putative plaintiffs have suffered an injury tied to an impact to the environment flowing from the challenged agency action.  The purpose of NEPA is "prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."  42 U.S.C. § 4321.  Thus, "[i]t is well settled that the zone of interests protected by NEPA is environmental."  *Nuclear Info. & Res. Serv. v. NRC*, 457 F.3d 941, 950 (9th Cir. 2006).  For instance, in *Catron County Board of Commissioners, New Mexico v. U.S. Fish & Wildlife*

*Service*, the Tenth Circuit held that the County's claimed injuries that the federal agency's action would cause flood damage to its property were "perceptible and environmental, not merely speculative or purely economic, and fall well within the zone of interests protected by NEPA." 75 F.3d 1429, 1433 (10th Cir. 1996).  Because the interests protected by NEPA are purely environmental, "to assert a claim under NEPA, a plaintiff must allege injury to the environment." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) (citation omitted).  Thus, "a NEPA claim may not be raised by a party with no claimed or apparent environmental interest." *Town of Stratford v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002).  "If a harm does not have a sufficiently close connection to the physical environment, NEPA does not apply." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 778 (1983).

> **B.**     **Plaintiffs' Alleged Interests In Challenging The 18-Percent Reduction In Permitted Livestock Numbers Do Not Fall Within NEPA's Environmental Zone Of Interests**

Plaintiffs challenge the Forest Service's 2010 Decision Notice to issue new 10-year term livestock grazing permits for the Alamosa and Jarita Mesa Allotments that, collectively, will reduce the permitted number of livestock on each Allotment by 18 percent from the previous term permits.  *See* Complaint, ECF No. 1 ¶ 5.  Plaintiffs allege that Plaintiffs "will be significantly injured as a result of the imposition of the 18% reduction in permitted cow/calf numbers," because "this loss of grazing permits causes not only severe economic harm to Plaintiffs but also grave damage to viability of the unique cultural and social fabric of their families and communities."  *Id.* ¶ 17.  For relief, Plaintiffs request that the Court "[i]ssue a judgment and an injunction voiding" the Forest Service's Decision to reduce permitted livestock numbers by 18 percent, and that the Court "order[] Defendants to adhere to the recommendation

for grazing permits on the Alamosa and Jarita Mesa Allotments to remain at approximately the same levels as were permitted prior to September, 2010." *Id.* at 55 ¶ 12.  In other words, Plaintiffs seek to have the Court require the Forest Service to increase the number of livestock that Permittee Plaintiffs are allowed to graze on the two Allotments by eliminating completely the 18-percent reduction.

Noticeably absent from Plaintiffs' Complaint is any allegation that the Forest Service's Decision to reduce permitted livestock numbers by 18 percent will cause any harm to the environment.  Plaintiffs do not allege that grazing less livestock on the Allotments will result in environmental impacts that would not have occurred if the Forest Service had selected the "proposed action" in the EA, which would have authorized permitted livestock numbers at the same levels as the previous permits.  Plaintiffs also do not allege that environmental injury from the Forest Service's Decision is the cause of Plaintiffs' alleged economic, social, and cultural injuries.  Instead, Plaintiffs allege only that their injuries flow from the reduction in permitted livestock numbers itself, not from any impact to the environment.  *See id.* ¶ 17.

Despite Plaintiffs' failure to allege any injury to the environment, Plaintiffs seek to use NEPA to set aside the Forest Service's 2010 Decision Notice and to allow livestock grazing at increased numbers.  Plaintiffs do not seek to protect the environment, but only seek to relieve purely economic impacts flowing from the Forest Service's Decision, and the social and cultural harm to their families and their community that Plaintiffs allege those economic impacts will cause.  Because there is no connection between Plaintiffs' alleged injuries and harm to the environment from the Forest Service's decision, Plaintiffs' interests do not fall within NEPA's

zone of interests, and their NEPA claims must be dismissed for failure to state a cause of action.

*See Lexmark*, 134 S. Ct. at 1388.[19]

This case is closely analogous to the circumstances facing the Ninth Circuit in *Nevada Land Action Association v. U.S. Forest Service,* 8 F.3d 713 (9th Cir. 1993).  In *Nevada Land Action*, an association of livestock ranchers alleged that the Forest Service violated NEPA in issuing a land management plan that decreased grazing levels to improve rangeland conditions. *Id.* at 715.  The ranching association argued that it fell within NEPA's zone of interests, but the Ninth Circuit ruled that the "purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."  *Id.* at 716.  Although "the primary injury suffered by [the ranching association's] members is economic," and although the association had "not allege[d] that the increased grazing levels it [sought] would benefit the natural environment," the association tried to sidestep the Court's ruling by arguing that the Forest Service's action "also affects the 'human environment' of [its] members and has therefore

