# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JARITA MESA LIVESTOCK GRAZING
ASSOCIATION; ALAMOSA LIVESTOCK
GRAZING ASSOCIATION; SEBEDEO
CHACON; THOMAS GRIEGO; DONALD
GRIEGO; MICHAEL PENA; JUAN GIRON;
JOE GURULE, JR.; FERNANDO GURULE;
DIEGO JARAMILLO; LORENZO
JARAMILLO; GABRIEL ALDAZ; ARTURO
RODARTE; JEFFREY CHACON; GLORIA
VALDEZ; JERRY VASQUEZ; CARLOS
ORTEGA; LEON ORTEGA; HORACIO
MARTINEZ; RONALD MARTINEZ; STEVE
CHAVEZ; VANGIE CHAVEZ; ALFONSO
CHACON; DANIEL RAEL; JOHN VALDEZ
and BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF
RIO ARRIBA,

       Plaintiffs,

vs.                                                                      No. CIV 12-0069 JB/KBM

UNITED STATES FOREST SERVICE and
DIANA TRUJILLO, in her official and
individual capacities,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Federal Defendants' Motion and

Memorandum to Dismiss Plaintiffs' Remaining Claims, filed February 10, 2015 (Doc. 144)

("MTD").  The Court held a hearing on May 21, 2015.  The primary issues are: (i) whether the

Plaintiffs who suffer no economic injury can establish standing; (ii) whether the Plaintiffs'

alleged injuries fall within the "zone of interests" of the National Environmental Policy Act of

1969, 42 U.S.C. §§ 4331-4370 ("NEPA"); (iii) whether the Plaintiffs properly exhausted their

administrative remedies; (iv) whether the Plaintiffs' claim that the Forest Service violated the National Forest Management Act of 1976, Pub. L. No. 94-588, 90 Stat. 2949 (codified in scattered sections of 16 U.S.C.)("NFMA"), by failing to remove wild horses is a judicially cognizable claim; (v) whether the Forest Service's guidance document is judicially enforceable; and (vi) whether the Sustained Yield Forest Management Act of 1944, 16 U.S.C. §§ 583, 583a-583i ("SYFMA"), governs the Forest Service's issuance of livestock grazing permits.

The Court concludes that the Plaintiffs who suffer no economic injury nonetheless have standing to redress their environmental, aesthetic, cultural, and recreational injuries. The Plaintiffs' injuries also fall within the zone of interests that the NEPA seeks to protect, although they may not pursue all of the remedies which they seek in the Complaint, filed January 20, 2012 (Doc. 1). Next, the Court concludes that the Plaintiffs have exhausted only some of their administrative remedies. The Court dismisses the unexhausted claims without prejudice to allow the Plaintiffs to exhaust their remaining claims before pursuing them in federal court. Even if the Plaintiffs had exhausted their remaining claims, however, the Court concludes that: (i) the Plaintiffs' claim that the Defendants violated the NFMA by failing to remove wild horses, Count Seven, is not judicially cognizable; (ii) the Forest Service's guidance document is not judicially enforceable under the Administrative Procedure Act, , 5 U.S.C. §§ 702-706, Pub. L. No. 79-404, 60 Stat. 237 ("APA"), making Count Nine unenforceable; and (iii) the Plaintiffs' claim that the Defendants violated the SYFMA, Count Eight, fails to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court grants the Motion as to the Complaint's Counts Three, Four, Six, Seven, Eight, and Nine. The Motion is denied as to the Complaint's Counts Two and Five.

## FACTUAL BACKGROUND

The history of the Plaintiffs' case predates the parties before the Court.  The Plaintiffs set forth a backdrop of social, cultural, and economic factors that they say are inextricably intertwined with the Plaintiffs' cattle grazing within the Carson National Forest in northern New Mexico.  The Plaintiffs also allege a history of tension between the Forest Service and the Plaintiffs' ancestors, which bears on the legality of the Defendants' actions managing national forestland in northern New Mexico over the last three years.[1]  The Court takes as true all non-conclusory factual statements in the Complaint for Declaratory and Injunctive Relief (First Amendment to the United States Constitution, National Environmental Policy Act; National Forest Management Act, Sustain Yield Forest Management Act; Administrative Procedure Act), filed January 20, 2012 (Doc. 1)("Complaint").

### 1.    The Parties to the Litigation.

"The Plaintiffs and their ancestors are Hispanic stockmen whose families have been grazing livestock" in northern New Mexico for many generations.  Complaint ¶ 3, at 2-3.  Most of the natural-person Plaintiffs' families were grazing livestock in the area that is now the Vallecitos Federal Sustained Yield Unit ("the Unit") before the Forest Service existed.  Complaint ¶ 3, at 3.  The Unit is an area of the Carson National Forest that Congress set aside to be managed for the economic benefit of the communities located in the Unit.  Congress specifically provided that these local communities should have access to the timber and other forest products within the Unit, as needed for the communities' economic stability.  See

---

[1]The Forest Service originated in 1891 with the Forest Reserve Act, which empowered the president to establish forest reserves from timber covered public domain land.  See U.S. Forest Service, Our History, U.S. Forest Service, (Dec. 22, 2009), http://www.fs.fed.us/learn/our-history.

Complaint ¶ 39, at 14.  Grazing livestock is an "integral part of their existence and is a central part of life in the villages they reside in . . . all of Northern New Mexico."  Complaint ¶ 3, at 3.

The Jarita Mesa Allotment and the Alamosa Allotment are areas within the Unit where cattle grazing is allowed.  See Complaint ¶ 2, at 2.  Plaintiffs Sebedeo Chacon, Michael Pena, Juan Giron, Gabriel Aldaz, Arturo Rodarte, Thomas Griego, Donald Griego, Joe Gurule, Jr., Lorenzo Jaramillo, Jeffrey Chacon, and Gloria Valdez (collectively, "the Jarita Mesa Permittees") have permits that the Forest Service issued, which allow them to graze cattle on the Jarita Mesa Allotment.  Complaint ¶ 3, at 2.  T. Griego, D. Griego, Plaintiffs Carlos Ortega, Leon Ortega, Daniel Rael, Horacio Martinez, Ronald Martinez, Fernando Gurule, Jerry Vasquez, and Alfonso Chacon (collectively, "the Alamosa Permittees") have permits that the Forest Service issued, which allow them to graze cattle on the Alamosa Allotment.  Complaint ¶ 3, at 2.  Plaintiff Steve Chavez is a former permittee on the Alamosa Allotment and now lives within the Unit with his wife, Plaintiff Vangie Chavez.  See Complaint ¶ 3, at 2.  J. Valdez is a former permittee on the Jarita Mesa Allotment and now resides within the Unit.  See Complaint ¶ 3, at 2-3.  The Jarita Mesa Grazing Association and the Alamosa Grazing Association (collectively, "the Associations") are "local livestock associations made up exclusively of grazing permittees on the respective allotments."  Complaint ¶ 13, at 5.  The Associations were established to: (i) protect and promote the permittees' livestock grazing on the Allotments; (ii) manage and share the costs of handling livestock, range improvements, and other programs for the benefit of the Allotments and their resources; (iii) express the Associations' members' wishes; and (iv) meet with and work with the Forest Service to ensure proper management of livestock and range resources on the allotments.  See Complaint ¶ 13, at 6.  S. Chacon was president of the Jarita Mesa Grazing Association throughout the events set forth in the Complaint.  See

Complaint ¶ 14, at 6.  T. Griego was president of the Alamosa Grazing Association throughout the events set forth in the Complaint.  See Complaint ¶ 15, at 7.

The Hispanic people in northern New Mexico have lived in the area for hundreds of years, long before Congress created the Forest Service.  See Complaint ¶ 37, at 13.  The Hispanic people living in villages near the Carson National Forests have historically relied on the resources of the national forests of northern New Mexico for sustenance.  See Complaint ¶ 37, at 13.  These Hispanics rely upon the "fodder, including grasses and other forage, like the marsh hay, mushrooms, nuts, and seeds" within the Unit for their sustenance.  Complaint ¶ 39, at 14.  Livestock grazing has been central to their cultural, social, and economic fabric since at least the 1690s.  See Complaint ¶ 40, at 14.  The Associations represent the communities "that have historically relied on, and continue to rely on, grazing on these ancient community . . . lands."  Complaint ¶ 40, at 15.

Plaintiff Board of County Commissioners of the County of Rio Arriba ("Rio Arriba County") is a political subdivision in northern New Mexico, in which a large portion of the Carson National Forest, including the Allotments and the El Rito Ranger District, is located.  See Complaint ¶ 16, at 7.  The Individual Plaintiffs are all residents of Rio Arriba County.  Rio Arriba County and local school districts receive payments derived from the grazing fees, in lieu of taxes, from the Forest Service.  Rio Arriba County is thus interested in ensuring that the "grazing permits on land administered by the Forest Service within Rio Arriba County are not unlawfully reduced."  Complaint ¶ 16, at 7.  Rio Arriba County is also interested in protecting the social fabric, customs, traditions, and cultural integrity of the traditional communities within the county, and in the economic betterment of its citizens.  Rio Arriba County is further interested in "making sure federal laws are followed and that its citizens are not punished by

- 5 -

federal officials for expressing their views on federal agency policy to elected officials and others."  Complaint ¶ 16, at 7.

The Forest Service is an agency of the United States Department of Agriculture and is charged with the "administration of lands within the United States that have been designated as National Forest Lands."  Complaint ¶ 17, at 8.  The Forest Service is charged with the Unit's management.  Throughout the events set forth in the Complaint, the Forest Service employed Defendant Diana Trujillo as the El Rito District Ranger.  Complaint ¶ 19, at 8.  Both Allotments are located in the El Rito District of the Carson National Forest.  See Complaint ¶ 1, at 2.  Trujillo is charged with "managing the natural resources in her district, including the range resource."  Complaint ¶ 19, at 8.

**2.**     **The Events Giving Rise to the Litigation.**

"[A]ll or a substantial part of the events or omissions giving rise to the [Plaintiffs'] claims . . . occurred within this judicial district."  Complaint ¶ 12, at 5.  Beginning in the 1920s, the Forest Service's management practices led to a reduction in the number of Hispanic residents near the Carson National Forest who were allowed to graze in the forest under permit.  See Complaint ¶ 43, at 16-17.  The Forest Service gradually eliminated milk cow and draft horse permits.  See Complaint ¶ 43, at 17.  The reduction in these permits has destabilized the Plaintiffs' cultural and social fabric.  See Complaint ¶ 43, at 17.  The Plaintiffs have "repeatedly voiced opposition to and have been highly critical of various actions taken by the Defendants," especially Trujillo's actions in recent years.  Complaint ¶ 57, at 22-23.  The Plaintiffs have written letters, spoken at public meetings, and contacted their congressional representatives about the Defendants' actions.  See Complaint ¶ 57, at 23.

- 6 -

Under the Forest Service's management, the population of wild horses and elk on the Unit has grown to the point that the vegetative cover, which the Plaintiffs rely on to graze their cattle, has degraded.  See Complaint ¶ 58, at 23.  In 2002, the Forest Service concluded that the wild horses on Jarita Mesa were competing with the cattle for forage.  See Complaint ¶ 59, at 23. In 2002, the Forest Service issued a Decision Notice ("2002 Decision Notice"), which authorizes the number of wild horses to increase from between twelve and fourteen, to between twenty and seventy.  Complaint ¶ 60, at 24.  The 2002 Decision Notice provides certain measures to be taken if the wild horse herd size grows above seventy horses.  See Complaint ¶ 60, at 24.

On or about April 8, 2006, S. Chacon, as the President of the Jarita Mesa Grazing Association, sent a letter to New Mexico's then-Governor Bill Richardson and to the New Mexico Congressional delegation, which over eighty residents of the Unit signed, and in which S. Chacon complained about the Forest Service's management of the El Rito Ranger District. The letter specifically complained about the Forest Service's failure to reduce the number of wild horse herds and to control the number of elk herds on the Unit.  See Complaint ¶ 62, at 25.  On May 24, 2006, the Plaintiffs[2] wrote to Trujillo's supervisor, Carson National Forest Supervisor Martin Chavez, and alleged that Trujillo was acting "in an abusive manner towards the Jarita Mesa permittees, was dealing with them in a less than honest manner, was arbitrarily and capriciously reducing the grazing time allowed under their permits, and was otherwise impairing their grazing rights" under the permits.  Complaint ¶ 63, at 25.  In June, 2006, a Forest Service employee admitted that the wild horse herd exceeded the number that the 2002 Decision Notice allowed and numbered at least 150.  See Complaint ¶ 64, at 25.

---

[2]The Plaintiffs do not clarify if all of the Plaintiffs, only the Individual Plaintiffs, or only the Jarita Mesa Permittees -- whose permits Trujillo's management of the Jarita Mesa Allotment affected -- signed the May 24, 2006 letter.  See Complaint ¶ 3, at 25.

On July 5, 2006, Trujillo ordered all cattle removed from the Jarita Mesa Allotment by July 31, 2006.  See Complaint ¶ 66, at 26.  Some of the Plaintiffs, including S. Chacon and Aldaz, appealed Trujillo's order.  See Complaint ¶ 66, at 27.  On July 25, 2006, Trujillo wrote to the Jarita Mesa Grazing Association and stated that the range conditions had not improved significantly, and, thus, she would not change her July 5, 2006, order to remove cattle by July 31, 2006.  See Complaint ¶ 68, at 27.  On July 28, 2006, acting Carson Forest Supervisor Kendall Clark decided to delay Trujillo's order for two weeks, because of recent rains and soil moisture levels.  A report by the Range Improvement Task Force ("RI Task Force"), associated with New Mexico State University ("NMSU"), subsequently found that the past grazing of the permittees' cattle had not damaged grazing resources and that there was sufficient grass to complete the grazing season as the permits authorized.  The Jarita Mesa Permittees were eventually allowed to complete their grazing season as their permits specified.  See Complaint ¶ 69, at 28.

Dr. David Correia, a professor of American Studies at the University of New Mexico, is a scholar who had been researching the Unit's history over several years.  Dr. Correia had been previously granted full access to the Forest Service records at the El Rito District Office for his research on the Unit.  In 2006, he began assisting the Plaintiffs with their interactions with Trujillo.  Dr. Correia attended a meeting in the El Rito area regarding grazing issues, at which Trujillo made statements to the effect that Unit residents caused most or all of the problems facing the Unit.  See Complaint ¶ 72, at 28.  Dr. Correia responded publicly at the meeting that the Forest Service's mismanagement of the Unit over the years was the source of the Unit's problems.  Subsequent to the 2006 meeting, Trujillo refused to allow Dr. Correia access to any records at the El Rito District Office and informed him that this change of policy was because of his statements at the meeting.  See Complaint ¶ 72, at 29.

Trujillo then announced that she would end the 2006 grazing season in September, 2006, instead of on October 31, 2006, as set forth in the Plaintiffs' permits.  Trujillo stated that this change was because the Plaintiffs failed to meet certain conditions that she had imposed -- conditions that, had they been met, would have allowed the season to end on October 31, 2006.  S. Chacon, as President of the Jarita Mesa Grazing Association, proposed a compromise end date of October 15, 2006.  See Complaint ¶ 73, at 29.  Trujillo responded that she would view S. Chacon's request as his alone and that individual permittees would need to address their needs to her individually.  Trujillo stated that, if the conditions she imposed were not met, she would suspend or cancel the permits, and charge fines for any cattle not removed by October 2, 2006.  See Complaint ¶ 74, at 30.

As of October 5, 2006, S. Chacon had seventeen cows lost in the Carson National Forest. Given the size of the Allotments, locating cattle at the end of a grazing season is often difficult for the permittees.  On October 6, 2006, Trujillo reduced S. Chacon's grazing permit by twenty percent over the next two years, because he had not retrieved all of his cattle by the deadline she imposed.  This decision was upheld on appeal.  See Complaint ¶ 75, at 30-31.  A Riparian Specialist and Natural Resource Specialist from New Mexico State University wrote to Trujillo regarding S. Chacon's permit reduction, and expressed that her standards were "unreasonable and unyielding," and that the Forest Service was aware that S. Chacon was not given enough time to recover his cattle.  Complaint ¶ 77, at 31-32.

Three years later, in the spring of 2009, the Plaintiffs complained to Trujillo and her staff regarding the Forest Service's management of the Allotments.  Trujillo responded with a certified letter in which she outlined the repercussions that the Plaintiffs would face if they did not comply with their grazing permits' terms.  See Complaint ¶ 79, at 32.  On June 1, 2009,

S. Chacon and T. Griego sent Trujillo a letter that twenty-six permittees signed, in which the Plaintiffs criticized Trujillo's management of the Allotments.  The Plaintiffs also sent the letter to the New Mexico Congressional delegation, Governor Richardson, and Trujillo's immediate supervisor, Carson Forest Supervisor Clark.  The Plaintiffs stated in the letter that Trujillo's certified letter insulted them, and the Plaintiffs accused Trujillo of attempting to intimidate them. The Plaintiffs alleged that Trujillo had failed to "install needed cattle guards or to fix plugged ones," and that Trujillo would sanction the permittees when their cattle drifted from one allotment to another.  Complaint ¶ 80, at 32-33.  The Plaintiffs complained that they believed Trujillo was attempting to end grazing on the Allotments.  See Complaint ¶ 80, at 33.

In 2009 and 2010, the Forest Service began preparing an Environmental Assessment ("EA")[3] that would determine the amount of grazing allowed on the Allotments for 2011 and

---

[3]Under the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852, federal agencies are required to assess the environmental impacts of proposed actions that will significantly affect the quality of a human environment.  Agencies must prepare an environmental impact statement that sets forth proposed actions and their environmental impact. See 42 U.S.C. § 4332(2)(C).  When the agency cannot determine whether a proposed action will have an environmental impact, the agency must prepare an EA.  See 40 C.F.R. § 1501.4(b).  An EA:

  (a)   Means a concise public document for which a Federal agency is responsible that serves to:

      (1)   Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

      (2)   Aid an agency's compliance with the Act when no environmental impact statement is necessary.

      (3)   Facilitate preparation of a statement when one is necessary.

  (b)   Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the

subsequent years.  See Complaint ¶ 78, at 32.  On August 20, 2009, the Forest Service made public three alternative courses of action for the El Rito District: (i) no grazing; (ii) grazing at the same level as the previous ten years, but with a minor reduction and improved management; and (iii) an eighteen-percent reduction in the number of permits with improved management.  The EA did not propose a reduction to the wild horse or elk population.  See Complaint ¶ 81, at 33.

The Forest Service requested comments from the RI Task Force regarding the EA's proposals.  The RI Task Force had been studying the socioeconomic and environmental effects and implications of Forest Service decisions regarding the Allotments for many years.  See Complaint ¶ 82, at 33.  The RI Task Force sent a letter to Trujillo expressing concern over the EA's scientific methodology, and the RI Task Force noted that the permittees "feel discouraged and powerless vis-à-vis" the Forest Service, as the strained relationship of the two over recent years evidences.  Complaint ¶ 82, at 34.  The RI Task Force recommended that Trujillo adopt the second proposal in the EA, which would allow grazing to remain at the same level as the previous years.  See Complaint ¶ 84, at 34.  The RI Task Force also recommended a longer grazing season.  See Complaint ¶ 84, at 34.

Rio Arriba County submitted a letter to the Defendants on September 17, 2009, in which it expressed concern about what it viewed as a "historical pattern of unjustified Forest Service action to reduce grazing opportunities for villagers that has chipped away and eroded the culture in the area and the way of life integral to that culture."  Complaint ¶ 85, at 35.  The Associations also submitted comments on September 17, 2009, in which they stated that the Forest Service

---

proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

should, as part of the upcoming EA, consider managing the wild horse and elk populations.  See Complaint ¶ 86, at 35.  On September 18, 2009, the New Mexico Department of Agriculture submitted comments in which it recommended that Trujillo adopt the EA's second proposal and stated its belief that proper management of the Carson National Forest would obviate the need to reduce the number of permits.  See Complaint ¶ 87, at 35.

On January 11, 2010, at a public meeting, Trujillo expressed her view that the current level of permits was an eighteen-percent temporary increase above the correct level -- an increase which occurred in 1980 and had, improperly, never been reduced to the correct level. See Complaint ¶ 89, at 36.  Trujillo also stated that she had been working with outside groups regarding the possibility of purchasing the Plaintiffs' permits.  See Complaint ¶ 89, at 36. Trujillo further stated that she would seek an eighteen-percent reduction in the number of permits, regardless of the EA's proposals.  See Complaint ¶ 89, at 37.  Trujillo contacted outside groups later in January and suggested that they purchase the Plaintiffs' permits.  See Complaint ¶ 90, at 37.

In March, 2010, the Plaintiffs submitted a petition to Carson National Forest Supervisor Clark, and Corbin Newman, the Regional Forester, which over 200 Unit residents signed, in which they requested that Trujillo be transferred from the El Rito District Ranger position. Trujillo was "extremely upset and angered by" the Plaintiffs' request.  Complaint ¶ 92, at 38.

On September 30, 2010, the Forest Service issued its EA.  See Complaint ¶ 4, at 3.  The EA contains approximately one page describing the socioeconomic and cultural impact that the proposed actions may have.  See Complaint ¶ 93, at 38.  The EA did not contain any recommendations regarding reducing the wild horse and elk population on the Allotments.  See Complaint ¶ 94, at 39.  The EA noted that, if the second alternative was adopted, which would

- 12 -

allow the permittees to remain at the same number but with better management, the overall environmental impact would be positive.  It added that the economic impact on the permittees would be less harsh than if the third alternative, an eighteen-percent reduction in the number of permittees, was adopted.  See Complaint ¶ 97, at 40.  The EA thus designated the second alternative as the Proposed Action.  See Complaint ¶ 98, at 41.

The 2010 EA's Proposed Action would have allowed the Plaintiffs to "continue grazing on both allotments with approximately the same number of cows as Plaintiffs have grazed on those allotments since 1980."  Complaint ¶ 4, at 3; id. ¶ 98, at 41.  Normally, the District Ranger for the Carson and Santa Fe National Forests in New Mexico adopts the Proposed Action set forth in an EA.  See Complaint ¶ 4, at 3; id. ¶ 99, at 41.  Rather than adopting the 2010 EA's Proposed Action, Trujillo adopted the third alternative set forth in the 2010 EA, which imposed an eighteen-percent reduction in the Plaintiffs' grazing permits.  See Complaint ¶ 5, at 3.  Trujillo stated that she took this action because the current number of permitted livestock on the Unit was unsustainable.  See Complaint ¶ 5, at 3-4; id. ¶ 100, at 42.  The EA did not conclude that the current grazing numbers were unsustainable.  See Complaint ¶ 100, at 42.

On November 29, 2010, the Associations and Rio Arriba County appealed Trujillo's 2010 Decision Notice.  See Complaint ¶ 105, at 44.  In 2011, Trujillo's' supervisors ruled on the appeal and announced that they were upholding her decision.  See Complaint ¶ 106, at 44.  The Plaintiffs assert that they "will be significantly injured as a result of the imposition of the 18% reduction in permitted cow/calf numbers."  Complaint ¶ 17, at 8.  The Plaintiffs state that the loss of grazing permits "causes not only severe economic harm to Plaintiffs but also grave damage to the viability of the unique cultural and social fabric of their families and communities."  Complaint ¶ 17, at 8.  They assert that the importance of their social and cultural fabric "has been

- 13 -

recognized by Defendant Forest Service as essential not just to the residents of northern New Mexico but to the entire nation."  Complaint ¶ 17, at 8.

The Plaintiffs also assert that Trujillo stated that the eighteen-percent increase in permits was the result of an agreement in which the Plaintiffs agreed to a shorter grazing permit term, but an eighteen-percent increase in the number of permits.  See Complaint ¶ 89, at 36.  The Plaintiffs assert that Trujillo's attempts to orchestrate the purchase of their permits was "completely outrageous" and beyond the scope of her duties, in addition to being in violation of the Policy's "letter and spirit."  Complaint ¶ 91, at 37.  The Plaintiffs assert that this "shocking" conduct demonstrates her "deep animosity towards the needs and aspirations of the permittees." Complaint ¶ 91, at 37.

The Plaintiffs also assert that Trujillo's 2010 Decision Notice, in which she chose to reduce the available permits by eighteen percent, was done out of her anger towards the Plaintiffs, and because she had "determined to retaliate against the Plaintiffs for having the temerity to point out her errors and criticize her mismanagement of the two allotments and the entire Sustained Yield Unit."  Complaint ¶ 99, at 42.  The Plaintiffs assert that Trujillo decided to reduce their permits by eighteen percent "long before the Final EA was issued."  Complaint ¶ 103, at 43.  The Plaintiffs assert that Trujillo's statements regarding the current level of permittees being unsustainable "was a pretext to conceal her retaliatory motive . . . to punish Plaintiffs and the other permittees for having complain[ed] to other government officials about Defendant Trujillo's conduct."  Complaint ¶ 104, at 44.

