# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JARITA MESA LIVESTOCK GRAZING
ASSOCIATION; ALAMOSA LIVESTOCK
GRAZING ASSOCIATION; SEBEDEO
CHACON; THOMAS GRIEGO; DONALD
GRIEGO; MICHAEL PENA; JUAN GIRON;
JOE GURULE, JR.; FERNANDO GURULE;
DIEGO JARAMILLO; LORENZO
JARAMILLO; GABRIEL ALDAZ; ARTURO
RODARTE; JEFFREY CHACON; GLORIA
VALDEZ; JERRY VASQUEZ; CARLOS
ORTEGA; LEON ORTEGA; HORACIO
MARTINEZ; RONALD MARTINEZ; STEVE
CHAVEZ; VANGIE CHAVEZ; ALFONSO
CHACON; DANIEL RAEL; JOHN VALDEZ
and BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF
RIO ARRIBA,

        Plaintiffs,

vs.                                    No. CIV 12-0069 JB/KBM

UNITED STATES FOREST SERVICE and
DIANA TRUJILLO, in her official and
individual capacities,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Amended Opening Brief,

filed October 18, 2016 (Doc. 181-1)("Opening Brief"). The Court held a hearing on January 26,

2017. The primary issues are: (i) whether the National Environmental Policy Act of 1969, Pub.

L. No. 91-190, 83 Stat. 852 [] ("NEPA") requires the Defendant United States Forest Service

("the Forest Service") to consider the social and economic impacts of a proposed action --

reducing grazing permits for the Alamosa and Jarita Mesa Grazing Allotments -- before deciding

to take it; and (ii) whether Defendant Diana Trujillo, former El Rito District Ranger,[1] decided to reduce grazing permits for the Alamosa and Jarita Mesa Grazing Districts before considering the Environmental Assessment for Jarita Mesa and Alamosa Grazing Allotments (dated September, 2010)(AR 011351-487)("EA"). The Court concludes that NEPA requires agencies to consider the environmental impacts of agency action, which may -- depending on a particular case's circumstances -- extend to secondary social and economic effects that flow from an action's impact on the physical environment. NEPA does not, however, require agencies to consider social and economic impacts that flow directly from an action and not from the action's effect on the physical environment. Because the Plaintiffs allege that the Defendants failed to consider an agency action's direct social and economic impacts, the Court concludes that the Plaintiffs' allegations do not amount to a NEPA violation. After examining the Administrative Record ("AR"), the Court also concludes that Trujillo did not violate NEPA by deciding to take a particular agency action before considering the EA's findings. Accordingly, the Court will affirm the administrative appeal's decision.

## FACTUAL BACKGROUND

The historical background surrounding this case predates both the parties before the Court and the Court itself. The individual Plaintiffs raise cattle in northern New Mexico and hold permits that allow their livestock to graze in either the Jarita Mesa Grazing Allotment ("Jarita Mesa Allotment") or the Alamosa Grazing Allotment ("Alamosa Allotment"), depending on the permit. Complaint for Declaratory and Injunctive Relief ¶ 3, at 2-3, filed January 20,

---

[1]The El Rito Ranger District is one of the six Ranger Districts that make up Carson National Forest. See Carson National Forest, Districts, U.S. Forest Service, http://www.fs. usda.gov/main/carson/about-forest/districts.

2012 (Doc. 1)("Complaint").[2]  The Jarita Mesa Allotment and the Alamosa Allotment are both within the El Rito Ranger District of Carson National Forest.  See  Complaint ¶ 1, at 2.  They are also part of the Vallecitos Federal Sustained Yield Unit.  See Complaint ¶ 2, at 2.  In the Federally Sustained Yield Forest Management Act of 1944, Pub. L. No. 78-273, 58 Stat. 132 (codified at 16 U.S.C. §§ 583-583i), Congress authorized the Secretary of Agriculture to establish co-operative sustained-yield units like the Vallecitos Federal Sustained Yield Unit in federally owned or administered forest land under the Secretary's jurisdiction.  See 16 U.S.C. § 583.

1.    **Historical Background.**

The Plaintiffs and their ancestors, however, began grazing livestock on the land that now comprises those Allotments long before the Secretary of Agriculture established the Vallecitos Federal Sustained Yield Unit.  See Complaint ¶ 3, at 2-3.  The Plaintiffs are the heirs to a

---

[2]Plaintiffs Sebedeo Chacon, Michael Pena, Juan Giron, Gabriel Aldaz, Arturo Rodarte, Thomas Griego, Donald Griego, Joe Gurule, Jr., Lorenzo Jaramillo, Jeffrey Chacon, and Gloria Valdez (collectively, "the Jarita Mesa Permittees") have permits that the Forest Service issued, which allow them to graze cattle on the Jarita Mesa Allotment.  Complaint ¶ 3, at 2.  T. Griego, D. Griego, Plaintiffs Carlos Ortega, Leon Ortega, Daniel Rael, Horacio Martinez, Ronald Martinez, Fernando Gurule, Jerry Vasquez, and Alfonso Chacon (collectively, "the Alamosa Permittees") have permits that the Forest Service issued, which allow them to graze cattle on the Alamosa Allotment.  Complaint ¶ 3, at 2.  Plaintiff Steve Chavez is a former permittee on the Alamosa Allotment and now lives within the Vallecitos Federal Sustained Yield Unit with his wife, Plaintiff Vangie Chavez.  See Complaint ¶ 3, at 2.  J. Valdez is a former permittee on the Jarita Mesa Allotment and now resides within the Vallecitos Federal Sustained Yield Unit.  See Complaint ¶ 3, at 2-3.  The Jarita Mesa Grazing Association and the Alamosa Grazing Association (collectively, "the Associations") are "local livestock associations made up exclusively of grazing permittees on the respective allotments."  Complaint ¶ 13, at 5.  The Associations were established to: (i) protect and promote the permittees' livestock grazing on the Allotments; (ii) manage and share the costs of handling livestock, range improvements, and other programs for the benefit of the Allotments and their resources; (iii) express the Associations' members' wishes; and (iv) meet with and work with the Forest Service to ensure proper management of livestock and range resources on the Allotments.  See Complaint ¶ 13, at 6.  S. Chacon was president of the Jarita Mesa Grazing Association throughout the events set forth in the Complaint.  See Complaint ¶ 14, at 6.  T. Griego was president of the Alamosa Grazing Association throughout the events set forth in the Complaint.  See Complaint ¶ 15, at 7.

"Hispano ranching tradition" that dates back to the colonization of New Mexico by the Spanish in 1598, Carol Raish & Alice M. McSweeney, United States Department of Agriculture, Economic, Social, and Cultural Aspects of Livestock Ranching on the Española and Canjilon Ranger Districts of the Santa Fe and Carson National Forests: A Pilot Study 3 (RMRS-GTR-133, 2003), available at http://doi.org/10.2737/RMRS-GTR-113.  The Spanish colonists brought their domesticated plants and animals -- including cattle, horses, sheep, and goats -- with them and introduced intensive irrigation agriculture, whereas indigenous farming practices relied on "extensive floodwater farming and soil retention techniques."  Raish & McSweeney at 3.  The Spanish were forced out of northern New Mexico by the Pueblo Revolt of 1680, but Don Diego de Vargas reconquered the area twelve years later.  See Raish & McSweeney at 3-4.  After the reconquest, the new generation of Spanish colonists "generally worked their own land and maintained relatively cordial relations with the Pueblo Indian groups as both used the land in similar ways."  Raish & McSweeney at 4.  The modern-day Hispanic villagers and farmers of northern New Mexico are descended from those farmers and ranchers.  See Raish & McSweeney at 4.

The Spanish Crown -- between 1598 and 1821 -- and then the Mexican government -- between 1821 and 1848 -- confirmed the settlers' use and ownership of the land by issuing land grants.  See Raish & McSweeney at 4.  One particular kind of land grant, the community grant, generated a land-ownership that persists even today.  See Raish & McSweeney at 4.  Community grants gave individual settlers ownership over a building site -- for a homestead -- as well as a small -- five to ten acres -- plot of land for farming.  See Raish & McSweeney at 4.  The lion's share of the land bestowed by a community grant, however, belonged not to any individual settler but, instead, to the settlers as a group, which permitted individuals to "use[] the village

grazing lands, timberlands, and community pastures as common lands."  Raish & McSweeney at

4.  That allocation of land supported a small population of subsistence farmers and their animals

for centuries with only scattered areas of land overuse near villages.  See Raish & McSweeney at

4.  Commercial sheep production increased while Mexico controlled the area, which in turn

increased the amount of land overuse, but

> [t]hroughout the 1800s, local Hispanic and Pueblo residents of the nearby valleys
> used the plateau as common property, bringing their small herds to the plateau for
> summer grazing. They also harvested from the abundant timber resources for
> personal use and small-scale business ventures and planted some summer crops.
> The small size and noncommercial nature of these operations ensured that
> sufficient grass and forest resources remained for all who needed them.