---

[19] Indeed, the Tenth Circuit has held, on more than one occasion, that to establish Article III standing for NEPA claims a plaintiff must demonstrate that the federal agency's alleged failure to comply with NEPA created a risk of *environmental* harm that injures the plaintiff's concrete interests.  *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002) (holding that, to establish an injury-in-fact from an agency's alleged failure to comply with NEPA, "a litigant must show: 1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent environmental harm; and 2) that this increased risk of environmental harm injures its concrete interest") (citing *Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445, 449 (10th Cir. 1996)).  These Tenth Circuit rulings comport with case law from other circuits holding that that "the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests' for purposes of prudential standing."  *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1231 (D.C. Cir. 1996); *see also Oberdorfer v. Jewkes*, 583 F. App'x 770, 773 (9th Cir. 2014) (holding that the plaintiff could not bring suit under NEPA because the plaintiff's "economic injury . . . suffices for Article III standing but does not fall within NEPA's zone of interests . . . [and the plaintiff's] environmental injury . . . is within NEPA's zone of interests but will not be redressed by a favorable decision [and thus does not satisfy Article III standing]").  Plaintiffs' failures to allege environmental harm flowing from the Forest Service's decision, or that their economic and other injuries flow from such environmental harm, also bar Plaintiffs' NEPA claims under Article III of the Constitution.

caused 'lifestyle loss,' as well as economic loss" and that "its members have an economic interest in maintaining the forest resources and therefore in protecting the environment." *Id.* The Court rejected these arguments, holding that the association "cannot invoke NEPA to prevent 'lifestyle loss' when the lifestyle in question is damaging to the environment" and when the association's "suit is 'more likely to frustrate than to further' the objectives of NEPA." *Id.* (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987)).  The *Nevada Land Action* Court therefore held that the association's NEPA claims were not cognizable under the zone-of-interests test for NEPA claims.

As in *Nevada Land Action*, Plaintiffs do not seek to protect the environment, but challenge the Forest Service's compliance with NEPA in an attempt to undo the Forest Service's efforts to reduce the environmental impacts of livestock grazing on the Alamosa and Jarita Mesa Allotments.  As a result, Plaintiffs' NEPA claims conflict with the purpose of NEPA, which is to infuse the federal government with "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331).  Plaintiffs' NEPA claims must be dismissed pursuant to the NEPA zone-of-interests test.

**IV.   PLAINTIFFS' CLAIM THAT THE FOREST SERVICE HAS VIOLATED NFMA AND THE FOREST PLAN BY ALLEGEDLY "FAIL[ING] TO ANNUALLY REMOVE EXCESS WILD HORSE POPULATIONS" IS NOT COGNIZABLE PURSUANT TO THE SUPREME COURT'S *SUWA* DECISION**

Count 7 of Plaintiffs' Complaint, raising an alleged NFMA violation, is not cognizable under the precepts of  *SUWA*, 542 U.S. 55, because the referenced Forest Plan provision is not a concrete and legally enforceable obligation.  Count 7 alleges that the Forest Service "failed to annually remove excess wild horse populations to levels outlined in Management Plans in violation [of] the Range Standards and Guidelines of the Carson National Forest Plan."

Complaint, ECF No. 1 ¶ 139.  Plaintiffs allege that the Forest Plan *requires* the Forest Service

"to annually remove excess wild horse populations as outlined in the Management Plans."  *Id.* ¶

138.  The Supreme Court in *SUWA* held that such provisions in federal land management plans

do not present legally binding commitments and thus are not enforceable under the APA.  542

U.S. at 67-72.  Because it does not present a cognizable claim under the APA, Count 7 must be

dismissed.

      **A.**     **The Forest Plan Provision For Wild Horse Management Is A Statement Of Objectives Subject To Forest Service Funding And Priorities**

Rather than a static enforceable commitment, the Forest Plan provision for wild horse

management is a flexible statement of the Forest's objectives reflecting the complex

management issues involved.  In accordance with NFMA, 16 U.S.C. § 1604, the Carson National

Forest adopted the Forest Plan in 1986.  *See* AR000688-964.  Over the years, the Forest Plan has

been amended numerous times.  *See* AR000965-1037.  The 2002 amendment modified the wild

horse provision in the Forest Plan to state:  "Wildhorse Populations:  Remove excess wild horse

populations to levels outlined in Management Plans."  AR008499.[20]  Recognizing that the prior

"approved management level" of 12-14 horses for the Jarita Mesa Wild Horse Territory was too

low to sustain a healthy horse population, and that the range could support more, the Forest

Service increased the target population in 2002 to between 20 and 70 animals.  AR008499.