The Plaintiffs assert that the economic loss they have suffered and will continue to suffer because of the 2010 Decision Notice is far greater than the Forest Service's $32,000.00 estimate. The Plaintiffs assert that their economic injuries are "compounded by permanent, irreparable

damage to the social and cultural fabric" of their communities.  Complaint ¶ 107, at 45.  The Plaintiffs point out that their "large extended families" share the beef they acquire from cattle raising, providing "the larger population of local residents with healthy and inexpensive meat on which they depend for a vital part of their diet," and the Plaintiffs will now have twenty percent less beef available for their needs.  Complaint ¶ 109, at 46.

## PROCEDURAL BACKGROUND

The Plaintiffs filed suit in federal court on January 20, 2012.  See Complaint at 1.  They assert nine causes of action.  They request declaratory, injunctive, and monetary relief.  See Complaint at 53-56.

### 1.    The Claims in the Complaint.

All of the Plaintiffs' alleged injuries are related to Trujillo's 2010 decision to reduce grazing on the Jarita Mesa and Alamosa Grazing Allotments, both of which lie within the El Rito Ranger District of the Carson National Forest.  The Plaintiffs initially alleged that the eighteen-percent reduction in their permits violated their First Amendment right to free speech and to petition for redress of their grievances, but the Court dismissed these claims for failure to exhaust administrative remedies.  See Amended Memorandum Opinion, filed November 18, 2014 (Doc. 135).  The Plaintiffs bring their remaining claims under the NEPA, the NFMA, the SYFMA, and the APA.  Complaint ¶ 9, at 4-5.  The Plaintiffs assert that the Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1346, 2201, and 2202.  See Complaint ¶ 10, at 5.

The Plaintiffs assert that, under the NEPA, all federal agencies are required to prepare an environmental impact statement ("EIS") regarding proposed actions that will significantly affect the quality of a human environment.  Complaint ¶ 23, at 9 (citing 42 U.S.C. § 4332(2)(C)).  The

Plaintiffs assert that agencies must prepare an EA when a proposed action's effect is uncertain. See Complaint ¶ 24, at 10 (citing 40 C.F.R. §§ 1501.4(b), 1508.9). The Plaintiffs contend that, as part of the EIS and EAs prepared under the NEPA, an agency "must consider a reasonable range of alternatives and analyze both the direct and indirect impacts of all proposed major federal actions significantly affecting the human environment." Complaint ¶ 26, at 10 (citing 40 C.F.R. § 1502.14). The Plaintiffs assert that, when a range of proposed actions are available and an EA is prepared, the EA "is considered the functional equivalent of the preferred alternative" in an EIS. Complaint ¶ 26, at 10. The Plaintiffs argue that an agency is required to "insure the professional integrity, including scientific integrity," of the environmental analyses underlying an EIS and EA. Complaint ¶ 28, at 10 (citing Natural Res. Def. Council v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972); 40 C.F.R. § 1502.24). The Plaintiffs allege that the environmental review process that the NEPA requires is subject to public comment, and that agencies must respond to public comments with thorough modifications or thorough explanations for why no modification is necessary. See Complaint ¶ 29, at 10-11 (citing 40 C.F.R. § 1503.4).

The Plaintiffs assert that the NFMA requires the Forest Service to develop land resource management plans ("Forest Plans") for each national forest and must implement the plan on a site-specific level. Complaint ¶¶ 30-32, at 11 (citing Pub. L. No. 94-588; 16 U.S.C. § 1604(a); 36 C.F.R. § 219.10). The Plaintiffs assert that the implementation of a Forest Plan must be consistent with the Forest Plan. See Complaint ¶ 32, at 11 (citing 16 U.S.C. § 1604(i)). The Plaintiffs assert that, under the SYFMA, the Forest Service must use timber and non-timber forest products within a sustained unit for the "benefit of and to stabilize the communities within each sustained yield unit." Complaint ¶ 33, at 12 (citing 16 U.S.C. §§ 583(b), 583(a)).

The Plaintiffs assert that the Forest Service's 1972 Region 3 Policy on Managing National Forest Land in Northern New Mexico ("the Policy") recognizes that northern New Mexico communities are dependent upon forest resources, declares the Spanish-American/Hispanic culture of the area to be a "resource," and acknowledges that the Forest Service's "objectives and policies must be altered to the extent possible to recognize and be responsive to the culture and peoples."   Complaint ¶ 34, at 12 (citing the Policy at 3).   The Plaintiffs assert that the Policy "'explicitly recognized the intimate relationship that the Native American and Hispanic residents of Northern New Mexico had with the land' . . . and that 'their economic well-being is often tied closely to the resources of the National Forests and the manner in which they are utilized."   Complaint ¶ 49, at 19-20 (quoting the Policy at 2).   The Plaintiffs assert that the Policy requires the Forest Service to take actions for the preservation of Spanish-American/Hispanic culture in the region, including authorizing livestock permits.  See Complaint ¶¶ 35-36, at 12-13.

The Plaintiffs argue that the Forest Service reduced their grazing permits out of racial animus.  See Complaint ¶¶ 43-44, at 17.   They allege that the Unit was created in 1948 "to address some of the economic and social afflictions" harming the Plaintiffs' communities, and resulting from the reduction in their grazing permits over the years.   Complaint ¶¶ 45-46, at 18. The Plaintiffs contend that, contrary to the Policy, the Forest Service "has, for the most part, dealt with the Hispanic communities within the Unit . . . by continuing to pursue . . . a reduction in grazing permits, that have worked to further destabilize and impair the cultural, social, and economic fabric" of the Plaintiffs' communities.   Complaint ¶ 54, at 22.   The Plaintiffs assert that, instead of "managing the [U]nit to provide stability to the communities within the Unit as

required by law," the Forest Service's conduct has "resulted in an increase in economic and cultural instability for the communities in the Unit."  Complaint ¶ 56, at 22.

The Plaintiffs allege that Trujillo has responded to their public criticism "by engaging in a continuing and ongoing campaign of retaliation, misusing her position to harass and punish Plaintiffs for their constitutionally protected conduct."  Complaint ¶ 57, at 23.  The Plaintiffs assert that the swelling of the wild horse and elk populations on the Unit has contributed to the destabilization of the Plaintiffs' grazing tradition and culture.  See Complaint ¶ 58, at 23.  The Plaintiffs assert that, rather than reducing the number of wild horses on the Unit, as the 2002 Decision Notice outlines, the Defendants have used the damaged forage as an "excuse to harass" the Plaintiffs about foraging conditions and restrict their grazing rights.  Complaint ¶ 61, at 25.

The Plaintiffs assert that Trujillo's July 5, 2006, order that the Plaintiffs remove their cattle from Jarita Mesa by July 31, 2006, and her refusal to lift that order, were "motivated, in whole or in part, by a desire to retaliate against Plaintiffs for the exercise of their First Amendment rights to free speech and to petition for redress of grievances."  Complaint ¶ 70, at 28.  The Plaintiffs assert that Trujillo's actions were part of an "ongoing pattern and practice of retaliatory conduct."  Complaint ¶ 71, at 28.  The Plaintiffs assert that Trujillo's decision in 2006 to reduce S. Chacon's grazing permit by twenty percent had a profound economic impact on him, "costing him tens of thousands of dollars," and also damaged the social and cultural fabric of his community and extended family.  Complaint ¶ 75, at 31.  The Plaintiffs assert that S. Chacon was "singled out for disparately harsh punishment by Defendant Trujillo because she perceived him as a leader of the Jarita Mesa Grazing Association," and because the Jarita Mesa Permittees had criticized her to the state government.  Complaint ¶ 76, at 31.  The Plaintiffs assert that Trujillo acted as she did to chill the Plaintiffs' speech.  See Complaint ¶ 76, at 31.

The Complaint's first count is a retaliation claim under the First Amendment to the Constitution of the United States against Trujillo, which the Court has dismissed for failure to exhaust administrative remedies.  As their second cause of action, the Plaintiffs allege that the Defendants failed to properly analyze the environmental impact in the 2010 EA, and, by failing to take a "hard look" at the social, economic, and environmental justice impact each alternative would have, violated the APA.  Complaint ¶¶ 116-119, at 48-49 (citing Natural Res. Def. Council v. Morton, 458 F.2d at 838; 5 U.S.C. §§ 702, 706(2)).  The Plaintiffs allege, as their third cause of action, that the Defendants failed to analyze properly the environmental impact in the 2010 EA by failing to develop a proper baseline with the best available science for their study, in violation of the APA.  See Complaint ¶¶ 120-123, at 49 (citing 40 C.F.R. § 1502.24; 5 U.S.C. §§ 702, 706(2)).  The Plaintiffs allege, as their fourth cause of action, that the Defendants failed to properly consider and respond to comments, and failed to consider a reasonable range of alternatives in the 2010 EA, in violation of the NEPA and the APA.  See Complaint ¶¶ 124-127, at 49-50 (citing 40 C.F.R. § 1503.4; 36 C.F.R. § 220.4(c); 5 U.S.C. §§ 702, 706(b)).  As their fifth cause of action, the Plaintiffs allege that Trujillo failed to consider the findings in the 2010 EA when she made her 2010 Decision Notice, in violation of the NEPA and the APA.  See Complaint ¶¶ 128-131, at 50 (citing 36 C.F.R. § 220.4(c)(4); 5 U.S.C. §§ 702, 706(2)).  As their sixth cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan ("Forest Plan") range standards and guidelines related to grazing numbers, in violation of the NFMA and the APA.  See Complaint ¶¶ 132-136, at 50-51 (citing 16 U.S.C. § 1604(i); 5 U.S.C. §§ 702, 706(b)).  As their seventh cause of action, the Plaintiffs allege that the Defendants failed to follow the Carson National Forest Plan's range standards and guidelines related to the management of wild horses on the Jarita Mesa Allotment, in violation of

the NFMA and the APA.  See Complaint ¶¶ 137-140, at 51-52 (citing 5 U.S.C. §§ 702, 706(2)).

As their eighth cause of action, the Plaintiffs allege that the Defendants violated the SYFMA and

the APA by failing to use the Carson National Forest for the benefit of the communities within

the Unit.  See Complaint ¶¶ 141-143, at 52 (citing 5 U.S.C. §§ 702, 706(2)).  As their ninth cause

of action, the Plaintiffs allege that the Defendants violated the Policy and the APA by failing to

manage the Allotments in a manner that is responsive to and compatible with the well-being of

the local resource-dependent communities, and that they did so without a reasonable explanation.

See Complaint ¶¶ 144-146, at 52-53 (citing 5 U.S.C. §§ 702, 706(2)).

The Plaintiffs request various forms of relief.  The Plaintiffs request that the Court:

(i) declare that the Defendants violated NEPA by failing to adequately analyze, or to "take a hard

look" at, the social, economic, and environmental impacts that would result from the 2010 EA

and the 2010 Decision Notice for the Allotments, Complaint ¶ 3, at 53; (ii) declare that the

Defendants violated NEPA by "failing to properly analyze impacts insofar as they failed to

develop or use a proper baseline based on the best available science," Complaint ¶ 4, at 53;

(iii) declare that the Defendants violated NEPA by failing to properly consider and respond to

comments, and by failing to consider a reasonable range of alternatives, see Complaint ¶ 5, at 54;

(iv) declare that Trujillo violated NEPA by failing to consider the alternatives that the EA

analyzed before issuing the 2010 Decision Notice, see Complaint ¶ 6, at 54; (v) declare that the

Defendants violated the NFMA by failing to act in accordance with the Carson National Forest

Plan's range standards and guidelines regarding grazing numbers, see Complaint ¶ 7, at 54;

(vi) declare that the Defendants violated the NFMA by failing to act consistently with the Carson

National Forest Plan's range standards and guidelines regarding wild horse management, see

Complaint ¶ 8, at 54; (vii) declare that the Defendants violated the Plaintiffs' rights under the

SYFMA by failing to manage the forest for the benefit of the communities within the Unit, see Complaint ¶ 9, at 54; (viii) declare that the Defendants violated the Policy by failing to be responsive to the needs of the local, resource-dependent communities and failing to act in a way that supports their future well-being, see Complaint ¶ 10, at 54; (ix) declare that the Defendants' actions violated the APA by not observing the procedures the law requires, and were arbitrary and capricious "and/or unconstitutional," Complaint ¶ 11, at 55; (x) issue a judgment and injunction that voids the 2010 Decision Notice, and orders the Defendants to adhere to the second alternative in the 2010 EA, which would allow the Plaintiffs to keep their permits at approximately the same levels as before the 2010 EA was issued, see Complaint ¶ 12, at 55; (xi) issue an injunction that compels the Forest Service to comply with NEPA, the NFMA, the SYFMA, and the APA, so as to prevent irreparable harm and satisfy the public interest, see Complaint ¶ 13, at 55; (xii) issue an injunction which requires the Defendants to adhere to the second alternative in the 2010 EA, see Complaint ¶ 14, at 55; (xiii) award compensatory damages, against Trujillo, to the Plaintiffs who had their permits reduced in the 2011 grazing season and any subsequent grazing season, see Complaint ¶ 15, at 55; (xiv) award punitive damages against Trujillo, see Complaint ¶ 16, at 56; (xv) award the Plaintiffs their "costs, expenses, expert witness fees, and reasonable attorney fees under applicable law," Complaint ¶ 17, at 56; and (xvi) grant the Plaintiffs "such other and further relief as the Court deems proper," Complaint ¶ 18, at 56.

## 2. **The Motion to Dismiss.**

The Defendants filed two previous Motions to Dismiss. They first moved to dismiss the First Amendment retaliation claim on May 23, 2012, on the grounds that it failed to state a plausible claim. See Defendants' Memorandum in Support of Motion to Dismiss, filed May 23,

2012 (Doc. 17)("First MTD").  The Defendants moved the Court to dismiss: (i) the claim under

Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics ("Bivens"),[4] 403 U.S.

388 (1971); (ii) the First Amendment retaliation claim; and (iii) the claims for declaratory relief.

See First MTD at 1.  The Court granted the First MTD as to (i) and (iii), and denied it as to (ii).

See Memorandum Opinion and Order at 1-3, 114, filed January 24, 2013 (Doc. 49), 921 F. Supp.

1137.  The Defendants filed a second Motion to Dismiss arguing that the Plaintiffs failed to

exhaust their administrative remedies.  See Federal Defendants' Motion to Dismiss Count 1 for

Failure to Exhaust Administrative Remedies, filed February 18, 2013 (Doc. 55)("Second

MTD").

On November 18, 2014, the Court granted the Defendant's Second MTD and dismissed

the Plaintiffs' First Amendment retaliation claim.  See Second MTD at 105 (Doc. 135).  The

Court dismissed this claim because the Plaintiffs did not satisfy the issue-exhaustion

requirements in the proceedings before the Forest Service, because they did not specifically raise

their First Amendment retaliation issue in a way that the Forest Service could respond to it.  See

Second MTD at 74.  The Court dismissed the claim without prejudice to allow the Plaintiffs to

exhaust their claim and renew it later.  See Second MTD at 104.

The Defendants filed their third motion -- the MTD -- to dismiss on February 10, 2015.

They now seek to dismiss all of the Plaintiffs' remaining claims.  First, the Defendants assert that

some of the Plaintiffs do not hold permits subject to the eighteen-percent reduction in permitted

livestock numbers, or did not hold permits at the time of the Forest Service decision.  See MTD

at 8.  Because these Plaintiffs were not, or are not now, subject to the eighteen-percent reduction

in permitted numbers, the Defendants assert that they cannot establish standing.  See MTD at 9.

---

[4]A Bivens action is the federal analogue to a 42 U.S.C. § 1983 claim; it is a private right of action for damages arising directly under the Constitution.  Bivens, 403 U.S. at 388.

Second, the Defendants argue that, because "the Court dismissed Plaintiffs' First Amendment claim for Plaintiffs' failure to allege retaliation in any administrative appeal, it necessarily follows that the Court must dismiss Plaintiffs' remaining claims to the extent that they rely on those same unexhausted allegations."  MTD at 3.  The Defendants assert that the Plaintiffs failed to raise their remaining claims in any administrative appeal.  See MTD at 3.  For example, the Plaintiffs allege violations of the NFMA, the SYFMA, and the Policy.  Yet the Defendants claim that the "Plaintiffs' Administrative Appeal does not so much as mention SYFMA or the Policy, and its single reference to NFMA is with regard to coordinating with State and local governments, which has nothing to do with the NFMA claims raised in the Complaint."  MTD at 3-4.  Third, the Defendants assert that the Plaintiffs did not property exhaust their NEPA claims on administrative appeal.  The Defendants argue that "there is a lack of congruence between the allegations in the Complaint and the arguments raised in Plaintiffs' Administrative Appeal."  MTD at 4.

Fourth, the Defendants assert that the Plaintiffs' remaining claims fail on their face, because they do not present claims subject to judicial review under the APA.  See MTD at 4.  The Defendants state that the Plaintiffs fail to allege that the reduction in permitted livestock numbers causes environmental impacts that injure the Plaintiffs' interests.   Rather, the Defendants state that the Plaintiffs allege only "economic, social, and cultural injuries."  MTD at 4.  These injuries, the Defendants argue, do not fall within NEPA's "zone of interests" the APA requires for judicial review.  MTD at 4.  Similarly, the Defendants assert that the Plaintiffs' NFMA "wild horse" claim, faulting the Defendants for failing to meet the Carson National Forest Plan's population objectives, does not present a cognizable claim under the APA, because such planning goals are not judicially enforceable.  MTD at 4 (citing Norton v. Southern Utah

Wilderness Alliance, 542 U.S. 55 (2004)("SUWA")).  Next, the Defendants contend that the Plaintiffs' SYFMA claims fail because SYFMA contains "no law to apply" to gauge the Forest Service's compliance, as the APA requires.  MTD at 5.  Finally, the Defendants assert that the Plaintiffs' claim that the Forest Service violated its Policy is not a cognizable cause of action under the APA, because "such internal agency policies are non-binding, and therefore not enforceable in Court."  MTD at 5 (citing Schweiker v. Hansen, 450 U.S. 785, 789-90 (1981)).

### 3.    The Plaintiffs Respond to the MTD.

The Plaintiffs responded to the MTD on April 17, 2015.  See Plaintiffs' Response to Federal Defendants' Motion to Dismiss Plaintiffs' Remaining Claims, filed April 17, 2015 (Doc. 155)("Response").  They first argue that the non-permittee Plaintiffs, including Rio Arriba County, meet the constitutional standing requirements of injury-in-fact, causation, and redressability.  See Response at 8.  The Plaintiffs contend that the non-permittee Plaintiffs suffer a concrete injury to their cultural, recreational, aesthetic, and spiritual interests.  See Response at 8-9.  They argue that the Defendants' failure to follow procedural requirements caused the Defendants to improperly analyze the environmental consequences of their decision.  The Plaintiffs contend that the Defendants' failure to analyze the environmental consequences thereby damages range resources, which injures the Plaintiffs' interests.  See Response at 8-15. Furthermore, they argue that the Associations have associational standing, and that Rio Arriba County has standing in its own right.  See Response at 13-14.

Second, the Plaintiffs argue that they raised "the substance of their claims during the administrative review and appeals process with sufficient clarity to put the Defendants on notice of and provide the Defendants with an opportunity to consider the issues raised."  Response at 18.  They assert that they discussed the applicable facts and law in their appeals in a way that put

the Defendants on notice of the issues they now raise.  See Response at 19.  Further, the Plaintiffs contend that their remaining claims "are not based on the allegations of bad faith retaliatory animus that underlie the First Amendment claim."  Response at 26.  Instead, they argue that their remaining claims are based on "specific enumerated failures to fulfill legally binding obligations."  Response at 26.

Third, the Plaintiffs assert that their interests fall within the "zone of interests" NEPA seeks to protect.  They contend that they suffer a "mix of environmental, cultural and socioeconomic" injuries from "the Defendants' mismanagement of lands and resources that play a central role in the Plaintiffs' culture and way of life."  Response at 29.  They argue that NEPA seeks to protect not only environmental interests, but also aesthetic and environmental well-being. See Response at 30.

Fourth, the Plaintiffs argue that the Defendants violated the NFMA by taking action inconsistent with the Carson National Forest Management Plan, without providing a reasoned justification for deviating from those standards.  See Response at 32.  They argue that the Carson Forest Land and Resource Management Plan ("CFLRMP") and the Wild Horse Management Plan incorporates enforceable governing standards, and not mere policy statements.  Rather, the Plaintiffs argue they are "concrete, mandatory directive[s] imposed by the Forest Service on its employees in managing these lands."  Response at 33.

Fifth, the Plaintiffs assert that the Defendants violated NEPA by taking action inconsistent with the Forest Plan standards without providing a reasoned justification, as the Forest Plan requires.  See Response at 34.  Doing so, the Plaintiffs assert, was arbitrary and capricious and violated the NFMA and the APA.  See Response at 34.  Sixth, the Plaintiffs contend that the SYFMA provides "law to apply" and a reasonable standard against which the

Court can judge the Defendants' challenged action.  Response at 35.  The Plaintiffs argue that "a proper construction of the SYFMA's language in conjunction with the necessary context of other applicable laws . . . provide a set of constraints on the Defendants' exercise of discretion." Response at 40.  Finally, the Plaintiffs argue that Count Nine states a cognizable claim for relief based on the Defendants' violations of the Policy's directives.  See Response at 41.

### 4.     __The Hearing.__

The Court held a hearing on the MTD on May 21, 2015.  See Transcript of Hearing (taken May 21, 2015)("Tr.").[5]   The parties discussed the case's procedural posture, what evidence the Court could consider, and whether the Court could decide the issues on a motion to dismiss.  The Court asked the Defendants why they raised the issues in a motion to dismiss, rather than an appellate-style brief on the merits.  See Tr. 37:3-8 (Court).  The Defendants answered that primarily, they were trying to save time and resources by raising threshold issues at this stage rather than on the merits.  See Tr. 37:10-15.  The Court questioned the Plaintiffs whether they were comfortable litigating the issues on a motion.  See Tr. 41:8-12 (Court).  The Plaintiffs responded that "the Court is obligated to rule on it."  Tr. 43:13-14 (Herskovitz).

The Plaintiffs conceded that it was appropriate for the Court to rule on the issues in the MTD because the Court could examine the entire administrative record, making the case more analogous to an appellate-style brief on the merits than a motion to dismiss.  See Tr. 44:2-12 (Attorney 2).  In reviewing a rule 12(b)(6) motion in an APA case, the court may examine the materials in the Administrative Record to determine the viability of the Plaintiffs' claims.  That

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

§ 6912(e) is not jurisdictional has a minimal impact on the MTD's procedural posture.[6] Generally, the Court's latitude to pierce the pleadings and fact-find at the motion-to-dismiss stage is much greater regarding jurisdictional issues -- analyzed under rule 12(b)(1) -- than elements of the substantive claims -- analyzed under rule 12(b)(6).  Affirmative defenses, in particular, are difficult to establish at the motion-to-dismiss stage.  See Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, at *17, *36-42 (D.N.M. May 16, 2014)(Browning, J.).

This case, however, is an appeal, governed by the APA's procedural provisions.[7]  As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts normally use, which presume nothing about the merits of the case, and divide burdens of proof and production almost equally between the plaintiff and the defendant.  The Court can see no reason, however, why the parties cannot use the familiar procedural devices of the Federal Rules of Civil Procedure if they wish, at least

---

[6]As the Court stated in its Amended Memorandum Opinion, § 6912(e)'s exhaustion requirement sets forth an affirmative defense and not a jurisdictional predicate.  See Amended Memorandum Opinion at 88 (citing Ace Prop. & Cas. Ins. Co. v. Fed. Crop. Ins. Corp., 440 F.3d 992, 999 (8th Cir. 2006)(holding that § 6912(e) was not jurisdictional); McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 980 (9th Cir. 2002)(same); Munsell v. Dep't of Agriculture, 509 F.3d at 580-81 (same); Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d at 603-06 (same)).

[7]Review of agency actions generally comes to the Court in the form of an appeal, and not a "separate and independent action, initiated by a complaint and subjected to discovery and a 'pretrial' motions practice."  Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579 (explaining that "[t]his process, at its core, is inconsistent with the standards for judicial review of agency action under the APA").  Olenhouse v. Commodity Credit Corp. states that a "district court should govern itself by referring to the Federal Rules of Appellate Procedure," a requirement that the Tenth Circuit has confirmed as recently as 2009.  42 F.3d at 1580.  See Wyoming v. U.S. Dep't of Interior, 587 F.3d at 1251 n.2.  See also Hamilton v. Sec'y of Health & Human Servs. of U.S., 961 F.2d 1495, 1504 (10th Cir. 1992).  There is no harm in taking the case in the form that the parties have presented it, so long as the Court uses procedural devices that respect the congressionally determined scheme of judicial review.

to the extent that they can be modified to comport with the APA.   To comply with these principles, the Court will use the entire administrative record in determining whether the Defendants establish the failure-to-exhaust defense.   To do otherwise -- to cabin the court's examination to the usual rules for looking outside the pleadings on a rule 12(b)(6) motion -- would be to let the Federal Rules of Civil Procedure's procedural forms trump the APA's. Consequently, the parties agreed that the Court should rule on the issues presented in the MTD at this stage.   See Tr. 44:19 (Attorney 2).