Raish & McSweeney at 4.  "By the time of the United States occupation of New Mexico, over

sixty such community grants were in existence."  Christine A. Klein, Treaties of Conquest:

Property Rights, Indian Treaties, and the Treaty of Guadalupe Hidalgo, 26 N.M. L. Rev. 201,

236 (1996).

The Mexican-American War drastically changed the way land in northern New Mexico

was owned and used.  When it signed the Treaty of Guadalupe Hidalgo in 1848, the United

States agreed to recognize and protect the property rights of the people who resided in the

territory that Mexico ceded to the United States.  See Treaty of Peace, Friendship, Limits, and

Settlement with the Republic of Mexico, Mex.-U.S., art. VII, February 2, 1948, 9 Stat. 922

(hereinafter "Treaty of Guadalupe Hidalgo")("Mexicans now established in territories previously

belonging to Mexico . . . shall be free to continue where they now reside, or to remove at any

time to the Mexican republic, retaining the property which they possess in said territories . . . .");

id. ("In the said territories, property of every kind, now belonging to Mexicans not established

there, shall be inviolably respected.");  id. art. IX ("Mexicans who, in the territories aforesaid,

shall not preserve the character of citizens of the Mexican republic [i.e., who shall elect to

become United States citizens] . . . shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."). The devil was, of course, in the details, because the Treaty of Guadalupe Hidalgo did not provide a mechanism for the residents of New Mexico to prove and assert their property rights.

Congress acted to provide such a mechanism when, in 1854, it established the office of Surveyor-General for New Mexico. See Act of July 22, 1854, ch. 103, § 1, 10 Stat. 308. The Surveyor-General was charged with "ascertain[ing] the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico," as well as with "mak[ing] a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo . . . with his decision as to the validity or invalidity of the same." Act of July 22, 1854 § 8, 10 Stat. at 309. Congress and not the Surveyor-General, however, was to make final decisions regarding the validity of New Mexican land claims. See Act of July 22, 1854 § 8, 10 Stat. at 309.

The Surveyor-General mechanism, however, was not up to the task of "determining title to some fifteen million square miles of territory." Klein, 26 N.M. L. Rev. at 225. "The time and finances of the surveyor general, for instance, were vastly inadequate," and "congressional action upon the surveyor general's recommendations was notoriously slow." Klein, 26 N.M. L. Rev. at 225. Congress was hesitant to act on the Surveyor-General's recommendations, because those recommendations raised complex legal issues and dealt with large amounts of land; moreover, there was "a pervasive feeling that many unsettled land claims were fraudulent." Klein, 26 N.M. L. Rev. at 225 n.186.

To address the problems associated with the Surveyor-General system, Congress established the Court of Private Land Claims in 1891. See Act of March 8, 1891, ch. 539, 26

Stat. 854 ("1891 Act"). Those who claimed -- under a Spanish or Mexican grant -- land within the New Mexico, Arizona, and Utah territories, or within the States of Nevada, Colorado, and Wyoming, needed to petition the Court of Private Land Claims to confirm their claim unless their title "was already complete and perfect." 1891 Act § 6, 26 Stat. at 856. If a claimant did not petition the Court of Private Land Claims as § 6 required within "two years from the taking effect of this act [of March 8, 1891]," then their claim was "deemed and taken, in all courts and elsewhere to be abandoned and shall be forever barred." 1891 Act § 12, 26 Stat. at 859. Claimants whose title "derived from the Spanish or Mexican Government," and was "already complete and perfect" when Mexico ceded its territory to the United States were permitted but not required to petition the Court of Private Land Claims to confirm their claim. 1891 Act § 8, 26 Stat. at 857. See Klein, 26 N.M. L. Rev. at 227 (identifying claims already complete and perfect as "those land grants that required [no] additional action by the Spanish or Mexican governments before good title could be conveyed"). But see Botiller v. Dominguez, 130 U.S. 238, 255-56 (1889)("[N]o title to land in California, dependent upon Spanish or Mexican grants can be of any validity which has not been submitted to and confirmed by the board provided for that purpose . . . .").

Congress instructed the Court of Private Land Claims to determine the claimants' property rights "according to the law of nations," the Treaty of Guadalupe Hidalgo, and the "laws and ordinances" of either Spain or Mexico, depending on which country made the land grant at issue in a particular case. 1891 Act § 7, 26 Stat. at 857. "[E]quity and the usages and customs of the Spanish and Mexican government" are notably absent from that list, so the Court of Private Land Claims "refused to confirm land grants where the letter of the Mexican [or

Spanish] law had not been observed, even if customary practices had been followed." Klein, 26

N.M. L. Rev. at 236. In the words of Chief Justice Fuller,

> under the act of March 3, 1891, it must appear, in order to the confirmation of a
> grant by the Court of Private Land Claims, not only that the title was lawfully and
> regularly derived, but that, if the grant were not complete and perfect, the
> claimant could, by right and not by grace, have demanded that it should be made
> perfect by the former government, had the territory not been acquired by the
> United States.

Ainsa v. United States, 161 U.S. 208, 223 (1896)(Fuller, C.J.).

Strict application of legal -- as opposed to equitable or customary -- rules elevated to

prime importance the technical issue whether Spanish and Mexican community land grants

conveyed legal title to common lands. See Klein, 26 N.M. L. Rev. at 226. Moreover, "under

international law, Mexico could cede only sovereign territory that had not been granted

previously to individuals." Klein, 26 N.M. L. Rev. at 236. It follows that,

> [i]f the commons belonged to the community, then, post-conquest title would
> remain in the community. On the other hand, territory retained by the Spanish
> and Mexican governments for communal use became part of the United States'
> public domain, even where local communities had relied for generations on the
> commons for their subsistence.

Klein, 26 N.M. L. Rev at 236. The Supreme Court of the United States tackled that issue in

United States v. Sandoval, 167 U.S. 278 (1897)(Fuller, C.J.), and it held that the Spanish and

Mexican governments retained legal title to land conveyed by a land grant that was not allocated

to any individual settler, because "unallotted lands were subject to disposition by the

government." 167 U.S. at 298. Like other common lands that community land grants conveyed,

the land that ranchers in northern New Mexico used to graze their livestock thus passed to the

United States as part of the Treaty of Guadalupe Hidalgo. Consequently, the Court of Private

Land Claims did not confirm Spanish and Mexican community land grants, at least with respect

to common lands. See Sandoval v. United States, 167 U.S. at 298 ("[N]either these settlers nor

this town could have demanded the legal title to such lands of the former government, and the Court of Private Land Claims was not empowered to pass the title to either. It is for the political department to deal with the equitable rights involved."). See also Raish & McSweeney at 5 ("[A]pproximately 24 percent of the acres claimed in New Mexico were confirmed compared to about 73 percent in California.").

2.      The Events Giving Rise to the Litigation.

"Today, much of the former grant land in northern New Mexico is managed by Federal agencies, primarily [the Forest Service]," Raish & McSweeney at 5,[3] and the Plaintiffs' claims arise out of the Forest Service's management of the Alamosa and Jarita Mesa Allotments. The Forest Service issues ten-year permits that allow their holders to graze a specific number of animals on either the Alamosa Allotment or the Jarita Mesa Allotment. See EA at-(AR 011357). As part of determining the number of grazing permits to issue in 2011 and subsequent years, the Forest Service prepared the EA during 2009 and 2010. See EA at-(AR 011352, 011358). The EA evaluated the environmental impacts of three potential, alternative actions that the Forest Service could take. See EA at-(AR 011363-66). Under the first alternative ("Alternative 1"), the Forest Service would cease issuing grazing permits entirely. See EA at-(AR 011363). Council on Environmental Quality ("CEQ")[4] regulations required the Forest Service to consider this alternative. See 40 C.F.R. § 1507.14(d). See also EA at-(AR 011363). Under the second alternative ("Alternative 2"), the Forest Service would maintain the pre-2011 grazing levels, see

---

[3]The Forest Service originated in 1891 with the Forest Reserve Act of 1891, Pub. L. No. 51-561, 26 Stat. 1095, which empowered the President to establish forest reserves from public lands. See Our History, U.S. FOREST SERVICE, http://www.fs.fed.us/learn/our-history.