During the NEPA process for this amendment, the Forest Service responded to a wide

range of concerns.  Some members of the public worried about the impacts of too many horses

on livestock, while others worried that a horse population below 100 or 200 would be too low to

---

[20] Plaintiffs' allegation that the Forest Service was required to "annually" remove excess wild
horses appears to be based on the pre-amendment version of this provision, which stated:
"Annually remove excess wildhorse populations to levels outlined in Management Plans when
territories were established."  AR000745.

ensure the genetic integrity and long-term survival of the herd.  AR008518.  Cost in maintaining

the herd was also a factor, because the horses are protected pursuant to the Wild Horses and

Burros Protection Act of 1971, 16 U.S.C. § 1331, so there are complex protocols that must be

followed in gathering and removing the animals and placing them up for adoption, making the

gather procedure very difficult and very expensive.  AR008515-16; *see also, e.g.*, AR008514

(noting that "[c]apture of wild free-roaming horses" to meet the "appropriate management level"

has "seldom[ly] been done successfully");[21] AR008557 (advising that, in 2002, it cost "about

$500 to $1,500 to capture a horse," and projecting the horse management program to cost

$107,880 over 50 years).  Based on these concerns, the 2002 EA recognizes that the wild horse

management plan "must be flexible year-to-year."  AR008516.

   Contrary to Plaintiffs' allegations, District Ranger Trujillo made wild horse removal on

the Jarita Mesa Wild Horse Territory a priority and was very proactive in attempting to obtain

funding for wild horse gathers in her District, to the benefit of Plaintiffs.  Under District Ranger

Trujillo's efforts, and despite budget constraints and other variables beyond her control, more

than 120 wild horses were removed from the Territory from 2003 through 2010, compared to

only 18 in the same length of time prior to her arrival on the District.  *See* AR001621-22.

District Ranger Trujillo's intensified efforts to address the wild horse issue brought in more

funding and hence more accurate survey procedures, and during her tenure the Forest Service

switched from aerial surveys to more accurate ground surveys, AR001621, and the agency also

---

[21] Even while criticizing the Forest Service for its management of the wild horse population,
Plaintiffs are well aware of the difficulties with removing horses from the Jarita Mesa Wild
Horse Territory.  President of Plaintiff Jarita Mesa Grazing Association, Plaintiff Sebedeo
Chacon, had been contracted to remove horses from the Territory, but was unsuccessful.  *See*
AR009243 (June 22, 2006 letter from the Forest Supervisor to Mr. Chacon, stating that "Several
contractors, including yourself, were not successful in capturing wild horses in the past several
years, in sufficient numbers to reduce the herd size to Approved Management Levels.").

stepped up the use of wild horse contraceptive vaccine in an attempt to further control the

population.  *See* ECF No. 118-2.

**B.      The APA Cannot Be Used To Compel Agency Action Pursuant To The Objectives Of A Federal Land Management Plan**

NFMA directs individual National Forests to prepare "land and resource management

plans" (or "Forest Plans") that encapsulate the unique attributes and multiple uses of each forest,

and provide guidance in maintaining those values.  16 U.S.C. § 1604.  Forest Plans are general

frameworks for forest management rather than a list of mandatory requirements:

> These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses (from logging to road construction), but do not directly compel specific actions, such as cutting of trees in a particular area or construction of a specific road.

*Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 966 (9th Cir. 2003); *see*

*also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (stating that Forest Plans "do

not command anyone to do anything or to refrain from doing anything;" "they do not grant,

withhold, or modify any formal legal license, power, or authority;" and "they create no legal

rights or obligations").  After a Forest Plan is adopted, "[r]esource plans and permits, contracts,

and other instruments for the use and occupancy of National Forest System lands shall be

consistent with the [Forest Plan]."  *Id.* § 1604(i).  These site-specific projects authorize specific

actions to be implemented on the Forest Plan.  *See Colorado Environmental Coal. v. Dombeck*,

185 F.3d 1162, 1167-68 (10th Cir. 1999) (stating that "the Forest Service implements the Forest

Plan by approving . . . or disapproving particular projects"); *Ohio Forestry*, 523 U.S. at 729-30

(describing the "considerable legal distance between the adoption of the Plan" and activities

implementing that Plan, such as tree cutting).