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."   Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(Barrett, J.)(citations omitted).   A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.   See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").   Rule 12(b)(1) allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion.   Fed. R. Civ. P. 12(b)(1).   The United States Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based."   Ruiz v. McDonnell, 299 F .3d 1173, 1180 (10th Cir. 2002)(VanBebber, J.).

On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.   See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981).   But when the attack is

aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations.  A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Hill v. Vanderbilt Capital Advisors, LLC, 2011 WL 6013025, at *8 (D.N.M. Sept. 30, 2011)(Browning, J.)(quoting Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *8-9 (D.N.M. Mar. 11, 2009)(Browning, J.)).  The United States Court of Appeals for the Fifth Circuit has stated:

[T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(Randall, J.)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)(Brorby, J.); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(Baldock, J.).  In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment. See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)(Anderson, J.)).  Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion either under rule 12(b)(6) or rule 56.  See Franklin Sav. Corp. v. United States, 180

- 29 -

F.3d 1124, 1129 (10th Cir. 1999)(Murphy, J.); Tippett v. United States, 108 F.3d 1194, 1196

(10th Cir. 1997)(Briscoe, J.).  "When deciding whether jurisdiction is intertwined with the merits

of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question

requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States,

343 F.3d 1282, 1296 (10th Cir. 2003)(Hartz, J.)(quoting Sizova v. Nat'l Inst. of Standards &

Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)(Seymour, J.)).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The

sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a

court must accept as true all well-pled factual allegations in the complaint, view those allegations

in the light most favorable to the non-moving party, and draw all reasonable inferences in the

plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322

(2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the

alleged facts would the defendant prevail on a motion to dismiss.");  Smith v. United States, 561

F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6)

motion, we accept as true all well-pled factual allegations in a complaint and view these

allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036,

1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers

labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions.  First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss.  See Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)); Robbins v. Oklahoma, 519 F.3d 1242.  Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the face of the complaint.  See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense that the complaint's uncontroverted facts is most likely to establish.  See 5 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute.  The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that once a plaintiff has pled facts in the complaint

indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense).  It appears that, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates.  See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.).  Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this practice.  See Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, at *17, *37-39 (D.N.M. May 16, 2014)(Browning, J.).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.  First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies.  Second, standing has a prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(Lucero, J.)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It

is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record." Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(Henry, J.)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

1. **Article III Standing.**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies." San Juan County v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc). See U.S. Const. art. III, § 2. "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(Ebel, J.)(quoting Massachusetts v. EPA, 549 U.S. 497 (2007))(internal quotation marks omitted). "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing." San Juan County v. United States, 503 F.3d at 1171. To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(Hartz, J.)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(Seymour, J.)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)). In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the

Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.   484 F.3d at 1285.   The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in <u>Nova Health Sys. v. Gandy</u>, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.   416 F.3d 1154. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova faced any imminent likelihood that it would lose some minor patients seeking abortions.   416 F.3d at 1155.   Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.   <u>See</u> 416 F.3d at 1155.

### 2.   **Prudential Standing**.

"Prudential standing is not jurisdictional in the same sense as Article III standing." <u>Finstuen v. Crutcher</u>, 496 F.3d 1139, 1147 (10th Cir. 2007)(Ebel, J.).   Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers."   <u>Bd. of County Comm'rs v. Geringer</u>, 297 F.3d 1108, 1112 (10th Cir. 2002)(Ebel, J.)(internal quotation

marks omitted).  Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing.  The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  Lexmark Int'l v. Static Control Components, 134 S. Ct. 1377, 1387 (2014).  Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked."  134 S. Ct. at 1387.  Notably, the Supreme Court stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'"  134 S. Ct. at 1389 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199 (2012)).  Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue."  Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1389 (internal quotation marks and citations omitted).  This "lenient approach" preserves the APA's flexible judicial-review provisions.  134 S. Ct. at 1389.

3.      **Article III Standing in NEPA Cases.**

Courts must analyze the injury-in-fact requirement differently in NEPA cases, where the plaintiff's alleged harm typically arises from an agency's failure to follow a required procedure. Congress enacted NEPA to protect and promote environmental quality.  See 42 U.S.C. § 4331(a-c)(1994).  To ensure this protection, NEPA establishes "action forcing" procedures that agencies must follow, like requiring an agency to prepare an EIS.  42 U.S.C. § 4332(2)(C)(i-v); 40 C.F.R. § 1502.9(c)(1)(i).  These procedures guarantee the agency will seriously consider its actions' environmental consequences.  See Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976); Sierra Club v. U.S. Dep't of Energy, 287 F.3d 1256, 1262 (10th Cir. 2002).  Although NEPA gives procedural rights to those interested in protecting the environment, a litigant must also meet Article III's standing requirements.  See Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972).

The Tenth Circuit breaks down the injury-in-fact prong into two parts in NEPA cases.  First, the litigant must "show that in making its decision without following the National Environmental Policy Act's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm."  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 449 (10th Cir. 1996)(Brorby, J.); see Sierra Club v. U.S. Dep't of Energy, 287 F.3d at 1265.  Second, the litigant must show that this "increased risk of environmental harm injures its concrete interests."  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 449.  The litigant can do this "by demonstrating either its geographical nexus to, or actual use of the site of the agency action."  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 449.  When reviewing standing questions on a motion to dismiss, "the court presumes general allegations embrace those specific facts necessary to support the claim."  102 F.3d at 449 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); see United States v. SCRAP, 412 U.S. 669, 689 (1973)).

### a.     Injury in Fact.

The plaintiff must demonstrate that he, rather than merely the environment, has suffered an injury.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000). This injury need not be economic, however.  Instead, the plaintiffs may satisfy the injury-in-fact requirement by showing they have suffered a recreational, aesthetic, or other non-economic injury.  See 528 U.S. at 182-83.  For example, in Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., the Supreme Court found that the plaintiff suffered a concrete injury when he lived and recreated near a river that the defendant allegedly polluted.  See 528 U.S. at 181-82. Another plaintiff demonstrated injury by stating that he would like to canoe on the river, but refrained because he thought it might be polluted.  See 528 U.S. at 183.

In the NEPA context, "the harm itself need not be immediate," as the federal agency's decision may not affect the litigant's interest for several years.  Sierra Club v. United States Dep't of Energy, 287 F.3d at 1265.  See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 449 n.4.  Further, the litigant need not "show with certainty, or even with a substantial probability," that the agency's decision will surely harm the environment.  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452.  See Sierra Club v. U.S. Dep't of Energy, 287 F.3d at 1265.  Rather, the litigant must show that the agency, in making its decision without following statutorily mandated procedures, created an increased risk of harm.  See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 449; Sierra Club v. U.S. Dep't of Energy, 287 F.3d at 1265.

### b.     Causation.

In NEPA cases, plantiffs may prove causation by tracing the increased risk of harm to the agency's alleged failure to follow NEPA's procedures.  See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 451.   Under NEPA, an injury results from the agency's uninformed

decisionmaking. The "failure substantively to consider the environmental ramifications of its actions in accordance with NEPA" causes the increased risk of environmental harm. Catron Cnty. Bd. of Comm'rs v. United States Fish & Wildlife Serv., 75 F.3d at 1433. See Lujan v. Defenders of Wildlife, 504 U.S. at 572 n.7; Resources Ltd. Inc. v. Robertson, 35 F.3d 1300, 1303 n.2 (9th Cir. 1993). The purpose of statutory requirements to consider environmental impacts is to ensure that, in reaching its decision, the agency will carefully consider detailed information and avoid damaging the environment. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). It also makes the information available to a "a larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." Robertson v. Methow Valley Citizens Council, 490 U.S. at 349. "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated." Robertson v. Methow Valley Citizens Council, 490 U.S. at 349.

In short, NEPA's purpose is to require agencies to follow certain procedures. It "does not mandate particular results." Robertson v. Methow Valley Citizens Council, 490 U.S. at 350. See Stryker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227-28 (1980). A plaintiff can therefore suffer injury when an agency fails to follow those procedures. To require a plaintiff to demonstrate that the agency's failure to follow the procedure will result in the impacts the procedure was meant to examine is "contrary to the intent and essence of [NEPA]." Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 451. NEPA was not intended to require the plaintiff to show the results of agency action; that is the purpose of NEPA's action-forcing procedural requirements. See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 451.

iii.    **Redressability.**

Finally, a plaintiff must also show that a favorable court decision could redress his injury. See Lujan v. Defenders of Wildlife, 504 U.S. at 561.  Under NEPA, a plaintiff need not establish that the ultimate agency decision would change if the agency complied with NEPA's requirements.  See Lujan v. Defenders of Wildlife, 504 U.S. at 572.  Rather, the plaintiff must establish that compliance with statutorily required procedures would avert the possibility that the agency may have overlooked significant environmental consequences of its action.  See Lujan v. Defenders of Wildlife, 504 U.S. at 572.

## LAW REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

The doctrine of exhaustion of administrative remedies governs the timing of federal-court decisionmaking.  McCarthy v. Madigan, 503 U.S. 140, 144 (1992), abrogated by statute as recognized in Garrett v. Hawk, 127 F.3d 1263, 1265 (10th Cir. 1997).  A court conducting an exhaustion inquiry must give "paramount importance" to congressional intent.  McCarthy v. Madigan, 503 U.S. at 144 (quoting Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 501 (1982)). Where Congress provides that certain administrative remedies are exclusive, exhaustion is required.  See Patsy v. Bd. of Regents of Fla., 457 U.S. at 502 n.4 (citing Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41 (1938)).  Moreover, even where a statute does not expressly require exhaustion, courts must draw guidance from congressional intent "in determining whether application of the doctrine would be consistent with the statutory scheme."  Patsy v. Bd. of Regents of Fla., 457 U.S. at 502 n.4.  Thus, in deciding whether exhaustion of federal remedies is required, "courts generally focus on the role Congress has assigned to the relevant federal agency, and tailor the exhaustion rule to fit the particular administrative scheme created by Congress."  Patsy v. Bd. of Regents of Fla., 457 U.S. at 502 n.4 (citing McKart v. United

States, 395 U.S. 185, 193-95 (1969)).  Not only does a party's failure to exhaust mandatory administrative remedies bar the court from hearing that party's claim, but it also prevents the court from treating that party as a class member in a class action claim.  See Arctic Slope Native Ass'n v. Sebelius, 583 F.3d 785, 796 (Fed. Cir. 2009)(Bryson, J.).

"The Administrative Procedure Act requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court."  Idaho Sporting Cong. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002)(Nelson, J.)(citing 5 U.S.C. § 704).  "Where the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review."  Darby v. Cisneros, 509 U.S. 137, 153-54 (1993).  Further, "[s]tatutes and regulations governing actions of the Forest Service reiterate the administrative exhaustion requirement."  Darby v. Cisneros, 509 U.S. at 153-54 (citing 7 U.S.C. § 6912(e), and 36 C.F.R. § 215.20).

Section 6912 of Title 7 of the United States Code provides:

> (e)     Exhaustion of administrative appeals
>
>         Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against --
>
>         (1)     the Secretary;
>
>         (2)     the Department; or
>
>         (3)     an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e).  Federal courts have strictly applied the statutory exhaustion requirement when asked to review Department of Agriculture administrative proceedings.[8]  "[T]he statutory provision mandating exhaustion contained in 7 U.S.C. § 6912(e) is explicit . . . .  There can be little doubt that Congress's intent, in enacting this statute, was to require plaintiffs to exhaust all administrative remedies before bringing suit in federal court."  Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94-95 (2d Cir. 1998).[9]  The United States Court of Appeals for the Second Circuit in Bastek v. Federal Crop Insurance Corp. held that "7 U.S.C. § 1912(e) unambiguously required plaintiffs to exhaust their administrative remedies before bringing suit, and their failure to do so deprived them of the opportunity to obtain relief in the district court."  145 F.3d at 95.

In Kleissler v. U.S. Forest Service, 183 F.3d 196 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit described the exhaustion process in claims brought against the USFS:

> It is abundantly clear by the plain language of the applicable statutes and regulations that the Forest Service must be given written notice of an objector's challenges.  Therefore, we will consider only those allegations and comments contained in written documentation and correspondence to the Forest Service.  Moreover, we hold that the claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the

---

[8]The Forest Service is an agency within the Department of Agriculture.  See, e.g., Utah Envtl. Congress v. Bosworth, 372 F.3d 1219, 1223 n.3 (10th Cir. 2004)("We review the Forest Service's approval of the Monroe Project as final agency action under the APA, 5 U.S.C. §§ 701-706.").

[9]The United States Court of Appeals for the Second Circuit extended this conclusion, i.e., that § 6912(e)'s exhaustion requirement is mandatory, to further conclude that § 6912(e)'s requirement is a jurisdictional requirement, rather than an affirmative defense.  Ensuing case law has called this second conclusion into question.  See, e.g., Jones v. Bock, 549 U.S. 199 (2007); Munsell v. Dep't of Agriculture, 509 F.3d 572, 578-81 (D.C. Cir. 2007)(Edwards, J.); Dawson Farms, LLC v. Farm Serv. Agency, 504 F.3d 592, 603-04 (5th Cir. 2007)(Dennis, J.).  Its conclusion that the exhaustion requirement is mandatory, however, remains intact.  See Forest Guardians v. U.S. Forest Serv., 641 F.3d at 431-32.

agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court.  We are admonished that:

> administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated.

> Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553-54 (1978).

Kleissler v. U.S. Forest Serv., 183 F.3d at 202 (footnote omitted).  See Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 965 ("Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and we must consider exhaustion arguments on a case-by-case basis.").  "The rationale underlying the exhaustion requirement is to avoid premature claims and to ensure that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties."  Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 965 (citing Saulsbury Orchards & Almond Processing, Inc. v. Yeutter, 917 F.2d 1190, 1195 (9th Cir. 1990)).

The Supreme Court at one time recognized at least three broad exceptions to the exhaustion requirement: (i) "First, requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action," McCarthy v. Madigan, 503 U.S. at 146-47; (ii) "Second, an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief,'" McCarthy v. Madigan, 503 U.S. at 147 (quoting Gibson v. Berryhill, 411 U.S. 564, 575 n.14 (1973)); and (iii) "Third, an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it," McCarthy v. Madigan, 503 U.S. at 147.  The Prison Litigation Reform Act of 1995's passage, Pub. L. No. 104-134, 110 Stat. 1321 (1996),

abrogated the case that outlined these three exceptions, McCarthy v. Madigan, which concluded

that federal prisoners need not exhaust their administrative remedies before filing Bivens actions.

See Garrett v. Hawk, 127 F.3d at 1265.  Furthermore, the exhaustion requirement into which the

Supreme Court carved exceptions in McCarthy v. Madigan was itself a judicial -- not statutory --

creation.  See McCarthy v. Madigan, 503 U.S. at 143 ("[B]ecause Bivens actions are a creation

of the judiciary, the courts may impose reasonable conditions upon their filing[, such as t]he

exhaustion rule . . . .").  Some courts have suggested that exceptions to an exhaustion

requirement can be made for judicially created exhaustion requirements, but not for statutory

ones:

> Two kinds of exhaustion doctrine are currently applied by the courts, and the
> distinction between them is pivotal.  Statutory exhaustion requirements are
> mandatory, and courts are not free to dispense with them. Common law (or
> "judicial") exhaustion doctrine, in contrast, recognizes judicial discretion to
> employ a broad array of exceptions that allow a plaintiff to bring his case in
> district court despite his abandonment of the administrative review process.

Bastek v. Fed. Crop Ins. Corp., 145 F.3d at 94.  "[A] dismissal based on lack of exhaustion

should ordinarily be without prejudice . . . ."  Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134,

1139 (10th Cir. 2005)(emphasis omitted).  "[A] district court may, notwithstanding failure to

exhaust, proceed to the merits of the claim and dismiss with prejudice if it concludes a party

would be unsuccessful even absent the exhaustion issue."  Fitzgerald v. Corr. Corp. of Am., 403

F.3d at 1139.  See Friedlander v. Davis & Pierce, 2009 WL 1330059, at *7 (D.N.M. May 1,

2009)(Browning, J.).

    In accordance with 7 U.S.C. § 6912(e), the Forest Service has promulgated detailed

regulations governing administrative appeals.  The regulations require the appellant to "provide

sufficient project- or activity-specific evidence and rationale, focusing on the decision, to show

why the Responsible Official's decision should be reversed."  36 C.F.R. § 215.14(a), (b)(8)

(2013).   Specifically, the appellant must include "[h]ow the appellant believes the decision specifically violates the law, regulation, or policy."  36 C.F.R. § 215.14(a), (b)(8) (2013).  The Tenth Circuit has emphasized that Section 6912(e)'s exhaustion requirement is "mandatory."  See Forest Guardians v. United States Forest Serv., 641 F.3d 423, 432 (10th Cir. 2011).  It may not be waived or excused.

## LAW REGARDING THE APA'S JUDICIAL REVIEW PROVISIONS

The Court reviews agency actions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  The APA describes the exclusive mechanism -- unless another statute provides an alternative or supplemental mechanism -- by which the federal district courts may review the actions of federal administrative agencies.  See Webster v. Doe, 486 U.S. at 607 (Scalia, J., dissenting). "The [APA] makes final agency action for which there is no other adequate remedy in a court subject to judicial review."  Utahns for Better Transp. v. United States Dep't of Transp, 305 F.3d 1152, 1164 (10th Cir. 2002).  "Because neither NEPA nor NFMA provide a private right of action, courts review final agency action under the APA."  Utah Envtl. Cong. v. Bosworth, 443 F.3d 732, 740 (10th Cir. 2006).

### 1.    The APA Does Not Impart Subject-Matter Jurisdiction, but It Waives Sovereign Immunity.

The APA does not, through § 702, create an independent basis of subject-matter jurisdiction.  See Eagle-Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. 1990).  It allows for judicial review of final agency action only if there is also an independent basis for subject-matter jurisdiction.  See Colo. Dep't of Soc. Servs. v. Dep't of Health & Human Servs., 558 F. Supp. 337, 339 (D. Colo. 1983).  Notably, before a court may review a party's grievance, the party must demonstrate that statutes do not preclude judicial review and that the law does not commit the action to agency discretion.  See Heckler v. Chaney, 470 U.S. 821, 828

(1985). Section 702 waives sovereign immunity, and makes clear that suits under the APA are for equitable relief only and not for damages. See 5 U.S.C. § 702.

Through 5 U.S.C. § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief." United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996). "This waiver is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).

> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis. Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.

Gilmore v. Weatherford, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012)(internal citations and quotation marks omitted). See Trudeau v. Fed. Trade Comm'n, 456 F.3d at 186 (holding that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not"); Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)(holding the same).

## 2.   District Courts Must Treat Cases Arising From Agency Actions as Appeals.

Pursuant to Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." 42 F.3d at 1580. See Wyo. v. United States Dep't of Interior, 587 F.3d 1245, 1251 n.2 (10th Cir. 2009) (quoting Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580). District courts may not entertain motions for summary judgment or any other procedural devices that shift the appellant's substantial burden -- arbitrary-or-capricious review for questions of fact and Chevron

deference for questions of statutory interpretation -- onto the agency.  See Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579-80.

     **3.**     **The Standard of Review for Factual Issues Is Arbitrary-or-Capricious Review -- Also Known as "Substantial Evidence" Review.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," and, in appeals from formal proceedings, unless they are "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (E). Although these standards appear different, the modern view is that they are the same, and that a decision is arbitrary and capricious if substantial evidence does not support it.  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984).  In reviewing a decision under the arbitrary-or-capricious standard, the court reviews the entire administrative record -- or at least those portions of the record that the parties provided -- but it may not consider materials outside of the administrative record.[10]  See 5 U.S.C. § 706.

> In cases where Congress has provided for judicial review without setting forth the standards to be used or procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had . . . .

Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d at 1137.  See Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."  (emphasis added)).  The court should not pass judgment on the wisdom or merits of the agency's decision.  See Colo. Envtl. Coal. v. Dombeck,

---

[10]Section 706(2)(F) of the APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

185 F.3d at 1172 (stating that the NEPA prohibits uninformed actions, but not unwise actions).

To fulfill its function under the arbitrary-or-capricious standard of review, however, a reviewing

court should engage in a "thorough, probing, in-depth review" of the administrative record.

Wyo. v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation omitted).   The Tenth

Circuit explained the relevant standard of review as follows:

> In determining whether the agency acted in an arbitrary and capricious
> manner, we must ensure that the agency decision was based on a consideration of
> the relevant factors and examine whether there has been a clear error of judgment.
> We consider an agency decision arbitrary and capricious if
>
> > the agency . . . relied on factors which Congress had not intended it
> > to consider, entirely failed to consider an important aspect of the
> > problem, offered an explanation for its decision that runs counter
> > to the evidence before the agency, or is so implausible that it could
> > not be ascribed to a difference in view or the product of agency
> > expertise.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1167 (omission in original)(citations omitted)

(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))

(internal quotation marks omitted).   The standard of review requires the district court "to engage

in a substantive review of the record to determine if the agency considered relevant factors and

articulated a reasoned basis for its conclusions."   Olenhouse v. Commodity Credit Corp., 42 F.3d

at 1580.   While the court may not invent a reasoned basis for the agency's action that the agency

did not give, the court should "uphold a decision of less than ideal clarity if the agency's path

may reasonably be discerned."   Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419

U.S. 281, 286 (1974)(citations omitted).   The agency must articulate the same rationale for its

findings and conclusions on appeal upon which it relied in its internal proceedings.   See Sec.

Exchange Comm'n v. Chenery Corp., 318 U.S. 80 (1943).

**4.    The Standard of Review for Legal Issues Varies Depending Upon the Source of Law That the Agency Is Interpreting.**

In promulgating and enforcing regulations, agencies must interpret the content of the Constitution, statutes, and their own previously enacted regulations.   The federal judiciary accords considerable deference to agencies' interpretations of their own organic statutes -- the statutes Congress has tasked an agency with enforcing, from which it derives its authority to act. See United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994).   This deference is known as Chevron deference, named after the first case adopting the approach, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).   Chevron deference involves a two-step process,[11] first asking whether the statutory provision in question is clear and then, if it is not, asking whether the agency's interpretation of the unclear statute is a reasonable one.   As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative agency interpretations of their organic statutes laid down by the Supreme Court in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).   Those directives require that we first determine whether Congress has directly spoken to the precise question at issue.   If the congressional intent is clear, we must give effect to that intent.   If the statute is silent or ambiguous on that specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22 F.3d at 238 (citation omitted).

---

[11]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all.   See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006).   Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute; (ii) whether the decision fits within the category of interpretations afforded the deference; and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001).   An affirmative answer to all three inquiries results in the agency's decision passing step zero.

Chevron's second step is the easier one to describe, because it is all but toothless: if the agency's decision makes it to step two, it is upheld almost without exception.  See Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 CHI. KENT L. REV. 1253, 1261 (1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second Chevron step."   (footnote omitted)); Jason J. Czarnezki, An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. COLO. L. REV. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice.").  Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

Even at the Supreme Court-level, however, substantial disagreement surrounds what Chevron's first step means.  Sometimes courts assess clarity in terms of obviousness.  In other words, if a statute requires in-depth interpretation, it cannot be clear.  Other times courts assess clarity in terms of the court's confidence that its interpretation is correct -- meaning that in-depth interpretation may result in a court concluding that the statute is clear.  An appellate court's conclusion that a statute is clear has binding stare decicis effect, see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967 (2005), but its conclusion that a statute is unclear does not, see United States v. Home Concrete & Supply, LLC, 132 S. Ct. 1836 (2012).

A number of policy considerations animate Chevron deference, among them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, is granting discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately

headed by the President of the United States, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state than a unified but Circuit-fragmented federal judiciary can.

When agencies interpret their own regulations -- to adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452 (1997); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).  This deference is applied in the same manner as Chevron deference and is substantively identical.  Justice Scalia, after years of applying the doctrine followed by years of gradually beginning to question its soundness, finally denounced Auer deference in his recent dissent in Decker v. Northwest Environmental Defense Center, 133 S. Ct. 1326 (2013)(finding no persuasive justification for Auer deference). Justice Scalia attacked Auer in a dissent, but two other Justices, the Honorable John G. Roberts and Samuel A. Alito, Joined in a concurring opinion stating that "[i]t may be appropriate to reconsider [Auer deference] in an appropriate case.  But this is not that case."  133 S. Ct. at 1338 (Roberts, C.J., concurring).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land and the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution.  See United States West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . .  [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions."  (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and constitutionally vested authority and

responsibility to interpret -- the Constitution's content.  The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation. See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d at 1085 ("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

## ANALYSIS

The primary issues are: (i) whether the Plaintiffs who suffer no economic injury can establish standing; (ii) whether the Plaintiffs' alleged injuries fall within the NEPA's "zone of interests;" (iii) whether the Plaintiffs properly exhausted their administrative remedies; (iv) whether the Plaintiffs' claim that the Forest Service violated the NFMA by failing to remove wild horses is a judicially cognizable claim; (v) whether the Forest Service's guidance document is judicially enforceable; and (vi) whether the SYFMA governs the Forest Service's issuance of livestock grazing permits.