[4]"CEQ oversees NEPA implementation, principally through issuing guidance and interpreting regulations that implement NEPA's procedural requirements Council on Environmental Quality, WHITE HOUSE, https://www.whitehouse.gov/ceq.

EA at-(AR 011364-65), including a "temporary" eighteen percent increase in grazing that was first adopted in 1980, <u>see</u> EA at-(AR 011366). Alternative 2, which the Forest Service designated the "proposed action," also incorporated improvements in the Forest Service's land-management practices. <u>See</u> EA at-(AR 011364-65). Under the third alternative ("Alternative 3"), the Forest Service would reduce grazing to pre-1980 levels. <u>See</u> EA at-(AR 011365-66).

The EA compared the effects of each alternative on sixteen different resources. <u>See</u> EA at-(AR 011368-70). Understandably, the EA focuses on classically "environmental" resources, <u>e.g.</u>, "Riparian Areas, Water Quality, and Wetlands," EA at-(AR 011512-21), but the EA's sixteen resources include "Economics," EA at-(AR 011466-67); "Social," EA at-(AR 011467); "Environmental Justice," EA at-(AR 011467-68); and "Recreation," EA at-(AR 011464-65). The EA did not, however, recommend or adopt any particular alternative. Instead, the EA served to inform agency decision-making by "disclos[ing] the direct, indirect, and cumulative environmental impacts that would result from the implementation of the proposed action and alternatives." EA at-(AR 011357).

On September 20, 2010, Trujillo decided to implement Alternative 3, which calls for an eighteen percent grazing reduction. <u>See</u> Decision Notice and Finding of No Significant Impact at-(AR 011488)(dated September 20, 2010)(AR 011488-500)("DN/FONSI"). The DN/FONSI indicates that she considered the EA in making her decision; <u>see</u> DN/FONSI at-(AR 011488); "fully underst[oo]d the economic impact this decision will have on local livestock operators"; DN/FONSI at-(AR 011493); and decided to reduce grazing to pre-1980 levels, because "[t]he effects of the 18% increase in permitted livestock have now been evaluated and determined to be unsustainable"; DN/FONSI at-(AR 011492). Trujillo also determined that her decision would

"not have a significant effect on the human environment[;] therefore an environmental impact statement will not be prepared." DN/FONSI at-(AR 011494).

Dissatisfied with Trujillo's decision, the Plaintiffs filed two administrative appeals. See Notice of Appeal for Jarita Mesa Livestock Grazing Association, Alamosa Livestock Grazing Association and Board of County Commissioners of the County of Rio Arriba of the El Rito District EA and FONSI (Appeal #11-03-02-0002-A215)(dated November 29, 2010), filed with the Forest Service November 29, 2010 (AR 011505-19); Letter from Steve Chavez to Diana M. Trujillo, District Ranger (Appeal #11-03-02-0001-A215)(dated October 30, 2010), filed with the Forest Service December 3, 2010 (AR 011503-04). District Ranger John D. Pierson was the Forest Service Appeal Reviewing Officer as to both appeals. See Letter from John D. Pierson to Kendall Clark (dated January 10, 2011)(AR 011525-26, 011539-40)("Pierson Letter"). Because the Appeals raised similar issues, Pierson consolidated the Appeals and issued a single recommendation. See Pierson Letter at-(AR 011526, 011540). Pierson concluded that Trujillo "conducted a proper and public NEPA process," and Pierson "found no violations of law, regulations, or Forest Service policy." Pierson Letter at-(AR 011526, 011540). Accordingly Pierson recommended that Trujillo's "decisions relating to this appeal be affirmed with respect to all of the appellant's contention." Pierson Letter at-(AR 011526, 011540). On January 10, 2011, Pierson submitted to Kendall Clark, Clarkson National Forest's Forest Supervisor: (i) his consolidated recommendation, see Pierson Letter at-(AR 011525-26, 011539-40); and (ii) a separate Review and Findings for each appeal, see Review and Findings for Appeal #11-03-02-0001-A215 (undated)(AR 011522-24); Review and Findings for Appeal #11-03-02-0002-A215 (undated)(AR 011530-38). Clark was the Forest Service Appeal Deciding Officer as to both appeals, and, after a detailed review of the record and Pierson's recommendation, Clark decided

- 11 -

to affirm Trujillo's decision.  See Letter from Kendall Clark to Steve Chavez at-(AR 011521), (dated January 13, 2011)(AR 011520-21); Letter from Kendall Clark to Ted Trujillo at-(AR 011529)(dated January 13, 2011)(AR 011528-29).

## PROCEDURAL HISTORY

The Plaintiffs filed their Complaint, which contains nine counts against the Forest Service and Trujillo, with the Court on January 20, 2012.  See Complaint ¶¶ 111-46, at 47-53. The Court dismissed the Complaint's First Count on September 30, 2013, for failure to exhaust administrative remedies.  See Order, filed September 30, 2013 (Doc. 102).  See also Amended Memorandum Opinion, 61 F. Supp. 3d 1013, filed November 18, 2014 (Doc. 135)(explaining more fully the Court's rationale).  That Count alleges that Trujillo retaliated against the Plaintiffs to punish them for exercising their rights under the First Amendment to the Constitution of the United States of America.  See Complaint ¶¶ 111-15, at 47-48.

On September 30, 2015, the Court dismissed Counts Three, Four, Six, Seven, Eight, and Nine, because the Plaintiffs failed to exhaust their administrative remedies.  See Memorandum Opinion and Order at 84-93, filed September 30, 2015 (Doc. 168)("Administrative Exhaustion MOO").  Count Three alleges that the Defendants violated NEPA by failing to develop a proper baseline using the best available science.  See Complaint ¶¶ 120-23, at 49.  Count Four alleges that the Defendants violated NEPA by failing to consider reducing the wild horse and elk populations on the Alamosa and Jarita Mesa Allotments as an alternative to reducing the number of grazing permits.  See Complaint ¶¶ 124-127, at 49-50.  Counts Six and Seven allege that the Defendants violated the National Forest Management Act, 16 U.S.C. § 1604.  See Complaint ¶¶ 132-40, at 50-52.  Count Eight alleges that the Defendants violated the Federally Sustained Yield Forest Management Act of 1944, Pub. L. No. 78-273, 58 Stat. 132 (codified at 16 U.S.C.

§§ 583-583i).  See Complaint ¶¶ 141-43, at 52.  Count Nine alleges that the Defendants violated Forest Service policy.  See Complaint ¶ 144-46, at 52-53.

Only Counts Two and Five, thus, remain before the Court.  In Count Two, the Plaintiffs allege that the Defendants violated NEPA, because they did not take a hard look at the social, economic, and environmental justice[5] impacts of their decision to decrease grazing in the Alamosa and Jarita Mesa Allotments.  See Complaint ¶¶ 116-19, at 48-49.  The Plaintiffs say that the EA's analysis of those impacts was "cursory at best and does not rise to the level of the hard look required under NEPA."  Complaint ¶ 118, at 48.  In Count Five, the Plaintiffs allege that Trujillo decided to reduce grazing "long before the Final EA was even issued."  Complaint ¶ 130, at 50.  Consequently, according to the Plaintiffs, Trujillo violated regulations requiring her to "consider the alternatives analyzed in an EA before rendering a decision."  Complaint ¶ 129, at 50.

Although the Plaintiffs style their initial filing as a "Complaint," it functions -- insofar as the Plaintiffs seek judicial review of an administrative action under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-07 ("APA")[6] -- as a Petition for Review of

---

[5]Executive Order No. 12898 states that "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."  Executive Order No. 12989, 59 F.R. 7629, 7629 (Feb. 11, 1994).  Executive Order No. 12989 is not judicially enforceable.  See Executive Order No. 12989, 59 F.R. at 7632-33.  See also Sur Contra La Contaminacion v. EPA, 202 F.3d 443, 449 (1st Cir. 2000); Air Transport Ass'n v. FAA, 169 F.3d 1,8 (D.C. Cir. 1999); Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 575 (9th Cir. 1998).

[6]The Complaint originally sought both judicial review under the APA and a damages award under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), see Complaint ¶ 1, at 1-2, but the Court dismissed the Plaintiffs' Bivens claims early on in this litigation, because the APA affords the Plaintiffs an adequate alternative

Agency Action, because, when the Court reviews an agency action, it treats the case as an appeal that the Federal Rules of Appellate Procedure govern.  See Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994); Wildearth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d 1314, 1323 (D.N.M. 2009)(Browning, J.).