In *SUWA*, the Supreme Court examined enforcement of the analogous federal land management planning regime governing the Bureau of Land Management ("BLM").  *See* 542 U.S. at 67 (stating that federal law required that BLM "'shall manage the public lands . . . in accordance with the land use plans" and that "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan") (quoting 43 U.S.C. § 1732(a) and 43 C.F.R. § 1610.5-3(a), respectively).  The plaintiffs in *SUWA* alleged that BLM had failed to "comply with certain provisions in its land use plans" and, specifically "'in light of damage from ORVs [(off-road vehicles)]'" in a particular wilderness study area, that BLM failed to comply with a provision of the land management plan stating that the area "'will be monitored and closed if warranted.'"  *Id*. at 67, 68 (citations omitted).  The Court found that this claim was not cognizable, holding that such statements in the plan "-- like other 'will do' projections of agency action set forth in land use plans -- are not a legally binding commitment enforceable under [the APA]."  *Id.* at 72.

The Supreme Court provided its reasoning for this holding as follows:

> Quite unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them.  It would be unreasonable to think that either Congress or the agency intended otherwise, since land use plans nationwide would commit the agency to actions far in the future, for which funds have not yet been appropriated. . . .  A statement by BLM about what it plans to do, at some point, *provided it has the funds and there are not more pressing priorities*, cannot be plucked out of context and made a basis for suit under [the APA].

542 U.S. at 71 (emphasis added).  The Court also recognized that allowing such a suit would cause BLM to produce vaguer land use plans, frustrating coordination with other agencies and depriving the public of information about the agency's long range intentions.  *Id*. at 71-72.  The Tenth Circuit has applied *SUWA*'s reasoning to the Forest Service's Forest Plans.  *See, e.g.*,

39

*Forest Guardians v. Forsgren*, 478 F.3d 1149, 1156 n.9 (10th Cir. 2007) ("Our reading of [*SUWA*] reveals that a 'land use plan' promulgated by the BLM does not differ significantly from a [Forest Plan] promulgated by the Forest Service.").

Like the land use plan at issue in *SUWA*, the provision for wild horse management cannot be plucked out of context and made the basis for a legal claim under the APA alleging that the Forest Service has failed to comply with that provision by allegedly failing to "annually remove excess wild horse populations."  Complaint, ECF No. 1 ¶ 139; *SUWA*, 542 U.S. at 71.  The call to monitor and remove excess wild horses in the Forest Plan is not a legally-binding commitment any more than the call to monitor and protect wilderness study areas in the land management plan at issue in *SUWA* is a legally-binding commitment.  Indeed, as the 2002 EA and Decision Notice for the wild horse amendment explain repeatedly, there was no guarantee that the population goals for the horses would be consistently met, given the complexities of managing the population in accordance with the Wild Horses and Burros Protection Act and other requirements and obstacles, and in light of the uncertainties in terms of funding and agency priorities.  *See, e.g.*, AR008523 (explaining that the 20 to 70 wild horse population objective is to "[w]ork toward attaining this number of wild horses as early as 2001 *and continue for several years*") (emphasis added).

Pursuant to *SUWA*, Plaintiffs' attempt to enforce the Forest Plan's wild horse provision as a violation of NFMA is not cognizable under the APA.  Therefore, the Court should dismiss Count 7.

V.   **PLAINTIFFS' SYFMA CLAIM FAILS BECAUSE SYFMA CONTAINS "NO
     LAW TO APPLY" FOR THE COURT TO REVIEW THE FOREST SERVICE'S
     DECISION PURSUANT TO THAT STATUTE**

Count 8 of Plaintiffs' Complaint alleges that the Forest Service has violated SYFMA by

allegedly "disregard[ing] the Proposed Action set forth in the EA in order to instead impose an

18% reduction in the number of permits allowed Plaintiffs and the other permittees on the

Vallecitos Sustained Yield Unit."  ECF No. 1 ¶ 142.  Because SYFMA does not impose a

mandatory, nondiscretionary duty on the Forest Service to manage the Alamosa and Jarita Mesa

Allotments in the manner that Plaintiffs allege, there is "no law to apply" to this claim under the

APA, 5 U.S.C. § 701(a)(2), and Count 8 must be dismissed.

   A.   **SYFMA Governs Management Of Timber Resources, Not Range
        Management**

Enacted in 1944, SYFMA established the Department of Agriculture's authority to

designate Sustained Yield Units to regulate timber production in National Forests in special

situations where local communities were dependent on sustainable timber markets.  The crux of

SYFMA was to orchestrate timber sales without competitive bidding, to make sure that those

sales benefitted the target communities.  Although Section 583b of SYFMA, detailing the

establishment of Sustained Yield Units, more broadly references "forest products," SYFMA's

legislative history consistently shows that the statute was intended to regulate timber sales, not

the issuance of term livestock grazing permits.

As the concept of Sustained Yield Units was developing, Claude R. Wickard, the

Secretary of Agriculture, explained in a May 1943 letter to the Senate's Chairman of the

Committee on Agriculture and Forestry:

> The plan is intended to benefit two types of problem situations.  The first involves
> private forest landowners who have insufficient mature and growing timber to
> enable them to cut on a sustained-yield basis. . . .   The second type of situation

> involves only national-forest timber.  Here, established dependent communities
> needing protection against competition would be wrecked if the national-forest
> timber were allowed to be manufactured elsewhere.