The Court concludes that the Plaintiffs who suffer no economic injury nonetheless have standing to redress their environmental, aesthetic, cultural, and recreational injuries.  The Plaintiffs' injuries also fall within the zone of interests that the NEPA seeks to protect, although they may not pursue all of the remedies which they seek in the Complaint.  Next, the Court concludes that the Plaintiffs have exhausted only some of their administrative remedies.  The Court dismisses the unexhausted claims without prejudice to allow the Plaintiffs to exhaust their remaining claims before pursuing them in federal court.  Even if the Plaintiffs had exhausted

their remaining claims, however, the Court concludes that: (i) the Plaintiffs' claim that the Defendants violated the NFMA by failing to remove wild horses, Count Seven, is not judicially cognizable; (ii) the Forest Service's guidance document is not judicially enforceable under the APA, making Count Nine unenforceable; and (iii) the Plaintiffs' claim that the Defendants violated the SYFMA, Count Eight, fails to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).   The Court therefore grants the MTD as to the Complaint's Counts Three, Four, Six, Seven, Eight, and Nine.   It denies the MTD as to the Complaint's Counts Two and Five.

## I.   THE PLAINTIFFS HAVE STANDING AS A RESULT OF THEIR PROCEDURAL INJURIES UNDER THE NEPA.

The non-permittee Plaintiffs, including Rio Arriba County, contend that the Defendants' failure to comply with the NEPA's procedural requirements creates an increased risk of environmental harm.   See Complaint ¶¶ 22-29, at 8-10.   Because of their unique relationship with the land, they allege that this harm injures their aesthetic, recreational, cultural, social, and spiritual interests in a particularized way.   See Response at 8-9; Complaint ¶¶ 37-57, at 13-22. The Plaintiffs therefore allege sufficient procedural injuries to demonstrate that they have Article III standing.

### A.   THE NON-PERMIT-HOLDING PLAINTIFFS SATISFY ARTICLE III'S CONSTITUTIONAL STANDING REQUIREMENTS.

To satisfy Article III's standing requirements, the non-permittee Plaintiffs must show injury, causation, and redressability.   See Lujan v. Defenders of Wildlife, 504 U.S. at 560.   They must demonstrate that they had standing at the time they filed the lawsuit.   See Smith v. United States Court of Appeals, for the Tenth Circuit, 484 F.3d at 1285.   The Plaintiffs concede that several of the named Plaintiffs did not hold permits when they filed this lawsuit.   See Complaint

¶¶ 14-15, at 6-7.  Specifically, Plaintiffs John Valdez and Steve Chavez formerly held permits, and Vangie Chavez -- "the wife of former permittee Steve Chavez" -- never held a permit. Complaint ¶¶ 14-15, at 6-7.  The Associations also have never held grazing permits.  Complaint ¶¶ 13, 16, at 5-7.[12]  The Defendants assert that because the non-permittee Plaintiffs "were not subject to the Forest Service's 2010 Decision Notice reducing permitted livestock numbers," they will not suffer the economic harm that the Plaintiffs allege will result.  MTD at 10.

### 1.    The Plaintiffs Have Demonstrated They Have Suffered an Injury in Fact.

Under the Tenth Circuit's two-step approach to injury-in-fact for NEPA cases, the Plaintiffs must demonstrate that, by failing to follow the NEPA's procedures, the agency "created an increased risk of actual, threatened, or imminent environmental harm."  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 449.  Second, they must show that this increased risk of environmental harm injures their concrete interests.  The litigant can satisfy the second prong "by demonstrating either its geographical nexus to, or actual use of the site of the agency action." Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 449.

With respect to the first criterion -- an increased risk of environmental harm -- the Plaintiffs argue that the Defendants' 2010 Decision Notice causes them to suffer a "severe injury," because these Plaintiffs have "centuries-old cultural ties to and concern for the lands that have been damaged."  Response at 8.[13]  See Complaint ¶ 17, at 8.  They argue that the

---

[12]The Associations held permits for bulls on the Allotments.  These permits, however, were not subject to the 2010 Decision Notice's eighteen-percent grazing reduction.  See Decision Notice and Finding of No Significant Impact for Rio Arriba County at 1 (dated Sept. 30, 2010)(AR011488).

[13]While the Plaintiffs' Response more clearly states the Plaintiffs' environmental injuries, the Court finds that the Complaint also supports the Plaintiffs' contention that they suffer

Defendants did not follow the NEPA's procedures when they failed to consider and respond to comments, and failed to consider all available alternatives -- primarily, damage that wild horse and elk populations cause.  See Response at 8; Complaint ¶¶ 22-29, at 8-10.  The Plaintiffs assert that this alleged procedural violation will allow the wild horse and elk populations "to increase to the point" where they will "cause degradation to vegetative cover in the pasture land." Complaint ¶ 58, at 23.  They assert that these populations "could lead to insufficient available forage and accelerated soil erosion."  Complaint ¶ 59, at 23 (citing the 2002 United States Forest Service Environmental Assessment)("2002 EA").  More simply, the Plaintiffs contend that the Defendants' failure to address these populations directly harms the physical environment the Plaintiffs enjoy.  They argue that the harm the horse and elk populations cause interferes with their "ability to use and enjoy the lands of the Allotments" for aesthetic, cultural, and spiritual enjoyment.  Response at 8.

The Plaintiffs' alleged environmental harm is not inherently speculative.   On the contrary, the Defendants expressly recognized that allowing the wild horse herd to increase would decrease vegetative cover.  See Complaint ¶ 60, at 24 (citing the 2002 EA).  The Plaintiffs also allege that, based on the Forest Service's website information, the wild horse herd has far surpassed the target levels that the 2002 EA established.   See Complaint ¶¶ 61-64, at 24. Regional Forester for the Intermountain Region Harvey Forsgren admitted that the wild horse herd vastly exceeded the number the 2002 EA allowed.  See Complaint ¶ 64, at 25.  Forsgren stated that, "Range and watershed conditions on Jarita Mesa have declined over several years,

---

environmental, recreational, cultural, and aesthetic injuries.   Accordingly, the Court will periodically cite to the Response when it better captures the Plaintiffs' argument.

primarily due to extended drought conditions and increased numbers of wild horses that graze year-round."  Complaint ¶ 64, at 25-26.

With regard to the second criterion -- their concrete interests -- the Plaintiffs assert that they use and enjoy the land and resources that the Defendants' 2010 Decision Notice affects. See Response at 8.  The non-permittee Plaintiffs use the land for "aesthetic and recreational purposes."  Response at 8.  Moreover, the Policy expressly recognizes the Plaintiffs' unique tie to the land.  "[T]he land supplies a substantial portion of their living regardless of the economic level involved."  Complaint ¶ 49, at 19-20 (the Policy at 2).  Thus, the Plaintiffs demonstrate their "geographical nexus to, or actual use of the site of the agency action."  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 449.  The Forest Service's decision also harms the non-permittees culturally.  See Complaint ¶ 17, at 8.  The Plaintiffs allege that the reduction in foraging resources will harm their community's "traditional small-scale livestock grazing" and reduce it to "unsustainable levels."  Response at 10.  See Complaint ¶ 17, at 8.  The Supreme Court has found that injuries to a plaintiff's recreational and aesthetic interests are sufficient to satisfy the injury-in-fact requirement.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. at 181 (finding that the plaintiffs demonstrated that they suffered injury when they lived and recreated near a river that the defendant allegedly polluted).

The Defendants argue that the Plaintiffs cannot demonstrate injury, because the decision to reduce permitted livestock "closely approximates the average numbers of livestock actually grazed on the Allotment in the decade prior to the Forest Service's 2010 Decision Notice."  MTD at 12.  In other words, the Defendants assert that the grazing reduction will impose no immediate impact on the Plaintiffs.  In the NEPA context, however, "the harm itself need not be immediate," as the federal agency's decision may not affect the litigant's interest for several

years.  Sierra Club v. United States Dep't of Energy, 287 F.3d at 1265.  See Comm. to Save the

Rio Hondo v. Lucero, 102 F.3d at 449 n.4.  Further, the litigant need not "show with certainty, or

even with a substantial probability," that the agency's decision will surely harm the environment.

Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452.  See Sierra Club v. United States

Dep't of Energy, 287 F.3d at 1265.  Rather, the litigant must show that the agency, in making its

decision without following statutorily mandated procedures, created an increased risk of harm.

See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 449; Sierra Club v. U.S. Dep't of

Energy, 287 F.3d at 1265.  The harm from the Defendants' alleged NEPA violation may not

accrue for several years.  The wild horse and elk populations may continue to multiply, degrade

vegetative cover, and erode the soil, but this process could take several years.  Nevertheless, the

Plaintiffs need not show that they are currently suffering the impacts of the Forest Service's

decision.  They must show only that the decision creates an increased risk of harm.  The non-

permittee Plaintiffs have made that showing here.

　　　While the non-permittee Plaintiffs can demonstrate that they may suffer from the

Defendants' alleged NEPA violations, they must also demonstrate that they suffered an injury

particular to them.  See Catron Cnty. Bd. Of Comm'rs v. United States Fish & Wildlife Serv., 75

F.3d 1429, 1433 (10th Cir. 1995).  The Plaintiffs assert that they have suffered such a

particularized injury, distinct from "the average environmental or recreational user."  Response

at 8.  They argue that, unlike general community members, they have "centuries-old cultural

ties" and a "significant personal interest in the health of the lands of their forefathers."  Response

at 8-9.  See Complaint ¶¶ 37-57, at 13-22 (describing the Plaintiffs' cultural and historical ties to

the land).  They argue that the Allotments have formed an "integral part of the traditional way of

life and culture" in their New Mexican Hispanic communities, and have played a "vital role in

the survival of the distinct culture embodied in these fragile communities." Response at 9.  See Complaint ¶ 52, at 21 (stating that the land "is integral to maintaining the cultural heritage and traditional values of the Hispanic people who live" near the Allotments).  The Plaintiffs argue that the failure to follow the NEPA's procedures harms the Plaintiffs environmentally, because failing to do so "mismanaged [resources] and did not meet the obligation to balance the various types of impacts and uses or effects on these allotments."  Tr. at 70:4-6 (Herskovitz).  See Complaint ¶ 72, at 28-29.  Not only have the Plaintiffs shown that they use the Allotments for aesthetic and recreational purposes, but they have shown that using the land forms a part of their culture.  The Tenth Circuit has found similar injury sufficient to constitute an injury-in-fact.  See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 450-51 (finding injury where the plaintiffs lived near and recreated on the area that the Forest Service exposed to an increased risk of environmental harm from its uninformed decisionmaking).

## 2.    The Plaintiffs Have Demonstrated Causation.

The Plaintiffs must also show that the 2010 Decision Notice caused the non-permittees' injury.  See Lujan v. Defenders of Wildlife, 504 U.S. at 560-61.  Although the Decision Notice requires permittees to reduce livestock by eighteen percent, the Defendants assert that the reduction did not cause economic harm to the community.  See MTD at 9.  Notably, the Defendants assert that the eighteen-percent grazing reduction approximates the average numbers of livestock grazed on the Allotment in the decade before the 2010 Decision Notice.  See MTD at 12.  The Plaintiffs do not, however, allege merely economic harm.

Instead, the non-permittee Plaintiffs argue that they suffer environmental, aesthetic, recreational, cultural, and spiritual harm.  See Response at 11.  Further, they can trace their injury to the Defendants' 2010 Decision Notice.  They assert that Trujillo's uninformed decision

to reduce grazing, based on inadequate scientific studies that ignored the destructive wild horse and elk populations, physically damages the land that forms a part of their society and culture. See Complaint ¶ 58, at 23; Response at 10.   The Plaintiffs support this assertion with testimony from researchers that "mismanagement of the Unit" has damaged the lands.  Complaint ¶ 72, at 28-29.  See Complaint ¶ 60, at 24 (citing the 2002 EA)(recognizing that allowing the wild horse herd to increase would decrease vegetative cover); Complaint ¶ 64, at 25-26 ("Range and watershed conditions on Jarita Mesa have declined" because of "increased numbers of wild horses that graze year-round.").  The Plaintiffs argue that, by failing to consider this alternative properly and not using the best scientific evidence, the large horse and elk populations will continue to degrade the land, reduce available foraging resources, and erode the soil, thereby damaging their use and enjoyment of the land.  They also allege that Trujillo's decision to reduce grazing diminishes the available foraging resources for cattle.  This economic harm hurts the entire community, because in "these extraordinarily small, tightly knit communities the neighboring families always have shared and depended on each other to ensure that all had enough to survive."  Response at 11.  See Complaint ¶ 109, at 46.

The Defendants argue that the Plaintiffs cannot demonstrate how their 2010 Decision Notice causes the Plaintiffs any actual harm.  See MTD at 12.  They argue that the possible harms that the Plaintiffs will suffer as a result of their decision are "based on a lengthy chain of speculative and attenuated contingencies."  MTD at 12.  In NEPA cases, however, the plaintiffs need not demonstrate that the Defendants' decision will certainly cause an environmental injury. See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 451 (finding that requiring the plaintiffs to show actual environmental injury would be contrary to the NEPA's purpose). NEPA plaintiffs must show only that the agency's failure to follow the NEPA's procedures led

to an increased risk of environmental harm.  See Comm. to Save the Rio Hondo v. Lucero, 102

F.3d at 451; Robertson v. Methow Valley Citizens Council, 490 U.S. at 349 (stating that the

purpose of statutory requirements to consider environmental impacts is to ensure that the agency

will carefully consider detailed information and avoid damaging the environment).  The "failure

substantively to consider the environmental ramifications of its actions in accordance with

NEPA" causes the increased risk of environmental harm.  Catron Cnty. Bd. Of Comm'rs v.

United States Fish & Wildlife Serv., 75 F.3d at 1433.  See Lujan v. Defenders of Wildlife, 504

U.S. at 572 n.7; Resources Ltd. Inc. v. Robertson, 35 F.3d 1300, 1303 n.2 (9th Cir. 1993).

Here, the Plaintiffs may not be able to demonstrate that the Forest Service's decision to

pursue one alternative over another will certainly result in grave environmental consequences.

They can show, as the Tenth Circuit and Supreme Court precedent require in NEPA cases, that

the Forest Service's decision causes an increased risk of harm to the environment.  They have

made that showing by demonstrating that the wild horse and elk populations cause serious

environmental damage, and that failing to address those animals may lead to greater

environmental impacts.  Complaint ¶ 58, at 23.  Specifically, they argue that the harm to their

recreational, aesthetic, and cultural interests arises from the failure to "balance the various types

of impacts and uses or effects on these allotments."  Tr. at 70:4-6 (Herskovits).  See Complaint ¶

72, at 28-29.  Because the Plaintiffs can trace the increased risk of environmental harm to the

Forest Service's failure to comply with the NEPA's requirements, they have satisfied Article

III's causation element.

### 3.   The Plaintiffs Have Demonstrated That the Court Can Redress Their Injuries.

Finally, the Plaintiffs must also show that a favorable court decision could redress their

injury.  See Lujan v. Defenders of Wildlife, 504 U.S. at 561.  Under the NEPA, a plaintiff need

not establish that the agency decision would change if the agency complied with the NEPA's requirements.  See Lujan v. Defenders of Wildlife, 504 U.S. at 572; Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452; Catron Cnty. Bd. Of Comm'rs v. United States Fish & Wildlife Serv., 75 F.3d at 1433.  Rather, the Plaintiffs must establish that compliance with statutorily required procedures would avert the possibility that the Forest Service may have overlooked its action's significant environmental consequences.  See Lujan v. Defenders of Wildlife, 504 U.S. at 572.  That the Forest Service may not change its decision is immaterial. See Catron Cnty. Bd. Of Comm'rs v. United States Fish & Wildlife Serv., 75 F.3d at 1433; Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452.

The Defendants assert that, because the Plaintiffs seek a remedy that would increase grazing, a Forest Service decision in the Plaintiffs' favor would "compound -- rather than help ameliorate -- any degradation of vegetation and range conditions."  Reply at 3.  The Plaintiffs do not, however, allege that all grazing damages range conditions.  Nor do they seek to increase grazing among all animals.  They argue that the wild horse and elk populations destroy range conditions, and that their harm arises from poor resource management.  Moreover, they allege a procedural injury -- that the Defendants' failure to properly consider alternatives presents an increased risk to the environment, which injures them.  See Reply at 15-16.  To remedy this injury, they seek a declaration that the Defendants failed to comply with the NEPA, the NFMA, and the SYFMA, and an injunction ordering the Defendants to comply with these statutes.  See Complaint ¶¶ 5-13, at 54-55.  Declaratory and injunctive relief ordering the Defendants to comply with these statutes could therefore redress the Plaintiffs' injury.

**B.      RIO ARRIBA COUNTY HAS STANDING TO SUE FOR INJURY TO ITS OWN INTERESTS.**

As a county, Rio Arriba County may not simply assert the particularized injuries to its citizens' interests and sue on their behalf.  States and counties do "not have standing as *parens patriae* to bring an action against the Federal Government." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 610 n.16 (1982).  States are not "normal litigants for the purposes of invoking federal jurisdiction." Mass. v. Envtl. Prot. Agency, 549 U.S. 497, 518 (2007).  Nevertheless, a "well-founded desire to preserve a state's sovereign territory" supports federal jurisdiction.  Mass. v. Envtl. Prot. Agency, 549 U.S. at 519.  A state therefore has standing to protect its own proprietary interests.  See City of Sausalito v. O'Neill, 386 F.3d 1186, 1197 (9th Cir. 2004)(Fletcher, J.); Catron Cnty. Bd. of Comm'rs, N.M. v. United States Fish & Wildlife Serv., 75 F.3d 1429, 1433 (10th Cir. 1996)(Kelly, J.)(holding that a county had standing when an agency's decision would prevent the county from pursuing its flood policies).  The term "proprietary" is not confined to protection of its real and personal property, but includes a municipality's "responsibilities, powers, and assets." City of Sausalito v. O'Neill, 386 F.3d at 1197.  See Catron Cnty. Bd. Of Comm'rs, N.M. v. United States Fish & Wildlife Serv., 75 F.3d at 1433.  These proprietary interests include the "ability to enforce land-use and health regulations," and to "protect[] its natural resources from harm." City of Sausalito v. O'Neill, 386 F.3d at 1197.  See Fireman's Fund Ins. Co. v. City of Lodi, 302 F.3d 928, 944 (9th Cir. 2002)(Pregerson, J.)(holding that a municipality has standing to protect its natural resources from harm); Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1178 (9th Cir. 2011)(per curiam)(finding that a state had standing to assert its own procedural interest in federal agency decisions made under the NEPA when the agency's decision would potentially increase the risk of environmental harm to areas within the state's borders).

The Ninth Circuit has considered whether a political subdivision has standing in cases similar to the one at issue, and the Court finds that the Ninth Circuit's reasoning complies with the NEPA's statutory purposes.  Even though "the intended beneficiaries of NEPA are individual citizens . . . the statute expressly contemplates that state and local governments are to play an important role in the effectuation of national environmental policy."  City of Davis v. Coleman, 521 F.2d 661, 670-71 (9th Cir. 1975)(Duniway, J.)(citing 42 U.S.C. §§4331(a), 4332(2)(C), 4332(2)(F), 4341(4), 4345(1)).  See Sabine River Authority v. United States Dep't of Interior, 951 F.2d 669, 675-76 (5th Cir. 1992)(Goldberg, J.)(allowing the Sabine River Authority and the Texas Water Conservation Association to bring a lawsuit over the defendants' alleged failure to comply with the NEPA).  For example, in City of Davis v. Coleman, the city demonstrated injury-in-fact by showing that a proposed industrial development would possibly affect the city water supply and cause an influx of people that would frustrate the city's controlled growth policies.  See 521 F.2d at 671.  The Ninth Circuit noted that the alleged environmental effects would affect the city's own interest.  Whether those "municipal interests are non-economic or unquantifiable is immaterial."  City of Davis v. Coleman, 521 F.2d at 671 (citing United States v. SCRAP, 412 U.S. 669, 686 (1973)).

Similarly, in City of Sausalito v. O'Neill, the Ninth Circuit found that a city had standing when it alleged injury to its human environment.  See 386 F.3d at 1197.  The federal agency's decision would increase traffic and crowds, affecting city-owned streets and municipal management objectives.  Further, the agency's decision to pursue a certain plan would "destroy the City's quiet, beauty, serenity and quaint and historic village character and attributes."  386 F.3d at 1198-98.  In all, the court found the city alleged cognizable aesthetic, management,

public safety, economic, and natural resource harms that constituted proprietary injuries.  See 386 F.3d at 1199.

Rio Arriba County has never held any Allotment grazing permits.  Like the non-permittee Plaintiffs, Rio Arriba County argues that the Defendants' failure to properly consider the alternative of reducing the wild horse and elk populations damages not only the citizens of Rio Arriba County, but also Rio Arriba County itself.  See Response at 13; Complaint ¶ 16, at 7 (describing how "[a] large percentage of the Carson National Forest, including the El Rito Ranger District, is located within Rio Arriba County").  It asserts that the harm to the physical land hurts Rio Arriba County's "human environment" that is "essential to the way of life, the quality of life and the very survival of the rural communities affected by the 2010 Decision Notice."  Response at 14.  See Complaint ¶ 16, at 7.  Rio Arriba County argues that this "way of life . . . forms the core of Rio Arriba County's heritage," and supports this argument by pointing to its official acts and planning efforts -- many of which purport to further Rio Arriba County's heritage and culture.  Response at 14.  See Complaint ¶ 16, at 7 (arguing that Rio Arriba County "has a strong interest in the well-being and continuance of the traditional communities within the County and has an interest in protecting the traditional social fabric, customs, traditions, and cultural integrity of its residents").  Whether Rio Arriba County's "municipal interests are non-economic or unquantifiable is immaterial."  City of Davis v. Coleman, 521 F.2d at 671.

In both City of Davis v. Coleman and City of Sausalito v. O'Neill, the Ninth Circuit found that the city suffered an injury when an agency's decision would potentially alter the make-up of the city's population and the city's ability to advance its management objectives.  Rio Arriba County makes a similar allegation.  It contends that altering the physical land will change Rio Arriba County's culture, its population, and its ability to advance its planning

objectives to further Rio Arriba County's "heritage and culture."   Response at 14.   See Complaint ¶ 16, at 7 (describing Rio Arriba County's own interest in maintaining "the well-being and continuance of the traditional communities within the County").   It asserts that the Defendants' actions impair its ability to carry out policies that prioritize "small-scale subsistence grazing."  Response at 14.  See Complaint ¶ 16, at 7 (arguing that the Defendants' actions impair Rio Arriba County's ability to protect its "traditional social fabric, customs, traditions, and cultural integrity").  Allowing Rio Arriba County to sue on its own behalf furthers the NEPA's policy objectives to give local governments a role in effectuating national environmental policy. This standing also gives local governments the ability to protect their own interests without waiting for enough citizens to band together to do so.  Here, Rio Arriba County has shown that the Forest Service's decision has led to an increased risk of environmental harm to the land within Rio Arriba County's borders.  See Complaint ¶ 16, at 7.  Moreover, Rio Arriba County has demonstrated injuries to its human environment and its ability to advance its management objectives.  This injury is sufficient to comply with Article III's standing requirements.

### C. THE ASSOCIATIONS HAVE STANDING.

The Associations exclusively comprise grazing permittees on the Jarita Mesa and Alamosa Allotments.  See Complaint ¶ 13, at 5; Response at 11.  The Supreme Court holds that associations have standing to sue on behalf of their members when (i) their members have standing in their own right; (ii) the interests at stake are relevant to the organization's purpose; and (iii) neither the claim asserted, nor the relief requested, requires the individual members to participate in the lawsuit.  See Friends of the Earth v. Laidlaw Envtl. Serv., 528 U.S. at 181; Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

Here, the Associations comprise permittees and represent those permittees' interests.  See Complaint ¶ 13, at 5; Response at 11.  As to the first requirement, the Association members have standing in their own right as described above.  They suffer a concrete, particularized injury to their cultural, aesthetic, and economic interests that the Defendants allegedly caused, and a favorable decision can redress this injury.  Second, the interests at stake are relevant to the organization's purpose, because the organization represents the permit holders' interests.  See Complaint ¶ 13, at 5-6; Response at 12.  Primarily, the permit holders seek to protect their economic interests by grazing on the land, and to protect their environmental, cultural, and aesthetic interests by grazing in a responsible manner and by ensuring continued viability of the land.  See Complaint ¶ 13, at 5-6; Response at 12.  To further their members' interests, the Associations aim to: (i) "protect and promote the permittees' livestock grazing activities;" (ii) "cooperatively manage and share the costs of handling livestock, range improvements and other programs for proper management of permitted livestock and range resources;" (iii) "express the wishes of the Associations' members;" and (iv) "work in cooperation with the Forest Service to ensure proper management" of range resources.  Complaint ¶ 13, at 5-6; Response at 12.  Finally, the Associations could fully and adequately represent the organizations' interests without requiring each individual member's participation.  See Hunt v. Wash. State Apple Adv. Comm'n, 432 U.S. at 342-43 ("[S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members.").  Accordingly, the Associations, along with the non-permittee Plaintiffs and Rio Arriba County, have standing.