       1.      **The Opening Brief.**

       The Plaintiffs filed their Opening Brief on October 18, 2016.  Opening Brief at 59.  The Plaintiffs argue that the Defendants were obliged to consider the Plaintiffs' social and historical context when determining the amount of grazing to permit on the Alamosa and Jarita Mesa Allotments.  See Opening Brief at 44.  The Plaintiffs observe that "their families and communities are typical of the small, poor land-based communities in northern New Mexico who historically had rights and access to, and always have depended on, the common property of their land grants that now comprises these two allotments for the pasturage and grazing of their livestock."  Opening Brief at 44-45.  The Plaintiffs contend that, to take a hard look at social, cultural, and economic effects of their decision to reduce grazing, the Defendants should have employed research methods much like those employed in the 2003 pilot study conducted by Carol Raish Alicia M. McSweeney.  See Opening Brief at 45-46 (citing Raish & McSweeney at 3, 34-44).  According to the Plaintiffs, that study and its research methodology offer "both analogous data and a template for how the Forest Service readily could have obtained the kind of information necessary to meaningfully consider the [Defendants' decision's] social, cultural, and economic effects."  Opening Brief at 46.  The Plaintiffs state that, instead of conducting that inquiry, the Defendants "summarily declare[d] that reduction of permittees permitted grazing by nearly a fifth would have no significant effect on the Plaintiffs."  Opening Brief at 46.  The

---

remedy, see Memorandum Opinion and Order, 921 F. Supp. 2d 1137, 1142, filed January 24, 2013 (Doc. 49).

Plaintiffs admit, however, that "the Defendants were not required to replicate the entire process followed by Raish and McSweeny," but the Plaintiffs maintain that the Defendants should have "engage[d] in at least a somewhat genuinely informed and robust evaluation . . . which necessarily would have entailed gathering additional data from the affected permittees and communities." Opening Brief at 50.

The Plaintiffs take particular issue with the EA's economic analysis' reliance on "a minimal, cursory, look at cattle commodity prices." Opening Brief at 47. According to the Plaintiffs,

> the Defendants' simplistic subtraction of a small percentage of the overall value of the pre-decision number of cattle permitted to graze on these allotments failed to recognize both: (1) the fact that the elimination of access to these allotments for part of the year would cause the permittees to lose the entire value of the number of cattle no longer permitted because they do not have access to alternative private pasturage for those cattle; and (2) the fact that the loss of those cows would result in significant secondary losses in calf production.

Opening Brief at 47. The Plaintiffs identify another reason why the EA oversimplified its economic analysis by looking solely at commodity prices:

> [T]he beef from the cattle they raise is not simply sold as a commodity at auction. It also is shared by Plaintiffs and other permittees with members of their extended families, providing that larger population of local residents with healthy and inexpensive meat on which they depend for a vital part of their diet.

Opening Brief at 32.

In support of their contention that Trujillo "failed to examine the analysis and findings of the EA prior to making her decision to reduce grazing by 18%," Opening Brief at 54, the Plaintiffs observe that, for all their criticism of the EA, it "adopt[ed] Alternative 2 [maintaining pre-2011 grazing levels] as the Proposed Action," Opening Brief at 52. The Plaintiffs contend that, by reducing grazing levels, Trujillo thus "disregarded the analysis contained in the EA" and "ma[de] good on her predetermined decision." Opening Brief at 28. As evidence that Trujillo

predetermined her decision, the Plaintiffs point to Trujillo's comments at a January 11, 2010 meeting of the Jarita Mesa Grazing Association, which "suggest[] that regardless of what the EA recommended after two years of study [with Alternative 2] as the proposed action, she would see that Alternative 3, which mandated an 18% reduction in permits, was chosen." Opening Brief at 22.

**2.    The Response.**

On November 11, 2016, the Defendants filed the Federal Defendants' Response Brief on the Merits, filed November 11, 2016 (Doc. 184)("Response"). The Defendants begin by asserting that they did not violate NEPA by failing to take a hard look at reducing grazing's social and economic impacts. <u>See</u> Response at 26. The Defendants justify that conclusion with two alternative rationales. <u>See</u> Response at 26-28; 30-32.

First, the Defendants argue that NEPA requires agencies to assess their actions' environmental impacts only, and that the economic and social impacts identified by the Plaintiffs are not environmental impacts. <u>See</u> Response at 26-28. According to the Defendants, economic and social impacts that are caused by an action's effect on the physical environment, "'the world around us, so to speak,'" qualify as environmental impacts, but economic and social impacts that flow directly from agency action are not. Response at 27-28 (quoting <u>Metropolitan Edison Co. v. People Against Nuclear Energy</u>, 460 U.S. 766, 772 (1983)(Rehnquist, J.)). The Defendants say that the "Plaintiffs' alleged economic and social impacts are not caused by any impact to the physical environment. Instead those alleged impacts flow directly from the 18-percent reduction in livestock numbers proposed in Alternative 3." Response at 28. Consequently, the Defendants argue, NEPA did not require the Defendants to consider those alleged impacts, nor was the EA required to study them. <u>See</u> Response at 28. That conclusion makes sense, according to the

Defendants, because "it is well-settled that the purpose of an EA is to determine whether a proposed agency action will have significant *environmental* impacts which would trigger the requirement for a detailed [Environmental Impact Statement]." Response at 28 (emphasis in original). The Defendants also observe that CEQ regulations regarding NEPA's implementation state that "'economic or social effects are not intended by themselves to require preparation of an environmental impact statement.'" Response at 30 (quoting 40 C.F.R. § 1508.14).

Second, the Defendants argue that, even if NEPA requires analysis of socioeconomic impacts, they satisfied that requirement. See Response at 32. The Defendants contend that -- contrary to the Plaintiffs' suggestion -- the Forest Service "did, in fact, consider, assess, and give great weight to the economic and social aspects of the decision to reauthorize livestock grazing on the Alamosa and Jarita Mesa Allotments." Response at 32. The Defendants highlight Trujillo's conclusion in the DN/FONSI that reducing the amount of grazing "would have more socioeconomic benefits" than maintaining the status quo, because,

> [w]hile on the surface, a cancellation of the temporary increase appears to be a negative effect on the permittees, the expected result of improved conditions that support a reliable grazing operation that would be more resilient to changing weather conditions would be beneficial to maintaining into the future the opportunity to continue grazing cattle, as has been so important to the local communities for many generations.

Response at 47 (quoting DN/FONSI at-(AR 011493)).

The Defendants next assert that Trujillo did not predetermine the NEPA process' outcome. See Response at 48-50. The Defendants argue that predetermination "'occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis,'" and that the record contains "no evidence to support such a finding by the Court." Response at 45 (emphasis in original)(quoting Forest Guardians v.

U.S. Fish & Wildlife Serv., 611 F.3d 692, 714 (10th Cir. 2010)(Holmes, J.)).  The Defendants

contend that, contrary to the Plaintiffs' suggestion, Trujillo's comments at a January 11, 2010

meeting of the Jarita Mesa Grazing Association do not indicate that Trujillo made a decision

before the EA was completed.  See Response at 48 (citing Opening Brief at 22).  The Defendants

support that contention by quoting the meeting notes: "'[S]he has put the decision on hold while

waiting for the NEPA report to be completed,' although '[i]t is *looking like* the 18% temporary

increase of 30 years ago will be rescinded.'"  Response at 48 (emphasis added by

Defendants)(quoting Jarita Mesa Allotment Meeting Minutes (dated January 11,

2010)(AR 010909-10)).  The Defendants argue that Trujillo, thus, "expressly conveys that she

had *not* made a decision because she was waiting for the EA to be completed."  Response at 48-

49 (emphasis in original).

The Defendants also assert that the Plaintiffs erroneously suggest that Trujillo

disregarded the EA when she decided to decrease grazing, because "'the EA adopted Alternative

2' (existing livestock numbers) as the 'Proposed Action.'"  Response at 51 (quoting Opening

Brief at 52).  The Defendants explain:

> Plaintiffs misapprehend how the NEPA process is supposed to work, and how it
> worked here.  The Administrative Record demonstrates that the proposed action
> was developed and identified long before the EA was prepared, and that the EA
> did not "adopt" or identify Alternative 2 as the preferred or even an acceptable
> alternative.  These same Administrative Record documents also demonstrate that
> it was District Ranger Trujillo who first designated the proposed action as
> maintaining existing livestock numbers, that she continued to consider this
> alternative as the proposed action throughout the NEPA process, and she did not
> select Alternative 3 until the Decision Notice.  The District Ranger thus complied
> with the requirement that she "[c]onsider[] the alternatives analyzed in
> environmental document(s) before rendering a decision on the proposal." 36
> C.F.R. § 220.4(c)(4).