Letter from Claude R. Wickard, Secretary, Dep't of Agriculture, to Hon. Ellison D. Smith,

Chairman, Committee on Agriculture and Forestry, United States Senate (May 21, 1943), in H.R.

Rep. No. 78-960, at 3 (1943) to accompany Cooperative Sustained-Yield Unit Agreements With

Forest Owners And Operators, S. 250, 78th Cong. (1943).

  Shortly thereafter, congressional hearings on the proposed law cast no doubt on the

exclusive purpose of the bill.  Only once, a Congressman (Representative Walter K. Granger of

Utah) inquired about a wider scope, and Forest Service Administrator C.M. Granger made the

boundaries very clear:

> Representative GRANGER [of Utah].  Does this legislation apply solely to timber
> reserves?
> Mr. GRANGER [Forest Service Administrator].  It applies solely to the timber, but it
> applies to publicly owned and privately owned timber.
> Representative GRANGER.  These contracts you are talking about only apply to timber,
> or might they apply to any private land other than forests?
> Mr. GRANGER.  No, it applies only to timber. It is a forest operation bill.
> Representative GRANGER.  But where it says here "to regulate the water supply, stream
> flow, prevention of soil erosion, and the preservation of wildlife," does that all have to do
> with forest lands?
> Mr. GRANGER.  Yes, those are some of the things which are affected by the methods
> employed in cutting timber.  If the timber is cut off the land may wash away, and it may
> impair the habitat of wild life and what not, whereas if it was cut properly there would be
> benefits in protecting against soil erosion and preserving the habitat of wildlife, and other
> things that are the benefits of the proper way of cutting timber.
> Representative GRANGER.  How do you define a forest up in the Mountain States?
> There you would have forests that do not have any timber but in those regions there is
> wild game and there is also the possibility of soil erosion.  That would come under this,
> would it not?
> Mr. GRANGER.  No, sir; that would not be affected at all.  This merely applies to a
> situation where there is timber to be cut . . . .

Hearings before the Committee on Agriculture, House of Representatives, 78th Cong. 68-69

(1943) (statement of C. M. Granger, representing the U.S. Forest Service).

Consistent with the Forest Service's contemporaneous understanding and interpretation of SYFMA at the time it was enacted, the Forest Service established the Vallecitos Sustained Yield Unit and adopted a "Management Plan" for the Unit in 1947 that governs only timber production and sale in the Unit, not livestock grazing permits.  *See* AR000001-35.  While the SYFMA Management Plan sets "Silvicultural Policies and Practices" that provide for "Timber Sale Policies," Timber Stand Improvement," and other timber management practices for the Unit, AR000029-35, nowhere does the Management Plan provide any guidance for livestock grazing management.  Instead, the Management Plan mentions livestock grazing only in a background section on "Land Use" in the Unit.  AR000008.

The Forest Service thus does not interpret SYFMA to apply to the use of forage by livestock under the agency's grazing permit system, and the Management Plan confirms that interpretation.  As this Court has noted, a federal agency's interpretation of the statutes it is charged with implementing is entitled to deference pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  ECF No. 143 at 51-54; *see also id.* at 52 (stating that an agency's interpretation of ambiguous statutory language "is upheld almost without exception").

Because SYFMA does not apply to livestock grazing management decisions such as the 2010 Decision Notice, Plaintiffs' SYFMA claim fails on its face as a matter of law.  In fact, even if SYFMA applied to such decisions, Plaintiffs fail to identify any provision of SYFMA that even arguably bars the Forest Service from reducing permitted livestock numbers.  Therefore Count 8 should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

**B.     SYFMA Explicitly Prescribes Agency Discretion, Precluding Judicial Review**

Even assuming *arguendo* that SYFMA's reference to "forest products" could be expanded to include forage, implementation of SYFMA is committed to the agency's discretion. Plaintiffs' attempt to enforce SYFMA in the context of the Forest Service's livestock grazing permit decisions is therefore outside the reach of the APA based on the doctrine of "no law to apply."