## II.   THE PLAINTIFFS' INJURIES FALL WITHIN THE NEPA'S ZONE OF INTERESTS.

Because the NEPA does not contain a private right of action to enforce its procedural requirements, the Plaintiffs must rely on the APA as the basis for their action.  See Wyo. v. United States Dep't of Agric., 661 F.3d 1209, 1226 (10th Cir. 2011).  Accordingly, they must satisfy both Article III's constitutional standing requirements, and establish, as the APA requires, that they are "adversely affected or aggrieved . . . within the meaning of a relevant statute" by some final agency action.  Lujan v. National Wildlife Fed'n, 497 U.S. at 883 (quoting 5 U.S.C. § 702).  Under the APA, "[t]he court may grant relief only when a petitioner shows its claims 'fall within the zone of interests protected by the statute forming the basis of [its] claims.'" Biodiversity Conservation Alliance v. Jiron, 762 F.3d 1036, 1058 n.25 (10th Cir. 2014)(quoting Utah v. Babbit, 137 F.3d 1193, 1203 (10th Cir. 1998)).  The court analyzes whether a plaintiff satisfies the zone-of-interest test first by "'discern[ing] the interests arguably . . . to be protected by the statutory provision at issue,' and then by 'inquiring[ing] whether the plaintiff's interests affected by the agency action in question are among them.'"  Wyo. ex rel. Crank v. United States, 539 F.3d 1236, 1243 (10th Cir. 2008)(quoting Nat'l Union Admin. V. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998)).  The relevant statute at issue is the NEPA, and the Plaintiffs have demonstrated that their interests fall within those that the NEPA seeks to protect.

### A.   THE NEPA SEEKS TO PROTECT INTERESTS CONNECTED TO THE ENVIRONMENT.

Congress passed the NEPA to "prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."  42 U.S.C. § 4321.  To fit within the NEPA's zone of interests, federal courts require plaintiffs to show an injury connected to the

physical environment.  The United States Court of Appeals for the D.C. Circuit[14] has held that "a

NEPA claim may not be raised by a party with no claimed or apparent environmental interest."

Town of Stratford v. FAA, 285 F.3d 84, 88 (D.C. Cir. 2002)(Silberman, J.)(finding that the

plaintiff's economic injury was not connected to any environmental damages that the EIS

caused).  The harm must "have a sufficiently close connection to the physical environment" for

the NEPA to apply.  Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 778

(1983)(finding that the plaintiffs' psychological injuries did not fall within the NEPA's zone of

interests).  Courts construe "environmental" harm broadly, however.  See RB Jai Alai, LLC v.

Sec'y of Fla. Dep't of Transp., 2015 WL 4040607, at *6 (M.D. Fla. June 30, 2015)(Byron,

J.)("Because land use, economic growth, public health and safety, and aesthetic concerns all

comprise the 'environment' which NEPA intends to protect, Plaintiffs fall within the statute's

zone of interests."); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 886 (finding that the NEPA's

---

[14]Although it is not the Court's parent Court of Appeals, the D.C. Circuit carries clout in the field of administrative law that goes well beyond that which a non-parent Circuit usually wields.  The D.C. Circuit is not a formally subject-matter specialized Court of Appeals, but practically, it is close.  Because most agencies are based in the District of Columbia, agency appeals nationwide can almost always be brought before the D.C. Circuit.  Additionally, the United States Code designates the D.C. Circuit as the exclusive venue for challenging many important agency actions.  See Gary Lawson, Federal Administrative Law 245 (4th ed. 2007).

The D.C. Circuit's influence in administrative law is head and shoulders above that of the other Courts of Appeals, probably combined, and it does more to shape administrative law nationally than the Supreme Court.  "From the perspective of administrative law, the D.C. Circuit has for decades been by far the most important court in the country -- *much* more important than the Supreme Court."  Lawson, supra, at 245 (emphasis in original).  See Antonin G. Scalia, Vermont Yankee: The APA, the D.C. Circuit, and the Supreme Court, 1978 SUP. CT. REV. 345, 371 ("As a practical matter, the D.C. Circuit is something of a resident manager [in administrative law], and the Supreme Court an absentee landlord.").

The D.C. Circuit's influence in administrative law could be analogized to the Delaware Court of Chancery's influence in corporate-governance law.  While the Court must of course follow Tenth Circuit precedent when it conflicts with D.C. Circuit case law, in the absence of Tenth Circuit precedent on point, the Court is inclined to give significant weight to D.C. Circuit precedent.

zone of interests encompasses claims for injury to recreational and aesthetic interests).  The test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1389 (internal quotation marks and citations omitted).

For example, the Tenth Circuit has found that a county's "threatened injury to its property" from flood damage that could result from a federal agency's decision fell "well within the zone of interests" that the NEPA protects.  Catron Cnty. Bd. Of Comm'rs, N.M. v. United States Fish & Wildlife Serv., 75 F.3d 1429, 1433 (10th Cir. 1996)(Kelly, J.).  The county alleged that the federal agency made a decision without following the NEPA's procedural requirements. It asserted that the agency's failure to follow the NEPA created an increased risk of flood damage to property within the county.  Because the county owned property that the agency's decision affected, the county's injury was connected to the increased risk of environmental harm and thus satisfied the zone-of-interests test.  75 F.3d at 1433.

As Tenth Circuit case law demonstrates, the plaintiff's alleged injuries must have some connection to the physical environment.  Purely economic harm does not fall within the NEPA's zone of interests.  See Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1173 (11th Cir. 2006); Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 940 (9th Cir. 2005); Oberdorfer v. Jewkes, 583 F. App'x 770, 773 (9th Cir. 2014)(finding that a telecommunications company's economic injury -- "broadcast interference with [its] radio tower" -- did not fall within the NEPA's zone of interests); Port of Astoria v. Hodel, 595 F.2d 467, 475 (9th Cir. 1979)(finding that a plaintiff who asserts purely economic injuries does not have standing).  A plaintiff may "have standing to sue under NEPA even if his or her interest is primarily economic, as long as he or she also alleges an

environmental interest or economic injuries that are causally related to an act within NEPA's embrace." Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. United States Dep't of Agric., 415 F.3d 1078, 1103 (9th Cir. 2005)("Ranchers Cattlemen")(citation and internal quotation marks omitted)(finding that the plaintiffs' interests were not within the NEPA's zone of interests when redressing their economic injuries would not protect the physical environment). A court may not redress the plaintiffs' economic injuries if doing so would injure the physical environment. See Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. at 773. "[A]lthough NEPA states its goals in sweeping terms of human health and welfare, those goals are the *ends* that Congress has chosen to pursue by *means* of protecting the physical environment." Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. at 773 (emphasis in original). Consequently, a plaintiff may not pursue the NEPA's ends -- i.e., protecting the human environment -- by obstructing its means -- environmental protection.

### B. THE PLAINTIFFS' ENVIRONMENTAL INTERESTS FALL WITHIN THE NEPA'S ZONE OF INTERESTS, BUT THEIR PURELY ECONOMIC INTERESTS DO NOT.

The Defendants argue that the Plaintiffs' NEPA claims do not fall within the "zone of interests" that Congress sought to protect in enacting the NEPA. See MTD at 29. They assert that the Plaintiffs do not suffer an environmental injury from the eighteen-percent reduction in permitted livestock numbers. See MTD at 30. The Defendants are correct in their assertion that the Plaintiffs' purely economic interests do not fall within NEPA's zone of interests. See, e.g., Port of Astoria v. Hodel, 595 F.2d at 475. Furthermore, the Plaintiffs have not shown that their economic interest is "causally related to an act within NEPA's embrace," because redressing their economic injuries will increase environmental harm. Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. United States Dep't of Agric., 415 F.3d at 1103 (finding

that the plaintiff ranching associations' injury was not within the NEPA's zone of interests because the remedy would harm the environment).  See Am. Independence Mines and Minerals Co. v. United States Dep't of Agric., 733 F. Supp. 2d 1241, 1251-52 (D. Idaho 2010)(Lodge, J.)(finding that the plaintiff mining associations could not link their pecuniary interest in mineral resource development to an environmental interest that the NEPA contemplates).

The Ninth Circuit has addressed a situation similar to this case in Nevada Land Action Association v. United States Forest Service, 8 F.3d 713 (9th Cir. 1993)(Choy, J.).  There, an association of cattle ranchers alleged that the Forest Service violated the NEPA and the NFMA in adopting a Land and Resource Management Plan that reduced grazing.  See 8 F.3d at 715. The plaintiff ranchers' association alleged that they primarily suffered economic injury, but that the Forest Service's decision also caused "lifestyle loss" that affected the "human environment." 8 F.3d at 715.  Even though the NEPA may seek to protect the human environment to some extent, the Ninth Circuit held that the plaintiffs could not "invoke NEPA to prevent 'lifestyle loss' when the lifestyle in question is damaging to the environment."  8 F.3d at 715 (emphasis added).  The ranchers' association asserted that they had an interest in maintaining forest resources and therefore protecting the environment, but the only reason to do so was to protect their economic interest.  See 8 F.3d at 715.  Moreover, the plaintiffs did not allege that the Forest Service's decision harmed their environmental, recreational, or aesthetic interests, and they did not seek relief that would further these interests.  See 8 F.3d at 715.

To the extent the Plaintiffs here allege purely economic harm, their injuries do not fall within the NEPA's zone of interest.  The NEPA seeks to improve the human environment when doing so also promotes physical environmental protection.  See, e.g., 42 U.S.C. § 4331(b)(identifying other interests to advance through the lens of environmental protection,

including ensuring "safe, healthful, productive, and esthetically and culturally pleasing surroundings," and "achiev[ing] a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities"). The NEPA does not, however, intend to promote these other interests at the physical environment's expense. See Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. at 773; Nev. Land Action Ass'n v. United States Forest Serv., 8 F.3d at 715 (finding that the plaintiffs could not seek relief that would promote their economic interests if doing so would damage the environment). The Plaintiffs' economic injury may be related to their alleged environmental injury, but redressing their economic injury would be "more likely to frustrate than further" the NEPA's objectives. Clarke v. Sec. Ind. Ass'n, 479 U.S. 338, 397 n.12 (1987). Accordingly, the Plaintiffs' economic interests do not fall within the NEPA's zone of interests. The Plaintiffs may not pursue those remedies that would further their economic interests at the expense of environmental protection.

The Plaintiffs allege more than economic harm, however, and seek some remedies that will redress their alleged environmental, recreational, and aesthetic injuries. The Defendants mischaracterize the Plaintiffs' argument by asserting that the Plaintiffs' harm solely "flow[s] from the reduction in permitted livestock numbers itself, not from any impact to the environment." MTD at 33. The Plaintiffs are not challenging the eighteen-percent grazing reduction alone; they challenge the Forest Service's environmental evaluation in arriving at that decision. They assert that, by failing to follow the NEPA's procedures, the Defendants created an increased risk of environmental harm to the Allotments' environmental resources, which thereby harms them socially, culturally, recreationally, aesthetically, economically, and environmentally. See Response at 29. They also assert that the Defendants used inadequate environmental studies in arriving at their decision, which increased the risk of environmental

harm to their physical environment.  See Complaint ¶¶ 120-123, at 49 (contending that the Defendants' environmental analysis failed to use adequate range monitoring and data collection techniques).  The Plaintiffs depend on the Allotments' land and resources, and therefore seek to preserve its environmental integrity.  They "use and enjoy the land for more than mere economic gain."  Response at 29-30 (citing Complaint ¶ 37, at 13).  In other words, the Plaintiffs' harm to their other interests flows directly from the increased risk of environmental harm to the Allotments.  See Response at 29.  Because the Plaintiffs also suffer an injury connected to the physical environment, the Plaintiffs' non-economic interests fall within the NEPA's zone of interests.

Unlike the plaintiffs in Ranchers Cattlemen, the Plaintiffs here allege that the Defendants injured more than their economic interests.  The Ninth Circuit there stated that the plaintiff ranchers' interests had "no connection to the physical environment."  415 F.3d at 1103.  Further, granting relief for the Plaintiffs' non-economic injuries -- requiring the Defendants to comply with the NEPA's procedural requirements -- will not, like the relief the plaintiffs requested in Nevada Land Action v. United States Forest Service, "frustrate rather than further" the NEPA's objectives.  See 8 F.3d at 716.  The Plaintiffs here sit in a "profoundly different" situation than large-scale commercial ranching operations, which depend on the land for purely economic reasons.  Response at 30.  Here, the Plaintiffs use the land for recreational and aesthetic purposes.  They are "intimately and constantly in touch with the local environment."  Response at 30-31.  See Complaint ¶ 49, at 19.  They seek to protect the land's environmental integrity and sustainability to preserve both the land itself and the culture that has arisen around that land.  See Complaint ¶ 16, at 7.  They "see themselves as one with the land" and have "a very direct interest in the environmental health of these lands."  Response at 31.  The "environment and

Plaintiffs' traditional uses of it . . . are so closely intertwined that the harm to one necessarily involves the other."  Response at 29.  Harm to their physical environment harms them not only environmentally, but also culturally, recreationally, and aesthetically.  Redressing the Plaintiffs' injuries by requiring the Defendants to adhere to the NEPA would further the NEPA's objective to "create and maintain conditions under which man and nature can exist in productive harmony."  42 U.S.C. § 4331.

The Ninth Circuit in American Independence Mines and Minerals Co. v. United States Department of Agriculture dealt with a similar situation: some plaintiffs could allege an environmental injury within the NEPA's zone of interests, but others could not.  The owners of a mining company charged the defendant agencies, the Forest Service and the Department of Agriculture, with violating the NEPA primarily to vindicate their economic injuries.  See 733 F. Supp. 2d at 1251.  They asserted that they "appreciate the environmental, historical and cultural values of lands and historic sites," and "derive intrinsic enjoyment from their use of the roads." 733 F. Supp. 2d at 1252.  The trial court nonetheless found that vindicating their economic injuries associated with resource development would not fall within the NEPA's zone of interests.  See 733 F. Supp. 2d at 1251-52.  Redressing the other plaintiffs' non-economic injuries would, however, fall within the NEPA's zone of interests.  The other plaintiff, a county, alleged "various interests on behalf of its citizens, one of which is to protect the rights of those citizens who derive intrinsic enjoyment from their use of these roads."  733 F. Supp. 2d at 1254 (internal citation omitted).  The trial court found that this and similar interests fell within the aesthetic and recreational enjoyment zones of interest that the NEPA protects.  See 733 F. Supp. 2d at 1254.  Further, redressing these plaintiffs' injuries would further the NEPA's policies.

As discussed above, the permit-holding Plaintiffs allege economic injury outside of the NEPA's zone of interests. Although they cannot pursue remedies to redress their economic injuries, the permit-holding Plaintiffs have also alleged environmental, aesthetic, recreational, and cultural injuries, which fall within the NEPA's zone of interests. Thus, as in American Independence Mines and Minerals Co. v. United States Department of Agriculture, the Plaintiffs may continue to seek relief for their non-economic injuries. Furthermore, both the NEPA and the APA limit the remedies a court may grant. The APA's § 702 makes clear that suits under the APA are for equitable relief only and not for damages. See 5 U.S.C. § 702. Similarly, the NEPA does not require agencies to arrive at a certain decision or outcome. It requires the agency to take a hard look at environmental consequences, and courts may not order agencies to reach a certain decision. See Catron Cnty. Bd. Of Comm'rs v. United States Fish & Wildlife Serv., 75 F.3d at 1433; Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452. Thus, to redress the Plaintiffs' NEPA injuries, the Court does not have the power to require the Forest Service to adhere to any specific action the EA discusses.

Accordingly, the Court cannot order the following forms of relief that the Plaintiffs seek in the Complaint: (i) issue an injunction voiding the 2010 Decision Notice and ordering the Forest Service to adhere to any recommendation for grazing permits, see Complaint ¶ 12, at 55; (ii) require the Defendants to adhere to the EA's proposed action regarding the number of grazing permits for the Allotments, see Complaint ¶ 14, at 55; (iii) award compensatory damages to individual Plaintiffs who had their permits reduced, see Complaint ¶ 15, at 55-56; and (iv) award punitive damages to individual permittee Plaintiffs, see Complaint ¶ 16, at 56. The Court may, however, provide the Plaintiffs with declaratory relief that the Defendants have violated the

various environmental statutes that the Plaintiffs cite, as the Complaint ¶¶ 3-8, at 54, requests and order them to comply with those provisions.

## III.    THE PLAINTIFFS HAVE FAILED TO EXHAUST THEIR NFMA, SYFMA, POLICY, AND SOME NEPA CLAIMS, AS § 6912(e) REQUIRES.

Section 6912 of Title 7 of the United States Code and Forest Service regulations require litigants to exhaust their claims before raising them in federal court.  Tenth Circuit case law establishes a rigorous standard to satisfy § 6912(e)'s exhaustion requirements.  The Plaintiffs have not satisfied that standard with respect to their NFMA, SYFMA, Policy, and two NEPA claims.

### A.    THE PLAINTIFFS' STATUTORY CLAIMS DO NOT DEPEND ON THE RETALIATORY ANIMUS ISSUE.

Congress restricts judicial review of Department of Agriculture actions under 7 U.S.C. § 6912(e).  Section 6912(e) requires litigants to "exhaust all administrative appeal procedures established by the Secretary or required by law" before litigating their dispute in court.  7 U.S.C. § 6912(e).  The Code of Federal Regulations, 36 C.F.R. § 215.14,[15] contains the "administrative appeal procedures established by the Secretary or required by law" to which the statute refers.

As the Court stated in its Amended Memorandum Order, the regulation at issue here, 36 C.F.R. § 215.14, requires issue exhaustion.  Section 215.14(b) requires that, "[a]t a minimum, an appeal must include the following":

(5)    Any specific change(s) in the decision that the appellant seeks and rationale for those changes;

---

[15]Since the MTD's filing, the Forest Service has "update[d], rename[d], and relocate[d] the administrative appeal regulations" that 36 C.F.R. § 215.14 formerly provided.  78 Fed. Reg. 33,705-01 (June 5, 2013); 79 Fed. Reg. 44,291-01 (July 31, 2014).  Part 214 of Title 36 of the Code of Federal Regulations now sets forth the appeal procedures.  The old, above-quoted provision, however, governed the proceedings that took place in this case.  The Court has surveyed the new provisions, and this case would not come out differently if the new provisions were in effect when this case was in its administrative stages.

(6)     Any portion(s) of the decision with which the appellant disagrees, and explanation for the disagreement;

(7)     Why the appellant believes the Responsible Official's decision failed to consider the substantive comments; and

(8)     <u>How the appellant believes the decision specifically violates law, regulation, or policy</u>.

36 C.F.R. § 215.14(b)(5)-(8)(emphasis added).[16]  The Court stated in its Amended Memorandum Order that judicial review of the Forest Service's actions requires issue exhaustion and not merely remedy exhaustion.  Because the Plaintiffs failed to exhaust their First Amendment claim (Count One), the Court dismissed the claim without prejudice.  <u>See</u> Amended Memorandum Order at 102-03.

_____

[16]Another section of the then-effective regulatory scheme is titled "Judicial Proceedings." 36 C.F.R. § 215.21.  It provides that "[i]t is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to appeal is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the appeal procedures in this part (7 U.S.C. 6912(e))."   36 C.F.R. § 215.21.   As the Court stated in its Amended Memorandum Opinion, § 215.21 does not trump § 215.14(b).  Allowing § 215.21 to trump § 215.14(b) would undermine the Forest Service's ability to enforce its internal procedural rules, rendering them largely toothless, because an appellant could ignore § 215.14(b)'s specificity requirement, and still seek judicial review of claims that he or she failed to assert in the administrative appeal.  The Court thus concludes that § 215.14(b) sets forth an internal Forest Service procedural rule, and that § 215.21 makes it a precondition of judicial review.

As the Court noted in its Amended Memorandum Opinion, a new Part -- containing 22 sections -- has replaced both § 215.14(b) and § 215.21 and governs the Forest Service's "postdecisional administrative review process."   36 C.F.R. 214 (capitalization altered for readability).  <u>See</u> note 14, <u>supra</u>, at 66.  One of these new sections, 36 C.F.R. § 214.20, is titled "exhaustion of administrative remedies."   It is analogous to the old § 215.21 and provides that, "[p]er 7 U.S.C. 6912(e), judicial review of a decision that is appealable under this part is premature unless the plaintiff has exhausted the administrative remedies under this part."   36 C.F.R. § 214.20.  A new section that sets forth an issue-exhaustion requirement in even clearer terms has replaced the old § 215.14(b): "All appeals must include . . . <u>discussion of issues raised</u> by the decision being appealed, including <u>identification of any laws, regulations, or policies</u> that were allegedly violated in reaching the decision being appealed."   36 C.F.R. § 214.8(a)(6)(emphasis added).

The Defendants now assert that the Court must dismiss the Plaintiffs' remaining claims, because they depend on the same "bad faith" retaliatory animus issue that the Court has held the Plaintiffs failed to exhaust.  See MTD at 16.  For example, in their Motion to Supplement and/or Complete the Administrative Record, filed November 25, 2013 (Doc. 106)("Motion to Supplement"), the Plaintiffs argue that discovery of evidence to confirm this bad faith is "necessary to further support allegations of Defendants' bad faith actions and develop counts 2 through 9."  Motion to Supplement at 12.  In response to the Defendants' MTD, the Plaintiffs now argue that none of their statutory claims are necessarily predicated on bad faith retaliatory animus issues.  See Response at 16.

Notwithstanding the Plaintiffs' overly broad language in their Motion to Supplement, the Plaintiffs' remaining claims do not depend upon the "retaliatory animus" issue.  Response at 26. They can support their assertion that the Defendants violated the law without evidence that the Defendants did so for retaliatory reasons.  The animus issue serves only to explain the Defendants' possible motive for their actions.  This situation is factually distinct from the Plaintiffs' First Amendment claims.  The Court found that the Plaintiffs failed to raise specifically the First Amendment or speech claim.  See Amended Memorandum Opinion at 102-03.  Moreover, they failed to tell the factual story of how the Defendants violated the First Amendment.  See Amended Memorandum Opinion at 102-03.  That story necessarily included the retaliation issue.  See Amended Memorandum Opinion at 102-03.  The retaliation issue is not essential to the Plaintiffs' remaining claims, which involve specifically enumerated failures to adhere to certain statutory provisions.  Accordingly, the Plaintiffs could have exhausted their claims without raising the retaliatory animus issue in their administrative appeal.  The Court will

therefore analyze whether the Plaintiffs sufficiently raised each claim in their administrative appeal.

**B.     THE PLAINTIFFS EXHAUSTED ONLY TWO OF THEIR FOUR NEPA CLAIMS.**

The purpose of requiring exhaustion is to avoid premature claims and to ensure that the agency, which has the most expertise in an area, has the first chance to resolve a litigant's claims. See Forest Guardians v. United States Forest Serv., 641 F.3d 423, 430-31 (10th Cir. 2011)(per curiam); Native Ecosystems Council v. Dombeck, 304 F.3d 886, 900 (9th Cir. 2002).  To comply with the Forest Service's issue-exhaustion requirement, claimants need not raise claims with "precise legal formulations" or "magic words."  Idaho Sporting Congress Inc. v. Rittenhouse, 305 F.3d at 965-66.  They may "try to resolve their difficulties by alerting the decision maker to the problem in general terms, rather than precise legal formulations," see Native Ecosystems Council v. Dombeck, 304 F.3d at 900, but "claimants are still obligated to raise their problem 'with *sufficient clarity* to allow the decision maker to understand and rule on the issues raised." Buckingham v. Sec'y of United States Dep't of Agric., 603 F.3d 1073, 1080 (9th Cir. 2010)(internal citations omitted)(emphasis in original).