Response at 53.

3.      **The Reply**.

The Plaintiffs filed their reply brief on December 16, 2016.  See Plaintiffs' Reply Brief, filed December 16, 2016 (Doc. 187)("Reply").  The Plaintiffs reiterate their argument that NEPA requires the Defendants to take a hard look at the social, economic, and environmental justice impacts of reducing grazing on the Alamosa and Jarita Mesa Allotments.  Reply at 9.  The Plaintiffs suggest that the Court disposed of this issue in its Administrative Exhaustion MOO. See Reply at 9.  In support of that suggestion, the Plaintiffs cite portions of the Administrative Exhaustion MOO where the Court determined: (i) that the Plaintiffs satisfied the injury-in-fact requirement of Article III of the Constitution of the United States of America; and (ii) that the Plaintiffs satisfied the APA-imposed requirement that their injuries fall within NEPA's zone of interests.  See Reply at 9, 11-13 (citing Administrative Exhaustion MOO at 53-60, 71-76).

The Plaintiffs argue that the Defendants did not take a hard look at the social, economic, and environmental justice impacts of reducing grazing.  See Reply at 14.  The Plaintiffs contend that Trujillo's assertion that she fully considered "such effects . . . does not square with the minimal, conclusory statements made in the record, which do not reflect any consideration of detailed information on potential social and economic effects or any consideration of cumulative social and economic effects."  Reply at 17.  The Plaintiffs contend that, "[a]s a consequence" of those minimal and conclusory statements, "there simply is not sufficient evidence in the record for a decision-maker to have reached an informed, reasoned determination as to what the social, cultural, and economic effects of challenged management decision were likely to be, or what their level of significance might be."  Reply at 19.

The Plaintiffs assert that, in their Opening Brief, they "cited a variety of record evidence that is probative of predetermination."  Reply at 22.  According to the Plaintiffs, that evidence

shows that Trujillo determined, before the EA was complete, that she would reduce the grazing on the Alamosa and Jarita Mesa Allotments by eighteen percent. See Reply at 22. The Plaintiffs argue that they do not need to "point[] to a formal express commitment by Defendant Trujillo to the grazing reduction prior to the" DN/FONSI to establish predetermination. Reply at 22.

### 4. **The Hearing.**

The Court held a hearing on January 26, 2017. See Transcript of Evidentiary Hearing, held January 26, 2017 ("Tr.").[7] The Court began the hearing by asking the Plaintiffs to refresh its memory regarding the Administrative Exhaustion MOO's holding. See Tr. at 3:3-6 (Court). The Plaintiffs obliged:

> I believe you said with regard to Count 2 . . . that where the social and economic or cultural effects of an action or decision are interrelated with, and resulting from the action itself and its effects on the physical environment, that gives rise to an obligation on the part of the agency to consider those types of impacts. And that the allegations in the complaint clearly set forth such a failure to consider those impacts . . . .

Tr. at 3:9-22 (Herskovits). The Court then asked the Plaintiffs to confirm that their argument is that although the Forest Service "looked at the social and cultural problems . . . it wasn't a hard enough look." Tr. at 6:4-7, 6:10-11 (Court). The Plaintiffs replied that, while they believe that the Forest Service "failed to meet the standard of a hard look," they would go further than the Court's characterization of their argument, because "[t]here is nothing material that shows any consideration of the actual facts or details of the kinds of social, economic, cultural, effects or spiritual effects." Tr. at 6:13-22 (Herskovits).

The Court asked the Plaintiffs how they would write the statement "so that the social and economic effects on the plaintiffs of this EA are tied to the physical environment effects of [the

---

[7]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Forest Service's] decision . . . so that the Government can't complain that . . . they have no obligation under NEPA to address just social and cultural [effects]." Tr. at 19:21-20:1 (Court). The Plaintiffs provided a formulation: "[I]mpos[ing] a grazing reduction . . . while permitting existing and overtime increased elk and wild horse grazing on the same allotments has caused social[,] . . . cultural[,] and economic impacts, . . . which under NEPA [means] that the Defendants [must] take a hard look . . . ." Tr. at 21:10-17 (Herskovits).[8]

The Court then refocused the discussion on the Plaintiffs' argument that Trujillo "already made [her] determination before she wrote the EA or [the] EA was prepared." Tr. at 30:11-15 (Court). The Court asked the Plaintiffs whether, if the Court agrees with the Plaintiffs' argument, "that's a home run for you, that you can't do it that way, that's the reason it's there, is that correct." Tr. at 30:15-17 (Court). The Plaintiffs answered that, while they "would never use the term 'home run,'" they believe that, if they prevail on either Count 2 or Count 5, "then, obviously, there has been a violation of NEPA." Tr. at 30:19-23 (Herskovits). Turning to the substance of their predetermination argument, the Plaintiffs then stated that the Defendants apply an incorrect legal standard when they "argue that nothing short of an express declaration . . . that they were definitively committing resources . . . in an irrevocable fashion to make a certain decision before engaging in a NEPA review process . . . allow[s] a court to conclude that an improper predetermination ha[s] been made." Tr. at 38:24-39:8 (Herskovits). The Plaintiffs argue that, instead, courts can "look at inconsistencies . . . between the record and the purported justification for a decision . . . and find on that basis alone that there is a sufficient evidentiary

_____

[8]In Count Four of their Complaint, the Plaintiffs allege that NEPA required the Defendants to consider reducing the elk and wild horse population as a reasonable alternative to reducing the number of grazing permits. See Complaint ¶¶ 124-27, at 49-50. Those allegations are not properly before the Court, because the Court dismissed Count Four for failure to exhaust administrative remedies. See Administrative Exhaustion MOO at 86-87.

foundation for finding that the agency improperly predetermined its decision." Tr. at 39:21-40:2 (Herskovits).

The Defendants then took to the podium and began by explaining that the Court's statements in its Administrative Exhaustion MOO addressed whether the Plaintiffs "ha[d] standing for a NEPA claim[, which] is actually lower than the bar for . . . showing [that] a particular effect must be considered in a NEPA process." Tr. at 46:21-24 (Smith). The Court asked the Defendants to confirm that they were not asking the Court to reconsider anything in its Administrative Exhaustion MOO, see Tr. at 47:6-8 (Court), and the Defendants obliged by stating that, in the briefing on the Administrative Exhaustion MOO, "[w]e didn't r[a]ise the merits of the NEPA claim in any respect," Tr. at 47:12-13 (Smith).

The Defendants argued that the Forest Service did not need to look at its decision to reduce grazing's "socioeconomic impact," because the "socioeconomic impacts aren't cause[d] by a change in the physical environment caused by the proposed action. [The Plaintiffs'] socioeconomic impacts are caused by the income loss or the loss of the livestock . . . that they would like to continue grazing." Tr. at 75:16-23 (Smith). The Defendants elaborated that, under NEPA, an agency needs to consider an action's socioeconomic impacts when there is a causal relationship between the action's impact on the physical environment and resultant socioeconomic impact. See Tr. at 80:5-14 (Smith).

The Plaintiffs then began their rebuttal. See Tr. at 101:11-14 (Herskovits). The Plaintiffs conceded that "there needs to be a causal relationship. There needs to be a relatively close one between the type of social or economic effect that's at issue and the environmental effect or change to the environment . . . . There is no dispute about that." Tr. at 107:14-20 (Herskovits). The Plaintiffs argued, however, that one effect of the Forest Service's decision on the physical

environment is that it reduced the number of livestock grazing on the Alamosa and Jarita Mesa Allotments.  See Tr. at 110:5-8 (Herskovits).  The Plaintiffs then said that this impact on the physical environment "clearly leads directly or relatively directly to economic harms and social harms that have been described in our briefing and in the complaint."  Tr. at 111:14-17 (Herskovits).

## STATUTORY AND REGULATORY BACKGROUND

NEPA requires federal agencies to

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on --

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).  "Although labeled an 'environmental' statute, NEPA is in essence a *procedural* statute; it does 'not require agencies to elevate environmental concerns over other appropriate considerations.'"  Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric., 817 F.2d 609, 620 (10th Cir. 1987)(emphasis in original)(quoting Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983)).  NEPA's procedural requirements exist to prevent "precipitous federal decision making at the agency level which may fail to adequately consider the environmental ramifications of agency actions."  Park Cty. Res. Council, Inc. v. U.S. Dep't

of Agric., 817 F.2d at 620. "NEPA merely prohibits uninformed -- rather than unwise -- agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989)(Stevens, J.).