The judicial review provisions of the APA are not applicable where "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  The Supreme Court addressed Section 701(a)(2) in *Heckler v. Chaney*, stating that "where Congress has not affirmatively precluded review [under Section 7(a)(1)], review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  70 U.S. 821, 830 (1985).  Under these "rare instances," the statute "can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely" because "there is no judicial review of an agency decision where there is no law for the court to apply."  *Id.*

Following *Chaney*, the Supreme Court applied the "no law to apply" doctrine in *Webster v. Doe*, 486 U.S. 592 (1988).  In *Webster*, the Supreme Court held that the National Security Act afforded the CIA Director such discretion that his decision to terminate an employee was committed to the Director's discretion and therefore unreviewable under the APA.  486 U.S. at 600-01.  In reaching this determination, the *Webster* Court found particularly compelling that the Act "allows termination of an Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States' (emphasis added), not simply when the dismissal *is* necessary or advisable to those interests."  *Id.* at 600 (quoting 50 U.S.C. § 403(c); emphasis in original).  The Court stated that "[t]his standard fairly exudes

44

deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review."  *Id.*

The Tenth Circuit applied *Chaney* in *Community Action of Laramie County v. Bowen*, 866 F.2d 347, 353 (10th Cir. 1989), when reviewing a decision by the Health and Human Services Department ("HHS") to terminate a Head Start grant.  Applicable regulations included 45 C.F.R. § 1303.33(a) (1999), providing that "[t]he responsible HHS official may terminate financial assistance to a grantee in whole or in part for failure to comply with any requirement . . . as stated in § 1303.30."  In turn, Section 1303.30 states that "[t]his subpart establishes rules and procedures for the suspension and termination of financial assistance under the Act, for the failure of a grantee to comply with applicable laws, regulations, guidelines, standards, instructions, assurances, terms and conditions"  *Id.* § 1303.30 (1999).  The Tenth Circuit held that when regulations are so broadly drawn, discretion is committed to the agency charged with following them:

> Because neither Congress nor HHS itself . . . has promulgated substantive guidelines for the agency to follow when deciding whether to terminate a grant or impose a lesser sanction for violation of the rules, there is no law for the court to apply.  The applicable statutes and regulations are so broadly drawn that the court has no standard against which to measure HHS' exercise of discretion.

*Cmty. Action of Laramie Cnty*, 866 F.2d at 353 (internal citation omitted).

Similarly, in *Wyoming v. U.S. Department of Agriculture*, 661 F.3d 1209, 1241-43 (10th Cir. 2011), the Tenth Circuit upheld the Forest Service's "Roadless Area Conservation Rule" against a challenge by the State of Wyoming.  In that case, Wyoming alleged that the Forest Service had violated NEPA by failing to grant "cooperating agency" status to Wyoming under the NEPA regulations during the decision-making process.  The Tenth Circuit rejected this

claim, finding that the decision of whether to grant a State "cooperating agency" status was committed to the federal agency's discretion, and therefore not subject to judicial review.

In reaching this conclusion, the Tenth Circuit noted that the applicable NEPA regulations provided that "[a] non-federal agency, such as a State or local agency, '*may* request the lead agency to designate it a cooperating agency,' [40 C.F.R.] § 1501.6 (emphasis added), and '*may* by agreement with the lead agency become a cooperating agency,' *id.* § 1508.5 (emphasis added)."  661 F.3d at 1242.  The Court explained:

> Although it is true that the [NEPA] Regulations permit Wyoming to request cooperating-agency status from the Forest Service, and further authorize the agency to grant such status, nothing in the regulations mandates or requires that the Forest Service grant such a request.  More importantly, the applicable regulations provide no standard for a court to apply in reviewing the Forest Service's denial of such a request, and are likewise devoid of any standards or directives that would guide the Forest Service in granting or denying such a request.  In other words, there is simply no law to apply. . . .  Under the applicable legal framework, therefore, the decision to grant or deny Wyoming's request was committed to the Forest Service's discretion and is not judicially reviewable under the APA.

*Id.* at 1242-43.

*Chaney*, *Webster*, *Community Action*, and *Wyoming* dictate that Count 8 must be dismissed because there is "no law to apply" to Plaintiffs' SYFMA claim.  All major decisions concerning Sustained Yield Units under SYFMA are 1) committed to agency discretion, or 2) so broadly defined as to provide no law to apply.  Section 583b is most instructive on this point:

> The Secretary of Agriculture and the Secretary of the Interior are further severally authorized, *whenever in their respective judgments* the maintenance of a stable community or communities is primarily dependent upon the sale of timber or other forest products . . . to establish by formal declaration for the purpose of maintaining the stability of such community or communities a sustained-yield unit . . . to determine and define the boundaries of the community or communities for whose benefit such unit is created, and to sell, *subject to such conditions and requirements as the Secretary believes necessary*, federally owned or administered timber and other forest products from such unit without competitive bidding at prices not less than their appraised values, to responsible purchasers within such community or communities.