Although there is no bright-line rule, the Tenth Circuit and Code of Federal Regulations provide guidance as to what will satisfy the exhaustion requirements.  The Tenth Circuit imposes two requirements.  First, claimants must raise the same claim in federal court that they raised in their administrative appeals.  See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31.  The claims that plaintiffs raise in federal court must be so similar to the ones they raised on administrative appeal that the agency was on notice of and had chance to consider the same claims.  See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31.  Second, claimants must raise their claims with sufficient clarity to allow the decision maker to understand

and rule on the issue raised.  See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31.   See Forest Guardians v. United States Forest Serv., 495 F.3d 1162, 1170 (10th Cir. 2007)(requiring plaintiffs to structure their claims to alert agencies to the "parties' position and contentions, in order to allow the agency to give the issue meaningful consideration" (internal quotations omitted)).  Claims cannot be "only vaguely and cryptically referred to, if at all, during the administrative appeal."  Kleissler v. United States Forest Serv., 183 F.3d 196, 203 (3d Cir. 1999).  Forest Service regulations also speak to the issue.  The litigant must state "[h]ow the appellant believes the [Forest Service's] decision specifically violates law, regulation or policy." 36 C.F.R. § 215.14(b)(8).

In Forest Guardians v. United States Forest Service, 2006 WL 4109661 (D.N.M. 2006), the Court found that the plaintiffs failed to raise a claim in their administrative appeal that they asserted before the Court.  The plaintiffs argued that the Forest Service violated its 1982 regulation.  By the time the plaintiffs litigated the case, however, the Forest Service updated the regulation and included a new requirement that the agency use the "best available science" ("BAS").  2006 WL 4109661, at *18.  The plaintiffs argued that, by asserting in their administrative appeals that the Forest Service violated the 1982 regulations, they implicitly argued that the Forest Service did not use the BAS.  See 2006 WL 4109661, at *18.  The Court held that implicit arguments were not enough to meet § 6912(e)'s requirements.  The plaintiffs had to raise the same argument why the Forest Service violated the regulations in both the administrative appeal and the federal complaint.  See 2006 WL 4109661, at *18.  The Tenth Circuit made a similar finding in Utah Envtl. Congress v. Bosworth, 443 F.3d at 744-49 (finding that by arguing that the Forest Service violated certain regulations, the plaintiffs did not raise the argument in their administrative appeals that the Forest Service failed to consider the BAS).

Notably, neither the Court nor the Tenth Circuit have held that the plaintiffs must invoke the specific provision or regulation that they charge the agency with violating.  Rather, the plaintiffs must raise the substance of the claim sufficiently to put the agency on notice of how the plaintiffs believe the agency violated the law.  See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31; Idaho Sporting Congress Inc. v. Rittenhouse, 305 F.3d at 965-66 (finding that the plaintiffs sufficiently raised an issue on administrative appeal by unambiguously describing what Forest Service actions violated federal regulations, even though the plaintiffs did "not specifically cite to" the provision that they alleged the defendant violated).  At the Court's hearing on the MTD, the Defendants conceded this fact.  See Tr. at 91 (Smith)("They don't have to be precise about the elements of what a particular claim would take . . . that would suffice for a legal claim in federal court.").

The Plaintiffs point to some Ninth Circuit case law that suggests courts apply a lenient standard to determine whether a litigant satisfied the exhaustion requirements.  See Response at 17-18 (citing Native Ecosystems Council v. Dombeck, 304 F.3d at 900)(stating that the plaintiffs need only raise a claim in "general terms" to exhaust their administrative remedies).  Despite this permissive language, the Ninth Circuit later clarified that the standard was not permissive. Rather, the claims that the plaintiffs raised in the administrative appeal and in the complaint "*must be so similar* that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, *the same claims* now raised in federal court." Buckingham v. Sec'y of United States Dep't of Agric., 603 F.3d 1081 (emphasis in original)(citing Native Ecosystems Council v. Dombeck, 304 F.3d at 899)(finding that the litigant must (i) tell the same story as to what agency actions allegedly violated the law, and (ii)

put the agency on notice of how this behavior violated the law and injured the plaintiff).  This reading comports with Tenth Circuit case law and with the exhaustion requirement's purpose.

In Ark Initiative v. United States Forest Service, 660 F.3d 1256 (10th Cir. 2011), the Tenth Circuit held that the plaintiffs failed to exhaust their administrative remedies.  See 660 F.3d at 1262.  In their administrative appeals, the Plaintiffs specifically described how the Forest Service's actions would deplete water and cause other harms, and how this action therefore violated the NEPA.  See 660 F.3d at 1262.  In federal court, the plaintiffs stated that the Forest Service's decision impacted not only water, but "wildlife[,] . . . air quality, water quality, litter, solid waste generation, visual quality, and so on."  660 F.3d at 1262.  The plaintiffs' agency appeal discussed the water depletion harm specifically, but "lump[ed] other potential resource impacts into blanket statements like 'other' impacts." 660 F.3d at 1262.  The Tenth Circuit held that these descriptions did not present a claim "in sufficient detail to allow the agency to rectify the alleged violation."  660 F.3d at 1262 (citing Forest Guardians v. United States Forest Serv., 495 F.3d at 1170).  "The agency needs something more to go on, and Plaintiffs cannot merely mention broad categories of potential impacts with little or no analysis. . . . More explanation is necessary."  660 F.3d at 1262.

### 1.   The Plaintiffs Exhausted Count Two.

The Plaintiffs raised four NEPA claims in their administrative appeal.  See Notice of Appeal for Jarita Mesa Livestock Grazing Association, Alamosa Livestock Grazing Association and Board of County Commissioners of the County of Rio Arriba of the El Rito District EA and FONSI (Nov. 29, 2010)(AR011509-16)("Notice of Appeal").[17]  The Plaintiffs' Complaint also raises four NEPA claims. See Complaint ¶¶ 117-131, at 48-50.  In the Complaint, Count Two

---

[17]The Forest Service filed the Administrative Record on March 18, 2013 (Doc. 68)(AR000001-AR011945).

alleges that the Defendants failed to properly analyze their decisions' impacts by failing to take a "hard look" at the social, economic, and environmental justice impacts of each alternative, as the NEPA requires.  Complaint ¶¶ 117-119, at 48-49.  The Plaintiffs allege that the "Forest Service's discussion and analysis of social, economic, and environmental justice impacts in the [EA] is cursory at best and does not rise to the level of the hard look" the NEPA requires.  Complaint ¶¶117-119, at 48-49.  The Plaintiffs can establish that the Defendants violated this NEPA provision without showing <u>why</u> the Defendants did not take a hard look at the social, economic, and environmental justice impacts.  Accordingly, the Plaintiffs need not show that retaliatory animus motivated the Defendants' decision.

The Plaintiffs expressly raised this issue in their administrative appeal.  <u>See</u> Notice of Appeal at 5 (Nov. 29, 2010)(AR011509).  Their first claim in their administrative appeal stated that "[t]he 'Economic, Social and Environmental Justice' section of the EA is on its face insufficient to meet federal, state or local legal requirements," including the NEPA's requirements.  Notice of Appeal at 5 (AR011509).  They alleged on appeal that "there is no identification or meaningful analysis and discussion" of the social, economic, and environmental justice impacts on their communities."  Notice of Appeal at 5 (AR011509).  They further asserted that the Forest Service omitted "any meaningful discussion of the interrelation of effects between the stockman's [sic] economic, social and natural environment."  Notice of Appeal at 12 (AR011516).  They raised the EA's lack of substantive discussion and analysis on numerous detailed issues that constitute "social, economic, and environmental justice" factors, including the "economic value" of the permits, the "stockmen's history of grazing," the "Indo-Hispano ethnography of the stockmen," the "custom and culture," the "environmental justice requirement[s]," and more.  Notice of Appeal at 4 (AR011508).  <u>See</u> Notice of Appeal at 3

(AR011507)(pointing to the Defendants' failure to consider their actions' "full socioeconomic impact").  The Plaintiffs described which Forest Service action -- the failure to properly analyze certain enumerated factors -- violated the NEPA's requirements.  See Notice of Appeal at 6 (AR011510).   In accordance with the Tenth Circuit's exhaustion standards, they raised these claims with sufficient clarity to put the Defendants on notice of how they allegedly violated the law.  See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31.  The Plaintiffs therefore satisfied § 6912(e)'s exhaustion requirements by stating "[h]ow the appellant believes the [Forest Service's] decision specifically violates law, regulation or policy."  36 C.F.R. § 215.14(b)(8).

### 2.      The Plaintiffs Did Not Exhaust Count Three.

Count Three alleges that the Defendants failed to properly analyze their decision's impacts by using a proper scientific baseline based on the BAS, as the NEPA requires.  Complaint ¶¶ 121-23, at 49.  The NEPA requires that an agency "insure the professional integrity, including scientific integrity" of environmental analysis.  40 C.F.R. § 1502.24.  The Plaintiffs contend that the Defendants' analysis "fails to use adequate range monitoring and data collection techniques," and therefore is "based on an improper baseline arrived at using faulty methodology."  Complaint ¶ 122, at 49.

The Plaintiffs' administrative appeal does not mention the Forest Service's "range monitoring and data collection techniques," nor does it allege that the EA is "based on an improper baseline" or a "faulty methodology."  See Notice of Appeal at 1-14 (AR011505-18).  The Plaintiffs state that they raised the issue "in substance" in their administrative appeals.  Response at 21.  They state that the "issue of lack of expertise and proper methodology" was "implicit in the statement of concern over the 'minimal participation' from . . . agencies of

significant and relevant technical skills or expertise."   Response at 21-22 (quoting Notice of

Appeal at 4 (AR011508)).   Chavez' letter questions the credentials of those who performed the

studies.   See Letter from Steve Chavez to Diana M. Trujillo, District Ranger at 1 (Oct. 30, 2010)

(AR011503)("Letter from Steve Chavez")("I have still to locate the credentials of anyone in your

office.").   Largely, however, the letter argues that the decision was incorrect and not that it was

based on improper methodology.   Nor does it state how the techniques the Forest Service used

were invalid.   See Letter from Steve Chavez at 1 (AR011503).   Finally, it does not state that the

study's lack of experts violated the NEPA.

The Plaintiffs questioned the EA's scientific integrity.   They did not, however, put the

agency on notice of how the Forest Service's decision lacked scientific integrity.   Their claims

were therefore insufficient to put the Forest Service on notice of the claims they now raise.   See

Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31 (requiring the plaintiffs to

raise the substance of the claim sufficiently to put the agency on notice of how the plaintiffs

believe the agency violated the law); Idaho Sporting Congress Inc. v. Rittenhouse, 305 F.3d at

965-66 (same).   Moreover, their claim of how the Forest Service violated this provision is

different now than it was in their administrative appeals.   It is therefore not "the same claim," as

the Tenth Circuit requires.   Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31.

See Ark Initiative v. United States Forest Serv., 660 F.3d at 1262.   On administrative appeal, the

Plaintiffs asserted that the Defendants' decision failed to include experts.   See Notice of Appeal

at 4 (AR011508).   In federal court, the Plaintiffs now assert that the Defendants' decision used

faulty scientific methodology, thereby violating the NEPA.   These are distinct claims.

In Forest Guardians v. U.S. Forest Service, the Tenth Circuit upheld the Court's finding

that, because the plaintiffs did not argue during the administrative process that the Forest Service

failed to consider and apply the BAS standard, it "failed to adequately present the BAS argument in its administrative appeal."  641 F.3d at 434.  In that case, the plaintiffs raised the argument that the Forest Service's decision lacked scientific integrity far more expressly than the plaintiffs do here.  See 2006 WL 4109661, at *18.  Further, the plaintiffs there raised the exact provision in their administrative appeals that they charged the Forest Service with violating in the Complaint.  See 2006 WL 4109661, at *18.  Nonetheless, the Court found that they did not state the same reason why the Defendants' decision violated the law in both their administrative appeal and in federal court.  To exhaust the claim that the Defendants' decision lacked scientific integrity, the Plaintiffs must have relied on the same reasons which they now bring to federal court.  They did not raise the claims they now raise in their administrative appeals and have therefore not exhausted Count Three.

### 3.   The Plaintiffs Did Not Exhaust Count Four.

Count Four alleges that the Defendants failed to properly consider and respond to comments, and to consider a reasonable range of alternatives, as the NEPA requires in 40 C.F.R. 1503.4 and 36 C.F.R. § 220.4(c).  See Complaint ¶¶ 125-126, at 49-50.  The Complaint states that "neither the EA nor the Decision Notice/FONSI considered a reduction in either population [of wild horse and elk] as a reasonable alternative."   Complaint ¶ 125, at 49-50.  In their administrative appeal, the Plaintiffs asserted that the EA's analysis of alternatives did not contain "the level of analysis that is required . . . under NEPA."  Notice of Appeal at 6 (AR011510).  Although the Plaintiffs faulted the EA's consideration of alternatives, it faulted the depth of analysis rather than the range of alternatives.  See Notice of Appeal at 6 (AR011510).  Nowhere in their appeal do they charge the Defendants with considering an inadequate range of alternatives or failing to respond to comments.  They do not propose an additional alternative or

suggest, as they now do in their Complaint, that reducing wild horse and elk grazing was a viable alternative the Defendants should have considered.

The Plaintiffs contend that they raised the issue of the Defendants' failure to consider a reasonable range of alternatives. See Response at 22-23. The portions of the record to which they cite, however, argue only that the EA omitted "several important and relevant topics" affecting them, including "the growing numbers of elk . . . and the increasing impacts that the elk are having on the available forage." Notice of Appeal at 4 (AR011508). The Plaintiffs did not label this as an "alternative" to the EA's other options. They did not put the Defendants on notice that they were, in fact, required to consider this alternative. They merely included the numbers of elk as one factor among many other cultural, social, and environmental justice factors that the Defendants should consider -- not as an "alternative." Notice of Appeal at 4 (AR011508). Notably, the Notice of Appeal omitted any reference to wild horses altogether. Consequently, the Plaintiffs did not exhaust Count Four.

### 4.   **The Plaintiffs Exhausted Count Five.**

Count Five asserts that Trujillo failed to properly consider the EA's findings before deciding to reduce grazing levels. See Complaint ¶¶ 129-131, at 50. Forest Service regulations require an official to consider the alternatives in an EA before rendering a decision. See 36 C.F.R. § 220.4(c)(4). Again, the Plaintiffs can establish that Trujillo decided to reduce grazing levels, before considering the EA's alternatives, without showing that she did so for retaliatory reasons. Thus, the retaliation issue is not necessary to the Plaintiffs' claim.

In their administrative appeal, the Plaintiffs raised the issue that Trujillo decided to reduce grazing before the EA. See Letter from Steve Chavez at 1 (AR011503); Notice of Appeal at 6-8 (AR011510-12). In Chavez' letter to Trujillo, he alleged that she decided to "pick and

choose the parts of the study to support [her] decision."   Letter from Steve Chavez at 1 (AR011503).   This statement demonstrates that the Plaintiffs alleged that Trujillo had already made her decision before finalizing the study.   Further, the Plaintiffs argued that Trujillo failed to consider findings regarding important scientific factors, objective data, and analysis.  See Letter from Steve Chavez at 1 (AR011503)(arguing that Defendant Trujillo made her decision without "giving thought to the full socioeconomic impact of [her] decision" and failed to base her decision "on a true, non-biased study").   The Plaintiffs alleged that she had already decided to reduce grazing before considering the EA's findings.   They asserted that the Forest Service and Trujillo were "predisposed to make additional reductions from the permitted numbers."  Notice of Appeal at 6 (AR011510).   See id. at 7 (AR011511)("The decision making approach of the Deciding Officer is pre-disposed to seek reductions in grazing wherever and whenever possible. This pre-disposition in the EA and FONSI . . . is evident.").   Thus, the Plaintiffs exhausted their administrative remedies regarding Count Five.   The Plaintiffs raised these claims with sufficient clarity to put the Defendants on notice of how they allegedly violated the law.   See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31.   The Plaintiffs therefore satisfied § 6912(e)'s exhaustion requirements.

## C.   THE PLAINTIFFS DID NOT EXHAUST COUNTS SIX AND SEVEN, THEIR NFMA CLAIMS.

The Plaintiffs' first NFMA Claim, Count Six, alleges that the Forest Service violated the NFMA's "consistency" provision, 16 U.S.C. § 1604(i).   See Complaint ¶¶ 133-35, at 51.   This provision requires that all Forest Service projects be "consistent with the land management plans."  16 U.S.C. § 1604(i).   The Plaintiffs assert that the land management plan applicable here is the Forest Plan.   See Complaint ¶¶ 133-35, at 51.   The "Standards and Guidelines in the Range Section" (Guidelines) provide guidelines on grazing numbers, and state that the Forest Service

should base any grazing permit adjustments on "production utilization studies."  <u>See</u> Complaint ¶¶ 133-35, at 51.  The Plaintiffs allege that the Defendants violated § 1604(i) by failing to "complete production utilization studies to determine the need for improvement to or change in the current [range] management system," as the Guidelines in the Forest Plan require.  Complaint ¶¶133-36, at 51.  More generally, they allege that the Forest Service deviated from the Forest Plan's guidelines "without providing a reasoned basis."  Response at 24.

The Plaintiffs' administrative appeal does not contain any references to this alleged violation.  It does not raise this provision of the NFMA.  It does not assert that the Forest Service acted inconsistently with the Forest Plan or that it was required to act consistently with the Forest Plan.  It does not state that the Forest Service failed to complete production utilization studies or that the NFMA required it to do so.  The Plaintiffs' only reference to the NFMA in their administrative appeal is to a different provision, 16 U.S.C. § 1604(a), in an entirely different context.  <u>See</u> Notice of Appeal at 9 (AR011513)(arguing that the NFMA "requires the Forest Service to coordinate with the land and resource management planning of State and local governments").  This reference, however, appeared in the Plaintiffs' arguments that the Forest Service violated the NEPA by inadequately coordinating with Rio Arriba County during the NEPA process.  <u>See</u> Notice of Appeal at 9-10 (AR011513-14).  This claim is distinct from the claim that the Plaintiffs now raise in federal court.

The Plaintiffs contend that they raised Count Six's contentions -- that the Forest Service's actions were inconsistent with the Forest Plan -- by alleging the Defendants' "failure to deal with or address all causes of range effects and alternatives for managing range conditions before imposing a reduction in livestock grazing numbers," which was a central objective of the Forest Plan.  Response at 24 (citing Letter from Steve Chavez at 1-2 (AR011503-011504)).  This

allegation does not put the Defendants on notice that: (i) the NFMA imposed an obligation to act in accordance with the Forest Plan; (ii) the Forest Plan's guidelines imposed specific requirements like conducting production utilization studies; or (iii) the Defendants failed to act in accordance with the Forest Plan.  The letter that the Plaintiffs cite for support does not raise the Forest Plan at all.  The Plaintiffs therefore failed to exhaust this claim in their administrative appeal.

In Count Seven, the Plaintiffs assert that the Forest Service violated the NFMA by failing to follow the Forest Plan's Guidelines.  Complaint ¶ 138, at 51.  The Plaintiffs allege that the Forest Plan's Guidelines require the Forest Service to "annually remove excess wild horse populations to levels outlined in Management Plans."  Complaint ¶ 138, at 51.  The Plaintiffs assert that the Defendants failed to remove the wild horses, thereby violating the Forest Plan's Guidelines.  See Complaint ¶¶ 138-39, at 51.  Again, the Plaintiffs' administrative appeal does not raise a NFMA violation.  It does not mention the Forest Plan.  It does not state that the NFMA requires the Defendants to act consistently with the Forest Plan.  It does not state that the Defendants are legally required to reduce the wild horse population.  It references "wild horses" only to say that the EA "reports that '132 wild horses have been captured and adopted since 2004.'"  Notice of Appeal at 3 (AR011507).  This factual statement does not put the Defendants on notice that the Plaintiffs were alleging that the Defendants violated any law by failing to remove wild horses.  Moreover, the statement that "132 wild horses have been captured" undermines the Plaintiffs' claim here.

S. Chavez' appeal similarly failed to raise the wild horse claim that the Plaintiffs now pursue.  His appeal does not mention the NFMA or any Forest Plan requirement to remove excess wild horses.  Instead, S. Chavez made only factual statements that he believed the 2010

Decision Notice's report on the number of horses inaccurate.  See Letter from Steve Chavez at 1 (AR011503)(stating that he "knows that in fact the number is much higher").  This factual assertion does not raise a claim or allege that the Forest Service violated either the NFMA or the Forest Plan by failing to remove excess horses.  See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31.  Consequently, neither S. Chavez nor the remaining Plaintiffs raised the claim in their administrative appeal that they now pursue before the Court.

### D.   THE PLAINTIFFS DID NOT EXHAUST COUNTS EIGHT AND NINE, THEIR SYFMA AND POLICY CLAIMS.

In Count Eight, the Plaintiffs allege that the Defendants violated the SYFMA, which allegedly "mandates" that the Defendants manage the resources of the forest for the benefit of the communities on the Unit.  Complaint ¶ 142, at 52.  The Plaintiffs argue that the Defendants' "decision to disregard the Proposed Action set forth in the EA" violates the SYFMA.  Complaint ¶ 142, at 52.  The Plaintiffs' administrative appeal does not mention the SYFMA.  It does not raise a claim that the Forest Service violated the SYFMA or that the Allotments are located in the Unit.  The Plaintiffs do not state that the Forest Service must manage forage in the Unit in any particular manner or that the SYFMA's requirements controlled.  See generally Notice of Appeal (AR011505-19).  The closest the Plaintiffs come to touching on this claim is in arguing that the Forest Service should have completed an EIS because of the Forest Service's impact on the "human environment."  See Response at 25; Notice of Appeal at 12-13 (AR011516-17).  This statement does not argue that the Defendants failed to manage the resources of the forest for the benefit of the communities on the Unit.  Nor does it state how the Defendants failed to manage the resources for those communities.  The Plaintiffs' contentions did not raise their claim with sufficient clarity to allow the Forest Service to understand and rule on the issue raised.  See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31; Forest Guardians v. United

States Forest Serv., 495 F.3d at 1170 (requiring plaintiffs to structure their claims to alert agencies to the "parties' position and contentions, in order to allow the agency to give the issue meaningful consideration" (internal quotations omitted)).  The Plaintiffs' claims cannot be "only vaguely and cryptically referred to, if at all, during the administrative appeal."  Kleissler v. United States Forest Service, 183 F.3d at 203.

Likewise, the Plaintiffs do not mention the Policy that they now allege the Forest Service violated in Count Nine.  Count Nine states that the Policy requires that "all Forest Service programs and plans be compatible with the future well-being and continuance of local resource dependent communities."  Complaint ¶ 145, at 52-53.  The Plaintiffs argue that the Defendants violated the Policy by taking actions that contradicted the Policy -- reducing grazing by eighteen percent.  See Complaint ¶ 145, at 52-53.  The Plaintiffs' administrative appeal, however, does not state that the Policy requires the Forest Service to maintain the welfare of their community or any other community.  The first time that the Plaintiffs raised the Policy is in the Complaint.  Nor do the Plaintiffs raise the issue that the Forest Service's actions must be compatible with the community's well-being. Although the Plaintiffs stated that the Forest Service should consider its actions' impact on them, they did not raise the claim in a way that would put the Forest Service on notice of the claims raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised. See Forest Guardians v. United States Forest Serv., 641 F.3d at 430-31.

The Plaintiffs nevertheless state that these two claims are "essentially synonymous" with the issues they raised in their administrative appeal concerning the Defendants' "failure to acknowledge the historical record and full panoply of laws" that oblige them to consider the Plaintiffs specifically.  Response at 25.  First, the statement that these claims are "essentially

synonymous" with the claims they raised on administrative appeal is factually incorrect.  The administrative record demonstrates that the Plaintiffs state that the Defendants should consider the Plaintiffs' interests in the land, but the Plaintiffs do not state that the Defendants are required to do so under any legal standard.  Second, alleging that the Defendants failed to acknowledge the "full panoply of laws" does not put the Defendants on notice as to how their behavior violated any specific law.  "The agency needs something more to go on, and Plaintiffs cannot merely mention broad categories of potential impacts with little or no analysis. . . . More explanation is necessary."  Ark Initiative v. United States Forest Serv., 660 F.3d at 1262.  The Plaintiffs' general references to the Defendants' failure to consider their culture and history do not put the Defendants on notice that failing to do so constitutes a legal violation.  Furthermore, it does not put the Defendants on notice of what actions allegedly violated the law, as 36 C.F.R. § 215.14(b)(8) requires.  They have therefore failed to exhaust this Counts Eight and Nine.

IV.    **THE PLAINTIFFS' CLAIM THAT THE FOREST SERVICE VIOLATED THE NFMA BY FAILING TO REMOVE WILD HORSES IS NOT COGNIZABLE PURSUANT TO THE SUPREME COURT'S SUWA DECISION.**

The Plaintiffs assert in Count Seven that the Forest Service violated the NFMA by failing to follow the Forest Plan's Guidelines.  See Complaint ¶ 138, at 51.  The Plaintiffs allege that the Forest Plan's Guidelines "require" the Forest Service to "annually remove excess wild horse populations to levels outlined in Management Plans."  Complaint ¶ 138, at 51.  Because provisions in federal land management plans do not constitute legally binding commitments, the Court cannot compel agency action under the APA.  See SUWA, 542 U.S. at 67-72.