CEQ regulations provide guidance on NEPA's implementation. See 40 C.F.R. §§ 1500-08. Those regulations are entitled to substantial deference. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 355-56 (1989); Andrus v. Sierra Club, 442 U.S. 347, 358 (1979). CEQ regulations set out three ways that agencies can comply with § 4332(C)'s "detailed statement" requirement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). First, an agency can satisfy that statutory requirement by preparing a detailed statement, called an environmental impact statement ("EIS"), that conforms to CEQ regulations regarding its format, content, and methodology. See 40 C.F.R. § 1502, 1508.11.

Second, if an agency is unsure whether an EIS is required for a proposed action, i.e., whether the action qualifies as a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), the agency may prepare an EA, see 40 C.F.R. §§ 1503(a), 1501.4(b). An EA "provide[s] sufficient evidence and analysis for determining whether to prepare" an EIS or, alternatively, "a finding of no significant impact," 40 C.F.R. § 1508.9(a)(1), which is "a document . . . briefly presenting the reasons why an action . . . will not have a significant effect on the human environment [such that an EIS] therefore will not be prepared," 40 C.F.R. § 1508.13. See 40 C.F.R. § 1502.2 (stating that, "[a]s in a finding of no significant impact," in an EIS' treatment of "other than significant issues[,] . . . there should be only enough discussion to show why more study is not warranted"). EAs also facilitate the preparation of an EIS when one is necessary, and they help agencies comply with NEPA when an EIS is not necessary. See 40 C.F.R. § 1508.9(a)(2)-(3). An EA needs to include "brief

discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(E), and] of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). Section 4332(E) requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E).

Third, an agency can determine that an EIS is not required without needing to prepare an EA when the proposed action falls within a categorical exclusion ("CE"). See 40 C.F.R. § 1508.4. A CE is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in [NEPA] procedures adopted by a Federal agency." 40 C.F.R. § 1508.4. See Utah Envtl. Cong. v. Russell, 518 F.3d 817, 821 (10th Cir. 2008); Wildearth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d at 1321-22.

## **LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTIONS**

Under the APA,

[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702. The APA states that district courts can:

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.  A district court is limited in its review, however, to the "whole record or those parts of it cited by a party."  5 U.S.C. § 706.

Through 5 U.S.C. § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief."  United States v. Murdock Mach. and Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996).  "This waiver is not limited to suits under the Administrative Procedure Act."  Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).

Pursuant to Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  42 F.3d at 1580.  See Wildearth Guardians v. U.S. Forest Serv., 668 F. Supp. at 1323.  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use,

which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant." Northern New Mexicans Protecting Land and Water Rights v. United States, 2015 WL 8329509, at *9 (D.N.M. 2015)(Browning, J.).

Under the APA, a reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing a decision under the arbitrary-and-capricious standard, the Court reviews the entire administrative record or so much of that record as has been provided by the parties. See 5 U.S.C. § 706(2). See also Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999). The court does not pass judgment on the wisdom or merits of the agency's decision. See Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172 (stating that NEPA prohibits uninformed actions, but not unwise actions). To fulfill its function under the arbitrary-and-capricious standard of review, however, a reviewing court should engage in a "thorough, probing, in-depth review." Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation omitted). The United States Court of Appeals for the Tenth Circuit explains the relevant standard of review:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1167 (citations and internal quotations omitted). The standard of review requires the district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions." Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580. While the court may not

supply a reasoned basis for the agency's action not given by the agency itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(internal citations omitted).

## LAW REGARDING ENVIRONMENTAL IMPACTS

CEQ regulations use the terms "effects" and "impacts" synonymously, and define them capaciously: "Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8. Notwithstanding that capacious definition, "economic or social effects are not intended by themselves to require an [EIS]," 40 C.F.R. § 1508.14, because "the heart of the environmental impact statement" presents only "the environmental impacts of the proposal and the alternatives" -- and not their impacts simpliciter -- "in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public," 40 C.F.R. § 1502.14.

To determine whether a particular effect qualifies as an environmental effect, courts "must look at the relationship between that effect and the change in the physical environment caused by the major federal action at issue." Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. at 773. There must be "a reasonably close causal relationship between a change in the physical environment and the effect at issue." Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. at 773. The term "physical environment" refers to "the world around us, so to speak." Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. at 772. Consequently, it is "'well-settled that socio-economic impacts, standing alone, do not

constitute significant environmental impacts cognizable under NEPA.'" Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin., 843 F.3d 886, 905 (10th Cir. 2016)("Art Smart")(Briscoe, J.)(quoting Cure Land LLC v. U.S. Dep't of Agric., 833 F.3d 1223, 1235 (10th Cir. 2016)). "[O]nly when an action 'will have primary impact on the natural environment' will 'secondary socio-economic effects . . . be considered.'" Art Smart, 843 F.3d at 905 (omission in original)(quoting Cure Land LLC v. U.S. Dep't of Agric., 833 F.3d at 1235 n.5).

### LAW REGARDING EA SUFFICIENCY

According to the Tenth Circuit, an EA is, by design, less detailed than an EIS:

An EA is essentially a more concise and less detailed version of an EIS. One of the principal purposes of an EA is to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." By conducting an EA, an agency considers environmental concerns yet reserves its resources for instances where a full EIS is appropriate. The EA must "include brief discussions of the need for the proposal, of alternatives . . . , of the environmental impacts of the proposed actions and alternatives, and a listing of agencies and persons consulted."

Utah Shared Access All. v. U.S. Forest Service, 288 F.3d 1205, 1213 (10th Cir. 2002)(alterations in original)(quoting Comm. to Pres. Boomer Lake Park v. Dept. of Transp., 4 F.3d 1543, 1554 n.9 (10th Cir. 1993)). So long as an agency makes a "reasoned evaluation of the available information and its method [of analysis] was not arbitrary or capricious," an EA satisfies NEPA's "hard look" requirement. Utah Shared Access All. v. U.S. Forest Service, 288 F.3d at 1213. "Once we are satisfied that an agency's exercise of discretion is truly informed, we must defer to that informed discretion." Utah Shared Access All. v. U.S. Forest Service, 288 F.3d at 1213.

In Utah Shared Access Alliance v. U.S. Forest Service, the Tenth Circuit commented that, "[i]t is true here, as it is in every case, that the agency could have discussed the relevant environmental impacts in greater detail. Yet the EA in this case was hardly superficial, and it

was consistent with the fundamental purpose of an EA . . . ."  288 F.3d at 1213.  "The fact that the [Forest] Service did not employ a particular method of analysis in its study . . . does not render its Environmental Assessment Inadequate."  288 F.3d at 1213.  It sufficed that

> [c]ommon sense alone suggests that a haphazard system of roads in close proximity to lakes would likely be a significant cause of erosion, and there is no dispute that agency personnel documented significant visible effects of lake sedimentation from the roads on Boulder Top . . . . It was not arbitrary or capricious for the Forest Service to rely upon such observations and informed opinions, nor was it arbitrary or capricious for the Service to conclude that the roads on Boulder Top were a major source of lake sedimentation that needed to be remedied.

288 F.3d at 1211.

## LAW REGARDING NEPA PREDETERMINATION

CEQ regulations state that "[a]gencies shall not commit resources prejudicing selection of alternatives before making a final decision."  40 C.F.R. § 1502.2(f).  Accordingly, agencies generally cannot take "action concerning the proposal . . . which would . . . [l]imit the choice of reasonable alternatives" before they issue a formal "record of decision."  40 C.F.R. § 1506.1(a). An exception to that rule applies while "work on a required [EIS] is in progress," but agencies still cannot take interim actions that would "prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives."  40 C.F.R. § 1506.1(c).  Those requirements implement a more general policy that, when an EIS is required, it "shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made."  40 C.F.R. § 1502.5 (citing 40 C.F.R. § 1502.2).  It follows that "an agency may violate NEPA, and consequently the APA, when it predetermines the result of its environmental analysis."  Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 714.

Agencies can, however, "have a preferred alternative in mind when it conducts a NEPA analysis." Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 712. See 40 C.F.R. § 1502.14(e)(stating that the final version of an EIS must "[i]dentify the agency's preferred alternative . . . unless another law prohibits the expression of such a preference."). Moreover, "[i]n analyzing the environmental impacts of a proposed action under NEPA, agency officials are not required to be 'subjectively impartial.'" Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209, 1263 (10th Cir. 2011)(Holmes, J.)(quoting Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 712). That an "agency's planning, or internal or external negotiations, seriously contemplated, or took into account, the *possibility* that a particular environmental outcome would be the result of its NEPA review of environmental effects" does not constitute predetermination. Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 712 (emphasis in original). An agency's subjective partiality does not amount to impermissible predetermination, because it "does not undermine an agency's ability to engage in the requisite hard look at environmental consequences -- *even though* subjective []partiality may under certain circumstances involve something resembling predetermination and lead an agency down the road to predetermination." Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 714 (emphasis in original).