46

16 U.S.C. § 583b (emphasis added).

Even under Plaintiffs' reading of SYFMA, the only possibly relevant provisions of SYFMA contain little specific direction to the agency beyond the requirement to sell timber and "other forest products" "without competitive bidding at prices not less than their appraised values." *Id.* But Plaintiffs do not allege a violation of that requirement. Every other action in SYFMA is expressly left to agency discretion; there is simply no reviewable standard by which the agency has been charged to manage timber or "other forest products." Therefore, pursuant to Section 701(a)(2) of the APA, there is no meaningful standard in SYFMA against which to judge the agency's exercise of discretion.

Plaintiffs have attempted to apply SYFMA, a statute governing the sale of timber and "other forest products," to a livestock grazing permit decision which, even if "forage" fell within the definition of "other forest products," do not involve the sale of forage. There is nothing in SYFMA directing the Forest Service to manage livestock grazing permits in any manner, let alone dictating that Forest Service cannot reduce permitted livestock numbers when it deems necessary for protection of resources on the National Forest. For these reasons, there is "no law to apply" to Plaintiffs' SYFMA claim pursuant to the APA. The Court should dismiss Count 8.

## VI.  PLAINTIFFS' CLAIM THAT THE FOREST SERVICE VIOLATED THE 1972 REGION 3 POLICY FAILS BECAUSE SUCH INTERNAL AGENCY POLICIES ARE NOT BINDING AND THEREFORE NOT ENFORCEABLE IN COURT

The final claim in Plaintiffs' Complaint, Count 9, alleges that "the inadequate analysis contained in Defendants' EA and the 18% grazing reduction imposed by Defendant Trujillo's Decision Notice and FONSI are in violation of the U.S. Forest Service 1972 Region 3 Policy. Complaint, ECF No. 1 ¶ 145. Plaintiffs allege that the 1972 Region 3 Policy "requires that all Forest Service programs and plans be compatible with the future well-being and continuance of

47

local resource dependent communities and that Forest Service objectives and policies be altered

to recognize and be responsive to the culture and peoples of those communities." *Id.* The 1972

Region 3 Policy, however, is an internal policy statement that creates no binding law that can be

judicially enforced against the Forest Service. Therefore, the APA is inapplicable, and Count 9

must be dismissed.

The Forest Service's "Region 3 Policy on Managing National Forest Land in Northern

New Mexico" was released by the Regional Forester on March 6, 1972. AR000154-57. The

Forest Supervisor for the Carson National Forest forwarded the Policy to the District Rangers

and other staff on March 13, 1972. AR000158. The Policy is short, focusing on the Regional

Forester's intentions to foster amicable relationships with rural neighbors and users of the

National Forests in Northern New Mexico, especially those of Spanish and Indian descent. It is

purely aspirational, and contains no specific directives or enforcement mechanisms for carrying

out these intentions. Such documents are not legally binding on the agency, and are not

enforceable against the Forest Service in federal court.

It is well-established that while "an agency must adhere to its own regulations . . . it need

not adhere to mere 'general statement[s] of policy.'" *Brock v. Cathedral Bluffs Shale Oil Co.*,

796 F.2d 533, 536 (D.C. Cir. 1986) (quoting *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38

(D.C. Cir. 1974)). For example, in *Western Radio Services Co. v. Espy*, 79 F.3d 896, 901 (9th

Cir. 1996), the Ninth Circuit determined that the Forest Service's Manual and Handbook --

which are far more organized and drafted like regulations than the 1972 Region 3 Policy, *see,*

*e.g.*, AR011563-945 -- did not have independent force and effect of law. The *Western Radio*

Court found that the Manual and Handbook were not substantive, noting that the Manual merely

established guidelines for the exercise of the Forest Service's administrative discretion, and did not act as a binding limitation on the agency's authority. *Id.*[22]

The 1972 Region 3 Policy is an example of internal agency guidance that does not rise even to the level of a procedural manual; it encapsulated little more than the Regional Forester's ideals.  Even its author, then-Regional Forester William D. Hurst, cast it as "philosophical in many respects."  AR 000154.  In substance, the Policy urges recognition of northern New Mexico's history and culture, especially its Pueblo Indians and Spanish Americans, and specifies three primary objectives:

> First, the uniqueness and value of Spanish American and Indian cultures in the Southwest must be recognized and efforts of the Forest Service must be directed toward their preservation. . . .  Second, the attitudes of people in the Forest Service, especially those who work in the Southwest, must be attuned to the land and its people and to the unique values involved. . . .  Third, Forest Service objectives and policies must be altered to the extent possible to recognize and be responsive to the culture and peoples.

AR 000156.  The Policy provides several examples of ways to foster this cultural respect.  For example, it urged small, rather than large, contracts for land management projects in the name of providing jobs for locals; it recommended small livestock permits, better tailored than large ones for local grazing practices; it suggested making dead wood and small-diameter trees available for community uses; and it encouraged respect for Indian artifacts and cultural sites.  AR000156-57.