A.    **AGENCY OBJECTIVES ARE NOT ENFORCEABLE UNDER THE APA.**

Congress enacted the NFMA in 1976 to assure that all Forest Service management activities on national forest lands: (i) are preceded by a comprehensive environmental review

process -- at both the forest-wide and site-specific levels; and (ii) protect the forest's various natural resources.  See 16 U.S.C. § 1604(a).  The NFMA directs National Forests to prepare "land resource management plans" or "forest plans," to provide guidance on maintaining each forest's unique attributes and uses.  16 U.S.C. § 1604.  The NFMA's § 1604(i) states that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of the National Forest System lands shall be consistent with the [Forest Plan]."  16 U.S.C. § 1604(i). See Colo. Off Highway Vehicle Coalition v. United States Forest Serv., 357 F.3d 1130, 1132 (10th Cir. 2004)(Baldock, J.)(stating that all projects and decisions must be consistent with the overall forest plan).  In accordance with the NFMA, 16 U.S.C. § 1604, the Carson National Forest adopted the Forest Plan in 1986.  See Forest Plan (Sept. 1986)(AR000688-964).

The Supreme Court has held that land resource management plans provide guidance rather than a list of mandatory requirements.  These plans "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power or authority . . . they create no legal rights or obligations."  Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998).  See Citizens for Better Forestry v. United States Dep't of Agric., 341 F.3d 961, 966 (9th Cir. 2003)("These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses (from logging to road construction), but do not directly compel specific actions, such as cutting of trees in a particular area or construction of a specific road."); Forest Guardians v. United States Forest Serv., 2006 WL 4109661, at *9 ("Forest Plans establish broad planning goals and objectives, identify guidelines for management of forest resources, ensuring consideration of both economic and environmental factors.")(citing 16 U.S.C. § 1604(g)(1)-(3)).

In SUWA, the Supreme Court considered the analogous federal land management planning regime governing the Bureau of Land Management ("BLM").  The plaintiffs alleged that the BLM failed to comply with provisions in its land use plans.  See 542 U.S. at 67-68.  The Supreme Court held that their claim was not cognizable, because statements in the land use plan "are not a legally binding commitment enforceable under [the APA]."  542 U.S. at 72.  The Supreme Court stated that, unlike statutory commands requiring discrete agency actions by a certain date, land use plans merely set forth a federal agency's ordering of priorities.  See 542 U.S. at 71.  The plans do not bind the agency to perform any action enforceable under 5 U.S.C. § 706(1).  See 542 U.S. at 71.  The Supreme Court expressed concern with holding agencies accountable to objectives outlined in their land use plans when they might not have the funds to carry out those objectives.  See 542 U.S. at 71.  The Supreme Court noted that an agency's statements about what it plans to do in the future, "provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit."  542 U.S. at 71.  The Supreme Court observed: "A land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them."  542 U.S. at 71.  The Supreme Court concluded that federal courts, therefore, do not have authority to compel a federal agency to carry out broad objectives in its land use plans.  See 542 U.S. at 66-72.

The Supreme Court stated that, if courts can compel compliance with broad statutory mandates like forest plans, it would "inject[] the judge into day-to-day agency management." 542 U.S. at 67.  As an example of the potential disastrous entanglements, the Supreme Court described a case where a plaintiff alleged that an agency failed to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural

ecological balance."   542 U.S. at 67.   The Supreme Court explained that the APA did not contemplate the "pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives."   542 U.S. at 67.   The Supreme Court observed that allowing litigants to sue agencies on this basis would cause severe policy consequences; for instance, agencies might produce vague land use plans to avoid being sued, frustrating coordination with other agencies and depriving the public of information about the agency's long-term goals.   See 542 U.S. at 71-72.   The Tenth Circuit has applied the Supreme Court's reasoning to the Forest Service's forest plans specifically: "Our reading of Norton reveals that a 'land use plan' promulgated by the BLM does not differ significantly from a [forest plan] promulgated by the Forest Service."   Forest Guardians v. Forsgren, 478 F.3d 1149, 1156 n.9 (10th Cir. 2007).   See id. at 1153 (finding that forest plans "generally contain desired conditions, objectives, and guidance for project and activity decisionmaking in the plan area.   Plans do not grant, withhold, or modify any contract, permit or other legal instrument . . . or create any legal rights"); id. at 1156 n.9 (agreeing with the Supreme Court's conclusion in SUWA that "a statement in a plan that BLM 'will' take this, that, or the other action," is not a legally binding commitment enforceable under the APA" (quoting SUWA, 542 U.S. at 72)).

### B.   THE FOREST PLAN'S PROVISION ON WILD HORSES STATES THE AGENCY'S OBJECTIVES, AND THEREFORE DOES NOT CREATE A COGNIZABLE CLAIM.

The Forest Plan provision on wild-horse management states the Forest Service's objectives in managing wild horses.   The 2002 amendments modified the wild-horse provision to state: "Wildhorse Populations: Remove excess wild horse populations to levels outlined in Management Plans."   2002 Wild Horse Decision Notice and Finding of No Significant Impact at

1 (Aug. 19, 2002)(AR008499-501)("FONSI").[18]   The Forest Service increased the target population in 2002 to between twenty and seventy animals.  See FONSI at 1 (AR008499). During the NEPA process for the 2002 amendment, the Forest Service considered numerous concerns, often in tension with each other, related to the wild-horse populations.  Some citizens expressed concerns about the horses' impact on livestock.  Other citizens worried that a low horse population would not support the herd's genetic integrity and long-term survival.  See MTD at 35-36 (citing Environmental Assessment for Wild Free-Roaming Horse Management on the El Rito Ranger District at 10 (Aug. 2, 2002)(AR008518)("EA for Horse Management")). Moreover, maintaining the herd pursuant to the Wild Horses and Burros Protection Act of 1971, 16 U.S.C. § 1331, involves considerable costs.  See MTD at 35-36 (citing EA for Horse Management at 7-8 (AR008515-16)).  The Wild Horses and Burros Protection Act imposes "complex protocols" that the Forest Service must follow to gather and remove the animals and place them for adoption, "making the gather[ing] procedure very difficult and very expensive." MTD at 37 (citing EA for Horse Management at 7-8 (AR008515-16)).

In addition to the costs of maintaining the horse population, the Defendants describe in detail the difficulty in rounding up wild horses.  See MTD at 37 (describing how S. Chacon -- the President of the Jarita Mesa Grazing Association -- when contracted to remove horses, could not successfully remove wild horses from the Jarita Mesa Wild Horse Territory).  See Letter from Forest Supervisor to Sebedeo Chacon (June 22, 2006)(AR009243)(stating that "[s]everal contractors, including yourself, were not successful in capturing wild horses in the past several years, in sufficient numbers to reduce the herd size to Approved Management Levels").  They

---

[18]The Plaintiffs state that the Forest Plan required the Defendants to "annually" remove excess wild horses.  This notion is based on the pre-amendment version of this provision, which stated: "Annually remove excess wildhorse populations to levels outlined in Management Plans when territories were established."  Forest Plan at Range-2 (AR000745).

note that "[c]apture of wild free-roaming horses" to meet the "appropriate management level" has "seldom been done successfully." EA for Horse Management at 6 (AR008514). In fact, the 2002 EA for Horse Management stated that it cost "about $500 to $1,500 to capture a horse" and projected the horse management program would cost $107,880.00 over fifty years. MTD at 37 (citing EA for Horse Management at 49 (AR008557)). In recognition of these conflicting concerns, the 2002 EA states that the wild-horse management plan "must be flexible year-to-year." EA for Horse Management at 8 (AR008516). Both the costs and difficulties of rounding up horses, and the conflicting goals in reducing horses, suggest that the wild-horse provisions do not lay out discrete, required agency actions to reduce the number of horses by a certain date. See SUWA, 542 U.S. at 71 (finding that, unlike statutory commands requiring discrete agency actions by a certain date, land use plans merely set forth a federal agency's ordering of priorities).

The Plaintiffs argue that the Forest Plan provides discrete directions for management that are enforceable. See Response at 32. The Plaintiffs cite to a provision stating that the Forest Service's "gathering of wild horses to reduce the population will be based on the following trigger points":

- When the wild horse population is exceeding the maximum of 70 horses, or

- When wild horses are located outside the herd-use area.

- When vegetation conditions have deteriorated or are projected to deteriorate below the acceptable level, based on:

  - Two or more consecutive years of drought (precipitation 20 percent below average), or

  - Greater than 40 percent forage utilization on the majority of key forage use areas for two or more consecutive years, or

    ○   Drought conditions are predicted for the next two or more years, such that forage utilization is expected to be unacceptably high.

FONSI at 2-3 (AR008499-501).  This language counters the Plaintiffs' own argument.  It suggests that gathering horses is subject to the Forest Service's own discretion, based on numerous factors, including the Forest Service's projections of vegetation deterioration.  Nothing in this language "command[s]" the Forest Service to take "a discrete agency action by a certain date."  Forest Guardians v. United States Forest Serv., 2006 WL 4109661, at *10.  Instead, it states that the Forest Service must conduct a round-up when, in its opinion, various conditions are met.  Furthermore, the provision does not state that the Forest Service must gather wild horses as a pre-condition to granting grazing permits.  It states that the Forest Service's decision to gather horses "will be based on" the above considerations.  If anything, the provision emphasizes the flexible approach that the Forest Plan takes to managing wild horses.  See MTD at 14.  It is similar to the provision requiring the BLM to "conduct 'Use Supervision and Monitoring'" that the Supreme Court found to be judicially unenforceable in SUWA.  541 U.S. at 72.  In sum, the Plaintiffs fail to demonstrate that the Forest Plan's provisions contain discrete, enforceable obligations.

       Finally, the Plaintiffs attempt to escape SUWA's holding by arguing that Count Seven alleges that they seek relief under § 706(2), which allows courts to set aside agency action, rather than under § 706(1), which allows courts to compel agency action.  They assert that the Supreme Court's holding in SUWA therefore does not apply to them.  See Response at 34.  Despite the Plaintiffs' contentions in their brief, the Complaint clearly alleges a failure to act.  See Complaint ¶ 139, at 51.  The Complaint states that the Forest Plan Guidelines "require the Forest Service to annually remove excess wild horse populations . . . .  Defendant has failed to annually remove excess wild horse populations to levels outlined in" the Forest Plan.  Complaint ¶¶ 138-39, at 51.

Thus, the Complaint states that the "agency action" that the Plaintiffs seek to "set aside" under § 706(2) is the failure to remove horses.  See Complaint ¶¶ 138-39, at 51.  The only way to "set aside" a failure to act is to compel agency action, however, which is the relief that § 706(1) provides.  See SUWA, 542 U.S. at 61-62.  Accordingly, the Plaintiffs state a failure-to-act claim.  They cannot escape SUWA by citing an irrelevant provision of the APA.  At the hearing on the MTD, the Plaintiffs conceded the problems with the Complaint's description of Count Seven.  See Tr. at 116:21-22 (Herskovitz)("So there may be a pleading issue with this count.").

In their Response, however, the Plaintiffs attempt to recharacterize their claim.  Contrary to the Complaint, they argue that the "agency action" they seek to set aside is the "2010 Decision Notice," Response at 34, rather than the "fail[ure] to annually remove excess wild horse populations," as they stated in the Complaint,  Complaint ¶¶ 138-39, at 51.  The "2010 Decision Notice" does not appear in Count Seven of the Complaint.  Count Seven references only the Forest Service's failure to remove horses.  Next, instead of arguing that the failure to remove horses was inconsistent with the Forest Plan, they now argue that the 2010 Decision Notice was inconsistent with the Forest Plan's provisions regarding wild horses.  See Response at 34.  Although the Court may set aside final agency action like the 2010 Decision Notice, the Court cannot do so here, where the alleged inconsistency with the Forest Plan is neither a final agency action nor a condition-precedent to the 2010 Decision Notice.  See Utah Envtl. Cong. v. Bosworth, 443 F.3d at 750; Forest Guardians v. United States Forest Serv., 2006 WL 4109661, at *10.

Ordinarily, courts cannot review an agency's failure to comply with provisions in its forest plan that do not constitute final agency action.  See SUWA, 542 U.S. at 64 (holding that the BLM's failure to implement an off-road vehicle monitoring program was not a final agency

- 100 -

action subject to judicial review under the APA); Utah Envtl. Cong. v. Bosworth, 443 F.3d at

749; Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d 922, 925-26 (9th Cir.

1999)(finding that courts may not review provisions in a forest plan that do not constitute final

agency action).  The Tenth Circuit has stated that Forest Service actions based on policies within

a forest plan "may indirectly impact" forest resources, "[b]ut this does not make such policies,

directions, and allowances 'action'" within the meaning of the APA.  Forest Guardians v.

Forsgren, 478 F.3d at 1157.  "In limited circumstances, however, we may review a monitoring

program to the extent it bears on the approval of a particular project."  Utah Environmental

Cong. v. Bosworth, 443 F.3d at 749.  See Ecology Ctr., Inc. v. United States Forest Serv., 192

F.3d at 926 n.6 (concluding that a plaintiff may "raise claims pertaining to inadequate monitoring

by bringing an APA challenge to a final decision")(emphasis added); Neighbors of Cuddy

Mountain v. Alexander, 303 F.3d 1059, 1067 (9th Cir. 2002)("[N]ot all forest-wide practices

may be challenged on the coattails of a site-specific action.").

        In Utah Environmental Congress v. Bosworth, the Tenth Circuit rejected the plaintiffs'

NFMA claim alleging that a site-specific project failed to comply with the Forest Plan's

requirements.  See 443 F.3d at 749.  The Forest Plan did not require the Forest Service to

monitor species as a condition precedent to approving the project.  See 443 F.3d at 749.

"Without such a relationship, a claim of deficient monitoring simply is not cognizable."  443

F.3d at 750.  In short, to review a claim that the Forest Service's actions were inconsistent with

the Forest Plan and therefore violated the NFMA, the provision the Plaintiffs charge the Forest

Service with violating must establish a condition precedent to the final agency action -- the 2010

Decision Notice.  Even if the Forest Plan's provision on wild horses was an enforceable

requirement, the Plaintiffs must therefore demonstrate that the enforceable requirement is "a

condition precedent to the approval of the site-specific project" alleged to be in violation of the NFMA.  Forest Guardians v. United States Forest Serv., 2006 WL 4109661, at *10, 24-25.

The Plaintiffs here face the same dilemma as the plaintiffs in Utah Environmental Congress v. Bosworth.  Accordingly, the Court may review the Forest Service's horse-management process to the extent it is a pre-condition to approving the 2010 Decision Notice. See Utah Environmental Cong. v. Bosworth, 443 F.3d at 749.  The Court exhaustively reviewed the requirements to grant livestock permits and found that the Forest Plan does not require the Forest Service to remove wild horses as a condition precedent to granting livestock permits.  See Forest Plan (AR000688-1037).  The Forest Plan states that the purpose of wild horse management is to "determine what number of wild free-roaming horses" is appropriate, "while maintaining a wild horse herd and thriving natural ecological conditions."  EA for Horse Management at 6 (AR008514).  The Forest Plan further states: "Management must do what is best for the wild horses, within multiple-use management and the other values of the land and resources."  EA for Horse Management at 7 (AR008515).  This language indicates that the horse-management provisions' purpose is to help the Forest Service achieve its overarching goals of maintaining ecological balance and multiple land uses.  See Forest Guardians v. United States Forest Serv., 2006 WL 4109661, at *24 (finding that the Forest Service's provision regarding monitoring species "indicates that the Monitoring Plan's purpose is to help the USFS achieve its goals in the Forest Plan and does not indicate a condition precedent to implementing a site-specific project").  Thus, the considerations are not a condition precedent to issuing grazing permits.  As the Tenth Circuit has held, "[w]ithout such a relationship," any claim that the 2010 Decision Notice violates the Forest Plan's wild horse provision "simply is not cognizable."  443 F.3d at 750.

**V.    THE PLAINTIFFS' CLAIM THAT THE FOREST SERVICE VIOLATED THE POLICY FAILS BECAUSE INTERNAL AGENCY POLICIES ARE NOT BINDING AND THEREFORE ARE NOT JUDICIALLY ENFORCEABLE.**

The Plaintiffs' allege in Count Nine that the Defendants' EA and 2010 Decision Notice do not comply with the Policy's requirement that "all Forest Service programs and plans be compatible with the future well-being and continuance of local resource dependent communities."  Complaint ¶ 145, at 52-53.  The Defendants assert that the Policy is only an "internal policy statement" and not a binding legal requirement.  See MTD at 48.  Because the Policy constitutes internal agency guidance, not promulgated in conformity with the APA's requirements, it cannot be judicially enforced against the Forest Service.

**A.    INTERNAL AGENCY GUIDANCE NOT PRODUCED IN CONFORMITY WITH THE APA'S REQUIREMENTS CANNOT BE ENFORCED AGAINST AGENCIES.**

Supreme Court case law establishes that internal policy statements are not legally binding and therefore not judicially enforceable against the Forest Service.  See Schweiker v. Hansen, 450 U.S. 785, 789-90 (1981)(holding that a federal agency's thirteen-volume internal instruction manual "is not a regulation[,] has no legal force, and it does not bind the [federal agency]").  Although agencies must adhere to their own regulations, they "need not adhere to mere 'general statement[s] of policy.'"  Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 536 (D.C. Cir. 1986)(Scalia, J.)(quoting Pac. Gas & Elec. Co. v. FPC, 506 F.2d 33, 38 (D.C. Cir. 1974)).  See Cement Kiln Recycling Coal v. Envtl. Prot. Agency, 493 F.3d 207, 227-28 (D.C. Cir. 2007)(concluding that the Environmental Protection Agency's technical guidance document was non-binding and that it "does not 'command,' does not 'require,' does not 'order,' and does not 'dictate'"); Kugel v. United States, 947 F.2d 1504, 1507 (D.C. Cir. 1991)(stating that intra-office

manuals "do not, however, create a duty in favor of the general public").  The D.C. Circuit has

elaborated on the distinction between general policy statements and regulations:

> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent proceedings. . . .  A properly adopted substantive rule establishes a standard of conduct which has the force of law. . . .
>
> A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. . . . A policy statement announces the agency's tentative intentions for the future. . . .

Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d at 537 (quoting Pac. Gas & Elec. Co. v. FPC,

506 F.2d at 38).   An agency's pronouncement is not a binding regulation if it has "some

substantive impact," as long as it "leave[s] the administrator free to exercise his informed

discretion."  Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp., 589 F.2d 658,

668 (D.C. Cir. 1978).  Furthermore, that the policy uses "mandatory language," such as "will" or

"must," does not transform the policy into a binding set of rules without "precision in its

directives" and a clear "indication of how the enumerated policies are to be prioritized."  The

Wilderness Soc'y v. Norton, 434 F.3d 584, 595 (D.C. Cir. 2006).

In line with this precedent, the D.C. Circuit has held that Department of Labor's

"Enforcement Policy and Guidelines," which the Secretary of Labor published in the Federal

Register, do not constitute a "binding, substantive regulation" when the "language of the

guidelines is replete with indications that the Secretary retained his discretion" to carry out the

policy.  Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d at 538.  Similarly, the Ninth Circuit

has held that the Forest Service's Manual and Handbook, which is drafted more like regulations

than internal policy guidance, did not have independent force and the effect of law.  See W.

Radio Servs. Co. v. Espy, 79 F.3d 896, 901 (9th Cir. 1996)(finding that the Manual merely

established guidelines for the exercise of the Forest Service's administrative discretion).  The

Tenth Circuit has arrived at similar conclusions.  See Forest Guardians v. Forsgren, 478 F.3d at

1157 ("Policies and directions only guide the Forest Service in determining whether an 'action'

may be properly undertaken . . . .  Moreover, the fact that a [land resource management plan]

'allows' certain activities to occur on forest lands does not commit the Forest Service to

anything.").

Furthermore, agency policies are more likely enforceable when the agency promulgates

them according to the APA's procedural requirements.  See River Runners for Wilderness v.

Martin, 593 F.3d 1064, 1073 (9th Cir. 2010).  "To have the force and effect of law, enforceable

against an agency in federal court," an agency's pronouncement must satisfy two tests:

> (1) prescribe substantive rules -- not interpretive rules, general statements of
> policy or rules of agency organization, procedure or practice -- and (2) conform to
> certain procedural requirements.  To satisfy the first requirement the rule must be
> legislative in nature, affecting individual rights and obligations; to satisfy the
> second, it must have been promulgated pursuant to a specific statutory grant of
> authority and in conformance with the procedural requirements imposed by
> Congress.

River Runners for Wilderness v. Martin, 593 F.3d at 1071 (quoting United States v. Fifty-Three

(53) Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir. 1982)(emphasis added)).  The procedures to

which the Ninth Circuit refers appear in the APA's provisions describing the notice and

comment rulemaking process.  See 5 U.S.C. § 553; Gen. Elec. Co. v. Envtl. Prot. Agency, 290

F.3d 377, 385 (D.C. Cir. 2002)(vacating an EPA guidance document because the EPA "failed to

publish a notice of proposed rulemaking, give interested parties an opportunity to comment, and

hold an informal hearing" (citing 15 U.S.C. § 2605(e)(4))).  The Ninth Circuit found it even

more significant that an agency did not publish its policies in the Code of Federal Regulations.

"This suggests that the Park Service did not intend to announce substantive rules enforceable by

third parties in federal court." River Runners for Wilderness v. Martin, 593 F.3d at 1072. See W. Radio Servs. Co., Inc. v. Espy, 79 F.3d at 901 (stating, in its determination that two agency documents did not constitute binding rules, that "[n]either [document] is published in the Federal Register or the Code of Federal Regulations"). The D.C. Circuit also found the lack of publication "particularly noteworthy" in concluding that policies were not substantive law. Wilderness Soc'y v. Norton, 434 F.3d at 595. See Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d at 539 ("The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations[.]"). Thus, to constitute a binding statement with the force of law, the document must prescribe substantive rules rather than general policy statements, and should conform to the APA's procedural requirements.

> **B.      THE FOREST SERVICE'S POLICY CONSTITUTES "GENERAL STATEMENTS OF POLICY," NOT PROMULGATED PURSUANT TO THE APA'S PROCEDURES, AND IT DOES NOT CARRY THE FORCE OF LAW.**

Regional Forester William Hurst dispersed the Policy throughout the Forest Service on March 6, 1972. See Policy at 1-4 (March 6, 1972)(AR000154-57). The Policy describes the Forest Service's intentions to foster positive relationships with rural inhabitants of the National Forests in Northern New Mexico, especially those of Spanish and Indian descent. See Policy at 2-4 (AR000155-57). The Defendants state that it is "purely aspirational, and contains no specific directives or enforcement mechanisms for carrying out these intentions." MTD at 51. They support this statement with evidence that the document characterizes the changes as "objectives" and the document as "philosophical." Policy at 1, 3 (AR000154). In fact, it states that the Policy's "philosophical aspects" "may be the most profound element of the policy statement." Policy at 1 (AR000154). The Policy proceeds to describe the rural inhabitants of Northern New Mexico and the Forest Service's aspirations to "be a viable, helpful, and effective arm of the

Government."  Policy at 3 (AR000156).  It then outlines three objectives: (i) to recognize and direct resources to protect "the uniqueness and value of Spanish American and Indian cultures;" (ii) to attune the Forest Service's attitudes "to the land and its people;" and (iii) to alter Forest Service objectives and policies "to the extent possible" to "recognize and be responsive to the culture and peoples."  Policy at 3 (AR000156).

The Plaintiffs point to no language in the Policy that suggests it carries the force of law. They argue that the Policy states that the Forest Service "must" recognize the culture and traditions of the people of Northern New Mexico, and that the residents of this area "should be considered 'resources' themselves."  Response at 42 (quoting AR000154-57).  This language is insufficient to constitute a binding requirement on the Forest Service.  See The Wilderness Soc'y v. Norton, 434 F.3d at 595 (finding that "mandatory language," such as "will" or "must," does not transform a policy into a binding set of rules); Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d at 536; Cement Kiln Recycling Coal v. Envtl. Prot. Agency, 493 F.3d at 227-28.  Instead, the Policy establishes only guidelines for the exercise of the Forest Service's administrative discretion.  See Western Radio Servs. Co. v. Espy, 79 F.3d at 901; Forest Guardians v. Forsgren, 478 F.3d at 1157.  Moreover, the Forest Service did not produce the Policy in conformity with the APA's public notice and comment requirements.  See Policy at 1-4 (AR000154-57); Gen. Elec. Co. v. Envtl. Prot. Agency, 290 F.3d at 385 (requiring notice and comment procedures for a guidance document to have the force of law).

The Plaintiffs further argue that the Policy's enforceability "must be understood in conjunction with the requirements imposed on the Forest Service by NEPA, NFMA, and other applicable law."  Response at 41.  The Plaintiffs assert that, "even if the Region 3 Policy is not enforceable on its own," "it is enforceable in conjunction with those laws in the sense that the

failure to comply" with the Policy's directives without providing a reasoned justification "rendered the Defendants' action arbitrary and capricious and in violation of law."  Response at 41.  These other laws, however, cannot convert the Policy into a legal requirement reviewable under the APA.