"[P]redetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis . . . ." Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 714 (emphasis in original). Because of "the stringent standard that must be met in order for [the Court] to conclude that an agency violated NEPA by predetermining the outcome of its environmental analysis -- a conclusion that [the Court] would not and should not reach lightly," a party challenging agency action "must meet a

high standard to prove predetermination." Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 714. The Tenth Circuit "ha[s] generally concluded that predetermination was present only when there was concrete evidence demonstrating that the agency had irreversibly and irretrievably bound itself to a certain outcome -- for example, through a contractual obligation or other binding agreement." Wyoming v. U.S. Dep't of Agric., 661 F.3d at 1265.

## ANALYSIS

The Court concludes that the Defendants did not violate NEPA by failing to properly analyze the social, economic, and environmental justice effects of their decision to reduce the number of grazing permits by eighteen percent. The Court also concludes that the Defendants did not violate NEPA by predetermining their decision before completing the NEPA process. Accordingly, the Court affirms the administrative appeal's decision.

I. **THE SOCIOECONOMIC EFFECTS THAT GRAZING PERMIT REDUCTIONS CAUSE ARE NOT ENVIRONMENTAL EFFECTS, SO THE DEFENDATS COULD NOT VIOLATE NEPA BY FAILING TO ANALYZE THEM.**

NEPA requires federal agencies to determine whether their actions will have significant environmental effects, but it does not require agencies to consider the non-environmental effects of their actions. The Court determines that the Plaintiffs identify socioeconomic effects that are not environmental effects, which is consistent with the Court's earlier determinations in the Administrative Exhaustion MOO. It follows that the Defendants could not violate NEPA by failing to consider those effects, so the Court will dismiss Count Two of the Complaint.

A. **NEPA REQUIRES AGENCIES TO CONSIDER ONLY THE ENVIRONMENTAL EFFECTS OF THEIR ACTIONS.**

NEPA requires agencies to prepare an EIS only when a proposed agency action will significantly affect "the quality of the human environment." 42 U.S.C. § 4332(C). Consequently, to assist an agency in determining whether an EIS is necessary, an EA needs to

briefly discuss "the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9. Just as non-environmental socioeconomic impacts do not require an agency to prepare an EIS, <u>see</u> <u>Art Smart</u>, 843 F.3d at 905, an EA does not need to discuss non-environmental socioeconomic impacts, <u>see</u> 40 C.F.R. § 1508.9. NEPA's "central concern" is whether the gains associated with agency action are "worth a given level of alteration of our physical environment or depletion of our natural resources." <u>Metropolitan Edison Co. v. People Against Nuclear Energy</u>, 460 U.S. at 776. <u>See</u> <u>id.</u> at 772 ("NEPA was designed to promote human welfare by alerting government actors to the effect of their proposed actions on the physical environment.").

      **B.    THE SOCIOECONOMIC EFFECTS THAT THE PLAINTIFFS IDENTIFY ARE NOT ENVIRONMENTAL EFFECTS.**

A socioeconomic impact qualifies as an environmental impact when agency action causes a change in the physical environment -- "the world around us, so to speak" -- that bears a "reasonably close causal relationship" to the socioeconomic impact. <u>Metropolitan Edison Co. v. People Against Nuclear Energy</u>, 460 U.S. at 772-73. "[O]nly when an action 'will have primary impact on the natural environment' will 'secondary socio-economic effects . . . be considered.'" <u>Art Smart</u>, 843 F.3d at 905 (omission in original)(quoting <u>Cure Land LLC v. U.S. Dep't of Agric.</u>, 833 F.3d at 1235 n.5).

In this case, the agency action at issue is the Forest Service's decision to issue eighteen percent fewer grazing permits for the Alamosa and Jarita Mesa Allotments. That action is not itself a change in the physical environment, but it will cause such changes, <u>e.g.</u>: (i) improving the range condition[9] from "poor to fair condition in most pastures" to "fair or better condition in all

---

[9]The EA defines range condition as

    a combination of an overall rating for plant composition, plant vigor, soil condition, bare ground, vegetation structure, plant litter, and plant diversity.

pastures"; (ii) improving rangeland grazing capacity;[10] (iii) decreasing soil compaction; and (iv) increasing streambank stability.  EA at-(AR 011368).

The Plaintiffs identify socioeconomic impacts that the Defendants' action directly causes and not impacts which changes in the physical environment that the action brings.  The Plaintiffs -- along with their families and communities -- have long depended on access to "the common property of their land grants that now comprises these two allotments for the pasturage and grazing of their livestock."  Opening Brief at 44.  The Plaintiffs have decreased access to grazing and pasturage on the Alamosa and Jarita Mesa Allotments, because the Forest Service has issued fewer grazing permits and not because the decreased number of permits has caused some change to the land that makes up those Allotments.  Even if the EA was incorrect and, surprisingly enough, decreasing the number of grazing permits did not change the Alamosa and Jarita Mesa Allotments in any way, the Plaintiffs would still have decreased access to grazing and pasturage.  Because that access decrease would occur even if there were no changes to the physical environment, it follows that the access decrease is not caused -- even in a "but for" sense -- by any changes to the physical environment that the Forest Service's action actually produces.  Consequently, the Plaintiffs' decreased access to grazing and pasturage -- and all of the social,

---

These seven components are the key indicators of range condition.  The condition rating is an estimate of the relative effects of grazing on vegetation.  Grazing by livestock may impact vegetation by changing the mix of species in the plant communities being grazed; the density and frequency of perennial forage plants; and the vigor of the grazed plants.  These effects are reflected by the following range condition classes: excellent, good, fair, poor, and very poor.

EA at-(AR 011388).

[10]"Rangeland grazing capacity refers to the average number of livestock and wildlife which may be sustained on an allotment compatible with objectives for that allotment."  EA at-(AR 011406).

economic, and environmental justice effects that flow from it -- do not constitute environmental impacts.

In other circumstances, however, decreased access to the Alamosa and Jarita Mesa Allotments for grazing and pasturage would constitute an environmental impact. For example, Forest Service action -- <u>e.g.</u>, introducing an insect or disease that kills grassy plants -- could make the Alamosa and Jarita Mesa Allotments unsuitable for cattle grazing. In that case, a change to the land itself -- and not just a change in Forest Services regulations regarding the use of the land -- would cause the Plaintiffs to be unable to graze their cattle. The resulting socioeconomic impacts would be, consequently, environmental impacts.

Because the socioeconomic impacts identified by the Plaintiffs are not environmental impacts, the Defendants could not violate NEPA by failing to consider them. The Court, accordingly, dismisses Count Two of the Complaint.

**C.    THE COURT'S CONCLUSION THAT NO NEPA VIOLATION OCCURRED IS CONSISTENT WITH ITS EARLIER DETERMINATION THAT THE PLAINTIFFS HAVE STANDING UNDER NEPA.**

In its Administrative Exhaustion MOO, the Court concluded that the Plaintiffs alleged NEPA violations that increased the risk of environmental harm. <u>See</u> Administrative Exhaustion MOO at 56-57. The Court also concluded that the increased risk of environmental harm qualified as a particularized harm -- vis-à-vis the Plaintiffs -- because the Plaintiffs' centuries-old cultural ties to the land that now makes up the Alamosa and Jarita Mesa Allotments mean that the Plaintiffs have a personal interest in the health of that land. <u>See</u> Administrative Exhaustion MOO at 57-58. <u>See also</u> <u>id.</u> at 73 ("The Plaintiffs depend on the Allotments' land and resources, and therefore seek to preserve its environmental integrity."). The Court, accordingly, determined that Plaintiffs had standing to assert the NEPA violations alleged in their Complaint. <u>See</u>

Administrative Exhaustion MOO at 53. The Court also determined that the Plaintiffs fell within the zone of interests that NEPA protects, because "they assert that, by failing to follow the NEPA's procedures, the Defendants created an increased risk of environmental harm to the Allotments' environmental resources, which thereby harms them socially, culturally, recreationally, aesthetically, economically, and environmentally." Administrative Exhaustion MOO at 72.

In essence, the Court concluded that the Plaintiffs' cultural, social, and economic ties are such that the Plaintiffs have an interest in making sure that the Defendants comply with NEPA. Whether the Defendants actually complied with NEPA is a separate issue. Similarly, that an environmental harm to the land "thereby harms [the Plaintiffs] socially, culturally, . . . [and] economically," Administrative Exhaustion MOO at 72, does not mean that environmental harms to the land cause all the Plaintiffs' social, cultural, and economic harms. The Court's determination that the socioeconomic impacts identified by the Plaintiffs are not environmental impacts is thus consistent with its earlier determinations in the Administrative Exhaustion MOO.