---

[22] *See also*, *Schweiker v. Hansen*, 450 U.S. 785, 789-90 (1981) (holding that federal agency's internal instruction manual, a 13-volume handbook for internal use by thousands of Social Security Administration employees, "is not a regulation[,] has no legal force, and it does not bind the [federal agency]"); *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 227-28 (D.C. Cir. 2007) (concluding that the EPA's technical guidance document, the Human Health Risk Assessment Protocol for Hazardous Waste Combustion Facilities, was non-binding because it "does not 'command[,]' does not 'require[,]' does not 'order[,]' and does not 'dictate'"); *Kugel v. United States*, 947 F.2d 1504, 1507 (D.C. Cir. 1991) (intra-office manuals, "The Attorney General's Guidelines on Criminal Investigations of Individuals and Organizations," "do not, however, create a duty in favor of the general public"); *Lynch v. U.S. Parole Comm'n*, 768 F.2d 491, 497 (2d Cir. 1985) (finding that the "internal procedures manual of an executive agency does not create due process rights in the public").

Finally, the 1972 Region 3 Policy is unenforceable under the APA because it was not a document produced in conformity with the APA's requirements.  Aside from providing additional support for the proposition that agency policies are not binding when they do not prescribe substantive rules, *River Runners for Wilderness v. Martin*, held that agency policies are only enforceable when they are promulgated in conformity with APA procedures.  593 F.3d, 1064, 1073 (9th Cir. 2010).  In *River Runners*, the Ninth Circuit relied on a two-part test from *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131 (9th Cir.1982), for determining when agency pronouncements have the force and effect of law:

> To have the force and effect of law, enforceable against an agency in federal court, the agency pronouncement must (1) prescribe substantive rules -- not interpretive rules, *general statements of policy* or rules of agency organization, procedure or practice -- and (2) conform to certain procedural requirements.  To satisfy the first requirement the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated *pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress*.

*River Runners*, 593 F.3d at 1071(quoting *Eclectus Parrots*, 685 F.d at 1136) (emphasis added).

The Court went on to note that the APA requires that "publication or service of a substantive rule shall be made not less than 30 days before its effective date."  5 U.S.C. § 553(d).  The 1972 Region 3 Policy was never published in the Federal Register, was never made available for public comment in draft or in final form, and was never promulgated in the Code of Federal Regulations.  These additional facts further demonstrate that the Policy does not rise to the level of binding regulation.  *See W. Radio Servs.*, 79 F.3d at 901 (stating that, in determining that the Forest Service Handbook and Manual did not satisfy the *Eclectus Parrots* test, that

"[n]either [document] is published in the Federal Register or the Code of Federal Regulations. . . . They are not subjected to notice and comment rulemaking; they are not regulations.").[23]

The 1972 Region 3 Policy has none of the characteristics of binding agency law.  As such, the Policy cannot be legally enforced under the APA by a third party against the Forest Service, as Plaintiffs attempt to do here.  Count 9 must be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiffs' remaining "statutory" claims alleging violations of NEPA, NFMA, SYFMA, and the 1972 Region 3 Policy, are not properly before this Court. Federal Defendants respectfully request that the Court dismiss these remaining claims and close this case.  Plaintiffs, through counsel of record, have been consulted and oppose this Motion to Dismiss.

Respectfully submitted this 10th of February, 2015.

JOHN C. CRUDEN
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

___/s/ Andrew A. Smith_____
ANDREW A. SMITH[24]
Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section

---

[23] *See also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) ("The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations[.]"); *Miller v. Henman*, 804 F.2d 421, 426 (7th Cir. 1986) (holding that a manual governing prison assignments "was not promulgated under the [APA] or published in the Code of Federal Regulations, and therefore it does not create legally enforceable entitlements.").

[24] Anne Minard, University of New Mexico School of Law, Class of 2016, a participant in the Law Office Extern Program, did substantial work on this brief.

c/o United States Attorney's Office
P.O. Box 607
Albuquerque, New Mexico 87103
Phone: (505) 224-1468
Fax: (505) 346-7205
andrew.smith@usdoj.gov


DAMON P. MARTINEZ
United States Attorney

RUTH FUESS KEEGAN
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
Phone: (505) 346-7274
Ruth.Keegan@usdoj.gov

*Of Counsel*:
        Cassandra Cassaus Currie
        Office of General Counsel
        U.S. Department of Agriculture

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2015, Federal Defendants filed through the United States District Court ECF System the foregoing Notice to be served by CM/ECF electronic filing on all counsel of record.

                              /s/ Andrew A. Smith
                              ANDREW A. SMITH
                              U.S. Department of Justice