The APA provides a cause of action to only a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702 (emphasis added).  "The relevant statute, of course, is the statute whose violation is the gravamen of the complaint."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 886.  When a statute does not contain substantive standards, courts may not review agency actions that allegedly violate policy statements, because there is no "law to apply," and because there is "no meaningful standard against which to judge the agency's discretion."  Or. Natural Res. Council v. Thomas, 92 F.3d 792, 798 (9th Cir. 1996)(citing Lincoln v. Vigil, 508 U.S. 182, 191 (1993)).  Accordingly, a plaintiff who cannot identify a relevant statute under which APA review can proceed cannot use the APA's private right of action.  See Eagle-Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. 1990)(concluding that the APA does not, through § 702, create an independent basis of subject-matter jurisdiction).  It allows for judicial review of final agency action only if there is also an independent basis for subject-matter jurisdiction.  See Furlong v. Shalala, 156 F.3d 384, 394 (2d Cir. 1998); Buckeye Cablevision, Inc. v. United States, 438 F.2d 948, 953 n.2 (6th Cir. 1971); Preferred Risk Mut. Ins. Co. v. United States, 86 F.3d 789, 792 (8th Cir. 1996); El Rescate Legal Servs. v. Exec. Office of Immigration Review, 959 F.2d 742, 753 (9th Cir. 1991); Or. Natural Res. Council v. Thomas, 92 F.3d at 798; Sierra Club v. Martin, 110 F.3d 1551, 1555 (11th Cir. 1997); Colo. Dep't of Soc. Servs. v. Dep't of Health & Human Servs., 558 F. Supp. 337, 339 (D. Colo. 1983).

Contrary to the Plaintiffs' assertions that the Forest Service's compliance with the Policy can be challenged absent any violation of the Policy itself, they cannot challenge the Policy alone pursuant to the APA.  See Or. Natural Res. Council v. Thomas, 92 F.3d at 798 (concluding that courts cannot review agency action "under APA § 706(2)(A) independent of another statute"); Nat'l Trust for Historic Pres. v. Suazo, 2015 WL 1432632, at *9 (D. Ariz. Mar. 27, 2015)(Campbell, J.)(dismissing a claim under the APA alone that failed to allege a violation of a substantive statute, and noting that the plaintiffs cannot "seek relief for an agency's violation of the APA regardless of whether the agency violated an underlying statute").  Because the Policy contains no substantive standards that an agency can violate, it does not constitute "a relevant statute" within the meaning of 5 U.S.C. § 702.  Instead, it merely recites the standards of judicial review under the APA.  This recitation is insufficient to allow "arbitrary and capricious review." Accordingly, Count Nine fails.

## VI.   THE PLAINTIFFS' SYFMA CLAIM FAILS TO STATE A CLAIM ON WHICH THE COURT CAN GRANT RELIEF.

In Count Eight, the Plaintiffs allege that the "Defendants' decision to disregard the Proposed Action set forth in the EA" and impose an eighteen percent grazing reduction violated the SYFMA.  Complaint ¶ 142, at 52.  The Plaintiffs argue that the SYFMA requires the Defendants to manage forest resources to stabilize the Unit's communities.  See Complaint ¶ 142, at 52.  Because the SYFMA does not impose a broad requirement to manage forest resources for the community's benefit or regulate the issuance of livestock grazing permits, Count Eight fails as a matter of law under rule 12(b)(6).

A.      THE PLAINTIFFS SYFMA CLAIM FAILS TO STATE A CLAIM ON WHICH THE COURT CAN GRANT RELIEF.

The SYFMA regulates timber production in National Forests where local communities depend on sustainable timber markets.  See 16 U.S.C. § 583.  The SYFMA seeks to: (i) "promote the stability" of forests and nearby communities "through continuous supplies of timber;" and (ii) "secure the benefits of forests."  16 U.S.C. § 583.  Predominantly, however, Congress passed the SYFMA to prevent large, commercial timber manufacturers from buying a community's timber supply.  As commercial operators out-bid local communities in timber sales, the commercial operators would manufacture the timber out-of-state, thereby removing a source of jobs and income from the local community.  See 16 U.S.C. § 583; Letter from Claude R. Wickard, Sec'y of the Dep't of Agric., to Hon. Ellison D. Smith, Chairman of the Comm. on Agric. and Forestry, United States Senate (May 21, 1943), in H.R. Rep. No. 78-960, at 3 (1943)("Letter from Claude Wickard"); La Compania Ocho, Inc. v. United States Forest Serv., 874 F. Supp. 1242, 1244 (D.N.M. 1995)(Burciaga, J.)("Congress enacted the SYFMA to promote the economic stability of communities dependent upon the harvesting and sale of timber from federally owned or administered land."); Forest Guardians v. Thomas, 967 F. Supp. 1536, 1540 (D. Ariz. 1997)(Rosenblatt, J.).

The SYFMA addresses this concern by authorizing the Secretary of Agriculture and the Secretary of the Interior to establish "sustained-yield units"[19] consisting of federally owned forest land.  See  16 U.S.C. § 583b.  The SYFMA allows the Forest Service to sell federally owned "timber and other forest products" from the unit "without competitive bidding," so that

---

[19]A sustained-yield unit is an area of land containing "enough forest land to provide, insofar as practicable, a permanent source of raw materials to support local communities and industries, giving due consideration to established forest products operations."  43 C.F.R. § 5040.1.

resource-dependent communities do not have to compete with large, commercial operations.  16

U.S.C. § 583b.  The provisions describing the means the Forest Service must use to stabilize

local communities involve non-competitive bidding at timber sales and hiring local community

members to manufacture the timber.  <u>See</u> 16 U.S.C. § 583.  Notably, the SYFMA does not

require the Forest Service to maintain grazing permits to "maintain[] the stability" of local

communities.  16 U.S.C. § 583.

The SYFMA's legislative history demonstrates that Congress chose to use the timber

industry -- not livestock grazing -- to support the local economy.  <u>See</u> Lane Krahl & Doug

Henderson, <u>Uncertain Steps Toward Community Forestry: A Case Study in Northern New</u>

<u>Mexico</u>, 38 NATURAL RESOURCES JOURNAL 53, 77 (1998)("Krahl & Henderson")(finding that

the SYFMA reflects the need to develop "an alternative to grazing as a source of income").

Claude Wickard, the Secretary of Agriculture, explained that the SYFMA's purpose was to use

the timber industry to support local communities:

> The plan is intended to benefit two types of problem situations.  The first involves
> private forest landowners who have insufficient mature and growing timber to
> enable them to cut on a sustained-yield basis. . . .  The second type of situation
> involves only national-forest timber.  Here, established dependent communities
> needing protection against competition would be wrecked if the national-forest
> timber were allowed to be manufactured elsewhere.

Letter from Claude Wickard.  "Had residents been asked which land management technologies

they desired and supported when the Unit was created, they undoubtedly would have included

grazing.  Instead, the Unit was established to provide support to the communities from forest

products industries obtaining a timber supply from the national forest."  Krahl & Henderson,

<u>supra</u> at 60-65.  Congressional hearings strengthen the concept that Congress sought to use the

timber industry to support local communities.

Representative GRANGER [of Utah].  Does this legislation apply solely to timber reserves?

Mr. GRANGER [Forest Service Administrator].  It applies solely to the timber, but it applies to publicly owned and privately owned timber.

Representative GRANGER.  These contracts you are talking about only apply to timber, or might they apply to any private land other than forests?

Mr. GRANGER.  No, it applies only to timber.  It is a forest operation bill.

Representative GRANGER.  But where it says here "to regulate the water supply, stream flow, prevention of soil erosion, and the preservation of wildlife," does that all have to do with forest lands?

Mr. GRANGER.  Yes, those are some of the things which are affected by the methods employed in cutting timber.  If the timber is cut off the land may wash away, and it may impair the habitat of wild life and what not, whereas if it was cut properly there would be benefits in protecting against soil erosion and preserving the habitat of wildlife, and other things that are the benefits of the proper way of cutting timber.

Hearings before the H. Comm. on Agric., 78th Cong. 68-69 (1943)(statement of C.M. Granger, representing the United States Forest Service).  Thus, the SYFMA seeks to "maintain[] the stability" of local communities, but only through the mechanism of timber sales -- not by any means necessary.

The Plaintiffs cite to portions of the SYFMA and its legislative history to argue that the SYFMA regulates more than timber.  First, they argue that one of the SYFMA's purposes is to "secure the benefits of forests in regulation of water supply and stream flow, prevention of soil erosion, amelioration of climate, and preservation of wildlife."  16 U.S.C. § 583.  See Response at 36 (citing Hearing before the H. Comm. on Agric., 78th Cong. at 1 (1943)).  The Plaintiffs argue that this statement of purpose demonstrates that Congress sought to regulate more than timber alone.  See Response at 36.  Second, they argue that the SYFMA's use of the phrase "other forest products" shows that Congress intended to regulate forage, "which is the basis for the livestock industry's presence on National Forest lands."  Response at 36.  Although Congress sought to regulate "other forest products," it did not seek to regulate livestock grazing permitting through the SYFMA.  The statements that the Plaintiffs cite merely demonstrate Congress'

recognition that timber management may affect other forest resources, including livestock grazing.

The SYFMA's language further demonstrates that Congress did not intend to regulate the issuance of livestock grazing permits through the SYFMA.  Section 583 regulates timber and forest products sales.  See 16 U.S.C. § 583b.  The Forest Service does not "sell" livestock grazing permits to the Plaintiffs in the Unit or release them for competitive bidding.  36 C.F.R. § 222.3(b)("Grazing permits and livestock use permits convey no right, title, or interest held by the United States in any lands or resources.").  The Forest Service's regulations specifically state that the Forest Service "issue[s]" grazing permits on a preferential basis "to persons who own livestock to be grazed."  36 C.F.R. § 222.3(c)(1)(i).  Notably, the Forest Service does not use competitive bidding to award grazing permits like it does to sell timber.  See 36 C.F.R. § 223.  Competitive bidding is the situation Congress sought to curtail through the SYFMA.  That § 583 governs competitive bidding sales makes clear that Congress did not intend to regulate livestock grazing in its use of the phrase "other forest products."

Furthermore, the Forest Service's regulations address "livestock grazing" and "timber and forest products" in entirely different Parts.  See 36 C.F.R. Part 222 (governing "Range Management" and addressing the issuance of livestock grazing permits); 36 C.F.R. Part 223 (governing the "Sale and Disposal of National Forest System Timber"). The provisions governing grazing permit issuance also impose detailed requirements on the Forest Service in issuing livestock grazing permits.  See 36 C.F.R. § 222.3.  This structure demonstrates that, like Congress, the Forest Service did not intend to address livestock grazing through its timber provisions.

The Plaintiffs concede that "the primary focus of the congressional discussion on the SYFMA was on timber production."  Response at 35.  The Plaintiffs nonetheless argue that the SYFMA "has more than one purpose."  Response at 35-36.  They fail, however, to identify any SYFMA provision that bars the Forest Service from reducing livestock numbers or that regulates livestock grazing generally.  Indeed, the Plaintiffs admit that the SYFMA contains no enforcement mechanism, and that they cannot cite a specific SYFMA provision proscribing the Forest Service's management of the Unit regarding livestock grazing.  See Tr. at 125:15-19 ("I will grant that the Sustained Yield Management Act doesn't in itself provide an [enforcement] mechanism.").  Because the SYFMA itself contains no provisions regulating livestock grazing permits, the Plaintiffs argue that the SYFMA's constraints must be read "in conjunction with" various other laws, including the "Management Plan," and "the interlocking laws that necessarily inform the Forest Service's fulfillment of its mandate under the SYFMA."  Response at 35.  Neither the Management Plan nor the other laws support the Plaintiffs' argument.

The Management Plan does not demonstrate that the SYFMA regulates grazing decisions.  See Management Plan at 1-35 (dated Oct. 31, 1947)(AR000001-35).  Pursuant to 16 U.S.C. § 583b, the Forest Service established the Unit and adopted a Management Plan for it in 1947.  Its plain language governs only timber production and sales in the Unit.  See MTD at 43; Management Plan at 6-7 (AR000009-10).  The Management Plan does not provide guidance for livestock grazing management.  See Management Plan at 1-35 (AR000001-35).  It references livestock grazing only in a background section on "Land Use" in the Unit, such as "Agricultural" and "Recreational," alongside numerous other uses.  Management Plan at 4-5 (AR000008-09)("How the land is being used is indicated in Table I. . . . Livestock grazing for example, occurs on timber producing land.").  The Management Plan's background section's description

of the livestock grazing describes grazing only to the extent that it bears upon the Unit's ability to support timber alongside various other uses.  See Management Plan at 5 (AR000009).  That the Management Plan addresses other land uses that the Forest Service should consider when selling timber pursuant to the SYFMA does not transform these other resources into "other forest products" that the SYFMA seeks to regulate.  If anything, the Management Plan reflects the idea that the Forest Service should reduce grazing to "rehabilitate the range" and better support timber production and sales -- the chosen means to "maintain[] the stability" of the community.  Management Plan at 5 (AR000009).  In sum, both the Management Plan and the SYFMA's plain language regulate sales of timber and forest products that are up for competitive bid.  See 16 U.S.C. § 583b.  They do not regulate grazing in particular or impose a broad requirement to act in the community's benefit in all Forest Service actions.

The various other laws that the Plaintiffs cite to support their argument that the SYFMA regulates livestock grazing do not apply.  The Plaintiffs argue that the SYFMA's § 583h "expressly directs that action taken under the SYFMA must adhere to the U.S. Forest Service's duties under other existing laws."  Response at 38.  The Plaintiffs mischaracterize this provision, however.  Section 583h states merely:

> Nothing contained in this subchapter shall be construed to abrogate or curtail any authority conferred upon the Secretary of Agriculture or the Secretary of the Interior by any Act relating to management of federally owned or administered forest lands, and nothing contained in any such Acts shall be construed to limit or restrict any authority conferred upon the Secretary of Agriculture or the Secretary of the Interior by this subchapter.

16 U.S.C. § 583h.  This language does not "expressly direct[]" Forest Service action to adhere to duties under other laws.  Response at 38.  Thus, neither the SYFMA nor the Management Plan established pursuant to the SYFMA contain provisions regulating the Forest Service's actions concerning livestock grazing permits.  The SYFMA requires the Forest Service to act for the

benefit of resource-dependent communities, but only insofar as the Forest Service's actions relate to timber sales or sales of other forest products. The SYFMA contains no broad requirement that all Forest Service actions must benefit local communities. The Court, therefore, agrees with the Defendants that the SYFMA does not apply to Forest Service livestock grazing decisions.

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Taking the Plaintiffs' allegations as true, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." Neitzke v. Williams, 490 U.S. 319, 326 (1989). Here, the Plaintiffs allege that the Defendants violated the SYFMA by failing to use the Carson National Forest for the benefit of the communities within the Unit. See Complaint ¶ 142, at 52. The SYFMA does not require the Forest Service to act for the benefit of local communities in all its actions. The SYFMA regulates only the Forest Service's actions regarding timber and forest product sales. Accordingly, even if the Defendants did not act for the benefit of the communities in the Unit in reducing livestock grazing permits, the SYFMA does not provide relief. The Plaintiffs' SYFMA claim therefore fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

### B.   THE SYFMA PROVIDES "NO LAW TO APPLY" UNDER THE APA.

The Defendants further argue that, even if the SYFMA's reference to "forest products" could be expanded to include forage, the SYFMA is committed to the agency's discretion and therefore leaves the Court with "no law to apply." MTD at 44. The APA's judicial review provisions are inapplicable where the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "The APA's legislative history reveals that subsection (a)(2) applies only

where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'"
Cmty. Action of Laramie Cnty. v. Bowen, 866 F.2d 347, 353 (10th Cir. 1989)(Baldock, J.).  The
Supreme Court explained in Heckler v. Chaney, 70 U.S. 821 (1985): "Where Congress has not
affirmatively precluded review, review is not to be had if the statute is drawn so that a court
would have no meaningful standard against which to judge the agency's exercise of discretion."
70 U.S. at 830.  In these "rare instances," the statute "can be taken to have 'committed' the
decisionmaking to the agency's judgment absolutely," because "there is no judicial review of an
agency decision where there is no law for the court to apply."  70 U.S. at 830.  In other words,
only if Congress "has indicated an intent to circumscribe agency enforcement discretion, and has
provided meaningful standards for defining the limits of that discretion," is there "law to apply."
70 U.S. at 834.

The Supreme Court applied the "no law to apply" standard in Webster v. Doe, 486 U.S.
592 (1988).  There, the Supreme Court held that the National Security Act of 1947, 50 U.S.C. §
403, gave the Director of the Central Intelligence Agency so much discretion that his decision to
terminate an employee was committed to the Director's discretion and therefore unreviewable.
See 486 U.S. at 600-01.  The National Security Act "allows termination of an Agency employee
whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the
United States,' not simply when the dismissal *is* necessary or advisable to those interests."  486
U.S. at 600 (quoting 50 U.S.C. § 403(c)(emphasis in original)).  The Supreme Court held that,
because this "standard fairly exudes deference to the Director," it foreclosed "the application of
any meaningful judicial standard of review."  486 U.S. at 600.

The Tenth Circuit considered the "no law to apply" standard in Community Action of
Laramie County, Inc. v. Bowen when reviewing a decision by the Health and Human Services

Department ("HHS") to terminate financial assistance from a federal grant.  See 866 F.2d at 353.

The applicable regulation provided: "The responsible HHS official may terminate financial

assistance to a grantee in whole or in part for failure to comply with any requirement . . . as

stated in § 1303.30."  45 C.F.R. § 1303.33(a).  Section 1303.30 described various ways in which

a grantee could violate grant requirements.  See 45 C.F.R. § 1303.30.  The plaintiff challenged

HHS' decision to terminate grant money for the plaintiff's failure to follow grant requirements.

See 866 F.2d at 353.  The Tenth Circuit found that the regulations limited HHS actions in

deciding whether the plaintiff violated the requirements for receiving grant money, but did not

limit HHS's discretion to terminate grant money after it determined that the plaintiff had violated

a rule.  See 866 F.2d at 353.  Accordingly, the Tenth Circuit found that there was no law to apply

to determine whether HHS appropriately decided to terminate the grant.  See 866 F.2d at 353.

The Tenth Circuit held that, when regulations are so broadly drawn, they commit discretion to

the agency charged with following them:

> Because neither Congress nor HHS itself, however, has promulgated substantive
> guidelines for the agency to follow when deciding whether to terminate a grant or
> impose a lesser sanction for violation of the rules, there is no law for the court to
> apply.  The applicable statutes and regulations are so broadly drawn that the court
> has no standard against which to measure HHS' exercise of discretion.

866 F.2d at 353 (internal citations omitted).  The Tenth Circuit noted that other language in the

regulations supported the finding that the decision was committed to agency discretion.  Section

1303.33(b) provided that "[i]f the responsible HHS official *believes* that alleged noncompliance

with any requirement . . . is serious enough to warrant termination of financial assistance . . . he

will so notify the grantee." 45 C.F.R. § 1303.33(b)(emphasis added).  "[T]his provision places no

boundaries on the HHS official's exercise of discretion."  866 F.2d at 353.

Similarly, in <u>Wyoming v. United States Department of Agriculture</u>, 661 F.3d 1209 (10th Cir. 2011)(Holmes, J.), the Tenth Circuit upheld the Forest Service's "Roadless Area Conservation Rule" against a challenge by the State of Wyoming.  661 F.3d at 1242.  Wyoming asserted that the Forest Service violated the NEPA by failing to grant "cooperating agency" status to Wyoming under the NEPA regulations during the decision-making process.  The Tenth Circuit rejected Wyoming's claim, finding that Congress committed the decision whether to grant a State "cooperating agency" status to the federal agency's discretion and therefore it was not subject to judicial review.  661 F.3d at 1242.  The Tenth Circuited noted that the NEPA regulations provided that a non-federal agency "'*may* request the lead agency to designate it a cooperating agency,' [40 C.F.R.] § 1501.6 (emphasis added), and '*may* by agreement with the lead agency become a cooperating agency,' *id.* § 1508.5 (emphasis added)."  661 F.3d at 1242.  The Court explained:

> Although it is true that the [NEPA] Regulations permit Wyoming to request cooperating-agency status from the Forest Service, and further authorize the agency to grant such status, nothing in the regulations mandates or requires that the Forest Service grant such a request.  More importantly, the applicable regulations provide no standard for a court to apply in reviewing the Forest Service's denial of such a request, and are likewise devoid of any standards or directives that would guide the Forest Service in granting or denying such a request.  In other words, there is simply no law to apply.  Under the applicable legal framework, therefore, the decision to grant or deny Wyoming's request was committed to the Forest Service's discretion and is not judicially reviewable under the APA.

661 F.3d at 1242-43 (internal citation omitted).

The Tenth Circuit found it persuasive that the regulations <u>authorize</u> the agency to grant such status.  <u>See</u> 661 F.3d at 1242.  Nothing required the Forest Service to act a certain way.  The same is true here.  Although the SYFMA permits the Secretaries to establish a sustained-yield unit and conduct timber sales, "nothing in the regulations mandates or requires that the Forest

Service" either conduct timber sales or affirmatively act for the community's benefit.  661 F.3d at

1242.  Section 583b <u>authorizes</u> the Secretaries to establish sustain-yield units when, "<u>in their

respective judgments</u> the maintenance of a stable community" depends on timber or forest

product sales.  16 U.S.C. § 583b (emphasis added).  It <u>authorizes</u> them to define the boundaries

of the community for whose benefit the unit is created, and to sell timber or forest products --

"subject to such conditions and requirements as the Secretary <u>believes</u> necessary."  16 U.S.C. §

583b (emphasis added).  Like in <u>Community Action of Laramie County, Inc. v. Bowen</u>, this

language demonstrates that Congress committed discretion how to maintain the community's

stability to the agency.  866 F.2d at 353 (finding it persuasive that a separate, non-applicable

regulation allowed the agency to take action upon an agency official's "belie[f]").

More importantly, "the applicable regulations provide no standard for a court to apply in

reviewing the Forest Service's" other decisions, including the decision to issue livestock grazing

permits.  <u>Wyo. V. United States Dep't of Agric.</u>, 661 F.3d at 1242.  They are "devoid of any

standards or directives that would guide the Forest Service in" issuing livestock grazing permits

or taking any action other than conducting timber sales.  661 F.3d at 1242-43.  <u>See</u> 16 U.S.C. §

583b.  This situation is similar to the situation in <u>Community Action of Laramie County, Inc. v.

Bowen</u>, where the regulations restricted the agency's discretion in determining whether a grantee

violated its grant requirements, but contained no limitations on the agency's discretion as to

whether to terminate its grant as a result.  <u>See</u> 866 F.2d at 353.  Here, § 583b restricts the Forest

Service's discretion in conducting timber sales, but contains no limitations on the Forest

Service's discretion as to whether to take other actions -- like issuing grazing permits.  "[T]he

applicable statutes and regulations are so broadly drawn that the court has no standard against

which to measure" the Forest Service's exercise of discretion.  Cmty. Action of Laramie Cnty., Inc. v. Bowen, 866 F.2d at 353.

Although § 583b provides law to apply in conducting sales, it fails to cabin the Secretaries' discretion whether to establish a sustained-yield unit and how to define its boundaries.  It provides no law to apply on what other actions the Secretaries must take to "maintain[] the stability" of the community.  It does not require the Secretaries to take any actions at all, including timber sales.  Rather, it leaves it to the Secretaries' discretion whether to conduct the sales.  Before the Secretaries choose to conduct a timber sale, § 583b imposes no requirements how to maintain the community's stability.  The Plaintiffs have attempted to apply the SYFMA -- a statute governing sales of timber and "other forest products" -- to a livestock grazing permit decision that does not involve the sale of forest products.  The SYFMA does not constrain the Forest Service's discretion or provide the Court with law to apply in issuing livestock grazing permits.  Thus, Count Eight fails.

**IT IS ORDERED** that the Federal Defendants' Motion and Memorandum to Dismiss Plaintiffs' Remaining Claims, filed February 10, 2015 (Doc. 144)("MTD"), is granted in part and denied in part.  The Court grants the Motion as to the Complaint's Counts Three, Four, Six, Seven, Eight, and Nine of the Complaint, filed January 20, 2012 (Doc. 1).  The Motion is denied as to the Complaint's Counts Two and Five.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Simeon Herskovits
Iris A. Thornton
Michelle T. Miano
Advocates for Community and Environment
El Prado, New Mexico

--and--

Richard Rosenstock
Richard Rosenstock Esq.
Santa Fe, New Mexico

      *Attorneys for the Plaintiffs*

Damon P. Martinez
  United States Attorney
Ruth F. Keegan
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Andrew A. Smith
John C. Cruden
Environment & Natural Resources Division
United States Department of Justice
Albuquerque, New Mexico

      *Attorneys for the Defendants*