**D.    THE DEFENDANTS DID NOT VIOLATE NEPA EVEN IF THE SOCIOECONOMIC IMPACTS IDENTIFIED BY THE PLAINTIFFS ARE ENVIRONMENTAL EFFECTS.**

So long as an agency makes a "reasoned evaluation of the available information and its method [of analysis] was not arbitrary or capricious," an EA satisfies NEPA's "hard look" requirement. Utah Shared Access All. v. U.S. Forest Service, 288 F.3d at 1213. Because the EA conducted a reasoned evaluation of the available information regarding socioeconomic impacts -- and because the EA did not employ an arbitrary and capricious methodology -- the Defendants did not violate NEPA even if those socioeconomic impacts are environmental effects.

The EA contains discussions of economic, social, and environmental justice impacts of the Defendants' decision to reduce grazing permits for the Alamosa and Jarita Mesa allotments by eighteen percent. See EA at-(AR 011466-68). Those discussions acknowledge the Plaintiffs' historical, social, and cultural context. For example, the EA states, with respect to environmental justice

> Native Americans have been present in the area for at least the past 1,000 years and Spanish settlers arrived in the area about 400 years ago. Many families in the study area trace their ancestry back to these original inhabitants. As such, there are strong ties to the land and a reliance on the natural resources of the forest.

> All the communities within the El Rito area would fall under the minority and/or low-income populations identified in the Environmental Justice Executive Order 12898. Generally, environmental justice is concerned with identifying these communities and ensuring that they are involved in and understand the potential effects of the proposed action. The people in the study area communities are interested in maintaining their historic and subsistence lifestyle, using the surrounding area to gather resources needed. Elimination of livestock grazing on national forest system lands would negatively affect this lifestyle.

EA at-(AR 011468). Similarly, the EA's discussion of social effects observes that:

> Small-scale producers stress the importance of the quality of life that ranching provides them and their families. Owning livestock is an important way of reaffirming ties to their ancestral lands and heritage. Preserving this working relationship with the land so it can be passed on to their children along with a feeling of self-sufficiency is a cornerstone of their values. Generally speaking, the more rural and remote the community, ranching becomes more important.

EA at-(AR 011467). The EA's discussion of economics acknowledges that the EA's economic analysis is based on "a very general estimate of income, not profit, and doesn't include the various expenses that normal livestock operations require," but the EA contends that "[i]t gives a general idea of income being generated from the livestock operation on the analysis area and is a basis for comparison of alternatives." EA at-(AR 011466). The EA thus compares economic impacts in a rational way even though that comparison is not as comprehensive as the Plaintiffs

desire.  See Opening Brief at 32-33.  The EA, thus, makes a reasoned evaluation of the available information regarding social, economic, and environmental justice effects.

That the EA did not conduct a full-scale sociological study akin to the 2003 pilot study that Carol Raish and Alicia M. McSweeney conducted -- and that the Plaintiffs laud, see Opening Brief at 45-46 -- does not mean that the EA violated NEPA.  There is no particular method of analysis that an EA needs to apply.  See Utah Shared Access All. v. U.S. Forest Service, 288 F.3d at 1212.  Likewise, the brevity of the EA's discussion of socioeconomic impacts does not mean that the EA violates NEPA.  An EA is brief by definition and design.  See 40 C.F.R. § 1508.9.  See also Utah Shared Access All. v. U.S. Forest Service, 288 F.3d at 1213 ("By conducting an EA, an agency considers environmental concerns yet reserves its resources for instances where a full EIS is appropriate.").  Consequently, the EA's discussion of socioeconomic impacts does not violate NEPA even if those socioeconomic impacts qualify as environmental effects.

## II.   THE DEFENDANTS DID NOT VIOLATE NEPA BY IRREVERSIBLY AND IRREVOCABLY COMMITING THEMSELVES TO A PARTICULAR DECISION BEFORE THE NEPA PROCESS WAS COMPLETE.

The NEPA process is meant to "insure that presently unquantified environmental amenities and value may be given appropriate consideration in decisionmaking," 42 U.S.C. § 4332(B), so the NEPA process needs to "serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made," 40 C.F.R. § 1502.5.  It follows that "an agency may violate NEPA, and consequently the APA, when it predetermines the result of its environmental analysis."  Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 714.

Federal agencies do not, however, have to operate beneath a Rawlsian veil of ignorance until the NEPA process is complete. Agencies can have a preferred alternative when they conduct a NEPA analysis, see 40 C.F.R. § 1502.14(e), and agency officials do not have to be subjectively impartial, see Wyoming v. U.S. Dep't of Agric., 661 F.3d at 1263. Consequently, "predetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis." Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d at 714 (emphasis in original). So long as an agency is free to change its mind, environmental information can still play a meaningful role in determining how an agency will act.

The Plaintiffs identify three pieces of record evidence that, they argue, indicate that the Defendants predetermined their decision to reduce grazing permits by eighteen percent. First, the Plaintiffs contend that Trujillo's comments at the January 11, 2010 meeting of the Jarita Mesa Grazing Association indicate that she had decided to reduce the number of grazing permits months before the EA's completion. See Opening Brief at 22. The Administrative Record, however, indicates that Trujillo only stated that "[i]t is looking like the 18% temporary increase of 30 years ago will be rescinded." Jarita Mesa Allotment Meeting Minutes at-(AR 010910), (dated January 11, 2010)(AR 010909-10). Second, the Plaintiffs state that Trujillo disregarded the EA's designation of Alternative 2, which would have maintained the existing number of grazing permits as the proposed action. See Opening Brief at 52. The Defendants, however, correctly observe that

> [the] Plaintiffs misapprehend how the NEPA process is supposed to work, and how it worked here. The Administrative Record demonstrates that the proposed action was developed and identified long before the EA was prepared, and that the EA did not "adopt" or identify Alternative 2 as the preferred or even an

acceptable alternative. These same Administrative Record documents also demonstrate that it was District Ranger Trujillo who first designated the proposed action as maintaining existing livestock numbers, that she continued to consider this alternative as the proposed action throughout the NEPA process, and she did not select Alternative 3 until the Decision Notice. The District Ranger thus complied with the requirement that she "[c]onsider[] the alternatives analyzed in environmental document(s) before rendering a decision on the proposal." 36 C.F.R. § 220.4(c)(4).

Response at 53.

Third, the Plaintiffs contend that the EA contradicts the rationale which the DN/FONSI states. See Opening Brief at 53. The EA states that, under Alternative 2, range condition is likely to continue in a stable trend and remain in poor to fair condition whereas, under Alternative 3, range condition will likely improve to fair or better condition. See EA at-(AR 011368). The DN/FONSI states that "[t]he effects of the 18% increase in permitted livestock have now been evaluated and determined to be unsustainable." DN/FONSI at-(AR 011492). The DN/FONSI also indicates that Trujillo "chose[] not to permit a higher number of livestock than the scientific data indicates that the analysis area is capable of supporting." DN/FONSI at-(AR 011492). Contrary to the Plaintiffs' suggestion, see Opening Brief at 53, those statements are not inconsistent. That the range capacity would not further deteriorate under Alternative 2 does not mean that poor to fair range capacity is a sustainable state of affairs.

The three pieces of record evidence that the Plaintiffs identify do not, either individually or collectively, indicate that the Defendants irreversibly and irretrievably committed themselves to a plan of action before the NEPA process was complete. The Defendants, therefore, did not violate NEPA by predetermining their decision. The Court, accordingly, dismisses Count Five of the Complaint.

**IT IS ORDERED** that (i) Count Two of the Complaint for Declaratory and Injunctive Relief, filed January 20, 2012 (Doc. 1) is dismissed; (ii) Count Five of the Complaint for Declaratory and Injunctive Relief, filed January 20, 2012 (Doc. 1) is dismissed; and (iii) the decision of the administrative appeal is affirmed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Richard Rosenstock
Richard Rosenstock Esq.
Santa Fe, New Mexico

--and--

Simeon Herskovits
Iris A. Thornton
Advocates for Community and Environment
El Prado, New Mexico

     *Attorneys for the Plaintiffs*

James D. Tierney
  Acting United States Attorney
Ruth F. Keegan
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Andrew A. Smith
Environment & Natural Resources Division
United States Department of Justice
Albuquerque, New Mexico

     *Attorneys for the Defendants*